IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Tampa Division
In Admiralty

| | |
|---|---|
| ODYSSEY MARINE EXPLORATION, INC. : : Plaintiff, : : v. : : THE UNIDENTIFIED, SHIPWRECKED VESSEL,: if any, its apparel, tackle, appurtenances and : cargo located within a five mile radius of the : center point coordinates provided to the Court : under seal, : : Defendant; : *in rem* : and : : The Kingdom of Spain, : : Claimant. : _____/ : | CIVIL ACTION Case No: 8:07-CV-00614-SCB-MAP |

**AFFIDAVIT OF GREGORY P. STEMM IN RELATION TO
PLAINTIFF'S MOTION FOR ENTRY OF A PROTECTIVE ORDER
REGARDING PRELIMINARY SITE ASSESSMENT**

1.　　My full name is Gregory Paul Stemm. My legal address is 5719 Longboat Blvd., Tampa Florida 33615, USA. I am competent to testify as to the matters covered in this affidavit.

2.　　I have personal knowledge regarding the information contained herein and hereby swear that the information is true and accurate to the best of my knowledge.

1

3. I am the Cofounder and Co-Chairman of Odyssey Marine Exploration, Inc. ("Odyssey"), an American company incorporated under the laws of the state of Nevada with its principal place of business located in Tampa, Florida.

4. This affidavit is prepared in support of Odyssey's Motion for Protective Order Regarding Preliminary Site Assessment ("PSA").

5. "Odyssey" has prepared an extensive Preliminary Site Assessment (hereinafter, "PSA") in relation to the Unidentified Shipwrecked Vessel ("Defendant Site"), and artifacts recovered therefrom, that are at issue in this case. The PSA reflects the labors of dozens of Odyssey employees and consultants as well as substantial research and investigation into the Defendant Site and the artifacts from the Defendant Site. The PSA also contains very sensitive and proprietary information (handled as trade secrets by the Odyssey) about Odyssey's sources and methods in conducting shipwreck exploration, archaeological excavation, as well as artifact curation and conservation.

6. Odyssey's research and expertise used in the process of identifying, recovering and conserving any wreck or wreck site greatly adds to the value of items ultimately recovered.

7. For reasons that I will elaborate here, Odyssey is very reluctant to have this PSA made available to the public. Release of the information set forth in the PSA would fuel a great deal of speculation about the identity of the Defendant Site. If the Defendant Site is one of the potential shipwrecks identified in the PSA, research suggests that there should be substantially more artifacts of significant value on the Defendant Site that have not been recovered to date. This possibility would most likely ignite a frenzy of competing activities and attempts to recover the balance of the goods at the site. Such

activity would not only endanger Odyssey's equipment and personnel at the Defendant Site (and at other sites), but would also threaten the legal rights Odyssey asserts in this case, as well as this Court's jurisdiction and authority to adjudicate the matter.

8. Odyssey is a publicly traded company in the United States (NASDAQ: ticker "OMEX"), subject to all of the public disclosure requirements and strictures of the U.S. Securities and Exchange Commission ("SEC") and The NASDAQ Stock Market. SEC and NASDAQ rules dictate the prompt release to the public of all material non-public information concerning the company's operations that are not otherwise privileged or proprietary. The exception is when the company has a significant strategic reason for keeping information confidential, and that the confidential information is subject to a strict nondisclosure policy which serves to assure that no information will be leaked, under strict penalties and consequences for anyone that violates this policy.

9. Attached is a nondisclosure agreement which must be signed by all Odyssey employees and consultants requiring them to maintain the confidentiality of information regarding Odyssey's business operations.

10. Odyssey signed a similar nondisclosure agreement with Volvo when it began a project in March 2007, in which Odyssey agreed to bury treasure for Volvo as part of a promotional contest. Speculating as to the nature of Odyssey's activities in this regard, the Spanish press linked it to the recovery of one of Odyssey's own shipwreck projects. In an attempt to explain its activities and in an effort to be fully transparent to both the U.S. and the Spanish governments, Odyssey received permission from Volvo to communicate the nature of the project. Odyssey provided the information to the U.S. State Department who communicated it to the Spanish Embassy with the express caveat

that the information must be kept confidential. Nevertheless, the information was leaked to the Spanish press the very next day. I was informed by a Spanish official that an internal investigation determined that this leak originated from the Spanish Ministry of Culture in Madrid.

11. Clearly, Odyssey has reason to believe the confidential nature of the PSA in this case will be jeopardized without protection from this Court. Furthermore, the release of the PSA to the Claimant in this case, without appropriate confidentiality safeguards, would constitute an actionable selective release of material non-public information and would dictate Odyssey making it available to the public as well.

