1    IN THE UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF FLORIDA
2                TAMPA DIVISION

3        Case No. 8:06-cv-1685-T-23MAP
                  8:07-cv-614-T-23MAP
4
                   June 9, 2008
5                 Tampa, Florida

6    ODYSSEY MARINE EXPLORATION, INC.,

7            Plaintiff,

8    vs.

9    THE UNIDENTIFIED SHIPWRECKED VESSEL
     OR VESSELS, their apparel, tackle,
10   appurtenances and cargo, etc.,

11           Defendant,
             In Rem
12
     and
13
     THE KINGDOM OF SPAIN,
14
             Claimant.
15
16   _____/

17            TRANSCRIPT OF DIGITALLY-RECORDED
                PRELIMINARY PRETRIAL CONFERENCE
18          BEFORE THE HONORABLE MARK A. PIZZO,
              UNITED STATES MAGISTRATE JUDGE
19

20   Appearances of Counsel:

21       For the Plaintiff:        Ms. Melinda MacConnel
                                   Mr. Allen K. Von Spiegelfeld
22
         For the Kingdom of Spain: Mr. James Goold
23
         For Keith Bray:          Mr. Frank D. Butler
24

25   Transcribed by:       Dennis Miracle, Official Reporter

1               P R O C E E D I N G S

2          THE COURT:  Good morning.

3          We have status conferences today in the case of

4    Odyssey Marine Exploration, Inc., plaintiff, versus

5    Unidentified Shipwrecked Vessels, the defendant in rem, and the

6    Kingdom of Spain.  This is Case Number 06-cv-1685-T-23MAP and

7    07-cv-614-T-23MAP.

8          And I also acknowledge Mr. Bray, who is a claimant in

9    07-614.

10         MR. BUTLER:  Excuse me, Your Honor.  Frank Butler for

11   Mr. Bray.

12         THE COURT:  Right.

13         MR. BUTLER:  That's 06.

14         THE COURT:  I'm sorry.  06- --

15         MR. BUTLER:  In the 06 case.

16         THE COURT:  -- civil-1685.  I apologize for that.

17         Will counsel announce their appearances?

18         MR. GOOLD:  Jim Goold for the Kingdom of Spain with

19   Keith Scorwitz of the Bush, Ross firm, and I'm accompanied by

20   Rear Admiral Luis Nucci of the Spanish Navy serving with

21   NATO -- or U.S. Central Command here in Tampa, Your Honor.

22         THE COURT:  Welcome.

23         MR. GOOLD:  Thank you, Your Honor.

24         MR. VON SPIEGELFELD:  Allen Von Spiegelfeld, and I

25   have with me Melinda --

1           MS. MacCONNEL:  MacConnel.

2           MR. VON SPIEGELFELD:  -- MacConnel -- I can't even

3 say it -- and Mark Gordon, president and chief operating

4 officer --

5           THE COURT:  Thank you.  Good to see you again.

6           MS. MacCONNEL:  Good morning, Your Honor.

7           MR. VON SPIEGELFELD:  -- of Odyssey.

8           MR. BUTLER:  Frank Butler for intervenor Keith Bray.

9           THE COURT:  Thank you, Mr. Butler.

10           The reason why I asked for this preliminary pretrial

11 conference -- I had been discussing the matter with

12 Judge Merryday several weeks ago and noted that -- we observed

13 that a case management order had not been issued in either

14 case, even though the parties had prepared case management

15 reports, and some of those dates had already expired without

16 the -- their adoption in the case management order, so I

17 thought it would be a good idea to meet and see where we are to

18 see whether these dates should remain the same, whether these

19 cases, at least for the administration of these cases, should

20 be separated so that perhaps they should go on different

21 tracks, what the status of the discovery is, how much more

22 information is needed to make some determination as to the

23 identity of either vessel, when that determination could be

24 made, or at least the position taken by the parties could be

25 made as to that, and the process for raising the FSIA arguments

1 as well, and, Mr. Goold, how you anticipated raising those
2 arguments, whether by a motion for summary judgment or a Rule
3 12(b)(1). I don't think the vehicle necessarily matters as
4 much as procedurally, frankly.
5     MR. GOOLD: Yes.
6     THE COURT: But let's -- let's first take up what --
7 what is the current status of discovery?
8     MR. GOOLD: I'd be pleased to cover that but also
9 talk about my proposed roadmap which spans essentially all the
10 Court has addressed vis-a-vis case 615 -- 614, however the
11 Court would like.
12     THE COURT: It makes no difference to me. Let's --
13 let -- let me just hear from Odyssey first as to the status of
14 discovery.
15     And also, Mr. Von Spiegelfeld, if you would relate as
16 well not only the status of the discovery vis-a-vis Spain and
17 Mr. Bray but also whether other artifacts continue to be
18 excavated or recovered over either site during the pendency of
19 the case.
20     MR. VON SPIEGELFELD: Okay. Your Honor, as far as
21 the last question, no other artifacts have been excavated since
22 the outset of this case --
23     MS. MacCONNEL: Allen, regarding the 35, that may not
24 be true.
25     MR. VON SPIEGELFELD: That may not be true in regard

to Mr. Bray's case, but it's certainly true about the other case. But anything that was excavated from the 35 -- the 2006 case is relatively minor. It's not a large item, and it's not -- and there's no identifying mark on anything.

THE COURT: So there are no ongoing search operations?

MS. MacCONNEL: Let me -- I will --

MR. VON SPIEGELFELD: Yeah.

MS. MacCONNEL: Your Honor, I know that we have been back to the site, 1685. The crew's coming back, I think, tonight with reports, so I'll have more information as to what, if anything, they have gotten from that site. They may not have recovered anything else; it may have been just another visit. I'm not sure.

MR. VON SPIEGELFELD: The other site has not been -- nobody has gone back to that, and nobody has touched anything there.

THE COURT: All right.

MR. VON SPIEGELFELD: As far as the discovery is concerned, pursuant to the Court's instructions and because we really want to move this along, we've provided Spain with the opportunity to go see everything that has been excavated to date from the -- from the site that they claim is the Mercedes.

They have asserted that it is the Mercedes in their

1  answers to interrogatories.  We still don't know that it's the

2  Mercedes, but that's their position.

3          We've both answered the interrogatories that the

4  Court has presented to us.  And other than that --

5          THE COURT:  Well, let me ask you, as to -- as to the

6  identification of what Spain contends is the Mercedes and what

7  you suspect might be the Mercedes, the 614 case, is your

8  information going to be any better at the close of discovery,

9  which you have as July 25, 2008, than it is as we sit here

10 today?

