IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
IN ADMIRALTY

ODYSSEY MARINE EXPLORATION, INC.,

               Plaintiff,                  Case No. 8:07-CV-00614-SDM-MAP

v.                                   DISPOSITIVE MOTION

THE UNIDENTIFIED SHIPWRECKED
VESSEL, if any, its apparel, tackle,
appurtenances and cargo located within
a five mile radius of the center point
coordinates provided to the Court under seal,

               Defendant,
               *in rem*
and

KINGDOM OF SPAIN, Claimant,

REPUBLIC OF PERU, Conditional Claimant
_____/

### CLAIMANT KINGDOM OF SPAIN'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

Pursuant to the Court's orders of June 11, 2008 (Dkt. 114) and July 11, 2008 (Dkt. 119), Claimant Kingdom of Spain ("Spain") hereby moves to dismiss the claims of Plaintiff Odyssey Marine Exploration, Inc. ("Odyssey") for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) or, in the alternative, to grant summary judgment in Spain's favor pursuant to Federal Rule of Civil Procedure 56(a). The Defendant in this *in rem* case is the Frigate of War *Nuestra Señora de las Mercedes*, a warship of the Royal Navy of Spain which is subject to immunity from Odyssey's claims in this Court and is not subject to salvage against the wishes of Spain.

## MEMORANDUM OF LAW

"The battle commenced soon after; our frigate received the first discharge by larboard; the salute was answered . . . [when] the devil went and set the magazine of the *Mercedes* afire, which blew up in a whisper, and everyone with this event, grieved so . . . that at the same time we saw ourselves lost."[1]

"The sunken warships of various countries are also the graveyards of marines who died while serving their homelands, and they should be properly handled by the State they served, which must take steps to prevent interference from foreign elements in that relationship."[2]

In the morning of October 5, 1804, the *Nuestra Señora de las Mercedes* ("*Mercedes*") came under attack, exploded, and sank. A Frigate of War of the Royal Navy of Spain, the *Mercedes* was nearing Cádiz, Spain (its final destination) on a mission that had taken it from El Ferrol, Spain to El Callao and Montevideo in Spain's American Viceroyalties. The *Mercedes* sank with over 250 Spanish naval servicemen and the family of a naval officer. The *Mercedes* also took with it Spanish coins and other valuables which the highest Spanish military authorities had ordered the *Mercedes* to bring securely to Spain; a "treasure" that Odyssey apparently found irresistible and covertly took from the resting place of the *Mercedes* in violation of express prohibitions by Spain, and of U.S. and international law.

This motion will show that it is indisputable that the Defendant is the *Mercedes* and is therefore immune from Odyssey's claims under the Foreign Sovereign Immunities Act and allied principles of U.S. and international law. Consequently, Odyssey's claims

---

[1]     Excerpt from the short story *Trafalgar* by the eminent Spanish author Benito Pérez Galdós. *Trafalgar*, *in* Benito Pérez Galdós, *Episodios Nacionales* 44, 45 (1872) (translation from Spanish original).

[2]     (Ex. F, ¶ 2 (de Cabo Decl.), Annex 1, at 2 (Odyssey's Legal Brief, *HMS Sussex*, Case No. 201/06-CA-01/06 (Council of Andalucía, Spain) (Sept. 26, 2006)).)

seeking to be declared the owner of the *Mercedes* (Count I) and seeking a salvage award (Count II) are subject to dismissal. In addition, Odyssey may not receive a salvage award in this case because Spain, the sovereign owner of the *Mercedes,* has prohibited unauthorized disturbance or salvage and Odyssey has engaged in misconduct that precludes any salvage award.

## I.     FACTS AND PROCEDURAL HISTORY

The historical record and the information Odyssey has disclosed as a result of this Court's orders, detailed in declarations submitted with this motion,[3] establish that the Defendant in this case — *i.e.*, the shipwrecked vessel and its associated artifacts — is the warship *Mercedes* of the Royal Spanish Navy. In order to sell coins and artifacts as curios to collectors, Odyssey covertly mined the site of the *Mercedes* for valuables, after Spain expressly refused Odyssey permission to do so. Faced with Spain's intervention in this case to protect its historical patrimony and the gravesite of Spanish servicemen, Odyssey has followed a strategy of claimed ignorance of the true identity of the

---

[3]     Spain submits with this motion the following declarations: Exhibit A – Declaration of Admiral Teodoro de Leste Contreras, Admiral Director of the Spanish Navy Institute of Naval History and Culture; Exhibit B (submitted under seal) – Confidential Declaration of Admiral de Leste; Exhibit C – Declaration of Hugo O'Donnell y Duque de Estrada, Spanish historian, Royal Academy of History; Exhibit D – Declaration of James P. Delgado, Ph.D., Maritime Historian and Archaeologist; Exhibit E (submitted under seal) – Confidential Declaration of James P. Delgado; Exhibit F – Declaration of Elisa de Cabo, Assistant Subdirector General, Directorate for the Protection of Fine Art and Cultural Patrimony, Ministry of Culture, Government of Spain; Exhibit G –Declaration of Victoria Stapells Johnson, historical researcher; Exhibit H – Declaration of Carmen Marcos Alonso, Head of the Department of Numismatics, National Museum of Archaeology, Madrid; Exhibit I - Declaration of James A. Goold, Counsel.

shipwreck.  The reason is obvious: Odyssey well knows that it may not disturb a
sovereign vessel and gravesite of Spain.

## A.  The Warship *Mercedes* of the Royal Spanish Navy.

From its construction in 1788 at the Spanish Navy Shipyard in Havana to its
sinking in battle in 1804, the *Mercedes* was in active service as a warship of the Royal
Spanish Navy.  (Ex. A, ¶¶ 3, 12 (de Leste Decl.); *id.* Annex 4.)  The *Mercedes*'s
distinguished history of service began in 1789 and included diverse missions that ranged
from participation in combat operations to the secure transportation of troops, specie, and
government officials.  (*Id.* ¶¶ 12-13.)  The *Mercedes* was and remains on the official
registers of warships of the Royal Spanish Navy.  (*Id.* ¶¶ 7-8.)  Spain has never
abandoned or relinquished its ownership of the *Mercedes*.  (*Id.* ¶¶ 5, 42.)

The last voyage of the *Mercedes* took place amidst war among European powers.
From 1796 to March 1802, Spain fought against Great Britain as an ally of France.
(Ex. C, ¶¶ 19-20 (O'Donnell Decl.).)  During the war, Great Britain's powerful navy had
interdicted mainland Spain's trans-Atlantic lifeline to its Viceroyalties in the Americas.
(*Id.* ¶ 23.)  In March 1802, the Treaty of Amiens brought a tense and temporary breathing
spell to the hostilities, but Spain remained allied with and obligated to provide military
and financial support to Napoleonic France.  (*Id.* ¶¶ 20-22; Ex. A, ¶ 14 (de Leste Decl.).)
The Spanish government feared that Spain would be drawn back into hostilities with
Great Britain if, as expected, war broke out again between Great Britain and France.  (Ex.
C, ¶¶ 20-23 (O'Donnell Decl.); *see* Ex. A, ¶¶ 14-15 (de Leste Decl.).)

Anticipating renewed war, in September 1802 the principal minister of King Carlos IV and commander of Spain's military forces, Manuel de Godoy, ordered the Minister of the Spanish Navy to determine whether to dispatch warships to secure specie and other valuables in Spain's American Viceroyalties. (Ex. A, ¶¶ 14-15 (de Leste Decl.); *see* Ex. C, ¶ 23 (O'Donnell Decl.).)  In response to Godoy's order, the Minister of the Spanish Navy, Domingo de Grandallana, ordered the Frigates of War *Mercedes* and *Clara* to sail from the navy base at El Ferrol, Spain, to El Callao "with the objective of bringing back the specie and effects of the Royal Treasury which are ready in America."[4] (Ex. A, ¶ 16 (de Leste Decl.).)  The *Mercedes* and the *Clara* set sail on February 27, 1803.  (*Id.* ¶17.)

