UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
IN ADMIRALTY

ODYSSEY MARINE EXPLORATION, INC.    :
                                    :
          Plaintiff,                :    CIVIL ACTION
                                    :
     v.                             :
                                    : Case No: 8:07-CV-00614-SDM-MAP
THE UNIDENTIFIED, SHIPWRECKED VESSEL,:
if any, its apparel, tackle, appurtenances and   :
cargo located within a five mile radius of the   :
center point coordinates provided to the Court   :
under seal,                         :
                                    :
          Defendant;                :
          *in rem*                  :
and                                 :
                                    :
The Kingdom of Spain and the Republic of Peru,   :
                                    :
          Claimants,                :
and                                 :
                                    :
(Gonzalo de Aliaga (the Count of San Juan   :
de Lurigancho), et. al.             :
                                    :
          Claimants.                :
_____/  :

## PLAINTIFF, ODYSSEY MARINE EXPLORATION, INC.'S RESPONSE TO CLAIMANT, KINGDOM OF SPAIN'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

COMES NOW the Plaintiff, Odyssey Marine Exploration, Inc. ("Odyssey"), and files

this, its Response to Claimant, Kingdom of Spain's ("Spain"), Motion to Dismiss or for

Summary Judgment and in support thereof states as follows:

Dockets.Justia.com

This Honorable Court has jurisdiction to hear this case and jurisdiction over the Defendant in this case. Therefore, Spain's Motion to Dismiss must be denied. Neither the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602 *et seq*, nor any other treaties or statutes will apply to defeat this Court's jurisdiction. The FSIA requires a claimant, here Spain, to bear the ultimate burden to prove that sovereign immunity exists and that no exception applies. Given the unsettled evidence surrounding, among other critical matters, the existence of any sovereign vessel at the site and the origin and ownership of the recovered coins, and necessarily construing those facts in favor of the non-moving party, Spain has failed to meet its burden. The record at least warrants further factual inquiry by the Court, including jurisdictional discovery as appropriate. Even if FSIA Section 1609 had any proper application here, which it does not, FSIA Section 1605(b) still permits this Court to conduct *in rem* proceedings to adjudicate the parties' respective rights to the *res* in this case, where Spain (as the claimant) seeks title to artifacts in Odyssey's actual possession.

The Defendant in this case is comprised of a site in the Atlantic Ocean which, at the time it was discovered by Odyssey, consisted mostly of piles of coins lying on the ocean floor, as well as the recovered coins that were properly brought into this Court's jurisdiction. Although Odyssey continues to investigate its hypothesis that various items at the site may have come from the *Nuestra Senora de las Mercedes* (the "*Mercedes*"), there is no conclusive evidence which verifies the identity of a vessel related to the site. In fact, there is evidence which suggests that the related vessel may not be the *Mercedes*. (*See* Reports of Sean Kingsley and James Sinclair attached hereto as Exhibits A and B.) There is no coherent vessel at the site, and the Defendant *res* in this case is **not** one and the same as the *Mercedes*.

Even if this Court were to determine that the Defendant Site contains parts of what once was the *Mercedes*, and that the cargo recovered from the site originated from the *Mercedes*, there would be no legal basis for dismissal of the case. First, the *Mercedes* was not a sovereign immune vessel. The *Mercedes*, while government-owned, was not on exclusively noncommercial service at the time of its sinking. In fact, the *Mercedes* set sail at a time of peace on a voyage that was predominantly for the carriage of commercial cargo (mostly privately owned merchant goods) and passengers. Moreover, the vast majority of specie carried aboard the *Mercedes* was privately owned commercial cargo that would not itself be subject, in any event, to sovereign immunity.

To the extent Spain's filing is considered a Motion for Summary Judgment, it must likewise be denied as a matter of law because there are many disputed genuine issues of material fact.

## MEMORANDUM OF LAW

## STATEMENT OF RELEVANT FACTS

Odyssey submits that the majority of facts asserted in Spain's Motion to Dismiss are either false or irrelevant to a motion purportedly based upon a lack of jurisdiction primarily under the FSIA. Moreover, as the disputed facts clearly demonstrate, Spain's Motion for Summary Judgment must fail as a matter of law. The true facts are as follows:

Odyssey is the world's leader in deep-ocean shipwreck exploration and recovery. As more fully described in the Affidavit of Gregory Stemm, Odyssey's CEO and Chairman, attached as Exhibit D, Odyssey retains the services of many researchers and consultants to review historical archival documentation for information about various shipwrecks. Spain

attached the declaration of one such researcher, Victoria Stapells Johnson, but mischaracterizes its relevance to this case. (Dkt. 131-17.) Ms. Johnson researched the *Mercedes* as well as other vessels as early as 2005. She also determined that the *Mercedes* was listed on the Spanish Naval Registry. At least five other researchers for Odyssey, however, had determined based on historical research that the *Mercedes* was not on exclusively noncommercial service at the time of its sinking, but instead was predominantly involved in transporting private passengers and merchant cargo. Odyssey thus knew that the *Mercedes,* itself, as well as its cargo in particular would not be entitled to immunity from arrest and salvage. Furthermore, despite Spain's declaration otherwise (Dkt. 131, p. 7), Odyssey knew Spain to have an express interest in locating and recovering vessels which may be of Spanish cultural interest.[1]

In 2006, Odyssey developed the "Amsterdam" project, which involved searching for targets in an area known to be heavily traveled by vessels believed to have been carrying valuable cargo. Odyssey developed a target list of no less than 30 vessels that may have sunk in the Amsterdam area and compiled information it had obtained through research about those vessels. One of the vessels on the Amsterdam project list was the *Mercedes*. Recognizing that Spain may have had a cultural (if not legal) interest in vessels that may be located within the Amsterdam area, Odyssey invited Spain to participate in the project.

---

[1] In 2006, Odyssey was involved in a project regarding another of its discoveries, a site believed to be that of the British warship HMS *Sussex*. Spain was also involved in that project, and the parties worked amicably together toward a plan for recovery which included salvage rights of Odyssey. Odyssey had previously participated in many meetings with Spanish representatives as detailed in the Affidavits of José Luis Goñi and Gregory Stemm, attached hereto as Exhibits C and D, which exhibited Spain's willingness and even enthusiasm for working with Odyssey. Spain never communicated to Odyssey a blanket refusal of salvage of Spanish vessels. In fact, the *Sussex* plan included the appointment by Spain of archaeologists to participate in the project.

Greg Stemm, Odyssey's CEO and Chairman, and Odyssey's counsel in Madrid, José Luis Goñi Etchevers, met with Elisa de Cabo[2] on November 17, 2006. This is the meeting referenced in Ms. de Cabo's declaration, submitted by Spain. Many of the assertions made by Ms. de Cabo and her characterization of the meeting as a whole are false or misleading.

As clearly indicated in the Goñi and Stemm Affidavits, the meeting was cordial in nature and at no time did Ms. de Cabo state or imply that Spain "objected to and refused any salvage or other disturbance by Odyssey with respect to any shipwreck in which the Government of Spain has an interest." Had Ms. de Cabo or any representative of Spain throughout its dealings with Odyssey ever wished to express such a specific declaration in regard to Odyssey's Amsterdam project, it would have been put in writing and officially documented. It never was. Such an objection to Odyssey's efforts would have been contrary to Spain's actions in dealing cooperatively and amicably with Odyssey over the last ten years to locate shipwrecks with a potential Spanish interest. (*See* generally Exhibits C and D.)

