UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
IN ADMIRALTY

ODYSSEY MARINE EXPLORATION, INC.,

       Plaintiff,

v.                                                    Case No. 8:07-CV-00614-SDM-MAP

THE UNIDENTIFIED, SHIPWRECKED VESSEL,
If any, its apparel, tackle, appurtenances and cargo
located within a five mile radius of the center point
coordinates provided to the Court under seal, *in rem*

       Defendant,

and

The Kingdom of Spain and the Republic of Peru,

       Claimants.

_____/

### The Republic of Peru's Response to the Kingdom of Spain's Motion to Dismiss or for Summary Judgment

Subject to its reservation of its sovereign immunity, the Republic of Peru responds to the Kingdom of Spain's motion to dismiss or for summary judgment.

### *Introduction*

Spain's motion and request for relief are anachronisms. Spain uses the term "Spanish" as if that term has same meaning today as it did in 1804, when the Spanish Empire covered much of the globe, including the territory that is now the Republic of Peru. When the treasure was lost, Peru and its citizens were "Spanish," but to call the treasure here "Spanish" ignores the fact that the Spanish Empire no longer extends to the Americas. Peru is now an

Dockets.Justia.com

independent and equally sovereign nation, and in this case, Peru has greater rights than Spain to treasure extracted from Peruvian territory by (generally the forced labor of) Peruvians.

Despite the historical background, without mentioning Peru, Spain requests that this Court (1) declare the present Kingdom of Spain the sole sovereign owner of the treasure and (2) award Spain its possession. Motion at 35 (requesting that "Court dismiss plaintiff's remaining claims against the Defendant *res*, vacate the arrest issued on April 7, 2007 ..., and direct that the artifacts in Odyssey's custody be promptly returned to the custody of Spain").

According to modern principles of international and domestic law, however, when a nation (like Spain in the 19th Century) is divided, all successor states are entitled to equitable shares of the state property, with preference given the state of historical and archaeological origin. In other words, if the treasure is to "be promptly returned to the custody of Spain," it must be "returned" to the nations that formed "Spain" at the time the treasure was lost, not just the small subset of the former global empire that retained the name "Spain." More importantly, the treasure should be "returned" to the territory and people of the "Spain" of 1804 that made this treasure, and that part of the relevant "Spain" is now called the Republic of Peru.

Thus, it does not suffice for Spain unilaterally to declare itself the owner of this "Spanish" vessel, and then, by asserting sovereign immunity, obtain the dismissal of this in rem admiralty proceeding. If that were the legal rule, then virtually all of the sunken artifacts in the world (from Asia, to Africa, to the Americas) would be owned by a handful of European countries, those that had extensive colonies, such as Spain, England, France and Portugal. Fortunately, that is not the law. Peru has ownership rights in historical artifacts found at sea that originated within its sovereign territory and with its people.

This Court should therefore address the competing claims of Peru and Spain before reaching the question of whether either or both nations have sovereign immunity from the claims of Odyssey Marine. Accordingly, Spain's motion should be denied as to Peru's claims.

## I.  *Facts and Procedural History*

### A.  *The origin of the treasure*

Peru's expert, Comandante Francisco Yabar, completed his inspection of the treasure and the other data about the site last week and is preparing his report. Spain's motion, however, can be decided on the basis of Spain's own evidence, which concedes the undeniable Peruvian connection to the treasure. Determination of Peru's immunity against a salvage claim by Odyssey, on the other hand, might require additional factual development, but that immunity question is not yet ripe for review.

Peru agrees with the basic facts set forth by Spain, particularly that the treasure originated in the Viceroyalty of Peru, and that the vast majority of the coins were minted in Lima. The Mercedes' cannons might also have been made in Lima, but until they are raised, that will probably not be confirmed.[1]

Other than the concession that, in 1804, Spain's finances were dependent on its American viceroyalties, however, Spain's motion ignores the historical background of how and why the resources of Peru were taken to Europe.

Fortunately, that sad history is irrelevant to disposition of Spain's current motion on sovereign immunity. Once this Court has determined that it has jurisdiction to determine the

---

[1] In keeping with the relevant principles of international law, Peru makes no claim to property that did not originate, in whole or in part, within the territory that now comprises the Republic of Peru.

respective rights of Spain and Peru, however, the history of the Spanish Empire in the Americas will determine the appropriate equitable division of the property.

Given the indisputable provenance of the vast majority of the treasure thus far extracted from the sea, whether the vessel is the Mercedes is irrelevant to a determination of Peru's rights. Peru has rights to any treasure that originated within Peru, regardless of what vessel was carrying it. Peru, however, agrees that the evidence adduced to date that the Mercedes has been found is compelling. It appears Odyssey is challenging the conclusion mainly to avoid any adverse affects from Spain's rejection of salvage.

### B. Salvage Rights

Peru also agrees that Spain had the authority to refuse salvage of the Mercedes. Spain is the successor to the Mercedes (albeit not to her cargo) and had control of the vessel when it was lost. Therefore, Spain could refuse salvage as to both the vessel's remains and the cargo, at least absent a contrary decision by a cargo-owner. As set forth in Peru's verified conditional claim, incorporated herein by reference, Odyssey never sought Peru's permission to salvage the cargo owned by Peru.

## II. Spain's Claim to Immunity

Spain does not have sovereign immunity from Peru's ownership claim, although either or both Peru and Spain have immunity from Odyssey's salvage claim.

### A. Spain cannot establish the first factual predicate of its motion – that it is the owner of the vessel and her cargo.

Spain's motion is predicated on its assumption that it is the sole owner of the vessel and her cargo, but that predicate is unproven and more importantly ignores Peru's rights as a successor nation to the former Spanish Empire. While Peru and/or Spain might have

immunity from other claimants, Spain cannot have immunity as against Peru because, if Spain has any rights to the cargo, it is as a co-owner with Peru.

It is not enough for Spain to declare the vessel to be of "Spanish" origin and then call for application of the FSIA. Spain must prove that the vessel and its cargo are *presently* owned by Spain, and to do that, Spain has to make a claim to the property, which waives Spain's immunity for Peru's competitive claims of sovereign ownership.

### B. *California v. Deep Sea Research* bears on Spain's sovereign immunity.

Peru is obliged to inform the Court that the opinion of the United States Supreme Court in *California v. Deep Sea Research*, 523 U.S. 491 (1998), is directly applicable to Spain's immunity argument in this case, but is not mentioned in its motion. In turn, *Deep Sea Research* is best read in relation to an earlier opinion of the Court, *Florida Department of State v. Treasure Salvors, Inc.*, 458 U.S. 670 (1982).

*Treasure Salvors* involved ownership of the wreck of the Nuestra Señora de la Atocha. The government of the State of Florida had taken possession of the artifacts from the wreck, and when the salvors sought to enforce their rights, Florida asserted its sovereign immunity from suit. The Court issued three Opinions with a plurality holding that the admiralty courts could not adjudicate Florida's interest in salvaged property in the State's possession. 458 U.S. at 711.

The holding in *Treasure Salvors* was narrowed dramatically in *Deep Sea Research*. In that case, California claimed the remains of the Brother Jonathan, a ship lost at sea in 1865 carrying California gold. Unlike Florida in *Treasure Salvors*, however, California did not have physical possession of the gold and other artifacts.

