**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
**IN ADMIRALTY**

ODYSSEY MARINE EXPLORATION, INC.,

                Plaintiff,                        CIVIL ACTION

        v.

                                      Case No. 8:07-cv-00614-SDM-MAP

THE UNIDENTIFIED SHIPWRECKED VESSEL,
If any, its apparel, tackle, appurtenances and
cargo located within a five mile radius of the          DISPOSITIVE MOTION
center point coordinates provided to the Court
under seal,

                    Defendant,
                    *in rem*

and

THE KINGDOM OF SPAIN, THE REPUBLIC OF PERU,
AND GONZALO DE ALIAGA (THE COUNT OF SAN JUAN
DE LURIGANCHO), *et al.*,

                    Claimants.

_____/

**KINGDOM OF SPAIN REPLY**
**TO CLAIMANT REPUBLIC OF PERU RESPONSE**
**TO SPAIN'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

      Movant Kingdom of Spain ("Spain") hereby replies to the Republic of Peru ("Peru")'s

Response in opposition to Spain's Motion to Dismiss or for Summary Judgment (Dkt. 141, "Peru

Opp.").

      Peru has presented no valid or justiciable basis for denial of Spain's motion vis-à-vis

Peru. At the relevant time, what is now Peru was a part of Spain, and Peru does not dispute the

*Mercedes*'s identity and history as a sovereign vessel of the Royal Navy of Spain. Peru makes

no claim, and certainly no showing, that Spain ceded, surrendered, or otherwise granted any

relevant rights to Peru when Peru became independent in 1824, or at any time since then.

When Spain granted Peru its independence in 1824, Spain ceded territory and property within the territory of the Viceroyalty of Peru. The *Mercedes* left the Viceroyalty in 1804, and Peru has presented no cognizable basis for this Court to rewrite the terms under which Peru became an independent nation. Any claim that Peru retroactively acquired a legal interest with respect to the *Mercedes* is not supported by the authorities Peru presents. Nor is it justiciable in this Court.[1]

As also discussed in Spain's Reply to Odyssey, to defeat Spain's showing and motion, Peru—like Odyssey—bore the burden to show that an exception applies to Spain's invocation of sovereign immunity as to the Defendant *res*. Peru has not met that burden. The policy arguments Peru advances are not grounds for denial of Spain's motion or for adjudication by a U.S. court.

I.     Factual Background

Peru's Opposition acknowledges at the outset the critical facts that in 1804, Spain included the "territory that is now the Republic of Peru," and "Peru and its citizens were

---

[1] Spain submits with this Reply the Declaration of Professor Carlos Martínez Shaw as Exhibit A to provide basic historical facts concerning Peru's attainment of independence. To avoid repetition, Spain also relies on and incorporates its factual and legal showing that the Defendant is the *Mercedes* and her contents, and, *inter alia*, is therefore immune as a sovereign vessel of Spain from arrest and claims in this Court, as set forth in and with Spain's motion and its Reply to Odyssey. The distinction Peru seeks to draw between the *Mercedes* and her contents (Peru Opp. 4-5, 8) is also contrary to the basic admiralty law principle that a shipwreck and its contents are a legally unified *res*. *See, e.g.*, Spain Mot. to Dismiss at 21-25; Spain Repl. to Odyssey at 16-17; *Lathrop v. Unidentified, Wrecked and Abandoned Vessel*, 817 F. Supp. 953, 963 (M.D. Fla. 1993); *Deep Sea Research v. The Brother Jonathan*, 102 F.3d 379, 388-89 (9th Cir. 1996), *vacated in part*, 523 U.S. 491 (1988). Peru cites *Columbus-America Discovery Group v. Atlantic Mut. Ins. Co.*, 974 F.2d 450, 464-68 (4th Cir. 1992), *cert. denied*, 113 S.Ct. 1625 (1993) (cited in Peru Opp. 8), in which the owner of a non-government vessel did not appear and it was therefore found that "any recovered parts of the ship, all passenger possessions, and any cargo besides the insured shipments" had been abandoned. That is the opposite of this case.

'Spanish.'" (Peru Opp. 1.) Peru also does not dispute Spain's showing of the identity, history, and service of the *Mercedes* as a Spanish Royal Navy Frigate. Peru acknowledges Spain's authority to this day as owner of the *Mercedes* to refuse salvage. (Peru Opp. 4.) Peru makes no claim, and no showing, that Spain has at any time abandoned or ceded the *Mercedes* and Spain's sovereign rights with respect to its vessel.

Rather, Peru's position rests on a theory that it acquired rights as a "successor nation" by virtue of having become independent of Spain in 1824. But Peru makes no claim and no showing that the terms under which it became independent ceded or conveyed any interest with respect to the *Mercedes* or anything else that had left the territory prior to independence. The historical facts are that Peru was ceded its territory and Spain's Royal property *within* the territory, but nothing outside of it, let alone the *Mercedes*. Peru has raised, at most, a "mere suggestion" of interest, unsupported by any evidence, which is insufficient. *See California v. Deep Sea Research, Inc.*, 523 U.S. 491, 507 (1998) (party asserting a sovereign interest must show more than a "mere suggestion of foreign government's ownership of vessel," as Spain has done and Peru has not).

A.    Peru's Independence

Peru acknowledges the historical facts that in 1804, Spain included the "territory that is now the Republic of Peru" and that "Peru and its citizens were 'Spanish.'" (Peru Opp. 1.) What is now Peru became a Viceroyalty of Spain beginning in 1554, and it remained a part of Spain until 1824, when a Spanish Royal Army commanded by Lieutenant General José de Canterac was defeated by the United Liberator Army commanded by General of the Division of the Republic of Colombia Antonio José de Sucre. The battle took place at Ayacucho, and the Capitulation of Ayacucho, executed on December 9, 1824 (Ex. A, Annex 2), followed.

