UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
IN ADMIRALTY

ODYSSEY MARINE EXPLORATION, INC.          :
                                          :
            Plaintiff,                    :   CIVIL ACTION
                                          :
        v.                                :
                                          : Case No: 8:07-CV-00614-SDM-MAP
THE UNIDENTIFIED, SHIPWRECKED VESSEL,:
if any, its apparel, tackle, appurtenances and :
cargo located within a five mile radius of the :
center point coordinates provided to the Court :
under seal,                               :
                                          :
            Defendant;                    :
            *in rem*                      :
and                                       :
                                          :
The Kingdom of Spain and the Republic of Peru,  :
                                          :
            Claimants,                    :
and                                       :
                                          :
Gonzalo de Aliaga (the Count of San Juan  :
de Lurigancho), et al.,                   :
                                          :
            Claimants,                    :
and                                       :
                                          :
Santiago de Alvear, et al.,               :
                                          :
            Claimants.                    :
_____/ :

## PLAINTIFF, ODYSSEY MARINE EXPLORATION, INC.'S REPLY TO CLAIMANT, THE REPUBLIC OF PERU'S RESPONSE TO THE KINGDOM OF SPAIN'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

1

Dockets.Justia.com

COMES NOW the Plaintiff, Odyssey Marine Exploration, Inc. ("Odyssey"), and files this, its Reply to Claimant, The Republic of Peru's Response to the Kingdom of Spain's Motion to Dismiss or for Summary Judgment and in support thereof states as follows:

1.  Peru has joined Odyssey in requesting that Spain's Motion to Dismiss be denied. Peru is legally correct that the Motion should be denied. Consistent with its approach toward all archaeological activity that it undertakes, Odyssey welcomes Peru's participation as one of several claimants with a potential cultural interest in the site and artifacts recovered. Peru's Response to the Motion, however, does not provide a valid basis for its own claim, as no evidence of ownership by Peru of any coins or artifacts recovered from the Defendant Site has been offered.

2.  Odyssey and Peru are in agreement on several important historical and legal issues raised by Spain's Motion. Most significantly, Odyssey and Peru both recognize that this Court has jurisdiction to hear this case and to determine the rights of the parties involved. On numerous other key points relating to the law of sovereign immunity and the law of salvage, however, Peru's response is notably flawed.

3.  Peru's Response appears to be an attempt to shortcut the proceedings in this case by presuming, manufacturing and frontloading ownership issues and attempting to exclude Odyssey from the judicial determination of rights to the very property which it has recovered. Peru's arguments raised in this regard are presumptive and unsupported by law. Like Spain, Peru erroneously asserts, without evidence or proper legal analysis, that the *res* in this case is sovereign-owned property. Peru also fails to recognize Odyssey's competing ownership claim, and completely ignores the claims of those claiming to have ownership

rights as Descendants of alleged original owners of the *res*. Finally, and most significantly, Peru misconstrues this Court's exclusive admiralty jurisdiction to decide the fate of the *res* and the rights of all parties involved.

4.     Although Peru's Response accurately asserts that this Court has jurisdiction in this case, Peru's Response otherwise distracts from the discrete issue currently before the Court, that is Spain's pending Motion to Dismiss or for Summary Judgment. As the arguments raised by Peru clearly demonstrate, however, the Motion to Dismiss or for Summary Judgment must be denied by the Court because there is no question that genuine issues of material fact exist.

5.     Odyssey reiterates its assertions and analysis in its Response to Spain's Motion to Dismiss or for Summary Judgment (Dkt. 138) and incorporates the Response by reference herein.

<u>**MEMORANDUM OF LAW**</u>

I.     **This Court has complete jurisdiction to hear all issues and all claims, and Peru's suggestion that the Court may resolve the competing claims of Spain and Peru, but not those of Odyssey, is without merit and legal support.**

Peru's Response to Spain's Motion to Dismiss or for Summary Judgment (Dkt. 141)[1] proves the point made in Odyssey's Response that there are many material issues of disputed fact which must prevent dismissal or summary judgment. Peru argues an interest in the property which has been recovered by Odyssey, but Peru's assertions of ownership and of sovereign immunity are unsupported by facts or law. Peru concedes that it seeks an award

---

[1] For convenience and readability, all page citations refer to Dkt. 141, the subject of this reply, unless otherwise specified.

"solely for the property that actually exists" (p. 13), but aside from the allegation that certain coins which have been recovered appear to have been minted in Peru (which would not itself give rise to a property interest in the cargo) Peru offers no valid basis for its assertion of any legal interest in the property which is part of the *res* in this case. Nevertheless, Peru requests this Court to deny Spain's Motion only as to Peru's competing ownership interest (p. 14), and only then to determine Odyssey's interest.

