## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION
## IN ADMIRALTY

ODYSSEY MARINE EXPLORATION, INC.,

               Plaintiff,

   v.

THE UNIDENTIFIED SHIPWRECKED VESSEL,
If any, its apparel, tackle, appurtenances and
cargo located within a five mile radius of the
center point coordinates provided to the Court
under seal,

               Defendant,
               *in rem*

and

THE KINGDOM OF SPAIN, THE REPUBLIC OF
PERU, (Conditional Claimant), and GONZALO DE
ALIAGA, *et al.*,

               Claimants.

_____/

CIVIL ACTION

Case No. 8:07-cv-00614-SDM-MAP

DISPOSITIVE MOTION

## CLAIMANT KINGDOM OF SPAIN'S REPLY TO PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

Claimant Kingdom of Spain ("Spain") submits this memorandum in reply to Odyssey Marine Exploration Inc.'s ("Odyssey") Response In Opposition to Spain's Motion to Dismiss or for Summary Judgment. (Dkt. 138 [hereinafter "Odyssey Resp."].)

Odyssey's opposition presents no sufficient grounds to delay granting the protections to which Spain's Royal Navy Frigate of War *Nuestra Señora de las Mercedes* ("*Mercedes*") is entitled under the Foreign Sovereign Immunities Act ("FSIA"), international treaties and long-standing principles of U.S., international and admiralty law. In response to Spain's motion ("Spain Mem."), Odyssey bore the burden of proof to show that the *Mercedes* is subject to an

exception to the protections mandated for vessels owned by foreign states, and especially for warships.  Try as it might, Odyssey has not and cannot.  After a year of representing that it could not identify the vessel, faced now with its photographs of the site and the other evidence Spain has marshaled, Odyssey belatedly admits that its own "leading hypothesis" is that the artifacts it took "came from the *Mercedes*" (Odyssey Resp. 7), a Spanish "government-owned" vessel (*id*. at 3).  Odyssey also does not even try to argue that the *Mercedes* has been abandoned by Spain, much less make any showing of such.  Nor does Odyssey dispute that disturbance of the resting place of the *Mercedes* and those who died in its explosion and sinking was prohibited by Spain.[1]

In its June 11, 2008 Order (Dkt. 114), the Court noted that in view of Spain's invocation of sovereign immunity for the *Mercedes*, the Court is "duty-bound to determine this issue at the earliest possible stage in the proceedings."  Spain respectfully submits that the Court is now also duty-bound to recognize and enforce the immunities and protections to which the *Mercedes* is entitled.

## I.      Odyssey Bore The Burden of Proof In Opposition To Spain's Motion

In bringing this motion, Spain was required to "produce . . . *prima facie* evidence of immunity."  *Gerding v. Republic of France*, 943 F.2d 521, 525 (4th Cir. 1991); *Alberti v. Empresa Nicaraguense De La Carne*, 705 F.2d 250, 255 (7th Cir. 1988).  Spain has done much more, documenting through official records the service and status of the *Mercedes* as a warship owned by and in the service of the Spanish Navy, sailing under orders of the Minister of the Navy when it was attacked and sunk.  In deciding Spain's motion to dismiss, "no presumptive

---

[1]      Spain submits with this reply the following supplemental declarations:  Exhibit A - Reply Declaration of James P. Delgado, Ph.D; Exhibit B - Reply Declaration of Hugo O'Donnell y Duque de Estrada; Exhibit C - Certification of Agustin Torreblanca Lopez; Exhibit D - Reply Declaration of James A. Goold.  Spain also incorporates by reference its Reply to the Opposition of the Republic of Peru to Spain's motion. (Dkt. 161.)

truthfulness attaches to plaintiff's allegations and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims." *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990); *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003); *Howland v. Hertz Corp.*, 431 F. Supp. 2d 1238, 1240 (M.D. Fla. 2006).

In opposition to Spain's showing, "the burden of going forward" shifted to Odyssey "to produce evidence establishing that the foreign state is not entitled to immunity." (Odyssey Resp. 10-11 (citing *Alberti v. Empresa Nicaraguense De La Carne,* 709 F. 2d 250, 255 (7th Cir. 1983).) Odyssey has not met that burden. "[M]ere conclusory allegations, speculation or conjecture are insufficient" to defeat a *prima facie* showing of sovereign immunity. *Maritrend, Inc. v. M/V Sebes*, Civ. A. No. 96-3140, 1997 U.S. Dist. LEXIS 23594, at *4 (E.D. La. Oct. 16, 1977). The ultimate test for the Court, weighing Spain's showing and Odyssey's opposition, is whether "a preponderance of the evidence" supports sovereign immunity. *Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1290 (11th Cir. 1999).

Additionally, as shown in Spain's Motion to Require Odyssey To Show Cause Why The Arrest Should Not Be Vacated And For Other Relief (Dkt. 132), because this case was brought under the Supplemental Admiralty Rules and Spain seeks vacation of the arrest and related relief under Rule E(4)(f), Odyssey was affirmatively required to show cause why Spain should not be granted the relief it seeks.[2]

---

[2] In opposition to Spain's Motion to Require Odyssey To Show Cause, Odyssey seeks to portray a Supplemental Rule E(4)(f) motion as limited to whether the arrest was procedurally proper. (Dkt. 140.) In fact, a Rule E (4)(f) motion puts the burden on the plaintiff to show, *inter alia*, that "there is no statutory or maritime law bar to the attachment." *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd*., 460 F.3d 434, 445 (2d Cir. 2006). The court also has "[t]he inherent power to adapt an admiralty rule to the equities of a particular situation," including "to vacate an (continued…)

Even if Spain's motion had not invoked sovereign immunity and it were viewed solely as a Rule 56 summary judgment motion, Odyssey's opposition is still inadequate. A factual and legal showing by the movant of the elements that entitle it to summary judgment can only be defeated by a showing of a *genuine* material issue of fact. "[A]rguments [that] merely offer speculation concerning the possibility of other evidence . . . fail to point to any evidence which, when construed in the light most favorable to them, creates a genuine issue of material fact." *Matia v. Carpet Transport, Inc.*, 888 F.2d 118, 120 (11th Cir. 1989). Raising "some metaphysical doubt as to the material facts" is not sufficient. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence proffered in opposition "is merely colorable . . . or is not significantly probative," the movant is entitled to summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party must establish the "existence of specific evidence in the record supporting elements essential to its claim[s]." *Maritrend*, 1977 U.S. Dist. LEXIS 23594, at *4.

## II.     The Predicates For Sovereign Immunity and Dismissal of Odyssey's Claims Have Been Fully Established

The factual record before the Court shows that every element to mandate granting Spain's motion has been established, and more.

### A.     The Identity and History of the *Mercedes* Have Been Fully Documented

Spain's showing that the *Mercedes* was constructed, commissioned and manned, and served, as a Frigate of War of the Royal Spanish Navy is historical fact that cannot be rewritten. As definitively documented by Admiral de Leste's declaration and annexes (Spain Mem., Ex.

---

attachment upon a showing of any improper practice or a manifest want of equity on the part of plaintiff." *Proshipline Inc. v. Aspen Infrastructures Ltd.*, 533 F. Supp. 2d 422, 429 (S.D.N.Y. 2008) (internal quotation marks and citations omitted).

A), the *Mercedes* was and remains a Frigate of War on the official service list of the Royal Navy. At the time of its sinking, the *Mercedes* was sailing under orders of the Minister of the Navy issued at the instruction of the Commander-in-Chief, manned by Navy Officers of War and crew, and engaged on an official mission to transport Royal Treasury property and other materials from the American Viceroyalties to Peninsular Spain at a time of threatened war. (*See also* Ex. B, O'Donnell Reply Decl., ¶¶ 3, 15.)

