UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
IN ADMIRALTY

ODYSSEY MARINE EXPLORATION, INC.,

   v.                                                        Case No. 8:07-CV-00614-SDM-MAP

THE UNIDENTIFIED, SHIPWRECKED VESSEL,
If any, its apparel, tackle, appurtenances and cargo
located within a five mile radius of the center point
coordinates provided to the Court under seal, *in rem*

and

The Kingdom of Spain and the Republic of Peru,
_____/

### Peru's Sur-Reply in Opposition to Spain's Motion to Dismiss

Subject to its sovereign immunity reservation, the Republic of Peru sur-replies in opposition to the Kingdom of Spain's motion to dismiss or for summary judgment.

### *Summary of Argument*

Spain's recent reply to Peru's claim is remarkably ethnocentric. In sharp contrast to Spain's repeated demands that this Court respect Spain's rights and status as a foreign sovereign, Spain asks this Court to reject Peru's claims without analysis. In an amazing display of either gall or hubris, Spain even argues that international comity (that is, respect for other nations) requires that this Court ignore Peru's claims because Spain does not want to be "enmesh[ed]" in a dispute with its "present or former subjects." Reply at 25.

In fact, Spain's reply is not based on immunity, but rather is a poorly camouflaged motion to dismiss Peru's claim on the merits. As such, Spain's reply concedes that this Court has jurisdiction to determine ownership between Peru and Spain. When Spain claims to own the treasure, it assumes the very question for this Court to determine.

Dockets.Justia.com

As to the merits, Spain's argument is premised on a series of unsupported and offensive "facts" that are actually legal claims that have been discredited for centuries. This Court is better served by reviewing sources of international law, such as the affidavit of Ambassador John Norton Moore, attached, than by reviewing Spain's ethnocentric version of history where Peru depends on Spain for all of its rights to its own patrimony.

**I.  *As a matter of fact and of law, Peru's sovereignty and its rights under international law do not depend on, or derive from, Spain.***

The facts in Spain's factual background are simply not facts at all.

**A.  *Peru contests Spain's unacceptable statements of fact regarding Peru's status and formation as an independent nation.***

To be clear: Peru rejects the assertion that Spain granted Peru its independence or that Peru's sovereign rights, then or now, could have been, or were, limited by Spain.

Peru's rights neither originate with, nor are limited by, Spain. Peru is a fully sovereign nation with ***all*** the coordinate rights under international law, including the customary international law set out in the United Nations Convention on the Law of the Sea ("UNCLOS") to its patrimony lost at sea.

Certainly, Peru is not asking this "Court to rewrite the terms under which Peru became an independent nation" when it rejects Spain's insulting and insupportable claim that "Spain granted Peru its independence in 1824." Reply at 2. Peru disputes the following insupportable claims of Spain (stated at facts):

- "Spain granted Peru its independence in 1824." *Id.*

- "The historical facts are that Peru was ceded its territory and Spain's Royal property *within* the territory, but nothing outside of it ...." *Id.*

- Peru's claim requires Peru to show "that Spain has at any time abandoned or ceded the *Mercedes* and Spain's sovereign rights with respect to its vessel." *Id.*

- The dispute between Peru and Spain is a dispute "involving Spain and its present or former subjects."

It is hard to believe that such statements were signed by an American lawyer. They are the equivalent of arguing that for more than two hundred years the United States has gotten it wrong: July 4, 1776 is an insignificant date. The United States was not a sovereign nation until England "granted" it independence on September 3, 1783, in the Treaty of Paris, and if England had never recognized the United States, our nation would still be a mere colony with limited sovereignty.

Of course, such propositions are not even worthy of consideration. The United States became a sovereign nation on July 4, 1776, and from that date forward it had all the rights of any other sovereign nation, whether its former colonizer agreed or not.

**B. As a matter of fact and United States policy, Spain did not grant, and cannot limit, Peru's independent sovereign status or its rights.**

**(1) Peru declared its independence and sovereign status on July 28, 1821.**

Peru was not **granted** its independence by Spain in December of 1824.

Peru **declared** itself and **became** independent on July 28, 1821. Pursuant to international law, Peru's sovereign rights stem entirely from that act.

