UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ODYSSEY MARINE EXPLORATION, INC.,

        Plaintiff,

v.                                                     Case No. 8:07-CV-614-SDM-MAP

THE UNIDENTIFIED SHIPWRECKED
VESSEL, if any, its apparel, tackle,
appurtenances and cargo located within a
five mile radius of the center point
coordinates provided to the Court under seal,

        Defendant,
        *in rem*

and

THE KINGDOM OF SPAIN,
THE REPUBLIC OF PERU, *et al.*,

        Claimants.
_____/

## REPORT AND RECOMMENDATION

      This *in rem* action involves competing claims over a shipwreck (the *res*) Odyssey

discovered in international waters off the Straits of Gibraltar. Although the parties dispute the

*res*'s identity, Spain claims it is the *Nuestra Señora de las Mercedes,* a Spanish frigate that

exploded in a pivotal 1804 engagement with the British and precipitated Spain's declaration of

war against Britain. Accordingly, Spain moves to dismiss the matter on grounds this Court is

without subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"). *See*

28 U.S.C. § 1602 *et seq.*; Fed. R. Civ. P. 12(b)(1). Having carefully considered the parties'

detailed submissions, I conclude the *res* is the *Mercedes*, that none of the exceptions to the FSIA

Dockets.Justia.com

apply, and that as such this Court is without jurisdiction to adjudicate the claims against Spain's property. Therefore, I recommend the district judge grant Spain's motion to dismiss the complaint for the reasons stated below.[1]

*A. Background*

Odyssey Marine Exploration Inc. ("Odyssey") bills itself as "the world's leader in deep-ocean shipwreck exploration and recovery." (Doc. 138 at 3.) As part of its business model, the firm extensively investigates its targets, and so it did with the *Mercedes.* By 2006, Odyssey listed the *Mercedes* with thirty other shipwrecks of interest (the "Amsterdam Project"). All carried valuable cargo, and all were suspected of meeting their demise along a heavily traveled area. In November 2006, Odyssey representatives met with an official from Spain's Ministry of Culture seeking Spain's consent to recover and sell artifacts from shipwrecks of historical or cultural interest to Spain. Although the participants now have different views about the meeting, all agree Spain failed to give Odyssey explicit approval.[2]

In March 2007, Odyssey discovered the *res* in international waters about 100 miles west of the Straits of Gibraltar at a depth of approximately 1100 meters.[3] (Doc. 138, Ex. A-1 at 5.) It recovered an artifact (a small bronze block), symbolically deposited that item with the Court, and

---

[1] The district judge referred the matter to me for a report and recommendation. (Doc. 20) *See* 28 U.S.C. § 636; Local Rule 6.01(b).

[2] Spain convincingly asserts that by the mid November 2006 meeting, Odyssey knew Spain considered the *Mercedes* a naval vessel. (Doc. 163 at 12.) Odyssey counters saying its experts had opined the *Mercedes* had primarily provided commercial services. (Doc. 138 at 23-25.) Irrespective, the meeting put Odyssey on notice that Spain had not abandoned its sovereignty of the *Mercedes* nor given express approval to Odyssey's commercial venture into Spanish shipwrecks.

[3] In its public pronouncements, Odyssey named its find *The Black Swan*.

filed this *in rem* action.  Based on Odyssey's submissions and per Supplemental Rule C(3), this Court directed the clerk to issue a warrant of arrest against "the Unidentified, Shipwrecked vessel, its apparel, tackle, appurtenances and cargo."  (Docs. 3, 5.)   Per the operative complaint, Odyssey now demands under the law of finds possessory rights and ownership over the items it has recovered and that remain at the salvage site; alternatively, under the law of salvage, the firm seeks "a liberal salvage award" for its services.[4]  (Doc. 25.)

Two sovereigns and twenty-five descendants of those aboard the *Mercedes* have filed claims against the *res*.  Spain's position is straightforward: the *res* is unquestionably the remnants of the *Mercedes*; Spain has not abandoned its sovereignty of the vessel, particularly one of such historical significance; under applicable treaties and Executive Branch directives, Spain's warship should be accorded the same respect as those of the United States; and this Court is without subject matter jurisdiction over the *res* under the FSIA.  The Republic of Peru, which did not exist as a sovereign in 1804, asserts a "conditional claim" to "all of its property and patrimony," namely that specie minted in or produced from ore extracted from Peruvian territory. In sum, Peru argues this Court should "address the competing claims of Peru and Spain before reaching the question of whether either or both nations have sovereign immunity from the claims of Odyssey."  (Doc. 141 at 3.)  Odyssey, in turn, levels a scattershot argument: the *res* is not a

---

[4]  The law of salvage and the law of finds are mutually exclusive.  *R.M.S. Titanic, Inc. v. Haver,* 171 F.3d 943, 961 (4th Cir. 1999).  Under the law of salvage, a rescuer takes possession, but not title to, the distressed vessel and its contents, and can obtain an award for services rendered.  The law of finds takes a more direct approach to ownership – "finders keepers." *International Aircraft Recovery, L.L.C. v. Unidentified, Wrecked and Abandoned Aircraft*, 218 F.3d 1255, 1258 (11th Cir. 2000).  By asking the Court to apply the law of finds, Odyssey essentially seeks a judicial declaration that would give it exclusive title against the world to artifacts located on a plot of Atlantic seabed over 4,000 miles from this district.

shipwreck at all; the *res* is not the *Mercedes*; the *res* is an amalgamation of shipwrecks none of which is the *Mercedes;* and if it is the *Mercedes*, the FSIA does not apply for a variety of reasons. From this brew, two core questions surface: is the *res* the *Mercedes* and, if so, is Spain entitled to sovereign immunity? In the main, answering the former answers the latter.

B. *Evidentiary Perspective*s

Although Odyssey and Spain have pored over the same evidence, they offer different conclusions about the *res*'s identity. The requisite review standard guides the Court's perspective for sifting through their differences. Spain's FSIA attack is a factual challenge to the Court's subject matter jurisdiction. *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990) (a facial attack requires the court to accept plaintiff's allegations as true and determine if the complaint sufficiently alleges a basis for subject matter jurisdiction; a factual attack on subject matter jurisdiction is an attack on the trial court's "very power to hear the case"); *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 849 (5th Cir. 2000) (FSIA challenges the court's very power to hear the case; hence, the court has the authority to resolve factual disputes as to its application using a variety of methods: discovery, affidavits, evidentiary hearing, and weighing testimony). Rule 12(b)(6)'s presumption of truthfulness does not attach to Odyssey's allegations. In short, a factual attack under Rule 12(b)(1) allows a court to proceed as it never could under Rules 12(b)(6) or 56 – it is free to independently weigh the facts. The existence of disputed material facts will not preclude it from evaluating for itself the merits of the jurisdictional claims. *Morrison v. Amway Corp.,* 323 F.3d 920, 924-925 (11th Cir. 2003); *see also Scarfo v. Ginsberg*, 175 F.3d 957, 961 (11th Cir. 1999) ("When faced with factual disputes regarding subject matter jurisdiction, the district court serves as the fact-finder and may weigh the evidence, provided that

the challenge to subject matter jurisdiction does not implicate an element of the cause of action.").[5]

## C. Facts

### 1. historical

The historical prelude to the *Mercedes*'s fateful, October 5, 1804, encounter with a British squadron near Cape Saint Mary, Portugal is well documented and is the obvious starting point for correlating the *res* to the *Mercedes*. Within a decade, Spain fought with the British against revolutionary France (*Guerra de la Convención* or War of the Convention – 1793-1795); ended those hostilities with the Peace of Basel (1795); quickly signed another treaty pledging support to France (Treaty of San Ildefonso – August 1796); and reaffirmed this alliance in a second treaty that demanded it cede Louisiana to France (Second Treaty of San Ildefonso – 1800). (Doc. 131, Ex. C ¶¶18-19.) In 1802, after years of constant strife, the European powers settled into a temporary respite with the Treaty of Amiens. (Doc. 131, Ex. C ¶ 20.) But this lull did not allay Spain's concerns about France. Fearing France's invasion, yet knowing that Britain would consider Spain's actions a cause for attack, Spain sought to appease

---

[5] Odyssey seemingly promotes Rule 56's more stringent review standard: a court should examine the evidence in the light most favorable to the non-movant (Odyssey) and draw all justifiable inferences in its favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). As noted, this counters Rule 12(b)(1)'s freedom to weigh and evaluate conflicting evidence. But even under Rule 56, once the moving party has satisfied its initial burden under the rule, the nonmoving party must show that a genuine issue of material fact remains and not just some "metaphysical doubt" as to these facts. *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Odyssey seeks to create doubt about the wreck's identity through the use of a logical fallacy, "denying the antecedent." However, "[t]he proposition that 'A implies B' [Spain's argument] is not the equivalent of 'non-A implies non-B' [Odyssey's argument], and neither proposition follows logically from the other." *Crouse-Hinds Co. v. InterNorth, Inc.,* 634 F.2d 690, 702 n. 20 (2d Cir. 1980) (citing J. Cooley, *A Primer of Formal Logic* 7 (1942)).

