UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
In Admiralty

ODYSSEY MARINE EXPLORATION, INC.,

      Plaintiff,

vs.                                                                  CASE NO. 8:07-CV-00614-SDM-MAP

THE UNIDENTIFIED SHIPWRECKED
VESSEL, if any, its apparel, tackle,
appurtenances and cargo, located within a
five mile radius of the center point
coordinates provided to the Court under seal,

      Defendant,
      *in rem*

and

THE KINGDOM OF SPAIN and
THE REPUBLIC OF PERU,

      Claimants,

and

GONZALO DE ALIAGA (the Count of
San Juan de Lurigancho), et al., SANTIAGO
DE ALVEAR, et al., ELSA D. WHITLOCK
f/k/a ELSA DORCA RUIZ, JOSE ANTONIO
RODRIGUEZ MENENDEZ a/k/a JOSEPH
ANTHONY RODRIGUEZ, and DR. JAIME
DURAND PALACIOS,

      Claimants.
_____/

## CLAIMANTS WHITLOCK'S AND DURAND'S
## OBJECTIONS TO MAGISTRATE'S REPORT AND RECOMMENDATIONS

**Preface**

1

The Report and Recommendations (the "Report") (Doc. 209), erred by holding the identity of the MERCEDES to be the controlling issue mandating that all of the issues concerning the Foreign Sovereign Immunities Act ("FSIA") be resolved in favor of the Kingdom of Spain. Private property claimant Elsa D. Whitlock, f/k/a Elsa Dorca Ruiz, and claimant Dr. Jaime Durand Palacios agree the vessel originally transporting their property was the MERCEDES, but this is the basis for their claims against the actual *res* of the recovered 594,000 coins. They have, and they assert, no claim to the vessel MERCEDES which exists only in name.

The Report simply failed to place the identity of the MERCEDES in context with the true property issues underlying the application of the FSIA and *in rem* admiralty jurisdiction. This context is essential to a proper resolution of the issues as set forth in the following sections: (A) Contextual Summary -- (1) The *Res* before the Court, (2) No FSIA Immunity for Commercial Activity and (3) No Grave Site; (B) Specific Objections to Report's Conclusions Regarding FSIA Immunity Issues Including Section 1609; and, (C) The Report Failed to Make Material Findings Relevant to Admiralty Jurisdiction and the FSIA.

**A. Contextual Summary**

1. The *Res* before the Court

From one site located approximately 4,000 feet deep in international waters, Odyssey has recovered, protected and conserved approximately 594,000 coins and physically brought them into the Middle District for adjudication of ownership and rights under the *in rem* admiralty jurisdiction of this Court. This commercial cargo of coins had been under contract for shipment on the MERCEDES, a naval vessel of the Kingdom of Spain engaged in commercial transport on behalf of the ancestors of claimants Whitlock and Durand and other private individuals. Most,

and possibly all, of this actual *res* of recovered coins now before the Court were owned by private parties who paid to have them shipped on the MERCEDES. This commercial cargo had separated from the MERCEDES when she exploded and was lost trying to evade capture by the British. Two hundred years later, at the time of the recovery, the MERCEDES did not exist as an extant vessel, and she admittedly was not in possession of the Kingdom of Spain or capable of being in anyone's possession.

This Court has *in rem* admiralty jurisdiction. The issue is whether this jurisdiction is authorized by the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, *et seq*.

The Report recommends all of the recovered coins be awarded to the Kingdom of Spain simply because they had been shipped on the MERCEDES, completely disregarding that Spain was not in possession of any of the coins and never was shown or found to be the owner of the recovered coins. This would constitute an injustice and denial of due process to Odyssey and the property claimants, who are the descendants of the shippers and owners, and an unjust enrichment to the Kingdom of Spain. The Kingdom of Spain cannot voluntarily appear and simultaneously assert this Court lacks any and all *in rem* jurisdiction over the recovered coins resting within the Middle District solely because the MERCEDES was a naval vessel and further claim an award of all recovered coins, including the privately-owned coins of claimants that are in the possession of Odyssey, free of any salvage lien. Contrary to the Report, this paradoxical result is not required by the FSIA. The Report should have found that, although the MERCEDES was a naval vessel, the FSIA did not divest this Court of jurisdiction over the actual *res* of recovered coins now before this Court.

