IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

*IN ADMIRALTY*

ODYSSEY MARINE EXPLORATION, INC.

        Plaintiff,                          CIVIL ACTION

v.
                                  Case No. 8:07-CV-00614-SDM-MAP

THE UNIDENTIFIED, SHIPWRECKED
VESSEL,

        Defendant,
        *In Rem*
And

The Kingdom of Spain and the Republic of Peru,

        Claimants;
And

Gonzalo de Aliaga (the Count of San Juan de Lurigancho),
Agustin de Aliaga (the current Marques de Zelada de la
Fuente), Gonzalo Alvarez del Villar, Ignacio de
Colmenares (the 11th Count of Polentinos), Alberto Emilio
Thiessen, Enriqueta Pita Duthurburu, Flora Leonor Perales
Calderon de Colmenares, Felipe Voysest, Adela Armida de
Izcue Bazo, Carola Daireaux Kinsky, Eleonora Daireaux
Kinsky, Matilde Daireaux Kinsky, Julio Vega Erausquin,
Inez Marquez Osorio, Javier de Goyeneche (the current
Count of Guaqui and Marques de Villafuente), Juan Mariano
de Goyeneche y Silvela (the current Marques of Casa Davila),

        Claimants.

Santiago de Alvear, et al.

        Claimants,
And

Elsa D. Whitlock f/k/a Elsa Dorca Ruiz,

_____Claimant_____/

Dockets.Justia.com

## DESCENDANT CLAIMANTS OBJECTION TO MAGISTRATE'S
## REPORT AND RECOMMENDATION

Claimants, Gonzalo de Aliaga (the Count of San Juan de Lurigancho), Agustin de Aliaga (the current Marques de Zelada de la Fuente), Gonzalo Alvarez del Villar, Ignacio de Colmenares (the 11th Count of Polentinos), Alberto Emilio Thiessen, Enriqueta Pita Duthurburu, Flora Leonor Perales Calderon de Colmenares, Felipe Voysest, Adela Armida de Izcue Bazo, Carola Daireaux Kinsky, Eleonora Daireaux Kinsky, Matilde Daireaux Kinsky, Julio Vega Erausquin, Inez Marquez Osorio, Javier de Goyeneche (the current Count of Guaqui and Marques de Villafuente) and Juan Mariano de Goyeneche y Silvela (the current Marquis of Casa Davila) (collectively referred to herein as "Descendant Claimants") submit this Objection to the Magistrate Judge's Report and Recommendation (Document #209) hereinafter the "Report".

### BASIS FOR OBJECTION

> "What seemed obvious becomes obscured in all the attention
> devoted to some point that one party decides to beat to
> death with thousands of pages or weeks of testimony."
>
> Philip K. Howard
> *The Death of Common Sense*
> Random House

When did Spain become the owner of the 12,344 coins consigned and shipped aboard the *Nuestra Senora de Las Mercedes* by Sebastian de Aliaga, or the 18,600 coins consigned and shipped by Damaso de Arias, or the 26,016 coins consigned and shipped by Antonio Alvarez del Villar, or the 39,837 coins consigned and shipped by Francisco Xavier de Izque? Could Spain have claimed the coins against their owners after consignment, but before they were loaded on the *Mercedes*? Once loaded, could Spain

have claimed the coins against their owners before the *Mercedes* sailed from Montevideo? Could Spain have claimed the coins against their owners upon the arrival of the *Mercedes* in Cadiz? Isn't the answer to these questions <u>obvious</u>? What if the *Mercedes* had been impounded by the British on October 5, 1804 and later released, could Spain have then claimed the coins against their owners? What if the *Mercedes* had wrecked on its way into the Cadiz Harbor and voluntary salvors had recovered 594,000 coins from the wreck, could Spain have claimed <u>all</u> of the salvaged coins against both the voluntary salvors and their owners? Again, the answers are obvious.

