UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
IN ADMIRALTY

ODYSSEY MARINE EXPLORATION, INC.,

        Plaintiff,

v.                               Case No: 8:07-cv-614-T-23MAP

THE UNIDENTIFIED, SHIPWRECKED        **ORAL ARGUMENT REQUESTED**
VESSEL, if any, its apparel, tackle,
appurtenances and cargo located within a five
mile radius of the center point coordinates
provided to the Court under seal,

        Defendant;
        *in rem*

and

THE KINGDOM OF SPAIN *et al.*,

        Claimants.

_____/

**PLAINTIFF ODYSSEY MARINE EXPLORATION, INC.'S OBJECTIONS TO THE
MAGISTRATE JUDGE'S JUNE 3, 2009, REPORT AND RECOMMENDATION**

**TABLE OF CONTENTS**

BACKGROUND ............................................................................................................ 1

OBJECTIONS............................................................................................................. 4

SUMMARY OF OBJECTIONS.......................................................................... 4

ARGUMENT .............................................................................................................. 5

I.    THE R&R APPLIES THE WRONG STANDARD OF REVIEW AND TAKES
      SEVERAL CRITICAL STEPS THAT ARE PRECLUDED BY THE APPLICABLE
      RULE 56 STANDARD OF REVIEW ......................................................... 5

      A.    The Rule 56 Standard Applies Because Jurisdictional Issues Are Intertwined
            With The Merits Of Odyssey's Claims, And The R&R Impermissibly
            Resolves Disputed Material Facts................................................... 7

            1.    Ownership Of The *Res* ........................................................ 9

            2.    Assuming The *Res* Came From The *Mercedes*, Whether She Was
                  Engaged In Commercial Activity ....................................... 12

                  a.    Record Evidence Shows The *Mercedes* Was Engaged In
                        Commercial Activity.............................................. 14

                  b.    Historical Context Is Consistent With The *Mercedes'*
                        Participation In Commercial Activity.................... 17

      B.    The R&R Impermissibly Resolves A "Battle Of The Experts"...................... 19

II.   THE R&R'S RECOMMENDATIONS ARE BASED ON AN ADDITIONAL,
      CRITICAL, AND INCORRECT FACTUAL FINDING REGARDING THE *RES*.. 21

III.  THE R&R'S CONCLUSIONS ARE PREMISED ON ERRORS OF LAW ............. 22

      A.    The R&R Incorrectly Concludes All Of The *Res* Enjoys Sovereign Immunity
            Under Section 1609 Of The FSIA ................................................ 22

            1.    The R&R's Conclusions Are Based On An Incorrect Application Of
                  International Agreements And Principles Of International Law ........ 22

                  a.    None Of The *Res* Is Protected By Sovereign Immunity Because
                        Relevant International Agreements Do Not Extend Immunity
                        To Vessels Engaged In Commercial Activity........................ 23

i

        b.      The *Res* Does Not Enjoy Sovereign Immunity Under International Law, And Principles Of Comity Do Not Support The R&R's Conclusions ......................................................... 25

    2.      The R&R Ignores That Under Section 1609 Only "Property of a Foreign State" Is Immune And The Majority Of The *Res* Is Not Property Of Spain ............................................................ 30

        a.      The Majority Of The *Res* Is Not Property Of Spain Because It Is Commercial Cargo That Belongs To Others....................... 30

        b.      The Cargo Components Of The *Res* Are Severable From The Vessel For The Purpose Of Determining The Scope Of Any Claimed Immunity .................................................................. 30

            (1)    U.S. Admiralty Law Routinely Separates Cargo From Vessels ..................................................................... 33

            (2)    The FSIA And Other Sovereign Immunity Principles Establish That The R&R Incorrectly Refused To Separate Rights To A Vessel From Rights To Its Cargo ................................................................................. 35

            (3)    *Pimentel* Does Not Preclude Jurisdiction Over The *Res* ................................................................................. 40

    3.      The R&R Incorrectly Concludes That Under The FSIA, A Foreign Sovereign Need Not Have Possession Of Property To Assert Sovereign Immunity Over It ............................................................ 42

  B.    The R&R Erroneously Rejected The Court's Alternative Basis For Subject Matter Jurisdiction Under Section 1605(b).................................................... 44

IV.    THE R&R ERRONEOUSLY RECOMMENDS THE "RETURN [OF] THE *RES* TO SPAIN" ............................................................................................................. 45

CONCLUSION ................................................................................................................. 47

On June 3, 2009, the Honorable Mark A. Pizzo filed a report and recommendation (the "R&R") (Doc. 209) on Spain's motion to dismiss or for summary judgment (Doc. 131). As plaintiff Odyssey Marine Exploration, Inc. ("Odyssey") shows in these Objections, the R&R erroneously concludes that, although the majority (if not all) of the *res* underlying this case has <u>never</u> belonged to Spain, it somehow enjoys Spain's sovereign immunity.  This unprecedented and unsupported application of sovereign immunity to the property of private interests, along with other incorrect legal conclusions, is based on (1) incorrectly applied standard of review and legal principles and (2) impermissible and wrong factual determinations.  In essence, the R&R makes three critical mistakes:

- • it applies the wrong standard of review;

- • it fails to recognize that the bulk of the cargo aboard the *Nuestra Senora de las Mercedes* (the "*Mercedes*") when she exploded was commercial in nature and belonged to parties other than Spain; and

- • it fails to distinguish between the cargo and other property that are the subject of this case, on the one hand, and the vessel from which they came, on the other (which the R&R concludes is the *Mercedes*).

"Sovereign immunity is a derogation from the normal exercise of jurisdiction by the courts and should be accorded only in clear cases."  *Victory Transport Inc. v. Comisaria General de Abastecimientos y Transportes*, 336 F.2d 354, 360 (2d Cir. 1964).  This is <u>not</u> one of those cases, and thus Odyssey's objections should be sustained and the R&R's findings and conclusions should be rejected.

## BACKGROUND

This action involves Odyssey's assertion of claims for ownership under the law of finds or, in the alternative, for a salvage award in connection with property (the "*res*")

1

recovered from and located in international waters of the Atlantic Ocean at a depth of approximately 1,100 meters and within a five-mile radius of center-point coordinates previously provided to the Court under seal (the "site"). (A photomosaic of the site is attached as Exhibit A, Annex 2 to the Affidavit of Dr. Sean A. Kingsley ("Kingsley Aff.") (Doc. 138-5).) Notably, although a significant amount of *res* was recovered, including artifacts primarily consisting of silver and gold coins, Odyssey's analysis and recovery efforts did not locate any vessel. They also did not locate any human remains.

Odyssey commenced this case as an admiralty *in rem* action on April 4, 2007, in full accord with the admiralty and maritime practice and procedure of the Court. Odyssey filed its verified complaint under Rules C and D of the Supplemental Rules for Certain Admiralty and Maritime Claims (Doc. 1), obtained orders for a warrant of arrest (Doc. 5) and appointment of Odyssey as substitute custodian (Doc. 8), and published notice of the action (Doc. 10), all in accordance with Local Admiralty Rule 7.03. The warrant was executed by the Marshal by arresting an artifact from the site (Doc. 24). Additional *res*, including artifacts and cargo, was also brought into the district; the Court obtained actual jurisdiction over all property brought into the district and constructive jurisdiction over the entire *res*.

On August 7, 2007, Odyssey filed an amended verified complaint (the "Amended Complaint") (Doc. 25), which is the operative complaint. The Amended Complaint included claims for possession and ownership of the *res* under the law of finds (Count I); an alternative claim for a salvage award (Count II); and claims for injunctive relief (Count III); declaratory judgment (Count IV); equitable relief under *quantum meruit*, unjust enrichment, and other theories (Count V); and damages (Count VI). With respect to its claim for a

salvage award, Odyssey has complied with the requirements of 28 U.S.C. §§ 1605(b)(1) and (2).

Before Odyssey filed the Amended Complaint, Spain appeared and filed a verified claim (Doc. 13) purporting to reserve its rights in "sunken vessels of . . . Spain, in vessels sunk while in the service of . . . Spain, and in cargo or other property of . . . Spain on or in sunken vessels." Claims to portions of the *res* based on ownership or other interests also were asserted by the Republic of Peru and 25 individuals (Docs. 120, 164, 168, 169, 175, 176).

On motion of Spain (Doc. 37), Counts III through VI were dismissed by order entered March 6, 2008 (Doc. 91). On September 22, 2008, Spain filed its motion to dismiss the remaining counts for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure or, in the alternative, for summary judgment under Rule 56 of the Federal Rules of Civil Procedure ("Spain's Motion") (Doc. 131), and also moved for an order to show cause why the arrest should not be vacated (Doc 132). On November 17, 2008, Odyssey filed its response to Spain's Motion ("Odyssey's Response") (Doc. 138). On January 26, 2009, Spain filed its reply to Odyssey's Response ("Spain's Reply") (Doc. 163). On February 13, 2009, Odyssey filed its response to Spain's Reply (Doc. 179). Spain's Motion and motion for an order to show cause were referred to Magistrate Judge Pizzo for a report and recommendation (Doc. 134).

Based solely on the parties' submissions and without a hearing (evidentiary or otherwise), on June 3, 2009, the Magistrate Judge issued his R&R. The R&R recommends that Spain's Motion should be granted; the Amended Complaint should be dismissed; the

3

warrant of arrest should be vacated; all claims against the *res* should be denied; and Odyssey should be directed to "return" the *res* to Spain.  For the reasons discussed below, Odyssey requests the Court to reject the R&R, deny Spain's Motion, accept jurisdiction of this matter, and enter an appropriate scheduling order and set this matter for trial on the merits.

## OBJECTIONS

## SUMMARY OF OBJECTIONS

First, the R&R applies the wrong standard of review on Spain's Motion.  Because factual issues related to the resolution of Spain's challenge to the Court's subject matter jurisdiction are intertwined with the merits of Odyssey's claims, the appropriate standard of review is the standard for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Nevertheless, the R&R proceeds under the more liberal standard of Rule 12(b)(1), and, in violation of the Rule 56 standard, rather than recognizing genuine issues of material fact requiring resolution at trial, resolves material factual disputes and competing expert opinions in reaching its conclusions.  Indeed, it accepts virtually all of Spain's factual assertions and either dismisses or ignores Odyssey's competent evidence, frequently with little more than a declaration that it is "without merit" or "not persuasive."  Most significantly, the R&R fails to address meaningfully the dispositive evidence submitted by Odyssey that the *Mercedes* – the vessel that Spain claims is located at the site – was engaged in commercial activity on her final voyage and the large majority of her cargo was privately owned commercial property.  Those facts are critical to the correct resolution of Spain's Motion because they preclude application of Spain's claimed sovereign immunity under the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §§ 1602 *et seq*.

