UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
IN ADMIRALTY

ODYSSEY MARINE EXPLORATION, INC.,

          Plaintiff,

v.                                   Case No. 8:07-CV-00614-SDM-MAP

THE UNIDENTIFIED SHIPWRECKED
VESSEL,
                    Defendant, *in rem*
and

THE KINGDOM OF SPAIN,
THE REPUBLIC OF PERU, *et al.*,

          Claimants.

_____/

### OBJECTION TO THE MAGISTRATE'S REPORT AND RECOMMENDATION ON THE KINGDOM OF SPAIN'S MOTION TO DISMISS THE AMENDED COMPLAINT OR FOR SUMMARY JUDGMENT

The Republic of Peru objects to the Magistrate's Report and Recommendation (Dkt. 209) (the "Recommendation") that the Kingdom of Spain's Motion to Dismiss the Amended Complaint or for Summary Judgment (Dkt. 131) be granted.

### *I. Introduction*

This Court has direct control over 17 tons of Treasure sitting in a Florida warehouse.

The Treasure is the sovereign property of the Republic of Peru.

Peru needs to be very clear on this point: Peru is not making a claim against Spain's property. The Treasure before this Court is owned by Peru, not Spain.

The Treasure was mined in Peru's mountains by Peruvians, refined in Peru by Peruvians, and minted in Peru by Peruvians. The Treasure did not reach, and was never possessed by,

Dockets.Justia.com

modern European Spain. Therefore, pursuant to the relevant international and admiralty law, the Treasure is part of Peru's sovereign patrimony. Included in the relevant authority is Article 149 of the United Nations Convention on the Law of the Seas ("UNCLOS"), which sets forth a directly applicable rule of law that decides this matter.

The Magistrate, however, recommends rejection of Peru's ownership rights without analysis or hearing, without evidence, and without discussion of Peru's authority. Instead of addressing the applicable law, the Recommendation assumes without authority that when a sovereign divides into parts (as did the Spanish Empire in the Nineteenth Century) only one nation survives the breakup with any rights. That assumption is contrary to all applicable law.

One stated reason for the Magistrate's refusal to consider Peru's ownership rights is that international comity (that is, respect for other nations) and the sovereign rights of Spain (although apparently not of Peru) would be violated by any questioning of Spain's claim to own the Treasure. The wholesale refusal to address Peru's contrary ownership claim, however, does not serve the principles of international comity; it perverts them into a basis for discriminating against the interests of Peru.

The best that can be said for the Recommendation's reasoning is that it appears to be based on a misunderstanding of the nature of Peru's claim, not a conscious decision to prefer Spain's rights to Peru's.

There is, however, no proper basis to give differing treatment to Peru's and Spain's identical claims of ownership. International comity and sovereign immunity apply to Peru in the exact same manner as to Spain.

More critically to Spain's motion to dismiss, the Recommendation fundamentally misapplies the doctrine of sovereign immunity. As an initial matter, the Recommendation

misses the central point that Spain can have no immunity in this *in rem* matter unless Spain owns the *res* – the Treasure. Secondly, sovereign immunity is a defense to jurisdiction, but in this case, Spain is not seeking to avoid this Court's jurisdiction. To the contrary, Spain requests specific and affirmative relief from this Court – to be declared the owner, and to be granted possession, of the Treasure. This Court can make such an order only if it first accepts jurisdiction over the *res*, which requires it to deny the motion to dismiss on immunity grounds.

Finally, the Recommendation errs in allowing its obvious reluctance to decide an international dispute to color its view of the applicability of UNCLOS Article 149 and the related principles of international law. In one manner or another, this case will set important precedent in an emerging area of admiralty law. Such precedent should be founded on careful analysis of the relevant jurisprudence, including UNCLOS, not avoidance of difficult decisions.

## II.  Standard of Review

This Court is required to make a *de novo* determination of any recommendations to which Peru objects. 28 U.S.C. § 626(b)(1). That is, this Court is to give "fresh consideration" to the issues to which specific objection has been made. *Hatmaker v. Liberty Mut. Fire Ins. Co.*, 308 F. Supp. 2d 1308, 1312 (M.D. Fla. 1993).

## III.  Factual Background

### A.  Peru does not dispute the Magistrate's findings of historical fact.

The Republic of Peru agrees with the Recommendation's findings of historical fact, chiefly that the shipwreck is the remains of the Mercedes, which was lost in 1804 carrying a vast treasure mined, minted and created in Peru by Peruvians.[1]

---

[1]A small part of the treasure was made in other Latin American nations. There is even one coin from Mexico. In keeping with its legal contentions, Peru seeks only that treasure linked to its territory (the "Treasure").

Peru's ownership of the Treasure is based on application of international and admiralty law to these indisputable historical facts:

- The Treasure originated in the territory that is now Peru.

- The Treasure never reached and has no link to the territory of modern Spain.

- The Treasure has been lost to humankind for two centuries.

- Following the loss of the Treasure at sea, the former Empire of Spain divided into separate sovereigns.

- Peru and modern European Spain are two of the independent nations that once formed the Empire of Spain.

**B. The Recommendation errs when it assumes legal conclusions about present ownership from the bare historical facts without reference to international or admiralty law.**

Although the Recommendation gets the historical facts correct, it goes astray when it assumes legal conclusions, stated as facts, based on the known history, and particularly when it fails to draw any distinction between the term "Spain" as that term was meant when the Mercedes was lost and that term today.

The Recommendation's anachronistic use of the term Spain as if Spain still ruled half the known world is not only historically inaccurate, it is legally inaccurate. The Recommendation errs when it wholly fails to address the significance of the changes in Spanish sovereignty since the loss of the Mercedes and the Treasure in 1804.

### IV.  Legal Errors in the Recommendation

**A.  The Recommendation misstates the nature of the dispute and Peru's claim.**

**1.  The Recommendation assumes the matter to be decided: "Who owns the Treasure?"**

In the Magistrate's view, this matter involves a shipwreck clearly owned by Spain, as to

which a number of parties have made claims, including Peru. Therefore, according to the Recommendation, the only question is whether there is an exception to sovereign immunity as to the claims made against Spain's property. In the Magistrate's words: "From this brew, two core questions surface: is the *res* the Mercedes and, if so, is Spain entitled to sovereign immunity?" Recommendation at 4.

That is not the nature of this case, and viewing this matter in such a way misses the point entirely and leads to the fundamental error of assuming the answer to the core question before the Court – Who owns the Treasure?

Without any legal basis, the Recommendation assumes that this core legal question can be answered solely by reference to the Mercedes' "Spanish" ownership in 1804, because, in the Magistrate's view: "Unquestionably, the *Mercedes* is the property of Spain." *Id.* at 17. The fact that the Treasure was "Spanish" in 1804, however, no more means the Treasure is still Spanish than the fact that Florida was Spanish in 1804 means that Florida is still sovereign property of Spain today.

According to the relevant principles of international law and UNCLOS, while Spain may own the scattered remains of the Mercedes, Peru owns the Treasure sitting in a Florida warehouse.

## 2. Peru is not making a claim against Spain or Spanish property; Peru is asserting direct ownership of the Treasure.

The Recommendation also never addresses the actual nature of Peru's claim.

Peru is not making a claim *against* Spain or the property of Spain.

Instead, Peru declares that Peru owns the Treasure and that Spain does not. As set forth in the first point in Peru's original response: "Spain cannot establish the first predicate of its

motion – that it is the owner of the vessel and her cargo." Dkt. 141 at 4.

The Recommendation is simply incorrect when it describes Peru's claim "as an equitable one grounded in claims of exploitation by its former colonial ruler." Recommendation at 29 (footnote omitted). The references to "equity" in Peru's pleadings do not refer to a claim for relief against Spain, but to the rules of international law related to property rights when a sovereign divides, as the Spanish Empire did in the Nineteenth Century. As explained below, upon such a division, the core principle to be applied is that movable property is to be apportioned equitably among all resulting States, with particular regard to the State with the closest territorial linkage to the property. In admiralty cases, the applicable legal rule is set forth in Article 149 of UNCLOS governing rights to historical objects found at sea.[2]

Peru and Spain are two of the now independent nations that formed the Empire of Spain that existed when the Treasure was lost, and therefore, their rights to rediscovered property of the former Empire (not in any nation's possession) are defined by international law and UNCLOS Article 149.

Thus, Peru's ownership claim is identical to, and under the principles of international comity, worthy of the same consideration and respect as, Spain's.

**B.  The Recommendation errs in reaching the question of sovereign immunity without first determining ownership of the Treasure.**

**1.  As noted in the Recommendation, the first step in the sovereign immunity analysis is proof of sovereign ownership.**

In a footnote, the Recommendation notes the applicable rule that, before reaching the merits of an immunity question, the sovereign must establish that the property in question is

---

[2] The mischaracterization of Peru's ownership claim also explains the Recommendation's irrelevant reference to the Act of State Doctrine, which would apply only if Peru were seeking damages from Spain, which it is not. Recommendation at 31.

sovereign property. Recommendation at 16 n.14. The Recommendation, however, fails to address this requirement or Peru's challenge to Spain's ownership claim.[3]

This error is basic: Spain can have immunity only if it owns the *res* (the Treasure), and Spain cannot provide that proof because Peru is the sovereign owner of the Treasure. If any nation is entitled to sovereign immunity as to claims against the Treasure, it is Peru, not Spain.

**2. *Spanish ownership cannot be assumed based on word games surrounding the word "Spanish."***

Rather than address the legal authority supporting Peru's claims (from Ambassador Moore, to Justice Holmes, to UNCLOS), the Recommendation falls into Spain's trap of confusing the ownership question through word games revolving around the terms "Spain" and "Spanish."

At times, Spain uses the terms "Spain" and "Spanish" as distinct from "Peru." At times the terms "Spain" and "Peru" are synonymous. Thus, according to Spain, the Treasure on the Mercedes was "Spanish" because it came from "Peru" (in this case "Spain"), but "Peru" (now distinct from "Spain") cannot claim the Treasure now, because it is "Spanish" (now meaning Spain of today, not then). It is all very confusing, and intentionally so.

The Recommendation makes the same error when it assumes without analysis that property that was Spanish in 1804 is Spanish property today. As set forth below, that assumption is completely unwarranted under international and admiralty law.

Would the Court so blithely grant ownership to Spain of property made in 1804 by citizens of Florida, Texas, or California?

---

[3] *See also S & Davis International, Inc. v. The Republic of Yemen,* 218 F.3d 1292, 1299 (11th Cir. 2000)(rejecting claim of sovereign status when purported sovereign agency produced no evidence of sovereign status); *Mangattu v. M/V IBN Hayyan,* 35 F.3d 205 (5th Cir. 1994)(analyzing whether vessel owner was a foreign sovereign under the FSIA).

