

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN ADMIRALTY

ODYSSEY MARINE EXPLORATION, INC.

    Plaintiff                               CIVIL ACTION

vs.

                                 Case No. 8:07-CV-00614-SDM-MAP

THE UNIDENTIFIED, SHIPWRECKED
VESSEL, its apparel, tackle
appurtenances and cargo located within
center point coordinates:
provided to the Court under seal,
in rem

      Defendant
      In Rem

And

The Kingdom of Spain and the Republic of Peru,

    Claimants

And

Gonzalo de Aliaga (the Count of San Juan de Lurigancho),
Agustin de Aliaga (the current Marques de Zelada de la Fuente),
Gonzalo Alvarez del Villar, Ignacio de Colmenares (the 11th Count
Of Polentinos), Alberto Emilio Thiessen, Enriqueta Pita Duthurburu,Flora Leonor Perales
Calderon de Colmenares, Felipe Voyest, Adela
Armida de Izcue Bazo, Carola Daireux Kinsky, Eleonora Daireux Kinsky,
Matilde Daireux Kinsky, Julio Vega Eurasquin, Inez Marquez Osorio,
Javier de Goyeneche (the current Count of Guaqui and Marques de Villafuente)
*and* Jose Antonio Rodriguez Menendez aka Joseph Anthony Rodriguez
    Claimants                                            /

## Objection of Claimant, Jose Antonio Rodriguez Menendez (Menendez) to Magistrate's Report and Recommendation

### Summary

1. In this Admiralty matter, Honorable Magistrate Pizzo has issued a Report and Recommendation which may be summarized as follows:

    a. Spain's motion to dismiss (Doc. 131) and motion to vacate the arrest warrant (Doc. 132) be granted.

    b. Odyssey's amended complaint (Doc. 25) be dismissed and the warrant of arrest (Doc. 5) be vacated.

    c. All claims against the *res* be denied without prejudice.

    d. Odyssey, as the substitute custodian, be directed to return the *res* to Spain within ten days or as mutually agreed.

    (DOCKET NO. 209)

2. Menendez objects to the Report and Recommendation because it errs in properly applying the FSIA (Foreign Sovereigns Immunity Act) to this case, thus failing to secure this Court's *in personam* jurisdiction over the Kingdom of Spain (KS) and, in-so-doing, improperly waiving the liability of KS to Menendez.

### General Background

3. Plaintiff, Odyssey Marine Exploration (OME) and several claimants collectively termed the "named descendants" (ND) contend that a ship or ships, perhaps a Spanish Government ship—perhaps not, possibly "La Mercedes", sank in International Waters, circa 1804.

4. OME and ND contend that the ancestors of ND transported private cargoes of coins and other valuable items on "La Mercedes" prior to its sinking.

5. OME and ND contend that by transporting said private cargoes on "La Mercedes" in return for compensation, KS was effectively running a commercial *shipping-for-hire* operation—one of the exclusion categories of the FSIA—a Federal statute which, otherwise, normally grants foreign states sovereign immunity from liability before U.S. courts. To enjoy protection from liability, however, foreign states must insure that their conduct is characteristically that of a sovereign state—on strict state business—and neither commercial nor otherwise excludable by FSIA criteria. *Guevara v. Republic of Peru*, 468 F.3d 1289, (11th Cir. 2006)

6. Menendez presented himself before this Court as a non-possessory lien-holder. (DOCKET NO. 175).

7. Menendez's non-possessory lien consists of a four hundred forty-four year-old Asiento (contract) between his ancestor, Pedro Menendez de Aviles, Alonso de la Campa,(PMA) and Felipe II, King of Spain (and Chief Executive Officer of the Kingdom of Spain [KS]). The Asiento is for the Pacification and Settlement of Florida—clearly a fait compli—and provided for military and naval protection, administration, colonization, and development of the vast area formerly known as "La Florida", aka Spanish Florida, portions of which are now the United States of America and eastern Canada to Newfoundland—as delineated in said contract by Spanish King, Felipe II. The contract may stand alone, in the absence of shipwrecks, and appears to be valid and enforceable.