12. As stated, many aspects of the PSA clearly contain proprietary data as to Odyssey's sources and methods in conducting shipwreck exploration and archaeological artifact recovery. This is information that Odyssey legitimately regards as trade secrets. It would be potentially damaging to the company to have the PSA released to the public – including our competitors. Odyssey's competitors in the field of shipwreck exploration would gain a material advantage in access to business methods and data, which has taken Odyssey years of experience, and millions of dollars in financing, to accumulate.

13. In particular, Spain's counsel in this matter, James Goold, is the Chairman of a Foundation called the RPM Nautical Foundation. The following are excerpts from RPM Nautical's own website:

> *About RPM Nautical Foundation*
>
> *RPM Nautical Foundation was founded in 2000 by George Robb. After his association with INA during the 1990's, George realized that new technologies could further advance the discipline of nautical archaeology. As such he founded RPM in order to apply cutting-edge multi-beam and ROV technologies to the exploration of underwater sites. Projects provide advanced technologies to international cultural ministries of governments that do not have the resources to invest in such specific archaeological equipment. Working in partnership with these countries, George establishes the protection of their underwater heritage as a fundamental tenet of RPV operations.*
> *Source: http://www.rpmnautical.org/aboutrpm.htm*

*This from the Project Overview section of the RPM Nautical Foundation's survey off Spain in 2004:*

*An extensive survey of the coastal waters near Cadiz, Spain was conducted from May 7 through July 15, 2004 in partnership with the Centro di Arquelogica Subaquatica of the Junta of Andalucia and Institute of Nautical of Archaeology. Archaeologists from CAS provided extensive information from previous work in the area and led diving teams to various sites located from previous reports and from remote sensing data generated during the project. RPM provided the survey vessels Hercules and Juno and associated auxiliary vessels, plus diving support. The National Geographic Society provided generous financial support as well as technical assistance with ROV operations and imaging.*

*Over six weeks of operations, approximately 150 square kilometers were surveyed, despite frequent interruptions due to adverse weather. Post-acquisition processing of the data is now (December 2004) underway.*

*To date more than 300 anomalies have been identified. Sites identified in the remote sensing data to date include several sites with size or other characteristics consistent with the warships sunk soon after being taken as prizes following the battle. Numerous more recent shipwreck sites have been identified, while anomalies were also observed that possess characteristics consistent with those of ancient shipwreck sites.*
Source: http://www.rpmnautical.org/cadiz.htm

14. Odyssey has been active in promoting the provision of underwater archaeology services to the Spanish Government and the Autonomous region of Andalucia. RPM Nautical Foundation is a direct competitor of Odyssey in these efforts. Odyssey has capabilities and technical expertise that significantly surpass the capabilities of RPM. Provision of technical details relating to the methodology that Odyssey uses for its projects would provide RPM with an advantage in competing with Odyssey in provision of these services.

15. RPM Nautical has ships, ROVs and search equipment that could be used to locate and work on the subject Defendant Site, if even only vague locational informational is obtained through their Chairman, Jim Goold. The Spanish Government has already shown through seizure and detention of the *Ocean Alert* that they are willing to violate International Law in order to attempt to gain information that may provide Spain with access to the subject Defendant Site. For this reason, Odyssey is concerned that any information relative to the location of the Defendant Site which is provided to

Goold or Spain may be used under the auspices of a request from the Spanish Government by either the RPM Nautical Group or some other company that could be contracted by Spain.

16. Publicly releasing the PSA will have a direct effect on the efficiency, safety and security of Odyssey's operations at the Defendant Site (and elsewhere). Release of the PSA to the public will inevitably result in the revelation of clues as to the whereabouts of the Defendant Site, as well as information and insights into the manner that Odyssey conducts its operations, such that a well-informed competitor – or the Spanish Government or their contactor - would be in a position to be better able to track and interfere with Odyssey's operations.

17. This interference could occur and affect a number of Odyssey's business and maritime activities throughout the world, all essential to Odyssey's operations. The archival and curation information in the PSA would allow the media, competitors, historians or foreign governments to interfere with Odyssey's access to archival source data, essential for the identification and ultimate protection of the Defendant Site. The operational data contained in the PSA would permit media, competitors, or officious intermeddlers to "shadow" and track Odyssey vessels, equipment, personnel and communications in attempts to reveal the location of the Defendant Site or other valuable data.

18. Release of the PSA might, in the most extreme case, allow a competitor or rival claimant to circumvent Odyssey's significant investment in research, data-collection, ocean surveys and ground-truthing, and actually locate and begin recovery operations on the Defendant Site. If such a rival competitor or claimant was based

outside of the United States, it would be most difficult for this Court to enforce its injunction writ against such a party, even for activities taken in violation of the Court's orders and in derogation of Odyssey's rights. The very jurisdiction of this Court to efficiently and effectively adjudicate this matter (not only in relation to Odyssey's rights, but those of any legitimate claimant) would thus be compromised, if not entirely arrogated.