11         MR. VON SPIEGELFELD:  Well, the answer to that is

12 sort of convoluted because Spain has made this very clear

13 assertion that it is the Mercedes.  We haven't seen any

14 discovery other than answers to interrogatories.  So we don't

15 know what they are basing that on other than their statement

16 that it is the Mercedes.

17         THE COURT:  So you have not -- I note that there is a

18 disclosure of expert testimony that was --

19         MR. VON SPIEGELFELD:  That's all --

20         THE COURT:  -- listed as May 1, 2008.

21         MR. VON SPIEGELFELD:  Yeah.  Those dates, sort of,

22 fell apart when the Court --

23         THE COURT:  Okay.

24         MR. VON SPIEGELFELD:  -- took over.

25         THE COURT:  All right.  So that's a good reason why

1  we're here, then.

2        MR. VON SPIEGELFELD:  Yeah.  And that's what I was

3  going to suggest, is I was going to suggest new dates --

4        THE COURT:  All right.

5        MR. VON SPIEGELFELD:  -- for the discovery -- ongoing

6  discovery, because the dates that have been set forth in our

7  original proposal have not -- cannot -- well, were not and

8  won't be applicable -- can't be applicable.

9        THE COURT:  All right.  Well, let's -- since I have

10  to recognize somebody first, let's start with you,

11  Mr. Von Spiegelfeld, and you propose to me, if you have some

12  dates to propose, what dates you think are appropriate, and

13  then I'll hear from Mr. Goold.  And I'll also hear, Mr. Goold,

14  from you as to your roadmap.

15        MR. VON SPIEGELFELD:  I -- I --

16        THE COURT:  Let's start with -- go ahead.

17        MR. VON SPIEGELFELD:  Okay.  I would suggest that we

18  start with the -- for disclosure of expert testimony, August 1

19  instead of May 1.

20        THE COURT:  All right.

21        MR. VON SPIEGELFELD:  And then a month later for

22  supplemental disclosures and responses.

23        THE COURT:  All right.  So that would be September --

24        MR. VON SPIEGELFELD:  September 1.

25        I actually have my calendar, and I can see if those

1  are Sundays.  But I -- I've never really thought that was that

2  much of a big deal anyway because --

3          THE COURT:  That's a Monday.

4          MR. VON SPIEGELFELD:  Okay.

5          THE COURT:  And August 1 is a Friday so --

6          MR. VON SPIEGELFELD:  That works out nicely.

7          THE COURT:  That works all right.

8          MR. VON SPIEGELFELD:  And then as far as the

9  completion of discovery, we had it set previously as

10 approximately --

11         THE COURT:  July 25.

12         MR. VON SPIEGELFELD:  Well, it was -- July 25 was

13 just about two months later, because after you've had your

14 supplemental, you're going to want some time to look at what

15 you have.  So if it's August, September, then it would be

16 the -- towards the end of October -- I would say October 23 for

17 the completion of discovery.

18         THE COURT:  All right.

19         MR. VON SPIEGELFELD:  And that pretty much completes

20 the discovery schedule.

21         THE COURT:  And you would -- you would want to keep

22 them the same in both matters?

23         MR. VON SPIEGELFELD:  Actually, the way we've always

24 done it in the past, Your Honor, is that --

25         THE COURT:  When you say "we've always done it in the

1 past," are you saying you've always done it in the past in this

2 courthouse or --

3         MR. VON SPIEGELFELD:  Yes.  Yes.

4         THE COURT:  Okay.

5         MR. VON SPIEGELFELD:  -- is that the -- the defendant

6 usually is one -- is about two weeks to a month behind the

7 plaintiff simply because --

8         THE COURT:  No, I'm talking about both cases; I'm not

9 talking about both sides.

10         MR. VON SPIEGELFELD:  Oh.  Yeah, both -- yes.

11         THE COURT:  I'm talking about both cases.

12         MR. VON SPIEGELFELD:  Both cases, yes, should be the

13 same.  Yes.

14         THE COURT:  What about as to Mr. Bray's claim?

15         MR. VON SPIEGELFELD:  The same.

16         THE COURT:  Why would -- would it make more sense to

17 have his claims maybe a month later than -- than the discovery

18 between your case and Spain's?

19         MR. VON SPIEGELFELD:  We're fine with that.  I mean,

20 we don't have a problem with that.  That would be fine.

21         THE COURT:  Mr. Butler, Mr. Bray's claims are

22 dependent entirely on what happens between Spain and Odyssey,

23 right?

24         MR. BUTLER:  I would say that's accurate, Your Honor,

25 yes.

1    THE COURT: Does it matter to you whether the date's

2  the same or not?

3    MR. BUTLER: It really doesn't matter, Your Honor.  I

4  was going to propose a six-month move of the dates across the

5  board.  And the reason I say that, Your Honor, is if we run

6  into motions to compel, or something along those lines, we

7  might find ourselves back here in front of you on a hearing

8  like today.

9    And my thoughts were -- and I don't know what the

10  time frame is as far as how fast these folks want to get the

11  case done -- but it seems to me that moving the dates all six

12  months forward would give us enough time that, if there's any

13  discovery complications, that we wouldn't have to come back in

14  on a -- on a status conference.  That's the only -- that's what

15  I came in prepared to suggest.  I'm certainly able to abide by

16  the time frames that are proposed this morning, though.

17    THE COURT: Okay.

18    MR. BUTLER: Yes.

19    MR. VON SPIEGELFELD: The other reason we would not

20  want to move back six months is -- I think Spain probably will

21  agree, but I'm not sure -- we'd like to get this over with as

22  quickly as possible and resolve it as quickly as possible for a

23  number of reasons.  From our perspective, there's a lot of cost

24  involved in maintaining the artifacts that have been taken from

25  the '14 site.  And the sooner we can get a resolution of how

1 | the -- what is going to happen with those, the better it is for
2 | Odyssey.
3 |       THE COURT:  Well, I'm also aware of the fact that the
4 | legal argument and the -- the principles behind the FSIA is to
5 | resolve the immunity issues as quickly as possible so as to --
6 | to take care of the costs and expense associated with
7 | litigation, because litigation should not have occurred in the
8 | first place, so I'm -- I'm aware of those -- that there are
9 | economic reasons, obviously, for Odyssey as well.  And that's
10 | why I'm asking all these questions to see -- I want everybody
11 | to have a fair shot at getting all -- marshaling all their
12 | information and evidence so as to present argument on these
13 | issues because they're not particularly simple issues at times
14 | so...
15 |       MR. VON SPIEGELFELD:  There is one other factor --
16 | and I was going to bring this up at a later date -- one of the
17 | discussions that we've been having with Mr. Goold is in regards
18 | to additional notices that we think are necessary --
19 |       THE COURT:  Well, that was another matter that I
20 | hadn't brought up that I was thinking about, and that is
21 | whether -- I note, for example, I guess, in the Seahunt case
22 | that the District Court required notice to be given to the
23 | United States and I think Spain as well initially at the outset
24 | of those proceedings.
25 |       MR. GOOLD:  Yes --

1         THE COURT:  So --

2         MR. GOOLD:  -- at the outset.

3         THE COURT:  And we have the -- the case which I had

4    not scheduled for today -- and that was the Italian ship -- and

5    whether notice should be given to Italy as well so...