By the time the *Mercedes* reached El Callao on August 7, 1803, the Treaty of Amiens had broken down, and war had resumed between Great Britain and France.  (*Id.*; Ex. C, ¶ 24 (O'Donnell Decl.).)  Due to the resumption of hostilities, the departure of the *Mercedes* from El Callao was delayed until March 31, 1804, while it also took on board property of Spanish citizens seeking protection from war.  (Ex. C, ¶ 24 (O'Donnell Decl.); *see* Ex. A, ¶¶ 11, 18. 36 (de Leste Decl.); *id*. Annex 30).  The *Mercedes* then

---

[4]    Spain was not alone in assigning its warships to transport specie and other valuables of the state and its citizens.  It was and remains the responsibility and purpose of the military to protect the interests of the nation and its citizens.  (Ex. A, ¶ 11 (de Leste Decl.).)  The U.S. and British Navies also carried out the same function.  *See* Act of April 23, 1800 for the Better Government of the Navy of the United States, art. XXIII, 2 Stat. 45, 48 (authorizing U.S. Naval vessels to carry "gold, silver, or jewels"); (*see also* Ex. D, ¶ 16 (Delgado Decl.); Ex. I, ¶¶ 4-6 (Goold Decl.), Annexes 3-6 (examples of U.S. Navy orders and missions carried out by U.S. Navy warships, including the U.S.S. *Constitution* ("Old Ironsides")).

sailed for Montevideo with two sister warships: the Frigates of War *Clara* and *Asunción*.
(Ex. A, ¶ 19 (de Leste Decl.).)  In Montevideo, the *Mercedes* was ordered to join a
squadron of Spanish Navy frigates comprised of the *Mercedes*, the *Clara*, the *Medea*, and
the *Fama*, under the command of Squadron Leader José de Bustamante y Guerra.  (*Id.*
¶ 19; Ex. C, ¶¶ 27-28 (O'Donnell Decl.).)  The squadron was assembled so as to have a
formidable combat force in case of attack during the voyage to Spain.  (Ex. C, ¶ 27
(O'Donnell Decl.); *id.* Annex 5.)  The squadron departed Montevideo for Cádiz on
August 9, 1804. (Ex. A, ¶ 20 (de Leste Decl.); Ex. C, ¶ 28 (O'Donnell Decl.).)

These concerns proved to be well-founded, as the British Navy awaited the
*Mercedes*'s squadron.  The British government had notified Spain that it considered war
an "infallible consequence" of Spain's support of France, and the British Admiralty had
learned a Spanish squadron was inbound to Cádiz with specie on board.  (Ex. D, ¶¶ 13-15
(Delgado Decl.); *see* Ex. A, ¶ 23 (de Leste Decl.).)  Four British Navy frigates were
dispatched to intercept their Spanish counterparts.  (Ex. D, ¶ 14 (Delgado Decl.); Ex. A,
¶ 23 (de Leste Decl.).)  Anticipating that, if the Spanish warships reached Spain the
specie they had on board would feed the coffers of its arch-enemy, Napoleonic France,
the British government ordered its Navy to intercept "Spanish homeward-bound Ships of
War" with "treasure on board."  (Ex. D, ¶15 (Delgado Decl.).)  The "Merchant Ships of
that Nation" were to be spared.  (*Id.*)

In the morning of October 5, 1804, the British squadron intercepted the Spanish
squadron south of Cape Saint Mary, Portugal; a day's sail west of Cádiz, Spain.  (Ex. A,
¶ 23 (de Leste Decl.).) After the Spanish commander rejected British demands for

surrender, the British warships opened fire and the Battle of Cape Saint Mary commenced.  (*E.g.*, *id.*)  Minutes later, the *Mercedes* was rocked by a catastrophic explosion and sank.  (*Id.* ¶ 24; Ex. D, ¶¶ 17-18 (Delgado Decl.).)  Only debris was left afloat with about 50 survivors.  (Ex. A, ¶¶ 24-25 (de Leste Decl.).)  Over 250 military personnel perished, as well as the family of Spanish Captain Diego de Alvear y Ponce de León.  (*Id.* ¶¶ 21, 25; *see also id.* ¶ 4 (describing "[t]he underwater resting place of the *Mercedes*" as a "gravesite").)  The remaining Spanish frigates yielded, were taken to Great Britain, and were impounded.  (*Id.* ¶ 26; Ex. D, ¶ 19 (Delgado Decl.).)

The sinking of the *Mercedes* and the Battle of Cape Saint Mary are famed and pivotal events in Spanish and European history.  (Ex. A, ¶¶ 27-28, 42 (de Leste Decl.); Ex. C, ¶¶ 30, 33-36 (O'Donnell Decl.).)  Citing the "sad loss of the frigate *Mercedes*," King Carlos IV of Spain declared war against Great Britain on December 12, 1804.  (Ex. A, ¶ 27 (de Leste Decl.); Ex. C, ¶ 33 (O'Donnell Decl.).)  Spain thus went to war as an ally of Napoleonic France, leading to the defeat of the Spanish and French Navies a year later in the Battle of Trafalgar and to a decade of conflict that shaped Spanish history.  (Ex. A, ¶ 28 (de Leste Decl.); Ex. C, ¶¶ 34-36 (O'Donnell Decl.).)

**B.  Odyssey's Unauthorized Disturbance of the *Mercedes* and Concealment of Its Identity.**

**1.  *Spain's Express Preservation of Title and Refusal of Salvage.***

On February 5, 2004, three years before this case began, Spain officially notified U.S. persons that its sunken ships may not be disturbed without its authorization.  The U.S. Department of State published Spain's notice in the Federal Register, which stated that:

> [i]n accordance with Spanish and international law, Spain
> has not abandoned or relinquished its ownership or other
> interests with respect to [sunken vessels that were lost
> while in the service of the Kingdom of Spain] and/or [their]
> contents, except by specific action pertaining to particular
> vessels or property taken by Royal Decree or Act of
> Parliament in accordance with Spanish law.

Protection of Sunken Warships, Military Aircraft and Other Sunken Government Property, 69 Fed. Reg. 5647, 5647 (Dep't of State Feb. 5, 2004).  Noting that "[m]any such vessels also are the resting place of military and/or civilian casualties," Spain further gave "notice that salvage or other disturbance of sunken vessels or their contents in which Spain has such interests is not authorized and may not be conducted without express consent by an authorized representative of the Kingdom of Spain."  *Id.*  Spain's notice was prefaced and reinforced by a United States Government admonition to "[t]hose who would engage in unauthorized activities directed at sunken State craft . . . that disturbance or recovery of such craft should not occur without the express permission of the sovereign . . . ."  *Id.* at 5647; *see also id.* at 5648 (full statement of the President).

Two years later, in a September 2006 submission to Spanish authorities, Odyssey acknowledged and voiced its own support for these principles.  Odyssey acknowledged that "[t]he sunken warships of various countries are also the graveyards of marines who died while serving their homelands, and they should be properly handled by the State they served, which must take steps to prevent interference from foreign elements in that relationship."  (Ex. F, ¶ 2 (de Cabo Decl.); *id.* Annex 1 at 2 (Odyssey's Legal Brief, *HMS Sussex*, Case No. 201/06-CA-01/06 (Council of Andalucía, Spain) (Sept. 26, 2006.).)  Because Spain "has more sunken ships than any other State in the world," Odyssey urged

that Spain "must assert its ownership and protect its property from looting, which is, unfortunately, on the rise." (*Id.*)

Two months later, Odyssey requested Spain's consent to recover and sell artifacts from shipwrecks of historical or cultural interest to Spain. At Odyssey's request, its CEO and Co-Founder Gregory Stemm and its Spanish counsel met on November 13, 2006 with the Assistant Subdirector General of the Directorate for the Protection of Fine Arts and Cultural Assets of Spain's Ministry of Culture. (Ex. F, ¶¶ 3-8 (de Cabo Decl.).) Odyssey had sought the meeting because it desired to conduct commercial operations on shipwrecks in which Spain had historical, cultural, or other interests. (*Id.* ¶ 4.) Odyssey asked for authorization and consent to recover and sell artifacts from such shipwrecks.[5] (*Id.* ¶¶ 4-5.)