In March 2007, when Odyssey's survey vessel was in the Amsterdam area, in the Atlantic Ocean beyond the territorial or contiguous waters of Spain or any other nation, Odyssey's side scan sonar revealed images which to many would resemble normal underwater geology. Odyssey's experts, however, noted a potential distinction worthy of further investigation. Odyssey deployed its sophisticated equipment to get a closer look, revealing not rocks or coral but piles of coins. Initial investigation of the surrounding area showed more piles of coins, but no hull or other identifiable vessel structure. Nevertheless, in

---

[2] Ms. De Cabo was the Assistant Subdirector General for the Protection of Historical Heritage in the Directorate General for the Protection of Fine Arts and Cultural Assets of the Ministry of Culture of the Government of Spain.

adhering to its strict policies of proper archaeology, Odyssey immediately began its predisturbance survey and recovered a bronze block to use for the symbolic arrest of the site. A photomosaic of the site was prepared by slowly and methodically running systematic lines over the site and taking individual photographs which could later be pieced together to depict the entire area's archaeological contexts. Once the pre-disturbance photomosaic was complete, Odyssey's experts were surprised as to what was **not** revealed. No ship existed. No hull. No keel. No intact structure suggesting the presence of a vessel.[3]

Several scattered seemingly "ship-related" objects were visible, as well as a number of cannon. Contrary to assertions made by James Delgado, an archaeologist asked by Spain to prepare an opinion based on review of video and photographs, the cannon were absolutely not indicative of any particular vessel. In fact, cannon bearing the supposedly diagnostic "dolphins" virtually identical to those at the Defendant Site have been found by Odyssey at sites of wrecks which were definitely not Spanish. (*See* Exhibit D attached hereto.)

Upon discovery of the coins, Odyssey immediately initiated legal proceedings in order to protect its rights to the site and to properly bring the matter before this Court.[4] The initial Complaint assumed a "shipwrecked vessel" would be found, but the Amended Verified Complaint identified the Defendant as "the Unidentified Shipwrecked Vessel, **if any**, its apparel, tackle, appurtenances and cargo...." (Dkts. 1 and 21.) The phrase "if any"

---

[3] *See* Kingsley Affidavit, Exhibit A, and attached photomosaic which reveal that the absence of a vessel at the subject site is truly unique.
[4] The Verified Complaint in Admiralty was filed on April 9, 2007. Odyssey completed an initial application for an export license on April 10, 2007. Spain seemingly asserts that these dates somehow reveal deception on Odyssey's part because Odyssey began recovery at the site before receiving the Court's Order Directing the Issuance of a Warrant of Arrest. However, Spain ignores that recovery of an artifact is obviously necessary prior to the arrest, and there is no legal obligation to file anything with the Court prior to recovery. Nevertheless, Odyssey began the procedure to arrest **immediately** upon discovery of the site – including recovering the block which was used to arrest it. (Exhibit D.)

was included because no vessel had been discovered. None has since been located. No vessel or hull was disturbed in any way in Odyssey's recovery of coins and artifacts from the site.

Spain implies that Odyssey knew, but chose not to reveal, the identity of a vessel related to the site, and alleges "covert" activity on the part of Odyssey. (Dkt. 131, p. 34.) These allegations are not only irrelevant to the subject motion but are also utterly unfounded. Odyssey would of course have preferred to announce that it had discovered the *Mercedes* – or whatever identifiable vessel it had located. As responsible archaeologists and as an accountable public corporation, Odyssey had and continues to have an ethical and fiduciary responsibility to confirm the identity of any shipwreck it recovers before announcing the identity to the world. The fact that no vessel was found at the site, combined with other factors suggesting that the site may **not** be related to the *Mercedes*, prevented Odyssey from making such a declaration. (*See* generally Exhibits A & B.) While Odyssey's leading hypothesis is that the recovered cargo came from the *Mercedes*, at the current level of site reconnaissance and study, there is no definitive archaeological evidence and all evidence pointing toward that theory remains circumstantial. (*See* Exhibit A, p. 4.) Responsible archaeologists, and this Court, must reach the same conclusion.

## LEGAL ARGUMENT

Spain's Motion to Dismiss this case, based primarily upon a lack of jurisdiction under the Foreign Sovereign Immunities Act (FSIA), must be denied.

I.     Summary

The United States Supreme Court, as well as the Eleventh Circuit, have ruled that the U.S. District courts do have jurisdiction as regards to any salvaged items, that were not at the

time of the salvage in the actual possession of a foreign government claiming immunity. *California v. Deep Sea Research,* 523 U.S. 491, 118 S.Ct. 1464, 149 L.Ed.2d, 626 (1998), *International Aircraft Recovery LLC v. the Unidentified Wreck and Abandoned Aircraft,* 218 F.3d 1255, 2000 A.M.C. 2345 (11th Cir. 2000). Moreover, the Defendant in this case is not an entity to which sovereign immunity would apply. There is no vessel located at the Defendant Site, and there is insufficient evidence to conclude that the vessel related to the cargo found is the *Mercedes.* Furthermore, the *Mercedes* is not a sovereign immune vessel, and even if it were, the vast majority of the cargo aboard was privately owned and not the property of a foreign sovereign.

II.    Admiralty Jurisdiction Generally

In this case involving an admiralty and maritime claim, this Court has exclusive subject matter jurisdiction pursuant to U.S. Const. art. III, § 2, cl. 1, 28 U.S.C. § 1333, and Rule 9(h) of the Federal Rules of Civil Procedure and Supplemental Admiralty Rules C and D. In addition, the Court has *in personam* jurisdiction over the Plaintiff and constructive *quasi in rem* jurisdiction over the Defendant Site. Claims arising out of salvage operations, including those that occur on the high seas, are unquestionably within the admiralty jurisdiction of the federal courts. *See Treasure Salvors, Inc. v. Unidentified, Wrecked and Defendant Sailing Vessel,* 640 F.2d 560, 566-67 (5th Cir. 1981) (*Treasure Salvors III*).

The FSIA cannot defeat the Court's jurisdiction in this case. As explained further below, Section 1609, which under certain circumstances prevents the arrest of "property in the United States of a foreign state," is inapplicable to the site and coins at issue in this case. 28 U.S.C. § 1609. In any case, even if properly invoked by Spain, Section 1609 is insufficient to

dispose of this case on immunity grounds. Under FSIA Section 1605(b), the Court may preside under *in rem* principles over a foreign state in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state. 28 U.S.C. § 1605; *see MariTrend, Inc. v. M/V Sebes*, 1997 U.S. Dist. LEXIS 23594 (E.D. La. Oct. 16, 1997); *Silver Star Enterprises, Inv. v. Saramacca MV*, F.3d 666, 668 n.1 (5th Cir. 1996).

III.    Standard of Review

When the jurisdictional basis of a claim is intertwined with the merits, the court should apply a summary judgment standard when ruling on a motion to dismiss. That is, there must be an absence of any disputed material fact, and all reasonable inferences must be drawn in favor of the non-moving party. *See Lawrence v. Dunbar*, 919 F.2d 1525 (11th Cir. Fla. 1990), *Williamson v. Tucker*, 645 F2d 404 (5th Cir. 1981), *cert. denied*, 454 U.S. 897; *Shotz v. City of Plantation, Fla.* 344 F.3d 1161 (11th Cir. 2003).

Jurisdiction of this Court is fundamentally a necessary and critical prerequisite to determine the respective interests of the parties involved, including Claimant Spain, to the *res* before the Court. Indeed, Spain recognized as much when it submitted to federal court jurisdiction to adjudicate its ownership rights to two other vessels, albeit on dissimilar facts. *See Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, 47 F. Supp.2d 678, (E.D. Va. 1999), *aff'd in part and rev'd in part*, 221 F.3d 634 (4th Cir. 2000). Facing a motion to dismiss for lack of such jurisdiction, this Court cannot merely accept an assertion of immunity, but rather has the power and duty to closely scrutinize allegations of sovereign immunity, resolve factual disputes, and reach its own jurisdictional conclusion. *See, e.g., The Pesaro*, 255 U.S. 216, 219 (1921); *Malewicz v. City of Amsterdam*, 517 F. Supp. 2d 322, 326

(D.D.C. 2007). When the jurisdictional facts bearing on an FSIA claim are in dispute, the Court should at least afford the parties opportunity to engage in jurisdictional discovery and participate in an evidentiary hearing. *See, e.g., Reiss v. Societe Centrale Du Groupe Des Assurs. Nationales*, 246 F. Supp. 2d 285, 287 (S.D.N.Y. 2003) (citation omitted).