The Court revisited its decision in *Treasure Salvors* and held that courts have *in rem* admiralty jurisdiction even when a sovereign seeks ownership of the res, ***so long as the res in question is not in the actual possession of the sovereign***. 523 U.S. at 507-08.

In contrast to the multiple opinions in *Treasure Salvors*, *Deep Sea Research* was a unanimous ruling. The Court noted a possible confusion created by *Treasure Salvors* and carefully clarified that its holding in *Treasure Salvors* was limited to cases in which the res in question was in the ***actual possession*** of the sovereign government: "It is true that statements in the fractured Opinions in *Treasure Salvors* might be read to suggest that a federal court may not undertake *In Rem* adjudication of the state's interest in property without the state's consent, regardless of the status of the res," *id.* at 505, but this "Court's consistent interpretation of the respective but related immunity doctrines pertaining to such vessels has been, upon proper presentation that the sovereign entity claims ownership *of a res in its possession*, to dismiss the suit or modify its judgment accordingly." *Id.* at 505 (citations omitted; emphasis in original).[2]

The Court emphasized that the "possession" requirement was "an actual possession, and not the mere constructive possession which is very often implied by reason of ownership under circumstances favorable to such implication." *The Davis*, 77 U.S. at 21; *Deep Sea Research*, 523 U.S. at 507.

The Court expressly applied this rule to foreign governments: "The Court's jurisprudence respecting the sovereign immunity of foreign governments has likewise turned

---

[2]Four Justices in *Deep Sea Research* indicated that there were willing to completely reconsider the earlier *Treasure Salvors* opinion. 523 U.S. at 509 (Justice Stevens, concurring)("I am now convinced that we should have affirmed the *Treasure Salvors'* judgment in its entirety."); *id.* (Justices Kennedy, Ginsberg and Breyer, concurring)("It ought to be evident ... that the issue of a Federal Court's *In Rem* jurisdiction even over an *In Rem* Defendant *in the state's possession* is 'open to reconsideration.'")(emphasis in original).

on the sovereign's possession of the res at issue. *See, e.g., The Pesaro,* 255 U.S. 216, 219, 41 S.Ct. 308, 309, 65 L.Ed. 592 (1921) (federal court's *in rem* jurisdiction not barred by mere suggestion of foreign government's ownership of vessel)." *Id.* at 507.

In contrast, the opinions cited in Spain's motion uniformly address vessels in the possession of their sovereign owners. Notably, the FSIA codified United States practice on foreign sovereign immunity, so the FSIA should be interpreted to establish a broader immunity for foreign sovereigns than that granted the United States and the individual States. *See, e.g.,* Restatement (Third) of Foreign Relations Law of the United States, Chapter Five, Introductory Note.

## C. Neither the Mercedes nor her cargo is military property entitled to immunity.

Although Spain's motion places particularly emphasis on the fact that the Mercedes was a Spanish military vessel in the 19th Century, its remains are hardly Spain's military property now. Spain seeks to invoke section 1661 of the FSIA, which immunizes property "that is, or is intended to be, used in connection with a military activity" if the property also "(A) is of a military character, or (B) is under the control of a military authority or defense agency." 28 U.S.C. §1661(b)(2). The protections of section 1661, however, apply only if the foreign state can "establish that there is some present or future intended use for the property that is connected to military activity." *Ministry of Defense and Support for Armed Forces of Islamic Republic of Iran v. Cubic Defense Systems, Inc.,* 385 F.3d 1206, 1223 (9th Cir. 2004). Thus, for example, "surplus military equipment withdrawn from military use would not be immune." *Id.* (citation omitted); *see also All American Trading Corp. v. Cuartel General Fuerza Aerea Guardia Nacional De Nicaragua,* 818 F.Supp. 1552, 1555 (S.D. Fla. 1993)("Each condition under § 1611(b)(2)(A) or (B) requires that the property is immune

only if its present or future use is military; however, if it is surplus equipment or is withdrawn from military use, it would not be immune.")(citation omitted).

The remains of the Mercedes are not military property of Spain.

Spain's jurisdictional argument also ignores the distinction between the cargo and the vessel. Ownership of the vessel does not equate with ownership of the cargo. *See e.g., Columbus-America Discovery Group v. Atlantic Mutual Insur. Co.,* 974 F.2d 450, 467-68 (4th Cir. 1992), *cert. denied,* 113 S.Ct. 1625 (1993); *Bearmis v. RMS Lusitania,* 884 F.Supp. 1042 (E.D.Va. 1995), *aff'd mem.,* 99 F.3d 1129 (4th Cir. 1996)(per curiam), *cert. denied,* 118 S.Ct. 1558 (1998).

Thus, even if it were true that the Mercedes, as a warship, has heightened immunity, the same is not necessarily true of the cargo. In fact, the treasure owned by Peru was never "of a military character," so it is protected by section 1661 only if it "is under the control of a military authority," which is not the case.

Finally, the ruling of *Deep Sea Research* has been applied to military craft owned by the United States. *International Aircraft Recovery, L.L.C. v. The Unidentified Wrecked and Abandoned Aircraft,* 54 F.Supp.2d 1172 (S.D.Fla. 1999), *rev'd on other grounds*, 218 F.3d 1255 (11th Cir. 2000). This case involved a World War II aircraft described by the United States government as "one of the rarest and most historic military aircraft still in existence." *Id.* at 1175. The United States intervened asserted sovereign immunity against the finders:

> Based upon last year's Supreme Court decision [in *Deep Sea* Research] governing all *In Rem* admiralty actions involving *In Rem* Defendants in which an official of a state, the federal government *or foreign government* asserts ownership, without actual possession, this Court now holds that the salvage services advanced by the Plaintiff/Salvor International Aircraft Recovery, LLC., and its predecessors in interest, constitute a valid maritime lien against the *In Rem* Defendant.

*Id.* at 1178 (emphasis supplied).

The Mercedes' status in 1804 does not give its remains any enhanced rights now.

### D. To obtain a declaration of ownership, Spain has to waive its immunity from suit for related claims such as Peru's ownership claim.

When the vessel is not in the sovereign's possession, the sovereign has to request affirmative relief from the court, and requesting relief causes a waiver of immunity to related claims. In this case, Spain directly requests that the Court "direct that the artifacts in Odyssey's custody be promptly returned to the custody of Spain." Motion at 35.

Spain's request to be declared the owner of the property waives its sovereign immunity from competing ownership claims like Peru's. A good example is *Lord, Day & Lord v. Socialist Republic of Vietnam*, 134 F.Supp.2d 549 (S.D.N.Y. 2001). In that case, a cargo of rice owned by the former Republic of Vietnam was lost following a collision in the Panama Canal. The Republic of Vietnam and its insurer (SOVAR), which had indemnified the loss, settled with the Panama Canal Corporation. Shortly after the settlement check was delivered to Vietnam's lawyers in New York, however, the Republic of Vietnam fell to the Socialist Republic of Vietnam, and the United States banned all transfers from the United States to the new Vietnamese government. Years later, the law firm interpleaded the settlement funds before a United States court and listed as possible claimants the Socialist Republic of Vietnam ("Vietnam"), SOVAR, and some European insurers that formerly owned SOVAR.