B. <u>The Capitulation of Ayacucho</u>

The Capitulation—which Peru's Opposition never mentions—specifically defines the terms of Spain's cession and the post-conflict rights of Peru vis-à-vis Spain. The Capitulation expressly limits the geographic scope of Spain's cessions to the territory that became the Republic of Peru. *See* Capitulation, Ex. A, Annex 2, at Preamble (Spain has "cede[d] the territory to the independent troops"). The Capitulation also granted, *inter alia*, Peru rights "within the territory" to property ceded by Spain, such as "garrisons," "the plaza del Callao," "parks, naval yards, and all existing warehouses," and other "forces and objects."[2] Nothing in the Capitulation surrendered, granted, or otherwise conferred any rights on Peru relevant to this case.

With respect to Spanish ships, both warships and merchant ships, the Capitulation provided no surrender or abandonment. On the contrary, Articles 13 and 14 provided for "warships and Spanish merchants … to restock provisions in the ports of Peru, for a term of six months … to make themselves fit and leave from the Pacific Ocean."[3] Spanish ships were given "passport, so that they can leave from the Pacific to the ports of Europe."[4] Peru makes no claim

---

[2] Ex. A, Annex 2, at art. 1 (stating that "[t]he territory that the Spanish troops garrisoned in Peru, shall be surrendered to the arms of the liberator army up to Desaguadero, with the parks, naval yards, and all the existent warehouses"); *id.* art. 11 (surrendering "[t]he plaza del Callao to the united liberatory army, and its garrison"). Article 6 also provides that the "State of Peru shall equally respect the properties of the Spanish individuals who are outside the territory, of which they shall be free to dispose of before the end of three years, being considered on the same terms of the Americans who do not want to move to the Peninsula, and who have interests belonging to them there."

[3] *Id.* at art. 13 ("The warships and Spanish merchants shall be permitted to restock provisions in the ports of Peru, for a term of six months after the notification of this agreement, to make themselves fit and leave from the Pacific Ocean.").

[4] *Id.* at art. 14 ("The warships and Spanish merchants shall be given passport, so that they can leave from the Pacific to the ports of Europe.").

that any treaty or other agreement between Spain and Peru, either before or after Peru's independence, conferred any relevant rights on Peru vis-à-vis Spain or the Defendant.

C.     The Peru-Spain Treaty of Friendship and Peace

In 1879, Peru and Spain entered into a treaty of friendship and peace to normalize relations between the two countries.  The treaty stipulates that "the dissensions that took place between [the] two governments and their subjects are, on both sides, completely forgotten," and expresses the two countries' "strong[] desir[e for] the reestablishment of amicable relations which should always unite peoples who are brothers by origin and interests." The treaty established "a solid and inviolable peace between the Republic of Peru and His Majesty the King of Spain."  It also engaged the two countries to "conclude the new treaties that will establish and will regulate the[ir] commercial and navigational relations."  *See* Peru-Spain Treaty of Friendship and Peace, Preamble and arts. 1, 3 & 4 (attached with French original and English translation as Ex. A, Annex 3).

II.     Peru's Attainment of Independence Conferred No Rights on Peru With Respect to the *Mercedes*

As shown in Spain's motion (Spain Mot. to Dismiss 26-28), admiralty and international law recognizes that "a sovereign vessel that appears to have been abandoned remains the property of the nation to which it belonged at the time of sinking unless that nation has taken formal action to abandon it or to transfer title to another party."  *Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, 221 F.3d 634, 643 (4th Cir. 2000) (quoting Dep't of Interior, Advisory Guidelines on Abandoned Shipwreck Act, 55 Fed. Reg. 50,166, 50,121 (1990)). Further, "U.S. domestic law is consistent with the customary international law rule that title to sunken warships may be abandoned only by an express act of abandonment." *Id.* (quoting Statement of Interest, U.S. Dep't of State, *in Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel*

*or Vessels*, ¶ 15).  Ownership of a shipwreck cannot pass from one state to another in the absence of express abandonment by authorized, official act of the flag state.  There has been no abandonment of the *Mercedes*, and the Capitulation makes clear that there was no abandonment or cession.

Sea Hunt v. Unidentified Shipwrecked Vessel or Vessels, supra, addressed, *inter alia*, a claim that a 1763 cession of territory and property from Spain to Great Britain also implicitly ceded Spain's rights vis-à-vis shipwrecks.  *See Sea Hunt*, 221 F.3d at 644.  Applying long-standing principles of law, the Fourth Circuit held that a treaty's provisions defining what was ceded foreclosed any claim of implied cession or abandonment going beyond the parties' agreement.  *See id.* ("When the parties to the 1763 Treaty intended to cede non-territorial state property, they did so with great particularity," and where treaty's cession provisions do not include terms such as "shipwreck," "vessels," "frigates" and "warships," and other provisions mention such terms explicitly, no implied abandonment can be read into the Treaty); *see also id.* at 643 n.1 ("Nothing" in Article 2 of Spain-U.S. Treaty of Friendship and General Relations "implies that Spain has ceded anything other than territory and the structures erected on that territory"; therefore, no cession or abandonment of sunken vessel).  The Capitulation of Ayacucho provides that Spain "cede[d] the territory to the independent troops" and Spain's property within that territory.  Nothing in it ceded ownership or any other rights with respect to ships, sunken or afloat, or anything else outside that territory.[5]  *See Sea Hunt*, 221 F.3d at 644 ("plain meaning" of territorial limitation on cession of state property was to cede "only what was located on land," and "Spain did not cede possessions in the sea or seabed").

_____

[5] Far from ceding Spanish ships, the Capitulation permitted them to remain in Peru for six months and granted them passport back to Europe.  *See* Ex. A, Annex 2, at arts. 13-14.

The *Sea Hunt* analysis applies with equal force to the Capitulation of Ayacucho, and is alone sufficient grounds for Peru's Opposition to fail. The Capitulation unambiguously cedes only territory and defined state property within that territory upon independence and ensures the safe departure of Spanish ships from Peru's ports. In so doing, it "specifically catalogues items other than territory intended to be conveyed," and defines what was ceded with "great particularity." *Id.* at 644. These terms, combined with the absence of any cession relating to Spanish ships, preclude any claim that Spain abandoned the *Mercedes* or ceded it to Peru upon independence. Peru's Opposition points to no agreement manifesting such an intention, let alone any "express declaration" on the part of Spain "abandoning title" to the *Mercedes*. *Id.* at 646.