The Court may not exercise its jurisdiction to determine solely the claims of Peru and Spain while bifurcating, subordinating or excluding the claims of Odyssey. Peru does recognize the holdings in *California v. Deep Sea Research,* 523 U.S. 491 (1998) and *Lord, Day & Lord v. Socialist Republic of Vietnam*, 134 F.Supp.2d 549 (S.D.N.Y. 2001), that a claimant must concede the Court's jurisdiction in order to obtain a declaration of its rights to a *res* that is not in its possession. Indeed, Spain itself conceded as much in the *Sea Hunt* case. (*See Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels,* 47 F. Supp.2d 678, (E.D. Va. 1999), *aff'd in part and rev'd in part,* 221 F.3d 634 (4th Cir. 2000). (Dkt. 138, pp. 30-31). Although Peru concurs with this proposition (p. 9), it subsequently attempts to limit its applicability to issues as between foreign entities, to the exclusion of other claimants. The fact remains, however, that Peru, like Spain, must submit to this Court's jurisdiction in order to obtain any relief it seeks.

The Court must further reject Peru's suggestion that the competing ownership claims of Peru and Spain should be resolved before addressing Odyssey's claims. In this admiralty *in rem* action, the Court must determine all claimants' relative rights to the *res*. Peru essentially ignores that Odyssey, in addition to Spain, Peru and other private claimants,

4

maintains an ownership claim to the artifacts. Peru only summarily asserts that the coins and artifacts cannot possibly belong to Odyssey because Peru has "rights to any treasure that originated within Peru." (p. 4). This is a disputed issue squarely before this Court. The mere presence of more than one sovereign among the claimants to a *res* does not subordinate the ownership and salvage claims of other claimants; Peru offers no authority to the contrary.

Count I of Odyssey's Amended Complaint (Dkt. 25), is a claim for ownership under the law of finds. Odyssey requests in this Count that it be deemed owner of the property it has found and recovered should no other party be determined to have an ownership interest. Clearly, as salvor in possession of the *res*, and absent definitive evidence of an owner thereof, Odyssey's claim to ownership must be considered by this Court. Moreover, even if this Court were to determine that the property recovered did originate from the *Mercedes*, there has been no clear showing that either Spain or Peru owned any of the specific cargo aboard that vessel. Therefore, the Court must deny the Motion to Dismiss and assume jurisdiction to determine the ownership rights of all claimants who have come forward, as well as ownership rights of Odyssey should no claimant meet its burden of proof as to ownership.

Furthermore, even if one or more of the claimants is able to prove an ownership interest, Odyssey would still be entitled to adjudication of a salvage award to be determined by this Court. In fact, contrary to the judicial procedure suggested by Peru, the Court may first determine the appropriate salvage award due to Odyssey, and then determine the competing interests of Spain, Peru and the individual claimants who have made claims in the case.

Peru strongly and correctly refutes Spain's claim of sovereign immunity as to the *res*, but then, confusingly, Peru supports Spain's alleged refusal of salvage even though this alleged refusal can only be supported by the claim of sovereign immunity. As explained in Odyssey's Response to Spain's Motion to Dismiss (Dkt. 138, pp. 26-30), Spain, at most, could only refuse salvage as to property which it owned. The evidence presented demonstrates that the vast majority of cargo aboard the *Mercedes* (assuming Spain can prove that the *Mercedes* is, in fact, the origin of the recovered cargo) was definitely <u>not</u> owned by Spain but by private merchants. Moreover, the Descendant Claimants in this case have acknowledged that they have <u>not</u> refused salvage to the property which they claim was owned by their ancestors and was aboard the *Mercedes*. (*See* Dkt. 136, p. 4; Dkt. 157, p. 3). For Peru to take the position that this matter is between Peru and Spain to the exclusion of all other claimants has no basis in law or reason.

II. **Peru's assertion that this Court has jurisdiction over this case is accurate, but Peru cannot selectively invoke the Foreign Sovereign Immunities Act to bar consideration of Odyssey's claims.**

Odyssey has previously demonstrated that the Court should not dismiss this case on the basis of sovereign immunity. Odyssey welcomes Peru's agreement with several of Odyssey's arguments in this regard, but in many instances Peru seeks to selectively apply these principles for the exclusive benefit of Peru. Indeed, Peru manufactures a double standard whereby sovereign immunity would be denied or waived between Spain and Peru yet would be preserved vis-à-vis the non-state claimants in this case, including Odyssey.

Because Peru's arguments to this effect disavow this Court's jurisdiction and misstate the law of sovereign immunity, they must be rejected.

Odyssey acknowledges Peru's concurrence that Spain's sovereign immunity does not extend to the *res* at issue (even assuming Spain could prove an ownership interest) due to Spain's lack of actual possession, the commercial nature of the *res*, and the separate legal identity of the vessel (if one exists) and its cargo. *See California v. Deep Sea Research,* 523 U.S. 491 (1988); *Florida Department of State v. Treasure Salvors,* 458 U.S. 670 (1982); *International Aircraft Recovery, L.L.C. v. The Unidentified Wrecked and Abandoned Aircraft,* 54 F.Supp.2d 1172 (S.D. Fla. 1999), *rev'd on other grounds,* 218 F.3d 1255 (11th Cir. 2000). Odyssey and Peru concur that nothing in FSIA Section 1611 (note: not § 1661, as Peru cites at pp.7-8) grants sovereign immunity to the *res* at issue.