The historical record also shows precisely why the *Mercedes* was assigned this mission. The Treaty of Amiens was only a breathing spell in the conflict in which Spain was allied with France against Great Britain. By the time the *Mercedes* reached El Callao, war between France and Great Britain had resumed, as Spain had feared. In anticipation that Spain would be drawn again into the war, the *Mercedes* was instructed in El Callao to go on alert "in case His Majesty found himself in the difficult circumstances of taking part" again in the war. (Spain Mem., Ex. C, Annex 3.) Because of that threat, the *Mercedes* was ordered to join a squadron of Frigates of War in Montevideo "to conduct the Specie of Lima and that compiled here" to Spain under the command of Squadron Leader Bustamante. (*Id.*, Annex 5.)

The *Mercedes* and her squadron were engaged by the British Navy precisely and only because they were recognized as warships. The British commander was under orders to detain only "Spanish homeward-bound Ships of War." (Spain Mem., Ex. D, Annex 3.) As instructed, the British squadron allowed Spanish merchant ships and a mail ship to "pass by freely." (Spain Mem., Ex. A, Annex 16, at 394.)

The historical importance of the *Mercedes* is also fully documented and undisputable. As acknowledged by one of Odyssey's declarants, "the loss of the *Mercedes* was a pivotal event in the history of Spain and of the Spanish Empire more broadly." (Odyssey Resp. Ex. C at 4.) The

fact that the *Mercedes* is a military gravesite is equally indisputable. Of her crew of more than 320 (Spain Mem., Ex. A, ¶ 21), "except forty taken up by the *Amphion's* boats, all on board perished." (Spain Mem. Ex. D, ¶ 18.) The family of Spanish Captain Alvear, returning under official orders and authorization to Spain (Ex. B, O'Donnell Reply Decl., ¶¶ 16-17), also perished. (Spain Mem., Ex. A, ¶ 25.)

In the face of the historical record, Odyssey argues that "research indicates that the *Mercedes* was in service for the Correos Maritimos under the authority of the Ministry of State, *not* the Spanish Navy."[3] (Odyssey Resp. 24.) Odyssey's speculation is debunked by Spain's showing and the historical records its own declarants provide, which identify the *Mercedes* as a Frigate of War manned by a "combat complement" (Odyssey Resp., Ex. C, Annex 26), commanded by Navy "officers of war," with more than 60 gunners and a detachment of 63 Marines. (Spain Mem., Ex. A, Annex 15; Ex. B, O'Donnell Reply Decl., ¶ 18.) In the extensive and exhaustive historical record before the Court, there is not one document purporting to withdraw the *Mercedes* from service as a Spanish Navy warship and a definitive record to the contrary. (Ex. B, O'Donnell Reply Decl.)

Odyssey's own research also documents that the *Mercedes* was not assigned to the Correos Marítimos. Odyssey declarant Carlisle, for example, refers to the assignment of Frigate Ensign Abello to the *Mercedes*, but acknowledges that he was a "*former* Correos Maritimos" officer. (Odyssey Resp., Ex. E, at 18 (emphasis in "former" added).) The document Odyssey

---

[3]     Odyssey acknowledges the *Mercedes* as a "naval ship" (Odyssey Resp., Ex. E, at 2, 16) and "government-owned" (Odyssey Resp. 3). If the *Mercedes* had been assigned to Correos Marítimos (which it was not), it would make no difference with respect to sovereign immunity in any case. The Correos Marítimos was a government-owned and operated fleet of vessels in official mail service between Peninsular Spain and its Viceroyalties. (Ex. B, O'Donnell Reply Decl., ¶¶ 9-13, 18.)

relies on records that he was seeking a pay raise because of the change in his service "from the maritime mail and embarking on the Frigate *Mercedes*." (*Id.*, Annex 19.) On the *Mercedes*, Abello was serving as an "officer of war" under the authority of the Minister of the Navy. (Spain Mem., Ex. A, Annex 15; Ex. B, O'Donnell Reply Decl., ¶¶ 12-13; *id.*, Annex 4.)

Historical sources that Odyssey examined, but omitted from its submissions, further document that the *Mercedes* was not a Correos Marítimos vessel. The reference work *Correos Marítimos Españoles,* cited and excerpted at Odyssey Resp., Ex. F, Annex 15, identifies Correos Marítimos vessels and their 1802-1804 voyages. Odyssey omitted that list, which shows that the *Mercedes* and her squadron were not Correos Marítimos vessels and were not on a Correos Marítimos mission. (Ex. B, O'Donnell Reply Decl., ¶ 7.) A Spanish mail ship and Spanish merchant ships that the British sighted were allowed to proceed unmolested because the British orders were only to engage "Spanish homeward-bound ships of war" (Spain Mem., Ex. D, ¶ 15; *id.*, Ex. A, Annex 16, at 394; Ex. B, O'Donnell Reply Dec., ¶ 6.)

Odyssey also argues that, "while government-owned," the *Mercedes* was "not a sovereign immune vessel" because it had privately owned property and passengers on board.[4] (*See, e.g.*, Odyssey Resp. 3.) The historical record is definitive that the *Mercedes* sank in military service. As stated in the declaration of Admiral de Leste, "[t]he use of warships to provide protection and safe passage to the interests and property of the Spanish monarchy and of its subjects is a military function of the Spanish Navy." (Spain Mem., Ex. A, ¶ 11.) The *Mercedes* was given such a mission by the Minister of the Navy (Spain Mem., Ex. A, Annex 12)

---

[4]      As discussed below, Odyssey is wrong as a matter of law. A foreign government-owned vessel of any kind is entitled to immunity unless it is "engaged in commercial activity in the United States." 28 U.S.C. § 1609; 28 U.S.C. § 1610(a). The mission of the *Mercedes* had nothing to do with the United States.

in response to instructions from the Commander-in-Chief that warships were to transport badly needed "specie and precious produce in Lima for Spain" (*Id.*, Annex 11; *see also* Ex. B, O'Donnell Reply Decl., ¶¶ 3, 15).

Spain was not alone in giving its Navy responsibility to protect the interests and property of the government and its subjects. The use of U.S. Navy vessels to provide protection for property of U.S. citizens was authorized by an 1800 Act of Congress by and standing orders of the Secretary of the Navy. U.S. Navy officers were also authorized to assess charges for doing so. The same was true for the British Navy.[5] (Spain Mem., Ex. A, ¶ 11; Spain Mem., Ex. D, ¶ 12; *id.* Annexes 4-5.) Odyssey does not even mention these uncontradicted facts.

It is no small irony that Odyssey argues that the *Mercedes* is not entitled to immunity because it "sailed at a time of peace." (Odyssey Resp. 25.) The historical record is undisputed that Britain and France were at war, Britain was threatening to attack Spain because of Spain's financial support of France, and the attack on the *Mercedes* and her squadron itself brought Spain into war.[6]

---

[5] Historical parallels in the record include the *U.S.S. Constitution* ("Old Ironsides"), which sailed from France on the eve of the War of 1812 fully laden with property of U.S. merchants seeking protection from the anticipated outbreak of war. In the Gulf of Mexico and the Pacific Ocean, U.S. Navy warships were assigned to transport specie of U.S. citizens to protect U.S. interests from pirates and raiders. (Spain Mem., Ex. I, ¶¶ 4-6; *id.*, Annexes 3-6.) Giving "protection to the persons and property of our citizens and for the transportation of specie to the United States" was a military function and sanctioned naval practice. (*Id.*, ¶ 4; *id.*, Annex 5; *see also* Odyssey Resp., Ex. E at 8 (explaining that "the Spanish were preparing for war by bringing in funds from the overseas colonies").)

[6] Indeed, it is absurd to suggest that sovereign immunity exists only, or a warship is a warship only, when a nation is at war. By Odyssey's reasoning (Odyssey Resp. 25), the *U.S.S. Arizona* would not be entitled to protection now because the U.S. entered World War II after, not before, the attack on Pearl Harbor.