**(2) Spain's surrender to Peru in December 1824 did not limit Peru's rights.**

Spain's argument rests on its interpretation of the Capitulation of Ayacucho, the document by which Spain surrendered to the already sovereign nation of Peru, three- and-a-half years after Peru's Declaration of Independence. The Capitulation is an Act, not a treaty, and it does not set forth grants by Spain to Peru, but rather requests for leniency by the

Spanish Army of the "State of Peru," including Spain's request that its soldiers be allowed to return to Europe on some vessels then in Peruvian ports.

The idea that Spain's surrender is the operative act determining Peru's rights as a nation is nonsensical. Spain was surrendering to Peru, not Peru to Spain. Spain was asking leniency of Peru, not Peru of Spain. Peru could accept Spain's surrender and grant its request for leniency only as a sovereign nation.

Surely, Spain does not suggest that it created Peru in order to surrender to it.

The Capitulation, itself, repeatedly references the "State of Peru" as an existing nation and does not contain any agreement by the "State of Peru" to waive any of its rights as a sovereign under international law.

### (3) The United States recognized Peru in 1822, before Spain's surrender.

According to the policy of the United States, Peru was a sovereign nation and protected against Spanish colonial aggression well before the Capitulation of Ayacucho. The United States recognized the Republic of Peru in 1822, and a year later, issued the Monroe Doctrine, declaring that "the American continents, by free and independent condition which they have assumed and maintain, are henceforth not to be considered as subjects to future colonization by any European powers."[1]

### (4) The Treaty of Peace and Friendship of 1879 did not limit Peru's sovereignty.

In the Treaty of Peace and Friendship of 1879, Spain established diplomatic relations with Peru, more than 50 years after the United States had done the same. Spain's interpretation of the Treaty demonstrates the desperate nature of Spain's core argument.

---

[1] J. M. Bákula, PERÚ: ENTRE LA REALIDAD Y LA UTOPÍA: 180 AÑOS DE POLÍTICA EXTERIOR. TOMO II at 1403 (Lima: Fundación Academia Diplomática del Perú y Fondo de Cultura Económica 2002); J. Lewis, THE AMERICAN UNION AND THE PROBLEM OF NEIGHBORHOOD: THE UNITED STATES AND THE COLLAPSE OF THE SPANISH EMPIRE, 1783-1829, at 156 (U.N.C. 1998).

According to Spain, the Treaty's flowery language that Peru and Spain were going to forget their troubled past was meant to convey an agreement by Peru to limit its sovereignty over its own patrimony – some 58 years after its Declaration of Independence. Reply at 5. Beyond being absurd on its face, the position completely contradicts the legal standard Spain claims for itself. When the question is whether Spain has abandoned rights to its patrimony, Spain demands clear and convincing evidence of an express act of abandonment, but according to Spain, Peru agrees to limit its sovereign rights merely by agreeing to enter into diplomatic relations with Spain.

Two matters are clear from the one-page Treaty. First, Spain recognizes Peru as a sovereign nation. While Spain's recognition was not necessary for Peru's sovereign status, it prohibits Spain from claiming Peru's non-existence now. "In public and private international law, international recognition of a change in sovereignty is not a prerequisite for state succession. In international public law, the act of recognition does not have the effect of conferring rights, but it is merely declarative in character." C. T. Ebenroth, *The Enduring Political nature of Questions of State Succession and the Quest for Objective Standards,* 17 U.Pa.J.Intl.L 753, 761 (1996). Secondly, the Treaty does not contain an agreement by Peru to limit its rights, and therefore, the Treaty is irrelevant to this case.

### C. As a matter of international law, Peru has the same rights as Spain.

#### (1) Under international law, all nations have equal rights.

Peru does not come to this Court as a subject (now or then) of Spain and demands the same respect and comity as granted to Spain. Pursuant to international law, incorporated into United States law, Peru is a sovereign nation with equal rights as Spain. As stated by James Kent, the Father of American Jurisprudence: "In the whole range of the matter discussed in

public International Law no proposition has been more explicitly announced or more implicitly accepted than this: that nations are equal in respect to each other, and entitled to claim equal consideration for their rights, whatever their relative dimensions or strength may be, or however they may differ in government, religion, or manners." Kent's Commentaries on International Law at 46 (1866).[2]

Thus, Peru's rights to its patrimony do not depend on, or derive from, Spain, but rather are determined by international law.