France by secretly agreeing to pay a monetary subsidy in lieu of furnishing the military aid required by the first Treaty of San Ildefonso. (Doc. 131, Ex. C ¶¶ 21-22.) In short, Spain needed all its resources for these tumultuous times; accordingly, it dispatched frigates to collect "specie and precious produce" from its American Viceroyalties. (Doc. 131, Ex. A at ¶¶ 15-16.) One was the *Mercedes*. (Doc. 131, Ex. A at ¶ 15.) By the time the *Mercedes* reached El Callao (near Lima, Peru), France and Britain were already at war. (Doc. 131, Ex. A at ¶ 14; Doc. 131, Ex. C at ¶ 24.) Madrid's June 8, 1803, dispatch to the Viceroy of Peru (the Marquis of Avilés) captures the fluidity of the political events:

> The political circumstances in Europe and the declared War between England and France require every Commander of the King's vessels to increase their care and vigilance to be prepared just in case H[is] M[ajesty] found himself in the difficult circumstance of taking part in this [conflict] …; but in the meantime and to not endanger the existing specie in that Realm and give time to examine the state that European political affairs are acquiring, as prudence dictates, H[is] M[ajesty] has found it proper to resolve that Y[our] E[xcellency] suspend the departure from Callao of the frigates, *Asuncion, Clara,* and *Mercedes*, which have gone [there] for specie ....

(Doc. 131, Ex. C at ¶ 24.)

The following summer, the *Mercedes* and three other frigates (the *Clara*, the *Medea*, and the *Fama*), set out from Montevideo bound for Cádiz. (Doc. 131, Ex. C at ¶¶ 27-28.) Spain undoubtedly anticipated a conflict with the British. (Doc. 131, Ex. C at ¶ 27.) On the morning of October 5, 1804, only a day's sail from Cadiz, a British squadron forewarned of the mission intercepted the four frigates south of Cape Saint Mary. (Doc. 131, Ex. A at ¶ 23; Doc. 138, Ex. E at Annex 27.) The British demanded their surrender; the Spaniards refused.

> As soon as the [British] officer returned with an unsatisfactory answer, I fired another shot a-head of the Admiral, and bore down close on his weather-bow. At this moment the Admiral's second a-stern fired into the *Amphion*; the Admiral

fired in to the *Indefatigable*; and I made the signal for close battle, which was instantly commenced with all the alacrity and vigour of English sailors.  In less than ten minutes, *la Mercedes*, the Admiral's second a-stern, blew up along-side the *Amphion*, with a tremendous explosion.

Captain Graham Moore, *Indefatigable* [6]

The force of the blast blew part of one of her quarterdeck guns into the *Amphion's* rigging.[7]

More than 250 perished, including its Captain (José Manuel Goycoa) and the family of Second Squadron Leader Diego de Alvear.  (Doc. 131, Ex. A at ¶¶ 9, 25.)  The remaining Spanish frigates surrendered, were taken to Great Britain, and impounded.  (Doc. 131, Ex. A at ¶ 26; Doc. 131, Ex. D at ¶ 19.)  Two months later, Spain declared war against Britain and sealed its fate by an allegiance to France.  (Doc. 131, Ex. A at ¶ 27.)

      *2.  identity*

Odyssey set out to find the *Mercedes* and found it.  Yet, despite conceding "[its] leading hypothesis is that the recovered cargo came from the *Mercedes*," Odyssey argues this Court should still entertain doubt because "at the current level of site reconnaissance and study, there is no definitive archaeological evidence and all evidence pointing toward that theory remains circumstantial."  (Doc. 138 at 7.)  This argument is wrong for three reasons.  It ignores the applicable standard of proof (preponderance of the evidence) and instead promotes something bordering on proof beyond a reasonable doubt.  It distinguishes direct (i.e., "definitive") evidence from circumstantial evidence, a proposition that wholly ignores an axiomatic legal

---

[6] *The Naval Chronicle, The Contemporary Record of the Royal Navy at War, 1804 – 1806*, at 74 (Nicholas Tracy ed., Chatham Publishing 1999).  (Doc. 131, Ex. D, Annex 3.)

[7] *The Naval Chronicle for 1804*, at 500.  (Doc. 131, Ex. D, Annex 6.)  The British attributed the cause of the massive explosion to the Spanish Navy's "dangerous method of loading their guns, which is by a shell from a cask where the powder is kept loose."  *Id.*

principle – circumstantial evidence and direct evidence are indistinguishable. *Holland v. United States*, 348 U.S. 121, 140 (1954) (circumstantial evidence is "intrinsically no different" from direct evidence); *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960) ("circumstantial evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence"); Eleventh Circuit Pattern Jury Instructions (Civil) (2005), Basic 2.1, 2.2, 2.3 ("The law makes no distinction between the weight you may give to either direct or circumstantial evidence."). And lastly, it minimizes the overwhelming circumstantial evidence pointing to the *Mercedes* – the location, coins, cannons, and artifacts.

### a. location

Based on the records of the *Mercedes*'s sister frigates, Spain plotted the likeliest area of her demise; the *res* lies within this zone. No other naval vessel matching her type, according to Spain, sank within this zone during this period. Indeed, even one of Odyssey's own experts (Sinclair) admits the "extant documents place the *Mercedes* in the area" of the site. (Doc. 138, Ex. B at 20.) Despite this concession, Odyssey nevertheless argues the *res*'s location does not match that suggested by some historical accounts or research. For example, at least one individual reported land to be visible when the *Mercedes* went down (none can be seen according to Odyssey from the site even with the aid of binoculars). (Doc. 138, Ex. D at ¶ 11; Doc. 138, Ex. A-1 at 61.) An Italian naval historian (Claudio Bonifacio) claims he discovered the *Mercedes* off Portugal in 1982. (Doc. 138, Ex. A-1 at 61-62.) None of this is remotely persuasive. These offhand contentions do not meet the basic reliability demands set out in Rule 56(e) or Fed. R. Evid. 702. Besides, none of this can be squared with Spanish or British logs of the time. *See* Doc. 163, Ex. A at ¶ 9 (per British logs and Captain Moore's report to the

Admiralty, the Spanish warships were more than 20 miles south of Cape Saint Mary when they moved *south* to intercept the Spanish squadron; the location where Bonifacio claims he discovered the *Mercedes* is ten miles from the Portuguese coast).