The misapplication and misconstruction of the FSIA occurred for several reasons. First, as discussed in the next section, the Report rejected FSIA § 1605(b) that precludes immunity for

commercial activity involved in this case. The Report's premise, that all artifacts found, recovered, and possessed by Odyssey, are now owned by the Kingdom of Spain because the recovery site may have contained bits and pieces of the MERCEDES, is an invalid construction and application of the FSIA and cannot provide legal grounds under the FSIA to bar jurisdiction. The Report failed to recognize that the *in rem* salvage claims to the recovered coins by Odyssey and the claimants are claims against this actual *res* and not claims being asserted against the Kingdom of Spain. Title to the MERCEDES is not an issue. Ownership of the recovered *res* of coins is the matter at issue.

Significantly, the Report failed to properly apply Supreme Court precedent relevant to sovereign immunity and *in rem* jurisdiction and even failed to recognize Odyssey had acted properly under valid orders of this Court that required the actual recovered *res* of 594,000 coins, already subject to the perfected salvage lien, to be brought into the Middle District. Contrary to the Report, jurisdiction is not presumptively precluded by the very terms of 28 U.S.C. § 1609 which applies to property of a foreign sovereign attached in the United States for purposes of acquiring jurisdiction over a foreign sovereign. *See* discussion in "B. Specific Objections to Report's Conclusions Regarding FSIA Immunity Issues Including Section 1609." (*Infra* at page 7.)

The Report determined the identity of the vessel to be the MERCEDES. Claimants Whitlock and Durand agree, but this is the beginning for their claims, not the end. This Court now needs to determine jurisdiction and claims to the 594,000 coins. The District Court, as noted by the Report at footnote 15, page 17, has dismissed Odyssey's *in personam* claims against Spain. For this purpose, the proceedings in this Court could be styled *Odyssey vs. 594,000 coins* with Spain, Peru, and the shippers' and owners' descendants listed as claimants.

4

The admiralty claims by Odyssey and by the private property claimants to this *res* involve a number of separate and independent issues requiring separate analyses under the FSIA.

## 2. No FSIA Immunity for Commercial Activity

The extensive and important commercial activities of the MERCEDES as a carrier of private goods, indisputably proved by the manifest and other documents, were totally rejected. To the contrary, the Report, at page 27, states the "MERCEDES clearly was not engaged in any commercial activity at the time of its [her] demise." This is directly contrary to undisputed documented facts. The Report erred in not applying FSIA § 1605(b) that provides:

> A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of a foreign state, which maritime lien is based upon a commercial activity of the foreign state . . .

The Report's further error in claiming § 1609 precludes application of § 1605(b) is discussed in pages 7-21, *infra*. The commercial activity referenced in § 1605(b) is not limited to activity within the United States. This section uses the phrase "commercial activity of the foreign state" and does not use the phrase "commercial activity carried on in the United States by a foreign state." *See* definitions in § 1603(d) and (e).

The manifest itself effectively refutes any pretense of no commercial activity. The shipping transaction was commercial – conducted the same as parties would do for shipment on privately-owned vessels. "Clearly," the MERCEDES was engaged in commercial activities. <u>At the time of her demise</u>, she was transporting commercial property for compensation. <u>The cause of her demise</u> was a foiled attempt by the British to capture this valuable prize (as was done with the accompanying Spanish vessels). It is certainly true that the plan was not to have the ship or cargo lost, destroyed or captured by the British. The plan was to deliver the cargo to Cadiz. Although this continuing commercial activity ended suddenly and tragically, as is well

5

documented by the Report, this does not erase the existence of all commercial activities that had transpired.

The Report was supposed to make the necessary and material findings under FSIA for submission to this Court. The Report failed to even consider or acknowledge the extensive data on commercial activity. For this error, the Report should be rejected by the Court.

### 3. No Grave Site

The Report made prejudicial and inflammatory findings unsupported by, and directly contrary to, acknowledged facts, by claiming the recovery disturbed the grave site of the vessel and passengers and crew – "Her place of rest and all those who perished with her that fateful day . . ." (Report, p. 33.) No human remains were ever found nor would such remains have ever "come to rest" at the recovery site of the coins several thousand feet below the surface because of the certain effects of flotation and sea currents on human remains following the surface explosion that blew the MERCEDES apart.