If it had taken a month to recover most or all of the coins from the wreck of the *Mercedes*, could Spain have then claimed all the coins that had been salvaged? What if it had taken a year or ten years or two hundred years? So, again, when did the owners lose their ownership to Spain? The answer is simple. They haven't – yet.

The Report and Recommendation (Doc #209) carefully avoids the obvious – the ownership of a vessel is totally separate from ownership of the cargo.

Fifty-three (53) years after the *Mercedes* sailed from Montevideo (Uruguay) with paying passengers (including women and children), and many consignments of civilian/merchant cargo (including hundreds of thousands of gold and silver coins) the *S.S. Central America* sailed from Aspinwall (Colombia) with paying passengers (including women and children) and many consignments of civilian/merchant cargo (including hundreds of thousands of gold and silver coins). In both cases, the ownership of the vessels was totally separate and apart from the commercial cargo they both carried. Both vessels failed to complete their voyage. Both vessels sank thousands of feet deep in international waters of the Atlantic Ocean. Both vessels deposited their privately owned

cargo on the ocean floor and for over a hundred years, the precise whereabouts of the wrecksite of the *S.S. Central America* remained unknown. The wrecksite of the *Mercedes* remained unknown for over two hundred years.

In 1989, a private salvor, The Columbus-America Discovery Group, filed an *In Rem* salvage action against the *S.S. Central America* and its cargo in the District Court for Virginia's Eastern District, Case No. 87-363-N. After a ten-day trial, the Lower Court found that the vessel had been abandoned by its owners and that the cargo insurers/underwriters (subrogated owners of the insured cargo) had abandoned their ownership interests by deliberately destroying certain documentation. Columbus-America Discovery Group, et al. v. The Unidentified Wrecked and Abandoned Sailing Vessel 742 F.Supp. 1327 (E.D. Virginia 1990). An appeal was taken by the owners of the cargo that had intervened as claimants. The Fourth Circuit reversed the Trial Court and remanded the case. See 974 F.2d 450 (4th Cir. 1992). The Fourth Circuit quoted "Benedict on Admiralty" for the proposition that:

> Admiralty favors the Law of Salvage over the Law of Finds because salvage law's aims, assumptions and rules are more consonant with the needs of maritime activity and because salvage law encouraged less competitive and secretive forms of conduct than finds law." 974 F.2d at 460

> \* \* \* \* \*

> Admiralty's equitable power to make an award for salvage-recognized since ancient times in maritime civilizations – is a corollary to the assumption of non-abandonment and has been applied irrespective of the owner's express refusal to accept such service. 974 F.2d at 461

The Fourth Circuit quoted numerous cases for the proposition that: "When articles are lost at sea, the title of the owner in them remains." 974 F.2d at 461. This specifically

covered cargoes <u>not</u> the vessels that carried them. (i.e. Two Hundred and five boxes of sugar; 1100 tons, more or less of Italian marble, ninety-nine gold coins, Two Thousand, One Hundred Thirty-Three Dollars).

In <u>Gardner v. Ninety-nine Gold coins</u>, 111 F. 552 (D. Mass. 1899) the Court stated, "it is very unlikely that the property would have been recovered at all had it not been recovered as it was by the libellants; and it would have been easy for the crew, after its recovery, to divide it among themselves without bringing it into Court." 111 F. at 553. The same result and considerations are seen in <u>Broere v. Two Thousand One Hundred Thirty-Three Dollars</u>, 72 F.Supp. 115 (D.C. NY 1947). In both cases, the "vessel" from which the gold coins and currency were salvaged were dead bodies.