4

Second, the R&R fundamentally misapplies the relevant statutory and international legal principles that govern this case. Section 1609 of the FSIA was not intended to apply to a case such as this, and even if it cloaks part of the *res* with immunity, it does not apply to the majority of *res* because it is not Spain's property. Further, contrary to the R&R's assertions, nothing in the FSIA, admiralty law, or the rules of civil procedure supports the R&R's failure to separate the vessel and her cargo for the purpose of adjudicating rights claimed by different owners. The R&R treats the fact that private property is part (and actually the majority) of the *res* as a consideration that is subsidiary to the misperceived greater interests of comity and Spain's expansive immunity claim. But Congress did not write the FSIA to achieve that result; no court has adopted such an inequitable approach; and, in any event, jurisdiction over this matter is entirely consistent with applicable principles of comity. The R&R also summarily and erroneously concludes that FSIA Section 1605(b) does not provide an alternative basis for the Court's jurisdiction over Odyssey's claim for a salvage award.

Third, the remedy proposed by the R&R – awarding to Spain the *res* that is in the United States today – is inequitable and operates as a judgment on the merits, and thus is inconsistent with the R&R's conclusion of lack of subject matter jurisdiction.

## ARGUMENT

I. **THE R&R APPLIES THE WRONG STANDARD OF REVIEW AND TAKES SEVERAL CRITICAL STEPS THAT ARE PRECLUDED BY THE APPLICABLE RULE 56 STANDARD OF REVIEW**

In resolving Spain's Motion, the R&R applies the wrong standard of review and impermissibly resolves factual disputes and a classic "battle of the experts." As a general rule, district courts in this Circuit may "independently weigh facts" when resolving a factual

5

attack on subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *See Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003). However, there is an important exception: if the facts necessary to decide jurisdiction are intertwined with the merits of the plaintiff's claim, the jurisdictional challenge must be resolved under the Rule 56 summary judgment standard. *See Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990); *Turcios v. Delicias Hispanas Corp.*, 275 Fed. App'x 879 (11th Cir. 2008); *Garcia v. Copenhaver, Bell & Assoc., M.D.'s, P.A.*, 104 F.3d 1256, 1258 (11th Cir. 1997); *see also Morrison*, 323 F.3d at 930 (reversing district court's Rule 12(b)(1) dismissal because it resolved disputed issues of fact and thus "erroneously invaded the province of the jury").

One Circuit apparently endorsed a different rule. In *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172-73 (5th Cir. 1994), the Fifth Circuit adopted a "limited exception to the general rule requiring the application of a 12(b)(6) or summary judgment standard to resolve issues dispositive of both subject matter jurisdiction and the merits" only for jurisdictional challenges under the FSIA. *Cf. Montez v. Dept. of the Navy*, 392 F.3d 147, 150 (5th Cir. 2004) (distinguishing *Moran* and noting either Rule 56 or Rule 12(b)(6) standard applies to jurisdictional challenge under Federal Tort Claims Act). However, neither the Eleventh Circuit nor any district court in this Circuit has applied the unprecedented *Moran* exception to FSIA jurisdictional challenges. Applying the narrower, Rule 56 standard to jurisdictional challenges under the Federal Tort Claims Act while applying the broader, Rule 12(b)(1) standard to jurisdictional challenges under the FSIA would unjustifiably extend far

more deference to a foreign state than to the United States.  In any event, for the reasons discussed in these Objections, Spain's Motion should be denied under any standard.

Here, the R&R cited the general rule as well as the exception but improperly analyzed and applied <u>only</u> the general rule.  (*See generally* R&R at 4-5.)  Spain's Motion is governed by the Rule 56 standard because the facts underlying Spain's jurisdictional challenge are intertwined with the merits of Odyssey's claims.  Under the applicable standard, the presence of genuine issues of material facts precludes dismissal of Odyssey's claims (and precludes summary judgment in favor of Spain).[1]

### A.    The Rule 56 Standard Applies Because Jurisdictional Issues Are Intertwined With The Merits Of Odyssey's Claims, And The R&R Impermissibly Resolves Disputed Material Facts

As noted above, a Rule 12(b)(1) challenge to subject matter jurisdiction that is intertwined with resolution of the merits of the underlying claim must be resolved under the Rule 56 summary judgment standard.  *See Lawrence*, 919 F.2d at 1529; *Palma v. Safe Hurricane Shutters, Inc.*, 615 F. Supp. 2d 1339, 1343 (S.D. Fla. 2009).  Under that standard,

---

[1]    Even assuming *arguendo* the R&R followed the correct standard of review, it still must be rejected because the Magistrate Judge did not hold an evidentiary hearing on Spain's Motion.  *See Fleischman v. Potts*, 2006 WL 1737181, *1 (N.D. Fla. June 23, 2006) ("A district court may address its lack of subject matter jurisdiction in two ways:  the court may find insufficient allegations in the pleading, viewing the alleged facts in the light most favorable to Plaintiff, similar to an evaluation pursuant to Rule 12(b)(6), or, <u>after an evidentiary hearing,</u> the court may weigh the evidence in determining whether the facts support the jurisdictional allegations. (emphasis added)); *Reiss v. Societe Centrale du Groupe des Assurances Nationales*, 246 F. Supp. 2d 273, 277 (S.D.N.Y. 2003) (finding evidentiary hearing is required when resolution of whether commercial-activity exception to FSIA immunity applies involves factual dispute); *see also Chalwest (Holdings) Ltd. v. Ellis*, 924 F.2d 1011, 1014 (11th Cir. 1991) ("If the issue is contested and there is conflicting evidence, the court must either deny the motion and postpone any further jurisdictional challenge until trial, or hold a preliminary evidentiary hearing.").

"a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citations omitted). "If the moving party shows the absence of a triable issue of fact . . . , the burden on summary judgment shifts to the nonmoving party, who must show that a genuine issue remains for trial." *United States v. Four Parcels of Real Property in Greene & Tuscaloosa Counties in State of Ala.*, 941 F.2d 1428, 1438 (11th Cir. 1991).

Under the Rule 56 standard, the Court cannot (a) accept the testimony of only Spain's experts or (b) resolve issues of material fact. *See Webster v. Offshore Food Srvc., Inc.*, 434 F.2d 1191, 1193 (5th Cir. 1970); *Lawrence*, 919 F.2d at 1530; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The R&R does both. Further, "[i]t is a hornbook principle that it is not proper for a district court to assess witness credibility when consider[ing] a motion for summary judgment" as such determinations are reserved for the fact-finder. *Allen-Sherrod v. Henry County School Dist.*, 248 Fed. App'x 145, 147-148 (11th Cir. 2007). Despite this unequivocal rule, the R&R also does this.

Here, Odyssey seeks ownership of or a salvage award in connection with its recovery of maritime property under the law of finds and of salvage, respectively. (Am. Compl. Counts I & II (Doc. 25).) A claim of ownership under the law of finds requires: (1) intent to reduce property to possession; (2) actual or constructive possession of the property; and (3) that the property is either unowned or abandoned. *Smith v. The Abandoned Vessel*, 610 F.

Supp. 2d 739, 753 (S.D. Tex. 2009).  A claim for a salvage award requires: (1) a marine peril, (2) service voluntarily rendered when not required as an existing duty or from a special contract, and (3) success in whole or in part or that the service rendered contributed to such success.  *The "Sabine,"* 101 U.S. 384, 384 (1879); *see Margate Shipping Co. v. M/V JA Orgeron*, 143 F.3d 976, 984 (5th Cir. 1998) ("An award of salvage is generally appropriate when property is successfully and voluntarily rescued from marine peril.").  A salvage award claim cannot succeed if the salved property owner rejects the salvor's services.  *See Consolidated Towing Co. v. Hannah*, 509 F. Supp. 1031, 1036 (W.D. Mo. 1981).  However, a salvor can overcome this defense if it shows the salved property has no "owner" (for example, if the property was abandoned).  *The Omaha*, 71 F. Supp. 314, 317 (D. P.R. 1947).

In turn, Spain's Motion asserts lack of subject matter jurisdiction to decide Odyssey's claims.  (*See generally* Spain's Mot. (Doc. 131).)  A jurisdictional challenge is "inextricably intertwined" with the merits of the claims when "a decision of one would effectively decide the other."  *Lawrence*, 919 F.2d at 1529.  Here, Spain's jurisdictional challenge is intertwined with the merits of Odyssey's claims because the challenge is based, in relevant part, on the following (disputed) fact questions, the resolution of which also would effectively decide the merits of Odyssey's claims.  *See Palma*, 615 F. Supp. 2d at 1343-44.

### 1.    Ownership Of The *Res*

The facts that determine who owned the *res*[2] when the transporting vessel perished, and who now owns it, are relevant to determining the Court's jurisdiction, Odyssey's claims,

---

[2]    The R&R repeatedly refers to the vessel and its cargo as "the *res*."  However, even assuming the pertinent vessel is the *Mercedes*, the vessel no longer exists, and, as shown in

and Spain's defenses.  A prerequisite for resolving ownership in this case is determining whether the *res* came from the *Mercedes*.  If the *res* did not come from the *Mercedes*, then based on the current record Spain has no claim to any part of it.

As an initial matter, the R&R acknowledges that whether the *res* came from the *Mercedes* implicates jurisdiction and the merits:  "The success of Odyssey's lien against Spain's claim of sovereign immunity, not to mention the fate of any claims against the *res*, has always hinged on the wreck's identity or its lack of any discernable identity."  (R&R at 30.)  Further, as noted in the previous section, ownership of the *res* – including whether it is deemed abandoned[3] – is an element of Odyssey's claim under the law of finds and relevant to the merits of its salvage claim.  Thus, a determination of whether the *res* came from the *Mercedes*, and, more broadly, who owned the *res* when the related vessel sank (and whether it was abandoned at sea), are necessary components of the merits of Odyssey's claims.  Notably, no claimant other than Spain has attempted to reject Odyssey's salvage of the *res*.

The R&R adopts Spain's arguments regarding the identity of the vessel supposedly associated with the site and concludes the site relates to the *Mercedes*.  (*Id.* at 12.)  The R&R reaches this conclusion despite a clear record of disputed material facts.[4]  (A definitive

---

Section III.A.2.b below, the vessel and her cargo must be separated.  Indeed, what constitutes the "*res*" is central to resolving this dispute.

[3]    *See Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel*, 569 F.2d 330, 337 (5th Cir. 1978) ("Disposition of a wrecked vessel whose very location has been lost for centuries as though its owner were still in existence stretches a fiction to absurd lengths.").

[4]    To the extent the parties made differing inferences based on undisputed facts, the Rule 56 standard still precludes the R&R's adoption of Spain's conclusions.  *See Lawrence*, 919 F.2d at 1530 (noting that genuine dispute precluding summary judgment exists when

identification certainly was not possible from Odyssey's initial site survey and cargo recovery and still is not possible from the evidence gathered to date, especially since no meaningful evidence of any vessel has been recovered.)[5]   The R&R dismisses without meaningful or adequate explanation the following (and other) evidence submitted by Odyssey:

- Several eyewitness accounts, including that of Diego de Alvear y Ponce de Leon, the second-in-command, a noted geographer, and keeper of the *Mercedes*' Diary of Navigation, observing the *Mercedes* perished within view of land.  (*See* Decl. of Teodoro de Leste Contreras ("de Leste Decl.") Annex 16 at 7 (Doc. 131-5).)  This proximity to land is also mentioned in other documents submitted by Spain.  (*See* Decl. of Hugo O'Donnell ("O'Donnell Decl.") Annex 6 at 66 (Doc. 131-8).)  The site is not within view of land. (Aff. of Gregory Stemm ("Stemm Aff.") ¶ 11 at 5 (Doc. 138-30).)