### 3. Sovereign immunity is the only issue before this Court; Peru's ownership claim has never been challenged.

Sovereign immunity is the only issue before this Court, as the lower court did not reach the issue of Spain's rejection of salvage, the only other operative motion. In particular, Spain never moved against the merits of Peru's ownership claim, despite direct invitations to do so.

In terms of immunity, one or more of the successors to the Spanish Empire of 1804 own the Treasure, so the proper course is for the Court to determine the immunity issues as between the sovereign and private parties, and then turn to the issues between the sovereigns.

The Magistrate found this course illogical, but that conclusion also appears to have been based on the same fundamental misunderstanding of Peru's claim as one levied against Spain's *res*, rather than a claim to own the *res* at issue.[4] In 1804, the Spanish Empire was one unit (at least according to Spain), so that the Mercedes had one sovereign owner. Given the fragmentation of the former Empire, there could be multiple sovereign owners of the various remains, but those sovereigns can still have immunity jointly against private claimants. *See Mangattu v. M/V IBN Hayyan*, 35 F.3d 205, 208 (5th Cir. 1994)(vessel owned by consortium of sovereign owners immune).

If there is any inconsistent reasoning, it is in the Recommendation's differing treatment of Peru's sovereignty and Spain's. There is nothing inconsistent in Peru stating that it, not Spain, owns the Treasure taken from Peruvian territory, while Spain owns the remains of the Mercedes, with Peru and Spain each having sovereign immunity as to their particular property.

### C. The Recommendation errs in assuming that Spain's claimed ownership of the Treasure cannot be challenged.

---

[4]The Magistrate wrote: "Against this historical backdrop, Peru argues Spain's rights must be measured against its patrimonial interests. But its reasoning is inconsistent. On one hand, Peru agrees that Spain is immune from Odyssey's salvage claim (indeed, it asserts it too is immune from Odyssey's claim); but on the other, it maintains Spain is not immune from Peru's claim against the *res*." Recommendation at 29.

Another central error in the Recommendation's analysis is its repeated assumption that Spain's claimed ownership cannot be questioned, but, like its criticism of Peru's argument, the Recommendation's "reasoning is inconsistent," because it dismisses Peru's ownership claim even in the absence of a challenge to it.

1. **The Recommendation contradicts clear Supreme Court precedent when it refuses to consider the legal implications of the fact that Spain has not possessed the Treasure for two centuries.**

   a. **The lack of possession is a critical factor, ignored by the Recommendation.**

The Recommendation misunderstands the significance of the fact that Spain does not possess the Treasure. As explained by the Supreme Court, when assessing immunity, lack of possession is determinative. It is one thing for a United States court to seize property in a sovereign's possession, wresting it from the sovereign's control. It is quite another for a foreign nation to point to property in the *custodia legis* of a United States court and claim, as Spain does, that the Court must declare it the owner and then deliver it the property.

Put in the practical framework of this case, if a present day warship of Spain came to Florida carrying Peruvian treasure, no matter how acquired, no United States court could enter that ship to take jurisdiction over the treasure to determine ownership. The respect for warships would grant Spain's bare claims absolute control.

But here: the Treasure is not in Spain's possession. In fact, the Treasure never reached the shores of European Spain (the claimant here) and has been lost for more than 200 years.

This Court is not being asked to remove property from Spain's grasp. To the contrary, Spain affirmatively requests that it be declared the owner of the *res* and that this Court take the Treasure from Odyssey and give it to Spain. *See* Dkt. 131 at 35.

The dilemma's is Spain's: it cannot maintain a claim to immunity from this Court's jurisdiction while at the same time requesting the Court to invoke its jurisdiction.

### b. Pursuant to <u>Deep Sea Research,</u> in an <u>in rem</u> admiralty case, a sovereign cannot assert sovereign immunity if it does not possess the <u>res</u>.

Contrary to the Recommendation's holding, at 20, Spain's immunity argument in this case is controlled by the Supreme Court's holding in *California v. Deep Sea Research,* 523 U.S. 491 (1998), which opinion is best understood in relation to the Court's earlier opinion in *Florida Department of State v. Treasure Salvors, Inc.,* 458 U.S. 670 (1982).

*Treasure Salvors* dealt with the wreck of the Nuestra Señora de la Atocha, a "Spanish" galleon. Florida took possession of artifacts from the wreck, and when the salvors sought a salvage award, Florida asserted its sovereign immunity from suit. The Court issued three opinions with a plurality holding that the admiralty court could not adjudicate Florida's interest in salvaged property **in the State's possession**. 458 U.S. at 711.

The holding in *Treasure Salvors* was clarified in *Deep Sea Research*. In that case, California claimed the remains of the Brother Jonathan, a ship lost at sea in 1865 carrying California gold. Unlike Florida in *Treasure Salvors*, however, California did not have physical possession of the gold and other artifacts. The Court revisited *Treasure Salvors* and held that federal courts have *in rem* admiralty jurisdiction even when a sovereign seeks ownership of the *res*, **so long as the res in question is not in the actual possession of the sovereign**. 523 U.S. at 507-08. In contrast to the divergent opinions in *Treasure Salvors,* the *Deep Sea Research* Court was unanimous. The Court noted the possible confusion created by *Treasure Salvors* and clarified that its holding in *Treasure Salvors* was limited to cases in which the *res* in question was in the **actual possession** of the sovereign government: "It is true that statements in the fractured Opinions in *Treasure Salvors*

might be read to suggest that a federal court may not undertake *In Rem* adjudication of the state's interest in property without the state's consent, regardless of the status of the *res*," but this "Court's consistent interpretation of the respective but related immunity doctrines pertaining to such vessels has been, upon proper presentation that the sovereign entity claims ownership *of a res in its possession,* to dismiss the suit or modify its judgment accordingly." *Id.* at 505 (citations omitted; emphasis in original).

### c. The rule of <u>*Deep Sea Research*</u> applies to foreign sovereigns and is consistent with the rightful role of sovereign immunity as a defense to jurisdiction.

The Recommendation incorrectly holds that *Deep Sea Research* "has no application here," because, in the Magistrate's view, the opinion was limited to Eleventh Amendment immunity, and had no relevance to foreign sovereign immunity under the Foreign Sovereign Immunities Act (or FSIA), but the distinction is unavailing. Recommendation at 20.

#### (1) The Supreme Court stated that the rule of <u>*Deep Sea Research*</u> applies to foreign sovereigns.

The Supreme Court expressly applied the possession rule to foreign governments: "The Court's jurisprudence respecting **the sovereign immunity of foreign governments** has likewise turned on the sovereign's possession of the res at issue." *Deep Sea Research,* 523 U.S. at 507 (citation omitted; emphasis supplied).

The reference to prior practice is compelling because the FSIA codified United States practice on foreign sovereign immunity and did not establish a broader immunity for foreign sovereigns than before its adoption or that was granted the United States and the individual States. *See, e.g.,* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES, Chapter Five, Introductory Note.

**(2) The rule of <u>Deep Sea Research</u> applies to sovereign vessels of the United States, which the Recommendation notes is the standard to be applied to Spain's vessels.**

As the Recommendation notes at 24, Spain's sovereign vessels are to be treated the same as United States sovereign vessels (not better, the same), and the ruling of *Deep Sea Research* applies to military craft owned by the United States. Indeed, the *Deep Sea Research* Court turned to the "guidance" provided by analogous rules for federal sovereign immunity. *Id.* at 508 ("In one such case, *The Davis,* 10 Wall. 15, 19 L.Ed. 875 (1869), the Court explained that 'proceedings *in rem* to enforce a lien against property of the United States are only forbidden in cases where, in order to sustain the proceeding, the possession of the United States must be invaded under process of the court.' *Id.,* 77 U.S. at 20.").

The *Deep Sea Research* rule was applied directly to a United States vessel in *International Aircraft Recovery, LLC v. The Unidentified Wrecked and Abandoned Aircraft,* 54 F. Supp. 2d 1172 (S.D.Fla. 1999), *rev'd on other grounds*, 218 F.3d 1255 (11th Cir. 2000). This case involved a World War II aircraft described by the United States government as "one of the rarest and most historic military aircraft still in existence." *Id.* at 1175. The United States' assertion of sovereign immunity against the finders was rejected because:

> Based upon last year's Supreme Court decision [in *Deep Sea Research*] governing all *In Rem* admiralty actions involving *In Rem* Defendants in which an official of a state, the federal government **or foreign government** asserts ownership, without actual possession, this Court now holds that the salvage services advanced by the Plaintiff/Salvor International Aircraft Recovery, LLC., and its predecessors in interest, constitute a valid maritime lien against the *In Rem* Defendant.

*Id.* at 1178 (emphasis supplied).

Thus, the opinion in *Deep Sea Research* cannot be distinguished from this matter.

**d. The rule of <u>Deep Sea Research</u> is based on the defensive nature of sovereign immunity under the FSIA.**

The Recommendation declines to apply the possession rule of *Deep Sea Research* because it dealt with the Eleventh Amendment, not the FSIA. The Court's analysis, however, lies squarely on the fundamental nature of all forms of immunity – they are defenses to jurisdiction.

**(1) As explained by the Supreme Court, the doctrine of sovereign immunity is a defense to the exercise of jurisdiction and is inconsistent with a request for judicial relief, such as Spain's.**

The Supreme Court in *Deep Sea Research* explained the basis of the possession rule: sovereign immunity is exclusively a defense to be used by a sovereign to avoid the jurisdiction of United States courts. When a sovereign seeks an award of property not in its possession (as does Spain), however, the sovereign is requesting an exercise of jurisdiction, and therefore, there can be no sovereign immunity.

To make its point, the Court quoted explanations by two noted former Justices. First, Justice Story, who stated: "'the jurisdiction of the court is founded upon the possession of the thing; and if the State should interpose a claim for the property, it does not act merely in the character of a defendant, but as an actor.'" *Id.* at 1470 (*quoting,* 2 J. Story, Commentaries on the Constitution of the United States § 1689, at 491-92 (5th ed. 1891)). The Court also turned to Justice Washington, who reasoned:

> [I]n cases of admiralty and maritime jurisdiction the property in dispute is generally in the possession of the court, or of persons bound to produce it, or its equivalent, and the proceedings are in rem. The court decides in whom the right is, and distributes the proceeds accordingly. In such a case the court need not depend upon the good will of a state claiming an interest in the thing to enable it to execute its decree. All the world are parties to such a suit, and of course are bound by the sentence. The state may interpose her claim and have it decided. But she cannot lie by, and, after the decree is passed say that she was a party, and therefore not bound, for want of jurisdiction in the court.

*Id.* at 1470-71 (*citing, United States v. Bright,* 24 F. Cas. 1232, 1236, No. 14,647 (CC Pa. 1809)).