8. This executory contract is filed in KS's, Archivos de Indias (Archives of the Indies), Seville, Spain and is a Public Document. Furthermore, in The Enterprise of Florida, footnotes p. 47, U.S. PMA expert and author, Dr. Eugene Lyons,

identifies multiple Spanish and U.S. archives harboring copies of said contract. In Seville, Spain and elsewhere, this contract has been accessible to KS, the Republic of Peru (RP), Named Descendant Claimants (ND), and Odyssey Marine Exploration (OME) since 1565, or shortly thereafter. See 3/A,4/A, 1/A, 2/A, 9/A, 10/A, and 102/A

9. In pacifying and settling La Florida, PMA founded America's oldest, continuously occupied European city: Saint Augustine, Florida (1565-66). Saint Augustine was founded 211years and 223 years, respectively, before ratification of the U.S. Declaration of Independence and U.S. Constitution by the Founding Fathers of the United States of America.

10. For successful performance of such an ambitious Asiento (and its Panuco River, Mexico, extension), Felipe II, King of Spain promised Pedro Menendez de Aviles:

> "King Felipe II: We grant you in perpetuity, free of costs for you and your heirs and successors, one fifteenth part of all the income, mines of gold and silver, precious stones, pearls and products which We shall have from the said lands and provinces of Florida."

ENTERPRISE OF FLORIDA, p. 55; footnote 26. P. 229-233; THE OFFICE OF ADELANTADO, p. 655 See 3/A, 4/A, 5/A, 6/A, 7/A, 93/A and 102/A.

11. The only precondition for fulfillment of the aforementioned promise is that the Asiento's obligations be complied with by Pedro Menendez de Aviles, "his heirs and successors". The aforementioned promise is activated or enabled at the moment in time when His Majesty (KS) i.e. "We shall have [income, mines of gold and silver, precious stones, pearls and products] from the said lands and provinces of Florida." There is no mention and no requirement that the "gold and

silver, precious stones, pearls" must originate from La Florida. In fact, it was a regular practice in the colony of La Florida for treasure-laden shipwrecks to be salvaged by Spanish settlers and sailors and for the finders and KS itself to share in profits derived from the recoveries. PRIVILEGE AND OBLIGATION, p. 42-48; THE OFFICE OF ADELANTADO, p. 660. See 93/A and 105/A.

6. PMA prepared a Testament and a Codicil which were executed following his death in Santander, Spain, on September 17, 1574. PMA required that heirs of the Florida benefits, as stipulated by the Asiento, must bear the surname of "Menendez" and reside in Florida no less than ten years and have a spouse. PMA states that the intent of this requirement is to settle La Florida and to evangelize the native population. Menendez has complied with the intent of PMA's wish and Menendez actually has produced a Florida-born line of descent which resides in Florida. (Name of minor child is masked on tax returns.) See 79/A and 109/A.

7. A title of Adelantado (or adelantamiento) is linked to the Royal compensations offered to PMA, his heirs, and successors in the contracts. However three testamentary issues serve as precedents to cut the link between the title of Adelantado and the Royal compensations of the contracts. In his Will and Codicil of 1574, PMA:

1) Granted the title of Marques and the 25 league square Florida land tract to which the Marques title was attached to his illegitimate daughter, Ana Maria Menendez. She and her husband DID NOT receive the title of Adelantado which was given by PMA to his legitimate daughter, Catalina Menendez de Aviles. When Ana Maria Menendez and her husband,

Velasco, failed to produce succession, the title of Marques and the Florida land tract passed to Juan Menendez Marques, who also DID NOT receive the title of Adelantado which had passed to Pedro Menendez Marquez, "El Mozo", son of PMA's eldest brother Alvaro Sanchez de Aviles who had died years prior.

2) REQUIRED heirs and successors of the Florida-linked compensations to:

   a) Be christained and retain the surname of "Menendez"

   b) Have a spouse

   c) Reside in Florida for ten years—preferably in their own home.

3) Named several nephews and nieces—i.e. collateral descendants-- such as Bartolome de Leon y Quiros as heirs:

> I state and order that Bartolome de Leon y Quiros, my nephews, that have served me very well as pages, each be given 200 ducados of gold of the best of my assets.

Bartolome Leon y Quiros was a descendant of la Casa de Trasona (House of Rodriguez de Leon) as is the Claimant, Menendez.

SEE GENEALOGIST'S REPORTS. See 79/A.