19. The disclosure of the PSA or any part of it would cause irreparable harm to Odyssey, to its shareholders, and to the archaeological integrity of this Defendant Site due to the fact that, if the location of the Defendant Site became known to the public, there would be no way to protect the wreck from plunderers. Thus, in my view and that of Odyssey, the PSA, or any part thereof, ought not to be disclosed to any party or claimant in this action without appropriate confidentiality safeguards to ensure that it will not be leaked or otherwise disclosed to the public.

I CERTIFY THAT THE ABOVE IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

*[signature]*

Gregory Paul Stemm
Cofounder and Co-Chairman Odyssey Marine Exploration Inc


STATE OF FLORIDA            )
COUNTY OF HILLSBOROUGH      )

The foregoing instrument was acknowledged before me this 6TH day of August, 2007, by GREGORY PAUL STEMM. He is personally known by me.

*[signature]*
Notary Public

BETSY W MARRERO
Comm# DD0374815
Expires 11/28/2008
Bonded thru (800)432-4254
Florida Notary Assn., Inc



**ATTACHMENT
CERTIFICATION OF AGREEMENT**

I CERTIFY THAT:

I have read and understand the following Company Statements of Policies:

    INSIDER TRADING
    ACKNOWLEDGEMENT OF LIMITED PHOTO & VIDEO RIGHTS
    CONFIDENTIALITY AGREEMENT
    ALCOHOL & DRUG POLICY
    HARASSMENT POLICY

I understand that a Company representative is available to answer any questions I have regarding the Statements of Policies. This representative is:

    Donna Fernandez
    Manager of Human Resources
    813-314-2551
    donna@shipwreck.net

I will agree to comply with the Statements of Policy by my signature below:

Signature: _____

Print name: _____

Date: _____



# CONFIDENTIALITY POLICY

1.0 <u>Purpose</u>

The purpose of this Confidentiality Agreement is to allow the Company to enter into a working relationship with the Persons Affected, as defined in paragraph 3.0 below.

2.0 <u>Revision History</u>

| October 27, 2004 | 2.0 | Revised |
|---|---|---|

3.0 <u>Persons Affected</u>

All Employees, Consultants, Contractors, Subcontractors, Visitors, Business Invitees, Technicians, Crew, Officers and Directors are "Affected Person(s)".

4.0 <u>Policy</u>

4.1 <u>Working Relationship</u>  The Company and Person Affected have entered into a working relationship involving one or more aspects of the Company's business. Hereinafter referred to as the ("Working Relationship"). In order for the Person Affected and the Company to potentially or actively engage in a Working Relationship, the Company agrees to furnished the Person Affected information, including certain confidential, non-public information, as well as general information about the company and/or its operations (collectively "the Information").

4.2 <u>Confidentiality</u>  In consideration of the Company's disclosure of the Information, the Person Affected agrees that he/she/they will keep the Information confidential and that the Information will not, without the prior written consent of the Company, be disclosed by the Person Affected, to any third parties, in any manner whatsoever, in whole or in part, and shall not be used by the Person Affected other than in connection with the proposed Working Relationship.

4.3 <u>Return of the Information</u>  The Person Affected agrees that, at the conclusion of his/her review of the Information, or within three business days after the Company's request, all copies of the Information in any form whatsoever (including, but not limited to any reports, memoranda or other materials prepared by the Person Affected or at his direction, whether on paper or magnetic, optical or other medium) will be delivered by the Person Affected to the Company.

4.4 <u>Material Non-Public Information</u>  The Company is a publicly traded company. The Information the Company supplies to the Person Affected may contain Material Non Public Information as defined by State and Federal securities laws.

The Person Affected further agrees that he will not execute any trades in the Company's securities while he/she/they are in possession of, or has knowledge of, any confidential,



**CONFIDENTIALITY POLICY**

material, non-public information regarding the Company. (See also: Insider Trading Policy)

4.5  <u>Injunctive Relief</u>  The Person Affected acknowledges and agrees that, in the event of any breach of this Agreement, the Company would be irreparably and immediately harmed and could not be made whole by monetary damages. Accordingly, it is agreed that, in addition to any other remedy to which it may be entitled at law or in equity, the Company shall be entitled to an injunction or injunctions (without the posting of any bond and without proof of actual damages) to prevent breaches or threatened breaches of this Agreement and/or to compel specific performance of this Agreement. Person Affected further agrees that he/she/they will be liable to the Company, its officers and directors for any damages caused by any unauthorized release or disclosure of the confidential, material, non-public information.