6         MS. MacCONNEL:  We have.

7         MR. VON SPIEGELFELD:  We've done that --

8         THE COURT:  All right.

9         MR. VON SPIEGELFELD:  -- pursuant to Judge Merryday's

10   order.

11        THE COURT:  Okay.

12        MR. VON SPIEGELFELD:  But we think that notice should

13   be given -- in light of the -- the assertions by Spain that

14   this is the Mercedes -- and obviously that was -- there was

15   some consideration given by Odyssey before that assertion was

16   made, that flat-out assertion -- there were, and there are,

17   manifests for the cargos that were on board that vessel.

18        And we think that it is necessary and is required by

19   the -- by the law to give notice to all of the potential

20   claimants, i.e., the people who had cargo on board that

21   vessel.  These were private individuals, merchants who had put

22   cargo on board a vessel.  Some of them were in South America.

23   Some of them were in Spain.

24        And we have prepared a proposed notice to go to both

25   a Spanish publication of general jurisdiction -- general

circulation and also some Spanish -- some South American ones, notably Argentina and Uruguay where the vessel started.

And we think -- we think that those should be -- the way the rules are set forth, you're supposed to either approve that or not approve that. And any additional notice is beyond the initial notice. That's in the Local Rule.

Actually, we've had some discussion whether I'm correct in that assertion or not.

THE COURT: Just a moment.

(Pause.)

THE COURT: All right.

MR. VON SPIEGELFELD: And we've proposed -- we've made a proposed notice of which we've sent to Mr. Goold. He has responded to that. We haven't reached an agreement on what the proposed notice should say, but I have a feeling we're going to be -- either we're going to get a resolution -- we're going to resolve it between ourselves or we'll be back before the Court with a proposed notice.

The way -- the way I read the Local Rule is, it says the Court shall or may enter a requirement for additional notices. The first notice is given pursuant to the Federal Rules which simply state you give it in a newspaper of general --

THE COURT: Correct.

MR. VON SPIEGELFELD: -- circulation. If -- the

1 Court can then order additional notices if it deems it

2 appropriate.

3 It's towards the beginning of the rules, I think, as

4 I remember them.

5 THE COURT: Well, obviously the difficulty -- I am

6 assuming -- and perhaps I shouldn't assume -- but I'm assuming

7 that there will be no -- given the age of these vessels and

8 perhaps the state of the world economy at that time, that there

9 may not have been insurance claims with respect to any of these

10 vessels. Certainly that would be a presumption.

11 So you're talking about the descendants and --

12 MR. VON SPIEGELFELD: We're talking about the

13 descendants and theoretically if it was a company, some

14 merchant -- some company that still exists, but primarily

15 descendants, yes.

16 THE COURT: Well, all right. We'll see where that

17 goes.

18 Anything else that you wanted to raise as far as

19 scheduling dates?

20 MR. VON SPIEGELFELD: No. I think that's pretty much

21 it, Your Honor.

22 THE COURT: Mr. Goold, you've been waiting patiently.

23 MR. GOOLD: That's my job. Thank you, Your Honor.

24 Well, I'll address 614 first, because I'm sure it's

25 caught the Court's eye that, yes, as far as we're concerned, it

is the Mercedes; photographs don't lie.  And we took care to
put up front in our interrogatory answers --

　　　　THE COURT:  I noticed that.

　　　　MR. GOOLD:  -- the sovereign immunity point.  So we
believe that guides indeed must guide, I say with all respect,
the proceedings from this chapter forward because it goes to
subject matter jurisdiction which must be determined by the
Court in the ordinary case at the outset.  And when you're
talking about a warship of another nation, the course, I
believe, the Court needs to follow was chartered -- charted as
early as 1812 during the Napoleonic wars by Chief Justice
Marshall in -- when it was a French brig in the Schooner
Exchange, 11 U.S. 116, where the Supreme Court put to the top
of its docket whether the U.S. courts would consider claims
against a public armed vessel of another nation.

　　　　And those principles have -- if there's one body of
law that's remained the same ever since, continuing on down
from there to the Eleventh Circuit and this court, it has been
that.  And I won't go through all the Supreme Court decisions,
et cetera, but I'll just note, for example, that the Eleventh
Circuit has similarly held that where it's a question of FSIA,
the Court should inquire into whether it has subject matter
jurisdiction at the earliest possible stage.

　　　　THE COURT:  Can you point to me an FSIA case that has
applied the immunity principles to an in rem action as opposed

1    to an in personam action?

2         MR. GOOLD:  Yes, Your Honor.  I can read off a list

3    of cases, if you'd like.  There's certainly a long line of

4    cases where -- and more commonly, yes, it is a floating ship --

5    but whether it is Liberian, Angolan, Algerian, et cetera, when

6    the owner comes forward with what is typically a 12(b)(1)

7    motion with the declarations, et cetera, that is the first

8    order of business and the exclusive order of business.  And I'd

9    be happy to --

10         THE COURT:  Well, I expect --

11         MR. GOOLD:  -- rattle off some cites, if you'd like.

12         THE COURT:  -- I will see that in your motion.

13         MR. GOOLD:  Yes, I suspect you will.

14         So as to case --

15         THE COURT:  Well, let me ask you, with respect to the

16    process --

17         MR. GOOLD:  Yes, with respect to the process -- well,

18    two parts:  First -- so I would certainly envision a 12(b)(1)

19    motion accompanied by the declarations by Spanish government

20    people, et cetera, as to the history of the vessel, which

21    you've seen a taste of --

22         THE COURT:  Right.

23         MR. GOOLD:  -- in the interrogatory answer; the

24    identity of the vessel, the special sensitivity of this vessel

25    that you've seen a bit of as what we say is the first order of

business.  And if there's one case I would respectfully refer
the Court to, it would be in this court Judge Bucklew's
decision in Howland v. Hertz where -- and that's 431 F.Supp 2d
1238.