Odyssey's request was denied in no uncertain terms. Odyssey was informed that it would not be given authorization or consent because artifacts from archeological excavations and from underwater cultural heritage are for public benefit and not for private sale. (*Id.* ¶¶ 6, 9.) Odyssey was also informed that Spain has adopted the UNESCO Convention on Underwater Cultural Heritage, which provides, *inter alia*, that "underwater cultural heritage shall not be traded, sold or bartered as commercial goods." (*Id.* ¶ 6; *see also id.* Annex 2, Rule 2, at 16.) Odyssey's representatives were angered by

---

[5] Even though Odyssey had targeted the *Mercedes* beginning in 2005 (Ex. G, ¶ 2 (Stapells Johnson Decl.)), and knew that the *Mercedes* was a Spanish Navy warship of historical importance to Spain (*id.* ¶ 3), Odyssey concealed at the meeting that it had set its sights on the *Mercedes* (*see* Ex. F, ¶¶ 4, 9 (de Cabo Decl.)).

the refusal and left. (*Id.* ¶ 7.) As is now clear from this case, Odyssey chose to go forward covertly shortly thereafter in disregard of Spain's instructions.

### 2. *Odyssey's Knowing Disturbance of the Mercedes.*

Before Odyssey conducts "any shipwreck search and recovery expedition," it conducts extensive historical research about the "target shipwreck." Odyssey, How It's Done (n.d.), http://shipwreck.net/howitsdone.html. The results of that research are reviewed in "exhaustive detail before expenses for search and recovery are incurred on the project." *Id.*

This case was no exception: Odyssey "invested substantial money and effort in . . . researching the history of the Defendant" before it filed this case. (Mot. for Order Directing Clerk to Issue Warrant of Arrest In Rem 3 (Dkt.3).) In fact, beginning in 2005, long before Odyssey approached Spain's Ministry of Culture, Odyssey had targeted the *Mercedes*. Odyssey commissioned extensive research on the *Mercedes* in Spain; research that confirmed the *Mercedes*'s status as a warship of the Royal Spanish Navy and as an important part of Spain's history. (Ex. G, ¶¶ 2-3 (Stapells Johnson Decl.).)

In its original Complaint, filed April 9, 2007, Odyssey alleged that it located "the site of the Defendant shipwrecked vessel in March 2007." (Compl. ¶ 5 (Dkt. 1).) Odyssey also asserted that, at that time, it had "begun a pre-disturbance survey" of the site. (*Id.*) In fact, on April 10, the day after filing the Complaint, Odyssey dispatched a chartered aircraft from Gibraltar with 203 gold coins, 10,080 silver coins, copper ingots, tin ingots, and military artifacts taken from the site. (Dkt. 37-2 (Gibraltar Customs Documents, Ex. 1 of Claimant's Mot. to Dismiss (Sept. 19, 2007)).) On or about May

18, 2007, a second aircraft chartered by Odyssey brought to this district more than 500,000 additional coins and other artifacts, taken from "a Colonial period shipwreck site code-named '*Black Swan*' at an undisclosed location in the Atlantic Ocean." (Odyssey, Press Release, Odyssey's Latest Shipwreck Find Yields Over 500,000 Silver and Gold Coins (May 18, 2007) (Dkt. 21-2, at 28).) In press releases issued before Spain filed its claim in this case, Odyssey announced that the site "bears characteristics of one shipwreck in particular" and "is believed to have immense historical significance." (*Id.*; Odyssey, Press Release, Odyssey Provides '*Black Swan*' Shipwreck Information Update (May 21, 2007) (Dkt. 21-2, at 30).)

Since Spain filed its Verified Claim on May 31, 2007, however, Odyssey has maintained before the Court that it is unable to identify, or even "state a good faith belief as to the identity" of, the shipwreck. (Pls.' Answers to Ct. Interrogs. 4 (Apr. 11, 2008) (Dkt. 105).) Even though Odyssey alleged in April 2007 that the "wreck site consists of *vessel remains* and unidentified objects" (Compl. ¶ 7) (emphasis added), Odyssey represented to this Court a year later that "the most outstanding characteristic of the site is the actual absence of a vessel" (Pls.' Answers to Ct. Interrogs. 4 (Apr. 11, 2008) (Dkt. 105).) In sworn answers that are manifestly evasive and disingenuous, Odyssey stated that "[o]ne vessel Odyssey has considered which may be related to the site is the *Nuestra Senora de los Mercedes y las Animas*," but that the artifacts may have been "jettisoned," or may have come from an unidentified "pirate ship" or a "ship which was lost in a storm

in the area," the identity of which had "so far eluded [Odyssey's] researchers and archivists."[6] (*Id.*)

### C. The *Mercedes* Is the Defendant in This Case.

The historical record of the *Mercedes*, combined with the photographs and videotapes of the site and artifacts, and other information that this Court ordered Odyssey to disclose (Order (Jan. 10, 2008) (Dkt. 75)); Order (Mar. 12, 2008) (Dkt. 92)), establish unmistakably that the Defendant in this case is the *Mercedes*. The declarations submitted herewith review this evidence in detail, key features of which are summarized below.

### 1. *Odyssey Retrieved the Artifacts From the Site Where the* Mercedes *Exploded and Sank in 1804.*

As detailed in the Confidential Declaration of Spanish Admiral Teodoro de Leste Contreras, Director of the Institute of Naval History and Culture (the "Institute"), the Institute has determined the likely location where the *Mercedes* sank in 1804 from Spanish records and has compared that data with the coordinates at which Odyssey took artifacts from the Defendant. (Ex. B, ¶¶ 3-9 (de Leste Confidential Decl.) (filed under seal).) The results of the analysis of the historical data and the Odyssey coordinates match. (*Id.*; *see also* Ex. E, ¶¶ 3-4 (Delgado Confidential Decl.) (filed under seal).)[7]

---

[6]      Odyssey's Interrogatory Answers thus made no mention at all of the *Nuestra Señora de las Mercedes*, referring instead to a different ship with a similar name ("*Nuestra Señora de las Mercedes y las Ánimas*"). Only the Spanish Navy Frigate of War *Nuestra Señora de las Mercedes* sank in the Battle of Cape Saint Mary of 1804 and, as discussed hereafter, the Defendant can only be this *Mercedes*.

[7]      Information about the location of the shipwreck, contained in Exhibits C and E, has been filed separately with a Motion to Seal Pursuant to Local Rule 1.09(b).

## 2. *The Defendant Is a Spanish Warship That Exploded and Sank.*

Contrary to Odyssey's representation that there is "an actual absence of a vessel" at the site, Odyssey's own photographs and video of the site show the remains of a Spanish warship of the time of the *Mercedes*. The site contains, *inter alia*, hull remains in precisely the condition to be expected of a wooden-hulled warship that exploded and sank two centuries ago. (Ex. D, ¶¶ 21-24 (Delgado Decl.).) Large complexes of wooden hull sections torn by the explosion, some with ship's rigging still attached; anchors; cannons; remains of the ship's pump and rudder, distinctive ship structural elements; plates, cutlery, other personal effects and abundant other remains of the vessel are present. (*Id.* ¶¶ 33, 40, 73-74, 80, 84, 101-117, 122-125, 129-131, 135.) Contrary to Odyssey's representations to the Court (Pls.' Answers to Ct. Interrogs. 4 (Apr. 11, 2008) (Dkt. 105)) (stating that Odyssey had not discovered, among other things, a "ballast pile" at the site)), piles of ballast stones rest on hull remains on the sea bed. (Ex. D**,** ¶¶ 75, 86-88 (Delgado Decl.).) In short, the site is a shipwreck; not the site of "jettisoned cargo," as Odyssey has suggested. Odyssey's Answers to the Court's Interrogatories are inexplicable. (*Id.* ¶¶ 40-42, 79.)