IV.     Burden of Proof for Sovereign Immunity

The "ultimate burden of persuasion" rests with Spain to demonstrate by a preponderance of the evidence the presence, its ownership, and the immunity of both a vessel and the recovered cargo, and that there are no applicable exceptions to immunity which would apply to the vessel or the cargo recovered. *Byrd v. Corporacion Forestal y Indus. de Olancho S.A.*, 182 F.3d 380, 388 (5th Cir. 1999); *Aquamar S.A. v. Del Monte Fresh Produce N.A.*, 179 F.3d 1279, 1289-90 (11th Cir. 1999). Spain's own cases do not suggest otherwise.

Spain incorrectly asserts that it has shown that "the Defendant is a sovereign vessel of Spain." (Dkt. 131, p. 16.) The Defendant in this case, however, is **not** a vessel at all. The Defendant is an underwater site which was composed mostly of piles of coins and the recovered coins and miscellaneous artifacts themselves. Moreover, based on the proportion of privately owned cargo that was known to be on the *Mercedes*, the vast majority of *res* that is within the jurisdiction of the Court – assuming it is from the *Mercedes* at all – was private property that was never owned by the Kingdom of Spain.

Spain is also mistaken that "Odyssey bears the burden to show that an exception to sovereign immunity applies in this case." (Dkt. 131, p. 17.) Indeed, Spain's own cited cases impose that burden on Spain. In *Alberti v. Empresa Nicaraguense de la Carne*, 705 F.2d 250,

255 (7th Cir. 1983),[5] the court emphasized that, to avail itself of immunity under FSIA, the foreign state must produce evidence:

> To establish that a foreign state or one of its subdivisions, agencies or instrumentalities is the defendant in the suit and that the plaintiff's claim relates to a public act of the foreign state – that is, an act not within the exceptions in section 1605-1607. Once the foreign state has produced such prima facie evidence of immunity, the burden of going forward would shift to the plaintiff to produce evidence establishing that the foreign state is not entitled to immunity. **The ultimate burden of proving immunity would rest with the foreign state.**

(Emphasis added.) Similarly, *Jet Line Services, Inc. v. M/V Marsa El Hariga* 462 F. Supp. 1165, 1172 (D. Md. 1978) and *Kelly v. Syria Petroleum Dev. B.V.*, 213 F.3d 841, 847 (5th Cir. 2000), clearly considered that the entities (corporations) were "organs" of foreign governments. The factual scenarios were vastly different than the one before this Court where no foreign "entity" exists and where there is certainly no organ of the state within the actual possession and control of a foreign sovereign. Furthermore, in *Jet Line Services*, the plaintiff failed to produce evidence to contest immunity. 462 F. Supp. at 1172.

Here, even assuming that Spain has provided prima facie evidence of immunity, Odyssey has presented countervailing evidence including, *inter alia*, archaeological reports which reveal that there is no coherent vessel at the Defendant Site and historical reports showing that the *Mercedes* was on a commercial mission (and thus not sovereign immune), and that the cargo aboard was predominantly private merchant cargo which was **not** the property of Spain. Given this evidence presented by Odyssey, the "ultimate burden" of proof of sovereign immunity shifts back to Spain. It is a burden which cannot be met.

---

[5] To the extent that the *Alberti* court found no jurisdiction, the ruling and its basis are inapplicable in the instant case because in *Alberti* there was no dispute as to whether the defendant foreign state (Nicaragua) or the defendant nationalized corporation (ENCAR) were to be treated as foreign states under the FSIA. *See id.* at 253, 256.

V.    Application of the FSIA will not defeat jurisdiction in this case.

Spain's Motion to Dismiss is based on the FSIA and related international law. Spain does not argue that there is no jurisdiction over the Kingdom of Spain as a Claimant. Rather, the Motion to Dismiss is based simply on §§ 1609-1611 of the FSIA. Section 1609 of the FSIA states:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act, the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.

In citing the statute, Spain deceptively omits the language making that provision applicable only to "property in the United States of a foreign state." First, it is undisputed that the Defendant Site is not located in the United States. Second, with respect to the coins and artifacts that have been brought into the Court's jurisdiction for proper adjudication, Spain has made no showing that cargo associated with the *Mercedes* is "the property of" Spain. The Court must assume jurisdiction over these artifacts to determine the rights of the parties involved, including other Claimants who have claimed an interest in the recovered property.

Spain notably does not assert its own immunity from suit under FSIA Section 1604. Indeed, such a position would be foreclosed by FSIA Section 1605(b), which provides that "a foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of a foreign state." 28 U.S.C. § 1605(b). In such a case, "the suit to enforce the maritime lien shall thereafter proceed and shall be heard and determined according to the principles of law and rules of practice of suits *in rem* whenever it appears that, had the vessel been privately

owned and possessed, a suit *in rem* might have been maintained." 28 U.S.C. § 1605(c).[6]

This case clearly involves Odyssey's attempt to enforce a lien (under the law of salvage) or property interest (under the law of finds) against the property it has recovered. Should the Court find that the site does include a "vessel," the admiralty lien sought against that vessel would fall under this exception as well. Should the Court determine that enough evidence exists to prove that the cargo recovered came from the *Mercedes*, the cargo, had it been privately owned and possessed, would be subject to a maritime lien for salvage, a lien enforceable under its very terms under the FSIA.

Moreover, if the Court determines that the cargo recovered came from the *Mercedes*, the facts show that the cargo was overwhelmingly commercial in nature and its transport was indisputably a commercial activity of Spain. (*See* Affidavits of Rodney Carlisle and William Flayhart attached hereto as Exhibits E and F.) Thus, the Court has jurisdiction under FSIA Section 1605(b) and (c) to, at the very least, maintain a proceeding against Spain for the *res*.[7]

VI.     There is no "vessel."

In this case, there is no vessel and thus no instrumentality or "organ" of a state. As noted in the attached affidavits (Exhibits A, B and D), there is no cohesive vessel at the Defendant Site, not even a hull or identifiable structure  As such, there is no sovereign entity to which sovereign immunity could possibly attach to defeat jurisdiction under the FSIA.

---

[6] Under 28 U.S.C. § 1605(b)(1), where there is more than a colorable issue of a foreign sovereign's claim to a vessel, courts have permitted the use of the *in rem* arrest procedure, without penalty. See *Oceanic Marine Supply Inc. v. M/T EL AGAMI*, 1981 A.M.C. 2636 (S.D. Tex. 1980); *Velidor v. L/P/G BENGHAZI*, 653 F.2d 812, 815 (3d Cir. 1981); *Entron, Ltd. v. Crane Vessel TITAN 5*, 1996 AMC 1463 (W.D. La. 1995), aff'd, 70 F.3d 1269 (5th Cir. 1995).

[7] The commercial nature of the cargo itself makes section 1605(b) applicable as an exception to immunity, and the commercial nature of Odyssey's interest in the cargo, as well as the overall commercial enterprise involved with the salvage of the cargo, will apply under section 1609 as an exception to immunity under FSIA.