Like Spain in this case, Vietnam tried to assert a claim against the funds without waiving its immunity from any contravening claims from others. As stated by the court:

"Effectively, Vietnam seeks to grant this Court jurisdiction solely for the purpose of awarding it the funds. This, Vietnam cannot do." Id. at 557.

The court first applied the FSIA's counter-claim exception to immunity and ruled that Vietnam, by making a claim to the funds, waived its immunity to all claims that arise from the same "transaction or occurrence." *Id.* In addition, the court held that, "[e]ven if the counterclaim exception was inapplicable here, Vietnam has also waived its immunity to the extent necessary for the Court to determine title to the funds in its possession." *Id.* at 558.

The opinion in *Lord, Day & Lord* is consistent with the rule of *Deep Sea Research* and contrasts nicely with the interpleader opinion cited by Spain: *Republic of the Philippines v. Pimentel*, 128 S.Ct. 2180 (2008). In the *Philippines* opinion, there was a dispute over proceeds in a bank account. One of the claimants was the Philippines, which claimed that the funds had been wrongfully taken by Ferdinand Marcos, and therefore were actually the property of the nation. Accordingly, the Philippines had initiated proceedings in the Philippines to establish its ownership of the funds. The other principal claimants were holders of a multi-billion dollar judgment against Marcos for human rights abuses. Facing competing claims to the account, the bank holding the funds interpleaded the funds before the district court.

The Philippines, however, refused to concede jurisdiction, even to the extent of presenting a claim to the funds. Instead, the Philippines asserted its immunity and then argued that the court lacked the power to determine ownership of the funds because the court could not take jurisdiction over a necessary party to the litigation – the Philippines.

The Supreme Court held (a) that the Philippines was immune from the suit and could not be compelled to participate and (b) that the interpleader proceeding could not continue

without the voluntary presence of the Philippines, because that might interfere with the Philippines' sovereignty, as its property might be disposed of without its participation. *Id.* at 2191 (citations omitted). The dissent argued that the majority had placed too much weight on the sovereign status of the Philippines, because they could elect to participate: "There is, of course, a risk of unfairness in conducting such proceedings without the participation of petitioners. But it is a risk that they can avoid by waiving their sovereign immunity...." *Id.* at 2195.

Thus, the *Republic of Philippines* is entirely consistent with *Lord, Day & Lord.* As indicated by the contrast between the majority and the dissent, the Philippines could not make a claim to the funds without waiving its immunity from suit.

Peru's ownership claim is the direct counterpart to Spain's ownership claim, and therefore, there is no manner in which Spain can seek a judicial order that it is the owner without granting jurisdiction to determine Peru's competing claim.

### E. Peru and Spain have immunity from Odyssey's salvage claim, but the proper course is to first determine the respective rights of the two sovereigns before Odyssey's claims are determined.

The fact that the Mercedes and its cargo are not military property does not mean that their sovereign owners (whether Peru or Spain or both) are subject to Odyssey's salvage claim.

The FSIA grants sovereign immunity to foreign sovereigns unless a specific statutory exception applies. In general, those exceptions are (1) maritime liens caused by voluntary actions of the foreign sovereign, (2) commercial activities in or directed at the United States, or (3) waiver. None of those exceptions applies here.

In applying the FSIA's exceptions, this Court should be guided by the fact that, since

the FSIA grants subject matter jurisdiction, it is to be strictly construed against jurisdiction. *E.g., Boelens v. Redman Homes, Inc.,* 748 F.2d 1058, 1067 (5th Cir. 1984)("[S]tatute conferring jurisdiction on federal courts are to be strictly construed, and doubts resolved against federal jurisdiction."). The United States Supreme Court has applied this strict construction to the interpretation of the FSIA: "We start with the settled proposition that the subject-matter jurisdiction of the lower federal courts is determined in Congress, 'in the exact degrees and character which Congress may seem proper for the public good.'" *Argentine Republic v. Amerada Hess Shipping Corp.,* 109 S.Ct. 683, 687 (1989)(citations omitted).

Before reaching the particular FSIA exceptions, Peru needs to address Odyssey's suggestion that, if there is no vessel, then there is no sovereign immunity.

### 1. The "lack of a vessel" does not affect the immunity question.

According to the historical records, the Mercedes was destroyed in a horrific explosion after its magazine caught fire. Based on the unsurprising assertion that little now remains of the Mercedes after 200 years at the bottom of sea, Odyssey claims there can be no sovereign immunity because there is no sovereign vessel.

Sovereign immunity, however, is not limited to sovereign vessels. Either Peru or Spain own what remains of the Mercedes. That property is immune unless an applicable provision of the FSIA applies, whether or not there is still a vessel after the explosion.

Peru frankly does not understand Odyssey's argument in Section XI of its response that immunity is limited to property within the United States. The FSIA governs any exercise of jurisdiction over a sovereign's property, wherever it is located. There is no FSIA exception that allows a court to exercise broader jurisdiction over sovereign property lying outside the United States, and the idea that the FSIA grants this Court broader power to arrest vessels

outside the United States than within the United States makes little sense and is not set out in the statute.

Finally, Odyssey's ontological argument that Spain (and presumably Peru) cannot own something that does not exist does not get Odyssey very far.[3] Peru at least is willing to concede that Peru seeks an award solely of the property that actually exists. But this litigation (including Odyssey's request for salvaging property) is over a vast treasure that is not imaginary. If Odyssey wants to enforce a lien against sovereign property, Odyssey must indicate what exception to immunity applies. To date, it has not done that.

### 2. *Odyssey does not seek to enforce a maritime lien of Spain or Peru.*

Section 1605(b) of the FSIA allows attachment of sovereign property to enforce a maritime lien, but only if the "*maritime lien is based upon a commercial activity of the foreign state....*" 28 U.S.C. § 1605(b) (emphasis supplied).

Although Odyssey claims a maritime salvage lien, that lien is based upon Odyssey's voluntary (and rejected) services, not on the basis of the commercial activities of Spain or Peru. The FSIA allows enforcement of liens that arise from a sovereign's commercial activities but not arising out of activities in which they had no part.

Since Odyssey's purported maritime lien does not arise from a commercial activity of either Peru or Spain, but rather Odyssey's voluntary actions, enforcement of that lien does not fall with section 1605(b).

### 3. *Odyssey's claims do not relate to commercial activities in or directed at the United States.*

---

[3]"The absence of a vessel is legally significant because Spain cannot claim ownership or possession of something that does not exist." Response at 14.

Odyssey spends much of its response arguing that the Mercedes was a commercial vessel and then claims that commercial vessels have no immunity. At least the legal predicate is untrue.

The FSIA authorizes jurisdiction over claims related to a sovereign's commercial activities only if those activities are in or directed at the United States. 28 U.S.C. § 1605(a)(2). The Mercedes was not on its way to the United States when it was lost; its remains are here only because Odyssey brought them here. Odyssey cannot manufacture subject matter jurisdiction under the FSIA against a foreign sovereign simply by bringing its property here against its will.