III.  Peru Has No Claim Under Article 149 of UNCLOS

In opposition to Spain's motion, Peru seeks to rely on Article 149 of the United Nations Convention on the Law of the Seas ("UNCLOS"). (Peru Opp. 17-26.) UNCLOS's Article 149 states that "objects of an archaeological and historical nature found in the Area shall be preserved or disposed of for the benefit of mankind as a whole," with "particular regard" being paid to the "State or country of origin" of those "objects." Peru's Opposition argues at length that Article 149 grants it a cognizable claim with respect to the *Mercedes*. UNCLOS's plain terms make Article 149 inapplicable to this case.[6]

A.  Article 149 is Inapplicable by its Own Terms Because Spain, not Peru, is the "State or Country of Origin"

As Peru's Opposition notes, UNCLOS's Article 149 states that "particular regard" should be paid "to the preferential rights of the State or country of origin, or the State of cultural origin,

_____

[6] *United States v. McPhee*, 336 F.3d 1269 (11th Cir. 2003) (cited at Peru Opp. 21), is inapposite, since that case only cited UNCLOS as supporting authority for the fact that the U.S. recognizes that a nation's territorial waters may extend up to 12 nautical miles from land. *Id.* at 1273.

or the State of historical and archaeological origin." But the fact is that Spain, not Peru, was the place "of origin" of the *Mercedes*. And when the *Mercedes* sailed from El Callao, everything placed on board there "originated" in what was part of Spain. Peru cites no authority for the proposition that a state not in existence at the time a vessel sinks can be its "State or country of origin" for purposes of UNCLOS.

The term "State or country of origin" has a meaning—the "State or country" is the sovereign in existence at the time something "originates."[7] Subsequent changes in the "State or country"'s sovereignty cannot change an object's "State or country of origin," because the object has already "originated."[8]

B.   Peru Acknowledges That Article 149 is Inapplicable By its Own Terms Because the Mercedes Was Not "Found in the Area"

As noted, Article 149 concerns only "objects of an archaeological and historical nature *found in the Area*" (emphasis added). UNCLOS defines the "Area" as "the seabed and ocean floor and subsoil thereof, *beyond the limits of national jurisdiction*." *Id.* art. 1 (emphasis added). Peru acknowledges that the *Mercedes* was not "found in the Area." (Peru Opp. 18.) Accordingly, Article 149, by its own terms, does not bear on this case.[9]

_____

[7] International law defines a "State" as a territorially recognized body exercising singularity and independence, with its own government and capacity to enter into agreements with other states. *See* James Crawford, *The Creation of States in International Law* 31-76 (1979). Peru makes no claim that it had such status in 1804.

[8] *Cf.* International Convention on the Protection of the Rights of All Migrant Workers and the Members of Their Families, art. 6(a) (defining "State of origin" as "the State of which the person concerned is a national").

[9] Peru argues, without supporting authority, that in this case "no nation has sought rights to the treasure based on its location and the rights of a coastal state, and therefore, the provisions of Article 149 should apply" to the *Mercedes*. (Peru Opp. 18.) To the extent Spain understands Peru's distinction, it is inconsistent with UNCLOS's terms of limitation. *See* UNCLOS, art. 134 ("This Part [Part XI, "The Area," which includes Article 149] applies to the Area."). Article 149 (continued…)

C.    Article 95 of the UNCLOS Expressly Recognizes Immunity of Warships

UNCLOS's Article 95 specifically addresses warships and precludes applying Article 149 to the *Mercedes*. Article 95 reflects long-standing international and U.S. law that warships have "complete immunity from the jurisdiction of any State other than the flag State." As Spain has shown in its motion and its Reply to Odyssey, the immunity recognized in Article 95 has a long and uniform pedigree that has been recognized and enforced by U.S. courts, and accurately states U.S. and customary international law. *See, e.g.*, *Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 146 (1812) (interference with a sovereign's ship "cannot take place without affecting [the sovereign owner]'s power and his dignity"); 28 U.S.C. § 1611(b)(2) (extending immunity to a foreign nation's military property); UNCLOS, art. 32 (except in certain narrow circumstances, "nothing in this Convention affects the immunities of warships"); Int'l Convention on Salvage, art. 4(1), S. Treaty Doc. No. 102-12 (Apr. 28, 1989) (salvage awards may not be granted against warships without express consent from the sovereign, and the owner of any vessel has the right to refuse salvage) (ratified by U.S. and Spain). There is no dispute that the *Mercedes* sailed under the Spanish Royal Navy flag, and Spain is the owner and "flag State" for immunity purposes. Article 149 does nothing to undermine this immunity.

---

by its terms does not apply to a shipwreck found outside the "Area," whether a claim "based on its location and the rights of a coastal state" has been made or not.

     **D.**     **Article 286 of UNCLOS Provides That "Any Dispute Concerning Its Interpretation Or Application" Must Be Brought Before the International Tribunal for the Law of the Sea or the International Court of Justice**

Peru seeks to rely on UNCLOS in this Court even though it "has neither signed nor ratified" it.[10] (Peru Opp. 18.) Even if Peru were a party to UNCLOS, a U.S. court is not the proper forum for Peru's UNCLOS-dependent theories. Section 2 of UNCLOS's "Compulsory Procedures" provides that disputes between states concerning the interpretation or application of UNCLOS shall be submitted "to the court or tribunal having jurisdiction under this section." UNCLOS, art. 286. Article 287 limits those courts to the International Tribunal for the Law of the Sea, the International Court of Justice, or a special tribunal constituted in accordance with other parts of the convention.[11] UNCLOS does not contemplate, let alone confer, jurisdiction for a U.S. court over a dispute between two independent states.

Article 287 provides for states to make declarations accepting specific forums for settlement of disputes; Spain's declaration stated that "it chooses the International Tribunal for the Law of the Sea and the International Court of Justice as means for the settlement of disputes concerning the interpretation or application of the [UNCLOS]." *See* http://www.un.org/ Depts/los/convention_agreements/convention_declarations.htm#Spain%20Declaration%20made %20after%20ratification. Needless to say, Spain did not consent to or designate the Middle District of Florida for UNCLOS disputes vis-à-vis Peru.