Odyssey also agrees with Peru that Spain's request for affirmative relief constitutes a waiver of immunity related to its claims (pp. 9-11); Peru, however, fails to recognize the application of this principle to its own claim. By requesting the Court to adjudicate its ownership interests, Spain has waived any immunity that it might otherwise have asserted, under the FSIA counter-claim exception, 28 U.S.C. § 1607, and under the broader principles in applicable legal decisions. *See Lord, Day & Lord supra.* For the same reason, Peru itself has waived any immunity that it might have asserted. If the Court has subject matter jurisdiction to adjudicate Peru's ownership claim with regards to Spain -- and Odyssey agrees that it does -- then it also has jurisdiction to hear Odyssey's ownership and salvage claims with respect to the same property. Peru's suggestion that Spain has waived immunity with respect to Peru's claims on the one hand, but that both Peru and Spain may somehow be

immune from Odyssey's claims on the other hand, has no basis in law. There is no support for the assertion that the FSIA allows a foreign state party to waive immunity for purposes of the Court's determination of ownership rights only as between sovereign states, while retaining immunity as to Odyssey's salvage and finds claims.

**III.** **Peru misstates the relevant legal standards under the FSIA and related law with respect to the status of the site and recovered artifacts in an effort to elevate and expedite consideration of its own interests.**

Peru's arguments that the vessel/site/cargo is immune under the FSIA are flawed on many levels and must likewise be rejected. Odyssey demonstrated in its prior response that the FSIA, particularly Sections 1609 and 1605(b), does not bar the present suit on sovereign immunity grounds and Spain has not fulfilled its heavy burden to demonstrate otherwise. Peru's objections here, though slightly different from Spain's, do not change this result and similarly find no basis in the law or facts of this case.

First, in asserting that the site and cargo are sovereign immune, (although arguing otherwise in portions of its pleading) Peru adopts Spain's approach of simply eliding the threshold question of whether the property, which is the subject of this case, is the property of a foreign state at all. Without any factual support, Peru merely states, "Either Peru or Spain own what remains of the *Mercedes*." (p. 12). Peru, unlike Spain, wisely appears to limit its claim to the *Mercedes*' cargo rather than the vessel itself (assuming for the sake of argument that the property recovered originated from the *Mercedes*). Indeed, Peru itself acknowledges that there is an important legal distinction between cargo and a vessel.

Peru, however, simply omits any reference to the essential fact that the majority of the cargo on the *Mercedes* was privately owned. That commercial/private character of the cargo and the *Mercedes'* function at the time it sank is the essential distinguishing feature of that vessel and would be legally significant for purposes of determining whether the FSIA is triggered at all if the Court finds that a vessel exists at the Defendant Site, and that the vessel is the *Mercedes*. The commercial/private character of the vessel and its cargo defeats any claim for sovereign immunity whether by Spain or Peru. The private ownership of the cargo is an historical fact which is completely distinct from the location where the private cargo was loaded onto the *Mercedes*, the location where the coins were minted, or the location where the raw materials for those coins may have originated. Those facts may be relevant for purposes of evaluating whether Peru or other governments have a potential *cultural heritage* interest in these coins, but they are irrelevant for purposes of evaluating whether the coins constitute "property of a foreign state" that is "located in the United States" for which an FSIA determination might be required under Section 1609, upon which Peru implicitly relies. In fact, the evidence presented by Odyssey, including the manifest of the *Mercedes*, as well as the claims made by those claiming to be descendants of the cargo owners, have shown that the FSIA will not apply to allow dismissal of the case.

Second, even if this case did involve some property of a foreign state to which FSIA immunity from attachment might otherwise apply, Section 1605(b) would still confer jurisdiction to adjudicate the parties' relative rights to the *res* in this case. Peru contests in four sentences (without citing any authority) that there is no applicable "maritime lien based on the commercial activity of the foreign state" (p. 13) because Odyssey's services were

voluntary and not in direct privity with Peru or Spain. Contrary to Peru's claim, however, the FSIA adds no conditions upon the maritime lien afforded by typical salvage operations. Odyssey's salvage claim is a maritime lien that arises out of the commercial activity of the foreign state (i.e., the carriage of large amounts of commercial freight, which Odyssey's extensive efforts have since returned to the stream of commerce).

In *The Sabine,* the U.S. Supreme Court observed that "Salvors, under the maritime law, have a lien upon the property saved, which enables them to maintain a suit *in rem* against the ship or cargo, or both where both are saved in part or in whole." 101 U.S. 384, 386 (1879). *See also* Thomas J. Schoenbaum, *Admiralty and Maritime Law,* § 9-1 (4th ed. 2004) ("A maritime lien is a privileged claim upon maritime property, such as a vessel, *arising out of services rendered* to or injuries caused by that property.") (emphasis added); *Offshore Marine Towing, Inc. v. MR23,* 412 F.3d 1254, 1257 (11th Cir. 2005) ("A maritime action *in rem* for salvage, including contract salvage, is also a suit to enforce a lien. 46 U.S.C. § 31301 (5)(F)."); *Oelwerke Teutonia v. Erlanger,* 248 U.S. 521, 525 (1919) ("[The salvors] went into a speculation and their only claim is a lien upon goods that they have rescued for a share in the saving that they have made for the owners.")