B.    Spain's Continuing Post-War Interest In The *Mercedes*

Spain's interest in the *Mercedes* did not cease with her sinking and the end of war with Great Britain.  In August 1824, after unsuccessful efforts by Spain to negotiate post-war reparations with Great Britain for the *Mercedes* and other 1804-1805 losses, a Royal Order was issued providing for indemnification by Spain of those who suffered losses from the Battle of Cape Saint Mary and other 1804-1805 naval engagements.  (Ex. C, Torreblanca López Cert.)

Pursuant to the "paternal oversight of his Majesty," the Royal Order provided for "all those interested in the ships and property of any nature," captured or sunk by the British in 1804-1805 to submit "documents that justify the property, era and circumstances of the damage and its amount."  (*Id.*, Annex 1.)  The indemnification decree included the *Mercedes*.  (Ex. C, Torreblanca López Cert.)  Public announcements were issued and the process remained active for decades thereafter, with extensions of deadlines by the Government of Spain that ultimately extended to at least 1851.  Those who showed entitlement to indemnification received interest-bearing Royal Treasury Public Debt of the State.  (*Id.*)

C.    The Site Is The *Mercedes*

Faced with the overwhelming evidence from the site, Odyssey now belatedly admits to a "leading hypothesis" that the artifacts it took "came from the *Mercedes*."  (Odyssey Resp. 7.)  Odyssey's admission effectively concedes that Spain has made the *prima facie* showing required by the FSIA.  Tellingly, Odyssey also identifies no other vessel that could account for what the historical record and Odyssey's photographs reveal.  The consistent and convergent historical and archaeological evidence is overwhelming.

The site of the Defendant corresponds to the contemporaneous Spanish and British Navy logs and reports for the location at which the *Mercedes*, the only casualty of the Battle of Cape Saint Mary, exploded and sank.  (Spain Mem., Ex. B, Annex 3.)  Odyssey does not dispute the

location analysis of the Spanish Navy and the correspondence between the exact coordinates recorded by Odyssey and the site of the Battle. (Spain Mem., Ex. D.) Nor does Odyssey dispute Dr. Delgado's analysis based on the British Commander's report. (Spain Mem., Ex. E, ¶¶ 3-4.) Odyssey's opposition includes additional contemporaneous Spanish and British position reports that also confirm the analysis. (Ex. D, Delgado Reply Decl. ¶ 8.)

At that site, vessel remains, ballast, cannon and other artifacts are deposited in a pattern that is distinctly that of a vessel that was torn apart, then sank a kilometer to the seabed. (Spain Mem., Ex. D, ¶¶ 21-27; Ex. A, Delgado Reply Dec., ¶¶ 6, 14, 23, 26.) An Odyssey declarant agrees that the site is "consistent with a vessel that has broken up at the surface, descended through the water columns and spilled out the cargo and various components on the seabed." (Odyssey Resp., Ex. B, at 8.) Blast damage is evident in the remains of copper sheathing with which the *Mercedes* was clad and other artifacts. (Spain Mem., Ex. D, ¶¶ 90-94.) An Odyssey declarant agrees the photographs show "the tearing and crumpling of the copper sheathing that covered the hull." (Odyssey Resp., Ex. B at 20.)

Cannon at the site consist of the sizes, types and shapes (12 lb. and 6 lb. iron cannon, 3 lb. pedreros, and 24 lb. obuses) with which the *Mercedes* was armed. The bronze cannon, whose exact design details are visible in the photographs, match Spanish Navy specifications for the weapons documented for the *Mercedes*. The corroded and concreted iron cannons also match the 12 lb. and 6 lb. main battery of the *Mercedes*. (Ex. A, Delgado Reply Decl., ¶¶ 6, 10.)

Wooden hull remains are present in the "largely decomposed" condition to be expected of a vessel torn apart by an explosion, then submerged for two centuries. (Odyssey Resp., Ex. B at 17; Spain Mem., Ex. D, ¶ 22.) Visible hull remains include ballast in place on remains of the

lower hull, above the keel.[7]  (Ex. A, Delgado Reply Decl., ¶ 30.)  The site is strewn with artifacts documented as on the *Mercedes*.  These include copper and tin ingots, chests of coins and two especially distinctive anachronistic items, culverins of the 16th and 17th Centuries, that were loaded on the *Mercedes* in El Callao for transport to Spain as out of service weapons.  (*Id.*, ¶¶ 6, 16-21.)

The coinage points even more specifically to the *Mercedes*.  Some 5,000 coins have been cleaned and analyzed (Odyssey Mem., Ex. B at 5.)  All are Spanish.  Lima mint marks predominate, corresponding to the *Mercedes* sailing from El Callao.  The coins have yielded a date range that begins in 1773, is dominated by the years closest to the *Mercedes'* mission, and stops in 1804, when the *Mercedes* sailed for Spain.  (Spain Mem., Ex. D, Ex. H; Ex. A, Delgado Reply Decl., ¶¶ 19-21.)  In the words of Odyssey's declarants, the evidence from the coins is "what one would expect from the *Mercedes*" (Odyssey Resp., Ex. B at 21), and the coinage "dovetails with the historically-attested coin cargo on the *Mercedes*" (Odyssey Resp., Ex. A at 54).

For all the research that Odyssey has conducted, including the research of Victoria Stapells Johnson (Spain Mem., Ex. G) and of at least five other un-named researchers (Odyssey Resp. 4), Odyssey identifies no other vessel that could account for the vast array of artifacts that are documented for the *Mercedes* and are at the site.  Odyssey argues instead that the evidence is "unsettled" because "there is no coherent vessel at the Site."  (Odyssey Resp. 2, 11.)  There is no

---

[7]  The ballast is especially revealing in view of Odyssey's Interrogatory Answers stating that there is an "actual absence" of a vessel at the site because, among other things, there is "no . . . ballast pile which is typically associated with a shipwreck."  (Dkt. 105.)  Faced with its own photographs showing a ballast pile and other vessel remains, Odyssey now admits that "there are items which appear to be pieces of a vessel."  (Odyssey Resp. 14.)  Odyssey therefore now tries the tack that there is no "coherent vessel."  (*Id.* at 11.)

reason for the site to consist of a "coherent vessel." The *Mercedes* was torn apart by an explosion. The remains would inevitably be scattered into a debris field as it sank. (Spain Mem., Ex. D, ¶¶ 34-35; Odyssey Resp., Ex. B, ¶ 17; Ex. A, Delgado Reply Decl., ¶¶ 23-26.) This process would not produce "an intact shipwreck site in the classic sense." (Odyssey Resp., Ex. B, at 10.) At the site is "a vessel that has broken up at the surface, descended through the water column, and spilled out the cargo and various components and the seabed."[8] (*Id.* at 8.)

      D.    <u>Odyssey's Location and Unauthorized Disturbance of the *Mercedes* Was Knowing And Calculated</u>

Odyssey acknowledges that it began investigating the *Mercedes* "as early as 2005," knew that it "was listed on the Spanish Naval registry," and nevertheless put it on a "target list" for search operations. (Odyssey Resp. 4.) Odyssey also makes no claim that it disclosed to Spain that it was seeking the *Mercedes*, much less that it obtained any authorization to disturb the site and strip it of coins.