### (2) Spain cannot avoid international law through circular reasoning.

Spain wants to revisit the time when it ruled half the world, but in this Court of law, Spain's rights are determined by international law, not the Spanish Armada.

### (a) Peru was never a subject of Spain.

Peru was never a subject of Spain.

According to Spanish law, Peru was part of Spain, not subject to it.

In reality, Peru was always its own State, but subjected to Spain's dominion and control, so that Spain has no rights to Peru's patrimony, including the treasure. That is, Spain has no rights as a successor state because it never had a proper claim under international law to Peru's resources.

### (b) Spain tries to avoid the relevant question of international law.

When it was lost, the treasure was either jointly-owned by Peru and Spain (Spain's view) or was solely the property of Peru, illegally looted by Spain. As a result, the legal question presented by Peru is: What are the respective rights of Peru and Spain to the treasure

---

[2] As an example of a violation of this principle Kent referred to what Emer de Vattel described as the "extravagant injustice" of Spain's treatment of the Inca King. Kent's Commentaries at 47.

under international law?  The answer to that question is set out in a number of international sources, as well as by Peru's expert on international and admiralty law, Ambassador John Norton Moore: "Peru … a successor state to Spain has superior rights to the coins and other artifacts which originated physically, culturally and historically in Peru."  Exhibit A at ¶26.

Spain tries mightily to avoid that question on the basis of word games revolving around the terms "Spain" and "Spanish," but rights under international and United States law are based on substance, not semantics and word games.

### (c) The terms "Spain" and "Spanish" cannot be given shifting meanings.

In order to avoid the dictates of international law, Spain uses the term "Spain" in any number of ways.  At times, Spain uses the terms "Spain" and "Spanish" as distinct from "Peru," at times the terms "Spain" and "Peru" are synonymous.  Thus, according to Spain, the treasure on the Mercedes was "Spanish" because it came from "Peru" (in this case "Spain"), but "Peru" (now distinct from "Spain") cannot claim it now, because it is "Spanish" (now meaning Spain of today, not then).  It is all very confusing, and intentionally so.

It is not enough for Spain to declare the vessel to be "Spanish" and call for application of the Foreign Sovereign Immunities Act ("FSIA").  Spain must prove that the treasure is *presently* owned by Spain, which entails an examination of Peru's competing claim of ownership under UNCLOS, as codification of international law, and its rights as a successor state.

### D.  The treasure originated in Peru and never reached Spain.

Stripped of the word-games, certain facts are indisputable:

- The treasure originated in the territory that is now Peru.

- Peru is now unquestionably independent of Spain.

- The treasure never reached and has no link to the territory of modern Spain.

Peru's claims in this matter are based on these facts.

### E. Spain will not consent to go to the International Court of Justice.

Spain neglects to mention one other salient fact: although Spain claims that only the International Court of Justice at the Hague can decide the dispute between Peru and Spain, when asked, Spain says that it will not (at this time) consent to place the dispute there. As a result, Spain's argument (discussed below) is (1) this matter should go to the International Court of Justice; (2) we will not go, so (3) we win – give us Peru's treasure.

## II. Spain's reply concedes the immunity issue before the Court.

Spain's opposition effectively concedes the immunity question before this Court.

### A. Spain's argument is merits-based and is not directed at sovereign immunity.

In Spain's words, it addresses sovereign immunity "summarily" in four paragraphs on pages 22-24 of its reply, and even those four-paragraphs fail to deal directly with sovereign immunity. Instead, Spain's immunity argument is that Peru cannot establish a facial claim to the treasure; for example, Spain claims (with no support) that Peru has failed to "demonstrate its entitlement to the shipwreck." *Id.* at 22. In other words, Spain is disguising a motion to dismiss in a reply on a sovereign immunity issue.