### b. coins

The *Mercedes* was loaded with approximately 900,000 coins from El Callao and Montevideo. (Doc. 131, Ex. H at ¶ 16.) The mix overwhelmingly favored silver to gold; in fact, the *Mercedes* only carried a few hundred gold coins. (Doc. 131, Ex. H at ¶ 16.) Coincidentally, Odyssey recovered: approximately 594,000 coins; with an overwhelming disparity of silver to gold; dating from the latter half of the 18th century to no later than 1804; all of Spanish nationality; and minted almost exclusively in the "South American Spanish Crown Colonies" and the mint in Lima in particular. (Doc. 131, Ex A at ¶ 39 & Annex 33; Doc. 131, Ex. D at ¶ 119; Doc. 131, Ex. H at ¶ 12.) Confronted with this parity, Odyssey challenges the relevancy, or denies the correlation, or offers other explanations: Spain's sampling (2,000 to 5,000) was too small to be relevant for proving they came from the *Mercedes* (although Odyssey possesses the coins, it has not presented any proof contradicting Spain's sampling); the 594,000 coins could have come from another vessel because Spanish coins were acceptable currency throughout the commercial world; or since ships of the 17th to 19th centuries carried up to 30 percent more specie than officially reported, Odyssey should have discovered more coins if the wreck were the *Mercedes*. (Doc. 138, Ex. A-1 at 52; Doc. 138, Ex. B at 5; Doc. 138, Ex. H at 5, 7; Doc. 138, Ex. I at 4.) These arguments, which simply advance metaphysical doubt, are not persuasive. *Matsushita,* 475 U.S. at 586.

*c. cannons*

The 17 cannons found at the site match the type the *Mercedes* would have carried:

> Iron and bronze cannon at the site are naval pattern iron and bronze guns of a size and style that identify the shipwreck as a Spanish warship, and specifically a warship of the late 18th or early 19th century. The iron cannon visible in the videotapes and photographs are smoothbore, muzzle-loading guns of the late 18th century . . . . The size and shape of the iron guns indicate that they are 6 to 12-pdr. cannon. This corresponds with the principal armament of *Mercedes*. . . . [A]t least 17 individually identifiable cannon have been noted.

(Doc. 131, Ex. D at ¶ 97.) The *Mercedes* also carried two other distinctive cannons, not as weapons but as cargo. Per a manifest, two *cañones de bronce inútiles* ("useless bronze cannons") were loaded onto the vessel at El Callao to be ferried to Cadíz. (Doc. 131, Ex. D at Annex 7.) Another contemporaneous report confirmed this using a slightly different description, *dos culebrinas excluidas de bronce* (two discarded bronze culverins). (Doc. 131, Ex. D at Annex 17 at 4.) By 1804, these items were obsolete as weaponry. (Doc. 131, Ex. D at ¶ 106.) Their value was in their metal, bronze, which could be melted to manufacture artillery, sheathing for warships, and other military hardware. (Doc. 131., Ex. C at ¶ 25.) The site includes two culverins, a fact Spain contends makes identification certain. I agree.[8]

Again, Odyssey proposes explanations other than the obvious: naval historians and marine archaeologists view cannons as "very weak" indicia of a ship's nationality and date because they were "extensively traded and distributed commodities"; the bronze *pedreros/obuses* at the site are very close in style to a series of late 18th century English bronze cannons without handles; the dolphin handles seen on the culverins at the site are not diagnostically Spanish; and

_____

[8] Although Spain asserts the site shows both culverins, Odyssey maintains only one was discovered. (Doc. 138, Ex. A-1 at 23.) Irrespective, the discovery of even one is highly probative of the vessel's identity.

17 cannons at the site are fewer than the 33 to 40 that she likely carried.[9]  (Doc. 138, Ex. A-1 at 4, 22, 25; Doc. 138, Ex. B at 18.)  These contentions, perhaps reasonable in the abstract, are not persuasive here because they suggest as the more reasonable hypothesis the unlikely proposition that these obsolete cannons, especially when found with cannons the *Mercedes* would have typically carried, were there by happenstance.  Besides, Odyssey's argument that cannons are weak indicators is based on examples predating the standardization of naval ships and their armament that had occurred during the 18th century, a standardization that was "well in place by the time of *Mercedes*."  (Doc. 163, Ex. A at ¶ 13.)

### d.  other artifacts

The *Mercedes*, according to historical records, carried "large quantities of copper and tin ingots for 'His Majesty' … when it sank."  (Doc. 131, Ex. A at ¶ 38; Doc. 131, Ex. D at ¶ 25.)  The site includes large quantities of copper and tin ingots.  (Doc. 131, Ex. D at ¶ 120.)  The *Mercedes*'s hull was sheathed with copper plates like those found at the site.  (Doc. 131, Ex. A at ¶ 34.)  Some of the debris and artifacts show evidence of a violent explosion.  (Doc. 131, Ex. D at ¶¶ 90-96.)  Even one of Odyssey's experts concedes the "scattered debris field" is "consistent with a vessel that has broken up at the surface, descended through the water column and spilled out the cargo and various components onto the seabed."  (Doc. 138, Ex. B at 8.)

---

[9]  There is some dispute as to the number of cannons the *Mercedes* carried and apparent at the site.  One of Odyssey's experts (Sinclair) opined the frigate would have had 33 to 40 and of those 17 are accounted for.  Spain and another Odyssey expert (Kingsley) puts the *Mercedes*'s number at 50 cannons with 17 (Spain) or 18 (Kingsley) apparent from the available evidence.  *Compare* Doc. 138, Ex. B at 18, *with* Doc. 131, Ex. A at ¶ 22, Doc. 131 Ex. D at ¶ 97, and Doc. 138, Ex. A-1 at 23.  Irrespective, the 17 or 18 the parties have identified are consistent with the type the *Mercedes* would have carried, and I do not find Odyssey's argument – that its failure to find more cannons means the vessel is not the *Mercedes* – persuasive.

### 3. finding

The debris field's location, coins, cannons, and artifacts persuasively match the *Mercedes*'s historical record. That Odyssey, which set out to discover the *Mercedes*, found this mix strewn about in an area a few football fields square where the vessel met its explosive ending makes the conclusion even more compelling. The *res* is the *Mercedes*.[10]

### D. Discussion

#### 1. admiralty principles, international waters, and patrimonial interests

To the casual observer, it might seem odd that a federal court in this district would be tasked with adjudicating salvage claims to the remnants of a centuries-old shipwreck discovered off the European continent in international waters. Two principles – *jus gentium* and constructive *in rem* jurisdiction – explain the case's presence here, and a sensitivity to their rationales when mixed with the traditional notion of comity in the exercise of extraterritorial jurisdiction colors the analytical perspective for deciding Spain's motion to dismiss.

Since our nation's founding, federal courts sitting in admiralty, and particularly when adjudicating salvage claims, have applied the *jus gentium*, or the customary law of the sea, the origins of which date back to the ancients. *See* 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 16-1 (4th ed. 2004). This common heritage of seafaring nations, and by implication, a presumed commonality among nations for resolving such disputes, underpins a federal court's exercise of subject matter jurisdiction irrespective of " the nationality of ships, sailors or seas involved." *Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing*

---

[10]  I find the evidence as to the *res*'s identity so one-sided that Spain would prevail as a matter of law, which is the standard for granting summary judgment under Rule 56. *Anderson,* 477 U.S. at 250 (Rule 56's standard mirrors that under Rule 50).

*Vessel,* 640 F.2d 560, 567 (5th Cir. 1981);[11] *see also R.M.S. Titanic, Inc.,* 171 F.3d at 961 ("The exercise of admiralty subject matter jurisdiction has never been limited to maritime causes arising solely in the United States territorial waters.").  A court's consideration of maritime claims arising "from anywhere in the world" is "subject only to a discretionary exercise of the doctrine of *forum non conveniens*."  *R.M.S. Titanic, Inc.*, 171 F.3d at 961 (citations omitted); *see also Treasure Salvors*, 640 F.2d at 566 ("[T]he courts of the United States take jurisdiction, subject to some reservations imposed by their own application of the doctrine of forum non conveniens, of suits on maritime claims arising out of transactions and occurrences anywhere in the world." (quoting G. Gilmore and C. Black, *The Law of Admiralty* 51 (2d ed. 1975))).[12]

To invoke *in rem* jurisdiction, the *res* must be *in custodia legis* – in the court's possession.  Courts routinely have exercised jurisdiction over vessels and their cargo positioned within the court's jurisdictional boundaries under theories of actual or constructive possession. *R.M.S. Titanic, Inc.*, 171 F.3d at 964.  In *California v. Deep Sea Research, Inc.*, 523 U.S. 491 (1998), the Supreme Court implicitly approved a salvor's presentation of a recovered artifact as the fictional equivalent of a wreck discovered in California's territorial waters.  *See id.* at 496.