The MERCEDES was a wooden vessel that had exploded into pieces, not a steel-hulled submarine that had sunk intact to the bottom of the sea trapping the remains of the crew and passengers. The passengers and crew, instead of being entombed in the vessel's compartments, would have been released into the water approximately 4,000 feet above the ocean floor for an uncertain final disposition and resting place that would have been considerably distant from the site of the explosion and the site of several tons of coins that, once separated from the vessel's holds, would have sunk directly and quickly.

The debris field where the coins were found was not a wreck site of the MERCEDES or any vessel, only some bits and pieces. It is certainly not the place of rest of the passengers and crew. The untrue and purposely inflammatory charge of "grave desecration" is a product of

evident bias that is illustrative of the entire Report's selective findings. The Kingdom of Spain made this desperate argument because it had no case for claiming immunity under the FSIA. The Report should have recognized Spain's argument for what it was – a blatant and false appeal to invoke prejudice.

### B. Specific Objections to Report's Conclusions Regarding FSIA Immunity Issues Including Section 1609

Odyssey previously had filed a Response to Spain's Reply on the FSIA issues on February 13, 2009, (Doc. 179) that effectively refutes many of the Report's subsequent findings on the FSIA. The Report ignored this response except for the identity issue of the MERCEDES. Private property claimants Whitlock and Durand incorporate those arguments from Odyssey's Response (Doc. 179) and expect to further adopt the additional FSIA arguments when Odyssey files its objections to the Report.

The Report's findings that federal admiralty jurisdiction was divested by the FSIA and the awarding of the 594,000 recovered coins to Spain are based primarily on three expressed conclusions:

    1. I conclude the *res* is the MERCEDES, that none of the exceptions to the FSIA apply and that as such this Court is without jurisdiction to adjudicate claims <u>against Spanish property</u>. (Report, p. 1-2; (emphasis added).)

    2. Given Spain's showing that <u>its property</u> is presumptively immune from suit under the FSIA, Odyssey must show an exception applies. (Report, p. 16; (emphasis added).)

    3. The FSIA as Spain correctly points out, grants immunity to a <u>foreign state's property in the United States</u> from attachment, arrest and execution except as provided in specific provisions of the act. (Report, p. 17.)

The validity of these conclusions depends on the vessel MERCEDES being the sole and only *res* before this Court. The Report and Spain contend the 594,000 coins are immune because they are

the *res* of the MERCEDES and constitute a foreign state's property in the United States under § 1609 that provides:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.

Odyssey's salvage lien had been perfected before the recovered cargo of coins had been brought into the United States, not afterwards; and, moreover, this *res* of recovered coins is not property of the Kingdom of Spain. The Report's fallacy, in seeking to avoid this fact, is the insistence that the only *res* is the vessel MERCEDES, not the privately-owned cargo. *See* Report page 30.

There is no immunity under § 1605(b) for the articles of salvage that have been recovered and brought into the jurisdiction of this Court because of the commercial activity involved. To avoid this result, the Report, at pages 26 and 27, states: "That section does not apply here for obvious reasons. Section 1609's language plainly precludes the inclusion of § 1605's exceptions." We differ with the use of "obvious" and "plainly" in the Report.

The Report's presumptive immunity argument depends entirely upon the construction and application of the FSIA § 1609 provision stating "the property in the United States of a foreign state shall be immune from attachment and arrest and execution except as provided in Section 1610 and 1611 of this chapter." By its very express terms § 1609 [plainly] has no application. Odyssey, by perfecting its salvage lien did not attach or arrest any property of the Kingdom of Spain in the United States; nor did Odyssey bring property of Spain into the United States and then seek to attach or arrest the property. Section 1609 does not arise until the Court first determines that property within the United States is property of Spain. If not, end of story. Odyssey's salvage lien had been perfected in international waters outside of the United States

8

when Odyssey's recovery vessel took possession of the artifacts. This salvage lien was not perfected in the United States and not perfected for the purpose of acquiring jurisdiction over the Kingdom of Spain. The Report fails to recognize that this is a critical difference for purposes of the FSIA.

The rationale of *Argentine Republic v. Amerada Hess Shipping Corporation*, 488 U.S. 428 (1986), supports Odyssey's position. In this case, Amerada Hess sought relief against Argentina for the bombing and sinking of a ship in international waters during the Falklands War. It was not an *in rem* admiralty action. The Supreme Court held Argentina was entitled to immunity, but acknowledged *in personam* admiralty suits for commercial activity could be brought under § 1605(b). The Court did not rule whether an *in rem* salvage lien against recovered articles possessed by a salvor was a claim against a foreign sovereign and barred by the FSIA. In this case, the salvage lien against the recovered articles of salvage was perfected out of the United States and not for purposes of acquiring jurisdiction over Spain. The salvage lien was perfected for purposes of acquiring *in rem* jurisdiction against the recovered articles of salvage. There is no immunity.