The Fourth Circuit's decision in <u>Columbus-America</u> makes it crystal clear (i.e. "obvious") that title to the vessel is a totally separate factual issue from title to the cargo. The *S.S. Central America* was abandoned by her owners and owned by Columbus-America. 974 F.2d at 465. The Trial Court ruled that both the vessel and her cargo had been abandoned by their owners. 742 F.Supp 1327. The Fourth Circuit ruled that even though Columbus America owned the ship, abandonment of the sunken cargo (so as to lose possession and ownership) must be shown not by mere cessation of attempts to recover it, but by the owner's positive relinquishment of rights in the property. 974 F.2d at 463. The Court stated that absent the cargo owner's abandonment, insurance underwriters (or even those to whom underwriters' assign their interest) retain the same interests as "original" owners for purposes of asserting rights in connection with the salvage of their property. 974 F.2d at 462. There was never a question as to whether a

descendant of a passenger could intervene and claim ownership. The Fourth Circuit observed:

> Also, there appears to have been a fairly significant amount of passenger gold aboard, but this case, almost surprisingly, has failed to see descendants of any of the passengers attempt to gain a share of the treasure." 974 F.2d at 465

The comparison of <u>Columbus-America</u> to the Report and Recommendation (Doc #209) is inescapable. The S.S. Central America was totally separate from passengers and gold and silver cargo consigned and shipped aboard her. The *Mercedes* is totally separate from the civilian passengers and gold and silver cargo consigned and shipped aboard her. This is the <u>obvious</u> mistake made in the Report and Recommendation. It is equally obvious that the Magistrate does not understand who the intervening Descendant Claimants are. In the Report at page 28, it states:

> In sum, Spain's property is immune from arrest, and this Court is without subject matter jurisdiction to adjudicate Odyssey's claims <u>and those of the private claimants (the purported descendants of those who perished)</u> against the *res*.

The "private claimants" that have appeared and filed their Verified Claims to verified numbers of coins consigned and shipped by their ancestors (Doc #169) are *not . . .* "purported descendants of those who perished". The present Descendant Claimants stand in the same (but much better) shoes as the insurance companies that paid the claims on the insured cargo of the *S.S. Central America*. Columbus-America argued (and lost) that ownership of the vessel and ownership of its cargo are "inextricably intertwined" and must be considered as one indivisible "*res*". The Report and Recommendation at page

23, states, "A vessel and its cargo are inextricably intertwined." The idea that Spain can claim the wrecksite is that of the *Mercedes* and therefore, all of the owners of the consigned and shipped cargo are foreclosed from their claim is "obviously" an error that must be corrected.

It was twenty-seven years ago, in Florida Dept. of State v. Treasure Salvors, Inc., 458 U.S. 670, 710 (1982), that Justice Stevens, writing for the plurality, was determining whether a sovereign could obtain immunity from a maritime salvage *In Rem* brought against vessels in which . . . "a foreign government has asserted ownership of the *res*." Sixteen years later, Justice Stevens (in his specially concurring Opinion) in California v. Deep Sea Research, 523 U.S. 496, 509 (1998), conceded that an error had been made in Treasure Salvors and that, "Having given further consideration to the special characteristics of *In Rem* admiralty actions and more particularly to the statements by Justice Story and Justice Washington quoted at pages 9 and 10 of the Court's Opinion, I am now convinced that we should have affirmed the Treasure Salvors judgment in its entirety." In effect, The Supreme Court has done so.

It was eleven years ago in the Court's unanimous Opinion in Deep Sea Research, that the Supreme Court again revisited the issue of sovereign immunity asserted by a sovereign Intervener in *In Rem* salvage actions. Quoting from The Siren, 74 U.S. 152 (1868) and The Davis, 77 U.S. 15 (1869), The Supreme Court held that the "fundamental premise" in those cases remains valid in today's *In Rem* admiralty actions. The unanimous Court explained the "fundamental premise" to be that:

> Proceedings *In Rem* to enforce a lien against property of the United States are only forbidden in cases where, in order to sustain the proceeding, the possession

of the United States must be invaded under process of the Court. (citation omitted) The possession referred to was actual possession, and not that mere constructive possession which is very often implied by reason of ownership under circumstances favorable to such implication. [And that] The Court's jurisprudence respecting the sovereign immunity of foreign governments has likewise turned on the sovereign's possession of the *res* as issue. Deep Sea Research, 523 U.S. at 507.