- Records showing the *Mercedes* was carrying somewhere between 33 and 50 cannon when she exploded.  (Kingsley Aff. ¶ 7 at 25-28 (Doc. 138-3).)  Only 17 or 18 cannon were found at the site, a contained area with a hardpan floor and minimal mobile sediment, thus precluding the possibility of a hidden hull. (*Id.* ¶ 4 at 14-16.)  Cannon are heavy and will not drift away.

- Evidence that two culverins at the site, upon which the R&R heavily relies to conclude the site relates to the *Mercedes* (*see* R&R at 10), are not reliable indicators:  one is buried in mud and not sufficiently visible to provide meaningful information and the other one has no identifying marks that associate it with the *Mercedes*.  (*See* Kingsley Aff. at 23-25 (Doc. 138-3).)

---

there are "conflicting factual inferences that could be drawn from the facts before the court"); *Impossible Elec. Tech. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982) ("Summary judgment may be inappropriate even when the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts.  If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." (citations omitted)).

[5]   Notably, Spain's own hostile actions against Odyssey's ships, in part based on a mistaken belief that the site lay within its territorial waters, precluded Odyssey from finishing its site investigation.  (*See, e.g.*, Statement of M. Rogers (Doc. 53-3) (describing Spain's seizure of Odyssey's *Odyssey Explorer* search vessel following its earlier lengthy seizure of Odyssey's *Ocean Alert* search vessel).)

Further, these were cannon that were common to many ships of the period. (*See id.*)

• Evidence showing that there was no trace of burning among the archaeological assemblages or artifacts, which is inconsistent with an exploded shipwreck, and thus the opposite would be expected for the *Mercedes*. (*See id.* at 16-22.)

• Evidence that in 1997 Claudio Bonifacio, a noted naval historian, author, and shipwreck explorer, concluded that a wreck found in 1982 off the coast of Portugal much closer to shore was the *Mercedes*. (*Id.* at 65.) Despite Bonifacio's published experience in this field and supporting news reports, the R&R summarily dismisses this evidence as an "offhand contention" without any discussion. (R&R at 8.)

Clearly, at a minimum this record evidence raises significant factual questions about the identity of the vessel related to the site, and thus the R&R's finding that "the evidence as to the *res*' identity is so one-sided that Spain would prevail as a matter of law" is wrong. (*Id.* at 12 n.10.)

### 2. Assuming The *Res* Came From The *Mercedes*, Whether She Was Engaged In Commercial Activity

A second question relevant to determining jurisdiction and which requires consideration of facts that are intertwined with the merits of Odyssey's claims is whether, assuming *arguendo* the vessel from which the *res* came was the *Mercedes*, she was engaged in commercial activity when she exploded. As discussed in detail in Section III below, that question is directly relevant to jurisdictional considerations under Sections 1609 and 1605(b) of the FSIA. Similarly, it is relevant to the merits because it is another component of the broader question of who owns the *res*. Specifically, if the transporting vessel was engaged in commercial activity when she perished, then all or parts of her cargo would have been owned by private parties instead of the vessel's owner.

12

Without factual support, the R&R summarily concludes the "*Mercedes* clearly was not engaged in any commercial activity at the time of its demise . . . ." (R&R at 27.) The R&R reaches this conclusion despite a clear record of undisputed (let alone, disputed) facts showing the opposite as well as conflicting expert opinions. Based on the record evidence, that conclusion is simply and very clearly wrong – under any standard of review – and leads to the incorrect conclusion that sovereign immunity applies.

According to the FSIA, commercial activity is "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). In *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993), a case cited in the R&R (*see* R&R at 27), the Supreme Court explained,

> [A] foreign state engages in commercial activity . . . only where it acts "in the manner of a private player within" the market.
>
> We emphasized in [*Republic of Argentina v.*] *Weltover* [*, Inc.*, 504 U.S. 607 (1992),] that whether a state acts in the manner of a private party is a question of behavior, not motivation:
>
>> Because the Act provides that the commercial character of an act is to be determined by reference to its "nature" rather than its "purpose," the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in "trade and traffic or commerce."
>
> We did not ignore the difficulty of distinguishing "'purpose' (*i.e.*, the *reason* why the foreign state engages in the activity) from 'nature' (*i.e.*, the outward form of the conduct that the foreign state performs or agrees to perform)," but recognized that the Act "unmistakably commands" us to observe the

13

> distinction.  Because Argentina had merely dealt in the bond market in the
> manner of a private player, we held, its refinancing of the bonds qualified as a
> commercial activity for purposes of the Act despite the apparent governmental
> motivation.

*Saudi Arabia*, 507 U.S. at 360 (selected citations omitted; emphasis in original).

In short, it is the nature of the activity, and not its purpose, that determines whether it is commercial.  The transport of commercial cargo in exchange for payment of freight charges and the transport of paying civilian passengers between the American Viceroyalties and Spain – as the *Mercedes* was doing at the time she perished – is precisely the same activity performed by private parties engaged in "trade and traffic or commerce," and thus is "commercial activity" under Section 1605(b).  *See, e.g.*, *Victory Transport Inc.*, 336 F.2d at 361-62 (showing that shipping is not peculiar to a sovereign).  That the *Mercedes* was a state-owned vessel does not change the commercial nature of its final voyage.  *See Olavarria & Co. v. United States*, 56 F. Supp. 758, 763 (S.D. Ala. 1944) ("This Court cannot escape the conclusion that under the Suits in Admiralty Act, the sovereign was placed on the same plane with the private operator whenever it entered the business of operating ships in the Merchant Service.").

### a.    Record Evidence Shows The *Mercedes* Was Engaged In Commercial Activity

The record shows that, although a Spanish navy frigate, the *Mercedes* was engaged in commercial activity when she perished.  Specifically, she was transporting to Spain private merchants' commercial property for freight charges and paying passengers.  The relevant record entries include the following:

- Historical documents showing the *Mercedes* was serving as a commercial transport vessel for the *Correos Maritimos*, the maritime mail service,

14

carrying goods and passengers for freight on her final voyage. (Aff. of William H. Flayhart, III ("Flayhart Aff.") ¶ 13 at 20-23 (Doc. 138-31).)

- 173 receipts for cargo shipments signed by a civilian "silver master" showing that roughly 75% of these consignments were private commercial property shipped at the standard 1% freight fee levied by the *Correos Maritimos*.[6] (Aff. of Rodney Carlisle ("Carlisle Aff.") ¶¶ 16-18 at 26-28 (Doc. 138-31); Flayhart Aff. at 12, 13 (Doc. 138-64).)

- Cargo registries showing that on her final voyage, the *Mercedes* freighted the same type of commercial cargo freighted by merchant vessels that were at Callao and Montevideo contemporaneously with the *Mercedes* (including "Trade Frigates" *Asia*, *Astigarraga*, *Los Dos Amigos*, and *Castor*). (Carlisle Aff. Annex 31 (Doc. 138-62) (translations and versions reduced to fit on one page are attached as part of Composite Exhibit 4 to the Morello Declaration).)

- Claims to an interest in the *res* filed by 25 individuals. (Docs. 164, 168, 169, 175, 176.) Contrary to the R&R's observations, these claimants are <u>not</u> "descendants of those aboard the *Mercedes*." (R&R at 3.) Instead, they primarily base their claims on asserted descendancy from persons who privately owned and commercially shipped cargo aboard the *Mercedes*. Most of the individual claimants purport to descend from individuals heavily engaged in the commerce between the Americas and Spain and who represented very powerful and wealthy merchant companies. These were private commercial operations and they routinely shipped to Spain enormous sums of money to purchase goods, settle debts, or repatriate profits.

- Paying passengers were aboard the *Mercedes* when she perished, and her gun decks had been reconfigured to carry these passengers. (*See* Carlisle Aff. at 20 (Doc. 138-31).)

---

[6]     The spreadsheet referenced by Dr. Carlisle (*see* Doc. 138-31 ¶ 18 at 28), which meticulously analyzes the 173 receipts for items consigned for shipment aboard the *Mercedes* on her final voyage, is attached to Dr. Carlisle's affidavit. (*See* Carlisle Aff. at 11-23 (Doc. 138-62).) A color copy of that spreadsheet is attached as Exhibit 1 to the Declaration of Gianluca Morello in Support of these Objections ("Morello Decl."), which is being filed along with these Objections. The spreadsheet is color-coded to reflect cargo that belonged to Spain or the vessel's officials (in blue) and cargo that belonged to private interests (in one of two shades of green). As the spreadsheet shows, the overwhelming majority of cargo aboard the *Mercedes* belonged to merchants and other private interests and <u>not</u> to Spain. A copy of a sample of consignment receipts is attached as part of Composite Exhibit 2 to the Morello Declaration. A copy of the original abbreviated cargo manifest is attached as part of Composite Exhibit 3 to the Morello Declaration.

At a minimum, the record evidence shows a disputed material fact question of whether the *Mercedes* was engaged in commercial activity, and under the Rule 56 standard, certainly does not permit the R&R's summary conclusion that the *Mercedes* "was not engaged in any commercial activity" when she perished.

Notably, the official investigation of Spain's own federal officials as well as additional evidence recently uncovered by Odyssey confirm the *Mercedes* was transporting commercial cargo on her final voyage.[7]  A report prepared for the Spanish Guardia Civil (a Spanish federal police agency that is part of the Spanish Ministry of the Interior) in connection with its investigation of Odyssey's actions notes the majority of the *Mercedes*' cargo was owned by private interests.  (*See Technical Report on Possible Undersea Archaeological Sites in the Operating Areas of the Odyssey and the Ocean Alert* (the "Police Report"), attached as Composite Exhibit 5 to the Morello Declaration).)  Specifically, the Police Report notes the *Mercedes* and the frigates that accompanied her on her final voyage were carrying 1,307,634 strong pesos for the King of Spain and 3,428,519 strong pesos for private interests.  (*See* Police Report at 10; *see also id.* at 16 (noting the *Mercedes* carried "treasures and goods of private interests.").)

Further, Odyssey uncovered additional evidence of the *Mercedes*' involvement in commercial activities.  That evidence includes the following:

- 18 of 23 merchants listed in a scholarly analysis of commercial shipping in 1803 between colonial Peru and Spain aboard Spanish ships, including "warships," also shipped commercial cargo aboard the *Mercedes* on her final voyage.  *Compare* Patricia Marks, *Deconstructing Legitimacy:  Viceroys,*

---

[7]    Consistent with Odyssey's protocol for investigating shipwrecks, it has continued to study the *res* and information relating to it.

*Merchants, and the Military in Late Colonial Peru* (2007) at 39 Table 2 (relevant pages are attached as Exhibit 6 to the Morello Declaration) *with* consignment receipts spreadsheet (Morello Decl. Ex. 1) (listing names of individuals who had private cargo aboard the *Mercedes* when she perished).