The Court explained, in the context of *Treasure Salvors,* that sovereign immunity applies to property in the possession of the sovereign because the doctrine shields the sovereign from the invasion caused by seizing property in the possession of a state actor. *Id.* at 504-08. In such a case, if the sovereign has possession (as did Florida in *Treasure Salvors*) and avoids the jurisdiction of the court, it retains possession.

There is no seizure here, and Spain is not seeking to avoid this Court's jurisdiction, but to utilize it to obtain the Treasure. Thus, this Court's jurisdiction in this case is consistent with two centuries of United States jurisprudence.

### (2) The opinion in <u>Deep Sea Research</u> is consistent with the FSIA.

The analysis of *Deep Sea Research* is consistent with FSIA jurisprudence.

The FSIA is a jurisdictional statute that determines when a United States court can exercise judicial control over a foreign sovereign or its property. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 433 (1989).

A request for judicial relief (like Spain's) is therefore contrary to the core nature of the statute. A good example of this principle is *Lord, Day & Lord v. Socialist Republic of Vietnam*, 134 F. Supp. 2d 549 (S.D. N.Y. 2001). In that case, a cargo of rice owned by the former Republic of Vietnam was lost following a collision in the Panama Canal. The Republic of Vietnam and its insurers settled the loss claim. Shortly after the settlement check was delivered to Vietnam's lawyers in New York, however, the Republic of Vietnam fell to the Socialist Republic of Vietnam, and the United States banned all transfers to the new Vietnamese government. Years later, the law firm interpleaded the settlement funds and listed as possible claimants the Socialist Republic of Vietnam ("Vietnam") and its insurers.

Like Spain in this case, Vietnam claimed the funds while at the same time trying to invoke sovereign immunity as a means of foreclosing any contravening ownership claims. As stated by the court: "Effectively, Vietnam seeks to grant this Court jurisdiction solely for the purpose of awarding it the funds. This, Vietnam cannot do." *Id.* at 557.

Applying the FSIA's counter-claim exception, the court first ruled that Vietnam, by claiming the funds, had waived immunity to contrary ownership claims. *Id.* In addition, the court held that, "[e]ven if the counterclaim exception was inapplicable here, **Vietnam has also waived its immunity to the extent necessary for the Court to determine title to the funds in its possession**." *Id.* at 558 (emphasis supplied).

On the other hand, neither the Recommendation nor Spain cite to any FSIA authority that indicates that a sovereign can request affirmative relief as to a *res* not in its possession and at the same time maintain immunity against contrary claims.

> **e. The Supreme Court's opinion in <u>The Republic of the Philippines v. Pimentel</u> did not change the rule of <u>Deep Sea Research</u>.**

To distinguish *Deep Sea Research,* the Recommendation placed substantial reliance on *Republic of the Philippines v. Pimentel*, 128 S.Ct. 2180 (2008). Recommendation at 22.

That reliance is misplaced.

> **(1) The <u>Philippines</u> opinion did not address sovereign immunity or <u>Deep Sea Research</u>.**

In relation to the rule of *Deep Sea Research*, the most notable feature of the *Philippines* opinion is that it does not address the basis for a claim to sovereign immunity.

The *Philippines* opinion involved a dispute over a bank account held in the name of Ferdinand Marcos. One of the potential claimants was the Philippines, which had initiated proceedings in the Philippines to establish ownership of the funds, claiming that the funds had

been wrongfully taken and were property of the nation.  The other principal claimants were holders of a multi-billion dollar judgment against Marcos for human rights abuses.  Faced with competing claims, the bank holding the funds interpleaded the funds before the district court.

Unlike Spain, however, the Philippines did **not** make a claim against the interpleaded funds.  "After being named as defendants in the interpleader action, the Republic [of the Philippines] asserted sovereign immunity" under the FSIA and "moved to dismiss pursuant to Rule 19(b), based on the premise that the action could not proceed without them."  *Id.* at 2186.

Thus, the Philippines sought to invoke sovereign immunity in its traditional formula to avoid the jurisdiction of the United States court, **even to the extent of presenting a claim to the funds**.  Instead, the Philippines asserted its immunity and argued that the court lacked the power to award ownership of the funds to any party remaining in the action, because the court could not take jurisdiction over a necessary party to the litigation – the Philippines.

No party in the case challenged the Philippine's assertion of sovereign immunity, so the Supreme Court did not address the issue.  *Id.* at 2191 ("Immunity in this case, then, is uncontested…").

The opinion also does not mention *Deep Sea Research*.

Another telling aspect of the opinion is the dissent, which argued that the majority placed too much weight on the sovereign status of the Philippines, because it could elect to participate: "There is, of course, a risk of unfairness in conducting such proceedings without the participation of petitioners.  But it is a risk that they can avoid by waiving their sovereign immunity…."  *Id.* at 2195.

Thus, as to immunity, the *Philippines* is entirely consistent with *Deep Sea Research* and *Lord, Day & Lord*.  As indicated by the contrast between the majority and the dissent, the Philippines

could not make a claim to the funds without acceding to the Court's jurisdiction. The *Philippines* opinion cannot contradict the rule of *Deep Sea Research* for at least four reasons: (1) the opinion did not address sovereign immunity; (2) the opinion did not refer to admiralty jurisdiction; (3) the opinion did not mention *Deep Sea Research* or the possession rule set out in that opinion; and finally (4) the Philippines invoked sovereign immunity solely as a defense and did not make a claim to the *res* in question.

### *(2) Philippines advises this Court to address Peru's claim on the merits.*

The actual ruling of the Court in *Philippines* supports Peru's position. The Court held that awarding property through the interpleader in the absence of the Philippines would constitute an improper adjudication of the Philippine's interest *in absentia*, because awarding the account to one of the other claimants would moot the Philippine's interest in the property:

> The Court of Appeals erred in not giving the necessary weight to the absent entities' assertion of sovereign immunity. The court in effect decided the merits of the Republic and the Commission's claims to the Arelma assets. Once it was recognized that those claims were not frivolous, it was error for the Court of Appeals to address them on their merits when the required entities had been granted sovereign immunity. The court's consideration of the merits was itself an infringement on foreign sovereign immunity; and, in any event, its analysis was flawed.
> ….
> Comity and dignity interests take concrete form in this case. The claims of the Republic and the Commission arise from events of historical and political significance for the Republic and its people.

*Id.* at 2189-90.

The same thing can be said about the recommendation to award property to Spain without addressing Peru's contrary ownership claim, even when Peru voluntarily appears and asserts its ownership of the property. Indeed, resolving Peru's claim without consideration is an even greater "infringement on foreign sovereign immunity" than doing so *in absentia*.

### f. The Recommendation conflicts with other recent and applicable opinion from at least four Courts of Appeals.

The Recommendation also conflicts with opinions issued after *Deep Sea Research* by at least four different Courts of Appeals, including the Eleventh Circuit.

### (1) *Fairport Int'l Exploration, Inc. v. The Captain Lawrence*, 177 F.3d 491 (6th Cir. 1998).

This is one of the first opinions to apply the rule of *Deep Sea Research* and clearly demonstrates the errors in the Recommendation.

According to legend, when the Captain Lawrence sank in Lake Michigan in 1933, it was carrying a ship's log that showed the location of gold lost during the Civil War and perhaps even a chest of gold. When rediscovered in 1984, it "was embedded in the bottom of Lake Michigan." *Id.* at 493. When the finder sought an "in rem arrest warrant for the vessel," the State of Michigan intervened and claimed it owned the wreck under the Abandoned Shipwreck Act of 1987 (the "ASA"), 43 U.S.C. §§ 2101-2106.

Michigan sought dismissal of the suit on the grounds of sovereign immunity, which the district court granted on the basis that Michigan had demonstrated a "colorable claim of ownership of the *Captain Lawrence*." *Id.* at 494.

On appeal, the Sixth Circuit affirmed, but, five days after issuing *Deep Sea Research,* the Supreme Court granted certiorari, vacated the Sixth Circuit's original opinion, and remanded the matter for reconsideration in light of *Deep Sea Research*. *Id.* at 496.

On remand, the Sixth Circuit rejected the claim to sovereign immunity.

In a telling comment for this Court, in relation to the question of "*Determining the Ownership of the Captain Lawrence*," the court of appeals described the sovereign immunity claim as a "red herring." *Id.* Quoting *Deep Sea Research*, the court found that its prior analysis of who

owned the wreck "was necessarily influenced by the [mistaken] assumption that the Eleventh Amendment was relevant to the courts' inquiry." *Id.* at 497 (brackets in original; citation omitted). After *Deep Sea Research*, the court concluded "no jurisdictional bar exists" to determining ownership of a sunken wreck outside the possession of a sovereign: *Deep Sea Research* "definitively instructs us that, if a State does not possess a shipwreck, the Eleventh Amendment does not prevent a federal court from entertaining claims under the ASA to the shipwreck. The Court explicitly distinguished past cases on this ground." *Id.*

In the same manner, there is no "jurisdictional bar" to this Court's determination of the ownership of the Treasure. Spain's immunity claim is likewise a "red herring" designed to lead the Court away from the core issue of who owns the Treasure.

> **(2) <u>Sea Hunt, Inc. v. Spain</u>, 47 F. Supp. 2d 678 (E.D. Va. 1999), <u>aff'd in part, rev'd in part</u>, 221 F.3d 634, 644 (4th Cir. 2000), <u>cert. denied</u>, 121 S. Ct. 1079 (2001).**

"*Sea Hunt* marked the first time in history that Spain laid legal claim to one of its many shipwrecks and prevailed in its legal battles to retain title to the shipwrecks and to refuse salvage activities." *Comment, Sea Hunt, Inc. v. The Unidentified Shipwrecked Vessels: How the Fourth Circuit Rocked the Boat*, 67 Brook. L. Rev. 1249, 1262 (2002).

The *Sea Hunt* matter is remarkably similar to this case. At issue were two Spanish Imperial frigates lost in 1802 and 1750. The claimants were (1) Spain, (2) another sovereign, Virginia, and (3) the finding company, Sea Hunt.

The *Sea Hunt* court addressed the competing claims of two sovereigns, Spain and Virginia, without even a hint that the respective rights of these two sovereigns were not entitled to be addressed directly. 47 F. Supp. 2d at 685-86; 221 F.3d at 640.

**(3)** _United States v. Steinmetz_, **763 F. Supp. 1293 (D. N.J. 1991),** _aff'd,_ **973 F.2d 212 (3ʳᵈ Cir. 1992),** _cert. denied,_ **507 U.S. 984 (1993).**

_Steinmetz_ involved a dispute between the finder of a historic bell from a Confederate warship and the United States, which claimed ownership as successor to the Confederacy. Like the other cases, the court found that it had jurisdiction to determine the competing ownership claims by the finder and the United States as successor to the Confederacy: "To the extent that Mr. Steinmetz's first claim interposes his own claim of ownership in derogation of the claim of the United States, he may properly assert it." 763 F. Supp. at 1300, _aff'd,_ 973 F.3d at 218-19.