8. Menendez has complied with the Florida residency requirements. His Cuban birth name is Jose Antonio Rodriguez Menendez, as reflected in his birth certificate and on his former Cuban passport. (As a naturalized U.S. citizen, Menendez now has a valid U.S. Passport). It is undersood that the current holder of the title of "Adelantado" is a resident of Spain and has not resided in Florida for ten years as mandated by PMA's Will and Testament. Furthermore, although being a native of

and residing in a Spanish-speaking country (where maternal surnames are retained) said titleholder has not retained the surname of Menendez —as a primary surname.

PRIVILEGE AND OBLIGATION, p. 46. See 105/A.

11. A successfully operating colony such as PMA's La Florida immerses itself in large-scale commerce and trade. La Florida was very much a commercial enterprise in the sixteenth century—as it is now. THE OFFICE OF ADELANTADO,p. 658; ENTERPRISE FLORIDA pp. 3-5, 18-33, 41-99; p. 208-210. Taxes were adjusted and collected cautiously, seemingly to avoid adverse effects on commerce and trade. PRIVILEGE AND OBLIGATION, pp. 50-52. See 105/A.

12. What began as a sole proprietorship venture soon became a joint venture which partnered Pedro Menendez de Aviles with KS. ENTERPRISE OF FLORIDA, APPENDIX 4 & 5, pp. 226 and 227. See 102/A.

13. For PMA and for KS there were obligations and privileges. Ibid., APPENDIX 2. See 102/A.

14. An Asiento for Adelantamiento—a contract for conquest and establishment of an operating colony—must be considered a commercial instrument, subject to the FSIA, which, in our case, binds the parties in perpetuity, as promised by Felipe II, King of Spain to Pedro Menendez de Aviles, Alonso de la Campa, his "heirs and successors" and as allowed by Florida Statute 689.225 (DOCKET No. 175, p.4, #5) and pertinent case law. In FLORIDA SUPREME COURT, *Old Port Cove*

*Holdings, Inc. et tal. v. Old Port Cove Condiminium Association One, Inc.*, Case

No. SC07-1032, the court asserts:

> We reaffirm our holding in <u>Iglehart</u> that rights of first refusal should be
> analyzed under the rule against unreasonable restraints, and close the door
> left open there by concluding that rights of first refusal are not subject to
> the common law rule against perpetuities. A right of first refusal is a
> contractual right. The rule against perpetuities, on the other hand, is "a
> rule of property law, not of contract law." <u>Iglehart</u>, 383 So. 2d at 614; see
> also <u>Warren</u>, 203 So. 2d at 526 (stating that an option does not vest the
> holder with an interest in the land, but is "strictly a contractual right, not a
> property right, while the rule against perpetuities is a rule of property
> rather than a rule of contract").

An Asiento for Adelantamiento is a contract. As such, it is NOT subject to the

statutory or common-law Rule Against Perpetuities. THE OFFICE OF

ADELANTADO, p. 656. See 93/A.

15. Under the Federal Foreign Sovereigns Immunity Act, KS is not immune to its

historic commercial promises and Asientos.

### The Parties

16. Plaintiff, OME, is a marine salvage firm corporately-registered in Nevada but

with its primary business office and operations headquartered in Tampa, Florida.

17. Defendant, Shipwreck etc., is possibly a late eighteenth/early nineteenth century

Spanish warship, "La Mercedes" (and/or perhaps others), discovered and partly

recovered by Plaintiff from International Waters. The Res reportedly consists of

silver, gold, gemstones, and other artifacts in coin, bullion and other form

reportedly valued in excess of $ 500 million in 2007. More than two hundred

Spanish sailors are reported to have died in the catastrophic powder-room

explosion that sank "La Mercedes".

18. Claimant, KS, is a parliamentary monarchy in western Europe. Today KS is a modern "G8" nation and key ally of the United States of America. In the fifteenth and sixteenth centuries, KS was the undisputed World Power and bankrolled Christopher Columbus's "discovery" of the New World. At the time, its European territory included the Iberian peninsula and much of Italy, as well as the Low Countries. At the zenith of its imperial power, KS claimed all of South America (except Brazil), Central America, most of the Caribbean, and much of North America. (Felipe II's Asiento defines "La Florida" as all real estate from the modern Florida border with Alabama, the modern Florida peninsula and the Eastern Seaboard to Newfoundland, Canada, while the Panuco River extension of said Asiento included the U.S. Southwest and northern Mexico to present-day Tampico/Veracruz.) The Louisiana Territory passed to Spain, momentarily, after the French and Indian (i.e. Seven Year) War ended in 1763. Spain held and settled California, Arizona, New Mexico, Colorado, and Texas for hundreds of years.