   THE COURT:  Twelve what?

   MR. GOOLD:  Thirty-eight, 2006, a case involving the
Bank of Indonesia where she laid out the principles regarding
what was called a 12(b)(1) factual attack.

   THE COURT:  I'm familiar with that.

   MR. GOOLD:  Okay.

   THE COURT:  And, frankly, I was -- as you were
talking about a 12(b)(1) motion, I was pondering that in my
mind as to whether we needed an evidentiary hearing or whether
it would be sufficient on the papers, including the affidavits,
and I'm -- I understand the argument, so --

   MR. GOOLD:  Yeah.  So my --

   THE COURT:  The question is whether you want to wait
until the close of discovery to do this or whether you want to
wait --

   MR. GOOLD:  Well, I think I've got to press forward
as rapidly and as single-mindedly as the cases teach as well,
because this is national territory of Spain, and I cannot
consent to other kinds of proceedings or rulings, in fact,
because it all goes to both -- especially when you're talking
about a Navy ship --

1       THE COURT:  I understand.

2       MR. GOOLD:  -- the kinds of sensitivities.

3       THE COURT:  The only -- I think your argument or your

4  suggestion carries with it the counter argument that Odyssey is

5  entitled either to depose or investigate the bases for your

6  opinion that this is the vessel that you say it is without

7  equivocation.  Obviously, without equivocation isn't the

8  standard of proof required here.  But, nonetheless, you make a

9  strong claim that it is.

10      And what do you anticipate or think would be the

11  rational and reasonable and due process demand for Odyssey to

12  be able to investigate your opinion?

13      MR. GOOLD:  Okay.  Well, as of now, prior to the

14  motion, I don't think they are in any position to do so, and it

15  would be improper and a big hullabaloo.  That's not to say that

16  it's impossible as this proceeds.

17      But let me be a little more specific, and that sounds

18  so perhaps elliptical.  Our burden is to come forward and make

19  a -- what I'll call prima facie showing:  This is the property,

20  territory, history, et cetera.

21      Their burden is to oppose that and try to show some

22  exception to sovereign immunity applies, but they are not, I

23  respectfully submit, entitled to open-ended discovery.  It must

24  be narrowly tailored, if it is necessary at all, to some

25  specific fact put in motion by the subject matter jurisdiction

1  question.

2         And I would again refer you, if I may, to the same

3  decision by Judge Bucklew because she pulled together those

4  cases -- and I even brought spares, Your Honor, if you would

5  like -- that there's immunity from discovery; a sovereign is

6  immune from, I wish, pretrial wrangling to trial itself;

7  discovery, if any, should be ordered circumspectly and only to

8  verify allegations of specific facts crucial to an immunity

9  determination.

10        THE COURT:  Well, I mean, the determination -- if --

11  if Spain were not -- if this didn't involve a sovereign nation,

12  the first order of business would be identify the ship in any

13  event.

14        MR. GOOLD:  Right.

15        THE COURT:  And so --

16        MR. GOOLD:  So as far --

17        THE COURT:  That has to be done in any event, so...

18        MR. GOOLD:  Yeah.  So now it's up to us to come

19  forward as we envision with the declarations, et cetera, to

20  present that to the Court.  Then -- and that, by the way, would

21  cover a lot more than your Rule 26-type disclosures in any

22  case, because that's laying out the key facts and the -- and

23  the -- the evidence behind them.

24        So my view, recommendation, request would be that we

25  proceed with the subject matter jurisdiction 12(b)(1) motion.

1  I will tell you -- and I've been thinking a lot about this, as
2  you would expect -- that I would like to do that within 60
3  days.  Odyssey can then oppose.

4      If they wish to apply to the Court for discovery on
5  something, I suppose they could, though there are a lot of
6  cases saying that one of the duties of the Court here is to try
7  to figure out, as you have said, how to deal with this while
8  minimizing the intrusion on the foreign sovereign, but it's too
9  early to say the courthouse door should be absolutely closed on
10  that; I recognize that --

11      THE COURT:  Well, I'm also contemplating whether an
12  evidentiary hearing would be necessary and whether the papers
13  would be sufficient.

14      MR. GOOLD:  Well, that's a good question.  My --
15  right now I have tended to think of it, frankly, in terms of
16  papers, photos, videotapes, declarations.  I wouldn't -- I'd
17  like to think about that a bit more, if I can.  I never want to
18  box myself off if I -- it turns out that someone needs to
19  testify live certainly.  But I suppose -- I still think the way
20  to tee it up is the -- a 12(b)(1) motion, which is a set of
21  brief and evidentiary submissions, at least beginning in the
22  form of paper and other hard media, Your Honor.

23      THE COURT:  And you think you can have that done in
24  60 days?

25      MR. GOOLD:  With a gulp, yes.

1    I'm doing things like looking through videotapes, and
2 then we've got to figure out, okay, how do you pick -- some of
3 that's tech stuff --

4    THE COURT:  Sure.

5    MR. GOOLD:  -- but that's what I'm shooting for.

6    Should I --

7    THE COURT:  Let me ask you, as to the artifacts
8 pertaining to the Mercedes, has -- in Spain's view, has Odyssey
9 uncovered anything that may be the wreck of a -- or the
10 artifacts of a different ship, a different wreck?

11    MR. GOOLD:  No, Your Honor, apart from the normal
12 unfortunate quotient of trash that you'll find anywhere on the
13 seabed, I don't think anyone on board the Mercedes was drinking
14 a -- from a Schwepps gin and topic water can or -- there's a
15 fishing net wrapped around a cannon.  There's that kind of
16 thing.  But everything we have seen --

17    THE COURT:  Points to that?

18    MR. GOOLD:  -- from Spanish Navy cannons, Spanish
19 Navy this, Spanish Navy that, points to the one and only
20 ship -- the one and only frigate that exploded and sank in 1804
21 at a specific location --

22    THE COURT:  All right.

23    MR. GOOLD:  -- west of Gibraltar, Your Honor.  So
24 that's what I have in mind as to 614.

25    On the question of notice, I think, with great

 1  respect, that's a -- would be a -- I don't want to sound
 2  disrespectful -- a fool's errand.  If there's subject matter
 3  jurisdiction -- if there's no subject matter jurisdiction,
 4  there's no subject matter jurisdiction no matter how many
 5  people might end up writing letters to this Court.

 6          And if there are claims by descendants of the crew of
 7  this ship that they didn't get enough in terms of pension or
 8  whatever, that's obviously not a matter for this Court to deal
 9  with; that's a matter for the Spanish process under the laws of
10  Spain.  This ship was under the exclusive legal control and
11  jurisdiction, in our view, of the Kingdom of Spain.