Evidence at the site also demonstrates that the shipwreck is unmistakably a Spanish Navy warship that exploded before sinking. The pattern of distribution of the artifacts at the site is that of a vessel which exploded before coming to rest in pieces within a concentrated area on the seabed. (*Id.* 24, 33-37; Ex. E, ¶ 5 (Delgado Confidential Decl.).) Cannons at the site are Spanish Navy guns of the specification with which the *Mercedes* was armed. (Ex. D, ¶¶ 57-62, 66, 95, 97, 99, 102-106 (Delgado

Decl.); Ex. A, ¶¶ 22, 31-32 (de Leste Decl.).)  Various artifacts show damage from an explosion, including at least one damaged cannon, deformed metal reinforcement elements, and twisted, collapsed piping.  (Ex. D, ¶¶ 95-96, 111 (Delgado Decl.).) Intermingled with the hull remains and other structural elements are the distinctive remains of the copper sheathing that covered the hull of the *Mercedes*, torn and crumpled by the effects of the explosion.  (Ex. A, ¶ 34 (de Leste Decl.); Ex. D, ¶¶ 21, 90-94 (Delgado Decl.).)

### 3. *Artifacts Taken By Odyssey And Those Remaining At The Site Point Specifically To The Mercedes.*

The artifacts Odyssey took from the site are equally telling.  For example, Odyssey took "approximately 595,000 coins" from the site (Ex. H, ¶ 16 (Marcos Alonso Decl.); *id.* Annex 2, at 6 (Odyssey's "Artifact Summary")), and the *Mercedes* sank with over 900,000 coins taken on board in El Callao and Montevideo before it sailed for Cádiz in August 1804 (*id.* ¶ 3).  Moreover, Odyssey's "Artifact Summary" reports that the coins Odyssey has examined "are almost exclusively milled coinage struck in South American Crown Colonies," and "the plurality of the coins recovered and thus far identified were struck at the mint in Lima, Peru" (*id.* Annex 2, at 6); facts consistent with most of the coins being put on board the *Mercedes* in El Callao, the port of Lima (*e.g.*, *id.* Annex 8; *see also id.* ¶¶ 14, 17).  Notably, the "dates [of the coins] range from 1773 to 1804" (*id.* Annex 2, at 6) — the year when the *Mercedes* left the Americas and sank (*e.g.*, *id.* ¶¶ 7, 11-12).  Hence, the quantity, origins, and dates of the coins leave no doubt that "the *Mercedes* is the source of the coins" taken by Odyssey.  (*Id.* ¶ 18.)

Other equally revealing artifacts were taken by Odyssey or photographed on the seabed. At El Callao, the *Mercedes* took on board a large quantity of copper and tin ingots. (Ex. A, ¶ 30 (de Leste Decl.); Ex. D, ¶ 25 (Delgado Decl.).) Copper and tin ingots were taken by Odyssey from the site. (Ex. D, ¶ 120 (Delgado Decl.).) Large numbers of additional copper and tin ingots are interspersed with the hull remains, cannons, and other artifacts on the seabed. (*Id.* ¶ 25; Ex. E, Annex 1 (Delgado Conf. Decl.).) At El Callao, the *Mercedes* also took on board two obsolete bronze cannons, known as *culebrinas*, for transport to Spain. (Ex. A, ¶ 37 (de Leste Decl.)); Ex. C, ¶¶ 25-26 (O'Donnell Decl.); Ex. D, ¶ 106 (Delgado Decl.).) Both of these highly distinctive and readily identifiable cannons are at the site. (Ex. A, ¶ 37 (de Leste Decl.); Ex. D, ¶¶ 106 107 (Delgado Decl.).)

*     *     *

In short, the evidence summarized above and presented in more detail in the attached declarations demonstrates that the "Defendant" is the *Mercedes* and that the identity of the shipwreck is obvious and indisputable. As maritime historian and archaeologist James P. Delgado concludes, "it is evident that the shipwreck involved in this case is *Nuestra Señora de las Mercedes*." (*Id.* ¶ 21; *see also id.* ¶ 29 (concluding that "the identity of the shipwreck as a Spanish Navy vessel warship, and *Mercedes* in particular, was readily evident by visual examination of the cannon, vessel remains, coins, ingots, etc.").) Likewise, Spanish Admiral Teodoro de Leste Contreras concludes that "it is clear that the shipwreck at issue in this case is the warship *Mercedes*" and confirms that Spain vehemently objects to the "disturbance by Odyssey of our warship,

its contents and the resting place of those who perished when the ship was attacked in what represented a crucial moment in our history."  (Ex. A, ¶¶ 40, 42 (de Leste Decl.).)

## II.    LEGAL STANDARD

Spain moves to dismiss Odyssey's remaining claims (Counts I and II of the Amended Complaint (Dkt. 21, 25)) for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and on further grounds presented by this motion.[8]  As a "factual attack" against the Court's jurisdiction, Spain's motion "challenge[s] 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings . . . .'" *Howland v. Hertz Corp.*, 431 F. Supp. 2d 1238, 1240 (M.D. Fla. 2006) (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1528 (11th Cir. 1990)).  In deciding such a motion, the Court may consider evidentiary matter outside the pleadings, such as the declarations and annexes submitted with this motion, and "'evaluat[e] for itself the merits of the jurisdictional issue,'" regardless of "'the existence of disputed material facts . . . .'" *Id.* (quoting *Morrison v. Amway Corp.*, 323 F.3d 920, 924-25 (11th Cir. 2003)).

Faced with Spain's showing that the Defendant is a sovereign vessel of Spain, Odyssey bears the burden to show that an exception to sovereign immunity applies in this case.  *See Gerding* v. *Republic of France*, 943 F.2d 521, 525 (4th Cir. 1991) ("Once the

---

[8]    In the alternative, Spain moves for summary judgment under Federal Rule of Civil Procedure 56.  Summary judgment is warranted because the record evidence, viewed in the light most favorable to Odyssey, shows that there is no genuine of material fact in this case, making judgment in Spain's favor appropriate as a matter of law.  *See, e.g.*, *Capt Chance, Inc. v. United States.*, 506 F. Supp. 2d 1196 (M.D. Fla. 2007).

Spain also files herewith a motion to vacate the arrest and other relief pursuant to Supplemental Rule E(4)(f) for consideration in conjunction with this motion.

foreign state has produced such prima facie evidence of immunity, the burden of going forward would shift to the plaintiff . . . ."); *Alberti* v. *Empresa Nicaraguense de la Carne*, 705 F.2d 250, 256 (7th Cir. 1983); *Jet Line Services, Inc. v. M/V Marsa El Hariga*, 462 F. Supp. 1165, 1172 (D. Md. 1978); *see also Kelly v. Syria Petroleum Dev. B.V.*, 213 F.3d 841, 847 (5th Cir. 2000). Odyssey cannot meet this burden.

III. **ODYSSEY CANNOT BE ADJUDGED OWNER OR SALVOR IN THIS CASE BECAUSE THE DEFENDANT IS SUBJECT TO IMMUNITY.**

This case calls for the application of the well- and long-recognized mandate of U.S. and international law that the rights of a sovereign nation over its vessels are protected from private claims in foreign courts. Under U.S. and international law, a vessel of a foreign sovereign — whether sunk or not — is immune from judicial arrest and may not be adjudicated in favor of a purported salvor absent the sovereign's express authorization of salvage. "Courts cannot just turn over the sovereign shipwrecks of other nations to commercial salvors where negotiated treaties show no sign of an abandonment, and where the nations involved all agree that title to the shipwrecks remains with the original owner." *Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, 221 F.3d 634, 647 (4th Cir. 2000).