The "picture" or photomosaic of the site (Exhibit A, Annex 2.1) reveals that no "vessel" exists. Odyssey and its experts in shipwreck exploration have seen and explored hundreds of shipwrecks throughout the world. As noted in the expert archaeologist reports attached hereto, the Defendant Site is very distinguishable from other shipwreck sites, the most obvious basis being the absence of a vessel. James Delgado, Spain's archaeologist, attaches to his report photographs and images from the site that in fact yield no vessel. Out of thousands of images and hours of video available to Spain, the images presented to the Court by Spain and its experts show nothing more than unidentifiable concretions and mostly unidentifiable objects. Although there are items which appear to be pieces of a vessel, it is absolutely unclear as to whether those pieces are from one vessel or from several, and those pieces contain no markings or other conclusively identifying information. Delgado references "hull remains" but concedes that "the exposed remains of the hull do not represent the intact hull of the vessel." (Dkt. 131-9, p. 22.) In fact, the "remains" referenced by Delgado are nothing more than various objects scattered about an area which may or may not be from any one identifiable vessel. (*See* Exhibit A.)

The absence of a vessel is legally significant because Spain cannot claim ownership or possession of something that does not exist. For FSIA purposes, it is clear that the instrumentality of the foreign sovereign must be actually owned and possessed by the sovereign. Spain focuses its argument solely on the assertion that the Defendant Site is one and the same as the *Mercedes*, but has presented no compelling evidence regarding its ownership rights of the coins and artifacts brought before this Court.

Moreover, Spain would have no ownership rights under Spanish law, which holds

that when property ceases to exist, all rights to that property also terminate. *See* Report of Victor Fuentes Camacho and José Goñi Etchevers attached as Exhibit G. Consequently, under Spanish Law, the Kingdom of Spain would not retain ownership rights, even if the property at issue could have been proven to belong to Spain at some point in history.

Spain's motion to dismiss under the FSIA cannot succeed because Spain can neither prove, nor have they even alleged, that they had actual possession over the *res* at the time of these arrest proceedings. The U.S. Supreme Court ruled in 1998 that the principles of sovereign immunity do not bar federal court jurisdiction in admiralty matters where the sovereign asserting a claim to the property in an *in rem* action is not in actual possession of the *res*. *California v. Deep Sea Research*, 523 U.S. 491, 118 S.Ct. 1464, 149 L.Ed.2d, 626 (1998). In *Deep Sea Research* the court cited *the Pesaro*, 255 U.S. 216, 219 (1921), for the proposition that mere ownership of a vessel by a sovereign does not make the vessel immune from arrest. Immunity is based not only on ownership but also on <u>actual</u> possession, which in the *Pesaro* required that the foreign government operate the vessel, as well as own it. [8] Previously, in the case of *the Davis*, 10 Wall. 15, 77 U.S. 15, 19 L.Ed. 875 (1869), the Supreme Court considered the status of a U.S. vessel. It stated that an *in rem* proceeding would only be stopped if the United States was in <u>actual</u> possession of the vessel at the time of the arrest. This doctrine has been adopted by the Southern District of Florida and the

---

[8] The Supreme Court's reference to *The Pesaro* was significant because, in later proceedings, the Court ruled that a foreign sovereign's vessels are immune in admiralty proceedings only if they are "owned and operated by a foreign government. . . ." 271 U.S. at 576. This observation was elaborated in the Supreme Court's holding in *The Navemar*, 303 U.S. 68 (1938), which involved a vessel under claim by the Spanish government. In denying Spain's claim to foreign sovereign immunity, the Court held that "actual possession by some act of physical dominion or control in behalf of the Spanish government was needful . . . or at least some recognition on the part of the ship's officers that they were controlling the vessel and crew in behalf of their government." *Id.* at 75-76 (citations omitted); *see also Republic of Mexico v. Hoffman*, 324 U.S. 30, 38 (1945).

Eleventh Circuit in the *International Aircraft* case. It is respectfully submitted that this Court is bound by the Eleventh Circuit and the holding in the *International Aircraft* case, and therefore, Spain's motion must be denied.

VII.    Insufficient evidence to identify a related vessel.

If the Court finds, despite all evidence to the contrary, that a vessel does exist at the Defendant Site, there is still insufficient evidence and no preponderance of evidence to determine that the vessel is the *Mercedes*. As indicated in the attached Affidavits of Kingsley and Sinclair, there are many inaccuracies and faulty presumptions in the reports filed by Spain that conclude otherwise. For example, and as already noted, Spain's expert incredibly asserts that the cannon at the site adorned with the two "dolphins" identifies the vessel as the *Mercedes*. There is nothing about the presence of this cannon or any other item from the site however, that proves it came from the *Mercedes*. (*See* Exhibits A and B.)

Similarly, the fact that Odyssey has recovered approximately 600,000 coins from the site cannot be used to "prove" the site is that of the *Mercedes*. In fact, there were at least 900,000 (and perhaps as many as 1,200,000) coins on the *Mercedes*, so the number is not consistent. Also, as indicated in the reports attached (Affidavits of Carol Tedesco and Chris Tsokos, Exhibits H and I), and despite the opinion of Spain's coin analyst, Carmen Marcos Alonso (Dkt. 131-18) (who by her own admission examined less than one tenth of one percent of the coins recovered), nothing about the coins conclusively links them to the *Mercedes* or distinguishes them from coins that would have been carried aboard any other ship of the period.

Spain also ignores the key fact that in 1997 Claudio Bonifacio, a noted shipwreck

explorer, concluded that a wreck found off the coast of Portugal in 1982 was the *Mercedes.* (Exhibit A, p. 61.) Other evidence also points to that site being much more likely the *Mercedes.* For example, it was noted in the journal of Diego de Alvear y Ponce de Leon, a noted surveyor and cartographer, (who witnessed the *Mercedes'* demise from a companion ship) that land could be seen from the place the vessel exploded. In fact, a drawing was prepared based upon Diego de Alvear's description which is remarkably similar to the horizon and land masses as seen from the Bonifacio site. (Exhibit A, Annex 22.2.) No land can be seen from the site where Odyssey recovered the coins in this case, much less the detail of mountains and hills in Alvear's drawing. *See* affidavit of Greg Stemm attached as Exhibit D.

The danger of adjudicating the rights to shipwrecks without conclusive information to identify the wrecks in question is underscored by *Sea Hunt*, 47 F. Supp.2d at 685-88, upon which Spain relies (and which is distinguished below). In *Sea Hunt*, the parties stipulated to the identity of the vessels at issue as the *Juno* and *La Galga*. The Court adjudicated the rights of the parties based upon that stipulation despite the absence of clear evidence as to their identity. Now, extensive research has revealed that it is likely the sites in question are not the *Juno* or *La Galga*. *See* affidavits of John Amrhein (Exhibit J) and James Sinclair (Exhibit B, p. 8). If the Defendant Site in this case is **not** that of the *Mercedes*, and the *Mercedes* is ultimately recovered by another salvor, Odyssey would have no adequate remedy to reopen this case. Moreover, any other salvor may be bound by the ruling of this Court without having had the opportunity to participate in any way in the proceeding. This is a key reason why the ultimate burden of proof must be on the claimant. In this case, Spain cannot meet the burden of proof to conclusively identify the Defendant Site as the *Mercedes*.

VIII.   <u>Sovereign immunity of vessels under the FSIA and related treaties.</u>

Even if Spain could show the presence of the *Mercedes* or any other vessel at the Defendant Site, it does not follow that sovereign immunity should apply.  Spain argues that the *Mercedes* would be entitled to sovereign immunity as a "warship" under the FSIA and cites several cases in which warships were found to be sovereign immune vessels.  These cases are inapposite for two critical reasons.  First, none of those cases involved shipwreck sites in which no vessel has been recovered or the identity of the vessel has not been proven or stipulated.  Second, the *Mercedes* does not meet the criteria under U.S. and international law for immunity as a sovereign vessel, which is limited to vessels on exclusively non-commercial missions.  The distinction between a state vessel's use for public and military missions, as opposed to private and commercial purposes, is well-established in U.S. law and practice. *See Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 711, 712 (1976) (App. 2 to opinion of the Court). *See also id.* at 700 (indicating historic reasons why U.S. courts have refused to give immunities to "State-owned commercial ships").  As described below, the *Mercedes* is likewise not entitled to such immunity.