There is certainly no provision of the FSIA that allows attachment of a sovereign's commercial vessels at will.

### 4. Peru has not waived its immunity to Odyssey's salvage claim.

As set out above, when Spain (or Peru) seeks a declaration of ownership of the property in question, they waive immunity to related claims, but Odyssey's salvage claim does not relate to ownership or the loss of the Mercedes. Odyssey's salvage claim relates to its voluntary activities more than 200 years after the Mercedes was lost. There is no logical connection between the salvage and ownership claims.

At this juncture of this action, therefore, this Court should deny Spain's motion as to Peru's competing ownership claim. Then, once sovereign ownership is determined, the Court can address the issue of whether Odyssey can force a foreign sovereign into court to defend a salvage claim by bringing that sovereign's property to the United States against its will (or at least without its permission).

### III. Odyssey's Claims.

### A. *Odyssey is not entitled to an award under the Law of Finds.*

The treasure in question is part of the patrimony of Peru, owned by the sovereign.

Spain correctly states the legal rule: "The uniform rule in admiralty is that a finding of abandonment requires proof by clear and convincing evidence." *Fairport Int'l Exploration, Inc. v. The Shipwrecked Vessel, Captain Lawrence*, 177 F.3d 491, 501 (6th Cir. 1999). Moreover, when an owner comes forward, particularly a sovereign owner, abandonment requires proof of an overt act of abandonment. *See e.g., Columbus-America Discovery Group v. Atlantic Mutual Insur. Co.,* 974 F.2d 450, 464-65 (4th Cir. 1992)(An "inference [of abandonment] would be improper, though, should a previous owner appear and assert his ownership interest; in such a case the normal presumptions would apply and an abandonment would have to be proved by strong and convincing evidence.") *cert. denied,* 113 S.Ct. 1625 (1993).

Peru has never abandoned its rights to the treasure in question. As set forth in the verified claim of the Republic of Peru, executed by the Peruvian Ambassador to the United States, Emb. Felipe Ortiz de Zevallos:

> The Republic of Peru maintains its interest in all of its property and patrimony and has not abandoned such interests, either expressly or impliedly, including any such property that may be the subject matter of this proceeding. All of Peru's sovereign and other rights in its property, artifacts, and other items sunken at sea are and have been reserved.

Odyssey does not even claim that Peru has acted inconsistently with its property rights.

### B. *Peru has not authorized the salvage of its property.*

While Peru does not have the information to speak on the facts as to Spain's rejection of salvage, Peru concurs with Spain that Spain had the authority to refuse salvage of the vessel and its contents. As stated in Spain's motion, rejection can be "by the owner or a

person with authority" or the master of the vessel. *Lathrop v. Unidentified, Wrecked & Abandoned Vessel,* 817 F.Supp. 953, 964 (M.D.Fla. 1993).

As successor to the owner of the vessel, Spain had the authority to refuse salvage, at least absent a contrary express statement by a cargo-owner. This Circuit has recognized that a master of a vessel can refuse salvage, even if the refusal is imprudent and the property is in marine peril in *International Aircraft Recovery, L.L.C. v. Unidentified, Wrecked and Abandoned Aircraft,* 218 F.3d 1255, 1260-63 (11th Cir. 2000), *cert. denied,* 531 U.S. 1144 (2001). While the court in that matter expressly did not reach the issue of whether "an owner could refuse salvage assistance if anything other than its own property interests were at stake," absent an express grant of authority by a cargo-owner, the vessel master's rejection should suffice for all cargo-owners. Any other rule would leave vessel masters without any means of preventing interference with their operations, because a prospective "salvor" could simply claim to be protecting some unnamed owner of part of the cargo.

As stated in Peru's verified claim:

> The Republic of Peru has not been asked to consent, and has not consented, to the salvage of its property, and in any event such consent would require express written authorization from the appropriate representatives of the Republic of Peru.

So, this is not a situation in which a cargo-owner authorizes salvage of its property in the face of rejection by the ship-owner or someone else with authority to deal with the vessel.

To the extent necessary, Peru ratifies Spain's rejection of salvage as to its property.

Peru does not have the basis to take a position on whether Odyssey has disqualified itself from a salvage award.

## IV. Peru is entitled to at least an equitable proportion of the treasure, which, in this case would mean all of the treasure that originated, in whole or in part, within the

*territory of what is now the Republic of Peru.*

In this admiralty proceeding, this Court should apply general admiralty principles within the broader context of contemporary international law: "The Titanic court's message could not be clearer: at least in the context of historic salvage, general maritime law only operates within the parameters of public international law and relies on national courts to apply it in an internationally sensitive manner." J. Nafziger, *Historic Salvage Revisited,* 31 Ocean Development & International Law 81, 85 (2000)(footnotes omitted).

**A.  This Court should apply the rule set forth in Article 149 of the United Nations Convention on the Law of the Seas (UNCLOS).**

   **1.  UNCLOS Article 149 sets forth the appropriate rule of law.**

Article 149 of the United Nations Convention on the Law of the Seas (UNCLOS) grants preferential right to the country of origin of all sunken "objects of an archaeological and historical nature" found in international waters, outside the preferential rights of any coastal state. Article 149 of UNCLOS, entitled "Archaeological and historical objects," states (with emphasis added): "All objects of an archaeological and historical nature found in the Area [defined as "the seabed and ocean floor and subsoil thereof, beyond the limits of national jurisdiction," Article 1] shall be preserved or disposed of for the benefit of mankind as a whole, *particular regard being paid to the preferential rights of the State or country of origin, or the State of cultural origin, or the State of historical and archaeological origin*."

Peru is manifestly the "State or country of origin," "cultural origin," and "historical and archeological origin" of the coins and other artifacts that were made within its territory by its people.  Moreover, those coins and other artifacts clearly constitute "objects of an archaeological and historical nature."  Article 1 of the UNESCO Convention on Protection of

the Underwater Cultural Heritage defines "underwater cultural heritage" as "as all traces of human existence having a cultural, historical or archaeological character which have been partially or totally under water for at least 100 years."

Although the treasure in this case may not have come from the "Area," as that term is technically defined, because it may have been found within the exclusive economic zone of a country, no nation has sought rights to the treasure based on its location and the rights of a coastal state, and therefore, the provisions of Article 149 should apply. In the absence of an enforceable right by a coastal state, the provisions of Article 149 are applicable to discovered artifacts.

### 2. *UNCLOS Article 149 reflects United States law.*

Spain has ratified UNCLOS. The United States has signed, but not ratified, the Convention. Peru has neither signed nor ratified the Convention. The lack of ratification, however, does not prevent application of the rule set forth in Article 149. There      are      a number of reasons why Article 149 reflects United States law.

#### a. *Having signed UNCLOS, the United States is required to refrain from acts that would defeat its purposes.*

Although UNCLOS "is currently pending ratification before the Senate, it *nevertheless carries the weight of law from the date of its submission by the President to the Senate.*" *United States v. Royal Caribbean Cruises,* 24 F.Supp.2d 155, 159 (D.P.R. 1997)(emphasis supplied). This is true because:

> *The submission of the treaty to the Senate expresses to the international community the United States' ultimate intention to be bound by the pact.* Pending a treaty's rejection or ratification by the Senate under Article 18 of the Vienna Convention, the United States is bound to uphold the purpose and principles of the agreement to which the executive branch has tentatively made the United States a party.