---

[10] Nor does Peru show, or attempt to show, that Peru itself recognizes UNCLOS as customary international law. Cases that Peru cites where the United States is a party, *see* Peru Opp. 18-24, are irrelevant to this case, which is not against the U.S.

[11] The UNESCO Convention on the Protection of Underwater Cultural Heritage (Spain Mem. Ex. F, Annex 2; cited at Peru Opp. 25) provides in Article 3 that it does not prejudice the rights of states under international law and expressly incorporates in Article 25 the UNCLOS provisions on venues for any dispute between state parties concerning its interpretation or application.

IV.    Peru Has No Claim Under International State Succession Principles

Peru also opposes Spain's motion by seeking to invoke the 1983 Vienna Convention on Succession of States in Respect of State Property, Archives and Debts (the "Convention"). (Peru Opp. 26-28 and Ex. A.)  As shown below, however, the Convention can have no force or effect in this case, its own terms preclude any relevance to this case, and Peru's invocation of it in this Court seeks to raise a nonjusticiable political question.

B.    The Convention is Inapplicable to this Case

1.    *The Convention has no force as conventional or customary international law*

As Peru concedes, *see* Peru Opp. 27, the 1983 Convention is not in force. In the twenty-five years since it was drafted, it has been ratified by only seven states (Croatia, Estonia, Georgia, Liberia, Slovenia, Macedonia, and Ukraine)[12]—less than half of the fifteen needed for its entry into force in those states that have ratified it.[13]  Moreover, the draft Convention was met with widespread opposition from, *inter alia*, the United States, Spain, and numerous nations of Europe and elsewhere, both on the whole and as to particular articles.

Far from accepting or endorsing the Convention, the U.S. Representative to the Conference that produced the draft forcefully protested that the Convention's drafters and proponents were using it "as an opportunity to impose minority theories of no immediate relevance," and were striking "a blow to the entire process" of codifying and developing international law; that "none of the articles which his delegation had found most unacceptable

---

[12]  *See* United Nations Treaty Collection Database, *available at* http://treaties.un.org/Pages/ViewDetails.aspx?src=IND&id=283&chapter=3&lang=en.

[13]  *See* Convention, art. 50.  *See also* Paul Williams & Jennifer Harris, "State Succession to Debts and Assets: The Modern Law and Policy," 42 *Harv. Int'l L.J.* 355, 356 n.3 (2001) [hereinafter Williams & Harris, "State Succession to Debts and Assets"] (cited at Peru Opp. 28) (noting that "due to a lack of signatures," the Convention "has never come into force").

had been ameliorated"; and that the United States' "position was that the draft convention contained much that was neither existing law nor acceptable as a formulation *de lege ferenda*." The U.S. "delegation intended to vote against" it "as a whole."[14]  Similarly, the Spanish Representative stated that the Convention "had not been generally accepted by the international community."[15]

The United States voiced particular objections to the Convention's Article 15 regarding newly independent states, upon which Peru seeks to rely here.  The U.S. Representative stated that Article 15 "created distinctions which were not well founded in logic, law or inherent

---

[14] Peru cites *Hans Berg v. British African & Steam Navigation Co.*, 243 U.S. 124, 151 (1917), for the proposition that a court may consider whether an unratified treaty "show[s] the attitude of the American government when the question is one of international law." Peru Opp. 27. As to the unratified 1983 Vienna Convention, the "attitude of the American government" was clearly communicated that it does not reflect customary international law and is *not* to be relied upon.

[15] *See* Official Records, U.N. Conference on Succession of States in Respect of State Property, Archives and Debts, Summary records of the plenary meetings and of the meetings of the Committee of the Whole, Vienna, 1 March—8 April 1983 (Vol. 1), 10th Plenary Meeting (7 April 1983), ¶¶ 20-23 (U.S.), ¶¶ 47-50 (Spain). The U.S. and Spain were by no means alone. *See also id.*, 6th Plenary Meeting (5 April 1983), ¶ 33 (France's representative stating that "the convention did not reflect any obligatory custom or, *a fortiori*, any peremptory and absolute rule of public international law"); *id.*, 10th Plenary Meeting (7 April 1983), ¶¶ 25-28 (German representative, on behalf of the ten-delegation European Community, stating "the text of the convention was not acceptable to them as a whole," and his own delegation was "against the adoption of the convention"); *id.*, ¶¶ 32-37 (Canadian representative stating that the Convention's "combination of unclear concepts, unclear drafting and unsatisfactory dispute settlement provisions would make [it] a factor of legal insecurity rather than of security in relations between predecessor and successor States," and represented "a political statement aimed at reflecting the views of a particular group of States"); *id.*, ¶¶ 42-45, 84-86, 96-104 (views of Italian, Swiss and United Kingdom representatives in voting against); *id.*, ¶¶ 63-78, 87-95, 105, 107, 110-13 (views of Austrian, Australian, Danish, Finnish, Japanese, Portuguese, Swedish, Greek, and Norwegian representatives in abstaining).  For the Court's convenience, Spain attaches as Exhibit B the relevant pages of the Official Record of the Convention that it cites from *infra*.

justice," and that "[n]othing in the material before the Committee … indicated that [the article] was an accurate statement of existing law or that its provisions should be accepted."[16]

The widely voiced objections to the Convention and its failure to achieve acceptance confirm that it did not and does not reflect a "general and consistent practice of states followed by them from a sense of legal obligation" such that it reflects or declares customary international law. *Restatement of the Foreign Relations Law of the United States* (Third), § 102(2) (1987). "[B]ecause customary international law is created by the general customs and practices of nations and therefore does not stem from any single, definitive, readily-identifiable source," district courts should "exercise extraordinary care and restraint in deciding" what constitutes such law. *Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co.*, 517 F.3d 104, 116 (2d Cir. 2008) (citation and quotations omitted); *cf. id.* at 118 (because of U.S. reservations to 1925 Geneva Protocol, "it would be an impermissible stretch to find that [it] had acquired the status of binding customary international law"); *see also Khulumani v. Barclay Nat'l. Bank Ltd.*, 504 F.3d 254, 319-20 (2d Cir. 2007) (where a convention "has not been ratified by the United States, most other mature democracies, or other states that play a significant role in international affairs … it is not a persuasive source of customary international law"); *Avero Belgium Ins. v. American Airlines, Inc.*, 423 F.3d 73, 80 (2d Cir. 2005) ("customary international law is comprised of those practices and customs that States view as obligatory and that are engaged in or otherwise acceded to by a preponderance of States in a uniform and consistent fashion").