Peru's argument that FSIA § 1605(b) does not include salvage claims because a salvage lien is based on voluntary services of the salvor, rather than activities of the foreign state, is not supported by the statute. Case law indicates that § 1605(b) does not require a commercial relationship between the salvor and foreign state. (*China Nat'l Chemical Import & Export Co. v. M/V Lago Hualaihue,* 504 F. Supp, 684, 686, 690 (D. Md. 1981)). Moreover, the voluntary nature of the salvor's activities, rather than defeating a maritime

lien, is a *prerequisite* for such a lien. *See The Sabine,* 101 U.S. 384, 384 (1879). ("Three

elements are necessary for a valid salvage claim: 1. A marine peril. 2. *Service voluntarily*

*rendered* when not required as an existing duty or from a special contract. 3. Success in

whole or in part, or that the service rendered contributed to such success.") (emphasis added);

*The Craster Hall,* 213 F. 436, 437 (5th Cir. 1914) (citing *The Rita,* 62 F. 761, 763 (5th Cir.

1894)) ("Salvage, in its simple character, is the service which volunteer adventurers

spontaneously render to the owners in the recovery of property from loss or damage at sea

under the responsibility of making restitution, and with a lien for their reward.").

Peru's further assertion that the commercial activities exception applies only if

activities are in or directed at the United States is simply wrong. That nexus requirement

applies only for the general commercial activity exception under § 1605(a)(2) for suits

against a foreign state, which has no bearing on Odyssey's claim at issue in this case.

Section 1605(b), by contrast, specifically governs maritime claims, including those based on

conduct with no nexus to the United States.

Ironically, Peru argues in its Response that Spain had the right to refuse salvage

(notwithstanding the lack of a vessel and the lack of possession), but then Peru, like Spain,

asks this Court to award Peru all that Odyssey has salvaged. At page 33 of its Response,

Peru cites *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba,* 462, US 611,

633-34 (1983) for the proposition that equity should prevent unjust enrichment of a party

who seeks to "reap the benefits" of another, yet in this case both Spain and Peru seek to reap

the benefits of Odyssey's efforts and expertise without acknowledging Odyssey's legal and

equitable right, at the very least, to a salvage award.

IV. **Although Peru accurately recognizes the distinct legal status of vessel and cargo, Peru's analysis of salvage law is unsound.**

As explained in Odyssey's Response to Spain's Motion to Dismiss, and as underscored in Peru's Response, the status of a vessel is separate and distinct from the status of its cargo. *See Borgships Inc. v. The M/V Marcarena*, Lexsee 1993 U.S. Dist. Lexis 14127; *Bemis v. The RMS Lusitania*, 884 F. Supp. 1042, 1053 (E.D. Va. 1995); *aff'd, Bemis v. The RMS Lusitania*, 99 F.3d 1129 (Table) (4th Cir. 1996). Thus, even if this Court were to somehow determine, despite all evidence to the contrary, that the *Mercedes* is located at the Defendant Site, and that the *Mercedes* was a sovereign immune vessel, that determination would not affect the status of the cargo. In other words, even if it is proven or adjudged that Odyssey has recovered cargo from the *Mercedes*, that cargo is not automatically considered sovereign immune property.

Furthermore, specific property to which Spain or Peru may claim ownership, must be proven by its owner not to have been abandoned. Assuming Peru or Spain has an ownership interest in a vessel (if one exists) or the artifacts recovered by Odyssey, relevant precedent in this jurisdiction allows the inference of abandonment based merely on the passage of time, and so implicates a presumption of abandonment. *Klein v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 758 F.2d 1511, 1514 (11th Cir. 1985); *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 569 F.2d 330, 337 (5th Cir. 1978).

This Court has already recognized a lenient standard of abandonment in *Odyssey Marine Exploration, Inc. v. The Unidentified Shipwrecked Vessel or Vessels*, 2006 WL

3091531 (M.D. Fla. Oct. 30, 2006). In that case, Judge Merryday adopted the Report and

Recommendation of Magistrate Judge Thomas B. McCoun, III, which noted that:

> Abandonment occurs "by an express or implied act of leaving or deserting property without hope of recovering it and without the intention of returning to it." *Columbus-America Discovery Group, Inc. v. The Unidentified, Wreck and Abandoned Sailing Vessel*, 742 F.Supp. 1327, 1335 (E.D. Va. 1990), *rev'd on other grounds by Columbus-America Discovery Group, Inc. v. Atlantic Mut. Ins. Co.*, 974 F.2d 450 (4th Cir. 1992). Abandonment may be inferred from all the relevant facts and circumstances. *Id.*

*Id.* at *3 n.4.

Under this standard, the *Mercedes* has been abandoned. It is not sufficient for Spain

to argue that merely because the *Mercedes* was owned or operated by Spain that would

entitle Spain to assert perpetual ownership under an express abandonment theory.

Furthermore, as indicated in Odyssey's Response to Spain's Motion, even under Spain's own

laws, it has abandoned the *Mercedes* and it would have no ownership rights to the *Mercedes*

today. (*See* Exhibit G to Odyssey's Response Dkt. 138, pp. 9, 10). At the very least, the

issue of abandonment is yet another disputed issue which must prevent dismissal or summary

judgment in this case. Moreover, Peru's assertion that Spain had the right to refuse salvage

and that "Odyssey never sought Peru's permission to salvage . . ." (p. 4) ignores the fact that

Odyssey had no knowledge, and to date still has no confirmation, of any ownership interest

of Spain or Peru in the Defendant Site or the artifacts recovered.