Odyssey also does not dispute that it was fully aware that unauthorized disturbance of the *Mercedes* and other Spanish vessels was forbidden. In Odyssey's words of September 2006,

---

[8]    Odyssey's archaeological declarations argue that identification of the site is premature because not all of the *Mercedes'* cannons, copper and tin ingots, coins, etc., are visible on the surface in the photographs of the photomosaic area. There is no reason to assume, or to require for purposes of this motion, that all of the ship and its contents came to rest in that area. The bow and/or forecastle remained afloat after the explosion, and there is a strong current on the surface and at the seabed. (Ex. A, Delgado Reply Decl., ¶¶ 26, 29.) Within the photomosaic area, many of the visible cannon and other artifacts are partially or largely buried. Seabed photographs also show loose sand or sediment within which artifacts have been buried. (*Id.*, ¶¶ 34-37.) There is also no reason to presume that the remains within the confines of the photomosaic area would be intact. A "lack of preservation is very evident on the Black Swan cite," and "the structural remains have been largely decomposed." (Odyssey Resp., Ex. B, at 9, 17.) The Defendant in this case also is not limited to the remains that came to rest within the confines of the area of which Odyssey prepared a photomosaic. The Defendant is an "Unidentified, Shipwrecked Vessel . . . within a five mile radius of the center point coordinates provided to the Court under Seal, *in rem*." (Odysset Am. Compl. (Dkt. 25); Odyssey Compl. (Dkt. 1).)

"Spain has more sunken ships than any other state" and "must assert its ownership and protect its property from looting." Warships are "the graveyards of marines who died while serving their homelands . . . ." (Spain Mem., Ex. F, Annex 1, at 2.) The "state they served . . . must take steps to prevent interference from foreign elements in that relationship." (*Id.*)

 E. Spain Exercised Its Sovereign Right to Prohibit Disturbance or Salvage

 The record also establishes that Spain maintained its sovereign right to refuse salvage and rejected, to use Odyssey's words, "interference from foreign elements." Spain did so under U.S. and international law when it exercised its right under Article 30 of the 1989 Salvage Convention to bar salvage awards for "maritime cultural property of prehistoric, archaeological or historic interest. . . ." (Spain Mem. 21.) Spain further provided official notice to U.S. persons in 2004 that salvage of sunken vessels that were "lost while in the service of the Kingdom of Spain," including their contents, "is not authorized and may not be conducted without express consent by an authorized representative of Spain." (Spain Mem., Ex. A, at 19.)

 Spain's position was also communicated face-to-face to Odyssey at a November 2006 meeting in Madrid. Odyssey disputes the exact words that were spoken, but its own version of the meeting shows there is no material issue of fact. Odyssey does not dispute that it failed to disclose that it had targeted the *Mercedes*. Odyssey's Spanish counsel also acknowledges that Odyssey was told that "the laws of Spain prevent archaeology for private gain" and Spain would not "enter into any such collaboration with a private company such as Odyssey acting for private gain." (Odyssey Resp., Ex. C, at 5.) Odyssey "express[ed] dissatisfaction at the outcome" of the meeting, which was "unproductive" from its point of view. (*Id.* at 6.)

**III.** **The *Mercedes* Is Indisputably Subject to Immunity Under FSIA Section 1609**

 Odyssey acknowledges the *Mercedes* as Spanish "government-owned . . . at the time of its sinking." (Odyssey Resp. 3.) This is sufficient in itself to mandate sovereign immunity. As a

foreign government-owned vessel not engaged in commerce, let alone U.S. commerce, the *Mercedes* is entitled under Section 1609 of the FSIA to immunity from arrest and from claims in U.S. courts. [9]

Bringing an artifact from the site and obtaining an arrest were the means by which Odyssey sought to bring the Defendant and everything it had taken from the Defendant "within the actual and/or constructive jurisdiction of this Court." (Compl. ¶ 11 (Dkt. 1); *see also* Am. Compl. ¶ 4 (Dkt. 25).) Section 1609 provides that "the property in the United States of a foreign state shall be immune from attachment arrest and execution." 28 U.S.C. § 1609. Section 1609 precludes attachment "for the purpose of obtaining jurisdiction over a foreign state or its property." *Id.*; H.R. Rep. No. 94-1487, at 26 (1976). Especially with Odyssey's own admission that the *Mercedes* is "government-owned," Odyssey had the burden to show that an exception to Section 1609 immunity provided in Sections 1610 or 1611 of the FSIA exists. Odyssey has made no such showing. Odyssey makes no claim, and certainly no showing, that the *Mercedes* was "used for a commercial activity in the United States." 28 U.S.C. § 1610(a). Odyssey also makes no claim that Spain waived immunity for the *Mercedes*. *Id.* §§ 1610(a)-(b).

Hoping to sidestep Section 1609, Odyssey makes a series of arguments that are misguided and often frivolous. Odyssey argues, for example, that "the criteria under U.S. and international law for immunity as a sovereign vessel . . .[are] . . . limited to vessels on exclusively non-commercial service." (Odyssey Resp. 18.) Section 1609 draws no such distinction: "Section 1609 of the FSIA prohibits the arrest or attachment of a vessel owned by a

---

[9]     As noted earlier, Odyssey does not and cannot claim that Spain has abandoned the *Mercedes*. Odyssey does not dispute in any way Spain's showing that it has not "renounce[d] or abandon[ed] the property rights or other interests of the Kingdom of Spain in the warship *Mercedes* and its cargo." (Spain Mem., Ex. A, ¶ 42.)

foreign government or one of its instrumentalities." *Maritrend v. M/V Sebes*, 1997 U.S. Dist. LEXIS 23594, at **12-13 (E.D. La. Oct. 16, 1997). "[The FSIA] keeps private litigants from seizing the personified and sovereign part of a foreign country that a national vessel represents." *Kim Crest, S.A. v. M/V Sverdlovsk*, 753 F. Supp. 642, 648 (S.D. Texas 1990).[10]

Government-owned vessels and government-owned shipping companies are protected by the FSIA even if claims against them relate to commercial vessels with no military connection whatsoever. *See Mangattu v. M/V Ibn Hayyan*, 35 F.3d 205 (5th Cir. 1994) (Mideast government-owned merchant vessel); *O'Connell Machinery Company v. M.V. Americana*, 734 F.2d 115 (2d. Cir. 1984) (Italian government-owned cargo vessel); *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012 (2d Cir. 1993) (Russian government-owned cargo vessel); *Jet Line Services, Inc. v. M/V Marsa El Hariga*, 462 F. Supp. 1165 (D. Md. 1978) (Libyan government-owned merchant vessel); *Castillo v. Shipping Corp. of India*, 606 F. Supp. 497 (S.D.N.Y. 1985) (Indian government-owned shipping company); *Maritrend v. M/V Sebes*, Civ. A. No. 96-3140, 1997 U.S. Dist. LEXIS 23594 (E.D. La. Oct. 16, 1997) (Romanian government-owned cargo ship). To defeat a showing of sovereign ownership and invocation of the FSIA, the

---

[10]     Odyssey even argues that Section 1609 does not apply because there is "no cohesive vessel at the Defendant Site." (Odyssey Resp., 13.) The fact that the *Mercedes* exploded and sank in no way renders Section 1609 inapplicable. Section 1609 is not limited to "cohesive" or undamaged vessels. As the U.S. Department of Defense cautions, sovereign vessels are protected "regardless of condition, location, or date of sinking." (Spain Mem., Ex. I, Annex 2, ¶ 6.) "[Any] disturbance or recovery should not occur without the express permission of the sovereign . . . ." 69 Fed. Reg. 5647, 5648 (Feb. 5, 2004). Nothing in Section 1609 requires that the vessel be in active service at the time of the case, as Odyssey also argues. (Odyssey Resp. 15.)

claimant must show its claims are based on commercial activity by the vessel in the United States and/or waiver of sovereign immunity.  Odyssey has done neither.[11]