Spain's merits argument, however, fails to address the actual immunity issue – whether Spain can claim immunity as against Peru, when Peru claims to be the sovereign owner of the same property as Spain. The answer is clearly no. For either or both Peru and Spain to have immunity from private claimants, they have to have a sovereign claim to the

property. Thus, this Court has to decide that ownership issue before immunity is reached. *See* Moore Affidavit at ¶¶45-50.

### B. Spain's merits argument is premature and concedes the jurisdictional question.

The FSIA equates immunity with subject matter jurisdiction. *See, e.g., Argentine Republic v. Amerada Hess Shipping Corp.*, 109 S.Ct. 683, 687-90 (1989). Therefore, this Court cannot reach the merits of Peru's claim unless it first finds jurisdiction, because a "court's consideration of the merits [is] itself an infringement on foreign sovereign immunity." *Republic of the Philippines v. Pimentel*, 128 S.Ct. 2180, 2189 (2008).

Thus, by seeking a ruling on the merits as to Peru's claim, Spain concedes jurisdiction as to that claim.

### III. This Court cannot entertain claims by private parties against Peru and/or Spain.

Jurisdiction over the dispute between Peru and Spain does not equate to jurisdiction to determine claims of private claimants against Peru and Spain. The historical record establishes the sovereign rights of either or both Peru and Spain to the property before this Court. Whether Peru and/or Spain have immunity from private claimants is another matter entirely. Until Odyssey brought the treasure here, the treasure had no connection to the United States. Nothing in the FSIA countenances a private party unilaterally bringing sovereign property to a United States court and forcing a foreign sovereign to hear claims from all comers. The FSIA is strictly construed against the exercise of jurisdiction, and none of its provisions allows such unilateral action by a private person.

Odyssey's complaint that dismissing its private claims would be inconsistent with a finding of no immunity as between Peru and Spain is of no moment. Peru and Spain, as

sovereigns, are legally different than the private claimants; it is logical that the immunity issues would be resolved differently for them.

Odyssey's argument also suffers from one of Spain's errors – it confuses merits with immunity. Peru's immunity does not mean that there are no viable salvage or inheritance claims, but solely that the FSIA does not grant jurisdiction to entertain such claims against a foreign sovereign with no voluntary connection to the United States.

Odyssey even recognizes that Peruvian law "unambiguously declares the State the steward of the Cultural Heritage of the Nation," but asks this Court to limit that stewardship in this case, because, in Odyssey's view, there are only coins as stake. This is exactly the kind of intrusion into sovereign rights that this Court cannot entertain on behalf of private claimants. There is no precedent (and it would be dangerous precedent indeed) for this Court to question Peru's claim that items unquestionably taken from Peru's territory are, under Peruvian law, part of Peru's patrimony, particularly when the treasure was brought to this Court without Peru's consent. In any event, the argument is manifestly merits-based and thus irrelevant to the jurisdictional issue.

### IV.  *International law grants Peru greater rights than Spain to the treasure.*

Spain seems to think that if it treats Peru's legal claim with disdain, the Court will not even address the serious claims brought by Peru. The great weight of authority, however, is clearly on Peru's side, while Spain cites no authority for (1) its "far-fetched" notion that Spain is the country of archaeological origin of the treasure, (2) its rejection of the international law principle of equitable allocation, or (3) its claim that international comity requires this Court to reject Peru's claims out-of-hand.

### A. *This Court should look to expert testimony on the international law issues.*

In contrast to Spain's bare rhetoric, Peru has retained the preeminent legal scholar on international and admiralty law, Ambassador John Norton Moore. His credentials go without saying, but are nonetheless set forth in his affidavit, attached. When it reaches the merits of Peru's claim, this Court should rely on such expert testimony rather than Spain's bald statements of the law. *E.g., United States v. Jurado-Rodriguez,* 907 F. Supp. 568, 574 (E.D.N.Y. 1995)("A court may seek the aid of expert witnesses in interpreting the law of a foreign state or of international law."); Fed. R. Civ. P. 44.1.