---

[11]  The Eleventh Circuit in an *en banc* decision, *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[12]  One commentator, however, questions the validity of applying this jurisdictional premise (*i.e.*, the *jus gentium*) to historic wrecks.  Only a few common law systems have accepted the law of salvage and finds; hence, no "general maritime law" or *jus gentium* exists to support the law of salvage or finds.  And more particularly as to historic wrecks, "[t]he advent of major treasure salvage is so recent that there simply is no applicable custom, let alone a *jus gentium*, that addresses the unique phenomenon of underwater cultural heritage in any coherent way."  *See* James A.R. Nafziger, *The Evolving Role of Admiralty Courts in Litigation Related to Historic Wreck*, 44 Harv. Int'l L.J. 251, 261 (2003).

The Fourth Circuit in *R.M.S. Titanic, Inc.* applied a constructive possession concept to a historic wreck in international waters. 171 F.3d at 967-968. Indeed, based on this model, I granted Odyssey's motion and authorized the arrest of the *res* at issue. (Doc. 3.)

Yet, this judicially created fiction when applied to a wreck on the high seas complicates a court's exercise of authority. The Fourth Circuit recognized as much:

> In applying these principles to a wreck lying in international waters, obvious complexities emerge. *In rem* jurisdiction, which depends on sovereignty over property, cannot be given effect to property beyond a nation's boundaries of sovereignty. . . . Where both persons and property are beyond a nation's zone of exclusive legal power, its ability to adjudicate rights as to them is limited, but not meaningless.

> When nations agree on law to apply on the high seas, they agree to an order even beyond their sovereign boundaries which, while they hope will be honored on the high seas, can only be enforced completely and effectively when the people or property are brought within a nation's zone of power – its sovereignty.

> So it must be with the *Titanic*. The *jus gentium*, the law of all maritime nations, is easy to define and declare. But its enforcement must depend on persons or property involved in such a declaration coming into the zone of power of participating nations.

*R.M.S. Titanic, Inc.*, 171 F.3d at 966. *Titanic* cautions a court should wade carefully into international waters to adjudicate a salvage claim, particularly one that concerns a historical wreck with significant loss of life. This admonition is even more appropriate when the salvor's claim implicates a foreign sovereign's patrimonial interests and that sovereign's asserted independence from suit per the FSIA. Put another way, a court must be sensitive to the principle of international comity when dealing with a dispute involving the exercise of extraterritorial jurisdiction, as the application of international law evokes a sense not only of discretion and courtesy but also of obligation among sovereign states. Restatement (Third) of Foreign Relations

Law § 403 cmt. *a* (1987). All this dictates that in the end, the Court's perspective is guided by

the principle of reasonableness. *Id.* at § 403 ("[A] state may not exercise jurisdiction to prescribe

law with respect to a person or activity having connections with another state when the exercise

of such jurisdiction is unreasonable."); *id.* at § 421 cmt. *a* ("there may be circumstances in which

a state has jurisdiction to prescribe but jurisdiction to adjudicate is absent or doubtful"); *see also*

2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 16-7 at n. 21 (4th ed. 2004).

### 2. FSIA

Before the FSIA, courts generally decided foreign sovereign immunity issues based on

the recommendations or suggestions of the Executive Branch. *Verlinden B.V. v. Central Bank of

Nigeria*, 461 U.S. 480, 486 (1983).[13] In 1952, with the so-called Tate Letter, the State

Department adopted the "restrictive" theory of sovereign immunity, whereby immunity was

"confined to suits involving the foreign sovereign's public acts" but not its strictly commercial

ones. *Id.* at 486-487. This scheme, however, proved cumbersome, and in 1976 Congress enacted

the FSIA, "in order to free the Government from the case-by-case diplomatic pressures, to clarify

the governing standards, and to assure litigants that … decisions are made on purely legal

grounds and under procedures that insure due process." *Id*. at 488 (citation omitted). Hence,

"the FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the courts of

_____

[13] As Spain aptly notes, Chief Justice Marshall applied the doctrine to a case involving another Napoleonic War vessel, and found that the courts of the United States lacked jurisdiction over an armed ship of a foreign state in a United States port. *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 146-47 (1812). His rationale still resonates: sovereign immunity "is premised upon the 'perfect equality and absolute independence of sovereigns, and th[e] common interest impelling them to mutual intercourse.'" *Republic of Philippines v. Pimentel,* 128 S. Ct. 2180, 2189-90 (2008) (quoting *The Schooner Exchange*, 11 U.S. (7 Cranch) at 137).

this country." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989); *see also* 28 U.S.C. § 1602 ("Findings and declaration of purpose," stating "[c]laims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter"). A foreign state, or its property, is "presumptively immune from the jurisdiction of United States courts; unless a specified [statutory] exception applies, a federal court lacks subject-matter jurisdiction" over claims against it or its property. *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *see also* 28 U.S.C. §§ 1604, 1609.

Given Spain's showing that its property is presumptively immune from suit under the FSIA, Odyssey must show an exception applies. *S & Davis Int'l, Inc. v. The Republic of Yemen*, 218 F.3d 1292, 1300 (11th Cir. 2000). And if Odyssey meets this threshold, Spain ultimately "bears the burden of proving by a preponderance of the evidence that the exception does not apply." *Id*; *see also Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.,* 179 F.3d 1279, 1290 (11th Cir. 1999).[14] Spain clearly meets its obligations with Odyssey failing to show any statutory

_____

[14] The Second, Fourth, Fifth, Sixth, and Tenth Circuits set out the same burden-shifting standard but add the foreign sovereign must make a *prima facie* showing that it is a foreign sovereign as defined by the FSIA. *In re Terrorist Attacks on September 11, 2001,* 538 F.3d 71, 80 (2d Cir. 2008), *petition for cert. filed*, 77 U.S.L.W. 3308 (U.S. Nov. 12, 2008) (No. 08-640); *Gerding v. Republic of France*, 943 F.2d 521, 525-526 (4th Cir. 1991); *Byrd v. Corporacion Forestal y Industrial de Olancho S.A.,* 182 F.3d 380, 388 (5th Cir. 1999); *O'Bryan v. Holy See*, 556 F.3d 361, 376 (6th Cir. 2009), *petition for cert. filed* (U.S. May 7, 2009) (No. 08-1384); *Orient Mineral Co. v. Bank of China,* 506 F.3d 980, 991-992 (10th Cir. 2007), *cert. denied*, 128 S. Ct. 2872 (2008). The Seventh Circuit varies the test slightly. *Alberti v. Empresa Nicaraguense De La Carne*, 705 F.2d 250, 256 (7th Cir. 1983) ("In our opinion Section 1604 requires a foreign state to establish a prima facie case on two elements: that it is a foreign state under the definition employed in FSIA, and that the claim relates to a 'public act.'"). *S & Davis Int'l*, in keeping with the other circuits, implicitly requires a sovereign or its property meet the FSIA's definitional demands.

exception applies.[15]

The FSIA, as Spain correctly points out, "grants immunity to a foreign state's property in the United States from attachment, arrest and execution except as provided in specific provisions of the Act." *Venus Lines Agency v. CVG Industria Venezolana De Aluminio, C.A.*, 210 F.3d 1309, 1311 (11th Cir. 2000) (citing 28 U.S.C. § 1609). Section 1609 of the FSIA states in pertinent part:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611.[16]

Unquestionably, the *Mercedes* is the property of Spain – constructed in 1788 by Navy Engineers in the shipyard of the Spanish Navy in Havana, Cuba; commanded by officers and crewed by sailors of the Royal Spanish Navy throughout its service; and designated as a Spanish frigate of war. (Doc. 131, Ex. A at ¶¶ 7, 9, 12.) It remains on the Royal Navy's official registry of ships. (Doc. 131, Ex. A at ¶ 7.) As such, 1609's plain reading limits Odyssey to arguing the Court has jurisdiction under "existing international agreements" or as permitted by 1610 and 1611. None of

---

[15] I note the district judge has already determined Spain is immune under the FSIA from Odyssey's *in personam* claims. *See* Order at Doc. 91 (dismissing Count IV ("a claim for a declaration that the shipwrecked vessel and artifacts are beyond the territorial waters of any nation and subject to the law of abandonment, finds, or salvage"), Count V ("a claim in the event of a successful adverse claim of ownership by a third party for equitable relief in the nature of a *quantum meruit* or the like to recover the reasonable and necessary cost of recovery and protection of the vessel and artifacts"), and Count VI ("a claim for damages arising from certain allegedly tortious acts by Spain that allegedly interfered with and burdened the activity of Odyssey and that breach[ed] an alleged duty of Spain to refrain from interference")).