The salvage brought into the United States was not the vessel MERCEDES which exists in name only. The actual salvage brought within the United States is the 594,000 coins that are not owned by Spain and were not in possession of Spain. Even if there were articles of salvage possibly owned by Spain, there still is no violation of § 1609 as the salvage lien had been perfected long before the 594,000 coins had been brought into the United States. Spain would be a claimant like the United States in *California v. Deep Sea Research*, 523 U.S. 491 (1998).

In *California v. Deep Sea Research,* there were competing claims to the wrecked vessel and her cargo by California, the United States, the salvor and other claimants. The Supreme Court, at 497-498, observed:

> The District Court stated that it was not deciding whether "any individual items of cargo or personal property have been abandoned," explaining that "[a]t this stage in the litigation, DSR is not asking the court to award it salvage fees from the *res* of the wreck, or to otherwise make any order regarding title to or distribution of the wreck or its contents." *Id*., at 1354. The District Court thought that the most prudent course would be to adjudicate title after DSR completes the salvage operation. Following the District Court's ruling, <u>the United States asserted a claim to any property</u> on the *Brother Jonathan* belonging to the Federal Government. (Emphasis added.)

The Supreme Court ruled the Eleventh Amendment did not bar admiralty jurisdiction because California was not in possession and noted the district court could now resolve all issues involving claims:

> Moreover, the District Court's inquiry was a preliminary one, based on the concern that it was premature "for the court to find that any individual items of cargo or personal property have been abandoned." 883 F.Supp., at 1354. In light of our ruling that the Eleventh Amendment does not bar <u>complete adjudication of the competing claims</u> to the *Brother Jonathan* in federal court, the application of the ASA must be reevaluated. (Emphasis added.)

*Id*. at 508.

The *California* case is very instructive to issues at bar. As noted by the Supreme Court, "the United States asserted a <u>claim to any property</u> on the BROTHER JONATHAN belonging to the Federal Government." *Id*. at 498; (emphasis added). The United States was acting as a claimant to the cargo transported by the vessel. The United States did not assert that the *in rem* action was a claim against the United States or that it violated the sovereign immunity of the United States. The United States filed a claim. This is exactly what Spain has done. Spain has

10

voluntarily appeared and filed a claim. The *in rem* proceedings over the actual *res* is not a claim against the Kingdom of Spain. FSIA § 1609 does not defeat jurisdiction.

The Report rejected *California v. Deep Sea Research* because it involved the 11th Amendment and not the FSIA and, thereby, failed even to consider the importance or any application of the Supreme Court's reasoning, at page 507:

> Based on longstanding precedent respecting the federal courts' assumption of *in rem* admiralty jurisdiction over vessels that are not in the possession of a sovereign, we conclude that the Eleventh Amendment does not bar federal jurisdiction.

The Eleventh Amendment's jurisdictional bar is far greater than that imposed by the FSIA. The direct relevance was simply ignored. The Supreme Court held that an admiralty *in rem* action against property not in possession of the State was not jurisdictionally barred by the 11th Amendment. As the basis for this ruling, the Supreme Court expressly relied on its prior holdings – that an admiralty *in rem* action against property not in possession of the foreign sovereign was not an action <u>against</u> the sovereign. That is relevant to the FSIA. It is the crux of this case: Is the salvage lien, and individual property owners' claims against the recovered *res* that is not in the possession of Spain, a claim against Spain? It is not.

Property claimants Whitlock and Durand agree with the Report in that the cargo was once aboard the MERCEDES, a Spanish naval vessel. The property claimants strongly disagree with the Report's repeated statements that the "*res*" and only "*res*" is the MERCEDES. The MERCEDES exists only in name and is not the basis for this Court's jurisdiction. The actual *res* within the Middle District is not the MERCEDES. The actual *res* is the recovered articles before this Court including some 594,000 coins. This actual *res* is not property of Spain. The Kingdom

of Spain, in making Spain's claim, is just like any other claimant. FSIA § 1609 has no application.