In The Davis, the cargo of cotton was owned by a sovereign, The United States. In The Siren, the vessel (prior to the collision given rise to the *In Rem* proceeding), had become property of the United States. In both cases, the admiralty court's jurisdiction turned on whether the sovereign's property was in "actual possession". The unanimous Court defined and clarified that sovereign immunity turned on "actual", not "constructive" possession. 523 U.S. at 506. See, e.g. The Pesaro, 255 U.S. 216, 219 (1921).

Spain does not own any coins that were part of the commercial shipment claimed by the Descendant Claimants. Spain does not have "actual possession" of the Descendant Claimants' coins, but this Court does. The Report and Recommendation treats the Descendant Claimants' ownership (clearly shown in the *Mercedes* commercial manifest) as somehow "irrelevant". The Report and Recommendation is that . . . "dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign" and that dismissal is required so as to avoid . . . "prejudicing Spain's sovereign interests and countering principles of comity". Report, page 23. This is obviously the tail attempting to wag the dog.

This Court must not hold it lacks jurisdiction over 594,000 coins and then go on to deny the Descendant Claimant's ownership and award Spain coins that it never owned and never possessed as owner. Spain would only come into "actual possession" if this Court adopts the Report and Recommendation of the Magistrate.

## THE FOREIGN SOVEREIGN IMMUNITIES ACT

Odyssey and private property claimants Whitlock and Durand, have filed extensive responses and objections regarding FSIA issues. (Doc. #179, 227). For the purpose of this Objection to the Magistrate's Report and Recommendation, the Descendant Claimants incorporate those arguments and adopt Odyssey's FSIA arguments in Odyssey's Objection to the Report and Recommendation.

To decide Spain's immunity against the ownership of the coins by the Descendant Claimants, the Court must decide the boundaries of the "commercial activity" exception as it is used in the FSIA. The Act states that "commercial activity" is:

> . . . "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."

28. U.S.C. §1603(D). In <u>Republic of Argentina v. Weltover, Inc.</u>, 504 U.S. 607, 612 (1992), the Court observed that the term "commercial" was largely undefined by Congress. The Court held that the sentence "simply establishes that the commercial nature of an activity does <u>not</u> depend on whether it is a single act or a regular course of conduct; and the second sentence merely specifies that element of the conduct determines commerciality." <u>Id.</u> The FSIA in general and its commercial exception in particular . . . "largely codifies the so-called 'restrictive' theory of foreign sovereign immunity." <u>Weltover</u> stands for the proposition that sovereign immunity <u>does not apply</u> to Spain's "commercial and private activities". <u>Id.</u>

In Bank of the United States v. Planters' Bank of Ga., 22 U.S. (9 Wheat.) 904, 907 (1824), Chief Justice Marshall states, "It is, we think, a sound principle, that when a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to the level with those with whom it associates itself, and takes the character which belongs to its associates, and to the business which is to be transacted." When Spain took on passengers, including women and children, and contracted with numerous private shippers, it acted as a private citizen or merchant, not in the role of a sovereign.

In 1952, the State Department changed United States policy to one embodying the "restrictive theory" of sovereign immunity. The State Department first signaled this shift in policy is a letter from Jack B. Tate, Acting Legal Adviser, United States Dept. of State, to Philip B. Perlman, Acting Attorney General. (May 19, 1952), as reprinted in 26 Dept. of State Bull, 984-85 (1952). Tate wrote in part:

> A study of the law of sovereign immunity reveals the existence of two conflicting concepts of sovereign immunity, each widely held and firmly established. According to the classical or absolute theory of sovereign immunity, a sovereign cannot, without his consent, be made a respondent in the Courts of another sovereign. According to the new or restrictive theory of sovereign immunity, the immunity of the sovereign is recognized with regard to sovereign or public acts (jure imperii) of a state, but not with respect to private acts (jure gestionis) . . . it will hereafter be the Department's policy to follow the restrictive theory of sovereign immunity in the consideration of requests of foreign governments for a grant of sovereign immunity.