• An official Spanish document which identifies commercial losses suffered at sea by a merchant guild in Cadiz. (*See Dossier/File On Seizures/Arrests of 1804 & 1805*, Archivio General de Indias, Consulados 94, Expedientes 22 (attached as part of Composite Exhibit 7 to the Morello Declaration).) The third page of the document itemizes those merchants' losses from the *Mercedes*.

### b. Historical Context Is Consistent With The *Mercedes'* Participation In Commercial Activity

Similarly, the historical context perceived and relied upon by the R&R in determining the nature of the *Mercedes'* final voyage is clearly disputed by record evidence and historical accounts. The R&R reaches an erroneous conclusion about the state of political affairs around the pertinent time. Essentially, the R&R concludes that Spain had an expectation of imminent war at the time of the *Mercedes'* final voyage, and uses this conclusion to support two findings: first, that because Spain anticipated imminent war, the *Mercedes* would have been on a war footing; and second, that all currency and similar valuable cargo aboard the *Mercedes* would have been en route to Spain to fill its coffers in preparation for war. (R&R at 6.) These conclusions and findings form the pivotal backdrop for the R&R's implicit conclusion that the *Mercedes'* cargo belonged to Spain rather than to private interests. In reaching these conclusions and findings, the R&R adopts Spain's position even though it is competently contradicted by evidence.

Record evidence reveals that Spain had no expectation of imminent war in October of 1804 and the *Mercedes* was not anticipating imminent conflict. (Carlisle Aff. Ex. E ¶ 12 at 18-20 (Doc. 138-31).) Indeed, Spain's own expert, Hugo O'Donnell, wrote:

17

> To the already mentioned Spanish disadvantages, other negative factors that would decide the fight were added: the Spanish ships not being duly forewarned considering themselves to be in time of peace, and not being able to put into effect an effective combat plan since the frigates were loaded with bundles of goods that presented obstacles to fire in the battery and combat on deck . . . . "[W]e never thought that they were trying to do anything but reconnoiter us, being certain that the neutrality between the two nations continued, as we had been assured by several other foreign vessels we had reconnoitered for this purpose" stated the Spanish commander in his report.

(Decl. of Hugo O'Donnell in Support of Spain's Reply ("O'Donnell Reply Decl.") at 37 (Doc. 163-9).)  Indeed, record evidence shows the *Mercedes* carried far less armament than would be carried by a warship expecting to encounter resistance or attack.  (Carlisle Aff. at 24 n.48 (Doc. 138-31).)  In light of record evidence of no imminent expectation of war, the R&R's adoption of Spain's position and its conclusions that the *Mercedes* was prepared for war at the time of her dispatch, that Spain undoubtedly anticipated a conflict with the British, and thus the *Mercedes* was on a war mission are plainly wrong.  (*See* R&R at 6.)

Similarly, noted Spanish historians, economic historians, and the record evidence do not support the R&R's conclusion that the *Mercedes*' final voyage was meant to fill Spain's official coffers in preparation for war.  (*See* Carlisle Aff. Ex. E ¶¶ 16-18 at 26-28 (Doc. 138-31); Flayhart Aff. Ex. F at 5, 6 (Doc. 138-64).)  As the undisputed evidence discussed above shows, the majority of the cargo was owned by private interests who paid freight charges to ship their property aboard the *Mercedes*.  Further, a crucial source of Spain's wealth was the wealth of the merchants and traders and the successful restoration of the Atlantic trade during the peace of Amiens, which promised Spain growing tax and duty revenues.  *See generally* Jacques A. Barbier & Herbert S. Klein, *Revolutionary Wars & Public Finances: The Madrid Treasury, 1784-1807*, J. Econ. History, Vol. 41, No. 2 (June 1981) at 315-339 (attached as

Exhibit 8 to the Morello Declaration).  In short, when the *Mercedes* perished, Spain was intent on continuing to restore its commercial growth, and that growth depended in large part on private commerce and trade with the colonies.  Indeed, to support that commerce, and to deliver vital supplies to sustain private mining and commerce in South America, the *Correos Maritimos* was reconstituted as a regularly-scheduled commercial freight service between the Americas and Spain.

**B.      The R&R Impermissibly Resolves A "Battle Of The Experts"**

Summary judgment is "often inappropriate where the evidence bearing on crucial issues of fact is in the form of expert opinion testimony."  *Webster v. Offshore Food Srvc., Inc.*, 434 F.2d 1191, 1193 (5th Cir. 1970); *see also Lexar Media, Inc. v. Fuji Photo Film USA, Inc.*, 2007 WL 677166, *3 (N.D. Cal. 2007) ("Summary judgment is improper when there is a conflict between expert opinions . . . .").   "[O]nce 'the court admits (expert) testimony, then it is for the jury to decide whether any, and if any what, weight is to be given to the testimony.'"  *Webster*, 434 F.2d at 1193 (citing *Sartor v. Arkansas Nat. Gas Corp.*, 321 U.S. 620, 627 (1944)); *see also United States v. Continental Ins. Co.*, 44 F.R.D. 354, 355 (E.D. Penn. 1968) ("Rule 56 does not permit the Court to assess [an affiant's] credibility on a motion for summary judgment.").   In other words, a "battle of the experts" precludes summary judgment.  *See, e.g.*, *Abilene Retail No. 30, Inc. v. Board of Comm'rs of Dickinson County, Kan.*, 492 F.3d 1164, 1188 (10th Cir. 2007) ("The battle of the experts that the parties present to us requires a trial and a trier of fact to resolve."); *Edwards Sys. Tech., Inc. v. Digital Control Sys., Inc.*, 99 Fed. App'x 911, 921 (Fed. Cir. 2004).

19

Here, the R&R's findings of fact align entirely with the conclusions reached by Spain's experts, and, with no meaningful explanation, the R&R rejects those reached by Odyssey's experts. (*See* R&R at 5-12.) For example, as discussed in the previous section, the parties presented conflicting historical accounts regarding the *Mercedes* and its final voyage. (*See generally* de Leste Decl. (Doc. 131-3) & O'Donnell Decl. (Doc. 131-8); Carlisle Aff. (Doc. 138-31) & Flayhart Aff. (Doc. 138-64).) Spain's historians, de Leste and O'Donnell, concluded (1) the *Mercedes* was a warship and (2) that, in turn, the site is subject to sovereign immunity. (O'Donnell Decl. ¶¶ 14-16 (Doc. 131-8); de Leste Decl. ¶¶ 7-11 (Doc. 131-3).) Odyssey's historians, Carlisle and Flayhart, concluded (1) the *Mercedes* was not engaged in an exclusively noncommercial mission when she perished and (2) thus, the site is not subject to sovereign immunity. (Carlisle Aff. at 2-4 (Doc. 138-31); Flayhart Aff. at 3 (Doc. 138-64).) Despite this classic "battle of the experts," in concluding that all of the *res* is cloaked by sovereign immunity, the R&R impermissibly accepts Spain's contentions and finds the *Mercedes* was a warship that set sail contemporaneously with an on-going war between France and Britain and in anticipation of Spain's imminent entrance into the Napoleonic War. (R&R at 5-7.)

Similarly, by concluding the site relates to the *Mercedes* (*see supra* Section I.A.1), the R&R improperly resolves other disputes between the experts in Spain's favor, including:

- the archaeological standards relied upon by the experts (*compare* Decl. of James P. Delgado in Support of Spain's Reply ("Delgado Reply Decl.") ¶¶ 42-45 (Doc. 163-2) *with* Aff. of James J. Sinclair ("Sinclair Aff.") ¶¶ 4-5, 9-11, 16 (Doc. 138-28));

- the amount and quality of evidence required to identify the site (*compare* Decl. of James P. Delgado ("Delgado Decl.") ¶ 137 (Doc. 131-9) *with* Kingsley Aff. ¶ 59 (Doc. 138-3)); and

- the extent of investigation required to identify the site (*see* Sinclair Aff. ¶ 19 (Doc. 138-28); Aff. of Carol L. Tedesco ("Tedesco Aff.") at 6 (Doc. 138-91)).

In sum, the R&R's adoption of the contentions and conclusions of Spain's experts and its rejection of those of Odyssey's experts necessarily involve impermissibly assessing and weighing the respective experts' credibility. This resolution of the classic "battle of the experts" requires rejection of the R&R's recommendations.[8]

## II. THE R&R'S RECOMMENDATIONS ARE BASED ON AN ADDITIONAL, CRITICAL, AND INCORRECT FACTUAL FINDING REGARDING THE *RES*

Applying the wrong standard of review, the R&R impermissibly makes another outcome-determinative factual finding. It finds the *res* is a vessel, and specifically that "the *res* is the *Mercedes*." (R&R at 12.) This factual finding is made despite a genuine dispute in the record (and despite dispositive evidence showing no vessel at the site). Because it underlies the R&R's central conclusion that the *res* is immune under the FSIA from Odyssey's claims (*see id.* at 4), that conclusion is wrong.

In reality, there is neither a vessel nor cohesive remnants of a vessel's hull at the site.[9] The absence of a vessel has been acknowledged by Spain (*see* Spain's Reply at 11-12 (Doc. 163)). Yet the R&R ignores the lack of a vessel and equates the entire *res* with the *Mercedes*. In doing so, the R&R fails to appreciate this action's unique facts, which involve

---

[8]     As noted in the Background section, the Magistrate Judge did not hold an evidentiary hearing despite the large record and the importance of the evidence to the resolution of Spain's Motion. Rather, as shown in this section, he impermissibly weighed the evidence and assessed its credibility to resolve that motion without any testimony.

[9]     For this reason, Odyssey amended its complaint to make the subject of this suit, in relevant part, the "Unidentified Shipwrecked Vessel, if any." (*See* Am. Compl. at 1, 5-7 (Doc. 25).)

a large volume of cargo remains scattered on the ocean floor with no meaningful association with a vessel. Under these circumstances, the conclusion that Spain's ownership of the *Mercedes* cloaks <u>all</u> *res* at the site with sovereign immunity – even recovered cargo over which Spain has neither shown nor asserted any property rights – is wrong.

The lack of vessel also undermines Spain's Motion's pervasive portrayal of the site as a graveyard (*see, e.g.*, Spain's Mot. at 3, 16, 17, 22 (Doc. 131)) and the R&R's acceptance of that portrayal (*see* R&R at 33). Aside from the lack of vessel, no human remains were found.

## III.    THE R&R'S CONCLUSIONS ARE PREMISED ON ERRORS OF LAW

Compounding the R&R's application of the wrong standard of review and impermissible (and incorrect) factual findings, the R&R also relies on several additional fundamental errors of law that compel rejection of its recommendations. Notably, no court has ever found the FSIA divests it of subject matter jurisdiction over admiralty claims relating to cargo recovered from the ocean floor.

### A.    The R&R Incorrectly Concludes All Of The *Res* Enjoys Sovereign Immunity Under Section 1609 Of The FSIA

The R&R errs in its application of Section 1609 of the FSIA to the unique circumstances of this case in several respects, each of which is discussed below.