**(4)** _Sea Services of the Keys, Inc. v. State of Florida_, **156 F.3d 1151 (11ᵗʰ Cir. 1998).**

The Eleventh Circuit applied the possession rule of _Deep Sea Research_ when the State of Florida claimed sovereign immunity from a salvage claim related to a vessel that Florida claimed was contraband and subject to forfeiture. The court affirmed the district court's denial of Florida's motion to dismiss on the grounds of sovereign immunity. 156 F.3d at 1153-54.

The Recommendation contravenes these authorities.

**2.  The Recommendation errs in holding that admiralty law equates ownership of a vessel with ownership of the vessel's cargo.**

**a.  Admiralty law distinguishes between a vessel and her cargo.**

The Recommendation errs when it equates, **as a matter of law**, the Mercedes and her cargo, so that ownership of the remains of the Mercedes necessarily equates to ownership of the Treasure. According to the Recommendation, "a vessel and her cargo are inextricably intertwined." Recommendation at 23.

The Recommendation's legal conclusion is contrary to current admiralty law. For example, in _Columbus-America Discovery Group v. Atlantic Mutual Insur. Co.,_ the Fourth Circuit

separately discussed ownership rights to the vessel, to the cargo, and to the passenger's personal property. 974 F.2d 450, 465-68 (4th Cir. 1992), *cert. denied,* 113 S.Ct. 1625 (1993). Ultimately, the court found that the vessel owners and the passengers had abandoned their rights by not making a claim, but that the commercial cargo owners had not. *Id.*

The court in the *Lusitania* case expressly rejected the argument that ownership of the shipwreck translated into ownership of the cargo or personal effects of the passengers. *Bearmis v. RMS Lusitania,* 884 F. Supp. 1042 (E.D.Va. 1995), *aff'd mem.,* 99 F.3d 1129 (4th Cir. 1996)(per curiam), *cert. denied,* 118 S.Ct. 1558 (1998).

The Recommendation's reference to the *Titanic* court's jurisdictional discussion, which explained that presenting one item before the Court allows jurisdiction over the whole vessel, frankly makes little sense. Yes: this Court can take jurisdiction over a vessel and her cargo based on possession of only part, but that is a matter of jurisdiction, not ownership.

The fact that this Court can take jurisdiction over a vessel and her cargo jointly does not allow (much less require) this Court to give ownership of the cargo to the owner of the vessel, anymore than taking control over a bank account requires the Court to give all the funds to the account holder. Certainly, the *Titanic* court did not rule that the owners of the Titanic magically became owners of the jewels of the Titanic's passengers once the ship set sail or sank.

It is hard to believe that even Spain would want to set such a precedent. Inevitably, a treasure seeker is going to find another pirate vessel carrying American treasure dating from the days of the Spanish Empire. *See Mar. Underwater Surveys, Inc. v. The Unidentified, Wrecked & Abandoned Sailing Vessel Believed to Be the Pirate Ship Whidah,* 717 F.2d 6 (1st Cir. 1983). The owner of that treasure should not be foreclosed from making a claim because the treasure was not found on one of its sovereign vessels.

### b. The wreck of the Mercedes is not entitled to the heightened protections given active warships.

The Recommendation's equating cargo and vessel may be part of what the Magistrate viewed as the heightened protections for warships, which the Magistrate conferred (without analysis) on the remains of the Mercedes. *See, e.g.,* Recommendation at 23 ("This is particularly so here as warships have always had a special status ....").

For an *active* warship in possession of its sovereign owner, the point makes some sense. It would be a serious invasion of foreign interests for a United States court to review the contents of one of Spain's (or Peru's) active warships.

As to the few remains of the Mercedes, however, the Magistrate's "special status" is misplaced and contrary to United States law. The FSIA defines what property has heightened protection as military property, and, although the Mercedes was a military vessel in the Nineteenth Century, its remains hardly have a military purpose today. Section 1611 of the FSIA affords heightened immunity protection solely to property that "is, or is intended to be, used in connection with a military activity." 28 U.S.C. § 1611. To meet that definition, the foreign state must "establish that there is some present or future intended use for the property that is connected to military activity." *Ministry of Defense and Support for Armed Forces of Islamic Republic of Iran v. Cubic Defense Systems, Inc.,* 385 F.3d 1206, 1223 (9th Cir. 2004); *see also All American Trading Corp. v. Cuartel General Fuerza Aerea Guardia Nacional De Nicaragua,* 818 F. Supp. 1552, 1555 (S.D. Fla. 1993)("Each condition under § 1611(b)(2)(A) or (B) requires that the property is immune only if its present or future use is military; however, if it is surplus equipment or is withdrawn

from military use, it would not be immune.")(citation omitted).[5]

Again, the Recommendation fails to distinguish historical fact from present day law. Today, neither the Treasure nor the random remains of the Mercedes are military property, and whether they were in 1804 is irrelevant.

### c. The rule stated in the Recommendation is unjust.

According to the rule set out in the Recommendation, any time a wreck is discovered, all of the contents of that vessel are, as a matter of unquestioned law, the property of the vessel's historic owner.

The recommended rule is, not only unprecedented, it is unjust and creates a legal rule that would immunize known violations of international law. For example, if a Nazi submarine were uncovered in international waters containing treasures plundered from occupied France, the recommended rule would foreclose claims by the victims of such illegal conduct.

No rule of international law grants a country's cultural treasures to whatever nation's vessel was carrying it away from their shores. *See, e.g.,* W. Sandholtz, PROHIBITING PLUNDER: HOW NORMS CHANGE (OXFORD 2007); IMPERIALISM, ART AND RESTITUTION; J. Greenfield, THE RETURN OF CULTURAL TREASURES (2007); A. Vrdoljak, INTERNATIONAL LAW, MUSEUMS AND THE RETURN OF CULTURAL OBJECTS (2008).

In a vain attempt to avoid treading into new areas of the law, the Recommendation instead sets new law. Unfortunately, the new law is contrary to some of the most noted jurisprudence of the United States.

---

[5] Note: under the FSIA's rule, a sunken warship that is not obsolete or historic would still be protected as military property, because any part of it that could be returned to service would retain its military character.

**d. The Recommendation's refusal to question Spain's claim to own everything carried by the _Mercedes_ conflicts with the Supreme Court's holding <u>In re Amistad</u>.**

This is not the first time Spain has claimed that international comity foreclosed United States courts from challenging its claim to own everything on board a Spanish vessel. One of the most historic cases in United States jurisprudence directly rejected that every assertion: _In re the Amistad_, 40 U.S. 518 (1841).

The Amistad was a Spanish schooner. During a trip from Havana to Principe Cuba, fifty-four Africans, held as slaves on the ship, revolted. The Africans spared two officers in exchange for their promise to return the Africans to their homes. Instead of traveling to Africa as promised, each night, the officers headed east, eventually reaching the United States.

Spain, represented by the United States Attorney General, claimed the vessel and all "property" on board, including the Africans. The Africans, represented by former President John Quincy Adams, claimed they were free men. At the time, slavery was legal in the Spanish Colonies and in the Southern United States, but the African Slave Trade had been abolished. Spain provided documents from Spanish Authorities stating the Africans were lawful slaves captured before abolishment of the slave trade, but the Africans testified that they had been recently kidnapped in Africa in violation of international law.

Spain argued that international comity prevented a United States court from questioning its ownership claim over the Africans. _Id._ at 595. The Supreme Court disagreed and allowed the challenge to the Spanish legal documents, and ultimately ruled that the Africans had been illegally kidnapped in Africa, and were free men. _Id._ at 595-96.

This Court also has the ability to judge the basis of Spain's ownership claim in this case.

**D. There is no principled basis for this Court to avoid the dispute between Peru and Spain.**

Another overriding theme of the Recommendation is the manifest reluctance of the Magistrate to enter into a dispute between two sovereigns.

No matter how great that reluctance, however, this Court has to grant the Treasure to some party, and a dislike for difficult decisions is not a basis to prefer Spain's ownership claim to Peru's or for avoiding this Court's duty to decide who owns the Treasure before it.

**1. This Court's jurisdiction is not tenuous and, even if it was, that is no excuse for declaring Spain the owner of Peru's Treasure.**

Before this Court is 17 tons of valuable treasure, which sits in a warehouse in this District under the enforceable orders and direct *custodia legis* of this Court. Spain asks this Court to declare it the sole owner of that Treasure. Peru makes the same request as to the Treasure originating in Peru.

There is therefore nothing "tenuous" about this Court's "jurisdictional grip," as found by the Magistrate at 29. This Court's jurisdiction is not based on a legal "fiction," *id.* at 13-14, but on direct control over property present in this District.

But, regardless of the nature of this Court's jurisdiction, both Spain and Peru have voluntarily appeared before this Court to ask for the identical relief – to be declared owner of the *res* – the Treasure. The nature of this Court's jurisdiction, therefore, is no legal basis to prefer Spain over Peru.

**2. This Court cannot avoid deciding this dispute; ownership and possession of the Treasure must be decided, directly or indirectly.**

The Magistrate's reluctance to decide an international dispute notwithstanding, it is simply impossible for this Court to avoid the legal dispute before it.

The Treasure is under the direct control of this Court. Ultimately, this Court will have to award the treasure to some party – Peru, Spain, Odyssey, or one of the purported descendants. Neither Spain nor Peru can take possession of the Treasure without a direct order of the Court. Absent an order from this Court, the Treasure would revert to Odyssey.

When this Court ultimately makes that award, it will have made at least a *de facto* determination of the core legal issue of which party owns the Treasure. See Moore Affidavit (exhibit A, attached) at ¶27. Peru merely asks that that disposition be based on the relevant law.

It is, of course, no coincidence that the necessity for an award of ownership coincides with the fact that no sovereign has possession of the Treasure. As noted by Justice Story more than a century ago, when the Court (as opposed to the sovereign) has possession, the defense of sovereign immunity is irrelevant, because the affected sovereign "does not act merely in the character of a defendant, but as an actor." 2 J. Story, Commentaries on the Constitution of the United States § 1689, at 491-92 (5th ed. 1891).

### 3. The Recommendation violates the principles of international comity in treating Peru's ownership claim differently than Spain's.

Another excuse raised by the Recommendation, at 32, for avoiding the question of who owns the Treasure is international comity, but the Recommendation applies the doctrine in a decidedly one-sided fashion, so that Spain's interests are protected, and Peru's ignored.