19. Claimant, Republic of Peru, (RP), is a modern Latin American nation arising from the ancient indigenous empires and cultures of the Andean and Amazonian regions of South America and from its three hundred-year status as an overseas colony of the Kingdom of Spain. Rich in natural resources, RP became a principal source of gold and other vital minerals for the Spanish Empire during the colonial period.

20. Named Descendants (ND) is a numerous group of claimants, some reportedly U.S.-based, some not. Several attorneys represent the various groups of ND. Their ancestors reportedly transported valuable private cargoes on the Spanish ship, "La

Mercedes", and these were lost when the ship sank. Presuming that the res constitutes cargo from "La Mercedes", they seek compensation.

Jose Antonio Rodriguez Menendez aka Joseph A. Rodriguez (Menendez) is a Cuban-born descendant of ancient, untitled Spanish Asturian nobles, termed "Hidalgos", via maternal lineages, such as "Menendez". As an example, the oldest House of Menendez is recognized by heraldists and genealogists to be located in Aviles. See <u>Dictionario de Heraldica</u>, by Jacques A. Schneiper Campos, Editorial Libsa, Madrid, 2001, p. 230:

> "This lineage originated in the Principality of Asturias and extended itself throughout the Iberian Peninsula and the Americas. The most ancient House of Menendez is found in Aviles"...

See 20/A.

Menendez is a naturalized U.S. citizen who has resided in Florida since 1991. He has owned his home in Broward County since 1994, he is married, and has a Florida-born descendant who is less than 18 years of age. Menendez is a collateral descendant of Pedro Menendez de Aviles, Alonso de la Campa—Adelantado of Florida. He is an "heir" of Pedro Menendez de Aviles, Alonso de la Campa in accordance with the Asiento (contract), Testament, and codicil to said Testament which establishes a precedent of collateral descent.See 8/A, 79/A, 89/A, 106/A, 107/A and 109/A. See Genealogist's Reports.

Jurisdiction

21. This U.S. District Court for the Middle District of Florida has jurisdiction over this case because it involves the U.S. Constitution, Federal law, and treaties of the United States: USC 28 section 1331.

22. This U.S. District Court for the Middle District of Florida has jurisdiction over this case because it involves citizens of different States, and citizens of a State and citizens or subjects of a foreign state: USC 28 section 1332.

23. This U.S. District Court for the Middle District of Florida has jurisdiction over this case because the district courts shall have original jurisdiction, exclusive of the courts of the States, of:

> Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled and of any prize brought into the United States and all proceedings for the condemnation of property taken as prize: USC 28 section 1333.

24. Most importantly, in matters involving foreign states, jurisdiction is determined by application of the FSIA and the so-called, "restrictive theory", of immunity.

25. The FSIA provides that a foreign state shall not be immune from the jurisdiction of courts of the Unites States or of the States in any case:

> In which the action is based [i] upon a commercial activity carried on in the United States by the foreign state, or [ii] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [iii] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

See *Republic of Argentina v. Weltover* and *Saudi Arabia v. Nelson.*

26. Operation of the colony La Florida from 1565 to 1821 was steeped in commerce and trade and took place within a territory that later became "in the United States".

27. Furthermore, from July 4, 1776 until 1898 (or so) Spain controlled lands on the mainland of North America and/or the islands of Cuba, Puerto Rico, and

Hispaniola and Spanish trade and commerce with the United States had a significant effect "in the United States".

28. Commercial activity includes "a broad spectrum of endeavor," activities "customarily carried on for profit," "a contract which might be made by a private person," and activities such as sale of a service or a product, leasing of property; borrowing money, employment or engagement of laborers or agents, and investment in a security. "[T]hat goods or services to be procured through a contract are to be used for a public purpose is irrelevant...Thus, a contract by a foreign government to buy provisions or equipment for its armed forces or to construct a government building constitutes a commercial activity", 1976 U.S.C.C.A.N. at 6614-15.