12          I could go on to 1685, if you would like, or respond
13  to any questions, or whatever the Court wishes.

14          THE COURT:  Well, leaving aside for a moment the
15  roadmap that you've suggested, for argument's sake, if you
16  would give me the dates -- well, let's do it this way:  Let me
17  hear what you have to say about -- about 1685, the Merchant
18  Royale, and dates as well.

19          MR. GOOLD:  Okay.  A disclaimer up front:  My -- my
20  vision is a little less clear on that one --

21          THE COURT:  So is mine.

22          MR. GOOLD:  -- but I -- but I'll explain why.  We
23  agree everything on the seabed suggests it is this Merchant
24  Royale.  We have seen documentary evidence that that ship was
25  in Cadiz, Spain, home of Admiral Nucci, from April through

September 1641 while awaiting to take on board a large amount
of money of the crusada, the Crusade, funds -- I'll indulge the
Court in a little bit of history -- that the -- were raised
through the church but awarded by the Pope to the king as royal
revenues for purposes of -- well --

THE COURT:  Proselytizing.

MR. GOOLD:  -- proselytizing by one means or
another.  And that was handled by the teserro henerao
(phonetic), an -- an official of the crown given that
responsibility.

We see strong evidence that the money, some or all of
it, was put on that ship.  I will tell you, Your Honor, that
there's also evidence that there was a sister ship with it, and
these were both British ships, as you know.  And at least the
Merchant Royale didn't make it.

Where did the money go?  Is it there or what?  We
know the ship did not sink catastrophically.  Frankly,
Your Honor, when we've looked at the photo mosaic-type
materials, there is very strong evidence, at least in the view
of myself and those who advise me, that this Odyssey -- this
ship is no stranger to previous visitors, and Odyssey was not
the first company there.  In fact, there have been statements
by a gentleman who was on Odyssey's board at one point that
before that, sometime in the past, he had been there.

Odyssey tells me they have not found the money.  If

the money is there, we would consider it the same as a
present-day counterpart, a shipment by a central bank subject
to sovereign immunity, but we don't know if it is, in fact,
there.  I've told you what I'm told by Odyssey.

So it all revolves, at least in the first instance,
on a factual question about, is it there?  We would concede, I
have seen no evidence as yet -- can't foreclose the
possibility -- that the ship was bareboat chartered to Spain.
I don't think that was the case, from what I know so far.  So
we are not the master of the vessel or the owner of the
vessel.

The question from a management point of view -- and I
suppose also shaped by the FSIA proposition -- is, okay, do we
have a subject matter jurisdiction issue as to some material
that may or may not be at this site, and how do we get to the
bottom of that?

And the answer to that, I would respectfully suggest,
is in Odyssey's hands or data bank --

THE COURT:  Robot.

MR. GOOLD:  -- or knowledge or Mr. Bray's, because,
remember, he did an awful lot of research, got a lot of money
for it.  And if that information got out on the table, we could
make some very more targeted decisions about where to go with
this case.  That was one of the reasons why I had hoped that
the January order would --

1          THE COURT:  Have --

2          MR. GOOLD:  Sorry.

3          THE COURT:  Have any -- I'm not familiar enough with

4  the recordkeeping of Spain's bureaucracy at the time, although

5  I know I -- I've read it's legendary -- but have any gold coins

6  been recorded and -- from that site, and are any of the gold

7  coins, if they have been recovered, traceable to this

8  shipment?

9          MR. GOOLD:  I -- I'll tell you exactly what I know

10  and what I don't know.  Yes, the recordkeeping is legendary,

11  but also there are gaps, as you might expect.  It's not all

12  retrievable on a hard drive from 1641.

13          We see evidence, documentary evidence, that the money

14  was gathered, came in the form of copper coins and, you know,

15  stuff from the local church level; then it gets consolidated.

16  Then it gets put in a common currency suitable for shipment

17  abroad, put in standardized chests of the -- that were the --

18  guided by the weight a mule could carry.

19          We understand that the official who was responsible

20  for this function reported a shortfall in the amount he was

21  able to get to the Spanish army in Flanders that year.  I won't

22  specify the exact amount for fear of precipitating the

23  treasure-hunting free-for-all that Odyssey sometimes say they

24  worry about.

25          We have not as yet seen the -- any detailed

postmortem-type stuff of, where did it go? Woe is us, the ship

sank, that kind of thing.

I fully expect, again, that's the kind of thing that

Odyssey went through quite thoroughly long before us, and we're

just, sort of, retracing their footsteps through archives,

Your Honor.

THE COURT: So essentially what you are saying is

that if an FSIA argument applies, it would apply to cargo that

may not have been recovered that may not exist on the site.

It, in effect, would be an academic answer or an advisory

opinion of some sort. That if it does, the FSIA applies, and

yet the Court would be on a dual track of applying either the

law of salvage or the law of finds which, by my reading in the

very end on a case, perhaps, like this, is a distinction

without a difference because the title would ultimately go to

Odyssey.

So how -- how would -- and let's assume that two

years or three years from now this case is processed and

Odyssey eventually gets title to whatever is under the water,

the wreck, and it were to discover coins that it contends is

not Spain's or at least not part of the shipment, and you say

it was; what's, then, the relief? What happens next?

MR. GOOLD: I don't know. I do know that I thought

about whether to bring something in the nature of a declaratory

judgment that -- but it would be so conditional.

1          If this material is there and it was what the Spanish

2 records say, then it is -- whatever might happen to the rest of

3 the ship and anything else they -- broken bottles or whatever

4 else they recovered --

5          THE COURT:  Isn't this more appropriate for a

6 resolution between Spain and Odyssey as to the recovery of

7 these items in an out-of-court settlement?  I mean, isn't that

8 the wisest course and the most efficient course to -- to --

9          MR. GOOLD:  There's some logic --

10          THE COURT:  -- take?

11          MR. GOOLD:  I'm sorry; I beg your pardon, Your Honor.

12          THE COURT:  No, I'm finished.

13          MR. GOOLD:  There's some logic to that.  What it

14 turns on is, what do they know?  If they were to come forward

15 and say, look, Spain --

16          THE COURT:  They may not know any more than you do,

17 Mr. Goold.

18          MR. GOOLD:  Oh, I'm sure they do.  If there's one

19 thing I have faith in --

20          THE COURT:  Are you a conspiracy theorist,

21 Mr. Goold?

22          (Laughter.)