Odyssey's pending claims in this case seek to assert rights over the shipwreck of a warship of the Royal Spanish Navy. Because the *Mercedes* is entitled to immunity from suit in U.S. courts, Odyssey's claims must be dismissed and the arrest against the *res* lifted. The gravesite of military personnel who died in the service of their nation may not be subjected to unauthorized and covert exploitation for private profit, as Odyssey well

knows.  (*See* Ex. F, Annex 1, at 2 (Odyssey's Legal Brief, *HMS Sussex*, Case No. 201/06-CA-01/06 (Council of Andalucía, Spain) (Sept. 26, 2006)).)

### A.  The Foreign Sovereign Immunities Act Mandates Dismissal of Odyssey's Claims.

Because they are premised on admiralty jurisdiction *in rem*, Odyssey's claims depend on the Court's arrest of the *Mercedes*.  *See* Supplemental Rule C(3)(a)(i) (requiring the arrest of a vessel that is the subject of an *in rem* action in admiralty); *Great Lakes Exploration Group, LLC v. Unidentified Wrecked & (For Salvage-Right Purposes), Abandoned Sailing Vessel*, 522 F.3d 682, 686 (6th Cir. 2008) ("In an *in rem* admiralty action, the arrest of a shipwreck is the procedure by which a salvor establishes jurisdiction in federal court.").  Odyssey's claims are therefore precluded by the Foreign Sovereign Immunities Act ("FSIA"), which provides that, except in circumstances not applicable here, "the property in the United States of a foreign state shall be immune from attachment, arrest and execution."[9]  28 U.S.C. § 1609.

Representing that the "Defendant Shipwrecked Vessel(s) is believed to be a sunken vessel," Odyssey moved for a warrant of arrest against the Defendant on April 11, 2007.  (Pl.'s Mot. for Order Directing Clerk to Issue Warrant of Arrest in Rem 2 (Dkt. 3).)  Odyssey presented "a portion of a bronze block" to the Court (*id.*), so that the Court

---

[9]     Exceptions to this general rule — spelled out in Sections 1610 and 1611 of the FSIA — pertain to (1) property that the foreign sovereign has "used for a commercial activity in the United States," 28 U.S.C. § 1610(a)-(b); (2) property with respect to which the foreign sovereign has "explicitly waived its immunity from attachment," *Id.* § 1610(d); (3) a vessel subject to foreclosure of a preferred mortgage, *Id.* § 1610(e); and (4) property with respect to which certain financial transactions are prohibited under U.S. law, *Id.* § 1610(f).  None of these exceptions even remotely apply in this case.

could "exercise constructive jurisdiction over the entire shipwreck" based on the arrest of this artifact, *Great Lakes*, 522 F.3d at 694. The Court issued an *ex parte* order of arrest on April 12, 2007. (Order (Apr. 12, 2007) (Dkt. 5).)

The arrest of the *Mercedes* and the claims Odyssey seeks to maintain against it are thus precluded under the FSIA. 28 U.S.C. § 1609; H.R. Rep. No. 94-1487, at 26 (1976) ("[S]ection 1609 states a general proposition that the property of a foreign state . . . is immune from attachment and from execution . . . ."); *see also id.* (pointing out that Section 1609 precludes attachment "for the purpose of obtaining jurisdiction over a foreign state or its property"). Odyssey's *in rem* claims in this case should therefore be dismissed and the arrest vacated. *See, e.g.*, *Mangattu v. M/V Ibn Hayyan*, 35 F.3d 205, 209-10 (5th Cir. 1994) (affirming dismissal of *in rem* claims against vessel jointly owned by Saudi Arabia, Kuwait, Qatar, the United Arab Emirates, Iraq, and Bahrain); *O'Connell Mach. Co. v. M.V. "Americana"*, 734 F.2d 115 (2d Cir. 1984) (affirming dismissal of *in rem* claims against vessel indirectly owned by Italy).

Under Section 1609, vessels of a foreign sovereign are immune from arrest in proceedings *in rem* such as this case, whether they are warships or serve(d) other functions, unless the plaintiff can show, *inter alia*, they were engaged in commercial activity in the United States. *See* 28 U.S.C. § 1610(d). Odyssey can make no such showing: the *Mercedes* simply had nothing to do with the United States. As discussed below, moreover, the immunities of the *Mercedes* extend beyond Section 1609 because the *Mercedes* is a warship of Spain and its remains mark the resting place of over 250 sailors of the Royal Spanish Navy who died in the service of their country.

**B.** **The Immunities of Warships Under International and U.S. Law Further Preclude Odyssey's Claims Against the _Mercedes_.**

Few principles have a longer pedigree in U.S. and international law than the special immunities of warships from private claims in admiralty. In 1812, in a case involving another Napoleonic War vessel, the Supreme Court applied these principles to dismiss _in rem_ claims against a "national armed vessel[] commissioned by, and in the service of the [E]mperor of France." _Schooner Exchange v. McFaddon_, 11 U.S. (7 Cranch) 116, 146 (1812). In the district court, the plaintiffs sought to attach the vessel, a French "public armed ship". _Id._ at 117. The Supreme Court gave the matter a priority hearing and held that the ship was immune from the admiralty claims asserted against it. _Id._ at 118-19. Chief Justice Marshall wrote for the Court:

> [A public armed ship] constitutes a part of the military force of her nation; acts under the immediate and direct command of the sovereign; is employed by him in national objects. He has many and powerful motives for preventing those objects from being defeated by the interference of a foreign state. Such interference cannot take place without affecting his power and his dignity.

_See id._ at 144.

The immunities of "public armed ships" recognized almost 200 years ago remain in full force today. _See, e.g._, 28 U.S.C. § 1611(b)(2) (extending immunity to a foreign nation's military property, even if certain exceptions to immunity otherwise apply)[10]; U.N. Convention on the Law of the Sea [UNCLOS] art. 95, Dec. 10, 1982, 1834

---

[10]    Congress's intent in Section 1611 was to define military property in the "broad sense," including "military transport," to "avoid the possibility that a foreign state might permit execution on military property of the United States abroad under a reciprocal application of the act." H.R. Rep. No. 94-1487, at 31.

U.N.T.S. 4, 41, 21 Int'l Legal Materials 1261, 1288 ("Warships on the high seas have complete immunity from the jurisdiction of any State other than the flag State."); *see also id.* art. 32 (providing that, except in certain narrow circumstances, "nothing in [UNCLOS] affects the immunities of warships . . . ."). The same immunities protect the *Mercedes* in this case.

The fact that a warship has sunk has no effect on its protected status under international law. The United States, Spain, and other sea-going nations recognize the rule that the site of a sunken warship may not be disturbed without the express permission of the warship's sovereign owner. *See, e.g.*, Protection of Sunken Warships, Military Aircraft and Other Sunken Government Property, 69 Fed. Reg. 5647, 5647 (Dep't of State Feb. 5, 2004). Indeed, over fifty nations — including Spain and the United States — have agreed that salvage awards may not be granted against warships absent express consent by the sovereign. *See* International Convention on Salvage [Salvage Convention] art. 4(1), Apr. 28, 1989, S. Treaty Doc. No. 102-12, at 4, 1953 U.N.T.S. 194, 196 (providing that the treaty "shall not apply to warships… unless that State decides otherwise"); *see also* U.S. Dep't of State, Letter of Submittal of the International Convention on Salvage (Aug. 21, 1991) ("The United States will not apply the Convention to its sovereign immune vessels."), *reprinted in* S. Treaty Doc. No. 102-12, at VII.[11]

---

[11] Moreover, as discussed further below, Spain has gone further and exercised the right provided in Article 30 of the Salvage Convention to exclude salvage awards against "maritime cultural property of prehistoric, archaeological or historic interest . . . situated (continued…)

Among many compelling reasons, unauthorized disturbance of sunken warships is prohibited in order to protect the resting place of fallen servicemen and the historical patrimony of their nation. The January 2001 Presidential Statement on United States Policy for the Protection of Sunken State Craft declares that sunken U.S. and foreign warships deserve "treatment as gravesites." 69 Fed. Reg. at 5648. The U.S. Department of State thus has recognized that "sunken warships . . . may be the final resting places of persons who died in the service of their nations." (Ex. I, Annex 1 (Statement of Interest of the U.S. Dep't of State ¶ 17 (b), *in Sea Hunt, Inc. v. Unidentified, Shipwrecked Vessel or Vessels*, No. 2:98-cv-281 (E.D. Va. Dec. 18, 1998).) The U.S. Department of Defense also considers that "[s]ubmerged [naval] vessels are due the same deference as a national cemetery, and the public's interest in preserving the sanctity of service members' graves [and] preserving historic cultural resources" is to be respected "regardless of the condition, date or location, or date of sinking of the vessel." (*Id.* Annex 2 (Statement of Interest of the U.S. Dep't of Defense ¶¶ 5-6, *in Sea Hunt*, No. 2:98-cv-281 (E.D. Va.)).)