Spain's FSIA analysis in this regard is faulty.  As noted above, 28 U.S.C. § 1609, upon which Spain exclusively relies, only prevents the arrest of property of a foreign state physically in the United States.  Because the Defendant Site is outside the United States and Spain has not shown its ownership or actual possession of the legally distinct recovered cargo, Section 1609 does not apply. *See Borgships Inc. v. The M/V Marcarena*, 1993 U.S. Dist. Lexis 14127 (E.D. La. Oct. 4, 1993).  Moreover, even if it did apply, Section 1609 would afford Spain only limited protection given that suit against the *res* could still be

maintained under Section 1605. 28 U.S.C. §§ 1605(b), (c).

It should also be noted that section 1609 states that it is "[s]ubject to existing international agreements to which the United States is a party at the time of the enactment of this Act." Thus, an application of section 1609 would require an analysis of relevant agreements and treaties. Such an analysis reveals that only vessels on exclusively noncommercial missions will be subject to sovereign immunity.

Spain cites the Treaty of Friendship and General Relations, U.S.-Sp., July 3, 1902, 33 Stat. 2105, Bevans 628 ["1902 FCN Treaty"]. Article X provides in full:

> In cases of shipwreck, damages at sea, or forced putting in, each party shall afford to the vessels of the other, whether belonging to the State or to individuals, the same assistance and protection and the same immunities which would have been granted to its own vessels in similar cases.

The 1902 FCN Treaty does not apply, however, in litigation concerning the wreck of a Spanish ship not situated in United States waters. First, the geographic scope of Article X is limited to "all territory under the sovereignty of the United States."[9] Second, the substantive scope of protection provided by article X is limited by its very terms to "vessels" of the other party. As discussed above, in the case of the Defendant Site, there is no "vessel" that is capable of being protected under this obligation.

Even if the 1902 treaty did apply, it would not impose an obligation on the United States to protect the immunity of the Defendant Site from Odyssey's claims. Under that treaty, the *Mercedes* would only be subject to immunity to the extent that a U.S. vessel "in

---

[9] The geographic scope of the FCN Treaty is discussed in detail in the diplomatic communications accompanying transmittal of the treaty. *Message from the President of the United States, transmitting A Treaty of Friendship and General Relations Between the United States and the Kingdom of Spain, Signed at Madrid on July 3, 1902*, S. Exec. Doc. F, 57-2 (December 4, 1902). These communications are binding upon the parties as a contemporaneous expression of their mutual understanding of the treaty.

similar cases" would be subject to immunity under U.S. law. On this score, Spain tries to bring this case within the scope of the Fourth Circuit's decision in *Sea Hunt*. Even if that case were relevant here (which it is not, as discussed further below), a new statutory development since the *Sea Hunt* case clarifies the immunities of U.S. sovereign vessels from claims of ownership and salvage. That is the Sunken Military Craft Act (SMCA), Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, div. A, tit. XIV, 118 Stat. 2094 (passed Oct. 8, 2004) (signed into law Oct. 28, 2004) (codified at 10 U.S.C.A. § 113 notes). The statute's definition of a "sunken military craft" – entitled to sovereign immunity, a presumption of express abandonment, and the ability to deny salvage – is stated as "any sunken warship, naval auxiliary, or other vessel that was owned or operated by a government *on military noncommercial service when it sank.*" *Id.* § 1408(3)(A) (emphasis added). The SMCA expressly incorporates principles of international law into its terms.[10]

The international law sources incorporated by law into the SMCA also confirm that the immunity claimed by Spain under U.S. law does not extend to vessels that were not on "military noncommercial service" at the time of sinking and certainly not to vessels on voyages that were predominantly commercial in nature. The Geneva Convention on the High Seas ("Geneva Convention"), Apr. 27, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 82, to which both Spain and the United States are parties and which predated the 1976 FSIA, clearly provides that a "warship" means "a ship belonging to the naval forces of a State and

---

[10] See *Id.* § 1406(b) ("This title and any regulations implementing this title shall be applied in accordance with generally recognized principles of international law and in accordance with the treaties, conventions, and other agreements to which the United States is a party.").

bearing the external marks distinguishing warships of its nationality, under the command of an officer duly commissioned by the government and whose name appears in the Navy List, and manned by a crew who are *under regular naval discipline*." *Id.* art. 8(2) (emphasis added). Additionally, article 9 of the Geneva Convention provides that "[s]hips owned or operated by a State and used *only on government non-commercial service* shall, on the high seas, have complete immunity from the jurisdiction of any State other than the flag State." *Id.* art. 9 (emphasis added). These provisions are recognized by the United States as reflecting customary international law. They are included verbatim into the correlating provisions of the 1982 U.N. Convention on the Law of the Sea, Dec. 10, 1982, 1833 U.N.T.S. 3 (entered into force on Nov. 16, 1994), which has been ratified by Spain but only signed (and not yet ratified) by the United States. *See id.* arts. 29, 95 & 96.

Additionally, both Spain and the United States are parties to the International Convention on Salvage, Apr. 28, 1989, S. Treaty Doc. No. 102-12, 1953 U.N.T.S. 165. Article 4(1) of this instrument links sovereign immunity to *"warships or other non-commercial vessels"* (emphasis added). (Spain's Motion cites this agreement but curiously omits the italicized language.) The 2001 UNESCO Convention on the Protection of Underwater Cultural Heritage, 41 I.L.M. 40 (2002), to which Spain is a party (but the United States is not), defines "state vessels and aircraft," subject to special treatment under the Convention, as "warships, and other vessels . . . that were owned or operated by a State and used, at the time of sinking, *only for government non-commercial purposes*, [and] that are identified as such . . . ." *Id.* at art. 1(8) (emphasis added).

Lastly, there is the Brussels Convention for the Unification of Certain Rules Concerning the Immunity of State-Owned Ships (Brussels Convention), Apr. 10, 1926, 176 L.N.T.S. 199, and its Additional Protocol of May 24, 1934, 176 L.N.T.S. 1934, 26 Am. J. Int'l L. Supp. 566 (1932), to which Spain is a signatory and which may be regarded as evidence of customary international law, and thus relevant within the ambit of sources mentioned in SMCA section 1406(b). Article 1 of the 1926 Brussels Convention provides:

> Sea-going ships owned or operated by States, cargoes owned by them, and cargoes and passengers carried on State-owned ships, as well as the States which own or operate such ships and own such cargoes shall be subject, as regards claims in respect of the operation of such ships or in respect of the carriage of such cargoes, to the same rules of liability and the same obligations as those applicable in the case of privately-owned ships, cargoes and equipment.