*Id.* (citation omitted; emphasis supplied).

This rule is set forth in both the Restatement (Third) of Foreign Relations Law ("Restatement") and the Vienna Convention on the Law of Treaties.

Restatement Section 312(3) states: "Prior to the entry into force of an international agreement, a state that has signed the agreement or expressed its consent to be bound is obliged to refrain from acts that would defeat the object and purpose of the agreement." At least three courts have applied this Restatement Section to UNCLOS: *Mansel v. Baker Hughes, Inc.*, 203 F.Supp.2d 745, 746 n.1 (S.D. Tex. 2002); *Mayaguezanos por la Salud y el Ambiente v. United States*, 198 F.3d 297, 305 (1st Cir. 1999); *United States v. Kun Yun Jho*, 465 F.Supp.2d 618, 624-25 (E.D. Tex. 2006)(same), *rev'd on other grounds*, 534 F.3d 398 (5th Cir. 2008); *but see United States v. Best*, 304 F.3d 308 (3rd Cir. 2002)(Stating without analysis: UNCLOS "has not been ratified by the Senate and, accordingly, does not have the force of law.")(footnote omitted). The court in *Royal Caribbean Cruises* applied the Vienna Convention to reach the same result. 24 F.Supp.2d at 159.

These rules are especially applicable to UNCLOS, because the United Nations adopted a formal resolution that "[c]alls upon all States to safeguard the unified character of the Convention and its related resolutions...." United Nations General Assembly Resolution 38/59 (1983); *see also* Restatement § 312, Reporters' Note 6 (The "resolution was addressed to all states, not only those that had signed the Convention.")(citations omitted).

> **b. The rule set forth in Article 149 should be applied because it (and most of UNCLOS) codifies customary international law.**
>
> **(1) Most of UNCLOS is recognized as codifying customary international law.**

Even though UNCLOS is not a binding treaty within the United States, its provisions, including Article 149, are still binding to the extent they reflect customary international law. "U.S. courts, too, rely upon [UNCLOS], not as an applicable governing document itself, but rather as the mirror that reflects customary international law." J.A. Duff, *The United States and the Law of the Sea*, 35 Oceans Development & International Law 195, 199 (2004).

The Ninth Circuit stated: UNCLOS "has been ratified by at least 149 nations, which is sufficient for it to codify customary international law...." *Sarei v. Rio Tinto, PLC.*, 456 F.3d 1069, 1078 (9th Cir. 2006), *opinion withdrawn and superseded on reh'g in part on other grounds*, 487 F.3d 1193 (9th Cir. 2007). In support of this conclusion, the Ninth Circuit referenced *United States v. Alaska,* 503 U.S. 569, 588 n. 10 (1992)("The United States ... has recognized that [the UNCLOS's] baseline provisions reflect customary international law."), and L.F. Damrosch et al., INTERNATIONAL LAW: CASES AND MATERIALS (4th ed. 2001) at 1386 (most provisions of the UNCLOS "are clearly established customary law of the sea"); *see also United States v. Royal Caribbean Cruise Lines Ltd.,* 11 F.Supp.2d 1358, 1372 (S.D. Fla. 1998)("It does appear from all of the testimony produced in this case, as well as the caselaw in this area, that UNCLOS is properly considered customary international law."); *Kun Yun Jho,* 465 F.Supp.2d at 624 (other citations omitted), *rev'd on other grounds*, 534 F.3d 398 (5th Cir. 2008):

> Although UNCLOS has been signed by the President and forwarded to the Senate, it has not yet been ratified. It is nevertheless appropriate for this Court to consider UNCLOS jurisdictional provisions as they relate to the prosecutions at bar. *Lauritzen v. Larsen,* 345 U.S. 571, 582, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) (courts generally defer to international maritime laws of "impressive maturity and universality").

Restatement Part V, Introductory Note; J.M. Zitter, "Construction and Application of United

Nations Convention on the Law of the Sea – Global Cases, 21 A.L.R. Fed. 2d 109, 109 (2007)("While this treaty, although signed by the President, has not been ratified by Congress, it is of great importance and influence in determining international law of the seas.").

The court in *In re Titanic* also referred to UNCLOS as evidence of international salvage law, including Article 303, which reads in part: "*Archaeological and historical objects found at sea.*" 171 F.3d at 962; *see also Historic Salvage Law Revisited* at 85 ("The court also relied in part on Article 303 of the Convention, one of the provisions in that agreement that specifically addresses the cultural heritage, to define the law of salvage and admiralty rules."); *id.* (*Titanic* court repeatedly referred to UNCLOS.).

Finally, the Eleventh Circuit referred to UNCLOS as indicative of international law in *United States v. McPhee,* 336 F.3d 1269, 1273 (11th Cir. 2003).

### (2) The position of the United States government is that, apart from the deep seabed mining provisions, UNCLOS sets forth customary international law.

The Restatement notes that, "by express or tacit agreement accompanied by consistent practice, the United States, and states generally, have accepted the substantive provisions of the Convention, other than those addressing deep sea-bed mining, as statements of customary international law binding upon them apart from the Convention." Restatement at Introductory Note to Part V ("Law of the Sea")(citation omitted).

The United States has repeatedly declared its intention to follow the Convention. On November 27, 2001, Ambassador Sichan Siv (the United States Representative on the United Nations Economic and Social Council) stated before the General Assembly:

> **The United States has long accepted the UN Convention on the Law of the Sea as embodying international law concerning traditional uses of the oceans**. The United States played an important role in negotiating the Convention, as well as the 1994 Agreement that remedied the flaws in Part XI

of the Convention on deep seabed mining. Because the rules of the Convention meet U.S. national security, economic, and environmental interests, I am pleased to inform you that the Administration of President George W. Bush supports accession of the United States to the Convention.

Statement on Oceans and Law of the Sea, November 27, 2001 (available at www.state.gov/g/oes/rle/rm/6796)(emphasis supplied). John D. Negroponte, the Assistant Secretary of State for Oceans and International Environmental and Scientific Affairs, has stated: "The United States is now engaged in a deliberate, methodical process of promoting the universal application of rules of international law reflected in the non-seabed parts of the Convention." J. Negroponte, "Current Developments in the U.S. Oceans Policy," *U.S. Department of State Bulletin 86* (September 1986).

The United States government has concluded that (apart from provisions related to deep sea mining) United States law is consistent with the provisions of UNCLOS, so there is no need for implementing legislation to execute UNCLOS' provisions upon ratification:

> The United States, as a Party, would be able to implement the Convention through existing laws, regulations, and practices (including enforcement practices), *which are consistent with the Convention and which would not need to change in order for the United States to meet its Convention obligations*. Except as noted in connection with declaration twenty-two above [related to deep sea mining], the United States does not need to enact any new legislation to supplement or modify existing U.S. law.