Consistent with these principles, the U.S. Representative unequivocally stated the U.S. position that the Convention—even if it entered into force in those nations that might ever ratify

---

[16] *Id.*, 13th Meeting of the Committee of the Whole (10 March 1983), ¶ 2.

it—would not be considered customary international law.[17]  Legal scholars agree.  The Convention, "which has been objected to by such an unprecedentedly large number of States[,] can hardly serve as a basis for the crystallization of norms of customary international law."  Eli Nathan, "The Vienna Convention of Succession of State Property, Archives and Debts," *in International Law at a Time of Perplexity* 489, 493 (Yoram Dinstein ed., 1989).  Indeed, a law review article which Peru cites, "State Succession to Debts and Assets: The Modern Law and Policy," 42 *Harv. Int'l L.J.* 355 (2001) (Peru Opp. 28-29), acknowledges that the Convention "is not generally considered to be a codification of customary international law." *Id.* at 356 n.3.  In both conventional and customary international law terms, the Convention is not recognized as customary, accepted international practice that can by imposed or applied by a U.S. court, in contravention of the U.S. government's position concerning the Convention.

### 2.    *The Convention does not apply to this case by its own terms*

Even assuming *arguendo* that the Convention—ratified by only seven states and widely opposed as not representative of customary international law—were in force or recognized as indicative of international law, it does not apply here in any event.  By its terms, the Convention applies "*only* in respect of a succession of States which has occurred after the entry into force of the Convention except as may otherwise be agreed."  Convention, art. 4 (emphasis added).[18]

---

[17] *See supra* note 15, 9th Plenary Meeting (7 April 1983), at ¶ 4  (U.S. Representative stating that the fifteen ratifications required to cause the Convention to come into force in ratifying nations "would not confer upon the rules embodied in it a sufficient degree of authority to be acknowledged as valid otherwise than strictly between the parties which had subscribed to the instrument").

[18] *Supra* note 15 (Vol. 2), Commentary on art. 4, at (1) ("Since a succession of States in most cases brings into being a new State, a convention on the law of succession in respect of State property, archives and debts would *ex hypothesi* not be binding on the successor State unless and until it took steps to become a party to that convention").  Peru itself has also not ratified the Convention.  *See supra* note 12 and accompanying text (list of ratifying countries).

Accordingly, even if it ever were to achieve acceptance, the Convention would apply only prospectively, not retroactively, to those nations that have ratified it. It is expressly inapplicable to events that occurred nearly 200 years ago.[19]

>3.    *The Convention is drafted to apply only in the absence of a written agreement between the predecessor and successor state*

The Convention provides that it may apply—if it ever took force—"[*u*]*nless otherwise agreed by the States concerned.*"  Convention, art. 10 (emphasis added).  State succession commentators have noted that "all succession issues should be settled first through a consensus and agreement among interested parties … ."  Dr. Enver Hasani, "The Evolution of the Succession Process in Former Yugoslavia," 29 *T. Jefferson L. Rev.* 111, 117 (2006). "Inheritance agreements between the new emerging states and colonial power regarding succession," where they exist, will always control.  R. C. Hingorani, *Modern International Law* 103 (1984).

The cessions made when Peru became independent are specifically set out in the Capitulation of Ayacucho, and do not include, *inter alia*, ships or their contents that had left the territory long before. As shown *supra*, the Capitulation defines what Spain ceded with particularity, and nowhere mentions shipwrecked vessels or anything else that had left the territory before its signing.[20]

---

[19] The Convention also states that "[n]othing" in it "shall be considered as prejudging in any respect any question relating to the effects of a succession of states in respect of matters other than those provided for in the present Convention." Convention, art. 5.  Therefore, the Convention itself cautions against any reliance upon it in successions to which it does not apply.

[20] *Sea Hunt* warns of the dangers associated with "supplant[ing] the textual framework of negotiated treaties with an unpredictable judicial exercise in weighing equities." *Sea Hunt*, 221 F.3d at 643.

4. *State succession principles customarily apply only to property within the territory of the successor state, absent specific agreement to the contrary*

Succession of state principles are fundamentally territorial in nature. *See* Official Records, U.N. Conference on Succession of States in Respect of State Property, Archives and Debts, Summary records of the plenary meetings and of the meetings of the Committee of the Whole, Vienna, 1 March—8 April 1983 (Vol. 2), Commentary on Sec. 2, at (6) ("Succession of States in respect of State property is governed, irrespective of the specific category of succession, by one key criterion: … the linkage of such property to the territory"); Hingorani, *Modern International Law* 109 ("A new State succeeds to local laws and property *within its territory*") (emphasis added).[21] A territoriality requirement is necessary to ensure that state succession is consistent with elementary notions of sovereignty. If a successor state had the unilateral ability to exercise sovereign authority outside its territory—particularly where the predecessor state continues to exist—orderly successions and international relations as to such matters would be endangered. The "property of the predecessor state not actually located in the [successor state's] territory does not change its ownership" upon succession, because the property "has not come within the sovereign jurisdiction of the successor state, and the latter can claim only so much of it as it can seize or as is ceded to it." Daniel P. O'Connell, *The Law of State Succession* 232 (1956); *see also* Williams & Harris, "State Succession to Debts and Assets," at 364 (cited at Peru Opp. 28-29) ("in the case of continuity [of the predecessor state], the national property is not divided among the successor states but remains with the continuing state"). Consistent with

---

[21] *See also* International Crisis Group Memorandum, "State Succession to the Immovable Assets of Former Yugoslavia" (1997) ("a successor state is entitled to the moveable and non-moveable assets *located within its territory*") (emphasis added), *available at* http://www.unhcr.org/refworld/publisher,ICG,,BIH,3ae6a6cf10,0.html.

these principles, the Capitulation ceded only territory and defined categories of property within the Viceroyalty's territory at that time. *See* Ex. A, Annex 2, at Preamble.