Peru also claims that a vessel owner can refuse salvage for cargo. Again, this would

only be true if the vessel owner also owned all of the cargo aboard. Peru makes a

supplemental argument that an owner of a vessel could refuse salvage for all cargo, owned

and unowned, because the salvor, focusing on cargo, could interfere with the master's control

over the vessel. Even if that were a compelling policy argument in a different case, it is entirely irrelevant here, where Odyssey's recovery of trade goods lying on the ocean floor for some 200 years certainly had no impact on the operation of any vessel. The Defendant Site is not in the actual possession of either Spain or Peru, such as to bring it within that ground for refusing salvage. *See The Laura,* 81 U.S. 336, 344 (1871); *Hamburg-Am. Line v. United States,* 168 F.2d 47, 56 (1st Cir. 1948) ("[s]alvage services are not compensable when forced upon a vessel after an offer of assistance has been expressly rejected, the crew remaining on board capable of meeting the peril.").

Moreover, it contravenes case law indicating that salvage cannot be refused in situations where the cargo of the vessel belongs to other parties. *See International Aircraft Recovery*, interpreting "the law of salvage to permit the owner of a vessel in marine peril to decline the assistance of others *so long as only the owner's property interests are at stake*" (218 F.3d 1255, 1262 (11th Cir. 2000)) (emphasis added). Finally, both Spain and Peru have completely ignored the fact that those claiming to be descendants of property owners in this case have explicitly not refused salvage.

V.     **Peru's claim to either a legal interest or an equitable right to the property recovered is unsupported by applicable law.**

Peru claims that it is entitled to the coins and artifacts recovered by Odyssey from the Defendant Site. Peru's assertion of an ownership interest, however, is unsupported in Peru's pleading. Indeed, although Peru makes the stunningly broad claim that it has "rights to any treasure that originated within Peru," (p. 4) it fails to demonstrate any legally relevant source

of those "rights," let alone any cognizable ownership interest in the wreck or private

merchant cargo, whether under international, U.S., Spanish or Peruvian law.

Peru seems to ground its claim under article 149 of the United Nations Convention on

the Law of the Sea, supplemented by the United Nations Educational, Scientific and Cultural

Organization ("UNESCO") 2001 Convention on the Protection of Underwater Cultural

Heritage. Peru's arguments regarding article 149's status as customary international law

binding on the United States and Peru, notwithstanding their non-party status, are very

dubious. Whatever its legal status, however, article 149 by its very terms is not relevant to

this proceeding because its scope is limited on its face to artifacts found in the "Area." The

Black Swan site is not in the Area.[2] To the extent the Law of the Sea Convention is relevant

to Peru's claim at all, article 303 would be the applicable provision, and article 303(3)

expressly preserves the application of the law of salvage. Also, the UNESCO 2001

Convention did not enter into force until January 2, 2009, among and between only the 20

states which are parties, and neither Peru nor the United States are parties. It is clear,

moreover, that the UNESCO 2001 Convention does not constitute customary international

law. Simply stated, the UNESCO 2001 Convention is not relevant to this proceeding.

Furthermore, Peru's own laws do not support Peru's suggested theory of state

property rights to the artifacts at issue in this case. In *Government of Peru v. Johnson,* 720 F.

Supp. 810 (C.D. Cal. 1989), the court found that "…in order for [Peru] to recover [the

---

[2] The Law of the Sea Convention defines the Area in article 1 as "… the seabed and ocean floor and subsoil thereof, beyond the limits of national jurisdiction." Under the Law of the Sea Convention, the limits of national jurisdiction, though specifically limited in application by the zones defined therein, extend to include the 200 mile Exclusive Economic Zone (EEZ) or further to the end of the continental shelf as defined in article 76. The Area represents the seabed outside of any zone or the continental shelf as defined in the Law of the Sea Convention.

artifacts at issue], it must prove that the Government of Peru was the legal owner at the time of their removal from that country. Such ownership depends upon the laws of Peru..." (*Id.* at 812). This case provides a synopsis of the evolution of Peruvian cultural heritage law to that point, and the ownership rights imparted thereby. The *Johnson* court surmised "that if any of the subject items left Peru before 1929, [Peru] cannot claim ownership of them." (*Id.* at 812). In its decision, the court observes "[t]he laws of Peru concerning its artifacts could reasonably be considered to have no more effect than export restrictions, and, as was pointed out in *United States v. McClain*, 545 F.2d 988, 1002 (5th Cir. 1977), export restrictions constitute an exercise of the police power of a state; 'they do not create "ownership" in the state. The state comes to own property only when it acquires such property in the general manner by which private persons come to own property, or when it declares itself the owner.'" (*Id.* at 814).[3]