Odyssey's references to an unpublished order in *Borgships, Inc. v. M/V Macarena*, Civ. A. No. 92-3119, 1993 U.S. Dist. LEXIS 14127 (E.D. La. Oct. 14, 1993) (Odyssey Resp. 26) do it little good for multiple reasons.  The court in *Borgships* ruled that *M/V Macarena*, a cargo vessel, was immune under FSIA Section 1609 as a government-owned vessel.  The case concerned a salvage award for services that were accepted, not refused:  a fire at sea on the vessel was extinguished with the aid of the claimant.  *Borgships, Inc. v. M/V Macarena*, Civ. A. No. 92-3119, 1993 U.S. Dist. LEXIS 9950 (E.D. La. July 14, 1993).  Odyssey cites no authority that a would-be-salvor may disturb and despoil a shipwreck whose owner has refused salvage and admiralty law considers a shipwreck a "legally unified *res*."  *Deep Sea Research, Inc. v. The Brother Jonathan*, 102 F.3d 379, 389 (9th Cir. 1996), *vacated in part on other grounds by California v. Deep Sea Research, Inc.*, 523 U.S. 491 (1998); *Lathrop v. Unidentified, Wrecked and Abandoned Vessel*, 817 F. Supp. 953, 963 (M.D. Fla. 1993) (right to refuse salvage includes shipwreck *and* associated artifacts).  Whether jurisdiction exists over a shipwreck is based "upon the fiction that the *res* is not divided and that therefore possession of some of it is constructively possession of all."  *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 964 (4th Cir. 1999); *see also R.M.S. Titanic Inc. v. Wrecked and Abandoned Vessel*, 435 F.3d 521, 529-530 (4th Cir. 2006);

---

[11]     Odyssey also cites *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682 (1976) as authority that Section 1609 does not apply.  (Odyssey Resp. 17.)  That case concerned whether the Act of State doctrine barred *in personam* claims arising from nationalization by Cuba of privately-owned businesses.  Sovereign immunity against *in rem* claims to foreign state property was not pleaded or at issue.  425 U.S. at 705.  Nothing in the decision or in the State Department letter reproduced as Appendix 2 to the decision addresses the FSIA, which was enacted after *Alfred Dunhill*.

*Ralli v. Troop*, 157 U.S. 386, 400-01 (1895).  The master of the vessel is "[e]ntrusted with the

command and safety of the common adventure, and of all the interests comprised therein . . .":

> [T]here is nothing clearer than that the master of a ship wrecked
> upon the coast remains and continues the master, with all a
> master's rights, authority, and responsibility, as long as a plank of
> her remains or a particle of the cargo can be saved by him. . . .  He
> has the custody and charge of the property with a special and
> qualified interest in it, and he may make such arrangements as he
> sees fit for saving it.  No stranger has ordinarily any right to
> interfere, without his consent, under the pretenses of saving the
> property.

*The Yucatan*, 30 F. Cas. 893, No. 18,194 (S.D. Fla. 1847).[12]

Odyssey also argues that sovereign immunity should not be recognized because "the

Defendant site is not located in the United States."  (Odyssey Resp. 12.)  Odyssey overlooks that

this case is premised on its claim to have brought the Defendant within the jurisdiction of this

Court.  (Am. Compl. ¶ 4 (Dkt. 25); Compl., ¶ 3 (Dkt. 1).)  Odyssey offers no authority that

Congress enacted the FSIA while leaving U.S. litigants free to seize property of foreign states

located outside the U.S.  By Odyssey's reasoning, it may bring an attachment and claim against

the Houses of Parliament in London and this Court could not rule that it had no jurisdiction.

An equally unavailing argument by Odyssey misreads the Supreme Court's decision in

*California v. Deep Sea Research, Inc.*, 523 U.S. 491 (1998) as precluding the Court from

granting immunity "where the sovereign asserting a claim to the property in an *in rem* action is

not in actual possession of the *res*."  (Odyssey Resp. 15.)  *Deep Sea Research* addressed

"whether a State's Eleventh Amendment immunity in an *in rem* admiralty action depends upon

---

[12]     Odyssey also admits that the coins it took cannot be segregated between those of the
Spanish Royal Treasury, the military pay of the crew that was on board (Ex. B, O'Donnell Reply
Decl., ¶ 15), and others.  (*See* Odyssey Mem., Ex. H, at 6 ("There is no way to link specific coins
to any specific shipper.").)  This attests to the fact that the Defendant *res* cannot be divided for
immunity purposes.

evidence of the State's ownership of the *res*." 523 U.S. at 500. The Supreme Court appropriately noted that obtaining immunity requires more than a "mere suggestion" of ownership of a shipwreck. *Id.* *Deep Sea Research* simply held that, when a state seeks to invoke immunity from federal court jurisdiction for a shipwreck not in its possession, the state must come forward with evidence of its interest for review by the court. The FSIA similarly requires foreign states to make a showing of their interest, as Spain has more than done.[13]

Odyssey also tries to sidestep Section 1609 of the FSIA arguing that "Spain does not assert its own immunity from suit under Section 1604" and Spain "would be foreclosed by FSIA Section 1605(b)" from doing so. (Odyssey Resp. 17.) Whether or not Spain has invoked immunity from *in personam* claims under Section 1604 has no bearing on application of Section 1609 in this *in rem* case. Moreover, Spain did invoke its Section 1604 immunity to bar *in personam* claims in this case and the Court has already upheld Spain's immunity against such claims. (Dkt. 91.) In opposition to Spain's September 17, 2007 motion seeking dismissal of *in personam* claims (Dkt. 37), Odyssey specifically argued that Section 1605(b) applied to this case (Dkt. 53, at 15-16). Odyssey cannot now resurrect Section 1605(b).

Section 1605(b) has no bearing on this case for additional reasons. Section 1605(b) authorizes *in personam* actions to enforce maritime liens "based upon a commercial activity of the foreign state." 28 U.S.C. § 1605(b). A maritime lien secures "creditors who provide

---

[13]     Not surprisingly, Odyssey's *Deep Sea Research* argument has been rejected. In *Fathom Exploration, LLC v. Unidentified Shipwrecked Vessel*, the salvor also claimed that *Deep Sea Research* means a sovereign "cannot successfully challenge [an *in rem* claim to a shipwreck] on sovereign immunity grounds unless it actually possesses the *res*. . . ." 352 F. Supp. 2d 1218, 1229 n.15 (S.D. Ala 2005). The court pointed out that "[t]his is a *non sequitur.*" *Id.*; *see also Great Lakes Exploration Group LLC* v. *Unidentified Wrecked And (For Salvage-Right Purposes) Abandoned Sailing Vessel*, 522 F. 3d 682, 688 (6th Cir. 2008) (*Deep Sea Research* "made clear" that once a state shows ownership of a shipwreck, "the federal courts lack jurisdiction").

'supplies which are necessary to keep the ship going.'" *Silver Star Enterprises, Inc. v. Saramacca M/V*, 82 F.3d 666, 668 (5th Cir. 1996). This case is not based on any commercial activity of Spain. It is based on Odyssey's attempt to subject a vessel that sank more than 200 years ago to Odyssey's modern-day commercial aspirations. Section 1605(b) requires a direct "nexus between the 'commercial activity'" of the shipowner (which is not present in this case) and the claim asserted. *Brazosport Towing Co. v. 3,838 Tons of Sorghum Laden on Bd. Barge NL No. 703*, 607 F. Supp. 11, 15 (S.D. Tex 1984), *aff'd*, 790 F.2d 891 (5th Cir. 1986).[14]

Odyssey's reliance on a 1989 memorandum of the Department of State Legal Adviser concerning the *Presidente Rivera* (Odyssey Resp. 23) also attests to its inability to navigate around Section 1609. As Odyssey acknowledges, the *Presidente Rivera* was a tanker chartered by a national oil company to carry oil to "commercial customers in the United States." (*Id.*) The tanker grounded in U.S. waters, the Delaware River, while delivering fuel oil to U.S. companies. *Digest of U.S. Practice in International Law* 291-94 (1989-1990). The ship was actively engaged in commercial activity in the United States, and thus within Section 1610's exception to Section 1609 immunity.