Ambassador Moore's expert opinion confirms the basic legal propositions of Peru:

> The Republic of Peru, as a sovereign nation, is entitled to all or a substantial portion of the culturally sensitive artifacts which physically and historically originated in Peru, and which are now before this court, on multiple grounds which include the law of the sea, the law of state succession, and considerations of equity and international policy concerning condemnation of colonialism, protection of permanent sovereignty over natural wealth and resources, the protection of cultural heritage and the prohibition against pillage of occupied countries.

Moore Affidavit at ¶28. Notably, experts for both Peru (Capitán Francisco Yábar Acuña) and Spain agree that the vast majority of the treasure originated in Peru.

**B. UNCLOS supports Peru's claim to its patrimony.**

**(1) Spain concedes that UNCLOS is binding United States law.**

Spain's reply does not contest one critical legal issue: the provisions of UNCLOS set forth public international law binding on this Court. *See, e.g.,* Moore Affidavit at ¶31. Spain's concession is significant, because UNCLOS directly states the rule of law: "preferential rights" are granted to "the State or country of origin, or the State of cultural origin, or the State of historical and archaeological origin." UNCLOS Art. 149.

**(2) Article 149 applies to this case.**

As explained by Ambassador Moore, Article 149 "is the appropriate contemporary international law normative criteria for determining the relative rights to" the treasure. Moore

Affidavit at ¶33. Ambassador Moore explains that this is true even though Article 149 is found in the part of UNCLOS dealing with the "Area" (international waters beyond the preferential rights of coastal states). That technical limitation does not affect Article 149's application here, because Article 149 is the only provision of UNCLOS that touches on the rights to historical objects found at sea. While the treasure was found within the Exclusive Economic Zone (EEZ) of Portugal, that state is not asserting a preferential right as a coastal State. In the absence of a claim by Portugal, Article 149 binds this Court as the only relevant rule in UNCLOS or international law. Moore Affidavit at ¶¶32-34.

Spain, on the other hand, provides no support for the proposition that, if the rule of Article 149 is technically unavailable, Spain wins under some other, unstated rule. No principled reason dictates a diametrically opposite result simply because the treasure was found in a legal gray area. To the contrary, UNCLOS Article 59 states that if there is a dispute over rights within the EEZ of a State, the dispute is to be determined "on the basis of equity and in the light of the interests involved of the parties as well as to the international community as a whole."

### (3) Peru is the "the State or country of origin, or the State of cultural origin, or the State of historical and archaeological origin" under Article 149.

Spain's convoluted word games are no more evident than when it tries to argue that Spain and Spain alone qualifies under Article 149 as "the State or country of origin, or the State of cultural origin, or the State of historical and archaeological origin." Without even pausing to discuss why the Article uses three different descriptions, Spain claims it is all three on the specious grounds that "Peru" did not exist in 1804. Ambassador Moore explains

that the argument is a classic example of both "begging the question" and "logic chopping." Moore Affidavit at ¶38.

There is no basis to graft on to Article 149 Spain's requirement that the State of origin be a political state in existence when the property was lost.

Spain's rewriting of Article 149 is manifestly inequitable and would have the practical effect of dividing all of the sunken artifacts in the world among a handful of colonizers. As stated by Ambassador Moore: "It is far-fetched indeed that a United Nations conference with a clear majority of developing countries powerfully opposed to colonialism would have had any such intent." *Id.*

If the next lost treasure ship contains a priceless piece of Incan art, to argue that Spain is the country of archaeological origin because "Peru" did not "exist" at the time the object was lost on its way to Spain is to place form over substance to a level worthy of Dickens.

Spain's rendition of the rule is also unworkable, because it would necessitate identifying when an item was lost and on unraveling the convoluted history of colonization. While the Mercedes has been identified, this will not always be the case. Under Spain's reinterpretation of Article 149, a court has no basis to award property to any sovereign without being able to date the loss, and even if the loss can be dated, the court could be faced with competing claims of sovereignty over specific territory during the relevant period. Countless wars were fought over such questions, but Spain's version of Article 149 would nonetheless require this Court to decide them, centuries later.