[16] No commas punctuate this provision. As one court remarked, the FSIA "is hardly a model of statutory clarity." *Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo General del Sindicato Revolucionario de Trabajadores Petroleros de la Republica Mexicana, S.C.*, 923 F.2d 380, 385 (5th Cir. 1991).

these exceptions apply here, as Spain urges and Odyssey's silence concedes.[17]   Instead, Odyssey

sidesteps § 1609's exceptions by claiming: § 1609 does not shield property *outside* the United

States; Spain must actually "possess" the *res*; the cargo should be partitioned to satisfy the

descendants' claims to the private lots; and other provisions of the FSIA deny Spain sovereign

immunity from *in personam* claims.   These contentions are without merit as all evade the FSIA's

goals, its statutory scheme, and the special status accorded warships per the various treaties and

agreements § 1609 necessarily incorporates.

### *a.  the geographical argument*

Odyssey parses § 1609's language to argue the provision is inapplicable because the

"Defendant site" is not "property *in* the United States."   (Doc. 138 at 12.)  Indeed, the debris

field lies far from our nation's sovereign boundaries.   Yet, Odyssey premised its salvage and

finds claims on the fiction it created – the depositing of an artifact with the clerk as emblematic

of the Court's possession of the *entire* shipwreck (*in custodia legis*).   And it sought by this *in rem*

---

[17]  Sections 1610(a) and (b) provide exceptions to the immunity of a foreign sovereign's property from "attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State" in specified situations, not to the immunity of a foreign sovereign's property from arrest.  28 U.S.C. § 1610 (a), (b).  The attachment and execution contemplated by § 1610(a) and (b) is available only after "a reasonable period of time has elapsed following the entry of judgment . . . ."  28 U.S.C. § 1610(c).  Section 1610(d) contemplates attachment of property "used for a commercial activity in the United States" prior to the entry of judgment, but expressly provides not only that the foreign state must have "explicitly waived its immunity from attachment prior to judgment," but also that the purpose of the attachment may not be to obtain jurisdiction.  28 U.S.C. §1610(d).  The remaining provisions in § 1610 provide exceptions to immunity in cases involving "arrest in rem, interlocutory sale, and execution in actions brought to foreclose a preferred mortgage," 28 U.S.C. § 1610(e); and execution and attachment in aid of execution where a judgment has been rendered against a foreign sovereign on a claim involving terrorism, 28 U.S.C. § 1610(f)(1)(A), (g).  Thus, Section 1610(e), which plainly is not applicable in this case, is the only provision providing an exception to the immunity of a foreign sovereign's property from arrest *in rem*.  Section 1611 provides exceptions to the Section 1610 exceptions.  In short, none of these exceptions apply here.

action to have the Court "adjudicate rights in specific property before the court" and to obtain a

judgment that "operate[s] against anyone in the world claiming against *that* property." *R.M.S.*

*Titanic, Inc.*, 171 F.3d at 957 (emphasis in original). Given this, Odyssey cannot avoid the

FSIA's reach by arguing the property it caused to be arrested and deposited before the Court is

not within the United States. Besides, accepting Odyssey's "geographical" distinction would

create an unacceptable consequence. Under Odyssey's logic, the FSIA would apply to the specie

and artifacts Odyssey recovered and transported to the United States because that property is now

Spain's property *in* the United States; yet, the Act would not cover Spain's property at the

wreck's site. This geographical bifurcation would immunize Spain from suit over its recovered

property warehoused in the United States but force it to litigate in our courts its rights to its

property situated well beyond our national boundaries. Such a result would gut the very purpose

of sovereign immunity: "The doctrine [of foreign sovereign immunity] is one of implied consent

by the territorial sovereign to exempt the foreign sovereign from its 'exclusive and absolute'

jurisdiction, the implication deriving from standards of public morality, fair dealing, reciprocal

self-interest, and respect for the 'power and dignity' of the foreign sovereign." *National City*

*Bank of New York v. Republic of China,* 348 U.S. 356, 362 (1955) (footnote and citation

omitted); *see also Pimentel*, 128 S. Ct. at 2190 ("Giving full effect to sovereign immunity

promotes the comity interests that have contributed to the development of the immunity

doctrine.").

### b. the possession argument

Odyssey next maintains that Spain is not entitled to immunity because it did not have

actual possession of the *res* at the time of arrest (presumably in the physical sense – a remarkable

feat given the depths of the wreck and the size of the debris field).  (Doc. 138 at 15.)  To support this theory, Odyssey seizes upon the Supreme Court's language in *California v. Deep Sea Research, Inc.*, 523 U.S. at 506-508, in which the Court held California did not have Eleventh Amendment immunity where it did not have "actual possession" of the *res* in an *in rem* admiralty case.  That case, which did not involve the FSIA but rather the Eleventh Amendment and the Abandoned Shipwreck Act, has no application here, particularly when the Supreme Court has repeatedly stated the FSIA "'provides the sole basis for obtaining jurisdiction over a foreign state.'"  *Nelson,* 507 U.S. at 355 (quoting *Amerada Hess Shipping Corp.*, 488 U.S. at 443).

When evaluating jurisdiction, the Court "start[s] from the settled proposition that the subject-matter jurisdiction of the lower federal courts is determined by Congress 'in the exact degrees and character which to Congress may seem proper for the public good.'"  *Amerada Hess Shipping Corp.*, 488 U.S. at 433 (quoting *Cary v. Curtis*, 44 U.S. (3 How.) 236, 245 (1845)).  "Claims of foreign states to immunity should [] be decided by courts … in conformity with the principles set forth in [the FSIA]."  28 U.S.C. § 1602.  When Congress enacted the FSIA, it did not include an actual possession requirement in the language of the statute.  Rather, it simply stated that "the property in the United States *of a foreign state* shall be immune ...."  28 U.S.C. § 1609 (emphasis added).  No section of the FSIA imposes the possessory requirement Odyssey advances, and I refuse to read one into the statute.  *See Calzadilla v. Banco Latino Internacional*, 413 F.3d 1285, 1287 (11th Cir. 2005) ("The starting point in statutory construction is the language of the statute, and if that is plain, then the sole function of the court is to enforce the statute according to its terms.")  Indeed, Odyssey's possession requirement would mean that a foreign state would always be required to litigate salvage claims against any of its sunken flagged

vessels, even its warships.

*c.  the cargo argument*

In 1824, having failed to win post-war reparations from Britain for the *Mercedes*, Spain

offered to compensate those who suffered losses.  (Doc. 163, Ex. C at 2-3.)  From this, Odyssey

deduces that Spain has necessarily conceded that not all the cargo aboard the *Mercedes* was

sovereign property.  And immunizing the entire cargo, so Odyssey further reasons, would deny

its rightful owners (namely, the claimants other than Spain) of their property.  Accordingly, the

Court should split the cargo from the vessel and then, to vindicate the individual claimants, split

the cargo into separate, private lots.  (Doc. 179 at 8-9.)  In support of this proposition, Odyssey

cites an unreported district court decision where the court refused to accord immunity to the

plaintiff's claims under the FSIA as to cargo on a foreign-state owned vessel because the

"claimants … failed to provide any authority for the proposition that property not belonging to a

foreign state but carried aboard a vessel belonging to a foreign state is immune from seizure."