The basis for the Report rests upon the single premise that because the MERCEDES was a Spanish naval ship, no admiralty jurisdiction can exist over privately-owned cargo that comprises the actual *res* before the Court. The MERCEDES does not exist as an extant vessel, and her bits and pieces, wherever they may lie, are not the basis for jurisdiction over the claims to the actual *res* now before this Court. This dispute is literally and factually over money – the cargo of coins recovered by Odyssey.

The Report, at page 23, also should have recognized the Law of the Sea Treaty ("only on a military mission") and the Sunken Military Craft Act ("military noncommercial mission") do not apply as reasons to bar relief. The recovered commercial cargo of 594,000 coins was not the military cargo of the MERCEDES.

Spain's FSIA argument, accepted by the Report, is that ownership of the MERCEDES mandates ownership of all cargo and, therefore, jurisdictionally bars owners and salvor for a claim against their salvaged property that never was the property of Spain and was not in possession of the Kingdom of Spain at the time of recovery. This theory of ownership is invalid in fact and in law. Spain did not claim to have been the owner of the private cargo shipped on the MERCEDES and has acknowledged the contrary.

The Report relies on the constructive fiction that the *res* is the whole of the shipwreck including cargo. The debris field where the coins were found did not comprise the shipwreck of the MERCEDES or any other vessel. The constructive fiction applicable for the purpose of enjoining interference from rival salvage operations within a specified <u>geographic area</u>, the constructive *res*, is not the basis for adjudication of title, ownership and salvage liens to recovered articles physically brought within the jurisdiction of the Court. The latter is based

12

upon the actual *res* before the Court - specific jurisdiction over recovered items - not constructive jurisdiction over an area.

> Filing an *in rem* arrest of recovered items merely confers *in rem* jurisdiction in the district court over the recovered property. *See Martha's Vineyard Scuba Headquarters, Inc. v. The Unidentified, Wrecked and Abandoned Steam Vessel*. Filing an *in rem* petition for arrest of artifacts does not automatically confer exclusive rights to a site [geographic area] as salvor in possession.

*Yukon Recovery v. Certain Abandoned Property*, 205 F.3d 1189, 1195 (9th Cir. 2000).

The Report at page 23 claims "vessel and cargo are inextricably intertwined." This theory that cargo and vessel are one single *res* incapable of division, separation, or, indeed, even a separate existence, is contrary to the entire history of maritime law. In 1815, Chief Justice Marshall in a prize case involving libel by owners of condemned cargo which had been transported on a vessel that had been condemned ruled:

> In this it is the opinion of the majority of the Court there is nothing unlawful. <u>The characters of the vessel and cargo remain as distinct in this as in any other case.</u> The sentence, therefore, of the Circuit Court must be reversed, and the property claimed by Manuel Pinto for himself and his partners, and for those other Spaniards for whom he has claimed, be restored, and the libel as to that property, be dismissed. (Emphasis added.)

*The Nereide*, 13 U.S. 388, 431 (1815).

The separation of ship and cargo is acknowledged in FSIA § 1605(b): "a maritime lien against a vessel <u>or</u> cargo of a foreign state." Today, the Carriage of Goods by the Sea Act, 46 U.S.C. § 30701, recognizes the distinction and separation between ship and cargo. The Report's and Spain's central thesis is wrong.

The *Santissima Trinidad*, 20 U.S. 283 (1822), involved a national ship of a foreign power and the commercial cargo that she had acquired by unlawfully taking the cargo from Spanish merchant ships. The libel was against "nine bales of cochineal" and other specific items of

cargo. Even though the SANTISSIMA TRINIDAD was a foreign public vessel, she had violated neutrality by certain prior actions within the United States. The libel against the cargo property was upheld and ordered released to the Spanish owners. Likewise, the ownership of the vessel MERCEDES is not the same as the ownership of the cargo shipped aboard.

It is well recognized that the Court, in treating the injunctive geographic area of the wreck or recovery site to be a single unitized integral constructive *res*, does not bar individual claimants from asserting separate rights to actual property salvaged and recovered. *See* competing cargo claims regarding the recovered *res* in the S. S. CENTRAL AMERICA litigation, *Columbus-America Disc. Group v. Atlantic Mutual Insurance*, 203 F.3d 291 (4th Cir. 2000).

### C. The Report Failed to Make Material Findings Relevant to Admiralty Jurisdiction and FSIA

1. The actual *in rem* jurisdiction before the Court consisted of articles of salvage, including approximately 594,000 coins recovered in international waters and brought into the Middle District of Florida by Odyssey, i.e., the recovered *res*, that should be decided under the admiralty law of salvage.