In Alfred Dunhill v. Republic of Cuba, 425 U.S., 682 at 698 (1976), the Supreme Court recognized the "shift" in the official policy of our government to the "restrictive"

approach to sovereign immunity. Rather than have the State Department make sovereign immunity decisions, Congress passed the FSIA giving the Federal Courts the power of making sovereign immunity determinations. See 28 U.S.C. §1602 (the determination of immunity by the Courts will "serve the interests of justice").

The FSIA retained the restrictive theory of immunity. The Legislative History of the FSIA confirmed that:

> . . . the bill would codify the so-called "restrictive" principle of sovereign immunity, as presently recognized in international law. Under this principle, the immunity of a foreign states is "restricted" to suits involving a foreign state's public acts (jure imperii) and does not extend to suits based on its commercial or private acts (jure gestionis).

H.R. Rep. No. 94-1487, at 6 (1976) reprinted in 1976 U.S.C.C.A.N. 6604, 6605.

Commercial activities and private activities are outside the bounds of sovereign immunity, whereas sovereign public acts are not. In Weltover, 504 U.S. at 613, the Court noted ". . . the distinction between state sovereign acts, on the one hand, and state commercial and private acts, on the other". The Supreme Court, in Weltover, instructed the United States District Courts in how to decide questions of foreign sovereign immunity:

> [W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are "commercial" within the meaning of the FSIA. . . . [B]ecause the Act provides that the commercial character of an act is to be determined by reference to its "nature" rather than its "purpose" 28 U.S.C. §1603(d), the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objections. Rather, the issue is whether the particular actions that the foreign sate performs (whatever the motive behind them) are the type of actions by which a private party engages in "trade and traffic or commerce. Black's Law Dictionary, 270 (6th ed. 1990).

<u>Weltover</u>, 504 U.S. at 614.


In <u>Honduras Aircraft Registry, Ltd. V. Gov't of Honduras</u>, 129 F.3d 543 (11th Cir. 1997), the Court discussed the <u>Weltover</u> decision and held that a "foreign state loses its immunity if it engages in commercial activity . . . because then it is exercising the same powers that a private citizen might be exercising . . . [a] foreign state is commercially engaged when it acts like an ordinary private person, not like a sovereign, in the market." 129 F.3d at 548. In <u>Honduras</u>, the government contracted for origination of a computer data base allowing for Honduran aircraft registry. This contracting with private parties was held to be a "commercial act" and the private parties were allowed to bring suit to enforce the contract. <u>Honduras</u>, 129 F.3d at 548. The Court held that . . . "[a]ll of those underlying activities were commercial in nature and of the type negotiable among private parties." <u>Id.</u> At 547.

When the private owners/shippers consigned the gold and silver coins to be shipped to Spain, the contract provided Spain with the contractual obligation of performing a service. (i.e. Transporting a private/commercial shipment.) The consignment/shipping contract for the commercial cargo mandated Spain's performance. The FSIA states that . . . "[t]the commercial character of an activity shall be determined by reference to the nature of the . . . act, rather than by reference to its purpose." 28 U.S.C. §1603(d). <u>Weltover</u>, 504 U.S. at 614.

The cargo manifest and consignment agreements prepared prior to the *Mercedes'* final voyage may not disclose the specific "profit motive", but it was certainly present.

Even if there was no profit motive in the shipping of the private cargo, it would still constitute a commercial act. The Legislative History of the FSIA shows:

> Certainly, if an activity is customarily carried on for profit, its commercial nature could readily be assumed. At the other end of the spectrum, a single contract, if of the same character as a contract which might be made by a private person, could constitute a "particular transaction or act."

H.R. Rep. No. 94-1487, at 16 (1976), Reprinted in 1976 U.S.C.A.N. 6604, 6615.

The <u>Weltover</u> test provides the Court with guidelines for determining when Spain can assert sovereign immunity. The <u>Weltover</u> test applies to suits "based upon a foreign state's participation in the marketplace in the manner of a private citizen. 504 U.S. at 614. Spain was not at war and was transporting private individuals and private cargo.