#### 1.    The R&R's Conclusions Are Based On An Incorrect Application Of International Agreements And Principles Of International Law

Even assuming *arguendo* the site relates to the *Mercedes*, the vessel (or other *res* subject to this suit) is not immune under international agreements and law. The R&R ignores or incorrectly applies these agreements or legal principles in two significant ways. First, although it recognizes that international agreements existing when the FSIA was enacted may

22

limit a foreign sovereign's immunity under Section 1609, it ignores the plain language of pertinent agreements. *See* 28 U.S.C. § 1609 (availability of sovereign immunity is "subject to existing international agreements to which the United States is a Party"). Second, the R&R relies heavily on a misperception that "comity" and other international legal principles somehow require that this Court deny jurisdiction. (*See* R&R at 14-15.) Pertinent here, international law does not immunize a foreign sovereign or its vessels from suit when the vessels are engaged in commercial activity, as was the *Mercedes*. Thus, rather than supporting dismissal for lack of jurisdiction, international agreements and longstanding principles of international law and comity are entirely consistent with the Court's exercise of jurisdiction over this matter.

> **a.     None Of The *Res* Is Protected By Sovereign Immunity Because Relevant International Agreements Do Not Extend Immunity To Vessels Engaged In Commercial Activity**

Under relevant international agreements in force at the time of the FSIA's enactment, Spain's sovereign immunity extends only to vessels that are on "noncommercial service" when they sink and does not extend to vessels on voyages that are commercial in nature, such as the *Mercedes*' final voyage. The 1958 Geneva Convention on the High Seas (the "Geneva Convention"),[10] to which both Spain and the United States are parties and which predated the FSIA, states that "[s]hips owned or operated by a State and used <u>only on government non-commercial service</u> shall, on the high seas, have complete immunity from the jurisdiction of any State other than the flag State." Geneva Convention, Art. 9 (emphasis added). This and

---

[10]     *See* Geneva Convention on the High Seas, Apr. 27, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 82.

other provisions of the Geneva Convention are "generally declaratory of established principles of international law." *Id.*, Preamble. They are copied verbatim in the correlating provisions of the 1982 U.N. Convention on the Law of the Sea ("UNCLOS"),[11] which has been ratified by Spain but not signed (or acceded to) by the United States. *See* UNCLOS, Arts. 29, 95, 96.

Further, and assuming *arguendo* it applies here, the 1902 Treaty of Friendship and General Relations between the United States and Spain (the "1902 Treaty")[12] accords Spanish vessels the same rights accorded to U.S. vessels under similar circumstances. *See* 1902 Treaty, Art. X ("In cases of shipwreck, damages at sea, or forced putting in, each party shall afford to the vessels of the other, whether belonging to the State or to individuals, the same assistance and protection and the same immunities which would have been granted to its own vessels in similar cases."). Thus, Spain's sovereign vessels are entitled to the same immunities as U.S. vessels – no more and no less. Relevant protections accorded to U.S. vessels under U.S. law are codified in the Sunken Military Craft Act (the "SMCA").[13] That statute extends specified protections to "sunken military craft," including sovereign immunity, abandonment only by express divestiture of title, and a blanket refusal of salvage. SMCA §§ 1401, 1402.

---

[11]    *See* 1982 U.N. Convention on the Law of the Sea, Dec. 10, 1982, 1833 U.N.T.S. 3 (entered into force on Nov. 16, 1994).

[12]    *See* Treaty of Friendship and General Relations, signed at Madrid July 3, 1902, entered into force April 13, 1903, 33 Stat. 2105, T.S. 422, 11 Bevans 628.

[13]    Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, Div. A, Tit. XIV, 118 Stat. 2094 (passed Oct. 8, 2004) (signed into law Oct. 28, 2004) (codified at 10 U.S.C. § 113 notes).

Notably, the R&R ignores that the SMCA does not apply to all military craft. Although the R&R quotes part of the definition of a "sunken military craft" (R&R at 25 n.20), it inexplicably fails to address or otherwise acknowledge the part of the definition that is most critical here. That part defines a craft entitled to these protections, including to sovereign immunity, as a "sunken warship, naval auxiliary, or other vessel that was owned or operated by a government <u>on military noncommercial service</u> when it sank." SMCA § 1408(3)(A) (emphasis added). The *Mercedes*, which, as discussed in detail in Section I.A.2 above, was transporting a large volume of merchants' and other private interests' commercial cargo for freight charges, was <u>not</u> on "military noncommercial service" and thus would not have qualified for various protections – including immunity – under the SMCA if it were a U.S. vessel. As a result, under the 1902 Treaty the *Mercedes* is not immune from this suit, and thus cannot be immune under the FSIA because Section 1609 conditions immunity on earlier agreements.[14]

> **b.    The *Res* Does Not Enjoy Sovereign Immunity Under International Law, And Principles Of Comity Do Not Support The R&R's Conclusions**

More broadly, other relevant international agreements and expressions of U.S. policy also uniformly except vessels engaged in any level of commercial activity from sovereign immunity. Although Odyssey addressed them in its briefing on Spain's Motion, the R&R

---

[14]    The R&R cites *Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels,* 221 F.3d 634, 638 (4th Cir. 2000), upon which Spain relies heavily. That case was very clearly distinguished in Odyssey's Response. (*See* Odyssey's Resp. at 30-31 (Doc. 138).) Further, *Sea Hunt* actually supports Odyssey's position of jurisdiction, as neither the trial court nor the appellate court relinquished jurisdiction despite finding that the property at issue belonged to Spain.

ignores them.  These agreements and policies are consistent with international law and demonstrate that, contrary to the R&R's conclusion, comity does not warrant a finding of immunity in this case.  In fact, the opposite is true:  it requires a finding that neither the *Mercedes* nor her cargo is immune.

Both Spain and the United States are parties to the International Convention on Salvage.[15]  Article 4(1) of that convention recognizes sovereign immunity for "warships <u>or other non-commercial</u> vessels" (emphasis added).  Spain's Motion cited that convention but omitted the underlined language, and the R&R does not cite or otherwise address it. Similarly, the 2001 UNESCO Convention on the Protection of Underwater Cultural Heritage, 41 I.L.M. 40 (2002), to which Spain is a party (but the United States is not), defines "state vessels and aircraft," subject to special treatment under the Convention, as "warships, and other vessels . . . that were owned or operated by a State and used, at the time of sinking, <u>only for government non-commercial purposes,</u> [and] that are identified as such . . . ." *Id.* Art. 1(8) (emphasis added).  Finally, the Brussels Convention for the Unification of Certain Rules Concerning the Immunity of State-Owned Ships (the "Brussels Convention"), and its Additional Protocol,[16] which Spain has signed (but not ratified), is consistent with all other relevant agreements.  Article 1 of the Brussels Convention states:

> Sea-going ships owned or operated by States, cargoes owned by them, and
> cargoes and passengers carried on State-owned ships, as well as the States

---

[15]    International Convention on Salvage, Apr. 28, 1989, S. Treaty Doc. No. 102-12, 1953 U.N.T.S. 165.

[16]    Brussels Convention for the Unification of Certain Rules Concerning the Immunity of State-Owned Ships, Apr. 10, 1926, 176 L.N.T.S. 199; Additional Protocol of May 24, 1934, 176 L.N.T.S. 1934, 26 Am. J. Int'l L. Supp. 566 (1932).

> which own or operate such ships and own such cargoes shall be subject, as
> regards claims in respect of the operation of such ships or in respect of the
> carriage of such cargoes, to the same rules of liability and the same
> obligations as those applicable in the case of privately-owned ships, cargoes
> and equipment.

Brussels Convention, Art. 1. This provision does not apply to "ships of war, State-owned

yachts, patrol vessels, hospital ships, fleet auxiliaries, supply ships and other vessels owned

or operated by a State <u>and employed exclusively at the time when the cause of action arises</u>

<u>on Government and non-commercial service.</u>" *Id*. Art. 3(1) (emphasis added).[17]

Compilations of U.S. practice in international law also confirm the crucial distinction

between warships on military or government service and their official cargo, on the one hand,

and government vessels transporting any commercial cargo, on the other. *See* DIGEST OF

U.S. PRACTICE IN INT'L LAW 1980 at 999 (Marian Nash Leich, ed., 1981) (Dec. 30, 1980,

letter from James H. Michel, Deputy Legal Adviser, U.S. Department of State). For

example, a July 13, 1989, memorandum of the Office of the Legal Adviser of the U.S.

Department of State analyzed the immunities of the Uruguayan state vessel, the *Presidente*

*Rivera*. Reprinted in DIGEST OF U.S. PRACTICE IN INT'L LAW (1989-90). The *Presidente*

*Rivera* was an "auxiliary ship of the Uruguayan Navy, one of its two oil tankers that operate

under charter to the state-owned oil company (ANCAP)." *Id*. at 1. The State Department

concluded the *Presidente Rivera* was not "entitled to the sovereign immunity of a warship or

other ship owned or operated by a State and used, for the time being, only on government

---

[17]     Notably, even if a ship falls into this category and there is a "claim in respect of
salvage," under the Brussels Convention "the State shall not be entitled to rely upon any
immunity as a defense." Brussels Convention, Art. 3(1). "The same rules shall apply to
State-owned cargoes carried on board any of the above-mentioned [classes of] ships." *Id*.
Art. 3(2).

non-commercial purposes . . . ." *Id.* Because the *Presidente Rivera*'s cargo of oil was destined for commercial customers in the United States, the State Department concluded that it was "clearly a government tanker, on commercial service," and not entitled to immunity. *Id* at 3.

All of these international conventions, and other customs consistent with those relevant provisions, evidence the relevant principles of the *jus gentium*, or the customary law of the sea, which "enjoy[s] international comity" and acceptance. *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 960, 966 (4th Cir. 1999) ("*Titanic I*") (citations omitted) ("When nations agree on law to apply on the high seas, they agree to an order even beyond their sovereign boundaries . . . ."); *see United States/Eemshaven Port Authority*, Supreme Court of The Netherlands, 12 Nov. 1999, at 228, 229 (attached as Exhibit 9 to the Morello Declaration) (holding that under "unwritten rules of public international law," a U.S. Navy vessel enjoys immunity if at the time the claim arose it "had the status of a warship or military supply ship and was <u>exclusively used in the fulfilment of military (i.e., non-commercial) government tasks.</u>" (emphasis added)). Court rulings that are consistent with the *jus gentium* cannot offend comity. As such, the Court has subject matter jurisdiction over this matter because the *Mercedes* (or Spain) does not enjoy immunity.

Despite this, the R&R appears heavily influenced by its incorrect analysis of comity and its misperception that the site is a graveyard. (*See* R&R at 14, 33.) Although Odyssey is mindful of sensitivities associated with shipwrecks, even if a site featuring the hull of a shipwreck and human remains were discovered, the R&R identifies no authority requiring any different treatment of such a site under applicable legal principles. Indeed, Odyssey's

claims in this case, if successful, would yield a result that is no different than Spain's own current, publicized efforts to recover gold reserves from shipwrecks.  *See* CommodityOnline, *Spain Hunts for Gold Treasure in Sea*, Jul. 14, 2009 (noting that if successful, efforts would improve Spain's economic health); Mirror, *Spain Seeks Sunken Treasure*, Jul. 13, 2009 (same); Atenea, *The Value of the Sunken Gold in Spanish Waters Tops the 100 Billion Public Deficit*, June 17, 2009 (same); El Mundo, *Over 100 Billion in Gold and Silver Sitting at the Bottom of the Sea*, June 21, 2009 (same).[18]  And in any event, no human remains were found during the detailed archaeological exploration of the site – a fact that is not disputed by Spain.  In short, comity requires conduct consistent with the principles discussed above; it does not require (or permit), as the R&R recommends, favoring one sovereign at the expense of others, including another sovereign.