Ironically, the Recommendation emphasizes that the principles of sovereign immunity and international comity are based on the "perfect equality and absolute independence of sovereigns," but the Recommendation then proceeds to treat Peru's ownership claim in a completely different manner than Spain's. *See* Recommendation at 15 n.13.

The Recommendation also stresses the admonition of the *Titanic* court that this Court "carefully" consider matters involving historical wrecks, particularly when "a foreign sovereign's patrimonial interests" are at stake, but once again the Recommendation fails to apply that admonition to Peru's claim. *Id.* at 14.

There is simply no basis in international or domestic law for the Recommendation's wholesale failure to address Peru's claim of sovereign ownership with the same respect, dignity and process as Spain's. Far from furthering the principles of international comity, the Recommendation distorts those principles into a purported legal basis for discrimination against Peru's interest. As explained by Ambassador Moore:

> The rule of law, one of the great strengths of human experience, suggests that this issue of comparative rights to these culturally and historically sensitive artifacts should be addressed and resolved by this court. For to ignore the plea of Peru that it has superior rights to possession of this property, and to turn these artifacts over to Spain without addressing the matter, would amount to a *de facto* adjudication – but an adjudication without considering the merits of Peru's claim and which would effectively set aside modern principles of international law and the law of the sea repudiating colonialism and protecting national cultural heritage. Surely, as against a superior claim of Peru to these artifacts, this court should not turn them over to Spain. And just as surely Peru is entitled to a hearing and adjudication of its rights to establish its superior claim. The argument in the Kingdom of Spain's "Reply" (page 24) that "[t]his Court should not undertake to become the arbiter of relations between Spain and Peru" is hypocritical as that is effectively what the Kingdom of Spain asks this court to do in its request that Spain be awarded the artifacts now before this court to which Peru has preferential rights.

Moore Affidavit, exhibit A, at ¶27.

This Court should not be misled by the Recommendation's inference that reference to sovereign immunity somehow means this Court is avoiding an international dispute. If the Court grants Spain's request to be given possession of the Treasure, this Court will not have merely refused to engage a dispute between two sovereigns. To the contrary, it will be deciding

the dispute; it will just be doing so on a false and incorrect basis.

### 4. *According to direct Supreme Court authority, this Court is competent to decide this dispute.*

The Recommendation at least infers that this Court is not competent to address the dispute between Spain and Peru. *See* Recommendation at 32-33.

The United States Supreme Court, however, has already determined the competency of United States courts to apply the required rules. As described more fully below, the United States Supreme Court was the first court in the world to apply international law to apportion property between divided sovereigns. *See discussion below* at 38-39. When Virginia and West Virginia could not agree on the equitable division of their non-territorial assets and debts, the first question addressed by the Supreme Court, which had original jurisdiction over the matter, was whether it was competent to make the determination. Justice Oliver Wendell Holmes concluded that "**what is just and equitable is a judicial question similar to many that arise in private litigation, and in nowise beyond the competence of a tribunal to decide.**" *Commonwealth of Virginia v. State of West Virginia,* 220 U.S. 1, 31 (1911) (emphasis supplied).

Justice Holmes cautioned that the division was "to be considered in the untechnical spirit proper for dealing with a quasi international controversy, remembering that there is no municipal code governing the matter…." *Id.* at 27. United States courts also utilize equitable apportionment when determining the respective rights of States to a shared body of water. *E.g., Colorado v. New Mexico,* 459 U.S. 176, 183 (1982)(Equitable apportionment "is a flexible doctrine which calls for 'the exercise of an informed judgment on a consideration of many factors' to secure a 'just and equitable' allocation. …. Our aim is always to secure a just and equitable apportionment 'without quibbling over formulas.'") (citations omitted).

There is no reference to this directly applicable authority in the Recommendation.

**5. Given Spain's rejection of an international forum, this Court must rule.**

The potential existence of an international forum is irrelevant to this Court's duty to decide who owns the property before it based on the law, especially in the face of Spain's refusal to agree to another forum.

In its initial response to Peru's claim, Spain argued that, pursuant to UNCLOS, the dispute between Spain and Peru had to be sent to the International Court of Justice at the Hague (the "ICJ"), Dkt. 161 at 10, but then on reflection, Spain refused to grant its consent, a necessary prerequisite to jurisdiction at the ICJ.

The reason for Spain's newfound reluctance is obvious: Spain knows it would lose in an international forum, because Spain knows that international law rejects its legal contentions. Spain prevails only if it can somehow avoid the need to support its ownership claim.

This Court should not allow Spain's refusal to go to an international forum to be used as sword to gain property Spain does not own.

More to the point, Spain's basic legal argument as to the ICJ is unsupported. No provision of UNCLOS deprives this Court of jurisdiction in favor of the International Court of Justice. Federal courts frequently interpret and apply UNCLOS in admiralty cases. *E.g., Mansel v. Baker Hughes, Inc.*, 203 F. Supp. 2d 745 (S.D. Tex. 2002); *Mayaguezanos por la Salud y el Ambiente v. United States*, 198 F.3d 297 (1st Cir. 1999). UNCLOS, itself, contemplates exhaustion of local remedies. UNCLOS Article 249.

**E. The Recommendation errs in ignoring the international law, including UNCLOS, that dictates Peruvian ownership of the Treasure linked to Peru's territory.**

Peru presents two main bases for its ownership claim: (1) Article 149 of UNCLOS, which presents the international community's direct expression of the rule to be applied in this admiralty proceeding, and (2) the international law related to the succession of states. Although Article 149 sets forth the most applicable rule of law to this case, given the overriding implications of Spain's dramatic changes in sovereignty since 1804, Peru begins there.

First, however, the Recommendation's general failure to address Peru's claim must be addressed.

**1. The Recommendation errs in failing to address the expert testimony provided in support of Peru's legal position.**

Peru provided the lower court with the affidavit of the preeminent legal scholar on international and admiralty law, Ambassador John Norton Moore of the University of Virginia School of Law, whose expert opinion confirms the basic legal propositions of Peru: "The Republic of Peru, as a sovereign nation, is entitled to all or a substantial portion of the culturally sensitive artifacts which physically and historically originated in Peru, and which are now before this court, on multiple grounds…." Exhibit A at ¶ 28.

Despite the direct relevance of Ambassador Moore's expert report, it goes entirely unmentioned in the Recommendation. It was error to ignore this evidence. F.R.C.P. 44.1; *United States v. Royal Caribbean Cruise Lines Ltd.,* 11 F. Supp. 2d 1358, 1372 (S.D. Fla. 1998)(utilizing expert testimony to interpret UNCLOS); *United States v. Jurado-Rodriguez,* 907 F. Supp. 568, 574 (E.D.N.Y. 1995)("A court may seek the aid of expert witnesses in interpreting the law of a foreign state or of international law.").

**2. The unprecedented nature of this case is not a reason to refuse to apply the appropriate rules of international and admiralty law, particularly UNCLOS Article 149.**

**a. As acknowledged by the Recommendation, this case will establish important precedent in an area of the law of growing significance.**

At least one of the reasons that *Deep Sea Research* is such an important precedent is that it advanced admiralty jurisprudence in an area of growing importance – the respective rights to historic vessels and objects found at sea. J.P. Jones, *The United States Supreme Court and Treasure Salvors: Issues Remaining After Brother Jonathan*, 30 J. Mar. L. and Comm. 205 (1999).

The chief reason for the growing importance of this area of the law is the rapid advancement in undersea technologies that have made the discovery and recovery of ancient shipwrecks and other artifacts far easier.[6]

Along with *Treasure Salvors, Deep Sea Research,* and *Titanic*, the jurisprudence related to historic vessels began in 1996 when Spain laid claim to the Juno and La Galga in *Sea Hunt*. This case merely expands that jurisprudence to include the rights of other successor nations who created the wealth at issue.

The Recommendation notes the unprecedented nature of this dispute, but rather than further that jurisprudence through a reasoned analysis, the Recommendation opts to use the unprecedented nature of this matter as an excuse not to address Peru's claim at all.

---

[6] *See, e.g.,* S. Dromgoole, THE PROTECTION OF THE UNDERWATER CULTURAL HERITAGE (2d Ed. 2006) (discussing the "international community's response to the remarkable advances in deep-sea technology that had taken place over the last twenty years."); J. Sweeney, *An Overview of Commercial Salvage Principles in the Context of Marine Archaeology,* 30 J. of Maritime Law and Commerce 185, (1999)("Implied abandonment did not begin to produce legal disputes until the present time because the technology to locate deep ocean wrecks and bring all or parts of them to the surface did not exist.").

### b. The Recommendation errs in refusing to set the required precedent.

The Recommendation refuses to apply the applicable rules of international and admiralty law on the specious ground that this would be the first case to apply them in this context. For example: "Considering that no court has applied Article 149, Peru's argument is not persuasive." Recommendation at 31.

This being the first case that calls for application of Article 149's rule of law, however, is not a reason to give Peru's Treasure to Spain. The courts in *Sea Hunt* were not deterred by the unprecedented nature of Spain's claim; this Court should extend the same courtesy to Peru. Since no court has addressed these issues, no court has rejected Peru's argument, and neither the Recommendation nor Spain point to any authority that says that Article 149 is not the law.

One way or the other, this Court will set important precedent setting out new law in area of growing importance. Such precedent should be based on the relevant legal issues, not an avoidance of the issues based on an unwarranted reluctance to decide a difficult issue.

In this admiralty matter, moreover, the precedent should be based on deference to the international *jus gentium* governing maritime affairs, derived from "the common consent of civilized communities." *Titanic,* 171 F.3d at 961 (citations omitted). As stated by the Supreme Court more than a hundred years ago:

> [W]here there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is.

*The Paquete Habana,* 175 U.S. 677, 700 (1900)(citation omitted).

As explained below, the relevant legal rule is set out in UNCLOS Article 149, which

codifies the international community's uniform judgment as to the appropriate disposition of historical objects found at sea. Not surprisingly, Article 149 follows the same structure as the principles of international law related to division of sovereign assets when a nation divides.

Particularly in the absence of a contrary rule, Article 149's rule should be applied.

### 3. The Recommendation does not address the legal implications of the changes in Spain's sovereignty since 1804.

#### a. Spanish sovereignty changed dramatically following the loss of the Mercedes.

A lot has changed since 1804, when the Spanish Empire claimed dominion over much of the world, including Florida, Texas, California and most of the American West. The Spanish Empire has since fragmented into independent nations (including much of ours, Peru and modern European Spain). Today, modern European Spain represents less than 5% of the territory that comprised the Spanish Empire in 1804, and that does not include the Louisiana Territories ceded by Spain to France a few years before, which were ultimately sold by France to the United States in the Louisiana Purchase in 1803.

The Recommendation errs when it assumes that the dramatic changes in Spain's sovereignty over the last 200 years have no legal implications, so that, if Imperial Spain could enforce dominion over the Treasure in 1804, Spain has an unquestionable legal claim to it now.