29. KS's many colonies were administratively linked and collaborative. KS mined the silver, gold, and gemstones in RP. This cargo was shipped to other New World Spanish colonies and to Spain, itself. In our case, the undersea cargo was intercepted by OME which then transhipped the ancient cargo to Tampa—on the soil of Florida—where the four hundred forty-four year-old Asiento is invoked. Thus, an Asiento involving the Pacification and Settlement of Florida, is signed in 1565 by KS and an ancestor of Menendez. Duly signed and activated, this ancient Asiento is now linked to disposition of the valuable cargo from an 1804 sunken ship which was sailing from the Spanish colony of Peru to Spain and transporting said cargo, portions of which were reportedly commercial in nature. Florida is the common denominator and is (after 1821) an integral part of the United States of America. See FSIA section 1605(a) (2) , clauses one, two, and three.

30. Today OME has transferred much of the *res* to Florida where it now rests. This Court had initially assumed *res* jurisdiction but now contemplates granting summary judgment to KS based upon the perceived absence of FSIA exclusion critera. A U.S. court should be able to adjudicate a case when sufficient effects occur in the United States whether or not the foreign state intended or could foresee the effects.

31. In *Voest-Alpine Trading*, the Fifth Circuit observed that when a non-trivial aspect of the performance of a contract or commercial transaction occurs in the United States, a claim based on the contract or transaction would typically satisfy either the first or second clause of the commercial activity exception. For that reason, cases based on a foreign state's failure to meet a contractual obligation to pay or perform at a location in the United States, such as *Weltover*, are properly analyzed under the first clause.

32. General jurisdiction is a personal jurisdiction concept meaning that the defendant may be sued at a particular location—such as "La Florida" as defined by the Asiento of King Felipe II—on any claim, whether the claim has any connections with the location or not. Justice Stevens in Nelson, 507 U.S. at 379 & n.3 (Steven, J., dissenting), suggested that the first clause of section 1605(a)(2) authorizes general jurisdiction, but most courts insist on a connection between the claim and the U.S. contacts. These courts have relied on the plain language of the statute, which makes clear that "the action" in each particular case must be "based upon" the commercial activity, act, or effect connected with the United States, and the key legislative history, which states that each of the immunity provisions

except the waiver provision "requires some connections between the lawsuit itself and the United States." 1976 U.S.C.C.A.N. at 6612.

33. And finally, the FSIA's tort exception, 28 USC section 1605(a)(5), provides that a foreign state shall not be immune from jurisdiction in any case:

> not otherwise encompassed [by the commercial activity exception], in which money damages to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment;

KS is cognizant of its contractual obligation to comply with the Asiento between itself, and PMA's "heirs" yet omits doing so and subjects itself to liability and a potential order by this Court for specific performance of the Asiento: Payment to Menendez of 1/15 (or 6.7%) of that portion of the value of the *res* which may be awarded to KS by this Court.

34. Despite this, the Spanish Crown Prosecutor ("Fiscal") linked to the Casa de Contratacion (New World contracting agency) alleged that PMA, his "heirs and successors" had failed to comply fully with the Asiento and were ineligible to enjoy any of its various benefits and compensations. The Fiscal accused PMA of failing to import five hundred African slaves as required by the Asiento:

> Furthermore: You pledge yourself to import to the aforesaid country, within the said three years, five hundred [negro] slaves for your service and that of the people you are to take over, and in order that the towns may be built and the land cultivated with greater ease; and for planting sugar cane for the sugar mills that may be built, and for building the said sugar mills.

ENTERPRISE OF FLORIDA p.49, ST. AUGUSTINE FOUNDATION, p. 7

35. A prolonged lawsuit ensued which finally ended in the early 1630's—largely in favor of PMA, his "heirs and successors"—and several benefits and compensations were granted to the victors. The full complement of benefits and compensations were seemingly not authorized in the Real Provision ruling because five hundred African slaves had not been imported to La Florida by PMA, "his heirs and successors". See 101/A.