23          MR. GOOLD:  No.  No.  No.  I just know that they

24 bought that Bray file, the infamous Bray file, and it caused

25 them to decide to go out and look for this ship, and then the

Bray agreement recites that they had been doing their other
research before that.  And I have seen other glimpses of how
extensive the archival search process is by them, as we've
discussed previously.

So my proposal would be extend, require, beseech
disclosure as to what happened with this ship and what it took
on board in Cadiz, Spain, on or about September 1641, and then
we can make informed judgments.

I've asked that question of Odyssey informally.
Ms. MacConnel doesn't want the people to tell me, like, when
we're meeting looking at maps and so on.  It seemed to me a
simple matter, and then we could report back to Your Honor
where we go from there.

THE COURT:  And this would do what?  Because if you
haven't found anything on the bottom of the ocean, what
difference does it make what you knew before you went out
there?

MR. GOOLD:  Pardon me?  Oh.  As to --

THE COURT:  I say, if you haven't found anything at
the bottom of the ocean --

MR. GOOLD:  That's the risk they run.  That's the
risk they run.  I have enough where I have reason to believe
that this ship left port with sovereign immune property on it.
I want to protect that position.

I will also add one more thing and then --

1          THE COURT:  I have to say that -- I mean, the
2  provision that you cite in the FSIA at first blush isn't near
3  as convincing as the argument you make in the other case so
4  that -- not that I am going to be the decider in this.  It
5  certainly very -- very well -- will be ultimately up to
6  Judge Merryday.
7          But, nonetheless, without having seen the briefs,
8  because none have been filed, it's -- it doesn't have the
9  logical appeal to me that the other argument does.
10         MR. GOOLD:  I -- I have --
11         THE COURT:  It seems a little bit of a stretch,
12  Mr. Goold.  That's what I'm saying.
13         MR. GOOLD:  I humbly respect your suggestion.  That's
14  easy to say if you don't live in a monarchy or have never -- in
15  a country that's never been a monarchy.  At that time the king
16  was the monetary authority --
17         THE COURT:  Oh, I understand, the supreme ruler.
18         MR. GOOLD:  -- but that's a historical question, yes.
19         THE COURT:  I understand that.
20         MR. GOOLD:  Yes.
21         So my proposal, which -- my vision, which admittedly
22  is a bit blurred, would be to require the disclosures as to
23  what is known about the material on board with specific
24  reference to the stuff I'm talking about.  If there were
25  elephant tusks or whatever --

1        THE COURT: Let's assume --

2        MR. GOOLD: -- that man was carrying around for his

3 own account, we don't claim it.

4        THE COURT: Let's assume, Mr. Goold, that I were to

5 take Odyssey's position on -- and reschedule the case

6 management landscape and give these new dates for discovery,

7 and discovery would proceed as any other case. You could

8 propound any interrogatories you want and requests for

9 admissions, all the tools of discovery; focus on what issue you

10 thought was appropriate. If the current issue that you've just

11 outlined for the Court is the one that you want to hammer on,

12 you have at it.

13        Come the close of discovery -- which, let's say, is

14 the end of the year -- you have to make some decisions about

15 what dispositive motions you're going to file. And you know no

16 more about whether these coins are at the bottom of the sea,

17 because none have been recovered. And so you file your motions

18 as best you can, and the first order of business for the Court

19 to decide is what's the identity of the vessel. We find that

20 it's the Merchant Royale. And you want to lay claim to some of

21 the property, but that property has not been recovered. What

22 are you going to ask the Court to do?

23        MR. GOOLD: Well, then, I would be in a holding

24 position, that if and when -- whether that's a stay or Odyssey

25 goes and does whatever they want --

1    THE COURT:  But wouldn't the law -- wouldn't the law

2  envision the law of -- assume the Court takes the law of

3  salvage as opposed to the law of finds and the Court were to

4  conclude that -- that it is entitled -- that is, Odyssey is

5  entitled to a lien on what's recovered, and no claimant has

6  come forward and, therefore, they are entitled to what they

7  recover.

8    MR. GOOLD:  As to the rest of the thing, yeah.

9  Okay.  Well, that's --

10    THE COURT:  So what happens?

11    MR. GOOLD:  Yeah, I'm not in a position -- I'm trying

12  to be as candid as I can with the Court -- I'm not -- we don't

13  claim to be the master --

14    THE COURT:  Right.

15    MR. GOOLD:  -- or owner of that vessel.  If there are

16  bracelets -- there's evidence of trade with Africa, for

17  example -- we have no reason to think that had anything to do

18  with Spain.  But I would say this -- and I think it's an

19  important point here -- that if we were to go through all of

20  the Rule 26 disclosures, interrogatories and depositions and

21  schedule all of this stuff for the -- it would be incredibly

22  inefficient when --

23    THE COURT:  It could be incredibly expensive as well.

24    MR. GOOLD:  And expensive, too.

25    THE COURT:  And that's why I go back to my original

1  suggestion -- not to conduct a mediation conference right here

2  in open court -- but it would seem to me that Spain's interest

3  in the cargo of the Merchant Royale is not the same as its

4  heritage and historic significance of the Mercedes.  I mean,

5  they are two different vessels and -- and two different --

6  what's the word? -- provenance or pedigree.

7         MR. GOOLD:  Yes, that's true, Your Honor.  And when

8  you began, in fact, by talking about whether we're now --

9  should be addressing divergence of the cases, you're right.

10  And so as to 1685 -- and I think it -- I don't want it to be

11  the tail wagging the dog here -- it just calls for a bit of

12  creativity and/or candor from Odyssey -- creativity by myself

13  or the Court or candor by Odyssey -- to figure out where we go

14  with that one.

15         MR. VON SPIEGELFELD:  Your Honor, if I might, I think

16  there's a little confusion here.  My understanding of the law

17  is that the cases before this Court is in regards to the

18  artifacts that have been brought before the Middle District of

19  Florida, and that is what he -- Mr. Goold has to make a

20  determination of whether or not his client --

21         THE COURT:  Well, that's --

22         MR. VON SPIEGELFELD:  The Court can't --

23         THE COURT:  As I understand the law,

24  Mr. Von Spiegelfeld, we're not -- we're not -- although the

25  artifacts bring the -- bring the jurisdiction of the Court to

bear in the -- in a tremendous piece of fiction, if -- if you are seeking a salvage award, the artifacts only give you in rem jurisdiction, but they give you in rem jurisdiction not solely as to those artifacts but to the shipwreck itself, the ship itself.

MR. VON SPIEGELFELD: As to -- as to continuing the salvage. But as to getting title to those goods, to the -- to whatever the goods are, they have to be brought before the Middle District.