The sites of U.S. and foreign sunken warships are also protected because they "may contain objects of a sensitive . . . archaeological or historical nature." 69 Fed. Reg. at 5648. The U.S. Department of State has thus recognized that "sunken warships are historical artifacts of special importance" which may "have unique histories making them part of their country's traditions," entitling them to "special protections." (Ex. I, Annex 1 (Statement of Interest of the U.S. Dep't. of State ¶ 17(b), *in Sea Hunt*, No. 2:98-cv-281

on the seabed." Salvage Convention art. 30, S. Treaty Doc. No. 102-12, at 14; *id.* 1953 U.N.T.S. at 268 (text of Spain's reservation).

(E.D. Va.)).)  The U.S. Department of Defense similarly considers sunken warships as "historic cultural resources" warranting special protection.  (*Id.* Annex 2 (Statement of Interest of the U.S. Dep't. of Defense ¶¶ 5-6, *in Sea Hunt*, No. 2:98-cv-281 (E.D. Va.)).)  Accordingly, "[t]hose who would engage in unauthorized activities directed at sunken State craft are advised that such disturbance or recovery should not occur without the express permission of the sovereign . . . ."  69 Fed. Reg. at 5648.[12]

Precisely to prevent the type of unauthorized activity Odyssey engaged in, the United States and Spain "recognize [] the international law rule that warships and their associated artifacts, whether or not sunken, are entitled to sovereign immunity."  (Ex. I, Annex 1 (Statement of Interest of the U.S. Dep't. of State ¶17(a), *in Sea Hunt*, No. 2:98-cv-281 (E.D. Va.)));  69 Fed. Reg. at 5647.  Accordingly, the Sunken Military Craft Act provides that "[n]o person shall engage in or attempt to engage in any activity directed at a sunken military craft that disturbs, removes, or injures any sunken military craft," unless expressly authorized by the sovereign.  Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, § 1402, 118 Stat. 1811, 2094-95 (Oct. 28, 2004) (codified at 10 U.S.C. § 113 note) [hereinafter the Sunken Military Craft Act].  Simply put, the "[u]nauthorized removal of any property from a U.S. Navy wreck is illegal."  Naval Historical Ctr., U.S. Dep't of the Navy, Policy Regarding Custody and Management of Sunken Naval Vessels and Aircraft Wreck Sites (Dec. 10, 2004), *available at* http://www.history.navy.mil/faqs/faq28-1.htm.

---

[12]    "[S]unken State craft" are "sunken government vessels, aircraft and spacecraft ('State Craft') of the United States and foreign nations."  69 Fed. Reg. at 5647.

Odyssey's disregard of the immunity to which the *Mercedes* is entitled disposes of Odyssey's admiralty claims in this case. Claims under the law of finds and of salvage against an immune sunken warship and its artifacts are precluded when the shipwreck site has been disturbed without permission. *E.g.*, Sunken Military Craft Act, *supra*, §§ 1406(c)-(d); *see id.* §§ 1408(1), (3) (defining "sunken military craft" to include "the equipment, cargo, and contents" of a sunken warship which "are within its debris field").

The same result — dismissal of Odyssey's claims — would follow if the sunken warship at issue in this case had been a U.S. warship, and the protection the United States demands for its own shipwrecked vessels is required by treaty to be applied to shipwrecked Spanish vessels. The Treaty of Friendship and General Relations between Spain and the United States provides that, "[i]n cases of shipwreck," "each party shall afford to the vessels of the other . . . the same immunities which would have been granted to its own vessels in similar cases." Treaty of Friendship and General Relations art. X, U.S.-Sp., July 3, 1902, 33 Stat. 2105, 2110. Consequently, the shipwrecks of Spain's warships are entitled to the same immunities as U.S. warships. *See* Sunken Military Craft Act, *supra*, § 1406(b) ("This title . . . shall be applied in accordance with . . . the treaties, conventions, and other agreements to which the United States is a party."); *Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, 221 F.3d 634, 642 (4th Cir. 2000) ("[The Treaty of Friendship and General Relations] requires that imperiled Spanish vessels shall receive the same immunities conferred upon similarly situated vessels of the United States."); (Ex. I, Annex 1 (Statement of Interest of the U.S. Dep't of State ¶ 14, *in Sea Hunt*, No. 2:98-cv-281 (E.D. Va.) ("Article X [of this treaty] imposes on the United

States the responsibility to afford to these Spanish vessels the same assistance and protection and the same immunities which would be granted to sunken United States warships in the same location.")).  Sovereign immunity applies to warships "of the United States and other nations, whether located in waters of the United States, a foreign nation, or in international waters."  69 Fed. Reg. at 5648.  The *Mercedes* is entitled to the same protection.

As the Supreme Court stated earlier this year, sovereign immunity "is premised upon the 'perfect equality and absolute interdependence of sovereigns'" and "[g]iving full effect to sovereign immunity promotes the comity that has contributed to the development of the [sovereign] immunity doctrine."  *Republic of Philippines v. Pimentel*, 128 S. Ct. 2180, 2189-90 (2008) (citing and quoting *Schooner Exchange*, 1 U.S. (7 Cranch) 116 (1812)).  Accordingly, "where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign."  *Id.* at 2191.  The Supreme Court therefore held that U.S. courts should refrain from adjudicating rights asserted by U.S. litigants against property of the foreign state, especially where claims on such property "arise from events of historical and political significance" for the foreign sovereign.  *Id.* at 2190.

In sum, Odyssey violated the protections and immunities that the warship *Mercedes* is entitled to under U.S. and international law when it took artifacts from the *Mercedes* without Spain's authorization.  Indeed, Odyssey disturbed the *Mercedes* after Spain expressly refused authorization or consent to conduct salvage operations.  This

refusal was rooted in Spain's sovereign rights in its vessels and its public policy to protect sunken vessels as historical heritage for public, not private, benefit, and as gravesites to be respected, not stripped of valuables for commercial exploitation. 69 Fed. Reg. at 5647; (Ex. A, ¶¶ 42-43 (de Leste Decl.); Ex. F, ¶ 6 (de Cabo Decl.).) Odyssey's remaining counts must therefore be dismissed

## IV. ODYSSEY'S CLAIMS ALSO FAIL BECAUSE SPAIN HAS NOT ABANDONED THE *MERCEDES* AND HAS EFFECTIVELY REFUSED SALVAGE.

Odyssey's claims also fail because Spain has never abandoned the warship *Mercedes*, and, thus, the remains of the *Mercedes* cannot be adjudicated as the property of Odyssey. Odyssey also is barred from receiving any salvage award in this case because Spain, as the owner of the *Mercedes*, has prohibited salvage or any other disturbance of the site. In addition, by its conduct, Odyssey has disqualified itself from any salvage award.

### A. Odyssey May Not Obtain Ownership Because Spain Has Never Abandoned the *Mercedes*.

It is a well-settled presumption of admiralty law that property found at sea "has not been divested of title." *E.g.*, *Jupiter Wreck, Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel*, 691 F. Supp. 1377, 1388 (S.D. Fla. 1988). To succeed on its claim to ownership of the *Mercedes*, Odyssey has to demonstrate, by clear and convincing evidence, *e.g.*, Thomas J. Schoenbaum, 2 *Admiralty and Maritime Law* § 16-7 (4th ed. 2004), that Spain has "'abandon[ed]' all interests in [its] vessel." *Int'l Aircraft Recovery, L.L.C. v. Unidentified, Wrecked & Abandoned Aircraft* [*Int'l Aircraft I*], 218 F.3d 1255, 1258 (11th Cir. 2000). Because the *Mercedes* is a sovereign vessel of Spain,

it "will not be considered abandoned without a clear and affirmative act by [the Spanish] government."  *Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, 221 F.3d 634, 642-43 (4th Cir. 2000).