*Id.* art 1. This provision does not apply to "ships of war, State-owned yachts, patrol vessels, hospital ships, fleet auxiliaries, supply ships and other vessels owned or operated by a State *and employed exclusively at the time when the cause of action arises on Government and non-commercial service.*" *Id.* art. 3(1) (emphasis added). But, according to the Brussels Convention, even if a ship falls into this category, and there is a "claim[] in respect of salvage," "the State shall not be entitled to rely upon any immunity as a defense." *Id.* art. 3(1). Moreover, "[t]he same rules shall apply to State-owned cargoes carried on board any of the above-mentioned [classes of] ships." *Id.* art. 3(2).[11]

Compilations of U.S. practice in international law also confirm the crucial distinction between "sunken warships and military cargo," on the one hand, and "merchant vessels and

---

[11] This provision of the 1926 Brussels Convention was specifically endorsed by the U.S. State Department, U.S. Navy Judge Advocate General (JAG) Office and Department of Defense General Counsel's office. *See* DIGEST OF UNITED STATES PRACTICE IN INTERNATIONAL LAW 1980, at 1003 (Marian Nash Leich, ed., 1981).

private cargo" on the other. DIGEST OF UNITED STATES PRACTICE IN INTERNATIONAL LAW 1980, at 999 (Marian Nash Leich, ed., 1981) (Dec. 30, 1980 letter from James H. Michel, Deputy Legal Adviser, U.S. Department of State). For example, a memorandum prepared by the Office of the Legal Adviser of the U.S. Department of State dated July 13, 1989, and reprinted in DIGEST OF U.S. PRACTICE IN INTERNATIONAL LAW (1989-90), analyzed the immunities of the Uruguayan state vessel, The *Presidente Rivera*. The *Presidente Rivera* was an "auxiliary ship of the Uruguayan Navy, one of its two oil tankers that operate under charter to the state-owned oil company (ANCAP)." *Id.* at 1. The State Department concluded that the *Presidente Rivera* was not "entitled to the sovereign immunity of a warship or other ship owned or operated by a State and used, for the time being, only on government non-commercial purposes. . . ." *Id.* Because the *Presidente Rivera*'s cargo of oil was destined for commercial customers in the United States, the Department concluded that it was "clearly a government tanker, on commercial service," and not entitled to immunity. *Id* at 3.

IX.    <u>The Mercedes was not a sovereign immune vessel.</u>

Applying the above applicable legal standards to the factual record in this case, including the FSIA, SMCA sections 1408(3)(A) and 1406(b), the 1902 FCN Treaty between the United States and Spain, and all relevant principles of international law, the *Mercedes* was not on exclusively noncommercial service at the time of its loss and hence was not a vessel entitled to sovereign immunity. Instead, the *Mercedes* was predominantly serving as a commercial transport vessel for merchant goods and passengers at the time she was lost.

Spain incorrectly translates various terms to suggest that the *Mercedes* was entitled to sovereign immunity. Although the vessel was classified as a "frigate," that term did not

necessarily connote a man-of war; in Spanish nomenclature it referred merely to the general design of the ship. (*See* Exhibit F, p 8.) Some Spanish frigates were actually in commercial service; indeed, the *Mercedes* was sometimes referred to as a "fragata" (and not consistently as a "fragata de guerra"), and (at least on one occasion) as a "navio de correos" (mail ship). (*See* Exhibit F p.8.) Spain incorrectly translates "navio" in many of the documents attached to its motion to mean "warship," when in fact, the term is properly translated simply as "vessel." Furthermore, Spain deemphasizes the nature of the private, commercial goods by mistranslating the terms "merchant" or "goods" as "particulars." (*See* Exhibit E, p. 6, footnote 6.)

More importantly, the historical analysis provided by Spain leaves out many critical elements, including most significantly the fact that the *Mercedes* was carrying predominantly privately owned merchant cargo as well as paying passengers. The archival documentation and evidence of the Mercedes' commercial nature are discussed in detail in the reports of expert historians Carlisle and Flayhart attached hereto as Exhibits E and F. For example, research indicates that the *Mercedes* was in service for the Correos Maritimos under the authority of the Ministry of the State, **not** the Spanish Navy. Thus, she was not sailing "under regular naval discipline." See 1958 Geneva Convention, supra, art. 8(2). Indeed, the Spanish government had made special provisions to address criminal charges or civil litigation against vessels or persons operating on behalf of the Correos Maritimos, demonstrating that even under contemporaneous Spanish law, ships on this service such as the *Mercedes* were not entitled to the legal immunities of a warship.

In addition, the *Mercedes* was armed merely in a defensive mode (as nearly all merchant ships of the period were) and even the gun deck had been reconfigured to accommodate passengers. *See* Exhibit F, pp. 8-9. The *Mercedes* was also sailing at a time of peace. The incident of October 5, 1804, was not a naval battle between two warring nations, but a tragic incident that resulted from the Spanish refusal to submit to a request to follow the English squadron back to England. At the time, Spain vehemently declared that the two countries were not at war. The incident served as the basis for Spain's declaration of war against England in December 1804 which came **after** the *Mercedes* was lost. This is conceded in Spain's motion. (Dkt. 131, p. 7.) Spain's assertion elsewhere that Spain or the *Mercedes* was at war is completely contrary to its own historical position.

X.  Salvage rights to a sovereign vessel will still exist when the salvor has not determined ownership.

Even if a court were to hold that a vessel exists at the Defendant Site, that the vessel is the *Mercedes*, and that the *Mercedes* (or even part of its cargo) constitutes the sovereign property of Spain, such a finding would not dispose of this case because Odyssey would still be entitled to a salvage award under maritime law. Odyssey had not determined (and still has not determined) the ownership of the cargo recovered. In *Tidewater Salvage, Inc. v. Weyerhauser Co.*, the Ninth Circuit considered a series of claims relating to salvaged logs that had floated away from a lumber plant. *Id.* at 1305-06. Despite the fact that the lumber company had explicitly rejected all salvage offers relating to the logs, the Ninth Circuit awarded a salvage company an award for the salvage of logs found in the water. *Id.* at 1307. The holding was based on the fact that a contrary decision would "discourage salvage as to

all floating logs; [because] not until a given log was taken aboard could the salvor, as a practical matter, determine the ownership and know that, as to that log, assistance had been refused." *Id.* The Ninth Circuit squarely addressed the question of whether an owner could refuse salvage services:

> A refusal of assistance, whether blanket or otherwise, is not completed, however, until the salvor, acting as a reasonable person, has determined, or could determine, the ownership of the object of salvage. *Id.*

Similarly with respect to Section 1605(b) of the FSIA, the court in *Coastal Cargo Co. v. M/V Gustav Sule*, 942 F. Supp 1082 (E.D. La. 1996), restricted damages under that section finding that the *in rem* plaintiff could not have been aware of the sovereign character of the cargo he was arresting.

XI.   Separation of vessel and cargo.

As stated, section 1609 of the FSIA applies only to property within the United States. The Defendant Site is not within the United States.  To the extent that Spain argues that the coins recovered enjoy sovereign immunity by virtue of the fact that they were allegedly aboard a vessel which was immune, the argument fails for two reasons.  First, the *Mercedes,* even if present at the Defendant Site, was not a sovereign immune vessel.  Second, Spain appears to mistakenly assume that privately owned cargo aboard a sovereign vessel is likewise sovereign immune and not subject to salvage, when that status in fact applies only to "property of a foreign state." Private cargo, even on a sovereign vessel, is not sovereign property and is subject to salvage, and a party may only refuse salvage for its own property.

In *Borgships*, the court had held that the Companie Transatlantica Espanola, S.A. ("CTE") by virtue of a demise charter was the owner *pro hac vice* of the vessel, the

*Marcarena*, and, as property of CTE, the vessel was immune from seizure. *See* 1993 U.S.

Dist. Lexis 14127 at 8. The Plaintiffs moved the court to reconsider the order with respect to

the cargo aboard the *Marcarena*. The court held that nothing in section 1609 of the FSIA

provided immunity to property not belonging to a foreign state but carried aboard a vessel

belonging to that foreign state:

> . . . Section 1609 affords immunity from prejudgment attachment only to the property of a foreign state and claimants have failed to provide any authority for the proposition that property not belonging to a foreign state but carried aboard a vessel belonging to a foreign state is immune from seizure. 28 U.S.C. § 1609. The Court finds no basis in the FSIA for holding that the cargo was immune from seizure.

*Id.*

Under the *Borgships* analysis, even assuming that the cargo recovered in this case

originated from the *Mercedes*, Spain's blanket claim of sovereign immunity to oust this

Court's jurisdiction must fail. The cargo manifest from the *Mercedes* shows indisputably

that the vast majority of cargo aboard the *Mercedes* was privately owned. (Exhibit E, p. 15

n.33.) Indeed, the private character of some of the cargo was recognized in legal proceedings

at the time. For example, the British Crown paid a claim made by de Alvear of £ 6,000 for

his private goods that were lost on the *Mercedes*. (Exhibit E, p. 22 n.56.) It is clear that such

cargo was not "property of a foreign state," in the words of section 1609 of the FSIA, and

thus this provision of the FSIA is inapplicable to that portion of the cargo that was private.