Senate Committee on Foreign Relations' Report on Convention on the Law of the Sea (December 19, 2007) at 18 (emphasis supplied); *see also* Congressional Research Services Issue Brief for Congress: The Law of the Sea Convention and U.S. Policy p. 11 (2006).

*(3) Expert testimony establishes that Article 149 reflects customary international law.*

"A court may seek the aid of expert witnesses in interpreting the law of a foreign state or of international law." *United States v. Jurado-Rodriguez,* 907 F.Supp. 568, 574 (E.D.N.Y. 1995); Fed. Rule of Civil Procedure 44.1.

A district court from the Southern District of Florida relied on expert testimony to decide that UNCLOS codifies customary international law.

> It does appear from all of the testimony produced in this case, as well as the caselaw in this area, that UNCLOS is properly considered customary international law. The expert testimony of Elliot Richardson and Bernard Oxman indicates the degree to which UNCLOS is regarded as customary law; Mr Oxman explains that the requirements of UNCLOS should be respected under international law
>
>> ... by the established principle that U.S. statutes are not to be interpreted and applied in a manner inconsistent with international law if any other interpretation is possible, by the clear undertaking by President Reagan to respect the relevant rules of the Convention, and by the firm position of the Executive Branch that the United States will respect the rules set forth in the Convention regarding navigation and other matters, expects other nations to do the same, and reserves the right to take such measures as may be necessary to ensure that they do so.

*United States v. Royal Caribbean Cruise Lines Ltd.,* 11 F.Supp.2d at 1372 (S.D. Fla. 1998).

Peru has retained as its expert on admiralty and international law Ambassador John Norton Moore, who received the title Ambassador by his appointment as United States Ambassador to the Third United Nations Conference on the Law of the Sea. Ambassador Moore is the Walter J. Brown Professor of Law at the University of Virginia and Director of the Center for Oceans Law and Policy. He is one, if the not the most, distinguished scholars in the area of international and admiralty law.

In a report to the members of the United States Senate Ambassador Moore (along with Admiral William L. Schachte, Jr., the former Judge Advocate General for the Navy) stated

*"the Convention is ... acknowledged by the United States as a reflection of customary international law, and is the core of modern ocean law."* J. Moore & W. Schachte, The Senate Should Give Immediate Advice and Consent to the Law of the Sea Convention at 6 (2004)(emphasis supplied).

Peru was not able to authorize the retention of Ambassador Moore until after its inspection of the artifacts and other confidential material from the site, which was not completed until last week. Ambassador Moore is therefore currently preparing his report on the basis of Peru's claim under international and admiralty law, including Peru's right to an equitable share of the treasure. Peru requests leave to supplement this response with Ambassador Moore's declaration when it is completed.

### c. As a party to UNCLOS, Spain should not be allowed to dispute the applicability of Article 149.

Although the United States and Peru are not parties to UNCLOS, Spain is. Article 149 is, therefore, part of Spanish law, and Spain should not be allowed to make a claim that is inconsistent with its own law. *Reino de Espana v. American Bureau of Shipping, Inc.*, 528 F.Supp.2d 455 (S.D.N.Y. 2008). In *Reino de Espana*, Spain brought suit against the inspector of the oil tanker, the Prestige, which had discharged millions of gallons of oil into Spain's coastal waters. Spain based its claim on the International Convention on Civil Liability for Oil Pollution Damage ("CLC"), which Spain had ratified. The CLC, however, prohibited the filing of suit in a non-signatory State, and the United States had not ratified the CLC. The inspector, therefore, moved to dismiss the action on the basis that Spain had to comply with the requirements of the CLC. The court ruled:

> Spain's principal argument against dismissal on the basis of the CLC's exclusivity and forum limitation clause is one to the effect that, because the

United States is not a signatory to the CLC, the United States is not bound to respect its provisions. .... Here, however, the issue is whether Spain, as a signatory to the CLC, is bound by the CLC's provisions and, thus, is obligated under Article IX(1) to pursue its claims in the courts of a contracting state. The CLC, which forms part of Spanish law, limits covered claims to those permitted under its terms .... This Court can, and must, recognize the CLC's limitations on pollution damage claims asserted by a country that has itself adopted the CLC. Spain, as a signatory to the CLC, is bound by the CLC's provisions ....

*Id.* at 460-61.

As a State Party to UNCLOS, Spain has obligated itself to promote its provisions. *Article 300, "Good faith and abuse of rights,"* reads: "States Parties shall fulfill in good faith the obligations assumed under this Convention and shall exercise the rights, jurisdiction and freedoms recognized in this Convention in a manner which would not constitute an abuse of right."

Spain has also ratified the UNESCO Convention on the Protection of the Underwater Cultural Heritage. Declaration of Elisa de Cabo. The UNESCO Convention, which is not in force, states that in disposing of underwater cultural heritage *"the interests of any State with a verifiable link, especially a cultural, historical or archaeological link, in respect of the underwater cultural heritage concerned,"* should be respected. Article 18(4)(emphasis supplied).[4] Article 2(4) of the UNESCO Convention states that all State Parties, which includes Spain, shall act, individually if necessary, in conformance with the Convention.

---

[4] Article 18(4) reads: "A State Party which has seized underwater cultural heritage shall ensure that its disposition be for the public benefit, taking into account the need for conservation and research; the need for reassembly of a dispersed collection; the need for public access, exhibition and education; and the interests of any State with a verifiable link, especially a cultural, historical or archaeological link, in respect of the underwater cultural heritage concerned."

Notably, the dilemma is Spain's. Just as the United States recognizes UNCLOS and the Vienna Convention as setting forth customary international law, despite the fact that the United States has not ratified those conventions, Peru can consistently recognize the UNCLOS as comprising customary international law although it has not ratified the Convention. On the other hand, it is inconsistent for Spain to ratify UNCLOS, making it part of Spanish law, and then argue that it should not apply.

**B. Modern international law on the rights and duties of successor states would grant Peru at least an equitable proportion of the treasure.**

### 1. Peru is a successor state.

Spain concedes that Peru was part of Spain when the Mercedes was lost. Declaration of Hugo O'Donnell y Duque de Estrada at ¶23 ("At the time, the Viceroyalty of Peru was part of the Kingdom of Spain."). There is also no dispute that most of the treasure was taken from the territory that is now Peru, and there should be no dispute that the means by which the Kingdom of Spain acquired that treasure would be illegal under modern international law.

Spain's recent motion, however, simply ignores Peru's continued existence and its rights as a sovereign and instead assumes that Spain is the sole succeeding nation with a right to the treasure. For Spain to prevail, it has to argue that, despite forming part of the Spain at the time the Mercedes was lost, and despite the indisputable fact that the treasure emanated from Peru's territory, Peru, nonetheless, has no rights to the treasure. That position is inconsistent with the modern rule as to successor states, as set out in the Vienna Convention on Succession of States in Respect of State Property, Archives and Debts (1983) and in the practice that has developed through the break-up of the former Soviet Union, Czechoslovakia

and Yugoslavia. It is also inconsistent with United States jurisprudence since at least the Civil War.

Under the modern rule, Peru is entitled to an equitable proportion of the treasure.

## 2. The Vienna Convention on Succession of States in Respect to State Property calls for equitable apportionment of state property.