>    5.    *The Convention does not confer jurisdiction on a U.S. court*

Like UNCLOS, the Convention vests compulsory jurisdiction over disputes concerning its application between ratifying states to previously agreed-to fora. *See* Convention, art. 44. Neither Peru, Spain, nor the United States has ratified the Convention, and no authority would permit a U.S. court to disregard its express provisions as to the designated fora (for disputes among those nations that ratify it, in successions to which it might apply), if it ever took force, and apply it for purposes of this case.

## V.    Peru's State Succession-Based Theory is Outside This Court's Jurisdiction

The Convention and the principles it sets out, both as a matter of international law and by their own terms, have no applicability to this case. More fundamentally, however, this Court may not deny Spain's motion vis-à-vis Peru based on a nonjusticiable theory.

This Circuit and courts elsewhere have consistently recognized that matters of international relations such as those Peru seeks to raise are not justiciable by a U.S. court. For example, in *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum Laden Aboard Tanker Dauntless Colocotronis*, 577 F.2d 1196, 1205 (5th Cir. 1978), the Fifth Circuit[22] held that a complaint asking the court to resolve a territorial dispute between sovereigns would extend "the judicial power beyond its philosophical limits." As in *Occidental of Umm al Qaywayn*, reaching Peru's state succession-based claim here would implicate the Court in a myriad of decisions regarding the effect of the sovereignty Peru attained, where "[t]he issue of

---

[22]    In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the 11th Circuit adopted as binding precedent the decisions of the former Fifth Circuit handed down prior to Oct. 1, 1981.

sovereignty is political … [and] judicial or manageable standards are lacking for its determination." *Id.* at 1204.

The same approach is uniformly followed in cases brought in the U.S. involving state succession as between other nations.[23]  In *Can v. United States*, 14 F.3d 160 (2d Cir. 1994), a class of former South Vietnamese citizens brought an action to recover assets held in the U.S. when South Vietnam was taken over by North Vietnam.  Because "the threshold determination of title to the blocked assets would require resolution of issues related to state succession," *id.* at 162, the court found that the claim presented a nonjusticiable political question.  The former South Vietnamese plaintiffs claimed "they [were] not seeking recognition as a sovereign, but simply as successor in interest to the property of their former government."  The court found this to be a "distinction without effect," because "[a]ny resolution of title in appellants' favor would prejudice other claimants, including any government the President might choose to recognize as sovereign successor" to South Vietnam. Moreover, "[t]he existence of competing claims demonstrates that adjudication of appellants' claims is intertwined with sovereign recognition *vel non*," and "[w]ere a court to grant appellants the relief they seek, it would not only decide a question of sovereign succession, but it would interfere with executive foreign policy prerogatives more generally."  *Id.* at 163 (citing *Baker v. Carr*, 369 U.S. 186 (1962)).

Especially instructive is *Federal Republic of Yugoslavia v. Park-71st Corp.*, 913 F. Supp. 191, 194 (S.D.N.Y. 1995), where Serbia and Montenegro, as the "Federal Republic of Yugoslavia," sought a declaratory judgment following the breakup of Yugoslavia that they had

---

[23]  Peru suggests that it seeks to assert a claim only to those "historical artifacts found at sea." (Peru Opp. 2.)  But Peru gives no limiting principle that would distinguish artifacts "found at sea" from anything else that left the territory. If Peru's interpretation were correct, then any successor state would be vested, upon succession, with a right to anything that left its territory, regardless of when that happened, where it is now, or in what condition or use it may now be.

succeeded to ownership of Manhattan property of the Embassy of the Socialist Federal Republic of Yugoslavia to the United Nations. Other newly independent states that had been part of the predecessor Yugoslavia intervened, each claiming an interest in the property. The court found the issues raised to be nonjusticiable, denied the request for declaratory judgment, and dismissed the case, noting the "absence of judicial competence to determine issues of succession, even where the succession is to property, rather than power." *Id.* (citing *Baker*, 369 U.S. at 217 and *Can*, 913 F.3d at 164). *See also Yucyco, Ltd. v. Republic of Slovenia*, 984 F. Supp. 209, 218 (S.D.N.Y. 1997) ("Courts have held that certain intractable issues involving state succession may pose such problems of justiciability," and therefore U.S. court could not resolve corporation's claim that successor state should be liable for equitable share of former Yugoslavia's debt).

VI.  The Court May Not Exercise Equitable Powers that are Not Available or Justiciable as to Peru in This Case

If all else fails, Peru asks the Court to "apply equitable principles" to effect "an equitable division of this treasure … to grant it to Peru entirely." (Peru Opp. 31, 29.) Peru's request is not a valid or justiciable theory, and the Court should decline the invitation.

A.  The Dispositions of State Property and Debts Peru Invokes are Inapplicable to This Case

Peru cites the dispositions of debt and assets that were worked out by the parties to the dissolutions of the former Soviet Union, Yugoslavia, and Czechoslovakia as precedent. (Peru Opp. 28-29.) But the recent breakups of these former nations bear no relevance to Peru's claim. Peru's Opposition argues that debts and assets were distributed equitably among the independent states that emerged from the dissolutions. In fact, distributions of those former nations' assets were settled via mutual agreements and/or consented-to proceedings among the relevant states

and/or their creditors, not via a U.S. court.[24]  Any rights the successor states obtained with respect to predecessor states were resolved *in connection with the succession.*  To Spain's knowledge, no U.S. court has ever accepted jurisdiction over a claim by a successor state against another state, let alone one raised nearly two hundred years after the successor won its independence.