Peru has since replaced the law then before the California court. Law No. 28296, entitled General Law of the Cultural Heritage of the Nation, was enacted in 2004 and abolishes all laws and regulations in opposition.[4] On the surface, this law, in part, defines the objects which Peru considers to be cultural property and implements measures to protect and preserve that cultural property, including strict export restrictions, while recognizing the rights of private ownership within the national territory. Law 28296 unambiguously declares the State the steward of the Cultural Heritage of the Nation, but the declaration of state

---

[3] The Johnson court also relied upon *United States v. McClain*, 593 F.2d 658 (5th Cir. 1979), the combination of which has come to be called the "McClain doctrine" which effectively places the largest part of the burden of protecting cultural heritage on the party claiming that heritage while protecting the rights of U.S. citizens.
[4] The official UNESCO English translation of this law is used on the basis of *United States v. McClain*, 593 F.2d 658 (5th Cir. 1979), which found that a law conveying ownership of artifacts to a state must do so "with sufficient clarity to survive translation into terms understandable by and binding upon American citizens." (*Id.* at 670).

ownership is limited as it may apply to the *res* in this matter. Title I, Article 5 asserts state ownership of all undiscovered cultural property; however this is only applicable to Peru's national territory and its waters. Article 10 asserts state ownership of all cultural property which has been illegally exported, or the illegal export of which has been attempted. Clearly, none of these conditions apply to the *res* in this matter (which would have left what is now Peruvian territory centuries before 1929 or 2004) and Peru has no basis for an ownership claim within its own law.

Peru's argument under the 1983 Vienna Convention on Succession of States (attached to Peru's Response as Exhibit A, Dkt. 141-2) raises significant legal questions, including arguments that contradict stated U.S. government positions. Fortunately, the Court need not address these issues because the 1983 Vienna Convention has not yet entered into force. Furthermore, Peru's argument that this Convention embodies customary international law is contradicted by the fact that in 25 years only 7 of the 15 parties required to cause entry into force have ratified or acceded to this instrument.[5] Notwithstanding the foregoing, any claim by Peru based on the concepts contained within this convention is relevant only to the extent that Spain itself had a state ownership interest to which Peru may have succeeded. For the reasons Odyssey has already explained, Spain has demonstrated no such interest.

Peru's suggestion that it has an ownership right to coins minted within an area which is now known as Peru is completely unsupported by law. The argument fails to recognize any true owners of the coins. It would be similar to arguing that a U.S. dollar in any man's

---

[5] Peru is a signatory to the 1983 Vienna Convention, but Spain is not. By its own terms, and were it in effect, the convention would only apply to a succession which occurred after entry into force (article 4) and would only apply to state owned property (article 6).

wallet actually belongs to the United States government. For this very reason, coins are generally not considered "cultural heritage" or "patrimony" under U.S. law.

In 1983, pursuant to the ratification of the UNESCO 1970 Convention on the Means of Prohibiting and Preventing the Illicit Import, Export, and Transfer of Ownership of Cultural Property,[6] the United States enacted 19 U.S.C. § 2600, the Convention on Cultural Property Implementation Act ("CPIA"). While not binding in this matter, this legislation embodies the U.S. definition of cultural property and rights thereto. Since its enactment, the U.S. has entered into various Memoranda of Understanding with more than a dozen nations regarding import restrictions of certain materials deemed by that nation to be of *archaeological, ethnological or cultural value* and recognized as such by the U.S.

Each of these Memoranda of Understanding includes a list of designated "protected" or "restricted" articles. With a single exception, coins are notably absent from these designated lists of restricted articles.[7] The list of restricted articles accompanying the Memorandum of Understanding regarding Peru does not list coins (62 FR 31713-31721).[8]

While it is clear that CPIA addresses the protection of "cultural property" with a high degree of specificity, CPIA primarily deals with items of "archaeological or ethnological"

---

[6] Both Peru and the United States have ratified this convention.

[7] The exception is that the designated list of articles pertaining to Cyprus that are restricted from import was amended in late 2007 to include certain Cypriot coins from the period spanning the 6th century BC through 235 AD (72 FR 38470-38474). This restriction, however, is limited to those coins illicitly exported from Cyprus and is but a subset of the date range extending to 1750 AD originally requested by Cyprus.

[8] The Memorandum of Understanding was extended in 2007 with no change to the list of restricted articles (72 FR 31176-31177). Of interest, in 1999, Italy submitted a request for restriction of imports that included coins. Although the dating of those coins is unclear, the request as granted includes objects dated up through the Imperial Roman period – 4th Century AD. In 2001, the U.S. and Italy entered into a Memorandum of Understanding regarding the requested import restrictions and coins are not included in the list of designated materials (66 FR 7399-7402). The Memorandum of Understanding was extended for 5 years in 2006 and despite the renewed requests of Italy, the list was not amended and coins are not included (71 FR 3000-3001).

interest in keeping with the UNESCO 1970 Convention it is designed to enforce, and defines them as:

> The term "archaeological or ethnological material of the State Party" means - (A) any object of archaeological interest; (B) any object of ethnological interest; or (C) any fragment or part of any object referred to in subparagraph (A) or (B); which was first discovered within, and is subject to export control by, the State Party.