## IV.    The Immunity of Warships Further Mandates Granting Spain's Motion

Because Odyssey acknowledges *Mercedes* as a Spanish "government-owned" vessel and makes no claim that it was engaged in U.S. commercial activity, the Court need not even

---

[14]    Any reason to speculate about Section 1605(b) also ended when Odyssey elected to proceed *in rem* and obtained an arrest. Section 1605(b) and the in rem case Odyssey elected to file are mutually exclusive. *See Jet Lines Services, Inc. v. M/V Marsa El Hariga*, 462 F. Supp. 1165, 1174-75 (D. Md. 1978) ("According to the legislative history of the Immunities Act, '[i]f . . . the vessel or its cargo is arrested or attached, the plaintiff will lose his *in personam* remedy and the foreign state will be entitled to immunity except in the case where the plaintiff was unaware that the vessel or cargo of a foreign state was involved.' (1976) U.S. Code Cong. & Admin. News, p. 6620.") (emphasis added); *see also Velidor v. L/P/G Benghazi*, 653 F.2d 812, 816 (3rd Cir. 1981).

consider Odyssey's efforts to rewrite the history and status of the *Mercedes*. But the record is definitive as to the *Mercedes*'s status as a commissioned warship in active military service which remains on Spain's Navy register. The principles of international and domestic law protection for a "public armed ship" since at least *Schooner Exchange v. McFaddon*, 11 U.S. 116, 117 (1812) remain in full force today.

The 1982 United Nations Convention on the Law of the Sea ("UNCLOS") disposes of Odyssey's efforts to rewrite international law. UNCLOS Article 95 provides succinctly and definitively that "[w]arships on the high seas have complete immunity from the jurisdiction of any state other than the [F]lag State."[15] UNCLOS art. 95, Dec. 10, 1982, 1834 U.N.T.S. 4, 41, 21 Int'l Legal Materials 1261, 1288. Article 95 is accepted as customary and vital international law because it "protects and strengthens the key principle of sovereign immunity for warships and military aircraft. Although not a new concept, sovereign immunity is a principle of vital importance to the United States. The Convention provides for a universally recognized formulation of this principle."[16] President's Transmittal of United Nations Convention on The Law Of The Sea, 1995 WL 655157, at *1412 (Oct. 7, 1994). UNCLOS Article 95 marked no

---

[15]      Article 29 of UNCLOS defines a warship as a vessel belonging to the "armed forces of a State," manned by military personnel and externally recognizable as a warship, as the *Mercedes* indisputably was.

[16]      The same is true of the Sunken Military Craft Act. *See* 10 U.S.C. § 113 note, § 1408(3)(A) (defining a "sunken military craft" is "any sunken *warship*, naval auxiliary, *or* other vessel that was owned or operated by a government on military noncommercial service . . .".). *See also* Convention for the Unification of Certain Rules of Law Respecting Assistance and Salvage at Sea art. 14, Sept. 23, 1910, 37 Stat. 1658, 1 Bevans 780 ("[T]his Convention shall not apply to s*hips of war or* to Government ships appropriated exclusively to a public service.") (emphasis added). Article 4 of the 1989 Convention on Salvage, discussed below, likewise protects "*warships or* other non-commercial vessels owned or operated by a State and entitled, at the time of salvage operations, to sovereign immunity. . ." International Convention on Salvage [Salvage Convention] art. 4, Apr. 28, 1989, S. Treaty Doc. No. 102-12, 1953 U.N.T.S. 194 (emphases added).

change in customary international law. UNCLOS's predecessor, the 1958 Geneva Convention on the High Seas, for example, provides in Article 8 that "[*w*]*arships* on the high seas have complete immunity from the jurisdiction of any State other than the [F]lag State." Convention on the High Seas, Apr. 29, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 82 (emphasis added).

These conventions single out warships and mandate immunity for them without qualification as to the mission in which they are engaged. Neither UNCLOS nor any other authority limits immunity to wartime, nor do they condition immunity on there being no private property on board. The policy behind this universal and long-standing principle for "public armed ships" was articulated by Chief Justice Marshall in *Schooner Exchange*. A warship "acts under the immediate and direct command of the sovereign; is employed by him in national objects . . . . [I]nterference cannot take place without affecting his power and his dignity." *Schooner Exchange*, 11 U.S. at 144. As a warship, the *Mercedes* is also subject to immunity under Section 1611(b) of FSIA, and not subject to Section 1610's exception for U.S. commercial activity, as a vessel of a "military character" "used in connection with a military activity."[17]

Odyssey labors unsuccessfully to distinguish *Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, 221 F.3d 634 (4th Cir. 2000). (Odyssey Resp. 30-31.) In *Sea Hunt*, precisely as here, Spain appeared as an *in rem* claimant, with reservation of its sovereign immunity, to protect its sunken ships and the "final resting place at sea" of its military personnel and civilians from unauthorized disturbance and commercial exploitation. 221 F. 3d at 647. As in this case,

> Spain put forth affidavits and exhibits showing that at the time of their sinking both ships were serving as vessels of the Royal Navy, that both vessels are currently on the register of the Spanish Navy,

---

[17] There is no functional difference for this case between Sections 1609 and 1611 because the *Mercedes* was not in U.S. commercial activity in any event.

and that transfer or abandonment of the vessels would require
formal authorization by the government of Spain.

*Id.* at 640.

When Spain entered the case, as here, the treasure hunter had commenced salvage operations without authorization by Spain. The treasure hunter was therefore ordered to cease any activity that would disturb the ships and "to deliver to Spain any artifacts" it had taken from them. *Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, No. 2:98cv281, 1999 U.S. Dist. LEXIS 21752, at **7-8, 13-14 (E.D. Va. June 25, 1999). And just as Odyssey does in this case, the treasure hunter contended that the frigates were in commercial service. (Ex. D, Goold Reply Decl. ¶ 3; *id.* Annex 1) (claim by would-be salvor in *Sea Hunt* that LA GALGA "was not engaged in a military mission of any kind at the time of her loss, but rather was engaged in a commercial enterprise"); *id*. ¶ 4; *id.* Annex 2 (likewise claiming that "there was a substantial amount of privately-consigned gold or silver on board the JUNO when she sank"). These claims were immaterial and irrelevant. "*Sea Hunt* knew from the outset of this action that *Juno* was a Spanish vessel . . . and possibly of a military character." 1999 U.S. Dist. LEXIS 21752, at **6-8. The Fourth Circuit affirmed, holding, *inter alia*, that, "[a]s sovereign vessels of Spain, LA GALGA and JUNO are covered by the 1802 Treaty of Friendship and General Relations between the United States and Spain. The reciprocal immunities established by this treaty are essential to protecting United States Shipwrecks and military gravesites."[18] 221 F.3d at 638.

---

[18] Odyssey also argues that the Spain-U.S. Treaty of Friendship does not apply if a case concerns "the wreck of a Spanish ship not situated in United States waters." (Odyssey Resp. 19.) Yet Odyssey brought this case with a claim that brought the Defendant within the jurisdiction of this Court. (Compl. ¶ 4 (Dkt. 1).) By its very terms, Article X of the treaty obliges the United States and Spain to recognize and apply protections and immunities "in cases of shipwreck." This shipwreck case concerns the vessel of one party to the treaty pending in a court of another (continued…)

*Sea Hunt* also disposes of Odyssey's claim that a shipwreck is unprotected if it is not a "cohesive vessel" (Odyssey Resp. 2, 11): "the wreck of JUNO is not in a single location but rather scattered about the ocean floor among several other shipwrecks." 1999 U.S. Dist. LEXIS 21752, at *10. LA GALGA "lies scattered and buried in the sand beneath the water . . . ." 221 F.3d at 647.