### *(4) The Mercedes' past status as a warship is irrelevant.*

Peru is not seeking the remains of the Mercedes, only what she contained, so the immunity of the wreck is irrelevant. Ambassador Moore explains:

The issue between Spain and Peru is not the *Mercedes* as Peru has not intervened in this action to seek custody of the *Mercedes*, but rather to recover artifacts which are Peruvian in origin and which are now before this court. These artifacts originated in the territory of Peru…. No amount of logic chopping can remove these artifacts from their physical, cultural and historical origin in Peru.

Moore Affidavit at ¶38.

No rule of international law grants a country's cultural treasures to whatever nation's vessel was carrying it away from their shores.

One of the most historic cases in United States jurisprudence directly rejects Spain's contention that its claim to own all the property on a Spanish vessel cannot be contested: *In re the Amistad*, 40 U.S. 518 (1841). The *Amistad* was a Spanish schooner. During a trip from Havana to Principe Cuba, fifty-four Africans, held as slaves, revolted. Two officers were spared in exchange for their promise to return the Africans home. Instead of traveling to Africa, however, each night, the ship headed east, eventually reaching the United States.

Spain, represented by the United States Attorney General, claimed the vessel and all "property" on board, including the Africans. The Africans, represented by former President John Quincy Adams, claimed they were free men. At the time, slavery was legal in the Spanish Colonies and in the Southern United States, but the African Slave Trade had been abolished. Spain provided documents from Spanish Authorities stating the Africans were lawful slaves captured before abolishment of the slave trade, but the Africans testified that they had been recently kidnapped in Africa in violation of international law.

Spain argued that international comity prevented a United States court from questioning its ownership claim. *Id.* at 595. The Supreme Court disagreed and allowed the

challenge to the Spanish legal documents. Ultimately, the Court ruled that the Africans had been illegally kidnapped in Africa, and were free men. *Id.* at 595-96.

This Court also has the duty to judge the basis of Spain's claim to the treasure here.

### (5) UNCLOS does not require this Court to send this dispute to the International Court of Justice, particularly if Spain will not consent to go.

Spain's final gambit to avoid the admittedly binding UNCLOS provisions is to argue that UNCLOS deprives this Court of jurisdiction in favor of the International Court of Justice. UNCLOS, however, says nothing of the sort, and federal courts have consistently interpreted and applied UNCLOS in admiralty cases. *E.g., Mayaguezanos por la Salud y el Ambiente v. United States*, 198 F.3d 297 (1st Cir. 1999).

UNCLOS, itself, contemplates exhaustion of local remedies, and compels that exhaustion if "required by international law." UNCLOS Art. 249.

Finally, disputes over application of UNCLOS are reviewable by the International Court of Justice only upon "request," but Spain says it has not yet decided if it make such a request, despite raising the issue before this Court. UNCLOS Art. 295. Surely, Spain cannot prevent this Court from acting when it will not submit to another neutral forum. The protections of the International Court of Justice are to foster justice, not avoid it.

This Court has taken control (that is, jurisdiction) over the treasure. That there may be other forums that Peru and Spain might choose is not a basis for this Court to avoid the responsibility that it has already undertaken. This Court cannot give the treasure to Spain unless it determines that Spain is the only sovereign with a claim to it, and that entails a decision on the merits of Peru's claim.

### D. The equitable apportionment rule is customary international law.

Spain's argument against Peru's rights as a successor nation relies on challenging selected portions of Peru's brief, but Spain fails to provide any modern source of international law that rejects the well established rule of equitable apportionment.

Spain implies that Peru's argument depends on controversial rules related to former colonies in the Vienna Convention on Succession of States in Respect of State Property, Archives and Debts, but the implication is untrue. The rule of equitable apportionment is found throughout that Convention, and applies to all state divisions. *E.g.,* Articles 17, 18, and 37. When it was drafted, there were some controversial provisions of the Convention, but the rule of equitable apportionment was not among them. The Convention's equitable proportion rules have even been applied by the International Court of Justice (according to Spain, its preferred forum) and have become an integral part of customary international law. *See, e.g.,* M. Craven, *The Decolonization of International Law: State Succession and the Law of Treaties* (Oxford 2007).

Ambassador Moore confirms the rule of equitable apportionment is a rule of customary international law, and thus is part of United States law. Moore Affidavit at ¶39.