*Borgships, Inc., Monrovia v. M/V Macarena*, Nos. 92-3119 & 93-622, 1993 WL 408342 at *3

(E.D. La. 1993) (citing 28 U.S.C. § 1609).   That case, which  involved a claim for salvage

services to a cargo vessel, is simply inapplicable here, and Odyssey's cargo argument fails for a

variety of reasons.

First, to the extent *Borgships* has any relevance, it weighs against Odyssey as the Court

dismissed the plaintiff's *in rem* action on grounds that § 1609 prohibits attachment or arrest of a

sovereign's property to acquire jurisdiction (*id.* at *2-3), the position that Spain argues and

Odyssey avoids.  Indeed, the House Report underscores Congress's deliberate preference for *in*

*personam* jurisdiction over *in rem* jurisdiction.  "Here it should be pointed out that neither

21

section 1610 nor 1611 would permit an attachment for the purpose of obtaining jurisdiction over

a foreign state or its property. For this reason, section 1609 has the effect of precluding

attachments as a means for commencing a lawsuit." H.R. Rep. 94-1487 at 26 (1976), *as*

*reprinted in* 1976 U.S.C.C.A.N. 6604, 6625. Such attachments "give rise to serious friction in

United States' foreign relations." *Id.* at 27, *as reprinted in* 1976 U.S.C.C.A.N. at 6626.

Accordingly, the Act, through its long-arm provisions, confers personal jurisdiction over a

foreign state as to every claim for which the foreign state is not entitled to immunity. *Id.*; *see*

*also*: *In Re B-727 Aircraft Serial No. 21010*, 272 F.3d 264, 270 (5th Cir. 2001) (the FSIA's

related grant of jurisdiction at 28 U.S.C. § 1330 confers jurisdiction only over any claim for relief

*in personam* against a foreign state as opposed to *in rem*); 14A Wright, Miller & Cooper, *Federal*

*Practice and Procedure* § 3662 (3d ed. 1998).

The adjudication of the rights of the private claimants would also necessarily implicate

Spain's rights to the property. Such an exercise would frustrate the FSIA's goals and

impermissibly prejudice Spain. In *Republic of Philippines v. Pimentel*, the Supreme Court

applied sovereign immunity principles to an interpleader action involving property allegedly

stolen by former President Ferdinand Marcos of the Philippines. 128 S. Ct. at 2184. Although

the two sovereign entities, the Republic of the Philippines and the Philippine Presidential

Commission on Good Governance, had been dismissed on the basis of foreign sovereign

immunity, the district court proceeded to judgment over their objections. *Id.* Reasoning that

neither sovereign entity would prevail on its claim to the funds, the Ninth Circuit affirmed. *Id.*

The Supreme Court reversed and dismissed the case under Fed. R. Civ. P. 19(b), concluding the

district and appellate courts gave insufficient consideration to the likely prejudice the Republic

and the Commission would have suffered if the interpleader had proceeded in their absence. *Id.* at 2192. "[W]here sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign." *Id.* at 2191. The Court also recognized that "[d]ismissal under Rule 19(b) will mean, in some instances, that plaintiffs will be left without a forum for definitive resolution of their claims. But that result is contemplated under the doctrine of foreign sovereign immunity." *Id.* at 2194. In many respects, Odyssey's *in rem* action approximates an interpleader. Odyssey constructively deposited the *res* with the Court asking for an adjudication of its rights and those of any potential claimants to the property. Hence, *Pimentel's* reasoning is instructive. Dividing the *Mercedes*'s cargo, either geographically or by ownership rights (private versus government owned) as Odyssey proposes, contradicts *Pimentel*'s teaching by prejudicing Spain's sovereign interests and countering principles of comity. *See* Restatement (Third) of Foreign Relations Law § 421 (1987), *supra*.

Odyssey's cargo versus vessel approach also departs from traditional admiralty precepts and subverts the plain reading of § 1609. A vessel and its cargo are inextricably intertwined. *See* Sunken Military Craft Act, *infra*, at note 20 (sunken military craft includes its cargo); *See R.M.S. Titanic, Inc.*, 171 F.3d at 964 ("The propriety of exercising *in rem* jurisdiction over an entire ship wreck within the court's territorial jurisdiction when only part of that wreck is actually presented to a court rests upon the fiction that the *res* is not divided and that therefore possession of some of it is constructively possession of all." (citation omitted)). This is particularly so here as warships have always been accorded a special status, a notion that dates back to *The Schooner Exchange, supra. See also Guevara v. Republic of Peru,* 468 F.3d 1289, 1296 (11th Cir. 2006)

(noting the distinction carved out in early Supreme Court cases dealing with the immunities granted to armed ships as opposed private trading vessels).

The *Mercedes*'s warship status is one that § 1609 necessarily recognizes because the provision requires this Court evaluate Spain's claim of immunity "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of [the FSIA]." 28 U.S.C. § 1609; *see also 767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United Nations*, 988 F.2d 295, 297 (2d Cir. 1993) ("Because of this provision the diplomatic and consular immunities of foreign states recognized under various treaties remain unaltered by the Act."); *Moore v. United Kingdom*, 384 F.3d 1079, 1084-85 (9th Cir. 2004) (international agreements existing at the time of enactment of the FSIA may expand or limit a foreign sovereign's exposure to suit). As Spain emphasizes, and as the Fourth Circuit has specifically held, Spain's sovereign vessels are covered by the 1902 Treaty of Friendship and General Relations between the United States and Spain. *Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels,* 221 F.3d 634, 638, 642-643 (4th Cir. 2000). Per its provisions, "[i]n cases of shipwreck … each party shall afford to the vessels of the other, whether belonging to the State or to individuals, the same assistance and protection and the same immunities which would have been granted to its own vessels in similar cases." Treaty of Friendship and General Relations, U.S.-Spain, Art. X, July 3, 1902, 33 Stat. 2105;[18] *see also Sea Hunt, Inc*., 221 F.3d at

---

[18] Odyssey argues contemporaneous diplomatic communications between the United States and Spain suggest that Article X is limited to our nation's territorial waters and would not cover wrecks in international waters. (Doc. 138 at 19 & n. 9) As set out in part D.2.a., *supra*, Odyssey has brought the *res* within Court's jurisdiction and, therefore, within the coverage of the Treaty. Odyssey's other arguments as to the Treaty's application are likewise without merit (*i.e.,* the Treaty applies only to vessels and there is not a vessel here; the treaty does not protect vessels on a commercial mission).

642. In short, this treaty is "unique" and "requires that imperiled Spanish vessels shall receive the same immunities conferred upon similarly situated vessels of the United States." *Sea Hunt,* 221 F.3d at 642.[19]

The United States protects its sunken warships. *See* Geneva Convention on the High Seas, Art. 8, April 29, 1958, 13 U.S.T. 2312, T.I.A.S. No. 5200 ("Warships on the high seas have complete immunity from the jurisdiction of any State other than the flag State"); Sunken Military Craft Act, Pub. L. No. 108-375, § 1406, 118 Stat. 2094 (codified at 10 U.S.C. § 113 note) (October 28, 2004) ("The law of finds shall not apply to … any foreign sunken military craft located in United States waters"; and "[n]o salvage rights or awards shall be granted with respect to … any foreign sunken military craft located in United States waters without the express permission of the relevant foreign state.");[20] Protection of Sunken Warships, Military Aircraft and Other Sunken Government Property, 69 F.R. 5647-01, 5648 (Feb. 5, 2004) (President Clinton's January 19, 2001, statement expressing concern that recent technological advances made the unauthorized disturbance of sunken State craft possible and stating the United States "recognizes that title to a United States or foreign sunken State craft, wherever located, is not extinguished by passage of time, regardless of when such sunken State craft was lost at sea;"

---

[19] *Sea Hunt* involved two Spanish frigates of the same era as the *Mercedes*, *La Galga* and the *Juno,* both lost off the Virginia coast in 1750 and 1802, respectively. Like here, a commercial salvor filed an *in rem* action to perfect its salvage rights, and Spain filed a verified claim of ownership. The Fourth Circuit upheld Spain's claims finding that under the treaty, "Spanish vessels, like those belonging to the United States, may only be abandoned by express acts." *Sea Hunt,* 221 F.3d at 638.