2. At the time of the constructive admiralty arrest, the articles of salvage were not in the possession of the Kingdom of Spain and had not been for two hundred years.

3. Under the maritime law of salvage, Odyssey perfected its lien against the 594,000 coins at the time when it obtained actual possession and custody of the articles of salvage from the site.

4. The *res* recovered by Odyssey and subject to its perfected salvage lien, was duly and lawfully brought into the Middle District for adjudication of right and claims.

5. The *in rem* claim of Odyssey for an award under the admiralty law of salvage is against the recovered *res* and not against the Kingdom of Spain.

6. The Kingdom of Spain's claim of ownership of the *res* is based upon the cargo having been transported by a sunken Spanish naval vessel, the MERCEDES, and not upon ownership of the 594,000 coins that comprise the actual *res* before the Court.

7. The Report's finding of identity of the MERCEDES depended upon a number of objective and subjective factors including an analysis of the recovered artifacts of privately-owned coins.

8. The Kingdom of Spain's voluntary claim to the actual *res* before this Court is not jurisdictionally barred by the Foreign Sovereign Immunities Act.

9. At the time of Odyssey's recovery, the Kingdom of Spain was not in possession of the MERCEDES; indeed, as recognized by the Report at pages 19-21, possession was not possible as she existed only in bits and pieces scattered and disbursed to unknown places. (*See* paragraphs 31, 32 and 33 below.)

10. Although the Kingdom of Spain states that Spain has never abandoned the MERCEDES and has not removed her name from a list of Spanish naval vessels, her naval existence is only a conceptual status, a constructive fiction.

11. The Kingdom of Spain has not shown, and the Report has not found, that any individual article of salvage which comprises the recovered *res* of 594,000 coins was property owned by the Kingdom of Spain.

12. The substantial majority of the cargo being transported by the MERCEDES was privately owned by individuals who contracted and paid to have it shipped in the same manner as would be done for carriage of goods on a privately-owned vessel.

13. The manifest of the MERCEDES lists the individual names and amount of cargo shipped by and to private persons.

14. The private commercial cargo of the MERCEDES was of great value and importance.

15. The Kingdom of Spain is not now and never was the owner of the privately-owned cargo shipped on the MERCEDES.

16. The commercial mission of the MERCEDES was to transport the privately-owned cargo to Cadiz, Spain, and to avoid interception or capture by the British.

17. The MERCEDES was not "only on a military mission" or on a "military non-commercial mission" for purposes of the Law of the Sea Treaty or the Sunken Military Craft Act. (Law of the Sea Convention, Article 96; and, Sunken Military Craft Act § 1408(3).)

18. This commercial cargo had separated from the MERCEDES when she exploded and was lost trying to evade capture by British naval vessels.

19. Two hundred years later, at the time of the recovery, the MERCEDES did not exist as an extant vessel, and she admittedly was not in possession of the Kingdom of Spain or capable of being possessed by anyone.

20. The extensive commercial activities of the MERCEDES were of great importance and conducted in the same business manner as cargo shipments on privately-owned merchant ships.

21. After the loss of the MERCEDES, the Kingdom of Spain acknowledged the loss to the private shippers and owners, but they did not receive compensation from the Kingdom of Spain.

22. The MERCEDES was loaded with approximately 900,000 coins of which a few hundred were gold. (Report, p. 9.)

23. Odyssey recovered approximately 594,000 coins with an overwhelming disparity of silver to gold. (Report, p. 9.)

24. All of the coins recovered by Odyssey could be private property owned by private persons, as the amount recovered is less than the amount of private property listed on the manifest.

25. Although the Report failed to find the number and amount of coins owned by the Kingdom of Spain, it was substantially less than the number of coins recovered by Odyssey.

26. Odyssey as substitute custodian acted under valid orders of this Court and properly performed its duties at great risk, effort and expense; and, in satisfaction for its salvage lien, should be granted a very liberal and generous award by distribution in-kind of the actual *res* before this Court.

27. Elsa D. Whitlock, f/k/a Elsa Dorca Ruiz, and Dr. Jaime Durand Palacios have filed admiralty claims to the recovered *res* documented by the manifest of the MERCEDES showing the names of their ancestors and the goods shipped; and, subject to the superior salvage lien of Odyssey, should be granted a distribution in-kind from the actual *res*.