From a policy perspective, granting Spain sovereign immunity and awarding Spain ownership of a treasure owned by the Descendant Claimants would totally destroy maritime salvage from beneath international waters. The incentive to return privately owned cargo to the streams of commerce would end and any incentive to bring a salvage action in United States District Courts would cease to exist.

If this Court follows the Report and Recommendation and finds it does not have jurisdiction . . . "The Court's sole remaining act is to dismiss the case for lack of jurisdiction." See <u>Morrison v. Allstate Indem. Co.</u>, 228 F.3d 1266, 1261 (11th Cir. 2000).

## CONCLUSION

Although we may want to blindfold Justice, we can't allow Justice to become oblivious to the fact that the Descendant Claimants have at least as strong of an

ownership claim as the insurance companies in <u>Columbus-America.</u> When Court's disregard what is clearly right the litigants have little incentive to be moderate or even intellectually honest.

WHEREFORE, the Descendant Claimants respectfully request that the Court reject the Magistrate's Report and Recommendation and go forward to adjudicate the ownership of the items within the Court's jurisdiction. Alternatively, the Descendant Claimants respectfully request that in the event this Court adopts the Magistrate's Recommendation, the Court should stay the "return" of the 594,000 coins to Spain pending resolution of the obvious conflict with the Supreme Court's decisions in <u>California v. Deep Sea Research</u>, 523 U.S. 491 (1998) and <u>Republic of Argentina v. Weltover, Inc.</u>, 504 U.S. 607 (1992).

Dated this 21st day of July 2009.

Respectfully submitted,

Horan, Wallace & Higgins, LLP
608 Whitehead Street
Key West, Florida 33040
Telephone (305) 294-4585
Facsimile (305) 294-7822

DAVID PAUL HORAN

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have electronically filed the foregoing document with the Clerk of the Court using CM/EDF. I further certify that the foregoing document was served on the **21st day of July 2009** on counsel of record in the manner specified via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to electronically receive Notices of Electronic Filing: record:

Jeffrey Andersen, Esq.
David Banker, Esq.
Keith Skorewicz, Esq.
Buss Ross, P.A.
P.O. Box 3913
Tampa, FL 33601-3913
Attorneys for Kingdom of Spain

James Goold, Esq.
Covington & Burling, LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-3913
Attorneys for Kingdom of Spain

K. Russell LaMotte, Esq.
Beveridge & Diamond, PC
1350 1st St. NW, Suite 700
Washington, DC 20005-3311
Attorneys for Odyssey Marine

Melinda J. MacConnell, Esq.
O'Brien Bower, P.A.
511 W. Bay St. Suite 330
Tampa, Fl 33606-3533
Attorneys for Odyssey Marine

Eric C. Thiel, Esq.
Allen K. von Spiegelfeld, Esq.
Banker Lopez Gassler, P.A.
501 E. Kennedy Blvd., Suite 1500
Tampa, FL 33602
Attorneys for Odyssey Marine

Mark Maney, Esq.
Maney Firm
711 Louisiana, Suite 3100
Houston, TX 77002-2711
Attorneys for Republic of Peru

Timothy Shusta, Esq.
Phelps Dunbar, LLP
100 S. Ashley Dr., Suite 1900
Tampa, FL 33602-5315
Attorneys for Republic of Peru

John McLaughlin, Esq.
Wagner, Vaughan & McLaughlin, PA
601 Bayshore Blvd., Suite 910
Tampa, FL 33606
Attorney for Claimants
Santiago de Alvear, et al.

**Certificate List Continued**

Marlow V. White, Esq.
Lewis & White, PLC
P.O. Box 1050
Tallahassee, Florida 32302
Attorneys for Claimant Elsa D. Whitlock

DAVID PAUL HORAN
For the Firm
Fla. Bar No. 142474
E-Mail: dph@horan-wallace.com