In short, the R&R has no basis for effectively disregarding the true nature of the *Mercedes*' final voyage in determining whether she enjoys immunity.  The course followed by the R&R would allow any sovereign – including one with nefarious intentions – to transport any item on its vessels with impunity under the protection of sovereign immunity. This is not a reasonable interpretation of the FSIA or other pertinent laws and treaties.

---

[18]     Each of these articles is attached as part of Composite Exhibit 10 to the Morello Declaration.

2.      **The R&R Ignores That Under Section 1609 Only "Property of a Foreign State" Is Immune And The Majority Of The *Res* Is Not Property Of Spain**

a.      **The Majority Of The *Res* Is Not Property Of Spain Because It Is Commercial Cargo That Belongs To Others**

The R&R also incorrectly concludes that all of the *res* in this case is immune from suit under Section 1609 because even assuming the *Mercedes* enjoys sovereign immunity, as discussed above in Section I.A.2, record evidence establishes, at a minimum, an issue of material fact with respect to whether the majority of cargo aboard the *Mercedes* when she perished was private commercial property, and thus not "property . . . of a foreign state." Even assuming the *res* came from the *Mercedes*, the majority of the *res*, including the majority of property recovered from the site and transported to the United States by Odyssey in compliance with all applicable laws, is private commercial cargo and thus not subject to Spain's claimed immunity. That cargo was not the property of Spain, and neither any record evidence nor legal principle establishes that it ever became its "property." As a result, the R&R incorrectly concludes the recovered property meets the threshold requirement for immunity under Section 1609, which by its terms applies only to "property of a foreign state."

b.      **The Cargo Components Of The *Res* Are Severable From The Vessel For The Purpose Of Determining The Scope Of Any Claimed Immunity**

The private cargo at and recovered from the site is legally distinct from any vessel that transported it, regardless of whether the vessel was the *Mercedes*, was owned by Spain, or is immune from suit. Because Spain has not shown (and cannot show) that it owns or ever owned all (or even a majority) of that cargo (including the large quantity of coins and other

artifacts that are in this District), its claimed sovereign immunity cannot extend to that property. Indeed, Spain's claim filed in this case purports to reserve rights only with respect to "sunken vessels[,] . . . cargo or other property of . . . Spain on or in sunken vessels." (Spain's Claim at 1 (Doc. 13).) As such, the Court has subject matter jurisdiction over Odyssey's claims as to the portion of the *res* to which Spain has no claim.[19]

The R&R recognizes the plain text of Section 1609 does not extend immunity to property that is not Spain's. (R&R at 27-28.) Nevertheless, the R&R misapplies two theories to extend the *Mercedes'* purported immunity to private commercial cargo she was carrying: first, by concluding the vessel and her cargo are legally inseparable; and second, by concluding that even if the cargo is separable from the vessel, the Court's jurisdiction over private cargo would "frustrate the FSIA's goals" and necessarily prejudice Spain's interests as an immune "foreign state." (*Id.* at 22.) Both theories are legally wrong and, notably, the R&R's blanket extension of any immunity enjoyed by the *Mercedes* to all of her cargo without any (let alone undisputed) proof that Spain has an ownership interest in all of it has far-reaching prejudicial ramifications: it means that a party asserting a vessel's immunity can extinguish others' rights to consideration of their interest in the vessel's cargo without requiring the party claiming immunity even to show that the property it claims is derivatively immune from suit (and not just the vessel) actually belongs to it.

---

[19] Although Odyssey's complaint asserts claims relating to the entire *res*, to the extent necessary, the Court can limit Odyssey's relief to the portion of the *res* that is not "property of" Spain. At a minimum, Odyssey should be permitted to amend its complaint to assert claims only with respect to that portion of the *res*.

In this regard, the R&R asserts that "traditional admiralty precepts" prescribe that a "vessel and its cargo are inextricably intertwined." (*Id.* at 23.) The R&R is wrong. There is no legal or other support for assimilating cargo to a vessel in a salvage context, like here, in which the Court must determine whether cargo is "property of a foreign state" and thus potentially immune from suit. Instead, it appears the R&R made this critical error by improperly applying a principle that developed to give U.S. admiralty courts jurisdiction, not to rob them of it – *i.e.*, the unified *res* theory for initiating *in rem* proceedings under salvage law – to determine the scope of immunity. The unified *res* theory has never been used to divest a court of jurisdiction. Once *in rem* jurisdiction is exercised, nothing prevents separation of cargo and vessel if rights to them are vested in separate parties, as is the case here.

For example, the R&R cites *Titanic I*, an *in rem* action in which the court used the unified *res* theory to exercise *in rem* jurisdiction over the wreck site of the *Titanic*. (*See* R&R at 23.) As *Titanic I* shows, the unified *res* theory establishes admiralty <u>*in rem* jurisdiction</u> over disparate property associated with a distant site; it does not apply here to determine whether all of the *res* – the majority of which demonstrably belongs to private interests – is cloaked with immunity and thus beyond the Court's <u>subject matter jurisdiction</u>.[20] Indeed, the *Titanic I* court specifically addressed and separated the rights of

---

[20]     The R&R's unsupported application of an *in rem* jurisdiction principle to its analysis of subject matter jurisdiction may be attributable to some misunderstanding about the effect of FSIA immunity on jurisdiction. After concluding the *Mercedes* enjoys sovereign immunity, the R&R finds that "*in rem* jurisdiction no longer exists." (R&R at 30.) The R&R is wrong because a finding of immunity under the FSIA would divest the Court of subject matter jurisdiction over sovereign property, not of *in rem* jurisdiction.

various cargo owners from those of the vessel owner.  *See* 171 F.3d. at 964.  Further, as that court noted, a joint American-French expedition first discovered the wreck of the *Titanic* in 1985 and began salvage efforts in 1987.  *See id.* at 952.  Those efforts, which preceded those of the plaintiff in *Titanic I*, resulted in the French Office of Maritime Affairs' exercise of jurisdiction over recovered cargo.  *See R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel*, 435 F.3d 521, 524 (4th Cir. 2006) ("*Titanic II*").  Thus, not only were the rights to the *Titanic*'s cargo separated from those to the vessel, but different cargo was subjected to the jurisdiction of different sovereigns.

Nothing in salvage law or sovereign immunity law precludes the separation of cargo from a vessel.  In fact, the FSIA itself, in Section 1605(b), directly contemplates separation of rights to a vessel and her cargo.  *See* 28 U.S.C. § 1605(b) ("A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against <u>a vessel or cargo</u> of the foreign state . . . .") (emphasis added)).

### (1)    U.S. Admiralty Law Routinely Separates Cargo From Vessels

Admiralty law routinely distinguishes between a vessel and its cargo.  For example, salvage awards are charged against the vessel and her cargo in proportion to their value at the port of rescue, with each interest (*i.e.*, vessel and cargo) being severally liable for its share alone.  *See* R. Hughes, *Handbook of Admiralty Law* at 152 (2d ed. 1920).  A salvor must look to cargo for the reward which cargo may owe and ordinarily cannot hold the hull liable for cargo's portion of the reward.  *See* M. Norris, *The Law of Salvage* at 331 (1958); *Georgia Co. v. Richfield Oil Co.*, 50 F.2d 901, 902 (W.D. Wash. 1930).  Consistent with this rule, *The*

*St. Paul*, 86 F. 340 (2d Cir. 1898), resulted in separate salvage awards for a vessel and its cargo. In that case, salvors salved the cargo and then salved the hull. The salvors initiated two suits, one against the cargo and one against the vessel. Although the suits were consolidated for trial, the court found the salvage of the cargo and of the vessel were two different operations and awarded two separate awards.

Other admiralty cases similarly severed a vessel and her cargo in analogous circumstances. Indeed, no court has held that, except for obtaining jurisdiction over scattered *res*, the *res* must be unified with and assimilated to the vessel. *See* M. Norris, *The Law of Salvage*, 3A Benedict on Admiralty § 27 (2009). For example, *Bemis v. RMS Lusitania*, 884 F. Supp. 1042, 1053 (E.D. Va. 1995), held that Bemis, the owner of the vessel, had acquired clear title to the shipwrecked vessel, but that because the relevant prior title-holder did not have an interest in the cargo or in the personal effects on the vessel, the prior title-holder could not transfer them. Bemis argued that a shipwreck consisted of the entire wreck site, but the court concluded the only way to establish ownership or possessory interest in the entire site was through law of finds or law of salvage, and Bemis had failed to meet those requirements. *Id*. at 1047-48. Bemis was awarded the artifacts he recovered and artifacts that were part of the vessel, but another salvor retained possession of and rights to artifacts it had recovered. *Id*. at 1053-54. In short, Bemis did not have ownership or possessory rights to the vessel's contents and cargo merely because he held title to the vessel. *Id*. at 1048. On appeal, the Fourth Circuit affirmed, noting that "[a]lthough the loss of artifacts would be unfortunate, Bemis simply has no right to the injunction absent an ownership interest in the contents of the ship, and he has not established such an interest." *See Bemis v. The RMS*

*Lusitania*, 99 F.3d 1129, 1996 WL 523417, *4 (4th Cir. 1996).  In short, *Bemis* precludes a vessel's owner from refusing salvage of the cargo and passenger-owned property because the owner's interest extends only to the vessel and its tackle, appurtenances, and furnishings.

Similarly, *Columbus America Discovery Group v. Atlantic Mut. Ins. Co.*, 974 F.2d 450 (4th Cir. 1992), found that insurers of gold aboard a shipwreck had not abandoned their ownership rights, but that all other owners of property aboard the vessel had, and then calculated a salvage award by first separating the vessel from the cargo and then separating the various parcels of cargo.  *Id*. at 467-68.  The insurer was awarded the value of the gold it had insured, less a substantial salvage award, and the remaining cargo was awarded to the salvor.

      **(2)     The FSIA And Other Sovereign Immunity Principles Establish That The R&R Incorrectly Refused To Separate Rights To A Vessel From Rights To Its Cargo**

Sovereign immunity jurisprudence in no way changes the admiralty law principle that a vessel and her cargo are severable, and that different parties may have interests in one but not the other.  Indeed, the inequities generated by the R&R's contrary conclusion are poignantly underscored in this case by the presence of 25 claimants who only lay claim to interests in cargo components of the *res*.  Yet, the R&R allows Spain's blanket assertion of immunity to summarily divest those claimants (who are properly before the Court) of a forum to adjudicate their rights to parts of the *res* that are within this Court's actual and constructive jurisdiction without the Court even considering whether Spain has an ownership interest in the cargo (or other) components of the *res* (let alone whether Spain has submitted dispositive evidence showing such an interest).