Under international law, all of the nations that formed the Spanish Empire, including ours, have rights to property linked to their territories that is not in the actual physical possession of another sovereign. The rights of all those nations are identical. As stated by James Kent, widely regarded as the Father of American Jurisprudence: "In the whole range of the matter discussed in public International Law no proposition has been more explicitly announced or more implicitly accepted than this: that nations are equal in respect to each other,

and entitled to claim equal consideration for their rights, whatever their relative dimensions or strength may be, or however they may differ in government, religion, or manners." Kent's Commentaries on International Law at 46 (1866).

Spain does not deny that Peru once formed part of the Empire of Spain in 1804; it just seeks to deny Peru any rights from that status. According to Spain, Peru was an indivisible part of Spain when the Mercedes was lost. Declaration of Hugo O'Donnell y Duque de Estrada at ¶23 ("At the time, the Viceroyalty of Peru was part of the Kingdom of Spain.").

Legally, this view is an overstatement: Spain forced a dominion over Peru, but Peru retained its separate sovereign status, so that the Treasure was always the sovereign property of Peru, over which Spain claimed a dominion that is now irrevocably lost.

Thus, legally, Peru is either one of the many successors to the Spanish Empire or the continuation of the now liberated Peru. In either case, Peru has ownership rights under international law to the Treasure taken from its territory and its people.

The Recommendation errs when it states, without any legal analysis, that the Republic of Peru did not exist in 1804 with the unstated conclusion that it, therefore, has no rights to its patrimony lost at sea. Recommendation at 3.

Peru has existed for millennia with one of the oldest and richest cultures and histories in the World.

**b. The Recommendation errs in accepting Spain's legal claim that only one sovereign survives a division of a nation with any rights in movable property.**

In contrast to Peru's evidence and legal authority, neither the Recommendation nor Spain provide any evidence or contemporary legal source that supports the premise that Spain, and Spain alone, owns all of the lost American treasure lying at the bottom of the sea.

Despite this lack of authority, the Recommendation at least tacitly adopts Spain's ethnocentric and rejected view of international law that, when an empire dissolves, only the former imperial power has rights to movable property. The Recommendation even impliedly accepts Spain's insulting premise that Spain granted Peru its independence and in doing so unilaterally limited Peru's rights under international law, a premise that is the equivalent of saying that the Declaration of Independence was irrelevant and that the United States became a nation only when England granted it independence and even then the United States received only the rights England deigned to grant it. [7]

Unfortunately for Spain, while its claim to be sole owner of all moveable property from its former dominions might have held sway when Spain could dictate international law with its Armada, such bold claims are now completely discredited. This country has rejected such claims since at least when Justice Holmes analyzed the implication of Virginia's division during the Civil War, but unsurprisingly, given our colonial heritage, the underlying premises of Spain's claimed dominion over the Americas was questioned by Chief Justice John Marshall at the very inception of our national jurisprudence. [8] Today, in this Court, Spain's rights are determined by

---

[7] In brief, Spain claims that, as a matter of United States law, Peru did not become a sovereign nation when it declared its independence on July 28, 1821, or even when the United States recognized it as a nation in 1822; nor when the United States issued the Monroe Doctrine of 1823, prohibiting further Spanish colonial aggression in the Americas. Instead, Spain claims that Spain granted Peru its independence and unilaterally set the limits of its rights as a sovereign in the 1824 Capitulation of Ayacucho, the document by which the Spanish Army surrendered to Peru. Of course, the idea that Spain's surrender and request for leniency is the operative act determining Peru's rights as a nation is nonsensical. Spain was surrendering to Peru, not Peru to Spain. Surely, Spain does not suggest that it created Peru in order to surrender to it.

Spain's protestations notwithstanding, however, Peru's sovereign rights are set by international law, not Spain.

[8] Justice Marshall wrote:

America, separated from Europe by a wide ocean, was inhabited by a distinct people, divided into separate nations, independent of each other and of the rest of the world, having institutions of their own, and governing themselves by their own laws. It is difficult to comprehend the proposition, that the inhabitants of either quarter of the globe could have rightful original claims of dominion over the inhabitants of the other, or over the lands they occupied; or that the

---

international law, including UNCLOS, not Spain's unilateral declarations.[9]

Spain's claim here is reminiscent of Russia's relatively recent claim to succeed to all the rights of the former Soviet Union, so that Russia, to the exclusion of all of the other successors to the Soviet Union, owned all of the Soviet merchant fleet, Embassy properties, and other movable property. While Russia's claim to continue the legal status of the Soviet Union for the purposes of treaties and UN membership went uncontested, Russia's claim that to ownership of all foreign-based property was rejected.[10] Russia was compelled by international law to share such property equitably with all of the nations that had formed the Soviet Union. *See* P. Williams and J. Harris, *State Succession to Debts and Assets: The Modern Law and Policy*, 43 Harv. L. Rev. 355, 379 (2001)("State Succession"). The similar claim by the Federal Republic of

---

> discovery of either by the other should give the discoverer rights in the country discovered, which annulled the pre-existing rights of its ancient possessors.

*Worcester v. Georgia*, 31 U.S. 515, 542-44 (1832). Based on this observation, Justice Marshall held that, although the then-current international law was effective to maintain peace among European powers, such laws could not govern those who had not agreed to them:

> To avoid bloody conflicts, which might terminate disastrously to all, it was necessary for the nations of Europe to establish some principle which all would acknowledge, and which should decide their respective rights as between themselves. This principle … was, 'that discovery gave title to the government by whose subjects or by whose authority it was made, against all other European governments, which title might be consummated by possession.'
>
> This principle, acknowledged by all Europeans, because it was the interest of all to acknowledge it, gave to the nation making the discovery, as its inevitable consequence, the sole right of acquiring the soil and of making settlements on it. It was an exclusive principle which shut out the right of competition among those who had agreed to it; not one which could annul the previous rights of those who had not agreed to it. It regulated the right given by discovery among the European discoverers; but could not affect the rights of those already in possession, either as aboriginal occupants, or as occupants by virtue of a discovery made before the memory of man.

*Id.* at 543-44 (citations omitted).

[9] "The law of State succession prevents the events accompanying changes of sovereignty from being manifestations of power." M. Craven, *The Decolonization of International Law: State Succession and the Law of Treaties* 95 (Oxford 2007).

[10] In a similar manner, as to some aspects of international law related to the succession of states, Spain might be considered as the continuation of the predecessor state, but as to division of property, Spain and Peru are to be treated identically, with their rights determined by international law.

Yugoslavia to own all the moveable property of the former Socialist Federal Republic of Yugoslavia was likewise rejected. *E.g.,* C. Stahn, *The Agreement on Succession Issues of the Former Socialist Federal Republic of Yugoslavia,* 96 Am. J. Int'l L. 379 (2002)("Yugoslavia").

Thus, it is not enough for the Court to find that the wreck is a "Spanish" vessel lost in 1804 and then call for application of the FSIA in Spain's behalf. Spain must demonstrate **present** ownership, which entails an examination of the rules set out in international law related to successor states and in UNCLOS.

### c. When a state divides, international law divides property equitably among all successor states, with particular emphasis on territorial linkage.

#### (1) The relevant rules of international law have been incorporated into United States law.

When a state divides, modern State practice divides extraterritorial assets and debts equitably among **all** States resulting from the division, with strong preference to the state territorially linked to the property. Moore Affidavit, exhibit A, at ¶39.

The rule of equitable apportionment has been adopted as a customary rule of international law.

> The principle of equity is another major principle applicable to the legal consequences of the changes in territorial sovereignty. Its application represents a crucial factor during State succession. **It has been accepted by State practice**.

E. Hasani, *The Evolution of the Succession Process in Former Yugoslavia,* 29 T.J.L.R. 111, 118 (2006)(footnote omitted; emphasis supplied); *see also State Succession,* 43 Harv. L. Rev. at 357 (Equitable allocation "appears to be the keystone principle for allocating debts and assets."); A. Langstrom and M. Nijhoff, TRANSFORMATION IN RUSSIA AND INTERNATIONAL LAW 223 (2003)("In sum, the principal rule for redistributing assets and liabilities in separation or

dissolution is that the states concerned have to agree on the issue. Failing an agreement there shall be distribution in equitable proportions."); *Yugoslavia,* 96 Am.J.Intl.L. at 384 (2002) ("Recognition of Equity as a Guiding Principle of State Succession … Equity plays … serves both as an auxiliary principle with a corrective function and as a substantive criterion for fixing on a just division of the assets and liabilities between the different predecessor and successor states.")(footnote omitted).

During discussions regarding the break-up of Yugoslavia, the European Community created an Arbitration Commission, which found with "respect to movable property … **that the provisions of the 1983 Vienna Convention represented commonly agreed principles and that federal property should be divided equitably among all of the successor states**." *Id.* at 396 (*referring to,* Arbitration Commission Opinion No. 14, 32 I.L.M. 1593 (Aug. 13, 1993)(emphasis supplied); *see also* T. Franck, FAIRNESS IN INTERNATIONAL LAW AND INSTITUTIONS 3 (1997).

This international law is also United States law, binding on this Court. As the Supreme Court has stated: "For two centuries we have affirmed that the domestic law of the United States recognizes the law of nations." *Sosa v. Alvarez-Machain,* 542 U.S. 692, 729-30 (2004) (citations omitted); *see also The Nereide,* 9 Cranch 388, 423, 3 L.Ed. 769 (1815)(Marshall, C.J.) ("[T]he Court is bound by the law of nations which is a part of the law of the land.").

Critically, when looking for the appropriate rule, the courts should look to the modern rule, not international law of the past:

> *Habana* is particularly instructive for present purposes, for it held that the traditional prohibition against seizure of an enemy's coastal fishing vessels during wartime, a standard that began as one of comity only, had ripened over the preceding century into "a settled rule of international law" by "the general assent of civilized nations." **Thus it is clear that courts must interpret international**

*law not as it was in 1789, but as it has evolved and exists among the nations of the world today.*

*Filartiga v. Pena-Irala,* 630 F.2d 876, 881 (2nd Cir. 1980)(citations omitted; emphasis supplied).

### (2) United States jurisprudence has long recognized the doctrine of equitable apportionment.

The United States Supreme Court was one of the first courts to apply the equitable apportionment doctrine to the division of a sovereign, and in doing so, "helped shape world opinion on issues such as succession to the rights and responsibilities of successor states." C.T. Ebenroth & M.J. Kemner, *The Enduring Political Nature of Questions of State Succession and Secession and the Quest for Objective Standard,* 17 U. Pa. J. Int'l Econ. L. 753 785 (1996).