36. Slavery is now unlawful in Spain and in the United States. As such, failure to engage in  slave trade may no longer be required by Spain in order for PMA's "heirs and successors" to enjoy the full benefits and compensations of the Asiento.

37. Menendez is unaware of any unilateral or bilateral termination of the Asiento— an executory contract—by the King of Spain, KS (a sovereign state) nor by PMA, his "heirs and successors".

38. Since then, a grateful KS has graced  Menendez de Aviles descendants with a number of benefits. Among the first to be graced were members of the "First (or American) Branch" of PMA's family tree: The Menendez Marquez line. These somewhat distant collateral descendants of PMA became beneficiaries of PMA's Will and Testament by virtue of its generous inheritance scheme.  The Menendez Marquez line inherited an enormous land grant in northern Florida (measuring 25 leagues per side) which had  initially been granted to PMA via the Asiento with KS.  This land grant (a working cattle ranch) known as "La Chua" was held by Menendez Marquez until the twilight of the First Spanish Period of Spanish ownership of Florida—ending in 1763—when Florida was traded by Spain to

Britain for Cuba at the end of the Seven Year War (known to Americans as the French and Indian War).

39. Graced by KS for approximately one hundred fifty years, Menendez Marquez family members were rulers of Florida (Treasury officials) for five generations between PMA's death and the Spanish Removal (to Havana, Cuba) of 1763.

40. Menendez de Aviles relatives in Spain did not lag behind in their collaborative relationship with KS. They too were graced by KS for services rendered to the Crown. One of these was the title and linked privileges granted to Martin Menendez de Aviles y Porras: Conde (English: Count) de Canalejas.

41. A yet closer relative of Menendez and, like Menendez, a descendant of la Casa de Trasona (aka Casa de Rodriguez (de) Leon), Cayetano Osorio y Navia (a descendant of Mayor de Leon Menendez de Aviles) was granted the title of Marques de Ferrara, in Asturias. It is believed that Cayetano and Menendez descend from Maria Alonso de Arango (mother of PMA) and her marital union with second husband, Juan Martinez de Sabugo. ("Menendez" is actually the surname of Elvira Menendez de Arango—mother of PMA's mother, Maria Alonso de Arango. "Menendez" was not a surname carried by PMA's father: Alonso Alvarez de Aviles aka Juan Sanchez de Aviles. It was common in sixteenth century Asturias to select the surname of one's more influential parent—in this case "Menendez", on the maternal side. "de Aviles" was a proper surname of PMA's paternal side.) See 91/A.

42. Aviles y Porras (younger brother of Martin) who had served in childhood as assistant to the Queen in the Royal quarters. This encomienda was granted to

Gabriel in 1781. An encomienda was an area served by a titled noble such as Gabriel Menendez de Aviles y Porras. Said area of natives paid tribute to said vasal of the Crown. See 108/A.

43. Impatient and seeking to enjoy the privileges of his Asiento with King Felipe II:

> Pedro Menendez de Aviles took advantage of a six-year letter-of-marque entitling him to any prizes he or his men might take, subject to the Crown share of one-third.

44. PMA's "heirs and successors" continued to serve KS. Menendez descendants have provided the Kingdom of Spain with invaluable military services for generations. Narciso Menendez Suarez Solis (Menendez's great great great grandfather) requested license to travel to Cuba in 1825 to "ejercitarse", i.e. enlist in the "ejercito" or Spanish land army in the Spanish Province of Cuba. Narciso's namesake and grandson, Narciso Menendez Rosales, entered the Voluntarios de Espana in Cuba in 1885 and earned the rank of second lieutenant by 1894. Menendez family legend relates that Narciso Menendez Rosales fought furiously and valiantly throughout the Spanish-American War, until its terminus in 1898, in defense of the interests of his Majesty, the King of Spain. Family legend relates, that Narciso Menendez Rosales ended his service to KS at the combat rank of Captain.SEE 24/A, 99/A.

45. In return, KS continued to reward PMA's "heirs and successors" for their participation in defending and promoting KS.

46. In fact:

> The King felt a particular obligation to conquistadores and their heirs. In spite of the fact that Pedro Menendez died without a very secure hold on Florida and it never became an economically profitable colony, the Crown settled 40,000 ducats, a fishery, and numerous honors on the heir to his

entailed estate in 1648, Martin Menendez de Aviles y Porras, although he represented a far-removed collateral line.