The Fourth Circuit has discussed this in regards to the Titanic. And actually in the Titanic case -- and it's a 2002 case -- decision by the Fourth Circuit -- it's an interesting case because there some of the goods that were originally salvaged were taken to France, and some were in the Fourth Circuit. And what they said -- what the salvors said is, hey, you know, those are our goods that are in France. And, in fact, the French court awarded those to us, and we want the U.S. court to award them to us, too. And the U.S. court said, well, that's interesting, but they're in France. We don't have jurisdiction over them in France. We can't give you title to them in the United States.

And what we're talking about here is -- and the reason that Odyssey comes before the Court on these cases is to obtain the right of salvor in possession over the site.

Now, if we at some point -- and I have no reason to

believe this to be true or not true -- but let's say at some
point we suddenly find big boxes of gold coins, and we bring
them up, and we bring them back to the Middle District of
Florida; we would then ask this Court for title to those as
salvors of those coins.  At that point in time if Mr. Goold
says, well, those are --

        THE COURT:  But wouldn't you have already --

        MR. VON SPIEGELFELD:  -- Spanish coins --

        THE COURT:  But wouldn't you already have title to
it --

        MR. VON SPIEGELFELD:  No.

        THE COURT:  -- if this Court were adjudicated?

        MR. VON SPIEGELFELD:  No.  At that point we would be
entitled to the salvage -- to -- to conduct the salvage.  We'd
be the salvors in possession.  But we would still have to have
the Court make a determination as to whether we were salvors or
whether it was finds and whether we had a hundred percent title
to it or if we have 80 percent or 90 percent, as in the case of
the Central America.  But that comes after they're brought to
the Middle District.

        In regards to the '14 case, I -- I can't remember all
these numbers; I'm not very good on numbers -- but the 14 case,
here we have a -- a large number of coins.  Now, we do not have
the vessel here.  We're not salvaging the vessel.  And the
videos would show clearly that these coins are just lying

around in clumps in the middle of the ocean.  They are not
lying inside a hull -- they are not lying inside the hull of a
ship, or anything like that.  They are clumps of coins that are
lying around in the middle of the ocean.

And the question is, who owns those coins?  And the
reason -- one of the reasons why discovery will be necessary is
that Mr. Goold is going to say, well, this was our vessel, and
these are our coins.  And you're not allowed to touch them or
have anything to do with them.

And we have to at least have the right to depose and
to find out from his people why they are asserting that these
are -- this is their coins, their gold, their whatever, when,
in fact, there's no vessel.  There's some cannons here; there's
some cannons there over a large area of -- of ground.  And then
there are clumps of coins.

No boxes of coins -- Mr. Goold was talking about
boxes of coins in regards to the Merchant Royale.  None of that
was found.  There's snuff containers, so obviously people had
bad habits back then, too.  But obviously that -- that doesn't
mean that that belonged to the Kingdom of Spain or anything
else.  It would belong to whoever wanted to use the snuff.

So the fact of the matter is, we do have two
different cases altogether.  In the one we have a lot of
property that we're asking for title to whether it be through
salvage or finds.  And Mr. Goold is asserting that that's

sovereign property.

In the other case we have not -- we have very few items, and we're asking for title to those few items. And we have two people who are contending that they have a right to those -- those few items that we have salvaged. That's where we stand today.

The Court has provided us with salvor-in-possession status. And as such, we are theoretically entitled to continue salvaging those sites. That's what the law has allowed us, and this goes -- goes back to a lot of cases. The Court -- you know, we'll be glad to brief that, if the Court wants, but, I mean, that's well-established law.

And you're absolutely correct: It seems like a far-fetched fiction. But by bringing those few artifacts into the Court, that's what gives us the right of salvor in possession.

It's interesting to note that there's also an Eleventh Circuit case which holds that the mere fact that you own -- it discusses -- it doesn't -- it was not the ruling, but it discusses the fact that the mere fact that a -- an owner of a vessel -- or in that case it was an airplane -- doesn't want it salvaged gives them certain rights but only as to what they own, not as to what they didn't own.

And they don't have a right to tell a salvor, or anybody else, don't pick up what I don't own. And our position

is that, in this particular case, the Spanish government didn't own what has been picked up by Odyssey.

THE COURT: What -- should England be given -- should Great Britain be given notice as to the Merchant Royale?

MR. GOOLD: I believe that would be appropriate, yes.

I'm -- I'm not sure I understand a fair amount of what Mr. Von Spiegelfeld, my learned friend, has said, with all respect. The -- artifacts from the Merchant Royale that we've seen in photographs, at least the stuff brought here or in the photographs you've seen, look like typical English stuff of that era. We don't claim them.

They claim a right, by virtue of having brought that here, as the Court has pointed out, to anything else that might be on that ship. You've heard my position on the coins -- on the royal monetary authority shipment.

THE COURT: Is the Merchant Royale -- do we know whether it was a naval vessel of the king's or -- or was it a private vessel? You mentioned a bareboat charter --

MR. GOOLD: Yeah.

THE COURT: -- Mr. Goold.

MR. GOOLD: From what I've seen, it was a -- a private -- privately-owned vessel.

THE COURT: So I take it what -- if it's not -- if it's not the property of the crown -- or was not the property

1   of the crown -- why would notice be appropriate, then, to

2   England, to Great Britain?  They wouldn't be able to raise the

3   foreign service -- Foreign Sovereign Immunity Act, would they?

4        MR. GOOLD:  Well, that's really Odyssey's business,

5   not mine.  But if they're so worried about descendants, then

6   those -- there was a Captain John Lemery who was apparently the

7   owner, entrepreneur in charge of this ship, and he would have

8   been the master of the vessel.  And it is the -- in the words

9   of the Eleventh Circuit, it is the privilege of the master of

10   the vessel to reject salvage, and that's why we're in a

11   different position vis-a-vis the Mercedes, because the master

12   of the vessel is present and active.

13        As to what's at the Mercedes on -- well, this will

14   come up in the motion; but whoever jettisoned material into the

15   sea, dismantled the ship, threw the Spanish Navy cannons

16   overboard, took the rudder off and threw it into the sea, took

17   the dishes off and threw the china cupboard into the sea, threw

18   the ship's pump into the sea, ripped the hull into pieces by an

19   explosion and threw them into the sea, et cetera, and then

20   presumably swam away, as Odyssey would have it, and that's

21   nonsense, but that's our burden to present to you and we will.

22        MR. VON SPIEGELFELD:  I didn't understand that.  I

23   didn't -- I didn't think I said that, Your Honor.