As the Fourth Circuit held when it upheld Spain's ownership and refusal of salvage of the Spanish Navy Frigates *La Galga* and *Juno* — sunk in 1750 and 1802, respectively — "U.S. domestic law is consistent with the customary international law rule that title to sunken warships may be abandoned only by an express act of abandonment." *Id.* at 643 (quoting the Statement of Interest of the U.S. Department of State).  "To adopt an implied abandonment standard in this context would casually divest sovereigns of ships which sank against their will and to which they still lay claim."  *Id.* at 642; *see also United States v. Steinmetz*, 973 F.2d 212, 222-23 (3d Cir. 1992) (reasoning that "warships that were sunk during military hostilities are presumed not to be abandoned" and therefore requiring the return to U.S. custody of the ship's bell of the Confederate commerce raider *Alabama*); *Int'l Aircraft I*, 218 F.3d at 1258-59 ("In the realm of admiralty law, courts have held that the United States has not abandoned its interests in ships sunk over a century ago during the Civil War.")

Express abandonment is required for an award of ownership as against the original owner of a sunken vessel, even if the *shipwreck* is not a warship and the owner is a private party.  *See* Sea Hunt, 221 F.3d at 641-642.  The *Mercedes*'s protection against any claim of abandonment extends further, however, because under the U.S.–Spain Treaty of Friendship and General Relations, *supra*, the *Mercedes* can only be abandoned by an express, authorized and affirmative act of the Government of Spain.  *See Sea Hunt*,

221 F.3d at 642-643.  Hence, Odyssey's claim of title to the Defendant (Count I, Am. Compl. ¶ 27) cannot succeed because Spain has not abandoned the *Mercedes*.  Far from abandoning the *Mercedes*, let alone through any "clear and affirmative act," Spain has done the opposite and has intervened in this case to protect the *Mercedes*.  In language equally applicable to this case, the Fourth Circuit has pointed out that "[u]nder admiralty law, where an owner comes forward to assert ownership in a shipwreck, abandonment must be shown by express acts."  *Sea Hunt*, 221 F.3d at 641.  "Far from abandoning [its] shipwrecks, Spain has vigorously asserted its ownership rights in this proceeding. Nothing in the law of admiralty suggests that Spain has abandoned its dead by respecting their final resting place at sea." *Id*. at 647.

**B.  Odyssey Is Not Entitled to a Salvage Award.**

  1.  *Spain Has Refused Salvage.*

  Odyssey's claim of salvage in this case (Count II) likewise fails under the longstanding rule of admiralty that the owner or master of the vessel, whether publicly- or privately-owned, has the right to refuse salvage.  Also known as the "doctrine of refusal," the rule has been summarized by this Court as follows:

> [W]here the vessel has sunk . . . [t]itle remains with the owner as does the right to refuse salvage. . . .  Potential salvors do not have an inherent right to save distressed vessels.  Instead, a salvage award may be denied if a salvor forces its services on a vessel despite rejection by the owner or by a person with authority. The doctrine of rejection normally applies when the master of a distressed vessel directly and unequivocally rejects a salvor's services.  In cases where the vessel has sunk, the master can communicate rejection of salvage services through a sign, buoy, marker or public advertisement.  When the master does so, a salvor who continues efforts to rescue the vessel will not be entitled to a salvage award.

*Lathrop v. Unidentified, Wrecked & Abandoned Vessel*, 817 F. Supp. 953, 964 (M.D. Fla. 1993) (internal citations omitted).

The right of the master or owner of a vessel to refuse salvage has a long pedigree in admiralty law. *See, e.g.*, *New Harbor Protection Co. v. Steamer Charles P. Chouteau*, 5 F. 463, 464 (D. La. 1881) ("[T]he master of a burning vessel . . . has a perfect right to decline any assistance that may be offered him: he should not be assisted against his will."), *aff'd*, *The Choteau*, 9 F. 211, 211 (C.C.E.D. La. 1881) ("Salvors cannot force themselves upon vessels in distress against the will of the master. It is at his option to accept their services or not, and if he refuse[s] them compensation cannot be recovered for assistance subsequently rendered against his will."); *Merritt & Chapman Derrick & Wrecking Co. v. United States*, 274 U.S. 611, 613 (1927) ("Salvage cannot be exacted for assistance forced upon a ship.").

This right is also recognized in international law. The 1989 Salvage Convention provides that "[s]ervices rendered notwithstanding the express and reasonable prohibition of the owner or master of the vessel . . . shall not give rise to payment under this Convention." Salvage Convention art. 19, S. Treaty Doc. No. 102-12, at 11.[13]

---

[13] As noted earlier, Spain has also exercised its right under Article 30 of the Salvage Convention to bar awards for salvage of "maritime cultural property of prehistoric, archaeological or historic interest . . . ." Salvage Convention art. 30, S. Treaty Doc. No. 102-12, at 14; *id.*, 1953 U.N.T.S. at 268 (text of Spain's reservation). The *Mercedes* unquestionably qualifies as such. (*E.g.*, Ex. A, ¶ 28 (de Leste Decl.) ("[T]he sinking of the *Mercedes* marked a decisive moment in Spanish history . . . ."); (Ex. C, ¶ 36 (O'Donnell Decl.) ("The Battle of Cape Saint Mary, and the shipwreck of the *Mercedes*, have immense historical significance for Spain.").)

In this Circuit, as elsewhere, the right to refuse salvage has been consistently recognized as precluding awards for unauthorized salvage in shipwreck cases. *See Klein v. Unidentified Wrecked and Abandoned Sailing Vessel*, 758 F.2d 1511, 1515 (11th Cir. 1985) ("[T]he owner of the property may not [have] even . . . desired for the property to be 'rescued.' When and if the United States determined it to be in the best interest of the administration of Biscayne National Park to remove the shipwreck, it was certainly capable of 'rescuing' the property at that time without assistance."); *see also*, *Int'l Aircraft Recovery, LLC v. Unidentified, Wrecked & Abandoned Aircraft* [*Int'l Aircraft II*], 373 F.3d 1147, 1151 (11th Cir. 2004) (per curiam); *Platoro, Ltd. v. Unidentified Remains of a Vessel, Her Cargo, Apparel, Tackle, & Furniture*, 695 F.2d 893, 901 (5th Cir. 1983) ("A salvage award may be denied if the salvor forces its services on a vessel despite rejection of them by a person with authority over the vessel."); *Lathrop*, *supra*, 817 F. Supp at 964.

The right to refuse salvage applies with particular force when a governmental interest in protecting a historical site is at stake. "Only in a rare case where the governmental owner gives express or implied consent to salvage, should an award be given because *the government has full power to reject or prohibit the services*." Schoenbaum, *supra*, § 16-7 (emphasis added); *accord Int'l Aircraft I*, 218 F.3d at 1262 n.16 (quoting Schoenbaum's passage with approval).

In the *International Aircraft* case, the Eleventh Circuit endorsed and enforced this precise principle to set aside a salvage award against a historic, sunken U.S. Navy World War II aircraft. *Int'l Aircraft I*, 218 F.3d at 1255; *Int'l Aircraft II*, 373 F.3d at 1150-51.