Also, in this case, Claimants purporting to have an interest in the private cargo which was

aboard the *Mercedes* have come forward to assert their rights to that cargo. (Dkt. 136.) They

have conceded that they have not refused salvage to that cargo, and in fact, have entered into

negotiations with Odyssey for salvage rights with respect to the cargo recovered, should that

cargo be determined to have come from the *Mercedes*. (Dkt.136, p.4.)

Further, in *International Aircraft*, (218 F.3d 1255, 1256-57), a salvor sought either title or a salvage award for the rescue of a military aircraft that had crashed off the coast of Florida during a training exercise. The government claimed ownership of the military aircraft, and opposed the salvage efforts. *Id.* at 1257. The *IAR* court interpreted "the law of salvage to permit the owner of a vessel in marine peril to decline the assistance of others *so long as only the owner's property interests are at stake*." *Id.* at 1262 (emphasis added). The court limited its opinion, which abrogated the prudent person standard for refusal of salvage for historic shipwrecks, to situations where "no other property interests were at stake." *Id.* at 1262, n.17.[12] Following the Eleventh Circuit's lead in *IAR*, Spain cannot refuse salvage for that part of the cargo that was owned or consigned by private parties at the time of the vessel's sinking.

In spite of Spain's own laws which would indicate no current ownership rights of Spain (*see* Exhibit G), even if State-owned property on board *the Mercedes* is regarded as Spanish property, that would still not oust jurisdiction of the federal court in view of the sovereign immunity principles and salvage laws discussed above. Even more pertinently, in a number of cases federal district courts have recognized that where there are no hull interests to protect, the only question is the disposition of the remaining cargo from the vessel.[13]

---

[12] The 11th Circuit affirmed the jurisdictional aspect of this opinion by deciding title to the property before it, which it could not have done absent jurisdiction.

[13] See *Treasure Salvors*, 556 F. Supp. at 1325 ("although identified as a 'wrecked vessel,' The *Santa Margarita* is more accurately termed a wreck site, for what the teredos and the passage of time have left for salvage is cargo scattered on and under an expanse of ocean floor."); *Great Lakes Exploration Group*, 2006 WL 3370878, at *9-10 (W.D. Mich. 2006) ("Given the passage of time, the weather, lake conditions, and other

Under relevant case law, Odyssey is entitled to either a determination of title or, at a minimum, a salvage award in relation to cargo on board the *Mercedes* that was privately-owned at the time of the sinking (assuming the *Mercedes* is at issue here), whether or not it is now the subject of a claim before the Court. In *Cobb Coin*, the district court awarded the salvaging company all the artifacts it recovered from a wreck site since the inception of the lawsuit as a salvage award. *See Cobb Coin Company, Inc., v. the Unidentified, Wrecked and Abandoned Sailing Vessel*, 525 F. Supp. 186, 195 (S.D. Fla. 1981) ("The true subject of the maritime action in the case before the Court, is not salvageable material ensconced in an extant hull, but the identifiable cargo of the former vessel."). The *Cobb Coin* court was not persuaded "that the process of natural history which eroded the vessel's structure has diminished the federal rights and remedies now available to a salvor who successfully returns to the mainstream of commerce goods otherwise buried beneath the sea." *Id.* The court granted a salvage award for the individual artifacts salvaged.

Establishing complete chain of title to an historic or ancient vessel, her hull, tackle and appurtenances does not equate to a transfer or grant of title to the cargo and personal effects of passengers and crew not conveyed by title. *Bemis v. The RMS Lusitania*, 884 F. Supp. 1042, 1053 (E.D. Va. 1995), *aff'd*, 99 F.3d 1129 (Table) (4th Cir. 1996). The *Bemis* decisions held that even an owner of an abandoned historic shipwrecked vessel could not maintain ownership rights to the entire site itself. *See id.* The *Bemis* court distinguished the already salvaged cargo and the still submerged personal effects by concluding that Bemis had not established any exclusive rights in the latter, and held that "the use of the term 'wreck'

---

factors Defendant [wreck-site] is apparently comprised of objects . . . strewn about the lake bottomland.").

was not dispositive and that the meaning of the word 'vessel' is, in English law, "the hull of a sunken ship **excluding its contents**." *Id.* (emphasis added).[14] Thus, absent exclusive title and possessory rights to the vessel as well as its cargo, a court can separate those artifacts comprising the *res* into separate groups based on the claimant's ownership rights. Clearly then, this case cannot be summarily dismissed under the FSIA or Spain's other asserted bases of sovereign immunity.

## XII.   Sea Hunt distinguished.

Spain relies heavily on the *Sea Hunt* case, *supra*, even attaching to its motion a statement filed by the U.S. State Department in that case. (Dkt. 131-19, Annex 1 to Exh. 1.) *Sea Hunt* is legally and factually distinguishable, and is not binding or applicable to this case. Most importantly, the *Sea Hunt* case was a merits decision on summary judgment rather than a ruling on a motion to dismiss based upon the FSIA or any other grounds. In fact, Spain did not contest jurisdiction of the U.S. court to determine the relevant issues. Sea Hunt sought a declaratory judgment in an admiralty *in rem* action. The court considered whether the vessels had been abandoned under the Abandoned Shipwreck Act (ASA), 43 U.S.C. § 2101 et seq., under which the United States and a State asserts title to any abandoned shipwreck in the submerged lands of that State.

*Sea Hunt* is also readily distinguishable factually. In *Sea Hunt*, the State of Virginia had asserted ownership rights over two Spanish vessels claimed to be in the United States'

---

[14] In Bemis, the RMS *Lusitania* was a luxury liner that was sunk off the coast of Ireland by a torpedo fired by a Germany U-Boat. *Bemis*, 884 F. Supp. 1042, 1044. The Court acknowledged that through a series of transactions Bemis acquired title to the sunken vessel. The court determined however that Bemis's title was only in the vessel hull itself, because that was all his predecessors had in interest, even though they transferred "the rights and interest in the wreck." *Bemis*, 884 F. Supp. 1042, 1048-1051.The *Bemis* Court allowed an award of possessory title in the artifacts brought up from Bemis's expeditions as a salvage award. *Id.* at 1053.

territorial waters off the coast of Virginia. The state had issued salvage permits to *Sea Hunt* to conduct salvage operations on the vessels. In addition, the parties had stipulated that the vessels were Spanish naval vessels, *La Galga* and *Juno*, and Sea Hunt stated that they knew the identity before bringing the action. [15] In stark contrast to this case, the *Sea Hunt* court was asked to determine the rights of the parties to those specific vessels prior to salvage operations by the would-be salvor. Next, neither the *Juno* nor *La Galga* were on commercial missions at the time of their sinking. They were not carrying private commercial goods for trade, and *Sea Hunt* had not recovered any private cargo. There was no property at issue before the court which was not stipulated to be owned by (or previously owned by) Spain. Finally, the case holding was premised on an analysis of the ASA which applies only to vessels located within the territorial waters of the United States. The case is thus legally and factually distinguishable and is neither binding nor applicable to the instant case.

XIII.    Spain's attempts to vilify Odyssey.

Although Odyssey respectfully submits that Spain's allegations of wrongdoing on Odyssey's part are irrelevant to its Motion, such claims must nonetheless be addressed because Spain claims that Odyssey has "disqualified" itself from a salvage award.