The Vienna Convention on Succession of States in Respect to State Property, Archives and Debts is not yet in force and is controversial chiefly because of its delineation of different rules for former Colonies. It is nonetheless evidence of international norms. *E.g., Hans Berg v. British & African Steam Navig. Co.*, 243 U.S. 124, 151 (1917)("While this [1902 Hague Convention] treaty may not be of binding obligation, owing to lack of ratification, it is very persuasive as showing the attitude of the American government when the question is one of international law...."); *see also Flores v. Southern Peru Copper Corp.*, 414 F.3d 233, 256 (2d Cir. 2003).

What is especially important is that, regardless of whether special rules are adopted for former Colonies, all of the alternative rules set out in the Vienna Convention would grant Peru at least an equitable share of the treasure.

For example, Article *Article 15, "Newly independent State,"* states in part, that, absent agreement:

> (e) movable property, having belonged to the territory to which the succession of States relates and having become State property of the predecessor State during the period of dependence, shall pass to the successor State;
>
> (f) movable State property of the predecessor State, other than the property mentioned in subparagraphs (d) and (e), to the creation of which the dependent territory has contributed, shall pass to the

successor State in proportion to the contribution of the dependent territory.

The full Convention is attached as exhibit A to this response.

### 3. *Modern state practice divides property in equitable proportion.*

Modern State practice on dividing property following the division of states follows the equitable allocation set out in the Vienna Convention. *See* P. Williams and J. Harris, *State Succession to Debts and Assets: The Modern Law and Policy*, 43 Harv. L. Rev. 355 (2001); C. Emanuelli, *State Succession, Then and Now, With Special Reference to the Louisiana Purchase (1803)*, 63 Louisiana L. Rev. 1277, 1280 (2003).

For example, following the dissolution of the Soviet Union, Russia claimed to be the sole successor to all state property, including all Embassy properties, currency and bullion deposits, and the merchant fleet throughout the world. 43 Harv. L. Rev. at 379. The claim failed, and the international community compelled application of the principle of equitable allocation among all successor states. Eventually, "Russia conceded that each successor state was entitled to a proportionate share of the total property ...." *Id.* at 381.

The "principle of equitable allocation" is one of the "most important categories of legal norms and regimes" coming out of the break-up of the Soviet Union, Czechoslovakia and Yugoslavia. *Id.* at 357; *see also id.* (equitable allocation "appears to be the keystone principle for allocating debts and assets."); *see also* A. Langstrom and M. Nijhoff, TRANSFORMATION IN RUSSIA AND INTERNATIONAL LAW 223 (2003)("In sum, the principal rule for redistributing assets and liabilities in separation or dissolution is that the states concerned have to agree on the issue. Failing an agreement there shall be distribution in equitable proportions.").

During discussions regarding the break-up of Yugoslavia, the European Community created an Arbitration Commission, which found with "respect to movable property ... *that the provisions of the 1983 Vienna Convention represented commonly agreed principles and that federal property should be divided equitably among all of the successor states*." *Id.* at 396 (*referring to,* Arbitration Commission Opinion No. 14, 32 I.L.M. 1593 (Aug. 13, 1993)(emphasis supplied).

The International Court of Justice has ruled that the required equitable division does not mean that each particular asset or debt be dived equitably, but rather that the division as a whole be equitable. *Id.* at 394-95. Given Spain's acquisition of most of Peru's resources over Centuries, the equitable division of this treasure should be to grant it to Peru entirely.

### 4. United States jurisprudence has long recognized the doctrine of "equitable proportion."

The United States Supreme Court recognized and applied the equitable proportion doctrine to determine the relative obligations of Virginia and West Virginia following their split before the Civil War. Before West Virginia was allowed back into the Union, it had to agree to assume "an equitable proportion" of the pre-War debts of the formerly larger State of Virginia. *Hartman v. Greenhow,* 102 U.S. 672, 677 (1880).

Significantly, although West Virginia agreed to the division, the Supreme Court repeatedly noted that the agreement to divide debts was in accordance with the then-prevailing, and well-established, rule of international law:

> *Writers on public law speak of the principle as well established, that where a State is divided into two or more States, in the adjustment of liabilities between each other, the debts of the parent State should be ratably apportioned among them.* On this subject Kent says: 'If a State should be divided in respect to territory, its rights and obligations are not impaired; and if they have not been apportioned by special agreement, their rights are to be

enjoyed and their obligations fulfilled by all the parts in common.' 1 Com. 26. And Halleck, speaking of a State divided into two or more distinct and independent sovereignties, says: 'In that case, the obligations which have accrued to the whole before the division are, unless they have been the subject of a special agreement, ratably binding upon the different parts. This principle is established by the concurrent opinions of text-writers, the decisions of courts, and the practice of nations.' International Law, c. 3, sect. 27.

*In conformity with the doctrine thus stated by Halleck, both States – Virginia and West Virginia – have recognized in their Constitutions their respective liability for an equitable proportion of the old debt of the State.*

*Id.* (emphasis supplied); *see also Commonwealth of Virginia v. State of West Virginia,* 220 U.S. 1, 31 (1911)(Holmes, J.)("The effect of that is that West Virginia must bear her just and equitable proportion of the public debt, as it was intimated in *Hartman v. Greenhow,* so long ago as 1880, that she should.")(citation omitted); *Antoni v. Greenhow,* 107 U.S. 769, 788 (1883)("*It is a well-settled doctrine of public law that upon a division of a state into two or more states, her debts shall be ratably apportioned among them.*")(emphasis supplied; citation omitted).

Application of this doctrine falls squarely within this Court's purview. In fact, when Virginia and West Virginia could not agree on the specific division of the debt, the matter was referred directly to the United States Supreme Court. The first question addressed was whether the Court had the ability to make such a decision between two sovereigns. Justice Oliver Wendell Holmes concluded that "*what is just and equitable is a judicial question similar to many that arise in private litigation, and in nowise beyond the competence of a tribunal to decide.*" *Id.* at 31 (emphasis supplied).

Justice Holmes concluded that the division was "to be considered in the untechnical spirit proper for dealing with a quasi international controversy, remembering that there is no municipal code governing the matter…." 220 U.S. at 27.

The Court's discussion did not end there. Years later, West Virginia asked for leave of Court to raise, for the first time, offsets in the form of assets retained by Virginia, which West Virginia argued should reduce its debt. The Supreme Court first granted the leave and then allowed the offset, thus apportioning non-territorial assets along with the debts. *Commonwealth of Virginia v. State of West Virginia,* 234 U.S. 117 (1914), 238 U.S. 202 (1915).

The term "equitable proportion" was used even prior to adoption of the Constitution and before the sinking of the Mercedes. In 1787, Noah Webster argued in favor of the Constitution claiming it would provide an "equitable proportion" of advantages to the individual states, as opposed to the unfair advantages then enjoyed by the more prosperous states like New York. N. Webster, "A Citizen of America, An Examination Into the Leading Principles of the Federal Constitution," October 17, 1787, collected in D. Wooten, THE ESSENTIAL FEDERALIST AND ANTI-FEDERALIST PAPERS (2003).