Peru's invocation of *Hartman v. Greenhow*, 102 U.S. 672 (1880), and subsequent cases (Peru Opp. 29-31) is equally unavailing.  In *Hartman*, the Supreme Court noted that Virginia's pre-Civil War public debt was "ratably apportioned" between it and West Virginia.  *Id.* at 677.  "[B]oth states—Virginia and West Virginia—[had] recognized in their Constitutions their respective liability for an equitable proportion of the old debt of the state, and have provided that measures should be taken for its settlement."  *Id.*[25]  The later-decided *Virginia v. West Virginia*, 220 U.S. 1 (1911), was a case between the two states, brought pursuant to the Supreme Court's original and exclusive jurisdiction over such disputes.  *See* U.S. Const., art. III, § 2; 28 U.S.C. §

_____

[24] In the former Soviet Union, "the successor states developed a process for negotiating an allocation of the debts and assets of the predecessor state, with the creditor states playing an influential role in the process and outcome of these negotiations."  *See* Williams & Harris, "State Succession to Debts and Assets," at 359 (cited at Peru Opp. 28); *see also id.* at 369-82.  A month and a half before the dissolution of Czechoslovakia on December 31, 1992, the Czechoslovakian Federal Parliament adopted the Constitutional Law on the Division of Czechoslovakia Property Between the Czech Republic and the Slovak Republic, which "addressed the division and transfer of federal property" and "other property rights and obligations belonging to the former Czechoslovakia" between the two successor Republics.  *See* Williams & Harris, *State Succession to Debts and Assets*, at 403-06.  Assets and debts of the former Yugoslavia were allocated via a Succession Agreement signed in June 2001.  *See* Agreement on Succession Issues Between the Five Successors of the Former State of Yugoslavia, June 29, 2001, *and* Annexes A (movable property) and G (private property and acquired rights), *available at* http://untreaty.un.org/unts/144078_158780/6/7/13812.pdf; *see also* Dr. Enver Hasani, "The Evolution of the Succession Process in Former Yugoslavia," 29 T. Jefferson L. Rev. 111 (2006).

[25] Moreover, the dispute in *Hartman* was not between the two states as it related to the assumption of pre-succession public debts, but between a Richmond resident and the city's Treasurer.  *See Hartman*, 102 U.S. at 673-74.

1251(a).  The West Virginia Constitution accepted "[a]n equitable proportion of the public debt of the commonwealth of Virginia," *id.* at 26.  The issue before the Court was "to ascertain the two states' proportion of the debt and their failure" "*so far as the original contract between the two states is concerned.*"  *Id.* at 28-31 (emphasis added).   In other words, neither state disputed its indebtedness *vel non*; to the contrary, each agreed to assume pre-secessionary debts, and the cases arose under state constitutions and statutes. *See also 767 Third Ave. Assocs. v. Consulate General of Socialist Federal Republic of Yugoslavia*, 218 F.3d 152, 162 & n. 7 (2d. Cir. 2000) (rejecting successor state's attempt to rely on *Virginia v. West Virginia* for the proposition that "courts are able to equitably allocate debt among sovereigns," and holding that "the federal courts do not have the authority or the means to determine the equitable distribution of the public debt of a foreign state among several successor states").  For obvious reasons, a case decided under the U.S. Supreme Court's original and exclusive jurisdiction to hear disputes between U.S. states provides no authority for this Court to consider rights claimed by Peru vis-à-vis Spain allegedly arising from its independence in 1824 or to rewrite the Capitulation of Ayacucho.

      B.      <u>No General Principle of Equity Justiciable by a U.S. Court Supports Peru's Claim</u>

Other "general principles of equity" Peru invokes (Peru Opp. 33) are similarly inapplicable. Peru cannot establish a right to a *pro rata* share of the *Mercedes* because determining a predecessor state's liability for an "equitable" share or "apportionment of responsibility" between the predecessor and successor state is a "task for which the Court is ill-suited and of a kind clearly for nonjudicial discretion." *Yucyco, Ltd.*, 984 F. Supp. at 218 (quotations omitted).   There is no "joint ownership" (Peru Opp. 34) in this case because, as demonstrated *supra*, Spain could not have acquired "resources from Peru," *id.*, when Peru was Spanish territory.  And lastly, Peru has no claim under "the first in order of time" principle, *id.*, because the *Mercedes* was, is, and always has been a Spanish sovereign vessel.

VII.   Peru Provides No Basis To Deny Spain's Motion To Dismiss Odyssey's Claims on
       Sovereign Immunity Grounds

Peru's arguments regarding FSIA's applicability to the Defendant (Peru Opp. 4-11) are of no relevance to Spain's motion, and can be addressed summarily.

First, Peru incorrectly argues that Spain cannot obtain immunity from suit as to the *Mercedes* because it is not in actual possession of it.  (Peru Opp. 4-7.)  As also discussed in Spain's Reply to Odyssey, *Deep Sea Research* stands for the proposition that a state must come to court and demonstrate its entitlement to the shipwreck for which it invokes immunity—precisely what Spain has done here, and what Peru has not.[26]  As noted previously, *Deep Sea Research* also points out that a party asserting a sovereign interest must show more than a "mere suggestion of [a] foreign government's ownership of [a] vessel," *Deep Sea Research*, 523 U.S. at 507—here, Peru has not done so.

Peru also claims that Spain has waived sovereign immunity by appearing as an *in rem* claimant in this case.  (Peru Opp. 9-10.)  But *Lord, Day & Lord v. Socialist Republic of Vietnam*, 134 F. Supp. 2d. 549 (S.D.N.Y. 2001) (discussed at Peru Opp. 9), has no bearing here, as it is not an *in rem* case where a sovereign appeared with full reservation of its sovereign immunity to protect its interest in an *in rem* Defendant.  In *Lord, Day, & Lord*, Vietnam brought an *in personam* case and obtained a judgment, then asserted immunity from counterclaims to the proceeds of its suit.  In accordance with FSIA Section 1607, the court held that a sovereign

_____

[26] In *International Aircraft Recovery, L.L.C. v. The Unidentified Wrecked and Abandoned Aircraft*, 54 F. Supp. 2d 1172 (S.D. Fl. 1999), *rev'd*, 218 F.3d 1255 (11th Cir. 2000) (discussed at Peru Opp. 8-9), the 11th Circuit also ruled that *Deep Sea Research* was not applicable in a case where the United States, not a state of the Union, was the claimant and the court therefore had "no cause to interpret the Abandoned Shipwreck Act." *Id.*, 218 F.3d at 1260.  Peru claims that the district court's decision in *International Aircraft* was reversed on other grounds, *see* Peru Opp. at 8, but the 11th Circuit clearly held that "the United States, as owner of the [sunken] plane," could protect it by bringing an *in rem* claim.