> For purposes of this paragraph - (i) no object may be considered to be an object of archaeological interest unless such object - (I) is of cultural significance; (II) is at least two hundred and fifty years old; and (III) was normally discovered as a result of scientific excavation, clandestine or accidental digging, or exploration on land or under water; and (ii) no object may be considered to be an object of ethnological interest unless such object is - (I) the product of a tribal or nonindustrial society, and (II) important to the cultural heritage of a people because of its distinctive characteristics, comparative rarity, or its contribution to the knowledge of the origins, development, or history of that people.

19 U.S.C. § 2601(2).

From the foregoing, it is clear that the *res* in this matter does not represent objects of ethnological interest, as coins of 18th or 19th century are certainly not a product of a tribal or non-industrial society, thereby negating any claim Peru may envision in that regard.[9]

"Cultural patrimony," which presumably consists of "cultural property," *is* defined in various U.S. statutes, for example:

> "cultural patrimony" which shall mean an object having ongoing historical, traditional, or cultural importance central to the Native American group or

---

[9] Among the criteria for "archaeological interest," CPIA states that the object must be over 250 years old and be of "cultural significance" however, CPIA does not define "cultural significance." The term "cultural property" however, is defined as: "articles described in article 1(a) – (k) of the [UNESCO 1970] convention… " (19 U.S.C. § 2601(6)), but does *not* appear in CPIA in terms of the import restrictions provisions. Quite the contrary, these are limited to materials of "archaeological interest" and "ethnological interest" *as defined by CPIA*. The term "cultural property" first appears in a definite sense in 19 U.S.C. § 2607 which is titled "Stolen Cultural Property" and addresses property stolen from a museum, church or some similar institution which normally houses and displays items of "cultural" value for the benefit of the community, and which may or may not fit into the definitions of "archaeological" or "ethnological" interest. Whatever the reason for raising the distinction, "cultural property" is otherwise undefined in CPIA, but is consistent with other legislation

culture itself, rather than property owned by an individual Native American, and which, therefore, cannot be alienated, appropriated, or conveyed by any individual regardless of whether or not the individual is a member of the Indian tribe or Native Hawaiian organization and such object shall have been considered inalienable by such Native American group at the time the object was separated from such group.

25 U.S.C. § 3001(3)(D).

While this statute is directed to the rights of Native Americans, it nonetheless is consistent with 19 U.S.C. § 2600 *et seq.* and generally establishes that for an object to be considered "cultural patrimony" it must be *central to the culture of the nation itself* and must have been considered an inalienable part of the culture *at the time it was separated from that culture*. Clearly the cargo of the *Mercedes* would not meet these standards; and for Peru to assert that coins minted within its territory either belong legally to Peru in perpetuity or are to be considered the "cultural patrimony" of Peru so as to somehow make them immune from attachment, is devoid of legal support and defies established laws to the contrary as well as common sense.

## VI. Peru has not submitted referenced declarations.

In its Response, Peru refers to reports prepared by experts, Comandante Francisco Yabar (p. 4) and John Norton Moore (p. 23). Peru, however, has failed to file any supporting affidavits with its response, although late on the business day prior to the deadline for this filing, counsel for Peru forwarded a rough draft of an Affidavit prepared by Moore. Counsel had previously communicated to counsel for Odyssey that he did not intend to file any affidavits. While Moore's affidavit supports Odyssey's positions that Spain's Motion to Dismiss or for Summary Judgment must be denied and that there is no sovereign immunity which would defeat jurisdiction of the Court in this case, it wrongfully considers potential

rights to the *res* as solely between Spain and Peru virtually ignoring Odyssey and the most material factual and legal issues. This Court has not ruled on Peru's plea for leave to supplement its Response (p. 24); clearly, assumptions and assertions made in Peru's Response, however, should not be considered by the Court to Odyssey's disfavor in the absence of valid supporting evidence as Odyssey has not had ample time to prepare an appropriate response thereto, and submission of any reports at this point would only serve to delay adjudication.

**VII.** **Even if this Court fails to accept jurisdiction in this case, the "return" of this "treasure," as advocated by Peru, would not result in a transfer of custody to either Spain or Peru, neither of which had possession at the time of salvage.**

Peru argues that "if the treasure is to be promptly returned to the custody of Spain, it must be 'returned' to the nations that formed Spain at the time the treasure was lost . . ." (p. 2). In fact, at the dawn of the 19th century, Spain's viceroyalties and other holdings included all of western South America, nearly all of Central America and Mexico, as well as the southwestern quarter of the U.S., Florida, the Philippines, and most of the Caribbean islands. (*See* Exhibit A attached hereto.) Under Peru's argument regarding the successor states rights, any or all of these territories (several dozen nations and 10 U.S. States), could have a claim to the *res* regardless of any actual ownership interest.

In this case, Peru's plea for return of the *res* to all of "Spain," comes on the heels of Spain's request for transfer of the property.[10] (Dkt. 131, p. 35). The request, however, is not

---

[10] Spain apparently bases its request on Supplementary Rule E(5) which addresses release of property. In effect, the Rule provides the owner of a vessel or a cargo at issue the ability to regain the custody and use/disposition of same in return for a bond sufficient to satisfy the plaintiff's claims as to that *res*. This Rule is especially

consistent with the pervasive, albeit unsound, argument made by both parties that salvage was denied and that the property should have been left at the bottom of the ocean. Following this argument to its absurd conclusion, if this Court were to grant Spain's Motion to Dismiss for lack of jurisdiction, the property would either be "released" to the party in possession, i.e., Odyssey, or returned to the bottom of the ocean floor. Nothing in the rules or law would require or allow transfer of the property to a party (either Spain or Peru) who did not have possession at the time of recovery.