Odyssey now also argues that *Sea Hunt* may be disregarded because "extensive research has revealed that it is likely that the sites in question are not the JUNO or LA GALGA." (Odyssey Resp. 17.) Nothing in *Sea Hunt* turned on whether or to what extent either ship was determined to be at the specific sites suspected by the treasure hunter. Spain's right as owner to protect them from disturbance was upheld even if they were "scattered about the ocean floor."[19]

## V.     Spain's Refusal Further Bars Any Claim or Award for Salvage

Even if the *Mercedes* were not immune from all claims, including salvage, under the FSIA, as discussed above, Spain's refusal of salvage is the long-standing admiralty law privilege of the owner or master of a vessel and bars a salvor from conducting operations on the vessel or disturbing it in any respect. The right to prohibit salvage applies to a sunken "vessel *and its historic artifacts.*" *Lathrop v. Unidentified, Wrecked and Abandoned Vessel*, 817 F. Supp. 953, 963 (M.D. Fla 1993) (emphasis added); *Sea Hunt*, 1999 U.S. Dist. LEXIS 21752, at *10. There is no exception that allows a would-be salvor to rummage through a historic shipwreck site —

---

party. U.S. courts are of course bound to recognize and apply U.S. law adopted by duly ratified treaty. *Sea Hunt*, 221 F.3d at 646.

[19]     The "extensive research" upon which Odyssey bases this argument (Odyssey Resp., Ex. J (Amrhein Decl.)) consisted of consultation with an individual of "proven psychic ability." "[U]sing his psychic ability," this individual drew a map purportedly showing the location of *La Galga*. (Ex. D, Goold Reply Decl. ¶ 6, Annex 3.) As to JUNO, it allegedly "disappeared in the vicinity of the salvage sites in 1802." *Sea Hunt*, 1999 U.S. Dist. LEXIS 21752, at *8.

and gravesite — in search of selected artifacts or valuables against the sovereign's wishes. Under admiralty law, also adopted as international and U.S. law in the 1989 Salvage Convention, the owner is the master of the vessel and its wishes must be honored.[20]

Odyssey does not begin to answer the agelong ranks of authorities recognizing and enforcing the shipowner's right to refuse salvage. Odyssey's reliance on *Tidewater Salvage, Inc. v. Weyerhaeuser Co.*, 633 F.2d 1304 (9th Cir. 1980) and *International Aircraft Recovery, LLC v. Unidentified, Wrecked and Abandoned Aircraft*, 218 F.3d 1255 (11th Cir. 2000), (Odyssey Resp. 25-28), is telling.

In *International Aircraft*, the Eleventh Circuit expressly "reject[ed] the district court's reasoning" that relied on *Tidewater Salvage* to grant a salvage award against a sunken U.S. Navy aircraft. *Id.* at 1262. The district court's award was reversed because, by relying on "dicta" in *Tidewater Salvage*, it had "under-appreciated the authority of a vessel's owner to prevent others from interfering with its property." *Id.* at 1261. The Eleventh Circuit stressed, however, that it was *not* deciding that, as Odyssey claims, property of others is excluded from the shipowner's refusal of salvage. (Odyssey Resp. 28.) The Court could not have been more explicit: "We have no occasion in this case to consider whether an owner could refuse salvage assistance if anything other than its own property interests were at stake."[21] 218 F.3d. at 1262.

---

[20] The 1989 Salvage Convention, to which Spain and the U.S. are parties, "applies whenever judicial or arbitral proceedings relating to matters dealt with in this Convention are brought in a State party." Salvage Convention, Art. 2. As previously noted (Spain Mem. 29), the Convention prohibits salvage awards against warships absent express consent by the sovereign and recognizes right of the owner of any vessel to refuse salvage. Salvage Convention, Arts. 14, 19.

[21] In *International Aircraft Recovery, LLC v. Unidentified, Wrecked and Abandoned Aircraft* [*International Aircraft II*], 373 F. 3d 1147 (11th Cir. 2004), the Court affirmed the district court's entry of summary judgment against a salvage award on remand.

Odyssey also cites *Bemis v. RMS Lusitania*, 884 F. Supp. 1042 (E.D. Va. 1995), *aff'd*, 99 F.3d 1129, 1196 WL 525417 (4th Cir. 1996).  (Odyssey Resp. 29-30.)  At issue in that case was whether a contract conveying title to a sunken English vessel "pass[ed] title to the cargo or personal effects."  *Id.* at 1047.  The district court held as a matter of English contract law that it did not.  *Id.*  The Fourth Circuit affirmed, finding that the contract of sale "transferred only the hull, tackle and appurtenances."  1996 WL 525417, at *2.  No refusal of salvage was at issue.

As the ultimate fall-back, Odyssey also argues that it can keep a salvage claim alive by maintaining that *Odyssey* "has not determined ownership."  (Odyssey Resp. 25.)  Odyssey targeted the *Mercedes*, knowing it is "listed on the Spanish Naval Registry" (*Id.* at 4.)  Claims of ignorance cannot be used to subvert or circumvent the shipowner's refusal of salvage, as explained in *Sea Hunt* when another treasure hunter tried the same ploy.  In language that applies equally to Odyssey, "Sea Hunt had time to contact Spain to determine Spain's wishes before beginning salvage."  1999 U.S. Dist. LEXIS 21752, at *12.  Even if there is "difficulty of determining the origin of a particular artifact without first bringing it out of the water to examine it," allowing the salvor to proceed "would in effect negate the right to refuse salvage, and would work to 'subordinate the rights of the owner to those of the salvor.'"  *Id.* (quoting *Jupiter Wreck, Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel*, 691 F. Supp. 1377, 1389 (S.D. Fla. 1988)).  Allowing salvage to proceed or granting any award based on self-serving claims of uncertainty or ignorance is impermissible: "[I]n a treasure salvage case, it would encourage potential salvors to intentionally remain ignorant of the ownership of a wrecked vessel in order to maintain salvage rights.  That is certainly not in harmony with the purposes of salvage law."  *Sea Hunt*, U.S. Dist. LEXIS 21752, at *7-8, 12-13, *aff'd*, 221 F.3d at 647.

A would-be salvor "acts as an agent for a vessel's owner," *Lathrop*, 817 F. Supp. at 694, and is subordinate to the rights of the shipowner. *Sea Hunt*, 1999 U.S. Dist. LEXIS 21752, at *10. Spain's refusal of salvage put the *Mercedes* off-limits to Odyssey. Odyssey became a "'gratuitous intermeddler' who is not entitled to any salvage award," *International Aircraft*, 218 F.3d at 1262, when it disregarded Spain's wishes and stripped the resting place the *Mercedes* of coins to sell to collectors.

The record before the Court now also establishes that denial of any salvage award, and dismissal of this action, is mandated by misconduct in accordance with the authorities and principles presented in Spain's Motion to Dismiss or for Summary Judgment and its Motion to Require Odyssey To Show Cause (Dkt. 132). Having targeted the *Mercedes* and knowing it was on the Spanish Navy registry, Odyssey concealed its intentions from Spain, then proceeded to strip the site of valuables even after it was instructed that Spain would not allow any such activity. Odyssey did so, moreover, in the face of its own avowals that Spain must "prevent interference from foreign elements" in the "graveyards of marines who died while serving their homelands." (Spain Mem., Ex. F, Annex 1, at 2.)

In language equally applicable to this case, the Fourth Circuit succinctly affirmed denial of a salvage award in *Sea Hunt* because:

> It is the right of the owner of any vessel to refuse unwanted salvage. Sea Hunt knew before bringing this action that the JUNO was a Spanish ship and that Spain might make a claim of ownership and decline salvage . . . . Because Sea Hunt had prior knowledge of Spain's ownership interests and had reason to expect Spain's ownership claim and refusal to agree to salvage activity on JUNO, Sea Hunt cannot be entitled to any salvage award.