### E. The treasure is linked with the territory of Peru, and Spain cannot make a claim to the treasure on a basis of possession.

#### (1) Spain concedes the country with the closest territorial link owns the treasure.

Spain argues that "succession of state principles are fundamentally territorial in nature" and that the "key criteria" is "***linkage of such property to the territory***." Reply at 16 (emphasis supplied). The treasure, however, is intimately linked to the territory of Peru and has no connection to the territory of modern Spain. The treasure was mined and minted in Peru, and never reached Spanish territory.

Spain's argument works only if Spain can cabin Peru to its geographical boundaries, but keep Spain unlimited in scope, so that Spain can claim property outside its physical boundaries, but Peru cannot. There is, however, no basis in the law for such unequal treatment. Linkage is straightforward, and here the link is to Peru.

### (2) Spain's own historic practice would link the treasure to Peru.

Spain, itself, does not follow the rule it espouses to this Court. It is perhaps not surprising, but as to debts (as opposed to assets), Spain historically maintains that debts linked to a Colonies' territory (despite being outside the territorial limits) pass to the successor state, not Spain. In the Capitulation of Ayacucho, for example, Spain asked Peru to recognize all debts related to the former Viceroyalty of Peru. Capitulation at ¶8. The request was declined, but Spain clearly was not declaring that Peru's patrimony was limited to the confines of Peru's physical borders. Spain took the same position following the Spanish-American War when it tried to avoid debt "tied" to Cuba, including sums used in vain attempts to gain territories outside Cuba and to suppress uprisings within Cuba. D.P. O'Connell, *State Succession in Municipal and International Law* (Cambridge 1967).

Thus, when convenient to Spain, non-territorial property of a former Colony reverts to the Colony. When the property is treasure, however, Spain declares itself the only possible owner. The decision of when to apply the legal rule is, fortunately, not Spain's. The rule applies or it does not.

### (3) Spain can make no claim based on possession.

There is an "emerging rule of international law that cultural treasures lost in times of occupation or dependence have to be returned to the countries of origin." K. Siehr, *"The Beautiful One Has Come – To Return,"* IMPERIALISM, ART AND RESTITUTION at 133-34.

Peru's claim in this case is distinguishable and superior to requests for return of items residing in museums of former colonists, because the treasure in this case has been lost for centuries. Most such cases focus on the effect of centuries of adverse possession.

There is no adverse possession here. The treasure never reached the territory of modern Spain, has no link to that territory, and has not been in anyone's possession for centuries.

### F. Equitable principles are incorporated in admiralty and international law, particularly in regards to state succession.

Spain's efforts to avoid an equitable award in this case are unavailing. International and admiralty law are clear that equitable rules apply to division of the treasure before this Court. "The word 'equity' is the key, it is believed, to the entire problem of State succession." D.P. O'Connell, *The Law of State Succession* at 268 (1956).

> The principle of equity is another major principle applicable to the legal consequences of the changes in territorial sovereignty. Its application represents a crucial factor during State succession. It has been accepted by State practice.

E. Hasani, *The Evolution of the Succession Process in Former Yugoslavia,* 29 T.J.L.R. 111, 118 (2006)(footnote omitted); *see also* C. Stahn*, The Agreement on Succession Issues of the Former Socialist Federal Republic of Yugoslavia,* 96 Am.J.Intl.L. 379, 384 (2002) ("Equity … serves both as an auxiliary principle with a corrective function and as a substantive criterion for fixing on a just division of the assets and liabilities between the different predecessor and successor states.")(footnote omitted); *Righting Wrongs: Towards a New Theory of State Succession to Responsibility for International Delicts,* 92 Colum. L. Rev. 2162, 2210 (1992)("[T]he principle of unjust enrichment is particularly well-suited to application in international law and has in fact been recognized as an important principle by

several theorists of state succession.")(footnote omitted).

It is not just or equitable to allow Spain to take even more of Peru's treasure.

### IV.  International Comity requires this Court to decide Peru's and Spain's rights.

In Spain's ethnocentric view, it would be a demonstration of respect for foreign nations for this Court to give Peru's patrimony to Spain without addressing Peru's rights.