[20] The Act defines a "sunken military craft" to include "associated contents," which means "(A) the equipment, cargo, and contents of a sunken military craft that are within its debris field; and (B) the remains and personal effects of the crew and passengers of a sunken military craft that are within its debris field." *Id.* at § 1408(1), (3).

sunken warships "may contain objects of a sensitive … archaeological or historical nature.");[21]

*see also International Aircraft Recovery, L.L.C. v. The Unidentified, Wrecked and Abandoned Aircraft*, 218 F.3d 1255, 1258-60 (11th Cir. 2000) (determining law of salvage and not law of finds applied to navy bomber that crashed in international waters where the United States had not abandoned its interests in ships sunk over a century ago); *Sea Hunt,* 221 F.3d at 647 (noting the United States' interest is "rooted in customary international law;" the "[p]rotection of the sacred sites of other nations thus assists in preventing the disturbance and exploitation of our own.");

*United States v. Steinmetz,* 763 F. Supp. 1293, 1299 (D.N.J. 1991) (reciting the State Department's position that warships and their remains are "clothed with sovereign immunity and therefore entitled to a presumption against abandonment of title"), *aff'd*, 973 F.2d 212 (3d Cir. 1992).

### d.  other FSIA arguments

Unable to penetrate § 1609's exceptions, Odyssey seeks refuge in another FSIA provision, § 1605, which deals with suits in admiralty to enforce a maritime lien based on the commercial activity of a foreign state.  28 U.S.C. § 1605(b).[22]  That section does not apply here

---

[21] Although the Sunken Military Craft Act and President Clinton's statement postdate enactment of the FSIA, the 1902 Treaty of Friendship and General Relations effectively incorporates their policies by requiring mutual protection.

[22]  Section 1605 (b) and (c), which set out exceptions to § 1604 immunity, provide in relevant part:

> (b) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of the foreign state . . . .

> (c) Whenever notice is delivered under subsection (b)(1), the suit to enforce a

26

for obvious reasons.  Section 1609's language plainly precludes the inclusion of § 1605's

exceptions.  Indeed, Odyssey essentially advances an exception to § 1609 that Congress

purposely omitted.  *Mangattu v. M/V Ibn Hayyan,* 35 F.3d 205, 209 (5th Cir. 1994) ("The plain

words of the statute [§ 1609] clearly preclude reading the language of §§ 1605 and 1606 to

control the issue in the case.").  Moreover, Odyssey's invocation of § 1605(b) counters the

procedural history in this case.  Congress, in enacting § 1605(b), opted for an *in personam* suit in

admiralty to enforce a maritime lien against a vessel or cargo of a foreign state as opposed to an

*in rem* action for a specific reason – to avoid the friction in the nation's foreign relations caused

by attachments or arrests of a foreign sovereign's property to acquire jurisdiction.  *Amerada Hess*

*Shipping Corp.,* 488 U.S. at 438; *see also* H.R. Rep. 94-1487 at 27, *as reprinted in* 1976

U.S.C.C.A.N. at 6626 (attachments "give rise to serious friction in United States' foreign

relations.").  In short, the Act contemplates an attachment or arrest to enforce a judgment, not an

arrest to gain jurisdiction as Odyssey achieved.  *See Mangattu,* 35 F.3d at 209.  And irrespective

of all this, the *Mercedes* clearly was not engaged in any commercial activity at the time of its

demise, despite Odyssey's contentions otherwise, as § 1605 would require.  *See* 28 U.S.C.

§ 1603(d); *see also Saudi Arabia v. Nelson*, 507 U.S. at 360 (for FSIA purposes, a foreign

government engages in commercial activity where it exercises "only those powers that can also

be exercised by private citizens, as distinct from those powers peculiar to sovereigns")

---

maritime lien shall thereafter proceed and shall be heard and determined according to the
principles of law and rules of practice of suits in rem whenever it appears that, had the
vessel been privately owned and possessed, a suit in rem might have been maintained. . . .

Notably, salvage gives rise to a lien, but a find of maritime property does not.  2 Thomas J.
Schoenbaum, *Admiralty and Maritime Law* § 16-7 (4th ed. 2004).

(quotations omitted); *Guevara v. Republic of Peru,* 468 F.3d at 1298 (a foreign state is commercially engaged if it acts like an ordinary private person and not like a sovereign (citation omitted)).  In sum, Spain's property is immune from arrest, and this Court is without subject matter jurisdiction to adjudicate Odyssey's claims and those of the private claimants (the purported descendants of those who perished) against the *res*.  28 U.S.C. § 1609.

### 3.  *The Republic of Peru*

When the *Mercedes* departed El Callao in 1804, the Viceroyalty of Peru covered present day Peru and Chile. But at its zenith, it included all of Spain's colonial empire in South America except for Venezuela.  That dominance waned over time with the creation of the Viceroyalty of New Grenada (Colombia, Ecuador, Panama, and Venezuela) in 1739 and the Viceroyalty of Rio de la Plata (Argentina, Uruguay, Paraguay, and Bolivia) in 1776.  As a consequence of the independence movements of the early 19th century, these viceroyalties disintegrated.  Peru declared its independence and sovereign status on July 28, 1821.[23]  In 1824, General de Sucre leading the United Liberator Army of Peru defeated a much larger Spanish force at the Battle of Ayacucho.  In the subsequent Capitulation of Ayacucho (December 9, 1824), Spain surrendered its territory and its objects within that territory.  (Doc. 161, Ex. A at ¶ 8.)  Eventually, Spain formally recognized Peru's independence in 1879 with execution of a peace and friendship treaty.  (Doc. 161, Ex. A at ¶ 11.)  Notably, that treaty provided from the date of its ratification, "there will be a complete forgetting of the past and a solid and inviolable peace between the Republic of Peru and His Majesty the King of Spain."  (Doc. 161, Ex. A at ¶ 11; "Peru, Viceroyalty of." Encyclopædia Britannica . 2009.  Encyclopædia Britannica Online. 14 May 2009

---

[23]  The United States recognized Peru's independent status in 1822.

< http://search.eb.com/eb/article-9059373>. ).

Against this historical backdrop, Peru argues Spain's rights must be measured against its patrimonial interests. But its reasoning is inconsistent. On one hand, Peru agrees that Spain is immune from Odyssey's salvage claim (indeed, it asserts it too is immune from Odyssey's claim); but on the other, it maintains Spain is not immune from Peru's claim against the *res*. And as a successor state, Peru contends its right to the specie (all or part) is superior to Spain's since the "property physically, culturally and historically originat[ed] in Peru." (Doc. 206, Ex. A at ¶ 25.) Peru arrives at this conclusion based upon "the law of the sea, the law of state succession, and considerations of equity and international policy concerning condemnation of colonialism, protection of permanent sovereignty over national wealth and resources, the protection of cultural heritage and the prohibition against pillage of occupied countries." (Doc. 206, Ex. A at ¶ 28.) Put more succinctly, Peru's argument is an equitable one grounded on claims of exploitation by its former colonial ruler.[24] Spain not only opposes Peru's legal bases, but it also opposes with justification this Court's authority to adjudicate Spain's and Peru's competing claims.