28. The adjudication of the admiralty *in rem* claims against the recovered *res* of approximately 594,000 coins, under the salvage lien and owner-descendant rights, does not interfere or affect Spain's claim or title to the MERCEDES.

29. The Report's recommended order, which takes the recovered coins possessed by the salvor Odyssey and owned by the private claimants and then awarding them to the Kingdom of Spain without compensation to the salvor and the private claimants, is not authorized or required by the FSIA and such an interpretation of the FSIA would violate the Fifth Amendment due process rights of Odyssey and the other claimants.

30. The Report's baseless and highly inflammatory charge at page 33, that the recovery site where Odyssey salvaged the coins is the grave site of the MERCEDES and her passengers and crew, should be struck.

31. The Report recognized that the MERCEDES had been intercepted by British naval vessels and lost after a violent explosion of the ship's powder magazine blew the ship apart, probably as the result of an internal mishap.

32. As a result of the explosion, no wreck site comprising identifiable structural parts of the vessel has been found and the MERCEDES ceased to exist as a ship or even as cohesive parts of the vessel.

33. An explosion as forceful as Spain claims would cause parts of the disintegrated vessel, cargo, crew and passengers to be scattered and dispersed and further separated by flotation, density and currents.

34. As a direct result of the force of the explosion, the passengers and crew, instead of being entombed in the vessel's compartments, would have been released into the water 4,000 feet above the ocean floor for an uncertain final disposition and resting place which would have been considerably distant from the site of the explosion, and the site of several tons of coins that, once separated from the vessel's holds, would have sunk directly and quickly.

35. The articles of salvage recovered by Odyssey were from two large separate piles resting on the ocean's floor 4,000 feet below the surface where the explosion occurred.

36. The recovery site where the articles of salvage were found by Odyssey did not contain human remains, and there is no basis for believing the recovery site has or ever had human remains.

### D. Conclusion

The Report failed to recognize the basic tenant of salvage *in rem* jurisdiction. A salvage lien on the articles recovered and possessed by the salvor is for the purpose of providing this Court with *in rem* jurisdiction for claims against the *res*. As a result, the Report misconstrued and misapplied the explicit wording of § 1609. The ownership claims of Whitlock and Durand to the recovered *res*, are properly within the jurisdiction of this Court. Claimant Whitlock and claimant Durand are grateful that Odyssey, at great expense, effort and risk, has been able to protect, conserve and preserve the 594,000 coins that include property of Whitlock and Durand, for proper adjudication by this Court.

**Prayer**

WHEREFORE, the Report and Recommendations should be rejected *in toto* and a hearing set before the Judge of this Court to consider claims to the recovered *res* of 594,000 coins.

/s/ Guy E. Burnette, Jr.
Guy Ellington Burnette, Jr.
Florida Bar No. 236578
GUY E. BURNETTE, JR., P. A.
3020 N. Shannon Lakes Drive
Tallahassee, Florida 32309
Vox: 850/668-7900
Fax: 850/668-7972
Email: geb@gburnette.com
ATTORNEYS FOR CLAIMANT
DR. JAIME DURAND PALACIOS

/s/ Marlow V. White
Marlow V. White
Florida Bar No. 275417
LEWIS & WHITE, P.L.C.
P.O. Box 1050
Tallahassee, Florida 32302
Vox: (850) 425-5000
Fax: (850) 425-5004
Email: mvw@lewisandwhite.com
ATTORNEYS FOR CLAIMANT
ELSA D. WHITLOCK

OF COUNSEL

William VanDercreek
Texas Bar Member 20442000
Email: wvcreek_tlh@msn.com
9441 LBJ Freeway, Suite 350
Dallas, Texas 75243
Telephone: (214) 361-4005

## CERTIFICATE OF SERVICE

      WE HEREBY CERTIFY that a true and correct copy hereof was electronically filed with the Clerk of the Court via the CM/ECF system on this 15th day of July, 2009; we electronically filed this document with the Clerk of the Court by using the CM/ECF system which will generate and transmit Notices of Electronic Filing to all parties except Jose Antonio Rodriguez-Menendez, who is being served by United States Mail at 4611 South University Drive, Davie, FL 33328-3817, this same day.


| /s/ Guy E. Burnette, Jr. | /s/ Marlow V. White |
|---|---|
| Guy Ellington Burnette, Jr. | Marlow V. White |
| Florida Bar No. 236578 | Florida Bar No. 275417 |