That result is particularly wrong here because, as previously noted, Spain's claim in this case purports to reserve its rights only with respect to "cargo or other property of . . . Spain." (Spain's Claim at 1 (Doc. 13) (emphasis added).) Thus, if a component of the *res* does not belong to Spain, it is not subject to Spain's claim of ownership, let alone of immunity, and Spain cannot divest this Court's jurisdiction to adjudicate rights with respect to that property through a blanket assertion of immunity.

The R&R dismisses a relevant case cited by Odyssey, *Borgships Inc. v. M/V Macarena*, 1993 WL 408342 (E.D. La. Oct. 4, 1993), as "simply inapplicable here" because it involved "a cargo vessel." (R&R at 21.) That distinction is wrong because as previously discussed in Section I.A.2 above, on its final voyage the *Mercedes* was transporting commercial cargo as paid freight, and in any event the R&R does not identify any authority that somehow presumptively deems all cargo aboard a state-owned vessel to be property of the sovereign. More problematic still is the R&R's erroneous finding that *Borgships* "weighs against Odyssey as the Court dismissed the *in rem* action on the grounds that § 1609 prohibits the attachment or arrest of a sovereign's property to acquire jurisdiction, the position that Spain argues and Odyssey avoids."[21] (R&R at 21.) That finding ignores *Borgships*' conclusion that an immune ship's cargo which is not independently shown to be property of a foreign state does not enjoy sovereign immunity. *See* 1993 WL 408342 at *3 ("Section 1609 affords immunity from prejudgment attachment only to the property of a

---

[21]    The R&R incorrectly asserts that Odyssey has avoided that position. As discussed in Sections I.A.1 and III.B, most (if not all) of the *res* is not property of a sovereign, and if any of the *res* is subject to Spain's sovereign immunity, then this case can proceed under FSIA Section 1605(b) with respect to that property.

foreign state and claimants have failed to provide any authority for the proposition that property not belonging to a foreign state but carried aboard a vessel belonging to a foreign state is immune from seizure."). That is precisely the legal principle espoused by Odyssey and erroneously rejected (in summary fashion) by the R&R.

The Eleventh Circuit implicitly acknowledged a distinction between title to a vessel and title to its cargo under salvage law. *See International Aircraft Recovery v. The Unidentified, Wrecked & Abandoned Aircraft*, 218 F.3d 1255, 1258, 1262 (11th Cir. 2000) ("Admiralty law presumes that owners do not give up title to ships and cargo in marine peril, even if cargo is swept overboard . . . . [We] interpret the law of salvage to permit the owner of a vessel in marine peril to decline the assistance of others so long as only the owner's property interests are at stake." (emphasis added)). Although that case involved immunity of a U.S. warplane (which carried no private cargo), the concept of severing the cargo from the vessel implicitly acknowledged by the Eleventh Circuit equally applies in the context of foreign sovereign immunity.

Further, Spain itself recognizes separation of vessel and cargo in shipwreck cases. The "notice" in the Federal Register that Spain argues refuses salvage for its sovereign vessels distinguishes between Spain's "ownership or other interests with respect to . . . vessels and/or its contents." [22] *See* 69 Fed. Reg. 5647 (2004) (emphasis added). Similarly,

---

[22]    Contrary to the R&R's conclusion (*see* R&R at 2 n.2), whether Spain has refused salvage with respect to the *res* and any vessel in this case – assuming Spain has an interest in them – is, at a minimum, another disputed fact. In fact, notwithstanding the text in the Federal Register, at the time Odyssey began salvage efforts at the site, it had discussed with Spain (and the U.K.) cooperating on recovery of artifacts from a different shipwreck, and those discussions eventually resulted in a cooperative agreement. (*See* Sworn Statement of Gregory Stemm, Ex. E at 7-24 & Ex. E-2 at 50-57 (Doc. 25-3).) Further, it had been engaged

its claim in this case notes that Spain "has not abandoned its ownership and other rights in sunken vessels of . . . Spain . . . and in cargo or other property <u>of . . . Spain</u> on or in sunken vessels." (Spain's Claim (Doc. 13).)  Further, in *Odyssey Marine Exploration, Inc. v. The Unidentified, Shipwrecked Vessel*, Case No. 8:06-cv-1685-T-23MAP (the "06-cv-1685 Action"), which also is pending in this Court, Spain has filed a claim to property aboard a shipwrecked vessel recovered by Odyssey pending a determination of the identity of that vessel (06-cv-1685 Action Doc. 24).  Spain's claim assumed the vessel was the *Merchant Royal*, a British vessel that Spain asserts was carrying Spanish property but that clearly was not owned by Spain.[23]  Spain's claim in that case extends only to cargo it owned – similar to

---

in ongoing discussions with Spain about collaborating and cooperating on locating and recovering Spanish wrecks.  (*See* Aff. of Jose Luis Goni Etchevers ("Goni Aff.") ¶ 12 (Doc. 138-29).)  Separately, Spain and Odyssey offered conflicting evidence about whether Spain rejected Odyssey's salvage efforts at a meeting between Spain's and Odyssey's representatives in 2006.  (*Compare* Stemm Aff. ¶ 7 (Doc. 138-30) ("Contrary to [Ms. de Cabo's] declaration relating to this meeting, at no time did Ms. De Cabo or anyone else at any other meeting state or even imply that Spain 'objected to and refused any salvage or other disturbance by Odyssey with respect to any shipwreck in which the Government of Spain has an interest.'  No such statement or anything at all similar to it was ever made.") *and* Goni Aff. ¶ 12 (Doc. 138-29) ("I can categorically state that at no time did Ms. de Cabo warn Mr. Stemm or myself that 'operations by Odyssey to take and sell objects from a shipwreck in which the Government of Spain has an interest would not be authorized or approved' neither generally nor in connection with any particular project.") *with* Declaration of Elisa de Cabo ¶ 9 (Doc. 131-16) ("I informed Odyssey that we objected to and refused any salvage or other disturbance by Odyssey with respect to any shipwreck in which the Government of Spain has an interest.").  In light of these facts (both disputed and undisputed), the record does not support a finding that Spain has rejected salvage with respect to the site.  *See Platoro Ltd., Inc. v. The Unidentified Remains of a Vessel, Her Cargo, Apparel, Tackle, & Furniture, in a Cause of Salvage, Civil & Maritime*, 695 F.2d 893, 902 (5th Cir. 1983).  In any event, Spain's purported rejection of salvage has no effect on its claimed immunity or on Odyssey's salvage of other claimants' property, all of whom have acknowledged Odyssey's entitlement to a salvage award.

[23]    Spain's counsel admitted, "So we are not the master of the vessel or the owner of the vessel.  The question from a management point of view – and I suppose also shaped by the

the descendents' claims in this case.  It concedes the *res* may be divided and that rights to property aboard a vessel should be considered separately from rights to the vessel itself.  In short, when it benefits Spain, Spain seeks broad rights to the Spanish contents of vessels in which it has no interest.  However, in other instances, such as in this case, when it cannot show that it has a right to the majority (if any part) of the *res*, Spain seeks to extinguish the rights of private property owners based upon an argument that it owned the vessel that was carrying their property.[24]

The notion that a vessel and its cargo are inextricably intertwined makes even less sense in this case.  Not only was it unnecessary for Odyssey to disturb a vessel in order to recover the *res*, but no vessel, or any vessel hull, has ever been found at the site.  The absence of a vessel further undermines the R&R's recommended extension of any immunity enjoyed by the *Mercedes* to all scattered *res* at the site.

---

FSIA proposition – is, okay, do we have a subject matter jurisdiction issue as to <u>some</u> material that may or may not be at this site . . . .  [T]here was a Captain John Lemery who was apparently the owner, entrepreneur in charge of this ship, and he would have been the master of the vessel."  (06-cv-1685 Action, Prelim. Pre-Trial Conf. Tr. at 23:9 & 38:6 (emphasis added).)

[24]     The SMCA assimilates certain cargo to a vessel under some circumstances, but would not do so under the peculiar facts of this case.  The SMCA applies to a sunken military craft and its "associated contents," which include "the equipment, cargo, and contents of a sunken military craft that are within its debris field."   SMCA § 1408.   Putting aside that the *Mercedes* is not a "sunken military craft" (*see supra* Section III.A.1.a), even if it were, in this case the SMCA would not aggregate the *Mercedes* and its privately-owned cargo into an inseparable unit.  The SMCA only aggregates "associated contents" and a sunken military craft "if title thereto has not been abandoned or transferred by the government concerned." SMCA § 1408(c)(3).  This implicitly means that cargo is assimilated to a vessel only if the vessel's title holder also holds title to the cargo.  As discussed above in Section I.A.1, the record evidence shows the vast majority of the *Mercedes'* cargo was owned by private interests, and <u>not</u> by Spain.

(3)     *Pimentel* **Does Not Preclude Jurisdiction Over The**
        **Res**

The R&R relies on *Republic of Philippines v. Pimentel*, 128 S. Ct. 2180 (2008), to conclude incorrectly that Spain's asserted immunity precludes the Court from exercising jurisdiction to determine claimants' rights to the *res*. *Pimentel* involved the joinder of two sovereign parties under Rule 19 of the Federal Rules of Civil Procedure in an interpleader action filed by a U.S. financial institution holding roughly $35 million of property allegedly stolen by the former President of the Philippines. *Id*. at 2184-85. The salient facts of *Pimentel* are distinguishable from those here on several grounds. First, *Pimentel* involved adjudication of rights to property <u>after</u> a determination was made that relevant interested entities enjoyed sovereign immunity. *See id.* at 2186. As the R&R observes (R&R at 22), the Supreme Court did not examine the sovereign immunity of those entities but instead only considered whether the lower courts sufficiently respected the predetermined immunity. *See id.* at 2190. By contrast, here the Court's consideration of ownership of the *res* is part of its determination of whether all or a portion of the *res* is immune from this Court's jurisdiction. In other words, the Court's determination of ownership of the *res* is a prerequisite to determining whether any part of it is subject to sovereign immunity. The R&R's broad reliance on *Pimentel* thus is premature and ignores the threshold question of whether Spain actually owns all of the cargo.

Second, contrary to the R&R's observation, the nature of the interpleader action in *Pimentel* starkly differs from the nature of this case. Rather than *in personam* creditor claims against assets of another that are held by a neutral stakeholder, this *in rem* case involves the parties' relative ownership and possessory rights to *res* discovered and held by Odyssey as an

40

interested plaintiff.  As observed by the Supreme Court in *Pimentel*, Odyssey's status here as more than a disinterested stakeholder "plaintiff" elevates its interests, and those interests would be prejudiced by dismissal of this case.  *See id.* at 2193.

Third, the *Pimentel* Court was concerned with a U.S. court's deciding the interpleader action while litigation regarding rights to the same claimed property was proceeding in the Philippines.  *See id* at 2190 ("The dignity of a foreign state is not enhanced if other nations bypass its courts without right or good cause.")  Here, there is no separate pending litigation and thus no risk of "piecemeal litigation and inconsistent, conflicting judgments" regarding any portion of the *res*.  *See id.* at 2193.  To the contrary, in this well-publicized matter, Odyssey and 27 separate claimants asserting interests in at least part of the *res* are before the Court, and thus this case could efficiently and fully adjudicate all interests in the *res*.