The Supreme Court recognized and applied the equitable apportionment doctrine to determine the relative obligations of Virginia and West Virginia following their split during the Civil War. Before Virginia was allowed back into the Union, it had to agree to assume "an equitable proportion" of the pre-War debts of the formerly larger State of Virginia. *Hartman v. Greenhow,* 102 U.S. 672, 677 (1880).

Significantly, although West Virginia and Virginia agreed to apply the rule of equitable apportionment, the Supreme Court repeatedly noted that the equitable apportionment doctrine was already well-established international law in 1883:

> **Writers on public law speak of the principle as well established, that where a State is divided into two or more States, in the adjustment of liabilities between each other, the debts of the parent State should be ratably apportioned among them.** On this subject Kent says: 'If a State should be divided in respect to territory, its rights and obligations are not impaired; and if they have not been apportioned by special agreement, their rights are to be enjoyed and their obligations fulfilled by all the parts in common.' 1 Com. 26. And Halleck, speaking of a State divided into two or more distinct and independent sovereignties, says: 'In that case, the obligations which have accrued to the whole before the division are, unless they have been the subject of a special agreement, ratably binding upon the different parts. This principle is

established by the concurrent opinions of text-writers, the decisions of courts, and the practice of nations.' International Law, c. 3, sect. 27.

> **In conformity with the doctrine thus stated by Halleck, both States –Virginia and West Virginia – have recognized in their Constitutions their respective liability for an equitable proportion of the old debt of the State.**

*Id.* (emphasis supplied); *see also Antoni v. Greenhow,* 107 U.S. 769, 788 (1883)("***It is a well-settled doctrine of public law that upon a division of a state into two or more states, her debts shall be ratably apportioned among them.***")(emphasis supplied; citation omitted).

The Court's acknowledgement of the rule was not limited to the division of debts. The Court accepted West Virginia's argument that an equitable division required that non-territorial assets offset applicable debt, thus apportioning non-territorial assets along with the debts. *Commonwealth of Virginia v. State of West Virginia,* 234 U.S. 117 (1914), 238 U.S. 202 (1915).

> **d. Spain's own authority and historical practice comports with the rule of equitable apportionment.**

Neither the Recommendation nor Spain cites any authority disputing the rule of equitable apportionment. To the contrary, Spain's own authority states that "succession of state principles are fundamentally territorial in nature" and that the "key criteria" is "***linkage of such property to the territory.***" Dkt. 161 at 16 (emphasis supplied).[11]

Of course, if there were only one, universal successor, as Spain suggests, there would be no need for any criteria, territorial or not, so Spain tacitly concedes the fallacy of its own argument.

---

[11] Spain also cites D.P O'Connell, Dkt. 161 at 16, who is generally noted as having stated the historical rule, but even he noted the predominant role of equity: "The word 'equity' is the key, it is believed, to the entire problem of State succession." D.P. O'Connell, *The Law of State Succession* at 268 (1956).

Applying Spain's own authority supports Peru's ownership claim, as the Treasure is intimately linked to the territory of Peru, where it was mined, refined and minted, and has no connection to the territory of modern Spain, whose shores it never reached.

Spain's ownership claim works within the confines of its own authority only if Spain can cabin Peru to its geographical boundaries, but keep Spain unlimited in scope, so that Spain can claim property outside its physical boundaries, but Peru cannot. There is, however, no basis in the law for such unequal treatment. Territorial linkage is straightforward, and here the link is to Peru. On the other hand, if Spain's universal succession argument had any merit, then there would be no need to look to territorial linkage at all. Indeed, if Spain were correct, there would be no need for any of the extensive literature on the rights of successor states; the former aggressor (whether Spain, Russia, Germany or another nation) would always win.

Fortunately, that is not the law, and Spain, itself, has not historically followed the vague rule set out in the Recommendation that Spain succeeds to all property not within the confines of Peruvian territory. It is perhaps not surprising, but as to debts (as opposed to assets), Spain has consistently maintained that all debts linked to a former colony's territory (despite being outside the colony) flow to the successor state, not Spain. For example, following the Spanish-American War, Spain argued that the United States should be liable for all of Spain's debts tied to Cuba, including sums used in vain attempts to gain new territories outside Cuba and to suppress uprisings within Cuba itself. D.P. O'Connell, *State Succession in Municipal and International Law* (Cambridge 1967).

Thus, when convenient to Spain, non-territorial property of a former colony reverts to the colony. When the property is treasure, however, Spain declares itself the only possible owner. The decision of when to apply the legal rule is, fortunately, not Spain's.

### e. The rule of equitable apportionment does not equate to a claim by Peru against Spain.

One explanation for the Recommendation's mischaracterization of Peru's claim might be a confusion caused by the "equitable apportionment" title of the legal rule.

The equitable apportionment doctrine, however, is not an equitable claim raised by one sovereign against another, but the basis for dividing ownership among separated States. International law does not even draw the legal/equitable distinction of the common law. Under international law, equity translates into fairness. *See, e.g.,* T. Franck, FAIRNESS IN INTERNATIONAL LAW AND INSTITUTIONS 47-50 (1997).

Thus, equitable apportionment is simply a means of dividing property fairly when a nation divides into parts, as the Spanish Empire did in the Nineteenth Century. Each part of the former whole has a claim to property not in the possession of another nation.

### 4. The Recommendation errs in not applying the second basis for Peru's legal position – UNCLOS Article 149.

There is directly applicable admiralty law on the central issues before the Court.

### a. UNCLOS Article 149 awards historical objects lost at sea to the country of historical and archaeological origin.

Granted: this is an unprecedented matter in an emerging area of admiralty law. The international community, however, has agreed on the applicable rule of law – UNCLOS Article 149.

#### (1) UNCLOS Article 149 sets forth the appropriate rule and does so consistently with the modern international rules related to successor states.

As Ambassador Moore explains, UNCLOS Article 149 sets forth binding legal principles and any reasonable reading of its provisions would award the Treasure to Peru. Exhibit A at ¶¶ 32-38.

UNCLOS Article 149 grants preferential right to the country of archaeological or historical origin of all sunken "objects of an archaeological and historical nature" found in international waters, outside the preferential rights of any coastal state. Article 149, entitled "Archaeological and historical objects," states (with emphasis added):

> All objects of an archaeological and historical nature found in the Area [defined as "the seabed and ocean floor and subsoil thereof, beyond the limits of national jurisdiction," Article 1] shall be preserved or disposed of for the benefit of mankind as a whole, **particular regard being paid to the preferential rights of the State or country of origin, or the State of cultural origin, or the State of historical and archaeological origin**.

The rule set out in UNCLOS Article 149 follows the same logical and equitable format as the rules governing division of property following a state division, which, as Spain recognizes, are territorial in nature. Thus, since the Treasure came from Peru's mountains, refineries, mints, and people, the Treasure should go to Peru.

### (2) The Treasure is comprised of "objects of an archaeological and historical nature."

No party disputes that the Treasure is comprised of coins that constitute "objects of an archaeological and historical nature" under Article 149. For example, Article 1 of the UNESCO Convention on Protection of the Underwater Cultural Heritage defines "underwater cultural heritage" as "as all traces of human existence having a cultural, historical or archaeological character which have been partially or totally under water for at least 100 years."

### (3) Peru is the State or country of origin, or the State of cultural origin, or the State of historical and archaeological origin."

Although Peru is manifestly the "State or country of origin," "cultural origin," and "historical and archeological origin" of coins made within its territory by its people with its silver

and gold, both Spain and the Recommendation go to great lengths to avoid this telling and clear fact.

Indeed, Spain's convoluted word games are no more evident than when it tries to argue that Spain, and Spain alone, qualifies under Article 149 as "the State or country of origin, or the State of cultural origin, or the State of historical and archaeological origin." Without even pausing to consider why Article 149 uses three different descriptions, Spain claims it is all three on the specious grounds that "Peru" did not exist in 1804.

According to Spain: "Peru cites no authority for the proposition that a state not in existence at the time a vessel sinks can be its 'State or country of origin' for purposes of UNCLOS." Dkt. 161 at 8. The Magistrate clearly adopts Spain's unsupported contention that Peru did not exist in 1804, Recommendation at 3, and notes with apparent approval Spain's overall argument: "Regardless, Spain vigorously argues it, not Peru, is the 'country of origin' whose historical interests are to be protected under Article 149," Recommendation at 31 n.26.

Ambassador Moore, however, explains that Spain's argument, tacitly adopted by the Recommendation, is a classic example of both "begging the question" and "logic chopping." Exhibit A at ¶ 38. "In addition, why should language of 'cultural,' 'historical' and 'archaeological' be included in Article 149 if preferential rights were to be determined simply as a matter of temporarily cabined sovereignty." *Id.*

There is no principled basis to graft on to Article 149 Spain's requirement that the State of "origin," "cultural origin," or "historical and archaeological origin" be a political state in "existence" when the property was lost,[12] and neither Spain nor the Recommendation cite any

---

[12]Spain and the Recommendation also incorrectly assume that Peru had no sovereign status in 1804 as a result of Spain's claimed colonial domination of it.

authority for the proposed additional requirement.

Spain's rewriting of Article 149 is manifestly inequitable and would have the practical effect of dividing all sunken artifacts in the world among a handful of European nations, leaving the rest of the World with no rights to their own cultural heritage. Under Spain's version of Article 149, an artifact from Egypt found in the Mediterranean could go to Italy if lost when Cleopatra and Marc Anthony lived, or to England, France or Turkey if lost in the Nineteenth Century, but Egypt would be legally excluded from being called the State or country of origin, cultural origin, or archaeological origin for any items lost between 343 BC and 1922, when Egypt shed two millennium of claimed foreign dominion.

As stated by Ambassador Moore: "It is far-fetched indeed that a United Nations conference with a clear majority of developing countries powerfully opposed to colonialism would have had any such intent." *Id.* Article 149 resulted from a submission by Greece and Turkey, neither of which could have intended to empower the nations that looted their cultural treasures. Greece certainly is not likely to have drafted a rule of law that guaranteed that a priceless piece of its cultural past was going to sit next to the Elgin Marbles in the British Museum just because it was found on the wreck of British ship. *See, e.g.,* J. Merryman, IMPERIALISM, ART AND RESTITUTION at 132, 147 (2006).

If the next lost treasure ship contains a priceless piece of Incan art, to argue that Spain is the country of archaeological origin because, in Spain's words, "a state not in existence at the time a vessel sinks can[not] be its 'State or country of origin' for purposes of UNCLOS" is to place form over substance to the highest degree. *See* Dkt. 161 at 8.