PRIVILEGE AND OBLIGATION, p. 72-74. See 101/A.

47.    KS is cognizant of the continued validity and applicability of the Asiento between Pedro Menendez de Aviles, Alonso de la Campa and Felipe II, King of Spain.  KS Is also cognizant of its obligation to grant Menendez 6.7% of any recovery of "income, mines of gold and silver, precious stones, pearls and products " by KS from the "from the said lands and provinces of Florida." Although paragraph #33 above shall not apply to "interference with contract rights" such "interference" alludes to any potential Menendez contractual right before a third party not Menendez's contractual rights before KS as stipulated in the Asiento.

43. Treaties between Spain and the U.S. and with Britain as well as the U.S. Constitution safeguard the Asiento of PMA with King Felipe II of KS.

44. Treaty of Paris 1763  [The definitive Treaty of Peace and Friendship between his Britannick Majesty, the Most Christian King, and the King of Spain. Paris February 10, 1763.] states…

> Art. XX. His Britannick Majesty farther agrees, that the Spanish inhabitants, or others who had been subjects of the Catholick King in the said countries, may retire, with all safety and freedom, wherever they think proper; and may sell their estates, provided it be to his Britannick Majesty's subjects, and bring away their effects, as well as their persons without being restrained in their emigration, under any pretence whatsoever, except that of debts, or of criminal prosecutions: the term limited for this emigration being fixed to the space of eighteen months, to be computed from the day of the exchange of the ratifications of the present treaty. It is moreover stipulated, that his Catholick Majesty shall have power to cause all the effects that may belong to him, to be brought away, whether it be artillery or other things.

45. Constitution of the United States asserts, unambiguously:

Article I; section 10. No State shall...pass any...ex post facto Law, or Law impairing the Obligation of Contracts...

Article XI. All Debts contracted and Engagements entered into, before the Adoption of this Constitution, shall be as valid against the United States under this Constitution, as under the Confederation.

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

47. Treaty of Friendship, Limits, and Navigation Between Spain and The United States; October 27, 1795 states...

ART. VII. The Citizens and Subjects of both Parties shall be allowed to employ such Advocates, Solicitors, Notaries, Agents, and Factors, as they may judge proper in all their affairs and in all their trials at law in which they may be concerned before the tribunals of the other Party, and such Agents shall have free access to be present at the proceedings in such causes, and at the taking of all examinations and evidence which may be exhibited in the said trials.

ART. XI. The Citizens and Subjects of each Party shall have power to dispose of their personal goods within the jurisdiction of the other by testament, donation, or otherwise; and their representatives being Subjects or Citizens of the other Party shall succeed to their said personal goods, whether by testament or ab intestate and they may take possession thereof either by themselves or others acting for them, and dispose of the same at their will paying such dues only as the inhabitants of the Country wherein the said goods are shall be subject to pay in like cases, and in case of the absence of the representatives, such care shall be taken of the said goods as would be taken of the goods of a native in like case, until the lawful owner may take measures for receiving them. And if question shall arise among several claimants to which of them the said goods belong the same shall be decided finally by the laws and Judges of the Land wherein the said goods are. And where on the death of any person holding real estate within the territories of the one Party, such real estate would by the laws of the Land descend on a

Citizen or Subject of the other were he not disqualified by being an alien, such subject shall be allowed a reasonable time to sell the same and to withdraw the proceeds without molestation, and exempt from all rights of detraction on the part of the Government of the respective states.

ART. XX. It is also agreed that the inhabitants of the territories of each Party shall respectively have free access to the Courts of Justice of the other, and they shall be permitted to prosecute suits for the recovery of their properties, the payment of their debts, and for obtaining satisfaction for the damages which they may have sustained, whether the persons whom they may sue be subjects or Citizens of the Country in which they may be found, or any other persons whatsoever who may have taken refuge therein; and the proceedings and sentences of the said Court shall be the same as if the contending parties had been subjects or Citizens of the said Country.

48. Treaty of Florida Purchase 1819 [Treat of Amity, Settlement, and Limits Between the

United States of America and His Catholic Majesty] states...