24        THE COURT:  Well, I'm not sure I understand it

25   either.  But, Mr. Goold, if -- if I keep the dates as Odyssey

suggests in the Merchant Royale case -- and obviously you can
file a 12(b)(1) motion at any time -- am I to anticipate that
you would file a 12(b)(1) motion in the 60-day period along the
lines of -- in the Mercedes case?

MR. GOOLD:  To be honest with you, I don't know.  And
I don't think it would be within 60 days because we've not
given it the same priority as the Mercedes.

We've seen some of the documents but not all, enough
to see the trail leading to this shipment, this -- talking
about the 1685 case.

I keep coming back -- I apologize, I don't mean to be
a broken record -- but what it takes to know where to go with
this case is right there on the other side of the table.  If
you do want to go through the whole case management order,
interrogatories, all of that kind of stuff, one, I suspect
we'll have big fights about that, but it needs to be, from my
point of view as to me, narrowly tailored if it's anything
aimed at Spain.  And I would think that Mr. Butler's six-month
rollover is a lot more sensible in any event than the dates --
realistic than the dates -- well, I'm not sure about that.
I -- Your Honor, I really don't know.  It's a guessing game
here, and that's why it's so frustrating to me because the
answer is right there.

THE COURT:  Mr. Von Spiegelfeld, not to pry into
Odyssey's intellectual property or schedule of recovery, but

1  let's say within a year's time -- well, let's make it more
2  exact.  If I were to adopt the close of discovery -- it was
3  roughly October of this year -- how many more times, if any,
4  would Odyssey be over the Merchant Royale site?

5         MR. VON SPIEGELFELD:  Well, your -- I can say without
6  any hesitation I haven't got the foggiest idea --

7         THE COURT:  Maybe your co-counsel would.

8         MR. VON SPIEGELFELD:  -- but I will -- I will say --
9  let me just say that from the point of view of how these --
10  I'll go back to the Titanic case.  That case started in
11  nineteen something --

12         THE COURT:  I understand.

13         MR. VON SPIEGELFELD:  -- and was still ongoing in
14  2002 because they were still going back.

15         THE COURT:  And I --

16         MR. VON SPIEGELFELD:  And I don't anticipate that --

17         THE COURT:  Judge Merryday and I would like to -- he
18  has a lifetime appointment.  I do not.  But I'm sure that his
19  lifetime appointment is not something that he wants to be
20  presiding over this particular case.

21         MR. VON SPIEGELFELD:  My -- my -- my point is that I
22  do not anticipate this being a Titanic-type case for a very
23  simple reason:  If -- if there were -- if Odyssey saw great big
24  boxes of gold, they probably would have gotten them by now, so
25  that -- and the pictures have been shown.  The entire video

1  mosaic has been shown to Mr. Goold and to his clients.

2         I don't know what he keeps referring to about we have

3  some sort of inside knowledge.  I don't know what that is.  But

4  I do know that it is -- in all likelihood all of the -- the

5  archaeological discovery at that site will be conducted within

6  the next year to two years.

7         Now, having said that, it's very possible that it's

8  already been conducted as we speak today, because Ms. MacConnel

9  has already pointed out that they did send somebody back.  They

10 have gone down and looked at some more stuff.

11        If they didn't find anything -- or if they did find

12 something -- that will certainly make -- be more enlightening

13 to the Court.  At that point, once I have those answers, I'll

14 be able to give you a better answer.

15        THE COURT:  What kind of discovery has been conducted

16 in the Merchant Royale case as far as -- have any depositions

17 occurred?

18        MR. VON SPIEGELFELD:  No.  No depositions, nothing

19 other than we provided Mr. Goold and his client with all of the

20 photo mosaics, with photographs, with -- with video; and we've

21 answered the interrogatories, and they've answered

22 interrogatories.

23        THE COURT:  All right.  Anything else that anybody

24 wants to discuss or add or any checklist that you have that we

25 didn't cover?

1  MR. GOOLD:  One procedural guidance question.
2  Vis-a-vis the anticipated, should the Court permit, 12(b)(1)
3  motion, I would expect it to include photos of artifacts, which
4  the Court has already ruled are not confidential.  We've
5  refrained from releasing those, as you may or may not have
6  noticed.
7        There are also artifacts on the seabed.  These are
8  not the photo mosaics but individual cannons, dishes, pots,
9  et cetera.  And at some point I'll need to get clarification as
10 to whether a photograph of an artifact on the seabed -- in
11 other words, it's not a landscape but a specific artifact -- is
12 confidential or not under your ruling addressing that of
13 earlier -- in March.
14       THE COURT:  Not by the protective order that you've
15 issued, no.
16       MR. GOOLD:  Okay.
17       MS. MacCONNEL:  Your Honor, just one thing, if we
18 could get some guidance to prevent us from having to come
19 back.  We do plan to publish notice in Spain, given Spain's
20 assertion that this is the Mercedes, giving the lists of
21 passengers and merchants we know were transporting private
22 goods aboard that ship.  What we had proposed to do was to
23 publish our web site, Odyssey's web site, and we would have a
24 very specific link directly to those lists -- they are rather
25 extensive -- with the names of the passengers and the merchants

who were transporting private goods.  Mr. Goold has objected to
that.  I don't know if Your Honor would have any guidance --

THE COURT:  My inclination would be to resolve the
FSIA issue first before discussing any notice or even
contemplating any notice issues.

MS. MacCONNEL:  So you would like us to refrain,
then, from publishing that notice?

THE COURT:  Yes.

MS. MacCONNEL:  Okay.  Thank you, Your Honor.

THE COURT:  I'm going to consider what everybody has
said and issue a case management order, but my inclination is
to have two separate tracks as to these cases.  But I want to
think about it some more, and I'll issue the appropriate
order.

Mr. Butler, I didn't ask you if you had anything else
that you wanted to say.

MR. BUTLER:  No, Your Honor.  We're good for right
now.

THE COURT:  All right.

MR. BUTLER:  Thank you.

THE COURT:  Thank you.

All right.  We'll be in recess.

MS. MacCONNEL:  Thank you, Your Honor.

MR. GOOLD:  Thank you, Your Honor.

(Thereupon, the proceedings in this case for this

1    date were concluded at this time.)

18                    C E R T I F I C A T E

19          I, Dennis Miracle, Official Court Reporter, do hereby
     certify that the foregoing proceedings were transcribed by me
20   from a digital record that was produced by the United States
     District Court for the Middle District of Florida, Tampa
21   Division, and is a true and accurate record of said proceedings
     to the best of my ability, **based on the quality of the**
22   **recording.**

24    /s/Dennis Miracle                    June 20, 2008
25   _____        _____
           Dennis Miracle                      Date