The Eleventh Circuit reasoned that, "[i]n the context of salvage claims pertaining to historic wrecks, numerous courts have held that title holders can prevent salvors from raising long submerged vessels." *Id.* at 1263. Based on this authority, the court held that the salvor "has no right to continue salvage operations over the express objections of the [sunken aircraft]'s owner," the United States. *Id.*; *accord Int'l Aircraft II*, 373 F.3d at 1150-51.[14]

Odyssey likewise had no right to conduct salvage operations on the *Mercedes* over Spain's express refusal. As noted earlier, in February 2004, Spain officially announced to U.S. persons its refusal of salvage of "sunken vessels that were lost while in the service of the Kingdom of Spain" and warned that "salvage or other disturbance of sunken vessels or their contents . . . is not authorized and may not be conducted without express consent by an authorized representative of . . . Spain." 69 Fed. Reg. at 5647. Spain reaffirmed this refusal face-to-face with Odyssey in November 2006, shortly before Odyssey disturbed the site of the *Mercedes*. (Ex. F, ¶¶ 2-7 (de Cabo Decl.).) Odyssey chose to ignore Spain's instructions and may not now be rewarded for doing so.

Because Spain effectively refused salvage of the warship *Mercedes*, Odyssey's claim for a salvage award fails just like the salvage claim of another purported salvor failed in the *Sea Hunt* case. The plaintiff in that case — like Odyssey in this case —

---

[14] Finding that the district court had "under-appreciated the authority of a vessel's owner to prevent others from interfering with its property," the Eleventh Circuit also held that the district court had erred in subjecting an owner's right to refuse salvage to review for whether it had been "prudent" or for whether the owner had made "alternative plans." *Int'l Aircraft I*, 218 F.3d at 1261.

sought a salvage award against the *Juno*, a Spanish Navy Frigate of War lost in 1802 with "at least 413 sailors, soldiers and civilians." *Sea Hunt*, 221 F.3d at 639. Because the purported salvor in *Sea Hunt* had reason to know "before the filing of [its] *in rem* action that Spain might refuse any salvage efforts," and Spain stood squarely behind Spain's refusal by filing a claim in the case, the district court found that the purported salvor was "entitled to no salvage award." *Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, No. 2:98-cv-281, 1999 U.S. Dist. LEXIS 21752, at *7-8, 14 (E.D. Va. June 25, 1999). The treasure hunter was therefore ordered to "refrain from any further salvage efforts" and "to deliver to Spain any artifacts salvaged . . . ." *Id.* at *13-14, *aff'd, Sea Hunt*, 221 F.3d at 647. The same outcome is even more justified in this case, given that Spain expressly refused Odyssey's overture to conduct salvage operations on Spanish ships *before* Odyssey set out to take artifacts from the *Mercedes*.

    *Sea Hunt* also teaches that a salvor may not subvert the ship owner's right of refusal by claiming ignorance of the source of the artifacts it seeks to recover. In *Sea Hunt*, the salvor "[claimed that] it is impossible to determine if a particular artifact belongs to JUNO without first salvaging the artifact," *id*. at *10, just as Odyssey has suggested in this case that it did not know that it was taking artifacts from the *Mercedes*. The district court in *Sea Hunt* held that "[t]o allow an award for artifacts recovered under [this] reasoning would provide an incentive for a salvor to purposefully conduct salvage operations despite the owner's refusal. Furthermore, in a treasure salvage case, it could encourage potential salvors to intentionally remain ignorant of the ownership of a

wrecked vessel in order to maintain salvage rights.  This is certainly not in harmony with the purposes of salvage law."  *Id*. at *12-13, *aff'd,* 221 F.3d at 647.

Spain's authority to forbid unauthorized disturbance of a sunken vessel that represents a pivotal event in Spanish history and to protect the submerged gravesite of its personnel is binding as against Odyssey and should be respected by this Court.

### 2. *Odyssey Has Disqualified Itself From Any Salvage Award.*

Because there is no inherent right to salvage and the owner holds title to the vessel, a salvor seeking an award is held to an exacting standard of conduct not only in its salvage operations, but also in proceedings seeking an award.  A salvor is held to the standard of a trustee of the property.  *R.M.S. Titanic, Inc. v. Wrecked and Abandoned Vessel,* 435 F.3d 521, 532 (4th Cir. 2006).  As such, any claim by the salvor is subordinate to the rights of the owner of the vessel.  *Sea Hunt*, 1999 U.S. Dist. LEXIS 21752, at *10; *see Lathrop*, 817 F. Supp. at 964 ("[A] salvor acts as an agent for a vessel's owner."); *Jupiter Wreck*, 691 F. Supp. at 1389.  Admiralty courts must therefore be:

> vigilant in protecting mariners from unscrupulous
> and dishonest salvors.  '[T]he law cannot tolerate
> [a] salvor['s] dishonesty, corruption, fraud,
> falsehood, either in rendering service, or in their
> proceedings to recover the salvage.

*Adams v. Unione Mediterranea di Sicurta*, 220 F.3d. 659, 676 (5th Cir. 2000) (citations omitted); *see Lathrop*, 817 F. Supp at 963 ("[A] salvor must acquire possession *lawfully* . . . [or] 'buccaneering would again flourish on the high seas.'") (emphasis in original); *see also* Salvage Convention art. 18, S. Treaty Doc. No. 102-12, at 11 (providing that a

salvor may be denied an award for "dishonest conduct" or other misbehavior); 3A

Benedict on Admiralty § 98 (noting that admiralty law "requires on the part of the salvors

the most scrupulous fidelity, utmost honesty, good faith and uprightness of conduct.").

Odyssey has manifestly failed to live up to these standards. Despite Spain's clear

non-abandonment of its vessels and refusal of salvage, Odyssey covertly stripped the

*Mercedes* of coins and other valuables, and has failed to disclose even basic information

about the shipwreck. Confronted with interrogatories propounded by the Court, Odyssey

dissembled, going so far as to represent that there is an "absence of a vessel" at the site

and that, for all Odyssey knew, it had stumbled across "jettisoned cargo." (Pls.' Answers

to Ct. Interrogs. 4 (Apr. 11, 2008) (Dkt. 105).) Odyssey made these representations even

though it specifically targeted the *Mercedes* and its own photographs and videotapes, and

the coins it retrieved, make plain that the site is that of the *Mercedes*.[15] Willful ignorance

and misrepresentations should not be encouraged by granting a salvage award in this

case.

**CONCLUSION**

For the foregoing reasons, Spain respectfully requests that the Court dismiss

plaintiff's remaining claims against the Defendant *res*, vacate the arrest issued on April 7,

---

[15]     Odyssey's misrepresentations in its Interrogatory Answers were not alone. In papers that this Court found to be "disingenuous and utterly without merit," Odyssey represented that its Interrogatory Answers that "professed uncertainty as to the identity of the vessel" should be given the same confidentiality treatment as the Coca-Cola formula, while at the same time Odyssey leaked its answers to the Spanish press. (Pls.' Mot. for Protective Order (Apr. 11, 2008) (Dkt. 99); Claimant's Emergency Resp. to Mot. for Protective Order (Apr. 14, 2008) (Dkt. 100); Order (Apr. 17, 2008) (Dkt. 104).)

2007 (Dkt. 5), withdraw Odyssey's designation as substitute custodian (Dkt. 8), and direct that the artifacts in Odyssey's custody be promptly returned to the custody of Spain.

Respectfully submitted on September 22, 2008,

s/ James A. Goold
James A. Goold
District of Columbia Bar # 430315
Covington & Burling LLP
1201 Pennsylvania Ave., NW
Washington, DC 20004
Telephone: (202) 662-5507
Fax: (202) 662-6291
E-mail: jgoold@cov.com

David C. Banker
Florida Bar # 352977
Bush Ross, PA
220 S. Franklin Street
P.O. Box 3913
Tampa, Florida 33601-3913
Telephone: (813) 224-9255
Fax: (813) 223-9255
E-mail: dbanker@bushross.com

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Motion to Dismiss or for Summary Judgment to be served on counsel of record for Plaintiff Odyssey Marine Exploration, Inc. and for Conditional Claimant Republic of Peru by filing with the Court via its CM/ECF system.

s/ James A. Goold
James A. Goold
District of Colombia Bar 430315
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Telephone:  (202) 662-5507
Fax:  (202) 662-6291
E-mail:  jgoold@cov.com