First, Spain alleges that Odyssey "stripped" the *Mercedes* of coins and other valuables and "has failed to disclose even basic information about the shipwreck." (Dkt. 131 p. 34.) These allegations are completely unfounded. The most cursory glance at the

---

[15] *La Galga* was a Spanish ship that sank in 1750. It had been carrying the Second Company of the Sixth Battalion of Spanish Marines, Spanish royal property and English military prisoners. *Juno* was also a Spanish ship transporting the Third Battalion of the Regiment of Africa. *Sea Hunt* at 691. Interestingly, as stated, since the Sea Hunt case was decided, evidence has been uncovered which suggests that the vessels at issue were not, in fact, the *Juno* and *La Galga*. See affidavits of John Amrhein (Exhibit L) and James. Sinclair (Exhibit B, page 8).

photomosaic of the Defendant Site reveals that there was no vessel to "strip." Odyssey recovered the coins and artifacts from the ocean floor at the subject site in a methodical, documented and archaeologically-sound manner under the supervision of qualified archaeologists. The coins and artifacts have undergone and continue to undergo a very specific and advanced process of conservation to ensure that they are properly preserved. (*See* NGC report, Exhibit 1, to Black Swan Project Artifact Summary, filed with Dkt. 131-18.) Also, contrary to Spain's repeated assertions (and despite its knowledge otherwise), no human remains have been found at the site. (*See* Exhibit D, #10.) The site is not a "grave site" as Spain declares, (Dkt. 131, p. 3) and such a reference is completely without merit given not only the lack of human remains but the likelihood, based on published studies, that no remains will be found. (*See* Exhibit A, p. 19 - 21.)

Furthermore, Spain's assertion that Odyssey has not provided information about its recovery is false. Odyssey, upon receipt of a proper Protective Order from this Court, has willingly made all evidence regarding the site available to Spain. Odyssey has produced thousands of images and hours of video, in fact everything requested by Spain. Odyssey has entertained representatives from Spain and made available all the coins and artifacts recovered. For Spain to now claim that Odyssey has withheld evidence is especially absurd given the fact that Spain, since the inception of this litigation, has intentionally intimidated and barred Odyssey's researchers from its archives, crippling Odyssey's continued efforts to identify the site and inhibiting Odyssey's ability to properly address some of the documents attached to Spain's motion. (Exhibit D, p. 8.)

Odyssey has acted in good faith in every respect of this case. Indeed, Spain does not

contest that Odyssey has provided adequate notice or service under the FSIA. Odyssey did not covertly recover artifacts to sell in the open market. Instead, Odyssey legally arrested the Defendant Site and provided all information regarding the site and the artifacts recovered. Odyssey has properly come before this Court for adjudication of its rights and the rights of any and all claimants, including Spain. Such rights may only be adjudicated if this Court accepts jurisdiction.

XIV.    Relief requested.

The final line of Spain's Motion to Dismiss is its request that the Court "direct that the artifacts in Odyssey's custody be promptly returned to the custody of Spain." This prayer ignores two very clear facts. First, if this Court does not have jurisdiction over the *res* in question, as argued by Spain up until the last line of their motion, it obviously does not have the authority to order disposition of the coins and artifacts which comprise part of the "Defendant." A dismissal would result in nothing more than returning the parties to their pre-litigation condition, a condition in which clearly Odyssey, not Spain, had possession of the coins and artifacts. (Supp. Adm. R.E(5)(c) & (d) and Local Rule 7.05(i)). Furthermore, when Odyssey discovered the Defendant Site and recovered the coins and artifacts therefrom, Spain did not have custody of them. Thus, they cannot be "returned to the custody of Spain."

XV.    Conclusion.

The Defendant in this case is comprised of an underwater site where no coherent vessel exists and a large quantity of coins and some other artifacts which have properly and legally been brought into the Court's jurisdiction. The Defendant is neither a vessel nor "property of a foreign state" as referred to in section 1609 of the FSIA or in any other section

of that statute. Even if this Court were to determine that a vessel actually exists, there is insufficient evidence to conclude that the vessel is the *Mercedes*. Even then, the *Mercedes* was engaged in a commercial mission at the time of its demise, and thus, must not be considered a sovereign immune vessel. Finally, the private cargo recovered, even if from the *Mercedes*, is most certainly not sovereign immune property. Therefore, Spain's Motion to Dismiss must be denied.

**WHEREFORE**, Odyssey respectfully requests this Court enter an Order denying Claimant, Spain's Motion to Dismiss or for Summary Judgment.

## ODYSSEY'S RESPONSE TO SPAIN'S MOTION FOR SUMMARY JUDGMENT

To the extent that Spain's Motion is considered as a Motion for Summary Judgment, it must be denied. Summary Judgment will only be granted when there are no disputed issues of material fact, and all facts must be construed in favor of the nonmoving party. (*See Shotz*, 344 F.3d at 1164). In this case, it is quite obvious that there are many issues of disputed material fact. Those include but are not limited to the following:

1. Whether a vessel exists at the Defendant Site;

2. Whether there is sufficient evidence to identify a vessel related to the site;

3. Whether the vessel related to the Defendant Site is the *Mercedes*;

4. Whether the Defendant is an instrument of a foreign state;

5. Whether the *Mercedes* was sailing at a time of peace;

6. Whether the *Mercedes* was on an exclusively noncommercial mission;

7. Whether there has been a valid refusal of salvage;

8. Whether there was privately-owned cargo aboard the *Mercedes*;

34

9.    Whether Odyssey has recovered private cargo;

10.   Whether claimants other than Spain have a valid claim in the recovered property;

11    Whether Spain had possession of the vessel or cargo when Odyssey began salvage activities.

These issues are more fully addressed in this Response above.

**WHEREFORE**, Odyssey respectfully requests this Court enter an Order denying Claimant, Spain's Motion to Dismiss or for Summary Judgment.

Respectfully submitted,

Dated: _11/17/08_

s/ Allen von Spiegelfeld
Allen von Spiegelfeld – FBN 256803
avonsp@bankerlopez.com
Eric C. Thiel – FBN 016267
ethiel@bankerlopez.com
BANKER LOPEZ GASSLER P.A.
501 E. Kennedy Blvd.
Suite 1500
Tampa, Florida 33602
(813) 221-1500
Facsimile: (813) 222-3066

Melinda J. MacConnel – FBN 871151
Odyssey Marine Exploration, Inc.
5215 West Laurel Street
Tampa, FL 33607
(813) 876-1776, ext. 2240
Fax: (813) 830-6609
E-mail: mmacconnel@shipwreck.net

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November ___17th___, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to James A. Goold, Covington & Burling LLP, 1201 Pennsylvania Ave., NW, Washington, DC 20004; and David C. Banker, Bush Ross P.A., 220 S. Franklin Street, P. O. Box 3913, Tampa, FL 33601, *Attorneys for Claimant, Kingdom of Spain;* and Timothy P. Shusta, Phelps Dunbar LLP, 100 S. Ashley Drive, Suite 1900, Tampa, FL 33602-5315; and Mark Maney, South Tower, Penzoil Place, 711 Louisiana, Suite 3100, Houston, TX 77002, *Attorneys for the Republic of Peru.*, and David Paul Horan, Horan, Wallace & Higgins, LLP, 608 Whitehead Street, Key West, FL 33040, *Attorney for Descendant Claimants.*

Allen von Spiegelfeld – FBN 256803
avonsp@bankerlopez.com
Eric C. Thiel – FBN 016267
ethiel@bankerlopez.com
Banker Lopez Gassler P.A.
501 E. Kennedy Blvd.
Suite 1500
Tampa, FL 33602
(813) 221-1500
Facsimile: (813) 222-3066

Melinda J. MacConnel – FBN 871151
Odyssey Marine Exploration, Inc.
5215 West Laurel Street
Tampa, FL 33607
(813) 876-1776, ext. 2240
Fax: (813) 830-6609
E-mail: mmacconnel@shipwreck.net

Attorneys for Plaintiff