United States courts also utilize equitable apportionment when determining the respective rights of States to a shared body of water. *E.g., Colorado v. New Mexico,* 459 U.S. 176, 183 (1982); *Kansas v. Colorado,* 206 U.S. 46, 98 (1907). Consistently with its equitable basis, the doctrine is applied in a flexible manner to achieve a just result: "It is a flexible doctrine which calls for 'the exercise of an informed judgment on a consideration of many factors' to secure a 'just and equitable' allocation. .... Our aim is always to secure a just and equitable apportionment 'without quibbling over formulas.'" *Colorado v. Mexico,* 459 U.S. at 183 (citations omitted).


*C. This Court should apply general equitable principles to divide the property.*

### 1. This Court has authority to apply equitable principles.

#### a. Admiralty law incorporates equitable principles.

Admiralty courts apply equitable principles. *The Marianna Flora*, 24 US 1 (1825) ("Courts of admiralty are in the habit of giving or withholding damages upon enlarged principles of justice and equity, and have not circumscribed themselves within the positive boundaries of mere municipal law."); *Adams v. United States,* 24 Ct.Cl. 31 (1888)("[Because these admiralty cases for capture of a vessel] rest upon the just and equitable principles of international law and are not matters of strict legal right, the court is of the opinion that the liability of neither France nor the United States is to be measured by the technical rules of municipal law."); *In re 4,885 Bags of Linseed*, 66 U.S. 108, 114 (1861)("But courts of admiralty, when carrying into execution maritime contracts and liens, are not governed by the strict and technical rules of the common law, and deal with them upon equitable principles, and with reference to the usages and necessities of trade."); *Inland Credit Corp. v. M/T Bow Egret,* 552 F.2d 1148, 1153 n. 6 (5th Cir.1977)(noting that "admiralty courts are much freer today than they may have been in the past to rely upon equitable principles to solve questions which arise in cases whose core is traditionally maritime"); R. Regan, *When Lost Liners Become Found: An Examination of the Effectiveness of Present Maritime and Legal and Statutory Regimes in International Waters with Some Proposals for Change,* 29 Tulane Maritime L. J. 313, 325 (2005)("Historically, salvage claims have been litigated under principles of equity ...."); *New York Dock Co. v. The Poznan,* 274 U.S. 117, 122 (1927)("The court of admiralty is asked, in the exercise of its admiralty jurisdiction, to administer the fund within its custody in accordance with equitable principles as its wont.").

#### b. International law incorporates equitable principles.

At least following the creation of the International Court of Justice, general equitable principles comprise part of international law. T. Franck, FAIRNESS IN INTERNATIONAL LAW AND INSTITUTIONS 48 (1997). One of the relevant principles is "unjust enrichment," which "advances the justice-based proposition that one party should not unfairly enrich itself at the expense of another." *Id.* at 50 (footnote omitted).

The United States Supreme Court has applied equitable principles in cases involving international law and sovereign immunity. *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba,* 462 US 611, 633-34 (1983)("Instead, it is the product of the application of internationally recognized equitable principles to avoid the injustice that would result from permitting a foreign state to reap the benefits of our courts while avoiding the obligations of international law."). Court found it was applying "principles of equity common to international law and federal common law." *Id.* at 623.

### 2. *Equity supports an award of at least a material portion of the treasure to Peru.*

The general principles of equity support Peru's claim.

First, equity seeks to protect the rights of *all* parties connected to property: "While the common law looked at and protected the rights of a person as a separate and distinct individual, equity rather regards and maintains, as far as possible, the rights of *all* who are connected to *any* common bond of interest or of obligation." J.M. Pomeroy, A TREATISE ON EQUITY JURISPRUDENCE AS ADMINISTERED IN THE UNITED STATES OF AMERICA §V ("Equality is Equity") §405, at 144 (5TH ED. 1941)(emphasis in original).

One example of this principle is the equitable doctrine of pro rata distribution, which applies whenever there are separate claims against the same fund. While in many cases the common law will allow one claimant precedent (as first in time, for example) to the exclusion

of others, equity strongly favors pro rata distribution so that all claimants recover a fair share. *Id.* at § 406. This principle has obvious application here and is consistent with the modern rule on the rights of successor states.

A Spanish claim to be the sole successor to the property would also conflict with the principle that "equity leans very strongly against joint ownership," preferring ownership in common. *Id.* at § 408, at 149. Under joint ownership, upon the death of one owner, the property descends entirely to the survivor. Equity, on the other hand, favors common ownership, in which ownership follows to the heirs. Applying this principle here, on the division between Spain and Peru, both would share any property not divided by their agreements. Note: the Supreme Court in the West Virginia/Virginia cases noted that, under international law, the obligations of divided states are shared "by all the parts in common." *Hartman,* 102 U.S. at 677 (citations omitted).

"Equity will not suffer a wrong without a remedy." *Id.* at § X. Under modern notions of international law, Spain's conquest of Peru, the taking of its natural resources, and its forced labor of the indigenous populations are criminal. Equity should not accept furthering those wrongs by assisting Spain's acquisition of even more resources from Peru.

Finally: "Where there are equal equities, the first in order of time shall prevail." *Id.* at § VI, at 160. While this principle is one of last resort (when other equitable principles are not controlling), it also favors Peru, since the treasure originated in the mines of the territory that is now Peru.

## VII.   *Conclusion*

At issue in this matter is treasure of historic importance. Peru has an undeniable role in the treasure's history, which gives Peru rights that are at least equal to Spain's. Indeed,

Peru believes that the determination of its rights to its historical patrimony is as important as the treasure itself.

Spain, on the other hand, wants to pretermit the central issues in this matter on the basis of assumed predicates and an overly technical reading of the FSIA, but Peru's claims are far too important to be side-stepped without being properly addressed. It is also significant that Spain is not asking this Court to remove itself from this important controversy; it expressly requests that this Court provide Spain with affirmative relief.

Therefore, the first step in this case should be the determination of the respective rights of Peru and Spain to the treasure. Then, the rights, if any, of Odyssey or other claimants can be adjudicated.

For these reasons, Peru requests that the Court find jurisdiction at least to determine the respective rights of Peru and Spain to the treasure.

Dated: November 17, 2008

Respectfully Submitted,

/s/ Mark Maney
Mark Maney (Trial Counsel)
Texas State Bar No. 12898200
South Tower, Pennzoil Place
711 Louisiana, Suite 3100
Houston, Texas 77002
713.654.8001
713.654.8818 (fax)
mmaney@maneylaw.com
Attorneys for the Republic of Peru

and

s/ Timothy P. Shusta
Timothy P. Shusta
FBN: 442305
Phelps Dunbar LLP
100 S. Ashley Drive
Suite 1900
Tampa, FL 33602-5315
813-472-7550
813-472-7570 Fax
shustat@phelps.com
Attorneys for the Republic of Peru

## Certificate of Service

I certify that on November 17, 2008, I electronically filed the foregoing Response to Spain's Motion to Dismiss or for Summary Judgment, by the Republic of Peru, with the Clerk of the Court by using CM/ECF system which will send a notice of electronic filing to all counsel of record.

s/ Timothy P. Shusta
Timothy P. Shusta