which has appeared in the U.S. to pursue an *in personam* claim is not immune from claims in the nature of counterclaims arising from or relating to the same cause of action. *Id.*, 134 F. Supp. at 556-58. Here, by contrast, Spain has invoked FSIA Sections 1609 and 1611 immunity in an *in rem* case concerning a Spanish Navy vessel. "Federal courts have been virtually unanimous in holding that the implied waiver provision of Section 1605(a)(1) must be construed narrowly," and that "[t]his approach is derived from the legislative history of the FSIA," which allows a finding of waiver where "a foreign state has filed a responsive pleading in an action *without raising the defense of sovereign immunity*." *Drexel Burnham Lambert Group Inc. v. Committee of Receivers for Galadari*, 12 F.3d 317, 325 (2d Cir. 1993) (citing FSIA legislative history) (emphasis added); *see also id.* ("courts have been reluctant to find an implied waiver where the circumstances were not similarly unambiguous"); *Calzadilla v. Banco Latino Internacional*, 413 F.3d 1285, 1287 (11th Cir. 2005) (recognizing that Section 1605(a)(1)'s implied waiver provision "is narrow and that it generally does not apply unless the foreign state reveals its intent to waive its immunity by … filing a responsive pleading in an action without raising the defense of sovereign immunity.").

This Court has already held that Spain's appearance to protect its interest in the Defendant *res*, with reservation of sovereign immunity, did not effect a waiver of immunity against counterclaims. *See* Verif. Claim of Kingdom of Spain (Dkt. 13) (fully reserving sovereign immunity); Spain Mot. to Dismiss Odyssey's *in personam* claims, at 15-17 (Dkt. 37) (noting that the waiver exception to FSIA does not apply because Spain's claim expressly reserved immunity); March 6, 2008 Order (Dkt. 91) (granting Spain's motion to dismiss Odyssey's *in personam* claims because, *inter alia*, Odyssey failed to establish subject matter jurisdiction for such claims). *Cf. United States v. Campa*, 529 F.3d 980, 1000-01 (11th Cir.

2008) (finding waiver of FSIA defense only where party raised it more than two years after first appearing before the district court). As this Court has previously held, Spain's filing of a claim *in rem* in this case does not limit its immunity in any way.

VIII. International Comity Should Compel This Court To Refuse To Hear Peru's Claim

In addition to and beyond the inherent nonjusticiability of the issues Peru seeks to have this Court consider, Spain respectfully submits that *Republic of Philippines v. Pimentel*, 128 S. Ct. 2180 (2008), as also discussed in Spain's motion and Reply to Odyssey, is controlling authority vis-à-vis Peru, and that Spain's motion should be granted based on the comity considerations that are a concomitant part of sovereign immunity. Consideration of Peru's contentions by this Court would enmesh it in matters which there is a clear comity interest to avoid. This Court should not undertake to become the arbiter of relations between Spain and Peru. The Supreme Court's guidance that the U.S. courts should decline jurisdiction so as to recognize the "comity and dignity interests" of other sovereign nations in matters involving "historical and political significance," *Pimentel*, 128 S. Ct. at 2191, applies with manifest logic and force to this case.

*Pimentel* is also especially relevant and compelling because, as shown in Spain's Reply to Odyssey, an 1824 Spanish Royal Order established a Spanish government process to indemnify those who suffered losses in the sinking of the *Mercedes* and the seizure of her sister ships, and established procedures and criteria for such claims. (Spain Reply to Odyssey, Ex. C.) Just as with the alleged descendants-claimants in this case (Dkts. 136, 157), Peru seeks to

enmesh this Court in a matter involving Spain and its present or former subjects for which this Court is not the proper forum. [27]

## CONCLUSION

For the foregoing reasons, and the reasons stated in Spain's Reply to Odyssey, Spain respectfully requests that the Court grant its Motion to Dismiss or for Summary Judgment (Dkt 131), notwithstanding Peru's opposition.

Respectfully submitted on January 26, 2009,

s/ James A. Goold
James A. Goold                                    David C. Banker
District of Columbia Bar #430315                  Florida Bar #352977
Covington & Burling LLP                           Bush Ross, PA
1201 Pennsylvania Ave. NW                         220 S. Franklin St.
Washington, DC  20004                             Tampa, FL  33601-3913
Telephone: (202) 662-5507                         Telephone: (813) 224-9255
Fax: (202) 662-6291                               Fax: (813) 223-9255
E-mail: jgoold@cov.com                            E-mail: dbanker@bushross.com

---

[27] As has previously been briefed in this case, moreover, the Act of State doctrine also precludes U.S. courts from hearing matters that would involve reviewing the acts of foreign sovereigns within their sovereign authority.  *See* authorities cited and briefed in Spain's Motion to Dismiss Odyssey's *in personam* claims (Dkt. 37 at 19-21); *see also Ricaud v. American Metal Co.*, 246 U.S. 304, 309 (1918) (Act of State doctrine requires that when "foreign government has acted in a given way on the subject-matter of the litigation, the details of such action or the merit of the result ... must be accepted by our courts"); *Glen v. Club Mediterranee, S.A.*, 450 F.3d 1251, 1253 (11th Cir. 2006) (Act of State doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory," and "requires that 'the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid'") (citations and quotation marks omitted).

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, January 26, 2009, I caused the foregoing Reply of Claimant Spain to Claimant Republic of Peru's Reply to Spain's Motion to Dismiss or for Summary Judgment and exhibits thereto to be served on counsel of record for all parties by filing with the Court via its CM/EMF system.

<u>s/ James A. Goold</u>
James A. Goold
District of Columbia Bar #430315
Covington & Burling LLP
1201 Pennsylvania Ave. NW
Washington, DC  20004
Telephone: (202) 662-5507
Fax: (202) 662-6291
E-mail: jgoold@cov.com