Fed. R. Civ. P. 41 provides:

> (b) Involuntary Dismissal: Effect Thereof. For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against the defendant. Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, *other than a dismissal for lack of jurisdiction*, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits. (Emphasis added.)

A dismissal of this case for lack of jurisdiction thus would not be an adjudication of the merits, and the Court could not order "release" of the subject property to Spain or Peru, as neither had possession of the subject property at the time it was found and recovered by Odyssey. There would be no valid legal mechanism or basis for an order transferring the property at issue to Peru or to Spain if this Court determined that it did not have jurisdiction in this case. Upon a dismissal, should Spain or Peru desire to request "return" or award of property they allege belongs to them, their recourse would be to bring a claim against Odyssey, the finder and party in possession, and by making such a claim, they would have to

---

important in matters concerning working vessels and/or perishable or otherwise time-sensitive cargo, but it has no bearing on the matter before this Court.

submit themselves to the jurisdiction of the Court. This is conceded by Peru in Moore's draft affidavit (paragraph 43).

Once a court determines it lacks jurisdiction over a claim, it thus lacks jurisdiction to make any determination of the merits underlying any claims before it or to take any other dispositive action. *See Steel Co., aka Chicago Steel & Pickling Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998) citing *Ex Parte McCardle,* 74 U.S. (7 Wall) 506, 514 (1869) ("Without jurisdiction, a court cannot proceed at all in any cause. Jurisdiction is power to declare law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").

Therefore, in the event that this Court should find somehow that it does not have jurisdiction to adjudicate this matter, the defendant *res* must be left to its state at the time the *res* was brought before this Court, which was in the lawful possession of Odyssey having been found and recovered by Odyssey in an area with no owner and not seized or otherwise removed from the possession, control or use of any other party.

## VIII.  Conclusion.

Peru is correct that this Court has jurisdiction to hear this case. Peru is incorrect, however, in asserting that the Court could have jurisdiction as to Spain and Peru, but not as to Odyssey or the other claimants who assert an interest. There is no sovereign immunity in this case, either of Spain or Peru, as to the defendant *res*, which would warrant dismissal under the FSIA or other grounds. The disputed facts, which are many, mandate a denial of Spain's Motion under all applicable laws. Only through the Court's acceptance of jurisdiction and adjudication of the merits of all claims can there be a determination of

whether Peru has any actual legal interest in the property which has been recovered by Odyssey. Spain's Motion to Dismiss or for Summary Judgment must be denied.

Respectfully submitted,

Dated: January 26, 2009

_____
Allen von Spiegelfeld – FBN 256803
avonsp@bankerlopez.com
Eric C. Thiel – FBN 016267
ethiel@bankerlopez.com
Banker Lopez Gassler P.A.
501 E. Kennedy Blvd.
Suite 1500
Tampa, FL 33602
(813) 221-1500
Facsimile: (813) 222-3066

and

Melinda J. MacConnel – FBN 871151
Odyssey Marine Exploration, Inc.
5215 West Laurel Street
Tampa, FL 33607
(813) 876-1776, ext. 2240
Fax: (813) 830-6609
E-mail: mmacconnel@shipwreck.net
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 26, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to James A. Goold, Covington & Burling LLP, 1201 Pennsylvania Ave., NW, Washington, DC 20004; and David C. Banker, Bush Ross P.A., 220 S. Franklin Street, P. O. Box 3913, Tampa, FL 33601, *Attorneys for Claimant, Kingdom of Spain;* and Timothy P. Shusta, Phelps Dunbar LLP, 100 S. Ashley Drive, Suite 1900, Tampa, FL 33602-5315; and Mark Maney, South Tower, Penzoil Place, 711 Louisiana, Suite 3100, Houston, TX 77002, *Attorneys for the Republic of Peru;* David Paul Horan, Horan, Wallace & Higgins, LLP, 608 Whitehead Street, Key West, FL 33040, *Attorney for Descendant Claimants;* and John J McLaughlin, Wagner, Vaughan & McLaughlin, P.A., 601 Bayshore Blvd., Ste. 910, Tampa , FL 33606, *Attorney for Descendant Claimants.*

Allen von Spiegelfeld – FBN 256803
avonsp@bankerlopez.com
Eric C. Thiel – FBN 016267
ethiel@bankerlopez.com
Banker Lopez Gassler P.A.
501 E. Kennedy Blvd.
Suite 1500
Tampa, FL 33602
(813) 221-1500
Facsimile: (813) 222-3066

and

Melinda J. MacConnel – FBN 871151
Odyssey Marine Exploration, Inc.
5215 West Laurel Street
Tampa, FL 33607
(813) 876-1776, ext. 2240
Fax: (813) 830-6609
E-mail: mmacconnel@shipwreck.net

Attorneys for Plaintiff