221 F.3d at 647-48. This case calls for the same result.

## VI.     International Comity Pursuant to the FSIA Also Requires Dismissal

The FSIA was enacted to "promot[e] harmonious international relations" and to provide "foreign sovereigns treatment in U.S. courts that it is similar to the treatment the U.S. would prefer to receive in foreign courts." *Aquamar S.A. v. Del Monte Fresh Produce*, 179 F.3d 1279, 1295 (11th Cir. 1999). "Giving full effect to sovereign immunity promotes the comity and dignity interests that contributed to the development of the immunity doctrine." *Republic of Philippines v. Pimentel*, 128 S. Ct. 2180, 2182 (2008). Particularly where a case involves property of "historic and political significance" in which a foreign state has a "unique interest," giving proper weight to the interests of a foreign state includes taking into account the "affront that could result . . . if property [of the sovereign] is seized by the decree of a foreign court." *Id.* at 2190. "Where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign." *Id.* at 2191.

*Pimentel* further disposes of Odyssey's argument that the *Mercedes* may be subjected to U.S. jurisdiction because its contents included articles placed on board by Spanish citizens which are or may become the subject of competing claims. (Odyssey Resp. 27.) Giving proper weight to immunity and comity required dismissal of claims asserted in U.S. courts to property of historical and political significance to another sovereign because the sovereign has "a unique interest in resolving the ownership of or claims to the [property]." 128 S. Ct. at 2190. U.S. courts should recognize that "[t]here is a comity interest in allowing a foreign state to use its own courts for a dispute if it has a right to do so," and not "bypass its courts without right or good cause." *Id.*

The considerations that led the Supreme Court to dismiss *Pimentel* are even more compelling here. The U.S. interest is clear: "Protection of the sacred sites of other nations thus assists in preventing the disturbance and exploitation of our own." Thus, a foreign governments' requests to prevent "interference with sunken military vessels, 'especially those with deceased individuals' . . . 'should be honored.'" *Sea Hunt*, 221 F.3d at 647. Failure to recognize Spain's rights to protect its sovereign vessels would violate "principles of international comity." *Id.*

Odyssey acknowledged to Spanish authorities in 2006 that the "wreckages of ships belong, for all proprietary and other purposes, to the flag state, regardless of the waters in which they are found," and that Spain has the right to prevent "interference from foreign elements in that relationship." (Spain Mem., Ex. F, Annex 1 at 2.) And according to Odyssey itself, "Spain's rights were recognized in the courts on the strength of this line of reasoning" in *Sea Hunt*. (*Id.*) Odyssey now proffers a memorandum by that same Spanish counsel which acknowledges Spanish laws protecting historical patrimony and archaeological finds as the public patrimony of Spain. (Odyssey Resp., Ex. G, at 3-8 (citing, *inter alia*, Spanish Civil Code Articles 334.3-4 and the Spanish Cultural Heritage Act). In the face of Odyssey's 2006 admissions, the opposite position is now argued under Spanish law, and even the position that artifacts from the site "lack the significance required to afford them the special protection granted in the Spanish Cultural Heritage Act." (*Id.* at 7.)

Spain does not agree with the legal arguments and conclusions now proffered by Odyssey as to how a Spanish court would decide claims relating to the *Mercedes* or her contents. Should the Court so desire, Spain would be pleased to submit briefing on Spanish law protecting historical and archaeological patrimony or any other questions of Spanish law. Spain respectfully submits, however, that Odyssey's efforts to recant its 2006 admissions and argue

how Spanish courts would interpret and apply Spanish law demonstrates precisely why *Pimentel* calls for dismissal of this case on, *inter alia*, comity grounds.[22]

The *Mercedes* is of the utmost historical significance to Spain, acknowledged by Odyssey and demonstrated by Spain's determination to protect its historical patrimony in this case. The *Mercedes* had nothing to do with any U.S. interest: she was nearing Spain on a mission between Spain's Viceroyalties and the Spanish mainland when she sank. There is no claim that any U.S. citizen had any interest in the *Mercedes*, nor can there be. The *Mercedes* was in the service of the Spanish Navy, protecting the interests of Spain and its people. Spain "rejects, denies and refuses to recognize the salvage or other disturbance by Odyssey of our warship, its contents, and the resting place of those who died in when the ship was attacked in what represented a crucial moment in our history." (Spain Mem. Ex. A, ¶ 41.) This Court should grant "the respect that international law accords Spain's claim of ownership with regard to its shipwrecks and the military gravesites that they contain." *Sea Hunt*, 221 F.3d at 644.

## VII.  Relief Requested

For the reasons set forth in its motion and this reply, Spain respectfully submits that the FSIA and the allied principles and authorities mandating protection of the *Mercedes* from unauthorized disturbance and commercial exploitation require that Spain be given the relief it

---

[22]    The same considerations would apply with respect to the claims of "Named Descendants" (Dkts. 136 and 157). These claims include, for example, rival groups of alleged descendants of Captain Alvear. (Dkt. 136, ¶ 14; Dkt. 157). These claimants seek to assert rights of purported Spanish ancestors which would involve unraveling two centuries of Spanish genealogies and Spanish estate and succession law, Spain's 1824 Royal Order for indemnification of those who showed entitlement thereto under Spanish law (Ex. C, Torreblanc Lopez Cert.), and the current legal status of any such claims in light of, *inter alia*, Spain's cultural heritage and public patrimony laws. This court is not the forum for such a process, and these claims certainly cannot override the immunity in this court of a sovereign vessel of Spain.

seeks.  In accordance with the FSIA and the wealth of authorities Spain has provided, that relief should consist of:

a) dismissal of *in rem* claims against the Defendant, a sovereign vessel of Spain that may not be arrested, subjected to claims or disturbed against Spain's wishes;

b) vacation of the arrest, termination of Odyssey's status as substitute custodian for the U.S. Marshal and release to Spain of all artifacts taken from the Defendant by order pursuant to Rule E(5)(c) upon the dismissal of this case.[23]

Respectfully submitted on January 26, 2009,

/s/ James A. Goold
James A. Goold
District of Columbia Bar #430315
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC  20004
Telephone:  (202) 662-5507
Fax:  (202) 662-6291
Email:  jgoold@cov.com

David C. Banker
Florida Bar #352977
Bush Ross, PA
220 S. Franklin Street
Tampa, FL  33601-3913
Telephone:  (813) 224-9255
Fax:  (813) 223-9255
Email:  dbanker@bushross.com

---

[23] It merits brief mention that Odyssey argues that dismissal of this case may result in a "pre-litigation condition" under which Odyssey "had possession of the coins and artifacts." (Odyssey Resp. 33.)  But Odyssey began shipping artifacts to this district from Gibraltar on April 10, 2007 with a representation that it had recovered them "pursuant to a federal arrest and resulting court order" (Dkt. 37.2, Ex. 1, at 4) and Odyssey does not dispute that its claim to be acting under an order of this Court was false.

Odyssey has no possessory rights to anything taken from the Defendant.  Everything it took is under the authority of the Court and the U.S. Marshal, held "for safekeeping until further Order of this Court." (Dkt. 8, at 2.)  Odyssey turns the law on its head when it suggests that a ruling vacating the arrest and dismissing this case could or should result in it gaining any rights. Supplemental Rule E(5)(c) authorizes the Court to vacate the arrest and order the return of the *res* to the rightful custodian.  As in *Sea Hunt*, dismissal of Odyssey's claims necessarily means that all artifacts taken from a Spanish sovereign vessel must be returned to the custody of Spain.

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing Reply of Claimant Kingdom of Spain to the

Odyssey Marine Exploration Response In Opposition to Spain's Motion to Dismiss or for

Summary Judgment and exhibits thereto to be served on counsel of record for all parties by filing

with the Court via its CM/EMF system.

Dated:  January 26, 2009

/s/ James A. Goold
James A. Goold
District of Columbia Bar #430315
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC  20004
Telephone:  (202) 662-5507
Fax:  (202) 662-6291
Email:  jgoold@cov.com