There is no basis for the position.  As held by Justice Holmes, the application of the equitable apportionment rule of international law falls squarely within this Court's purview, because "what is just and equitable is a judicial question similar to many that arise in private litigation, and in nowise beyond the competence of a tribunal to decide." *Commonwealth of Virginia v. State of West Virginia,* 220 U.S. 1, 31 (1911).

Spain's authority on this issue is inapposite and, in fact, refutes Spain's ultimate request.  *Federal Republic of Yugoslavia v. Park-71^(st) Corp.*, 913 F.Supp. 191 (S.D.N.Y. 1995).  In this case, the Federal Republic of Yugoslavia sought possession of the former residence of Ambassador of the former Socialist Federal Republic of Yugoslavia ("SFRY"). Like Spain here, the Republic of Yugoslavia claimed ownership of the residence as the sole successor to the former SFRY since it kept the name "Yugoslavia."  The Court denied the claim.  Indeed, the Republic of Yugoslavia was ultimately forced to abandon its claim of universal succession.  M. Sterio, *Implications of the Altmann Decision on Former Yugoslav States,* 20 Conn.J.Intl.L. 39 (2004).

As to the political question issue, the residence had been "blocked" by Executive Order, and the United States intervened in the case requesting that the matter be dismissed. *Id.* at 192-94.  The court declined to interfere with the Executive Order blocking the property.

There is no such order here, and the United States has not suggested that this Court should decline to award relief in this case.

As explained by Ambassador Moore:

The rule of law, one of the great strengths of human experience, suggests that this issue of comparative rights to these culturally and historically sensitive artifacts should be addressed and resolved by this court. For to ignore the plea of Peru that it has superior rights to possession of this property, and to turn these artifacts over to Spain without addressing the matter, would amount to a *de facto* adjudication – but an adjudication without considering the merits of Peru's claim and which would effectively set aside modern principles of international law and the law of the sea repudiating colonialism and protecting national cultural heritage. Surely, as against a superior claim of Peru to these artifacts, this court should not turn them over to Spain. And just as surely Peru is entitled to a hearing and adjudication of its rights to establish its superior claim. The argument in the Kingdom of Spain's "Reply" (page 24) that "[t]his Court should not undertake to become the arbiter of relations between Spain and Peru" is hypocritical as that is effectively what the Kingdom of Spain asks this court to do in its request that Spain be awarded the artifacts now before this court to which Peru has preferential rights.

Moore Affidavit at ¶27.

### Conclusion

The issues presented by Peru's claim are important, both for the parties and for international jurisprudence. They deserve careful consideration, with reference to the best legal experts and sources of law and equity.

The issues certainly should not be passed over on the basis of anachronistic view of the rights of a Colonizer, a view this nation has rejected since its inception and that the international community has condemned for at least a century. International comity requires careful consideration of the rights of Peru, not dismissal.

For these reasons, Peru respectfully requests that the Court find jurisdiction to determine the respective rights of Peru and Spain to the treasure.

Dated: May 4, 2009

Respectfully Submitted,

/s/ Mark Maney
Mark Maney (Trial Counsel)
Texas State Bar No. 12898200
Burford & Maney pc
700 Louisiana, Suite 4600
Houston, Texas 77002
713.237.1111
713.222.1475 (fax)
mmaney@burfordmaney.com
Attorneys for the Republic of Peru

and

_s/ Timothy P. Shusta_____
Timothy P. Shusta
FBN: 442305
Phelps Dunbar LLP
100 S. Ashley Drive
Suite 1900
Tampa, FL 33602-5315
813-472-7550
813-472-7570 Fax
shustat@phelps.com
Attorneys for the Republic of Peru

## Certificate of Service

I HEREBY CERTIFY that a true and correct copy of the foregoing document and Exhibit A was electronically filed with the Clerk of Court via CM/ECF system on May 4, 2009, which will generate and transmit Notices of Electronic Filing generated by the CM/ECF system, and was sent via e-mail to Joseph A. Rodriguez-Menendez on May 4, 2009.

_/s/ Timothy P. Shusta___
Timothy P. Shusta