Peru overlooks this Court's tenuous jurisdictional grip over the *res*. This is not the typical *in rem* action involving a maritime lien on a cargo vessel docked at a port within the district. Here, the *res* lacks any nexus to our nation's sovereign boundaries. Instead of the usual

---

[24] Peru, without factual attribution, assumes that all the specie minted in Lima came from ore mined within the boundaries of present day Peru. Given the early date of some of the coins Odyssey recovered, it is reasonable to conclude that these could have been struck from ore mined in Upper Peru (later part of the Viceroyalty of Rio de la Plata). *See* John Fisher, *Silver Production in the Viceroyalty of Peru, 1776-1824,* The Hispanic American Historical Review, Vol. 55, No. 1 (Feb. 1975), http://www.jstor.org/stable/2512735.

jurisdictional ties, *in rem* jurisdiction has precariously rested on the concepts of *jus gentium* and constructive possession of the wreck, the bases for the Court's initial exercise of authority upon Odyssey's verified complaint. In some practical sense, this jurisdictional grant has been an inchoate one. *See R.M.S. Titanic,* 286 F.3d at 196 ("Acting under principles of salvage law and consistent with the inchoate lien that RMST obtained as salvor, the district court exercised *in rem* jurisdiction and issued a warrant [of arrest]"). The success of Odyssey's lien against Spain's claim of sovereign immunity, not to mention the fate of any claims against the *res*, has always hinged on the wreck's identity or its lack of any discernable identity. With the *Mercedes*'s identity confirmed and her status cloaked with her sovereign's immunity, her jurisdictional mooring line to this district has been severed. *In rem* jurisdiction no longer exists. *L.B. Harvey Marine, Inc. v. M/V River Arc,* 712 F.2d 458, 459 (11th Cir. 1983) ("where the res is no longer before the court, its in rem jurisdiction is destroyed" (citation omitted)); *Taylor v. Tracor Marine, Inc.,* 683 F.2d 1361, 1362 (11th Cir. 1982) (same).

But even if the Court were to accept Peru's jurisdictional presupposition – that Spain's immunity did not divest the Court of jurisdiction to resolve Peru's claim to part of the *res* (the specie) – several reasons warrant the dismissal of Peru's claim.[25] In the main, Peru points to Article 149 of the 1982 United Nations Convention on the Law of the Sea (UNCLOS), a provision that promotes the preservation and disposition of "[a]ll objects of an archaeological and historical nature found in the Area … for the benefit of mankind as a whole [with] particular regard being paid to the preferential rights of the State or country of origin, or the State of

---

[25] I note that the Court's exercise of equitable power (or its refusal to do same) is reviewed for an abuse of discretion. *Dresdner Bank AG v. M/V Olympia Voyager,* 465 F.3d 1267, 1273 (11th Cir. 2006).

cultural origin, or the State of historical and archaeological origin." United Nations Convention

on the Law of the Sea, art. 149, Dec. 10, 1982, 21 I.L.M. 1245. Peru makes this argument even

though it concedes it has neither signed nor ratified UNCLOS and the *Mercedes* is not within the

"Area." *See id.* at Article 1 (defining the "Area" as "the seabed and ocean floor and subsoil

thereof, beyond the limits of national jurisdiction." ). Regardless, because the Senate has not yet

ratified UNCLOS, Article 149 would have relevancy only to the extent the article reflects

customary international law. *United States v. Jho,* 534 F.3d 398, 406 n.6 (5th Cir. 2008)

("[S]ources are unclear as to which provisions of UNCLOS constitute customary international

law."). The Restatement defines customary international law as that which "results from a

general and consistent practice of states followed by them from a sense of legal obligation."

Restatement (Third) of Foreign Relations Law § 102. As one leading treatise remarks,

"[i]nternational law is sparse concerning jurisdiction over shipwrecks." 2 Thomas J.

Schoenbaum, *Admiralty and Maritime Law* § 16-7 (4th ed. 2004). For disputes between

competing sovereigns over underwater cultural heritage discovered in international waters, there

is no customary international law. *See generally* James A.R. Nafziger, *The Evolving Role of

Admiralty Courts in Litigation Related to Historic Wreck*, 44 Harv. Int'l L.J. 251, 261 (2003).

And no court has ventured into waters far beyond its jurisdictional boundaries to resolve a

dispute between two sovereigns over the remnants of one of the sovereign's sunken warships.

Considering that no court has applied Article 149, Peru's argument is not persuasive.[26]

---

[26] Peru's invocation of Article 149 infers, at least to some degree, that Spain would not
preserve the specie for "the benefit of mankind as a whole." Such a notion counters Spain's
quick legal efforts to defeat Odyssey's claims against the *res*. Regardless, Spain vigorously
argues it, not Peru, is the "country of origin" whose historical interests are to be protected under
Article 149. Further, Peru's effort to separate the specie from the vessel is like Odyssey's failed

Peru and Spain's dispute is intertwined with centuries of mutual history. Addressing their differences in this forum, as Peru argues equity dictates, would undermine the traditional notions of international comity as applied from *The Schooner Exchange* through *Pimentel*. Indeed, it is not surprising that our national courts have been reluctant to adjudicate claims between sovereigns unless the commercial exceptions to the FSIA apply. *See* Restatement (Third) of Foreign Relations Law § 451 cmt. *e* (1987) ("National courts have not normally adjudicated claims of one state against another, but where instrumentalities of two states have commercial relations with each other, there is no reason why controversies arising out of such relations could not be submitted to national courts"); *see, e.g., Honduras Aircraft Registry, Ltd. v. Government of Honduras,* 129 F.3d 543, 549-50 (11th Cir. 1997) (FSIA commercial exception applied to suit by Honduran corporation and Bahamian corporation against Honduran government, but case remanded for consideration of "act of state" doctrine).

Lastly, whether viewed from the perspective of an exploited colony or of a sovereign power using its resources, their dispute implicates the act of state doctrine, as Spain asserts.[27] Unlike the FSIA, the act of state doctrine does not divest a court of jurisdiction. Rather, it "provides foreign states with a substantive defense on the merits." *Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004). In its traditional formulation, it "precludes the courts of this

---

arguments to separate the cargo into lots or geographical zones. All this makes any determination of the claims by this Court an unreasonable exercise of its jurisdiction. *See* Restatement (Third) of Foreign Relations Law § 421 (1987) (listing factors for determining if a state's exercise of jurisdiction over a thing is reasonable).

[27] "As a rule, when a foreign nation confiscates the property of its own nationals, it does not implicate principles of international law." *Fogade v. ENB Revocable Trust*, 263 F.3d 1274, 1294 (11th Cir. 2001) (citations omitted).

country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964); *see also Altmann*, 541 U.S. at 700 ("Under that doctrine, the courts of one state will not question the validity of public acts (acts *jure imperii*) performed by other sovereigns within their own borders, even when such courts have jurisdiction over a controversy in which one of the litigants has standing to challenge those acts."); *Glen v. Club Mediterranee, S.A.*, 450 F.3d 1251, 1253 (11th Cir. 2006) ("The doctrine prevents any court in the United States from declaring that an official act of a foreign sovereign performed within its own territory is invalid." (citing *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400, 405-06 (1990)). In sum, Spain and Peru's dispute over the specie is best resolved through direct negotiations between the two and not in this forum. Restatement (Third) of Foreign Relations Law § 902 cmt. *d* (1987).

### E.  Conclusion

More than two hundred years have passed since the *Mercedes* exploded. Her place of rest and all those who perished with her that fateful day remained undisturbed for the centuries – until recently. International law recognizes the solemnity of their memorial, and Spain's sovereign interests in preserving it. *Sea Hunt,* 221 F.3d at 647. This Court's adherence to those principles promotes reciprocal respect for our nation's dead at sea. *Id.* It is this comity of interests and mutual respect among nations, whether expressed as the *jus gentium* (an impetus to exercise judicial authority) or as sovereign immunity (an impetus for refraining from the exercise of judicial authority), that warrants granting Spain's motions to vacate the *Mercedes*'s arrest and to dismiss Odyssey's amended complaint. Accordingly, it is

RECOMMENDED:

1. Spain's motion to dismiss (Doc. 131) and motion to vacate the arrest warrant (Doc. 132) be granted.

2. Odyssey's amended complaint (Doc. 25) be dismissed and the warrant of arrest (Doc. 5) be vacated.

3. All claims against the *res* be denied without prejudice.

4. Odyssey, as the substitute custodian, be directed to return the *res* to Spain within ten days or as mutually agreed.

IT IS SO REPORTED at Tampa, Florida on June 3, 2009.

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE


## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. § 636(b)(1).


cc:    Hon. Steven D. Merryday
       Counsel of Record
       Pro Se Claimants