Fourth, no authority involving the intersection of admiralty law and foreign sovereign immunity supports the R&R's conclusion that conferring immunity for only the portion of the cargo to which Spain is entitled would in anyway prejudice Spain's sovereign interests. (*See* R&R at 22.)  To the contrary, by allowing Spain to preclude the adjudication of rights to all of the *res* when, at best for Spain, it has an ownership interest in only a portion of the *res*, the R&R improperly confers on Spain rights that are inconsistent with the FSIA, international law, and admiralty principles at the expense of other potential owners, including another sovereign.

In sum, as *Titanic* shows, the comity and dignity interests that weighed on the *Pimentel* Court and arose from that interpleader to adjudicate rights to assets in a U.S. brokerage account are not the same as those that govern here and that are shaped by

longstanding principles of admiralty and international law, including the universal and longstanding principle that immunity does not extend to commercial activity (*see supra* Section III.A.1).

### 3.    The R&R Incorrectly Concludes That Under The FSIA, A Foreign Sovereign Need Not Have Possession Of Property To Assert Sovereign Immunity Over It

The R&R incorrectly rejects Odyssey's argument that sovereign immunity under Section 1609 is precluded by Spain's lack of possession of the *res* (or of any vessel)*.  (See* R&R at 19-21.)  Although, as the R&R observed (*see id.* at 20), the FSIA contains no express "actual possession" requirement, when legislating in both the admiralty and sovereign immunity fields, Congress is assumed to do so in the context of prior Supreme Court jurisprudence.  *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) ("Congress is understood to legislate against a background of common-law adjudicatory principles.  Thus, where a common-law principle is well established . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply except 'when a statutory purpose to the contrary is evident.'" (citations omitted)).  The FSIA was enacted when the Supreme Court had consistently held that a "foreign state" which claimed sovereign immunity over *res* needed possession of the *res* to preclude a U.S. court's subject matter jurisdiction.  *See, e.g., The Pesaro*, 255 U.S. 216, 219 (1921) (holding *in rem* jurisdiction was not precluded by mere suggestion of foreign sovereign's ownership of vessel); *The Navemar*, 303 U.S. 68, 75 (1938) (holding that "actual possession by some act of physical dominion or control on behalf of the Spanish government was needful").

Nothing in the FSIA's text or legislative history is inconsistent with or otherwise abrogates that precedent. To the contrary, FSIA Section 1605(b)'s grant of *in personam* jurisdiction in admiralty proceedings only makes sense if a foreign sovereign has actual possession of the *res* underlying the suit. Section 1605(b) essentially provides a "statutory 'long-arm' procedure for obtaining *in personam* jurisdiction over foreign sovereigns" to permit a plaintiff to sue on a maritime lien. *See Coastal Cargo Co., Inc. v. M/V Gustav Sule*, 942 F. Supp. 1082, 1086 (E.D. La. 1996). Once the Court has jurisdiction, "the action proceeds in an *in rem* fashion," which, in relevant part, is how Odyssey's *in rem* salvage claim proceeds here. *Id.*

Further, the R&R ignores that although *California v. Deep Sea Research*, 523 U.S. 491, 507 (1998), involved a state's Eleventh Amendment immunity instead of foreign sovereign immunity, the Supreme Court specifically observed that "[t]he Court's jurisprudence respecting the sovereign immunity of foreign governments has . . . turned on the sovereign's possession of the *res* at issue." Importantly, that case post-dated enactment of the FSIA and cited *The Pesaro*, 255 U.S. at 219, a foreign sovereign immunity case, in holding that actual possession is a prerequisite for immunity in an *in rem* admiralty action. This Circuit's precedent also cites to this longstanding principle. *See Int'l Aircraft Recovery v. The Unidentified, Wrecked, and Abandoned Aircraft*, 54 F. Supp. 2d 1172, 1178 (S.D. Fla. 1999), *rev'd in part on other grounds*, 218 F.3d 1255 (11th Cir. 2000). In sum, because Spain did not have actual possession of the *res* (or even of the *Mercedes*) at the time of salvage, sovereign immunity cannot preclude this *in rem* proceeding.

43

**B.     The R&R Erroneously Rejected The Court's Alternative Basis For Subject Matter Jurisdiction Under Section 1605(b)**

Even assuming *arguendo* all of the *res* is cloaked by sovereign immunity under Section 1609, the R&R incorrectly fails to recognize that Odyssey's salvage claim may proceed under Section 1605(b) of the FSIA as an *in personam* claim against Spain.  As an exception to immunity, Section 1605(b) authorizes a party with a claim for a maritime lien based on commercial activity of the foreign state to enforce the lien *in personam* against the state.  *See Silver Star Enters., Inc., et al. v. Saramacca MV*, 82 F.3d 666, 667 n.1 (5th Cir. 1996); *Coastal Cargo Co.*, 942 F. Supp. at 1086.

Here, in relevant part Odyssey asserted a salvage claim, which gives rise to a maritime lien over the salved property, and thus Section 1605(b) permits Odyssey to pursue that claim *in personam* because, as discussed in Section I.A.2 above, if the cargo was from the *Mercedes*, it was engaged in commercial activity.[25]  *See Titanic I*, 171 F.3d at 963 ("Upon rendering salvage service, a salvor obtains a lien in the saved property by operation of law . . . ."); *Coastal Cargo*, 942 F. Supp. at 1086; Gilmore & Black, *The Law of Admiralty* (2d ed., 1975) at 628 (claim for salvage gives rise to maritime lien over salved property); *China Nat'l Chemical Import & Export Corp. v. M/V Lago Hualaihue*, 504 F. Supp. 684, 689-90 (D. Mass. 1981) ("Congress did not intend to limit § 1605(b) to cases where there is a commercial relationship between the injured party and the foreign state; rather, . . . Congress

---

[25]     Spain has not challenged Odyssey's satisfaction of the notice and service requirements of Sections 1605(b)(1) and (2).

intended to allow plaintiffs . . . to bring an action under § 1605(b) where the alleged maritime

tort lien arises out of a commercial activity of a foreign state . . . .").[26]

## IV.    THE R&R ERRONEOUSLY RECOMMENDS THE "RETURN [OF] THE *RES* TO SPAIN"

The R&R's recommendation that "Odyssey, as the substitute custodian, be directed to

return the *res* to Spain within ten days or as mutually agreed" (R&R at 34), also demonstrates

the fundamental error in the R&R's findings and conclusions.  That recommendation is

wrong because it would grant Spain possession of property that record evidence shows it

never owned (and is the subject of competing claims).  As such, it would effectively render a

judgment on the merits that awards to Spain private property that was recovered from the

Atlantic Ocean beyond any country's territorial waters, and to which it has no rights.  That

would directly contradict a finding of lack of subject matter jurisdiction to adjudicate rights

to that property.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998);

(Odyssey's Resp. at 33 (Doc. 138); (Odyssey's Reply to Peru's Resp. to Spain's Mot. at 21-

23 (Doc. 162)).

---

[26]    That this case was initiated by an arrest of *res* purportedly belonging to a foreign state does not bar proceeding *in personam* under Section 1605(b).  *See, e.g.*, *Borgships, Inc. v. The M/V Macarena*, 1993 WL 278453, *4-*5 (E.D. La. July 15, 1993) (following finding of sovereign immunity, the court allowed conversion of suit into *in personam* action under Section 1605(b)).  The only consequence of commencing the suit in that manner is the potential for exposure to claims for damages resulting from the arrest if Odyssey knew or should have known the *res* consisted of property of a foreign state before arresting it.  *See* 28 U.S.C. § 1605(b)(1) (noting that "if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit, the service of process of arrest shall be deemed to constitute valid delivery of such notice, but the party bringing the suit shall be liable for any damages sustained by the foreign state as a result of the arrest if the party bringing the suit had actual or constructive knowledge that the vessel or cargo of a foreign state was involved").

Under established and basic principles of admiralty law, Odyssey had the right to retain possession of the *res* in the first instance to protect its interests while it prepared and commenced this action. *See* 3A Benedict on Admiralty § 151 (Matthew Bender & Co. 7th ed. 2006). When this action was commenced and the *res* was arrested, notwithstanding that Odyssey was appointed substitute custodian, the *res* came within and remains within the exclusive jurisdiction of this Court. If the Court releases all of the *res* to Spain, the Court will have necessarily determined all of the *res* belongs to Spain. Otherwise, Spain would have no right to possession of any of the *res* it does not own. However, such a ruling would be entirely inconsistent with dismissal based on a lack of subject matter jurisdiction and contrary to substantial, and undisputed, evidence that the majority of the *res* does not belong to Spain. Indeed, the factual evidence in the record overwhelmingly points to the conclusion that Spain has a very small interest, if any, in the *res*.

There can be no clearer example of the rationale for the well-established rule: where a jurisdictional challenge implicates the merits of the claims, the district court should find it has jurisdiction and adjudicate the merits. *See Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003). The facts and circumstances of this action require the application of this rule to prevent injustice to all claimants to the *res*, because Spain has no right to any of the *res* it does not own and cannot cloak *res* it does not own with immunity. The "property" referred to in Sections 1605, 1609, and 1610 of the FSIA is "property of the foreign state." Therefore, it is only property belonging to Spain that may be subject to immunity under the FSIA, and what, if any, of the *res* belongs to Spain can only be determined by a trial on the merits.

46

## CONCLUSION

For each of these reasons, Odyssey respectfully requests that: the Court sustain these objections to the R&R and deny Spain's Motion to Dismiss or for Summary Judgment (Doc. 131), and its motion for an order to show cause why the arrest should not be vacated (Doc. 132); the Court retain jurisdiction over this matter; and the Court enter an appropriate scheduling order and set this matter for trial on the merits of Odyssey's claims to the *res* and for a salvage award.[27]

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 21, 2009, I electronically filed this document with the Clerk of the Court by using the CM/ECF system and mailed a true and correct copy to non-CM/ECF participant Joseph A. Rodriguez, *pro se*, 4611 South University Drive, Davie, FL 33328-3817.

Respectfully Submitted,

s/ Gianluca Morello
Carl R. Nelson, FBN 0280186
cnelson@fowlerwhite.com
Gianluca Morello, FBN 034997
gianluca.morello@fowlerwhite.com
FOWLER WHITE BOGGS P.A.
501 E. Kennedy Blvd., Suite 1700
Tampa, FL 33602
Phone: (813) 228-7411
Fax No: (813) 229-8313

---

[27] To the extent the Court adopts the disposition of the *res* recommended by the R&R, Odyssey respectfully requests the Court stay the effect of that order to enable Odyssey to consider and pursue an appeal.

47

Melinda J. MacConnel, FBN 871151
mmacconnel@shipwreck.net
Odyssey Marine Exploration, Inc.
5215 West Laurel Street
Tampa, FL  33607
Phone:  (813) 876-1776, ext. 2240
Fax No.:  (813) 830-6609

Attorneys for Plaintiff Odyssey Marine
Exploration, Inc.