The stilted version of Article 149 argued by Spain falls well short of Justice Holmes' admonition to apply rules in cases like this in an "untechnical spirit," 220 U.S. at 27, and the

dictates of the Vienna Convention on the Law of Treaties, which include: "A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose," Article 31.[13]

Finally, Spain's rendition of the rule is essentially unworkable, because it would necessitate identifying when an item was lost and require unraveling the convoluted history of colonialism. While the Mercedes can be identified and has a well-documented history, this will not always be the case. Under Spain's reinterpretation of Article 149, a court has no basis to award property to any sovereign without being able to date the loss. Even if the loss can be dated, in many cases, the court would be faced with competing claims of dominion or sovereignty over specific territory during the relevant period. Wars were fought during the Colonial Periods without resolving such questions. Spain's rule nonetheless requires those moot questions to be decided Centuries after-the-fact.

In short: "No amount of logic chopping can remove these artifacts from their physical, cultural and historical origin in Peru." Moore Affidavit, exhibit A, at ¶38.

### (4) The territorial limits of Article 149 are irrelevant to this dispute, because no nation makes a claim based on the rights of a coastal state.

The Recommendation, in part, refuses to apply Article 149 because Article 149 is found in the part of UNCLOS dealing with the "Area" (international waters beyond the jurisdictional rights of any coastal State), while the Treasure was found just outside the Area in the Exclusive Economic Zone ("EEZ") of Portugal. Recommendation at 31.

Ambassador Moore explains that Article 149's technical territorial limitation to the Area does not affect the Article's application here, because Article 149 is the only provision of

---

[13] The Vienna Convention on the Law of Treaties also cautions against interpretations that are "ambiguous or obscure" or which lead "to a result which is manifestly absurd or unreasonable." Article 32.

UNCLOS that mentions sovereign rights to historical objects found at sea. While the Treasure was found within Portugal's EEZ, that State is not making a claim based on any rights it might have as a coastal State. In the absence of a claim by Portugal, Article 149 binds this Court as the only relevant rule in UNCLOS or international law. Exhibit A at ¶¶ 32-34.

Neither the Recommendation nor Spain provide any support for the proposition that, if the rule of Article 149 is technically unavailable, Spain wins under some other, unstated rule.

No principled reason dictates a diametrically opposite result simply because the treasure was found in a legal gray area. Certainly, UNCLOS does not contain a contrary rule granting former colonizers heightened rights outside the Area. To the contrary, UNCLOS generally adopts the equitable rules found in other areas of international law. Dispute over rights within the EEZ of a State are to be determined, according to UNCLOS Article 59, "on the basis of equity and in the light of the interests involved of the parties as well as to the international community as a whole." Thus, the fact that the Treasure was found in the EEZ of Portugal does not provide a basis for avoiding application of the rule of Article 149.

### b. UNCLOS Art. 149 is binding United States law.

#### (1) The fact that Article 149 has yet to be applied by a United States court is not a reason to ignore it.

The Recommendation found Peru's reference to Article 149 "not persuasive" because "no court has applied" it. Recommendation at 31.

The binding nature of UNCLOS, including Article 149, however, comes from its universal acceptance in the international community, not whether there has been an opportunity for a court to apply it. This Court has that honor.

#### (2) The lack of ratification by the United States and Peru of UNCLOS does not affect the binding nature of Article 149.

The other reason the Recommendation refuses to apply UNCLOS Article 149 is that neither the United States nor Peru has ratified UNCLOS, but that failure also does not affect the binding nature of Article 149.

### (a) Spain ratified UNCLOS and therefore is bound to recognize its rule.

Spain has ratified UNCLOS, and therefore Spain is bound to recognize its provisions, which comprise part of Spanish law. *Reino de Espana v. American Bureau of Shipping, Inc.,* 528 F. Supp. 2d 455, 460-61 (S.D.N.Y. 2008)("This Court can, and must, recognize the [treaty's] limitations on pollution damage claims asserted by a country that has itself adopted the [treaty]. Spain, as a signatory to the [treaty], is bound by the [treaty's] provisions ….")(referring to a different admiralty treaty, not UNCLOS).

### (b) The United States is also bound to follow UNCLOS.

Although UNCLOS "is currently pending ratification before the Senate, it **nevertheless carries the weight of law from the date of its submission by the President to the Senate**." *United States v. Royal Caribbean Cruises,* 24 F. Supp. 2d 155, 159 (D.P.R. 1997)(emphasis supplied).

This is true because the "submission of the treaty to the Senate expresses to the international community the United States' ultimate intention to be bound by the pact." *Id.* (*citing* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW Section 312(3) and the Vienna Convention on the Law of Treaties).

This rule is especially applicable to UNCLOS, because the United States has repeatedly stated its intention to abide by UNCLOS. For example, on November 27, 2001, United States Ambassador Sichan Siv stated before the General Assembly: "The United States has long accepted the UN Convention on the Law of the Sea as embodying international law concerning

traditional uses of the oceans." Statement on Oceans and Law of the Sea, November 27, 2001 (available at www.state.gov/g/oes/rle/rm/6796. John D. Negroponte, the Assistant Secretary of State for Oceans and International Environmental and Scientific Affairs, stated: "The United States is now engaged in a deliberate, methodical process of promoting the universal application of rules of international law reflected in the non-seabed parts of the Convention." J. Negroponte, "Current Developments in the U.S. Oceans Policy," *U.S. Department of State Bulletin* 86 (September 1986).

### (c) UNCLOS reflects customary international law.

Even if the United States had not signed the Convention, the provisions of UNCLOS, including Article 149, would still be binding because they reflect customary international law.

As stated by the Ninth Circuit: UNCLOS "has been ratified by at least 149 nations, which is sufficient for it to codify customary international law…." *Sarei v. Rio Tinto, PLC.*, 456 F.3d 1069, 1078 (9th Cir. 2006), *opinion withdrawn and superseded on reh'g in part on other grounds*, 487 F.3d 1193 (9th Cir. 2007); *see also United States v. Royal Caribbean Cruise Lines Ltd.*, 11 F. Supp. 2d 1358, 1372 (S.D. Fla. 1998)("It does appear from all of the testimony produced in this case, as well as the caselaw in this area, that UNCLOS is properly considered customary international law."). The Eleventh Circuit referred to UNCLOS as indicative of international law in *United States v. McPhee,* 336 F.3d 1269, 1273 (11th Cir. 2003).

The Restatement notes that, "by express or tacit agreement accompanied by consistent practice, the United States, and states generally, have accepted the substantive provisions of the Convention, other than those addressing deep sea-bed mining, as statements of customary international law binding upon them apart from the Convention." RESTATEMENT at Introductory Note to Part V ("Law of the Sea")(citation omitted).

### (d) Expert testimony confirms the binding nature of UNCLOS.

Ambassador Moore also confirms the binding nature of UNCLOS on this Court, and it was error to ignore this evidence. *United States v. Royal Caribbean Cruise Lines Ltd.*, 11 F. Supp. 2d at 1372 (S.D. Fla. 1998).

### c. Given the unprecedented nature of this case and the international nature of admiralty law, UNCLOS Article 149 is the only acceptable rule of law.

In its undue reluctance to establish new law, the Recommendation refuses to recognize Article 149's binding nature or to apply its provisions for the first time.

That reluctance is inherently error, especially given the need for precedent in this growing area and the need for a simple, direct, and just rule like Article 149. "An impressive appellate opinion in [the *Titanic*] case underscores the need for a more stable and detailed regime of rules to govern the underwater heritage." J.A.R. Nafziger, *Historic Salvage Revisited*, 31 Ocean Devel. & Int'l L. 81, 83 (2000); *see also id.* at 85 (emphasizing need for "uniformity under the *jus gentium*").

The Recommendation points to no other rule of law that applies; instead, it distorts the sovereign immunity defense to avoid the issue entirely. But: if this Court applies the FSIA in its intended form, it must turn to some source for the applicable rule, and the best and only source is UNCLOS.

Article 149 reflects the considered and universal view of the greatest scholars in the area of maritime law, a law that has repeatedly been described as international in nature. Representatives from 160 nations took seven years to draft UNCLOS. To date, 158 nations, including Spain, have ratified UNCLOS, thus expressing their interest in the adoption of its

provisions. The United States government has also indicated that United States policy is to follow the rules set forth in UNCLOS.

One of the goals of UNCLOS was to set rights to historic wrecks, and the Convention does so in Article 149. "This need to address the issue of wreck ownership at an international level was considered by the drafters of the United Nations Convention on the Law of the Seas (UNCLOS), an international convention intended to govern most of the major issues affecting international maritime law …. **This convention was intended to augment and clarify the general principles of customary maritime law and clearly define the rights and obligations of member states with respect to historic wrecks**." R. Regan, *When Lost Liners Become Found: An Examination of the Effectiveness of Present Maritime Legal and Statutory Regimes for Protecting Historic Wrecks in International Waters with Some Proposals for Change*, 29 Tulane Maritime L. J. 313, 318 (2005)(emphasis supplied; footnote omitted).

Particularly in the peculiarly international arena of admiralty law, this Court should follow the lead of UNCLOS.

### V. Conclusion

At issue in this matter is Treasure of historic importance. Peru has an undeniable role in the Treasure's history, which gives Peru rights that are at least equal to Spain's.

The precedent established by this matter will also have historic importance. Indeed, Peru believes that the determination of its rights to its historical patrimony is as valuable as the Treasure itself.

The Recommendation, however, avoids the core ownership issue in this matter on the basis of assumed predicates and due to an unwarranted reluctance to decide an unprecedented and important dispute between two sovereigns, but Peru's claims are far too important to be

side-stepped without being properly addressed. It is also significant that Spain is not asking this Court to remove itself from this important controversy; Spain expressly requests that this Court provide Spain with affirmative relief – declaring Spain to be the owner of this Peruvian Treasure.

For these reasons, the Republic of Peru requests that this Court decline to adopt the Recommendation, conduct a *de novo* review of Spain's Motion, and deny that motion as to Peru, and that it set a schedule for addressing the merits of the dispute between Spain and Peru.

Respectfully submitted,

/s/ Mark Maney
Mark Maney (Trial Counsel)
Texas State Bar No. 12898200
Burford & Maney PC
700 Louisiana, Suite 4600
Houston, Texas 77002
713.237.1111
713.222.1475 (fax)
mmaney@burfordmaney.com

and

/s/ Timothy P. Shusta
Timothy P. Shusta
FBN: 442305
Phelps Dunbar LLP
100 S. Ashley Drive
Suite 1900
Tampa, FL 33602-5315
813-472-7550
813-472-7570 Fax
shustat@phelps.com
Attorneys for the Republic of Peru

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document was electronically filed with the Clerk of Court via CM/ECF system on July 21, 2009, which will generate and transmit Notices of Electronic Filing generated by the CM/ECF system, and was sent via e-mail to Joseph A. Rodriguez-Menendez on July 21, 2009.

/s/ Timothy P. Shusta
Timothy P. Shusta