Article VIII. All the grants of land made before the 24th of January, 1818, by His Catholic Majesty, or by his lawful authorities, in the said territories ceded by His Majesty to the United States, shall be ratified and confirmed to the persons in possession of the lands, to the same extent that the same grants would be valid if the territories had remained under the dominion of His Catholic Majesty...

Certificate of Service

I hereby certify, on July 20, 2009, that I caused the attached documents to be served upon

the Court:

Clerk of Court
Sam M. Gibbons U.S. Courthouse
801 N. Florida Avenue
Tampa, FL 33602

and upon attorneys of record for the parties listed below, by Fedex Carrier to:

Allen von Spiegelfeld/
Eric C. Thiel
Fowler, White, Boggs, Banker, P.A.          AND          James A. Goold, Esq.
501 E. Kennedy Blvd.- Ste. 1700                              Covington & Burling, LLP

P.O. Box 1438
Tampa, FL 33601-1438
Fax: (813) 229-8313

Attorneys for Plaintiff (Odyssey Marine)

Melinda J. MacConnel—FBN 871151
Odyssey Marine Exploration, Inc.
5215 West Laurel Street
Tampa, FL 33607
(813) 876-1776, ext. 2240
Fax: (813) 830-6609
Email: mmacconnel@shipwreck.net

Attorneys for Plaintiff

John D. Kimball, Esq.
Blank Rome LLP
405 Lexington Avenue
New York, NY 10174
(212) 885-5259
Fax: (917) 332-3730
Email: jkimball@blankrome.com

Attorneys for Plaintiff

K. Russell LaMotte
Beveridge & Diamond, PC
Suite 700
1350 1 St. NW
Washington, DC 20005-3311
Tel. (202) 789-6080
Fax (202) 789-6190
Email: rlamotte@bdlaw.com

Attorneys for Plaintiff

1201 Pennsylvania Avenue, NW
Washington, D.C. 20004
Fax: (202) 662-6291
Email: jgoold@cov.com
Attorneys for Kingdom of Spain

David C. Banker/
Jeffrey Carter Andersen/
Keith Dennis Skorewicz
Florida Bar 352977
Bush Ross, PA
1801 North Highland Avenue
Tampa, Florida 33602-2656
(813) 244-9255

(813) 223-9620
Kingdom of Spain

Mark Maney (Trial Counsel)
Texas State Bar No. 12898200
South Tower, Pennzoil Place
711 Louisiana, Suite 3100
Houston, Texas   77002
Tel (713) 654-8001
Fax (713) 654-8818
mmaney@maneylaw.com
Attorneys for the Republic of Peru

And

Timothy P. Shusta
FBN: 442305
Phelps Dunbar LLP
100 S. Ashley Drive
Suite 1900
Tampa, FL   33602-5315
Tel. (813) 472-7550
Fax (813) 472-7570
Shustat@phelps.com
Attorneys for the Republic of Peru

Marlowe V. White, Jr.
Lewis & White, PLC
222W. Georgia St.
P.O. Box 1050 Tallahassee, FL   32302
Tel. (850) 425-5000
Fax (850) 425-5004
Email:  lawlaw@polaris.net
Attorney of Elsa Dorca Whitlock
David Paul Horan
FL Bar 142474
Horan, Wallace, and Higgins, LLP
608 Whitehead Street
Key West, FL   33040
Tel. (305) 294-4585
Fax (305) 294-7822
Attorney of Named Descendants

John J. McLaughlin
Wagner, Vaughan & McLaughlin, P.A.
601 Bayshore Blvd., Suite 910
Tampa, FL   33606

Tel. (813) 225-4000
Fax (813) 225-4010
Attorney of Santiago & Emilio Alvear,
Maria Eugenia, Agustina, & Ignacio Solveyra,
And Elsa Dorca Whitlock

Guy Ellington Burnette, Jr.
Guy E. Burnette, Jr., P.A.
3020 N. Shannon Lakes DR
Tallahassee, FL   32309
Tel. (850) 668-7900
Fax (850) 668-7972
Email:  geb@gburnette.com
Attorney of Dr. Jaime Durand Palacios

Respectfully submitted,

Joseph A. Rodriguez
Pro Se/ Unrepresented Party

4611 South University Drive
Davie, FL 33328-3817
Tel. (954) 804-4115
Email: Expertdoctor@aol.com