# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION
## IN ADMIRALTY

ODYSSEY MARINE EXPLORATION, INC.,

                Plaintiff,                CIVIL ACTION

      v.

                                        Case No. 8:07-cv-00614-SDM-MAP

THE UNIDENTIFIED SHIPWRECKED VESSEL,
If any, its apparel, tackle, appurtenances and
cargo located within a five mile radius of the
center point coordinates provided to the Court
under seal,

                Defendant,
                *in rem*

and

THE KINGDOM OF SPAIN, THE REPUBLIC OF PERU, AND
GONZALO DE ALIAGA, *et al.,*

                Claimants.
_____/


## KINGDOM OF SPAIN'S RESPONSE TO
## OBJECTIONS OF ODYSSEY MARINE EXPLORATION
## AND INDIVIDUAL CLAIMANTS TO THE MAGISTRATE
## JUDGE'S JUNE 3, 2009 REPORT AND RECOMMENDATION

**TABLE OF CONTENTS**

Page

I.   THE COURT NOT ONLY MAY WEIGH THE EVIDENCE AND MAKE FACTUAL FINDINGS TO DETERMINE SUBJECT MATTER JURISDICTION, IT IS REQUIRED TO DO SO BY THE FOREIGN SOVEREIGN IMMUNITIES ACT. .................................................................... 3

II.  THE MAGISTRATE JUDGE'S FACTUAL FINDINGS ARE AMPLY SUPPORTED. .................................................................................................... 8

     A.   The *Mercedes*'s History and Ownership Is Indisputably Documented. ................. 8

     B.   Odyssey Knew the *Mercedes* Is Off Limits to Unauthorized Disturbance. .......... 12

     C.   The Finding that the *Res* is the *Mercedes* Is Compelled by Overwhelming Evidence. ................................................................................................ 15

III. THE R&R CORRECTLY CONCLUDES THAT THE *RES* IS PROTECTED BY SOVEREIGN IMMUNITY. ........................................................................ 20

     A.   No "Commercial Activity" Exception Applies. ................................................... 20

     B.   International Law Further Confirms the Immunity of the *Res*. ........................... 26

          1.   *The U.S.-Spain Treaty of Friendship and General Relations Mandates Recognition of the* Mercedes*'s Immunity.* ................................. 27

          2.   *Multilateral Treaties Further Confirm the Immunity To Which the* Mercedes *Is Entitled.* ............................................................... 30

     C.   Immunity Does Not Depend on Physical Possession. .......................................... 32

     D.   Section 1605(b) Provides No Back-Door Exception to Foreign Sovereign Immunity Here. ..................................................................................... 33

IV.  THE R&R APPROPRIATELY RECOGNIZES THE COMPELLING INTERNATIONAL COMITY CONSIDERATIONS IMPLICATED BY THIS CASE. ...................................................................................................... 34

     A.   Exercising Jurisdiction Over the *Res* Would "Frustrate FSIA's Goals and Impermissibly Prejudice Spain." ............................................................ 34

     B.   The R&R Recognizes The Heightened Comity Interest in Protection of Military Vessels and Military Casualties. ................................................... 38

V.  THE R&R'S RECOMMENDED DISPOSITION OF THE *RES* IS CORRECT AS A MATTER OF LAW. ................................................................... 40

    A.  The R&R Appropriately Recommends Release of the *Res*. ............................... 40

        1.  *Odyssey Has No "Right to Possession" of The* Res*; It Is Merely The Substitute Custodian For The U.S. Marshal.* ..................................... 41

        2.  *The* Res *In The Marshal's Custody Is to Be Released "Upon the Dismissal of The Action."* ....................................................... 42

        3.  *The Return of The* Res *Is Contemplated By FSIA Section 1609.* .............. 42

CONCLUSION ...................................................................................................... 44

The Kingdom of Spain ("Spain") hereby responds to the Objections of Odyssey Marine Exploration, Inc. ("Odyssey") (Doc. 230) and individual claimants (Docs. 227-29, 234) to Magistrate Judge Mark A. Pizzo's Report and Recommendation of June 3, 2009. (Doc. 209.)

The Report and Recommendation of Magistrate Judge Pizzo ("R&R") reflects careful review of the factual evidence and legal arguments offered by all parties, and applies well-settled principles of law to conclude that (1) Spain's Motion to Dismiss Or For Summary Judgment (Doc. 131) is well-founded and should be granted, and (2) the arrest of Spain's sovereign vessel should be vacated and the *res* should be returned to Spain. As the threshold and dispositive factual matter, Magistrate Judge Pizzo found that "[t]he *res* is the *Mercedes*," a Frigate of War of the Spanish Navy that sank in battle in 1804. (R&R at 12.) Indeed, the "evidence as to the *res*'s identity is so one-sided that Spain would prevail as a matter of law" on this issue. (*Id.* at 12 n.10.) Having found that the *res* the *Mercedes* is "[u]nquestionably . . . the property of Spain" (*id.* at 17), the Magistrate Judge rightly concluded that it inevitably followed as a matter of law that the *res* is entitled to sovereign immunity from arrest and from the claims against it, and that immunity is reinforced by compelling principles of comity.[1]

The Objections of Odyssey and the individual claimants fail to show anything remotely approaching error in the analysis and conclusions of the Magistrate Judge. Instead, they recycle arguments that were squarely addressed and refuted in his R&R.[2] Magistrate Judge Pizzo put it

---

[1] The R&R also concludes that Spain's separately-filed Motion to Vacate Arrest Warrant (Doc. 132) should be granted. (R&R at 34.) That motion included additional factual and legal grounds for vacating the arrest and dismissing Odyssey's claims against the *res*, including misconduct by Odyssey in procuring the arrest.

[2] The Objections of individual claimants (Docs. 227-229, 234) largely adopt or restate Odyssey's arguments. Spain therefore responds to those arguments jointly herein. Spain cites the (continued…)

well: Odyssey's arguments are "without merit as all evade the FSIA's goals, its statutory scheme, and the special status accorded warships per the various treaties and agreements § 1609 necessarily incorporates."  (R&R at 18.)  Contrary to Odyssey's assertions, Magistrate Judge Pizzo properly considered the evidentiary record to find that the *res* is the *Mercedes* and, thus, the remains of a warship of great historical importance to Spain and the resting place of more than 250 Spanish sailors and family members.  There is no error in recognizing that the *Mercedes* is entitled to the same respect and protection to which U.S. sovereign vessels and military casualties are entitled, as the United States itself has shown compellingly in this case. *See* Statement of Interest and Brief of the United States as *Amicus Curiae* in Support of the Kingdom of Spain. (Doc. 235-2, "U.S. Stmt. of Int.".) Spain respectfully submits that the Court should affirm the granting of Spain's motions and the return of the *res*.

## STANDARD OF REVIEW

Under Section 636 of the Magistrates Act, a district court may make a "de novo determination of those portions of the [magistrate's report and recommendations] to which objection is made." *United States v. Raddatz*, 447 U.S. 667, 673 (quoting 28 U.S.C. § 636).  "[I]n providing for a 'de novo determination' rather than de novo hearing, Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations." *Id.* at 676.  It is also "incumbent upon the parties filing objections to an R&R to specifically identify those findings objected to and the

---

Objections of Odyssey as "Objs," and refers to the Objections of individual claimants by name where necessary.  In addition, Spain has simultaneously filed a Response to Claimant Republic of Peru's Objection to the R&R. (Doc. 231.)  Spain's Response to Peru's Objection is incorporated by reference herein.

specific basis for such objections." *State Contracting & Engineering Corp. v. Condotte America, Inc.*, 368 F. Supp. 2d 1296, 1300 (S.D. Fl. 2005); *see also Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir.), *cert. denied*, 488 U.S. 983 (1988). "If an objection fails to identify the specific findings or a specific basis the district court need not consider it." *Condotte America, Inc.*, *id.*

## ARGUMENT

I.     **THE COURT NOT ONLY MAY WEIGH THE EVIDENCE AND MAKE FACTUAL FINDINGS TO DETERMINE SUBJECT MATTER JURISDICTION, IT IS REQUIRED TO DO SO BY THE FOREIGN SOVEREIGN IMMUNITIES ACT.**

Odyssey begins its Objections by seeking to create the appearance of procedural error where none exists. Odyssey argues that Magistrate Judge Pizzo applied the "wrong standard of review" (Objs. at 5), the Rule 12(b)(1) standard delineated by the Eleventh Circuit for deciding factual challenges to subject matter jurisdiction. (*See* R&R at 4 (citing *Morrison v. Amway Corp.*, 323 F.3d 920 (11th Cir. 2003) and *Scarfo v. Ginsberg*, 175 F.3d 957 (11th Cir. 1999)).) According to Odyssey, Magistrate Judge Pizzo should have applied the "Rule 56 summary judgment standard," and genuine issues of material fact compel further proceedings. (Objs. at 4, 6, 11-21.) Conspicuously absent from Odyssey's argument is acknowledgement that the R&R expressly notes that it did consider the Rule 56 summary judgment standard and found that the evidence was "so one-sided" that Odyssey had failed to show a genuine issue of material fact under that standard, and Spain's motion would therefore be granted under Rule 56 even if it were applicable. (R&R at 5 n.5 and 12 n.10.)

The case law applying the Foreign Sovereign Immunities Act makes clear that this Court not only *may* make findings of fact when examining whether it has jurisdiction, it is *required* to

do so in order to carry out the Act.  There was no error by Magistrate Judge Pizzo in weighing the evidence and finding that the *res* is the *Mercedes*, a Spanish Navy Frigate of War that exploded and sank under attack by a British Navy squadron on October 5, 1804.  Magistrate Judge Pizzo applied the standard that this District and other courts consistently apply when, as Spain has done here, a foreign sovereign brings a factual challenge to jurisdiction under the FSIA.  (R&R at 4.)  As the R&R correctly points out, when a Rule 12(b)(1) motion brings a factual challenge to subject matter jurisdiction under the FSIA, the court "is free to independently weigh the facts" related to the FSIA's application.  (*Id.*)

Odyssey argues that Magistrate Judge Pizzo erred because the jurisdictional facts here are purportedly "intertwined with the merits of the plaintiff's claim[s]" and should have been evaluated under the more stringent Rule 56 standard.  (Objs. at 6.)  But, apart from the fact that the R&R did take the Rule 56 standard into account and found that Odyssey's opposition to Spain's motion failed even under that standard, the "intertwined" exception to the Rule 12(b)(1) standard does not apply in FSIA cases in any event.

Tellingly, Odyssey cites no case holding that the "intertwined" exception applies to a Rule 12(b)(1) motion bringing a factual challenge to jurisdiction under the FSIA.  To the contrary, the FSIA case law is legion—in this district and elsewhere—that, when a foreign sovereign contests subject matter jurisdiction under the FSIA, courts have "the authority to resolve factual disputes, along with the discretion to devise a method for making a determination with regard to the jurisdictional issue."  *Kelly v. Syria Shell Petroleum Dev., B.V.*, 213 F.3d 841, 849 (5th Cir. 2000) (quoting *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994)); *see also, e.g.*, *S & Davis Int'l, Inc. v. Republic of Yemen*, 218 F.3d 1292, 1295-97, 1299-1300, 1302-03 (11th Cir. 2000) (evaluating facts derived from the evidentiary record to

determine whether the denial of a Rule 12(b)(1) motion to dismiss under the FSIA was proper).

Indeed, when a foreign sovereign has made the threshold factual showing in support of its invocation of sovereign immunity, as Spain did and more, it is error *not* to weigh the evidence and determine as expeditiously as possible whether the Court has subject matter jurisdiction. *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 38 (D.C. Cir. 2000) (remanding due to district court's failure to "settle[] any contested jurisdictional facts necessary to decide [the foreign sovereign']s motion to dismiss under the FSIA"); *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1019 (2d Cir. 1993); *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 451 (6th Cir. 1988). This Court has recognized and applied these principles in this case, moreover, in its June 11, 2008 Order noting that "because Spain's assertion of sovereign immunity is a challenge to this Court's jurisdiction, the Court is duty-bound to determine this issue at the earliest possible stage in the case." (Doc. 114, Order, at 1 (citing *Guevara v. Republic of Peru*, 468 F.3d 1289, 1309 (11th Cir. 2006)).)

Odyssey overlooks this authority and disparages as "unprecedented" *Moran v. Kingdom of Saudi Arabia*, an analogous Fifth Circuit case that squarely addressed whether the "intertwined" exception applies in the FSIA context. (Objs. at 6.) In *Moran*, the appellant argued that the district court erred in applying a Rule 12(b)(1) standard when it dismissed the complaint under the FSIA because the jurisdictional facts were "intertwined with the merits" of the claim against a foreign sovereign. *Moran*, 27 F.3d at 172. The Fifth Circuit rejected that argument and affirmed the dismissal. *Id.* at 172-73; *accord Kelly*, 213 F.3d at 849 (citing *Moran* to "resolve a factual dispute" regarding FSIA jurisdiction).

Despite Odyssey's claim that "[no] . . . district court in this Circuit has applied" these principles (Objs. at 6), this very District Court has done just that. In *Howland v. Hertz*

*Corporation*, cited in this Court's June 11, 2008 Order (Doc. 114), Indonesia moved under the FSIA to dismiss tort claims against it, arguing that the Bank of Indonesia employee who injured the plaintiff was not acting within the scope of her employment. 431 F. Supp. 2d 1238, 1244 (M.D. Fla. 2006). The court applied the Rule 12(b)(1) standard to resolve "specific facts crucial to an immunity determination" and dismiss claims against an instrumentality of the Republic of Indonesia; in that case, facts as to whether Indonesia was liable for its employee's negligence under a *respondeat superior* theory. *Id.* at 1244 (citing *Kelly*, 213 F.3d at 849). This is precisely what the court in *Moran* did. *Moran*, 27 F.3d at 172-73. And it is precisely what the R&R did.[3]

The Eleventh Circuit cases Odyssey cites are not to the contrary. For all the length of its argument, Odyssey neglects to include the Eleventh Circuit's express and specific definition of "intertwinedness":

> [J]urisdiction becomes intertwined with the merits of a cause of action when a statute provides the basis for both [1] the subject matter jurisdiction of the federal court and [2] *the plaintiff's substantive claim for relief*.

*E.g.*, *Morrison v. Amway*, 323 F.3d 920, 926 (11th Cir. 2003) (emphasis added) (cited in Objs. at 6); *accord Turcios v. Delicias Hispana Corp.*, 275 Fed. Appx. 879, 880, 2008 WL 1923071, at

---

[3] Other district courts follow the same procedure. *See, e.g.*, *Lizarbe v. Rondon*, 2009 WL 2208159, *2 (D. Md. Feb. 3, 2009) ("[T]o the extent that the [FSIA] motion challenges subject matter jurisdiction pursuant to Rule 12(b)(1), evidence outside the four corners of the complaint may be considered without turning the motion into one for summary judgment."); *Doe v. Bin Laden*, 580 F. Supp. 2d 93, 96 (D.D.C. 2008) ("when a factual basis [for a sovereign's claim to FSIA immunity] is challenged, the court cannot deny a Rule 12(b)(1) motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff," and the court "retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction"); *Glencore Denrees Paris v. Dep't of Nat'l Store Branch*, 2008 WL 4298609, at *3 (S.D.N.Y. Sept. 19, 2008) (unlike Rule 56—under which "[t]here is no requirement that the trial judge make findings of fact"—"before arriving at its legal conclusion regarding the existence *vel non* of subject matter jurisdiction under the FSIA, the district court should resolve the disputed factual matters by means of findings of fact") (quotations and internal citations in all omitted).

*1 (11th Cir. Apr. 29, 2008) (same) (cited in Objs. at 6); *Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1262 (11th Cir. 1997) (same) (cited in Objs at 6.)[4]  The FSIA nowhere provides the substantive causes of action alleged in the operative Complaint—claims under "the law of finds [and] . . . of salvage." (Objs. at 8; Doc. 25, Am. Compl., at 12.) *See In re B-727 Aircraft Serial No. 21010*, 272 F.3d 264, 270 (5th Cir. 2001) ("[t]he FSIA was not intended to create a new federal cause of action") (citation omitted). Odyssey's *in personam* claims against Spain have already been dismissed by this Court (R&R at 17 n.15), and Odyssey's operative Complaint contains no claim under the FSIA. (Doc. 25.)

There is no merit to Odyssey's claim that "[a]pplying the . . . Rule 56 standard to jurisdictional challenges under the Federal Tort Claims Act [("FTCA")] while applying the . . . Rule 12(b)(1) standard to jurisdictional challenges under the FSIA would *unjustifiably* extend far more deference to a foreign state than to the United States." (Objs. at 6-7 (emphasis added).) The Eleventh and other Circuits have held that courts should apply the Rule 56 standard when the jurisdictional facts are "intertwined" with the elements of a tort claim brought under the FTCA, but not when the FSIA is invoked. *E.g.*, *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990); *Montez v. Dep't of the Navy*, 392 F.3d 147, 150 (5th Cir. 2004) (cited in Objs. at 6). As *Montez*—the very case Odyssey cites—makes clear, the distinction between the FTCA and the FSIA is necessary because the FSIA provides "immunity from suit, not from liability," and

---

[4] Odyssey's argument that this Court was required to hold a hearing on Spain's motion (Objs. at 7 n.1) likewise fails to mention that the Rules of this Court provide that "motions and other applications will ordinarily be determined by the Court on the basis of the motion papers and briefs or legal memoranda . . . ." (Local Rule 3.01.)  The Local Rule recognizes that whether and when the Court may conduct hearings "[are] matters peculiarly within its discretion." *Acree v. County Bd. of Ed. of Richmond County, Georgia*, 533 F.2d 131, 132 (5th Cir. 1976).

"implicate[s] notions of international comity, a concern that does not exist in FTCA cases against the United States." *Montez*, 392 F.3d at 150; *see also, e.g.*, *Belhas v. Ya'alon*, 515 F.3d 1279, 1281 (D.C. Cir. 2008) (noting that "pretrial factual and legal determinations" are necessary in the FSIA context because the statute "provides protection from suit and not merely a defense to liability").

Odyssey seeks to frustrate the underlying purposes of the FSIA through further delay in this litigation. As this Court has recognized in its June 11, 2008 Order, "[s]overeign immunity is an immunity from the burdens of becoming involved in any part of the litigation process, from pretrial wrangling to trial itself." (Doc. 114 at 2, citing *Howland*, 431 F. Supp. 2d at 1244 (quoting *United States v. Moats*, 961 F.2d 1198, 1203 (5th Cir. 1992)).) For precisely that reason, "the Court is duty-bound to determine this issue at the earliest possible stage in the case." (Doc. 114 at 1.) Magistrate Judge Pizzo properly decided Spain's motion by carefully evaluating the jurisdictional facts presented by Spain and by Odyssey in accordance with that duty.

## II.   THE MAGISTRATE JUDGE'S FACTUAL FINDINGS ARE AMPLY SUPPORTED.

The identity and history of the *Nuestra Señora de las Mercedes* ("*Mercedes*") are matters of historical record that cannot be rewritten. The evidence demonstrated beyond dispute that, as Magistrate Judge Pizzo determined, the "Unidentified Shipwrecked Vessel" that is the *in rem* Defendant in this case is the *Mercedes*, a Frigate of War of the Spanish Navy that sank in battle in 1804 while nearing Cádiz, Spain, with fateful consequences for Spain.

### A.   The *Mercedes*'s History and Ownership Is Indisputably Documented.

The historical record documents "[t]he *Mercedes*'s warship status." (R&R at 24.) The *Mercedes* was constructed as a Frigate of War of the Spanish Navy at its Havana shipyard and

entered on the official register of Spanish Navy warships.  (Doc. 131-2, Ex. A to Spain Mot. to Dismiss (De Leste Decl.) at ¶ 12; *see also* O'Donnell at 2 (*Mercedes* served as a "fragata de guerra" and "buque de guerra").)  She served continuously thereafter on a distinguished career of military missions under the command of Spanish Navy officers, and manned by a crew of Spanish Navy sailors.  (R&R at 17; Doc. 131-2, Ex. A (De Leste Decl.) at ¶¶ 8-9, 13; Doc. 131-7, Ex. C (O'Donnell Decl.) at ¶ 14; Doc. 163-2, Spain Repl. to Odyssey Resp. to Spain Mot. to Dismiss, Ex. B (O'Donnell Reply Decl.) at ¶ 3.)  The *Mercedes* remains on the official register of the Spanish Navy.  (R&R at 17; Doc. 131-2, Ex. A (De Leste Decl.) at ¶ 7.)[5]

In 1802, during the short-lived respite of the Treaty of Amiens from ten years of European war, with Spain committed to providing a monetary subsidy to its ally France, the *Mercedes* was ordered by the Minister of the Navy to collect "specie and precious produce" from Spain's American Vice Royalties.  (Doc. 131-2, Ex. A (De Leste Decl.) at ¶¶ 14-16; Doc. 131-7, Ex. C (O'Donnell Decl.) at ¶ 23; Doc. 163-2, Ex. B (O'Donnell Reply Decl.) at ¶ 3.)  According to Odyssey itself, restoring Spain's links to the Americas during the brief respite provided by the Treaty of Amiens was "crucial" to Spain's national interests.  (Objs. at 18.)  By the time the

---

[5] Spain's showing with its Motion included undisputed proof that "the Spanish Navy and the Kingdom of Spain have never abandoned the warship *Mercedes*."  (Doc. 131-2, Ex. A (De Leste Decl.) at ¶¶ 5, 41-42.)  Spain's showing was not contested in opposition to its Motion to Dismiss or for Summary Judgment, nor is it disputed in any objection to the R&R.  "[W]here an owner comes forward to assert ownership in a shipwreck, abandonment must be shown by express acts."  *Sea Hunt, Inc. v. Kingdom of Spain*, 221 F.3d 634, 641 (4th Cir. 2000); *see also Int'l Aircraft v. Unidentified, Wrecked and Abandoned Aircraft,* 218 F.3d 1257, 1258 (11th Cir. 2000); *see also* Doc. 235-6, Stmt. of Int. of the U.S. Dept. of the Navy at ¶¶ 10, 17 (it is "consistent United States policy that [United States] sunken military craft and their associated artifacts remain the property of the United States absent the government's formal affirmative abandonment . . ." and the U.S. Navy "has a strong interest in ensuring that foreign sunken military craft, their contents and debris fields are treated in the same way . . . .").

*Mercedes* reached El Callao on August 7, 1803, war in Europe had resumed, and commanders of the Spanish Navy were ordered to be on alert against renewed Spanish involvement in conflict with Great Britain. (R&R at 6; Doc. 131-2, Ex. A (De Leste Decl.) at ¶ 14; Doc. 131-7, Ex. C (O'Donnell Decl.) at ¶ 24; Doc. 163-2, Ex. B (O'Donnell Reply Decl.) at ¶ 3.) For the return voyage, the *Mercedes* was assigned to become part of a squadron of four Spanish Navy Frigates for greater strength against interception and attack. (Doc. 131-2, Ex. A (De Leste Decl.) at ¶ 19; Doc. 131-7, Ex. C (O'Donnell Decl.) at ¶¶ 27-28.)

Magistrate Judge Pizzo found with ample reason that the *Mercedes* was attacked and sunk in active military service, not commercial service. (R&R at 6, 27; (Doc. 131-2, Ex. A (De Leste Decl.) at Annex 12; Doc 131-7, Ex. C (O'Donnell Decl.) at ¶ 28; Doc. 163-2, Ex. B (O'Donnell Reply Decl.) at ¶¶ 3, 5-6).) Sailing under orders of the Minister of the Navy, the *Mercedes* was engaged in the official discharge of the Spanish Navy's military function to provide "protection and safe passage to the interests and property of the Spanish monarchy and of its subjects," as was particularly necessary "in times of war or threatened war." (Doc. 131-2, Ex. A (De Leste Decl.) at ¶ 11.) The passengers on the *Mercedes* (Objs. at 14) were the family of the Second Squadron Leader Captain Don Diego de Alvear, all of whom perished with the *Mercedes*. (R&R at 7.)

The undisputed record evidence is that navies, including the U.S. and British Navies (Doc. 131-8 Ex. D (Delgado Decl.) at ¶¶ 10, 16), had the same function and responsibility, including, in the case of the U.S. Navy, authorization by an 1800 Act of Congress to transport "gold, silver and jewels" and standing orders to assess charges for doing so. (*Id.* at ¶ 16; *see also* Doc. 131-18, Ex. I (Goold Decl.) Annexes 1-6.) Among the U.S. warships that carried out those functions was the legendary U.S.S. Constitution ("Old Ironsides"). (Doc. 131-18, Ex. I (Goold

Decl) at ¶ 4(b); *see also* Doc. 235-6, Stmt. of Int. of the U.S. Dept. of Navy at ¶ 5; ("[I]t was common practice in the age of sail for national warships to transport privately owned specie for citizens of the country to whose navy the warships belonged."); *id.* at ¶ 8 (this practice was "military noncommercial service . . . to protect the public safety security interests of the nations and its citizens at a time when such transport provided the safest means of crossing the seas").) The *Mercedes* and her Squadron were intercepted by the British fleet precisely because the British Commander was under orders to engage only "Spanish home-ward bound ships of war," and not merchant ships. (Doc. 163-2, Ex. B (O'Donnell Reply Decl.) at ¶¶ 3, 6.)

"Spain undoubtedly anticipated a conflict with the British" (R&R at 6; Doc 131-2, Ex. A (De Leste Decl.) at ¶ 14; Doc 131-7, Ex. C (O'Donnell Decl.) at ¶ 27; Doc. 163-2, Ex. B (O'Donnell Reply Decl.) at ¶¶ 3), and the fear of renewed war proved to be all too true. A British squadron lay in wait south of Cape Saint Mary, Portugal under orders to engage "Spanish home-ward bound ships of war." (Doc. 163-2, Ex. B (O'Donnell Reply Decl.) at ¶¶ 3, 6.) The Spanish Admiral of the *Mercedes*'s Squadron refused to surrender, invoking his "officialdom" and citing "the R[oyal] Orders" he was duty-bound to execute. (Doc. 131-2, Ex. A (De Leste Decl.) at ¶ 23.) The Battle of Cape Saint Mary began as a result. (*Id.* at ¶¶ 23-25.) Soon thereafter, the *Mercedes* suffered a "catastrophic explosion" and sank. (*Id.* at ¶ 24.) Of her crew of approximately 337 officers, marines, sailors, and other officials, more than 250 died, as well as the family of the Second Squadron Leader, Captain Diego de Alvear. (R&R at 7; Doc. 131-2, Ex. A (De Leste Decl.) at ¶¶ 21, 25; Doc. 131-7, Ex. C (O'Donnell Decl.) at ¶ 29.)

As one of Odyssey's own declarants put it, "the loss of the *Mercedes* . . . was a pivotal event in the history of Spain and of the Spanish Empire more broadly." (Doc. 138-30, Odyssey Resp. to Spain Mot. to Dismiss, Ex. E (Carlisle Aff.) at ¶ 5.) The British attack and the loss of

life on the *Mercedes* precipitated the Spanish declaration of war of December 12, 1804. (Doc. 131-2, Ex. A (De Leste Decl.) at ¶ 27; Doc. 131-7, Ex. C (O'Donnell Decl.) at ¶¶ 33-34.) Citing the "sad loss of the frigate *Mercedes*" and those who died with her, the declaration of war brought Spain into war against Great Britain on the side of France, leading to the destruction of the Spanish Navy at the Battle of Trafalgar in 1805, the installation of Napoleon's brother Joseph on the Spanish throne, civil war, and severance of Spain's links to its Vice Royalties. (Doc. 131-2, Ex. A (De Leste Decl.) at ¶¶ 27-28; Doc. 131-7, Ex. C (O'Donnell Decl.) at ¶¶ 35-36.)[6]

B.   **Odyssey Knew the *Mercedes* Is Off Limits to Unauthorized Disturbance.**

Odyssey "set out to find the *Mercedes* and found it." (R&R at 7.) Odyssey did so knowing full well that the *Mercedes* was off limits. In a September 2006 legal brief to Spanish authorities appealing a conviction and fine for unauthorized archaeological activity in Spanish waters, Odyssey represented that it fully understood that shipwrecks of sovereign nations belong for "*all proprietary and other purposes*" to the flag State, that sovereigns "prevent interference

---

[6] The R&R finds, and no Objection disputes, that after failing to obtain post-war reparations from Great Britain, "Spain offered to compensate those who suffered losses" in the loss of the *Mercedes*. (R&R at 21.) Pursuant to the "paternal oversight of his Majesty," an August 1824 Royal Order provided for "all those interested in the ships and property of any nature" captured or sunk by the British in 1804-1805 to submit "documents that justify the property, era and circumstances of the damage and its amount." (Doc. 163-10, Ex. C (Torreblanca Cert.) at Annex 1.) The indemnification decree included the *Mercedes*. (*Id.* at Part 4, Section 3.) Public announcements were issued and the process remained active for decades thereafter, with extensions of deadlines by the Government of Spain through 1851. Those who showed entitlement to indemnification in accordance with the Royal Order and the process established thereunder received interest-bearing Royal Treasury Public Debt of the State. (*Id.* at Part 4, Sections 1-2.) Neither Odyssey nor any of the individual claimants dispute these facts or otherwise offer any other argument that would justify or permit this Court to revisit or readjudicate the Spanish Government's response to the loss of the *Mercedes* and how it was carried out.

from foreign elements in that relationship," and that Spain's rights to protect its sunken vessels have "been recognized in the courts." In Odyssey's words:

> A number of sovereign States, including Spain, Great Britain, and the United States, have recognized and maintained the position in the international arena that the wreckages of ships belong, for all proprietary and other purposes, to the flag State, regardless of the waters in which they are found. This position strongly favors Spain, inasmuch as it has more sunken ships than any other State in the world, as a result of its discovery and conquest of the Americas and the war operations of its global empire, and it must assert its ownership and protect its property from looting, which is, unfortunately, on the rise.

> The sunken warships of various countries are also the graveyards of marines who died while serving their homelands, and they should be properly handled by the State they served, which must take steps to prevent interference from foreign elements in that relationship.

> \* \* \*

> Spain's rights have been recognized in the courts on the strength of this line of reasoning. See the case of the historic Spanish vessels *Juno* and *La Galga*, which sunk off the coast of the United States. [*Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, 221 F.3d 634 (4th Cir. 2000).]

(Doc. 131-15, Ex. F (de Cabo Decl.) at ¶ 2; Annex 1 at 2.)

At the time Odyssey avowed its understanding and respect for these principles, it knew from research conducted in Spanish historical and naval archives that the *Mercedes* was a Spanish Navy warship of historical importance. (Doc. 131-16, Ex. G (Stapells Johnson Decl.) at ¶¶ 2-3.) When Odyssey sought Spain's consent to engage in commercial exploitation of Spanish shipwrecks, it was not granted. (R&R at 2; Doc.131-15, Ex. F (de Cabo Decl.) at ¶ 6.) Spanish law mandates the protection of historical and cultural patrimony for public benefit, not

commercial sale. (Doc. 131-15, Ex. F (de Cabo Decl.) at ¶ 6.)[7] Odyssey nevertheless proceeded to target the *Mercedes*, without authorization. (R&R at 2, 7.)

Upon locating the *Mercedes*, Odyssey covertly stripped the site of coins and other artifacts, flew them to this district, and claimed that the "Unidentified Shipwrecked Vessel" named as the *in rem* Defendant in this case was a mystery vessel code-named the "Black Swan." (Doc. 21-2, Am. Compl. (Stemm Sworn Statement) Exhibit A, Black Swan Press Release on May 18.) In this Court, Odyssey maintained for months that it could not identify the *res* and had no obligation to do so. (Doc. 53, Odyssey Mem. in Opp. to Spain Mot. to Dismiss, at 8; Doc. 57, Odyssey Repl. to Resp. to Mot. for Preliminary Injunction, at 2.) When Odyssey was ordered to answer interrogatories propounded by the Court to compel Odyssey to disclose the identity of the vessel, Odyssey responded that "there is no confirmation that the site represents any specific vessel." (Doc. 105, Answer to Interrogs. #3 at 4-5.) Odyssey represented to the Court that the site might be "jettisoned cargo," a "pirate ship," or a ship whose identity had "eluded our researchers and archivists," dissembling that the "Spanish vessel" *Mercedes* was but "[o]ne vessel Odyssey has considered." (*Id.*)

In response to Odyssey's claims that it could not identify the vessel, the Court ordered Odyssey to produce videotapes, photographs, artifact identifications and location information in its possession (Doc. 75; Doc. 92), evidence which is "overwhelming" in showing that the *res* is

---

[7] In its Objections, Odyssey goes so far as to argue, based solely on media clippings, that Odyssey is engaged in activity "no different than Spain's own current, publicized efforts to recover gold reserves from shipwrecks." (Objs. 29.) Spain therefore submits for the record the Protocol of the Spanish Navy and the Ministry of Culture for Protecting the Underwater Archaeological Heritage (Ex. A (Goold Decl.) at Annex 2), which demonstrates Spain's commitment to protect its underwater cultural heritage from treasure hunting and to preserve it for public benefit in public museums.

the *Mercedes*. (R&R at 8-12.) Only when this evidence was presented to the Court with Spain's motion did Odyssey belatedly concede that its "leading hypothesis" is that the site is the *Mercedes* (Doc. 138 at 7), and it now admits that the *Mercedes* is a "Spanish navy [F]rigate." (Objs. at 14.) With the evidence from Odyssey's own photographs, videotapes, and other records before him, Magistrate Judge Pizzo appropriately found that it "makes identification certain": "[t]he *res* is the *Mercedes*." (R&R at 10, 12.)

### C. The Finding that the *Res* is the *Mercedes* Is Compelled by Overwhelming Evidence.

Based on a careful and thorough review of the record, Magistrate Judge Pizzo found that the evidence indisputably establishes that the *res* is the *Mercedes*. Odyssey rehashes its effort to cast doubt on the shipwreck's identity (Objs. at 10-12), repeating the same "scattershot arguments" (R&R at 3) that Magistrate Judge Pizzo found to fly in the face of the "overwhelming" evidence "pointing to the *Mercedes*—the location, coins, cannons and artifacts" (R&R at 8):

*1. Site location.* The location of the site matches the contemporaneous reports contained in both British and Spanish ship logs of where the *Mercedes* sank during the Battle of Cape Saint Mary. (R&R at 8; Doc. 131-2, Ex. B (De Leste Conf. Decl.) at ¶¶ 3-5; Doc. 131-7, Ex. E (Delgado Conf. Decl.) at ¶¶ 2-4.) In response to the R&R, Odyssey repeats the same "offhand contentions" that Magistrate Judge Pizzo found to be not "remotely persuasive." (R&R at 8.) Odyssey identifies no error in the R&R's findings based on the contemporaneous British and Spanish ship logs and the match between the historical record and the coordinates at which Odyssey conducted its operations. (Doc. 131-2, Ex. B (De Leste Conf. Decl.) at ¶¶ 3-5; Doc. 131-7, Ex. E (Delgado Conf. Decl.) at ¶¶ 2-4.) Odyssey has also admitted that its own "leading

hypothesis" is that the artifacts it took are "from the *Mercedes*." (Doc. 138 at 7.) One of its own expert declarants acknowledged that the "extant documents place the *Mercedes* in the area . . . ." (R&R at 8.)

Despite all this, Odyssey's Objections rehash the discredited argument that there is an issue of fact as to whether land can be seen from the site of the Battle of Cape Saint Mary (Objs. at 11), when the contemporaneous ships' logs report that land was in fact visible and base their location reports on their distance from Cape Saint Mary to the north. (Doc. 131-2, Ex. A (De Leste Decl.) Annex 16 at 388.) As the *España Marítima*, or *Spanish Coast Pilot*, reports, land becomes visible south of Cape Saint Mary "[f]rom the poop of a man of war, in clear weather, . . . when you are due South from it, as far as in Lat. 36º 15,' that is at a distance of 164 leagues . . . ." (Ex. A (Goold Decl.) at Annex 1 at 112.) In other words, land comes in sight miles south of the point much closer to Cape Saint Mary where the Battle took place and the *Mercedes* rests on the sea bed.[8]

*2. Cannons.* The cannons at the site match the Spanish Navy weaponry with which the *Mercedes* was armed. (R&R at 10-11.) Exposed cannons on the seabed include exact matches with Spanish Navy specifications for its warships of the time. (*Id.* at 10; Doc. 131-2, Ex. A (De Leste Decl.) at ¶ 32; Doc. 131-8, Ex. D (Delgado Decl.) at ¶ 21).) Cannons whose details are obscured by burial or by corrosion are 6 and 12 pounders that were the *Mercedes*'s principal armament of the "size and style that identify the shipwreck as a Spanish warship, and specifically as a Spanish warship of the late 18th or early 19th century." (R&R at 10 (quoting Doc. 131-8,

---

[8] The exact location was filed under seal to protect the site from further disturbance. (Doc. 131, Ex. B (De Leste Conf. Decl.); Doc. 131, Ex. E (Delgado Conf. Decl.).)

Ex. D (Delgado Decl.) at ¶ 97).)  Odyssey makes no claim that the R&R erred in finding that cannons at the site "correspond with the principal armament of the *Mercedes*."  (R&R at 10.)

Odyssey argues that the two highly distinctive culverin cannons of the 16th–17th Centuries listed on the *Mercedes*'s manifest and present at the site (Doc. 131-8, Ex. D (Delgado Decl.) at ¶¶ 106-107) "are not reliable indicators." (Objs. at 11.)  But Odyssey does not dispute that, as the historical records show and the R&R finds, the *Mercedes* had two antiquated bronze culverins on board for return to Spain and recycling of their bronze.  (R&R at 10.)  Odyssey also does not dispute that there are two culverins at the site and concedes that the visible details of at least one show that it is in fact a culverin.  (Objs. at 11.)  Nor does Odyssey show how the R&R errs in finding that the presence of these culverins documented in the *Mercedes*'s manifest as cargo, together with the *Mercedes*'s own suite of cannons, the coins and other artifacts documented for the *Mercedes* "makes identification certain."  (R&R at 10.)

Odyssey also reargues that because not all of the *Mercedes*'s cannons are exposed on the seabed, the R&R erred in identifying the *res* as the *Mercedes* (Objs. at 11), an argument Magistrate Judge Pizzo considered and rejected.  (R&R at 11.)  Odyssey's own photographs show that cannons are buried to varying degrees in the seabed, with some of those that are exposed only barely visible.  (Doc. 131-8, Ex. D (Delgado Decl.) at ¶¶ 22, 32, 38, 60, 65, 66, 73, 77, 98, 106, 107.)  It is particularly notable, moreover, that Odyssey's discussion of the culverins impeaches its own effort to create a factual dispute based on the number of cannons visible at the site.  Odyssey argues that not all of the cannons that were aboard the *Mercedes* are visible on the "hardpan floor" of the seabed (Objs. at 11), but in its very next paragraph, Odyssey itself points out that "one [of the two culverins] is buried in mud." (*Id.*)

*3. Coins.* Odyssey makes no claim of error in the R&R's findings that the coins "persuasively match" the *Mercedes* and add to the "overwhelming" evidence that the *res* is the *Mercedes*. (R&R at 8, 12.) The R&R pointedly notes that Odyssey presented no evidence to contradict Spain's showing that the coins' origins, dates ending in 1804, and other characteristics leave no doubt that the *res* is the *Mercedes*. Odyssey does not even pretend to present any such evidence in its Objections.[9]

*4. Other Artifacts.* Odyssey ignores Magistrate Judge Pizzo's finding that other artifacts found at the site, including large quantities of copper and tin ingots of "His Majesty" also documented on the *Mercedes*'s manifest, further prove the site is the *Mercedes*. (R&R at 11; Doc. 131-8, Ex. D (Delgado Decl.) at Annexes 12, 18.) Moreover, telltale evidence of "a violent explosion" can be seen in the debris and artifacts. (R&R at 11.) This includes highly distinctive tearing and crumpling of the copper plates which sheathed the *Mercedes*'s hull, blast damage to one of the antipersonnel *pedrero* cannons with which the *Mercedes* was armed, and deformation of a metal gun deck reinforcement element. (Doc. 131-8, Ex. D (Delgado Decl.) at ¶¶ 24, 90-96.) Odyssey does not and cannot make any claims that these critical findings are in error.

Other artifacts taken from the site or photographed on the seabed attest to the loss of its crew. These include the tableware of naval officers, the remains of personal weapons of the crew, and other personal effects. (Doc. 131-8, Ex. D (Delgado Decl.) at ¶¶ 122-131, 135.)

*5. Vessel Remains.* Odyssey argues that there is "no meaningful association with a vessel" at the site. (*E.g.*, Objs. at 21-22.) Whatever this rhetoric may mean, Odyssey does not

---

[9] Indeed, Odyssey's Objections concede that artifacts Odyssey took from the site correspond to the *Mercedes*'s manifest, confirming that the *res* is the *Mercedes*. (*See* Objs. at 15-16.)

dispute that, as the R&R pointedly notes, one of its own experts acknowledged that the site is "consistent with a vessel that has broken up at the surface, descended through the water column and spilled out the cargo and various components onto the seabed." (R&R at 11.) The record amply shows that the site is that of a "centuries-old shipwreck" (R&R at 12) containing, *inter alia*, (1) "hull remains in precisely the condition to be expected of a wooden-hulled warship that exploded and sank two centuries ago"; (2) "[l]arge complexes of wooden hull sections torn by the explosion, some with ship's rigging still attached"; and (3) anchors, remains of the ship's pump and rudder, and numerous other vessel remains, including ballast, all resting within a concentrated area on the seabed. (Doc. 131 at 13-14 (citing record evidence (Doc. 131-8, Ex. D (Delgado Decl.) at ¶¶ 21-24, 33, 40, 73-74, 80, 84, 101-117, 122-125, 129-131, 135); *see also* Doc. 138-27, Ex. B (Sinclair Aff.) at 17 (noting that wooden hull remains at the site are in the "largely decomposed" condition to be expected after two centuries).) The fact that these remains are "in an area a few football fields square where the vessel met its explosive ending makes the conclusion even more compelling." (R&R at 12.) Odyssey identifies no specific basis, much less a plausible one, for its objection to the Magistrate Judge's reliance on this evidence to conclude that the *res* is the *Mercedes*.

*6. Casualties.* Nor is there any merit to Odyssey's claim that the site cannot be considered a gravesite because, so Odyssey claims, "no human remains were found." (Objs. at 22.) Odyssey does not dispute the loss of more than 250 Spanish sailors with the *Mercedes* and Odyssey itself has recognized that "sunken warships . . . are . . . the graveyards of marines who died while serving their homelands" (Doc. 131-15, Ex. F (de Cabo Decl.) at ¶ 2), just as the United States and other countries have recognized. (*E.g.*, Doc. 131 at 22 (discussing U.S. Government measures).)

*          *          *

In the face of the "overwhelming" evidence making "identification certain" (R&R at 8-12), Odyssey has manifestly failed to demonstrate that Magistrate Judge Pizzo erred in concluding that the *res* is the *Mercedes*, a warship of pivotal historical importance to Spain, and that her site is the "place of rest [of] all those who perished with her" on October 5, 1804. (*Id.* at 8-12, 33.)

## III. THE R&R CORRECTLY CONCLUDES THAT THE *RES* IS PROTECTED BY SOVEREIGN IMMUNITY.

Having properly found that the *res* corresponds to the *Mercedes*, and that "[u]nquestionably, the *Mercedes* is the property of Spain" (R&R at 17), Magistrate Judge Pizzo correctly found that she is "cloaked with her sovereign's immunity." (*Id.* at 30.) As the R&R appropriately summarizes "the core questions," "answering the former [the *res* is the *Mercedes*] answers the latter [sovereign immunity applies]." (*Id.* at 4.) Upon Spain's showing that the *res* is the *Mercedes*, Odyssey "must show [that] an exception [to sovereign immunity] applies." (*Id.* at 16-17 (citing *S & Davis Int'l, Inc. v. The Republic of Yemen*, 218 F.3d 1292, 1300 (11th Cir. Cir. 2000) and *Venus Lines Agency v. CVG Industries Venezolana De Aluminio, C.A.*, 210 F.3d 1309, 1311 (11th Cir. 2000)).) Odyssey failed to show any exception in opposition to Spain's motion; its Objections only confirm what the R&R correctly finds: Odyssey's contentions "evade the FSIA's goals, its statutory scheme, and the special status accorded warships per the various treaties and agreements §1609 necessarily incorporates." (R&R at 18.)

### A. No "Commercial Activity" Exception Applies.

The "*Mercedes* clearly was not engaged in any commercial activity at the time of its demise." (R&R at 27.) In the face of that finding, Odyssey pins its Objections largely on

repeating arguments that were carefully considered and rejected by Magistrate Judge Pizzo. (Odyssey Obj. at 4, 12-17, 22-29, 36-42.)

Odyssey has acknowledged the *Mercedes* as "government-owned" (Doc. 179, Odyssey Sur-Repl. to Spain Repl. to Odyssey Resp. to Spain Mot. to Dismiss, at 3) and makes no claim, much less shows any genuine issue of fact, that the *Mercedes* had anything to do with the United States. Odyssey's rehash of "commercial activity" arguments conspicuously fails to acknowledge that the exception expressly applies only to "property used for a commercial activity in the United States," if it "is or was used for the commercial activity upon which the claim is based." 28 U.S.C. §§ 1610(a), 1610(a)(2). Moreover, the FSIA defines "commercial activity in the United States" as "commercial activity carried on by such state and having substantial contact with the United States." 28 U.S.C. § 1603(e). It is undisputed that the *Mercedes* had nothing to do with the United States: "the *res* lacks any nexus to our nation's sovereign boundaries." (R&R at 29.)

Absent a showing of a statutory exception to immunity, "Section 1609 of the FSIA prohibits the arrest or attachment of a vessel owned by a foreign government or one of its instrumentalities." *MariTrend v. M/V Sebes*, 1997 U.S. Dist. LEXIS 23594, at **12-13 (E.D. La. Oct. 16, 1997). "[The FSIA] keeps private litigants from seizing the personified and sovereign part of a foreign country that a national vessel represents." *Kim Crest, S.A. v. M.V. Sverdlovsk*, 753 F. Supp. 642, 648 (S.D. Texas 1990).

Government-owned vessels and government-owned shipping companies are protected by the FSIA even if claims against them relate to commercial vessels with no military connection whatsoever. *See Mangattu v. M/V Ibn Hayyan*, 35 F.3d 205, 209-10 (5th Cir. 1994) (Mideast government-owned merchant vessel); *O'Connell Mach. Co. v. M.V. Americana*, 734 F.2d 115,

116-17 (2d. Cir. 1984) (Italian government-owned cargo vessel); *Jet Line Services, Inc. v. M/V Marsa El Hariga*, 462 F. Supp. 1165, 1172 (D. Md 1978) (Libyan government-owned merchant vessel); *Castillo v. Shipping Corp. of India*, 606 F. Supp. 497, 499-500 (S.D.N.Y. 1985) (Indian government-owned shipping company); *Maritrend v. M/V Sebes,* Civ. A. No. 96-3140, 1997 U.S. Dist. LEXIS 23594, * 12-15 (E.D. La. Oct. 16, 1997) (Romanian government-owned cargo ship). To defeat a showing of sovereign ownership and invocation of the FSIA, the claimant must show its claims are based on commercial activity by the vessel in the United States and/or a waiver of sovereign immunity.[10] Odyssey has done neither.

Applying Section 1609 to vacate the arrest, dismiss all claims and release the *res* (including all artifacts taken from the *res*) is also, as the R&R correctly holds, required by "traditional admiralty precepts" that a sovereign's "vessel and its cargo are inextricably intertwined" and the "plain reading of §1609." (R&R at 23.) As the R&R points out, the jurisdiction over the *Mercedes* that Odyssey seeks to impose rests upon a premise "that the *res* is not divided and that therefore possession of some of it is constructively possession of all." (R&R at 23, citing *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 964 (4th Cir. 1999); *see also Lathrop v. Unidentified, Wrecked and Abandoned Vessel*, 817 F. Supp. 953, 693 (M.D. Fla. 1993) (United States' right to protect a historic shipwreck site includes the shipwreck *and* associated artifacts); *Deep Sea Research, Inc. v. The Brother Jonathan*, 102 F.3d 379, 386 (9th

---

[10] A 1989 State Department memorandum concerning the *Presidente Rivera*, cited by Odyssey at Objs. 27-28, itself confirms the requirement that the commercial activity take place in the U.S. The *Presidente Rivera* was a tanker operating in U.S. waters (the Delaware River) under charter to a national oil company to transport oil to "commercial customers in the United States" (Objs. at 27-28) when it grounded, giving rise to the State Department analysis of whether the vessel had sovereign immunity. *Digest of U.S. Practice in International Law*, 291-294 (1989-1990); *see also* Doc. 235-2 (Ambassador Balton Decl.) at ¶ 9.)

Cir. 1996), *vacated in part on other grounds by California v. Deep Sea Research, Inc.*, 523 U.S. 491 (1998) (admiralty law considers a shipwreck a "legally unified *res*".))

This principle has been adopted by Congress, moreover, specifically for historic shipwrecks and military vessels. The Abandoned Shipwreck Act defines "shipwreck" to include "vessel or wreck, its cargo and other contents." 43 U.S.C. § 2102(d). The Sunken Military Craft Act likewise incorporates "associated contents" and "debris field" in its definition of "sunken military craft" which are protected from unauthorized disturbance. 10 U.S.C. § 113, note at § 1402(b). *See also* Doc. 235-8 (L. Murphy Decl.) at ¶¶ 3, 7 ("[I]nternational and U.S. domestic law and policy" are to protect the state's "public interest in the entire shipwreck" as "one integrated resource, even if some of the contents are no longer within the hull or other portions of the ship," including "privately owned cargo and personal property.").

Odyssey persists in arguing that Section 1609 does not apply, or that the Court should retain partial jurisdiction over the *res* despite the FSIA, in the face of the R&R's sound holding that "[s]uch an exercise would frustrate the FSIA's goals and impermissibly prejudice Spain." (R&R at 22 (citing *Republic of Philippines v. Pimentel*, 128 S.Ct. 2180, 2184 (2008)).) The R&R cites and follows *Pimentel* for good reason. In *Pimentel*, discussed further below, the Supreme Court held that "where sovereign immunity is asserted and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is potential for injury to the interests of the absent sovereign." *Id.* at 1291. Under the FSIA, as well as the comity principles reflected in the FSIA discussed further below, the Ninth Circuit was reversed for failing to "accord proper weight to the compelling claim of sovereign immunity" when it decided to retain jurisdiction over funds in the U.S. claimed by alleged Philippine victims of the Marcos regime despite the "historical and political significance" of the property for the Philippine Government.

*Pimentel*, 128 S.Ct. at 2190-92. The Supreme Court instructed that the FSIA requires taking into account "the affront . . . that could result . . . if property [of the sovereign] is seized by the decree of a foreign court." *Id*. at 1290.[11]  Dismissal of the case was ordered, to prevent intrusion on the Philippine government's interests and to respect the sovereign's "unique interest in resolving the ownership of or claims to the [property]."[12]  *Id*.

Odyssey provides no authority that remotely counters Spain's showing and the R&R's finding that denying Spain's motion and failing to apply Section 1609 to the *Mercedes* would "necessarily implicate Spain's rights to the property," "frustrate the FSIA's goals and impermissibly prejudice Spain."  (R&R at 22.)  The cases Odyssey cites, at Objs. 32-35, 37-39, are plainly inapplicable.  To begin with, the sole FSIA case Odyssey cites is *Borgships, Inc., Monrovia v. M/V Macarena*, Nos. 92-3119 & 93-622, 1993 WL 408342 at *3 (E.D. La. 1993). The R&R carefully considers that unreported decision and finds that not only is it "simply inapplicable," it also "weighs against Odyssey." (R&R at 21-22.)  Moreover, as the R&R points out, *Titanic I*, 171 F.3d at 964 (cited at Objs. at 32), recognizes the traditional precepts of admiralty law that "the *res* is not divided." (R&R at 23.)  *Bemis v. RMS Lusitania* simply held that under English law a contract conveying title to a sunken vessel transferred only the "hull, tackle and appurtenances."  884 F. Supp. 1042, 1047 (E.D. Va. 1995) (cited in Objs. at 34-35).

---

[11] Odyssey acknowledges that its "complaint asserts claims relating to the entire *res* . . . ."  (Objs. at 31 n.19.)

[12] Odyssey purports to distinguish *Pimentel* by arguing that the Philippines' right to invoke sovereign immunity was "predetermined."  (Objs. at 40.)  Odyssey does not and cannot dispute that Spain is a foreign state entitled to invoke sovereign immunity to protect its interests, just as the Philippines did.  In fact, Spain's entitlement to invoke sovereign immunity was, to use Odyssey's words, "predetermined" by this Court's Order of March 6, 2008. (Doc. 91.)  The R&R disposes of Odyssey's argument that *Pimentel* "starkly differs" from this case because *Pimentel* arose in the context of an interpleader action. (R&R at 23; Objs. at 40.)

*Columbus America Discovery Group v. Atlantic. Mutual Insurance Co.* dealt with allocating a salvage award between insurers and the salvor, where no sovereign had any interest in the vessel. 974 F.2d 450, 462-44 (4th Cir. 1992) (cited in Objs. at 35). *International Aircraft Recovery Co. v. The Unidentified, Wrecked & Abandoned Aircraft* affirmed the United States' ownership of, and right to prohibit disturbance of, a historic U.S. Navy aircraft, setting aside a district court salvage award that "under-appreciated the authority of a vessel's owner to prevent others from interfering with its property." 218 F. 3d 1255, 1261 (11th Cir. 2000) (cited in Objs. at 37). Far from "implicitly acknowledg[ing] a distinction between title to a vessel and title to its cargo" (Objs. at 37), the Eleventh Circuit stressed that "we have no occasion in this case to consider whether an owner could refuse salvage assistance if anything other than its own property interests were at stake." 218 F.3d at 1262.[13]

Even if Odyssey had shown—contrary to the historical facts reflected in the R&R's finding that "the Mercedes clearly was not engaged in any commercial activity at the time of its demise" (R&R at 27)—that the *Mercedes* was a commercial vessel and not a Spanish Navy frigate, it is "government-owned" (Doc. 179 at 3) and had nothing to do with the United States,

---

[13] Odyssey also draws no support from selective transcript excerpts from Case 8:06-cv-01685-T-23MAP (cited at Objs. 38-39). Odyssey omits Spain's Answers to the Court's Interrogatories in that case. (Doc. 114 of Case No. 8:06-cv-01685.) Spain's Answers stated that at issue in that case is whether Odyssey has located a vessel that "was engaged by agents of the King of Spain" in 1641 to transport funds of the Crown's monetary authority, the Tesorero General de la Cruzada, to the Spanish Army in Flanders. Spain specifically noted that "under the Foreign Sovereign Immunities Act, 28 U.S.C. Section 1611(b), the funds of a foreign state's 'monetary authority held for its own account' are immune from attachment, execution or other U.S. legal process." (*Id.*). Invoking the statutory immunity provided by the FSIA to protect the funds of a sovereign's monetary authority on a vessel engaged in its service can hardly be construed as a waiver of sovereign immunity in this case.

much less any commercial activity in the United States. The "plain reading" of Section 1609 confers immunity on the *res.* (R&R at 23.)

Odyssey's "commercial activity" exception argument must also be denied, as discussed further below, because warships and their contents are not subject to any such exception. The *Mercedes* was engaged in the same service of "the public safety security interests of the nation" that was an "officially authorized activity of United States warships in carrying out the military responsibility of the Navy to protect the interests of the nation and its citizens." (Doc. 131-2, Ex. A (De Leste Decl.) at ¶ 11; Doc. 131-7, Ex. C (O'Donnell Decl.) at ¶¶ 23-24; U.S. Stmt. of Int. at 19; Doc. 235-6 Stmt. of Int. of U.S. Dept. of Navy at ¶¶ 5-7.)

**B.     International Law Further Confirms the Immunity of the *Res*.**

Rather than any exception to sovereign immunity, the immunity long accorded to warships extends to the *Mercedes*, as Magistrate Judge Pizzo recognized (R&R at 23-24) and the policies, laws and principles presented by the United States confirm. (U.S. Stmt. of Int. at 21-24.) "[W]arships have always been accorded a special status, a notion that dates back to *The Schooner Exchange . . . .*" (R&R at 23 (citing *Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812)).) And "[t]he *Mercedes*'s warship status is one that § 1609 necessarily recognizes because the provision requires this Court evaluate Spain's claim of immunity '[s]ubject to existing international agreements to which the United States is a party at the time of enactment of [the FSIA].'" (*Id.* at 24.) Accordingly, the special protections that the United States, Spain, and other countries accord to their sunken military craft apply to the *Mercedes* here. (*Id.* at 24-25; *see also* Doc. 235-6, Ambassador Balton Decl. ¶¶ 5-6.)

Odyssey tries to sidestep this analysis by citing selective excerpts of international treaties to advance the false proposition that they limit the immunities of the *Mercedes*, omitting

provisions that expressly relate to warships such as the *Mercedes*. (Objs. at 22-23.) Odyssey misrepresents these instruments; rather than supply an exception to immunity in this case, they validate Magistrate Judge Pizzo's recommendation to dismiss Odyssey's claims and vacate the arrest of the *Mercedes*.

1.      ***The U.S.-Spain Treaty of Friendship and General Relations Mandates Recognition of the* Mercedes*'s Immunity.***

The 1902 Treaty of Friendship and General Relations between the United States and Spain mandates that the shipwrecks of Spanish vessels be accorded the same immunities as the shipwrecks of U.S. vessels. (R&R at 24-26.) Both State parties to the treaty so recognize. (U.S. Stmt. of Int. at 6 ("Spain and the United States read [Article X of the 1902 Treaty] to extend to Spain the same protection and immunities the United States customarily affords to its own sunken vessels.").) As the Fourth Circuit held in *Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, and Magistrate Judge Pizzo correctly acknowledges (R&R. at 24-25 (citing *Sea Hunt*)):

> [The] sovereign vessels of Spain . . . are covered by the 1902 Treaty of Friendship and General Relations between the United States and Spain. The reciprocal immunities established by this treaty are essential to protecting US shipwrecks and military gravesites. . . . Protection of the sacred sites of other nations thus assists in preventing the disturbance and exploitation of our own.

*Sea Hunt*, 221 F.3d 634, 638, 647. The court in *Sea Hunt* therefore rejected the claims of a purported salvor against two sunken naval vessels of Spain just as these claims would have been rejected if they had been filed against the sunken naval vessels of the United States. *Id.* at 634, 642-43 (holding, *inter alia*, that Spain has not abandoned its sunken craft).

The U.S.-Spain Treaty thus extends to Spain the immunities recognized by, *inter alia*, the Sunken Military Craft Act ("SMCA"), which protects the underwater remains and contents of

U.S. warships and other shipwrecks of the United States from disturbance by purported salvors. Ronald W. Reagan Nat'l Def. Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, § 1402(a)-(b), 118 Stat. 1811, (Oct. 28, 2004) [hereinafter SMCA]; H.R. Rep. No. 108-767, at 817 (2004) (Conf. Rep.) (noting that sunken military craft are "*entitled to sovereign immunity*") (emphasis added).  The remains and contents of the *Mercedes*, including her coins and other artifacts, are entitled to the same protection.  (*See* R&R at 24-26; U.S. Stmt. of Int. at 18-20); SMCA § 1408(1), (3) (defining "sunken military craft" as "all or any portion of" "*any sunken warship*, naval auxiliary, *or* other vessel that was owned or operated by a government on military noncommercial service when it sank," including the "*equipment, cargo*, and *contents*," as well as "the remains and personal effects of the crew and passengers") (emphasis added).)

Odyssey's attempts to salvage its claims from the U.S.-Spain Treaty of Friendship and General Relations are without merit, as the U.S. Government recognizes.  (U.S. Stmt. of Int. at 5-7.)  Odyssey scolds Magistrate Judge Pizzo for "inexplicably fail[ing] to address or otherwise acknowledge" what it deems to be the "most critical" part of the statutory definition of a "sunken military craft" in the SMCA: the part encompassing "other vessel[s] that w[ere] owned or operated by a government on military noncommercial service when [they] sank."  (Objs. at 25 (citing to SMCA § 1408(3)(A) (emphasis omitted).)  But this part is irrelevant here because the *Mercedes* is a warship, and "any sunken warship" constitutes a "sunken military craft."  SMCA § 1408(3)(A); (U.S. Stmt. of Int. at 20-21.)

Odyssey also argues in a footnote that—contrary to the statutory text—the contents of the *Mercedes* may be excluded from the definition of "sunken military craft."  (Objs. at 39 n.24.) Odyssey's reading of the SMCA is belied by its unambiguous text, which includes a warship's "*contents*," her "*debris field*," and the "*personal effects* of [her] crew and passengers."  SMCA §

1408(1) (emphasis added). "Odyssey's reading is [also] plainly inconsistent with the reasons why the SMCA was enacted," *i.e.*, the protection of sunken U.S. warships and other sovereign vessels from unauthorized disturbance. (U.S. Stmt. of Int. at 18 n.7; *see also* Stmt. of Int. of the U.S. Dept. of Navy at ¶ 12 ("[A]nyone seeking to recover specie and other artifacts, including privately owned property, from a sunken U.S. military craft, wherever located, or its debris field is required by § 1406(d)(1) [of the SMCA] to obtain 'express permission . . . .'").)

The U.S.-Spain Treaty, U.S. policy and practice as to its own vessels, the case law and the SMCA dispose of Odyssey's and individual Claimants' pleas to strip portions of the *Mercedes*'s contents from immunity. (Objs. at 30-41.) The SMCA confirms that the "cargo[] and contents" of a sunken sovereign vessel are inseparable, a principle that has been endorsed by the United States and its courts. The U.S. Department of State articulates U.S. policy thus:

> [W]arships *and their associated contents* are . . . entitled to recognition and protection *as property of the flag state*, unless the vessel has been expressly abandoned by the flag state.

(Doc. 235-2, (Ambassador Balton Decl.) at ¶ 5 (emphasis added).) Similarly, in *Sea Hunt*, the court rejected the argument that the sunken naval vessels of Spain are exempt from protection if they were transporting "privately-consigned" coins or passengers when they sank. (*See* Doc. 163-15, Ex. D (Goold Reply Decl.) at ¶ 4; *id.* at Annexes 1, 2 (claims by plaintiff in *Sea Hunt* that "there was a substantial amount of privately-consigned gold or silver" and passengers "on board the JUNO when she sank" and *La Galga* was "engaged in a commercial enterprise"); *Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, No. 2:98-cv-281, 1999 U.S. Dist. LEXIS 21752, at *6-8 (E.D. Va. June 25, 1999), *aff'd by Sea Hunt*, 221 F.3d at 634.) Odyssey's argument should likewise be rejected here.

Far from supplying an exception to sovereign immunity, as Odyssey contends, the 1902 Treaty of Friendship and General Relations compels Magistrate Judge Pizzo's conclusion that the *Mercedes* has immunity. (R&R at 24-26, 33-34.) Indeed, Article X of the Treaty mandates immunity in itself for the *Mercedes*, as the *res* whose identity is so well-proven that Spain "would prevail as a matter of law." (R&R at 12 n.10, U.S. Stmt. of Int. at 5 n.1 (noting that the treaty would confer immunity on the *Mercedes,* under U.S. law protecting U.S. vessels and their contents); (Doc. 235-2 (Ambassador Balton Decl.) at ¶ 16.)

2. ***Multilateral Treaties Further Confirm the Immunity To Which the* Mercedes *Is Entitled.***

The international treaties Odyssey cites only confirm the *Mercedes*'s entitlement to sovereign immunity. Article 8 of the 1958 Geneva Convention on the High Seas—a provision Odyssey conveniently ignores (Objs. at 23-24)—extends "complete immunity" to warships without exception. Geneva Convention on the High Seas [hereinafter Geneva Convention] arts. 8(1), Apr. 27, 1958, 13 U.S.T. 2312, 2315-16, 450 U.N.T.S. 81, 82 (extending immunity to warships).[14] Odyssey's Objections admit that the *Mercedes* is a "Spanish navy frigate" (Objs. at

---

[14] By definition, warships are deemed to be engaged in "non-commercial" service. (*See* Doc. 235-6, Stmt. of Int. of the U.S. Dept. of Navy at ¶ 8; U.S. U.S. Stmt. of Int. at 21-23); U.N. Conference on the Law of the Sea, Geneva, Switz., Feb. 24-Apr.27, 1958, *IV Official Records: Second Committee*, at 33, U.N. Doc. No. A/CONF.13/40 (noting that the draft treaty "divided ships into . . . government ships *other than warships*[] and warships") (emphasis added); International Convention on Salvage art. 4(1), Apr. 28, 1989, S. Treaty Doc. No. 102-12, at 4, 1953 U.N.T.S. 194, 196 (cited in Objs. at 26) (immunizing "warships *or other non-commercial vessels*") (emphasis added); UNESCO Convention on the Protection of Underwater Cultural Heritage arts. 1(8), 2(8), Paris, Fr., Nov. 6, 2001, 41 I.L.M. 40, 42 (2002) (cited in Objs. at 26) (defining "[s]tate vessels" as "warships, and *other vessels* . . . that were owned or operated by a State and used . . . only for government non-commercial purposes," without "modifying the rules of international law and State practice pertaining to sovereign immunities") (emphasis added); Brussels Convention on the Unification of Certain Rules Concerning the Immunity of State-Owned Ships, Apr. 10, 1926, 176 L.N.T.S. 199 (cited in Objs. at 26) (immunizing "ships of war, (continued…)

14), yet they omit that Article 8 of the Geneva Convention specifically applies to warships. Article 9 of the Geneva Convention, on which Odyssey seeks to rely (Objs. at 23-24), is a separate article relating to other types of government-owned vessels that intentionally puts them in a separate category. (*See* U.S. Stmt. of Int. at 21-22.)

Article 95 of the 1982 United Nations Convention on the Law of the Sea ("UNCLOS"), Dec. 10, 1982, 1834 U.N.T.S. 4, 41, 21 Int'l Legal Materials 1261, 1288, also nowhere acknowledged in Odyssey's Objections, carries forward the same complete immunity of warships. Article 95 unambiguously provides that "[w]arships on the high seas have complete immunity from the jurisdiction of any state other than the [F]lag State." *Id.* art. 95. The United States considers Article 95 a "vital rule" of international law because it "protects and strengthens the key principle of sovereign immunity for warships and military aircraft. Although not a new concept, sovereign immunity is a principle of vital importance to the United States. The Convention provides for a universally recognized formulation of this principle." President's Transmittal of UNCLOS to the Senate, 1995 WL 655157, at *1412 (Oct. 7, 1994); *see also* U.S. Stmt. of Int. at 22.

Odyssey's attempts to manufacture a treaty-based exception in this case should therefore be rejected.

---

State-owned [vessels] and *other vessels* owned or operated by a State and employed exclusively . . . on Government and non-commercial service") (emphasis added); Convention for the Unification of Certain Rules of Law Respecting Assistance and Salvage at Sea art. 14, Sept. 23, 1910, 37 Stat. 1658, 1672, 1 Bevans 780, 786 ("This Convention shall not apply to *ships of war or* to Government ships appropriated exclusively to a public service.") (emphasis added).

## C. Immunity Does Not Depend on Physical Possession.

The R&R disposes of Odyssey's effort to reargue that sovereign immunity is conditioned on physical possession (Objs. at 42-43): "No section of the FSIA imposes the possessory requirement Odyssey advances, and I refuse to read one into the statute." (R&R at 20; *see also id.* (noting that Congress intended "[c]laims of foreign states to immunity . . . [to] be decided by courts . . . in conformity with the principles set forth in [the FSIA].")). Rewriting a "possession" exception into the FSIA would lead to the absurd result that "a foreign state would always be required to litigate salvage claims against any of its sunken flagged vessels, even its warships." (R&R at 20-21.)

Odyssey ignores the text and purposes of the FSIA and misrepresents the import of the cases it cites to posit a non-existent "possession" exception. (Objs. at 42-43.) As Magistrate Judge Pizzo noted, *Deep Sea Research* is inapposite because it did not concern the FSIA, the statute that "provides the sole basis for obtaining jurisdiction" as to a foreign state. (R&R at 20 (quoting from *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993)) (internal quotations omitted).) Nor can *Deep Sea Research* supply the "jurisprudence" that Odyssey claims should be "assumed" to have been considered by Congress when it enacted the FSIA (Objs. at 42-43), since *Deep Sea Research* was decided over 20 years after the FSIA was enacted.[15]

---

[15] Not surprisingly, Odyssey's *Deep Sea Research* argument has been rejected by other courts in shipwreck cases. In *Fathom Exploration, LLC v. Unidentified Shipwrecked Vessel*, the salvor also claimed that *Deep Sea Research* means a sovereign "cannot successfully challenge [an *in rem* claim to shipwreck] on sovereign immunity grounds unless it actually possesses the *res* . . . ." 352 F. Supp. 2d 1218, 1229 n.15 (S.D. Ala 2005). The court pointed out that "[t]his is a *non sequitur*." *Id.*; *see also Great Lakes Exploration Group LLC v. Unidentified Wrecked And (For Salvage-Right Purposes) Abandoned Sailing Vessel*, 522 F. 3d 682, 688 (6th Cir. 2008) (*Deep Sea Research* "made clear" that once a state shows ownership of a shipwreck, "the federal courts lack jurisdiction").

Neither do the other Supreme Court cases Odyssey cites supply an implicit "possession" exception to immunity. These cases simply stand for the proposition that a "mere suggestion" of a sovereign's interest, without a factual showing in support, is insufficient to dismiss claims against the *res* on immunity grounds. *The Pesaro*, 255 U.S. 216, 217-19 (1921) (reversing dismissal of an *in rem* claim against a vessel based merely upon the "suggestion" of Italy that it owned and possessed the vessel at the time of the arrest); *The Navemar*, 303 U.S. 68, 74-75 (1938) (reversing the Circuit Court's acceptance of a foreign sovereign's claim, without a factual showing, as sufficient for dismissal). It is not enough merely to allege a sovereign interest: the state must come forward with evidence of its interest for review by the court, just as foreign sovereigns must do under the FSIA and as Spain has more than done in this case. (R&R at 16-18); *see S & Davis Int'l, Inc. v. Republic of Yemen*, 218 F.3d 1292, 1300 (11th Cir. 2000). Odyssey's attempt to write a "possession" exception would "gut the very purpose of sovereign immunity" and is therefore without merit. (R&R at 19-20.)

**D.    Section 1605(b) Provides No Back-Door Exception to Foreign Sovereign Immunity Here.**

Odyssey tries to circumvent Section 1609 of the FSIA by once again asking the Court to apply Section 1605(b) to its salvage claim. (Objs. at 44-45.) But, as Magistrate Judge Pizzo explained, Sections 1609 and 1605(b) are mutually exclusive, and Section 1609 clearly applies to Odyssey's claim. (R&R at 26-28; *see also* H.R. Rep. No. 94-1487, at 21 (1976) ("In view of section 1609 . . ., section 1605(b) is designed to avoid arrests of vessels or cargo of a foreign state to commence a suit."); *Mangattu v. M/V Ibn Hayyan*, 35 F.3d 205, 209 (5th Cir. 1994)

("The plain words of [§ 1609] clearly preclude reading the language of §§ 1605 and 1606 to control the issue in this case.")[16]

## IV. THE R&R APPROPRIATELY RECOGNIZES THE COMPELLING INTERNATIONAL COMITY CONSIDERATIONS IMPLICATED BY THIS CASE.

### A. Exercising Jurisdiction Over the *Res* Would "Frustrate FSIA's Goals and Impermissibly Prejudice Spain."

The R&R appropriately recognizes and applies the compelling international comity considerations inherent in this case involving a shipwreck far from U.S. shores, the sovereignty of the flag State in its vessels, and respect for another nations' "patrimonial interests" (R&R at 14), including for those who died in the service of their nation. As a starting point for its legal analysis, the R&R correctly notes that "a court should wade carefully into international waters to adjudicate a salvage claim, particularly one that concerns a historical wreck with significant loss of life":

> a court must be sensitive to the principle of international comity when dealing with a dispute involving the exercise of extraterritorial jurisdiction, as the application of international law evokes a sense not only of discretion and courtesy but also of obligation among sovereign states.

---

[16] Indeed, Odyssey undermines its own argument by positing that *in personam* jurisdiction under 1605(b) "only makes sense if a foreign sovereign has actual possession of the *res* underlying the suit" (Objs. at 45), while at the same time arguing that Spain is not in possession. If Odyssey were right, then every "*in personam*" salvage claim against foreign sovereigns' vessels would be *per se* exempt from the FSIA. 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 16-7 (4th ed. 2004) ("[B]oth the law of salvage and finds presuppose that *the salvor has reduced the property to its possession or control*; without this, subject matter jurisdiction is absent.") (emphasis added).

(R&R at 14.)  Exercising jurisdiction over the *res* as Odyssey advocates would not only violate international law regarding the "special status" of "warships," (R&R at 23; *see also supra*), it would also "frustrate FSIA's goals and impermissibly prejudice Spain."  (R&R at 2.)

Spain's interests are clear and compelling.  As summarized by Admiral Teodoro de Leste Contreras, Director General of Spain's Institute of Naval History and Culture, the Naval Museum, and the Spanish Navy's Archives, Spain "rejects, denies, and refuses to recognize the . . . disturbance by Odyssey of our warship, its contents, and the resting place of those who perished when the ship was attacked in what represented a crucial moment in our history."  (*See* Doc. 131-2, Ex. A (de Leste Declaration) at ¶ 42.)

The R&R could not be more correct in finding that Chief Justice Marshall's teaching in *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 120, 134 (1812) that "a public armed vessel of a foreign sovereign, in amity with our government, is not subject to the ordinary judicial tribunals of the country," and the "immunity of the public armed vessel of a sovereign" stems from "the nature of sovereignty, and from the universal practice of nations" "still resonate[s]."  (R&R at 15 n.13.)  The principles laid down in *The Schooner Exchange* that a "public armed ship[]" acts "under the immediate and direct command of the sovereign; is employed by him in national objects. . . . [I]nterference cannot take place without affecting his power and dignity" remain in full force to this day, as the R&R finds.  (*Id.*)

"Dividing the *Mercedes*'s cargo, either geographically or by ownership rights (private versus government owned) as Odyssey proposes, contradicts *Pimentel*'s teaching by prejudicing Spain's sovereign interests and countering principles of comity."  (R&R at 23 (also citing Restatement (Third) of Foreign Relations Law § 421(1987).)  In *Pimentel*, the Supreme Court noted that "[c]omity and dignity interests take concrete form" where the relevant claims "arise

from events of historical and political significance for the [sovereign] and its people" and where the sovereign has "a unique interest" in the property at issue. *Pimentel*, 128 S. Ct. at 2182. Giving proper weight to the interests of a foreign state includes taking into account the "specific affront that could result . . . if property [the sovereign has claimed] is seized by the decree of a foreign court." *Id.* The R&R is unquestionably correct that denying Spain's motion and dividing the *res* in this case over Spain's objections would give "insufficient weight to the sovereign status" of Spain. *Pimentel*, 128 S. Ct. at 2182; *see also id.* at 2191 ("dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign") (quoted in R&R at 23.)

According to Odyssey, *Pimentel* is distinguishable because it "involved adjudication of rights to property after a determination was made that the relevant interested entities enjoyed sovereign immunity." (Objs. at 40 (emphasis omitted).) *Pimentel* actually held the opposite; the Supreme Court reversed the Ninth Circuit and dismissed the case in its entirety, noting that "[t]he court's consideration of the merits *was itself an infringement on foreign sovereign immunity*." *Pimentel*, 128 S. Ct. at 2189 (emphasis added). *Pimentel* recognized that the U.S. courts have no role to play in a dispute between another nation and its nationals in disregard of the sovereign's wishes, and especially where another sovereign's historic interests are implicated.[17] "Split[ting]

---

[17] Odyssey also argues that, unlike in *Pimentel*, there is "no risk of 'piecemeal litigation and inconsistent, conflicting judgments' regarding any portion of the *res*." (Objs. at 41 (quoting *Pimentel*).) But "split[ting] the cargo" from a sovereign's vessel and "then, to vindicate the individual claimants, split[ting] the cargo into separate, private lots," as Odyssey proposes, surely would constitute "piecemeal litigation" as well as result in "inconsistent, conflicting judgments." Odyssey's own coin expert admits that dividing the coins aboard the *Mercedes* up by "shipper" would be impossible. (*See* Doc. 138-90, Ex. H (Tedesco Aff.) at 6 ("There is no way to link specific coins to any specific shipper.").)

the cargo from the vessel and then, to vindicate the individual claimants, split[ting] the cargo into separate, private lots" would, as the R&R shows, "necessarily implicate Spain's rights to the property" in a manner fundamentally inconsistent with international comity. (R&R at 22.) This is the very kind of interference with a foreign sovereign's interest which *Pimentel* commands U.S. courts to avoid.[18]

Respecting these principles also avoids intrusion in foreign relations. International comity "contributes so largely to promote justice between individuals, and to produce a friendly intercourse between the sovereignties to which they belong." *Belize Telecom, Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1305 (11th Cir. 2008) (quoting *Bank v. Earle*, 38 U.S. (13 Pet.) 519, 589 (1839)). Section 1609 of the FSIA was enacted for the purpose of avoiding "serious friction in [the] United States' foreign relations." (R&R at 22 (quoting FSIA legislative history).) "Our Constitution charges the political branches with the conduct of foreign affairs," and exercising jurisdiction over another sovereign's vessels "would interfere with this long standing political judgment in sensitive matters of international law." *Sea Hunt*, 221 F.3d at 643.

As the R&R finds, these same considerations would apply as much or more to the individual claimants (Docs. 227-29, 234)), who purport to be descendants of ancestors who suffered losses in the sinking of the *Mercedes*.[19] (R&R at 28.) Adjudicating these claims would

---

[18] *Pimentel* thus also applies no less to Peru's claim.

[19] One claimant, Jose Antonio Rodriguez-Menendez, purports to assert rights not because of any connection to the *Mercedes*, but rather based on a claim that an ancestor of his was granted rights in 1555 to "one fifteenth part of all the income, mines of gold and silver, precious stones, pearls and products which we shall have from the said lands and provinces of Florida." (Doc. 175, Rodriguez-Menendez Verified Claim; Doc. 234, Rodriguez-Menendez Objs.) By Article 2 of the 1819 Treaty of Amity, Settlement and Limits Between the United States of America and His (continued…)

involve unraveling two centuries of Spanish genealogies and Spanish estate and succession law (including the competing claims of rival alleged descendants of Second Squadron Leader Don Diego de Alvear (Docs. 178, 229)) and have this Court adjudicate those claims as against Spain's 1824-1851 indemnification procedure pursuant to Royal Order for those who suffered losses on the *Mercedes*, discussed *supra*. Any such exercise would also necessarily address the current legal status of any such claims as against, *inter alia*, Spain's cultural heritage and public patrimony laws. (Doc. 131-15, Ex. F (de Cabo Decl.) at ¶ 6.)[20] This court is not the forum for such an inquiry, and these claims certainly cannot override Spain's sovereign interests.[21] "The adjudication of the rights of private claimants would also necessarily implicate Spain's rights to the property" in violation of Spain's "unique interest in resolving the ownership of or claims to the [property]." (R&R at 22; *Pimentel*, 128 S. Ct. at 2190.)

## B. The R&R Recognizes The Heightened Comity Interest in Protection of Military Vessels and Military Casualties.

By respecting Spain's interests, the R&R also recognizes the U.S. comity interest in protecting its own vessels and casualties (R&R at 28) reflected in centuries of case law,

Catholic Majesty, Spain ceded Florida "in full property and sovereignty" to the United States. 8 Stat. 252.

[20] Odyssey's and the individual claimants' claims also implicate the act of state doctrine, which "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964); *see also Glen v. Club Mediteranee, S.A.*, 450 F.3d 1251, 1253 (11th Cir.) (act of state doctrine "prevents any court in the U.S. from declaring that an official act of a foreign sovereign performed within its territory is invalid"). *See also* R&R at 32-33.

[21] Under the U.S.-Spain Treaty of Friendship and General Relations, Odyssey and all other claimants are subject to the same prohibition of salvage or other access to the *Mercedes*'s contents without Spain's consent that the U.S. mandates for its own vessels. (*See* Part III.C., *supra*; Doc. 235-2, U.S. Stmt. of Int. at 15; Doc. 235-6, Stmt. of Int. of the U.S. Dept. of the Navy at ¶¶ 11-12; 10 U.S.C. § 1406(d)(1).)

customary international law, and international treaties. *See* Part III.C., *supra*. The need for reciprocity among sovereigns is the animating principle underlying the FSIA. *Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1295 (11th Cir. 1999) (FSIA enacted to "promot[e] harmonious international relations" and to provide "foreign sovereigns treatment in U.S. courts that it is similar to the treatment the United States would prefer to receive in foreign courts"). Exercise by a foreign court of control over a U.S. warship, its contents, or its casualties would intrude on U.S. sovereignty, when the "United States desires sovereign nations to recognize the United States' perpetual interests in its own craft." (Doc. 235-6, Stmt. of Int. of the U.S. Dept. of Navy at ¶ 16.) *See also Sea Hunt*, 221 F.3d at 647 (noting the U.S. "government interest" in "seek[ing] to insure that its sunken vessels and lost crews are treated as sovereign ships and honored graves, and are not subject to exploration, or exploitation, by private parties seeking treasures of the sea" because, *inter alia*, the "[p]rotection of the sacred sites of other nations thus assists in preventing the disturbance and exploitation of" the U.S.'s).

The United States' strong comity interest has been made clear in this case:

> [T]he United States has a foreign policy interest in obtaining reciprocal treatment from Spain and other countries for its own vessels. As a major maritime power with the world's largest Navy, adherence to the aforementioned principles of U.S. and international law regarding the protection of sunken state vessels is of significant importance to the United States. The United States has thousands of sunken warships located in waters across the globe—in U.S. waters, foreign waters, and international waters. The sites of these sunken warships may not only contain the vessels, but also cargo and equipment of importance to the United States, including that which is property of the United States Government and which may contain protected information, and serve as the final resting place for individuals lost in service to their country. The United States must uphold the principles that afford protection to these sunken vessels, not only to meet its obligations under international law, but also to ensure commensurate reciprocal treatment by other States of our vessels.

(Doc. 235-2 (Ambassador Balton Decl.) at ¶ 19.) Allowing or rewarding unauthorized disturbance of the *Mercedes* would undermine the U.S. Navy's own "strong interest in ensuring

that foreign sunken military craft, their contents and debris fields are treated in the same way that we would want sunken military craft of the United States *and their contents and debris fields* to be treated." (Doc. 235-6, Stmt. of Int. of the U.S. Dept. of Navy at ¶ 17.) (emphasis added).)

Protecting the *Mercedes* from "exploration, or exploitation, by private parties seeking treasures of the sea" protects the U.S.'s interest in its own counterparts to the *Mercedes*. The R&R appropriately notes that "[i]nternational law recognizes the solemnity of their [the *Mercedes* and those who perished with her] memorial, and Spain's sovereign interests in preserving it. This Court's adherence to those principles promotes reciprocal respect for our nation's dead at sea." (R&R at 33 (citation omitted).)

## V.  THE R&R'S RECOMMENDED DISPOSITION OF THE *RES* IS CORRECT AS A MATTER OF LAW.

### A.  The R&R Appropriately Recommends Release of the *Res*.

By bringing this action, Odyssey sought to put the *res* in the custody of the Court. Odyssey is only a substitute custodian *pendente lite*, with no possessory rights to anything taken from the *res*. Everything Odyssey took from the *res* is under the authority of the Court and the U.S. Marshal "for . . . safekeeping until further Order of this Court." (Doc. 8, Order Granting Mot. for Appt. of Substitute Custodian, at ¶ 3.) Odyssey turns the law on its head when it suggests that returning the *res* to Spain would be error. (Objs. at 45-46.) Granting Spain's motion to dismiss and vacating the arrest necessarily means that the arrested *res* cannot be retained by the party that wrongfully arrested it, and it must be released to the prevailing party-claimant, as the R&R provides. (R&R at 34.)

It bears noting in this connection that Magistrate Judge Pizzo granted not only Spain's motion to dismiss, but also Spain's simultaneously-filed motion to vacate the arrest on the

ground that Odyssey could not meet its burden to sustain the arrest of the *res*.[22]  *Id.*; *see* Doc. 132; Doc. 131 at 16 n.8.  *See also Aqua Stoli Shipping, Ltd. v. Gardner Smith Pty Ltd.,* 460 F. 3d 434, 445 (2d. Cir. 2006) ("a district court *must* vacate an attachment if the plaintiff fails to sustain his burden" in showing why the seizure should not be vacated) (emphasis added). Magistrate Judge Pizzo was unquestionably correct that dismissal of Odyssey's claims and vacatur of the arrest necessarily means that Odyssey cannot retain what it took from the *res*, and that everything taken from the *res* must be released to Spain.  (R&R at 34.)

1.  ***Odyssey Has No "Right to Possession" of The* Res*; It Is Merely The Substitute Custodian For The U.S. Marshal.***

Odyssey's objections to releasing the *res* disregard the fact that its own action sought to place the *res* under the authority of this Court.  It is the U.S. Marshal as an arm of the Court, not Odyssey, which controls the *res.*  There was no *res* in this case until this Court arrested the Defendant at Odyssey's request, and upon arrest, this Court has exclusive control over the *res*. (R&R at 13 ("To invoke *in rem* jurisdiction, the *res* must be *in custodia legis*—in the *court's* possession") (emphasis added)); *see also R.M.S. Titanic, Inc.*, 171 F.3d at 964 ("Only if the court has exclusive custody and control over the property does it have jurisdiction over the property . . . .").

Odyssey's claim that it has any possessory "rights" to the *res* (Objs. at 46), let alone rights superior to Spain, is simply incorrect.  The *res* is, from the moment of judicial arrest,

---

[22] Odyssey's Objections make no mention of, and no objection to, the recommended granting of Spain's motion to vacate the arrest. "[I]t is incumbent upon the parties filing objections to an R & R to specifically identify those findings objected to and the specific basis for such objections," and "[i]f an objection fails to identify the specific findings or a specific basis the district court need not consider it."  *State Contracting & Engineering Corp. v. Condotte America, Inc.*, 368 F. Supp. 2d at 1300.

under the authority of the U.S. Marshal, and subject to the court's orders, not the wrongful arrestor whose status as substitute custodian necessarily ends when its claims are dismissed and the underlying arrest is vacated.

2. ***The* Res *In The Marshal's Custody Is to Be Released "Upon the Dismissal of The Action."***

Supplemental Rule (E)(5)—which Odyssey's Objections ignore—speaks directly to the Court's authority to release the *res* in this case. It provides that an order releasing "any vessel . . . in the custody of the marshal" may be entered "as of course by the clerk . . . *upon dismissal or discontinuance of the action*." Fed. R. Civ. P. Supp. Rule (E)(5)(c) (emphasis added); *see also* Local Admiralty R. 7.05(i)(3) (allowing for "release of property in accordance with Supplemental Rule (E)(5)" "upon the dismissal or discontinuance of an action"). Despite Odyssey's intimations to the contrary (*see* Objs. at 46), Supplemental Rule (E)(5) makes no distinction between a dismissal on the merits or on jurisdictional grounds. The rule clearly provides for release of arrested *res* upon dismissal for any reason, including for lack of subject matter jurisdiction. Release of the *res* in accordance with the R&R is therefore entirely proper.

3. ***The Return of The* Res *Is Contemplated By FSIA Section 1609.***

The R&R's disposition of the *res*—including vacating the arrest, terminating Odyssey's substitute custodianship, and directing Odyssey to return the *res* to Spain—is also entirely consistent with FSIA Section 1609 and the long-standing historical immunities of warships discussed *supra*. *See, e.g.*, *Mangattu v. M/V Ibn Hayyan*, 35 F.3d 205, 207 (5th Cir. 1994) ("appellants could not arrest or attach the vessel" because of FSIA § 1609; therefore "district court[-]ordered release of the vessel" was proper). Consistent with these obvious principles, in *Sea Hunt*, the court held that Spain, "as the sovereign owner [that] has come forward to assert a

claim to its property," 221 F.3d at 641, was entitled to the "well-established prerogatives of sovereign nations" to dismissal of all claims against its sovereign vessels and to the return to Spanish custody of all artifacts taken from the sites. 221 F.3d at 644-46; Opinion and Order, *Sea Hunt*, Case No. 2:98-cv-00281 (E.D. Va.), (Doc. No. 139) (ordering Sea Hunt to "deliver to Spain any artifacts" advertently or inadvertently "salvaged from JUNO which are currently in Sea Hunt's possession"), *aff'd in relevant part*, *Sea Hunt* (4th Cir. 2000). This Court's power to grant Spain's motion and vacate the arrest on the ground that the *res* is the *Mercedes* necessarily entails the power to terminate the substitute custodianship and release the *res* to Spain. Any other result would make the proscription in the FSIA barring the arrest of foreign property a dead letter.

The sole case Odyssey cites for the proposition that granting Spain's motion and vacating the arrest could somehow not result in returning the *res* to the prevailing party, *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998) (cited in Objs. at 45), has no bearing on the consequences of a finding of immunity, dismissal of claims against the *res*, and vacatur of the arrest. *Steel Co.* did not concern an *in rem* arrest. Nothing was taken into the custody of the court. Nor did it involve the FSIA. Rather, in *Steel Co.*, the Supreme Court held that a lack of jurisdiction mandates dismissal of a plaintiff's claims, just as the R&R holds. *See Steel Co.*, 523 U.S. at 98 (noting "two centuries of jurisprudence affirming the necessity of determining jurisdiction before proceeding to the merits"); R&R at 4-5. That unremarkable holding offers no support for the remarkable proposition that, on dismissal of an *in rem* case and vacatur of an arrest, the court should not release to the prevailing party the *res* that was wrongfully arrested.

If Odyssey's proposed disposition of the *res* were correct, it and other would-be salvors would be rewarded for disturbing sunken sovereign warships and gravesites—in contravention of

U.S., international, and admiralty law, see *supra*—by (1) looting their remains and contents, (2) seeking warrants of arrest, and then (3) arguing that even if their claims are barred and the arrest must be vacated, the court lacks power to make restitution of anything wrongfully taken from the *res*.[23]

## CONCLUSION

For the foregoing reasons, Spain respectfully submits that the R&R contains no error of fact or law and the recommended granting of Spain's Motions to Dismiss or for Summary Judgment and to Vacate the Arrest should be affirmed.

Respectfully submitted on August 31, 2009,

s/ James A. Goold
James A. Goold                           David C. Banker
District of Columbia Bar #430315         Florida Bar #352977
Covington & Burling LLP                  Bush Ross, PA
1201 Pennsylvania Ave. NW                220 S. Franklin St.
Washington, DC  20004                    Tampa, FL  33601-3913
Telephone: (202) 662-5507               Telephone: (813) 224-9255
Fax: (202) 662-6291                      Fax: (813) 223-9255
E-mail: jgoold@cov.com                   E-mail: dbanker@bushross.com

---

[23] Odyssey's claim is especially indefensible because it shipped its first planeload of artifacts from Gibraltar on April 10, 2007 with a false representation in its export and import documents that it had recovered the materials "pursuant to a Federal arrest and resulting court order." (Doc. 37-1, Spain Mot. to Dismiss Am. Compl., Ex. 1 (UK Export Documents) at 4.)  In fact, Odyssey had not yet even sought, let alone obtained, a "federal arrest and resulting court order."  (*See* Doc. 3, Odyssey Mot. for Order Directing Clerk to Issue Warrant of Arrest, dated April 11, 2007.)

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, August 31, 2009, I caused the foregoing Response to Odyssey's Objections to the Magistrate's Report and Recommendation on Spain's Motion to Dismiss the Amended Complaint or for Summary Judgment and Spain's Motion to Vacate the Arrest to be served on counsel of record for all parties by filing with the Court via its CM/EMF system.

s/ James A. Goold
James A. Goold
District of Columbia Bar #430315
Covington & Burling LLP
1201 Pennsylvania Ave. NW
Washington, DC  20004
Telephone: (202) 662-5507
Fax: (202) 662-6291
E-mail: jgoold@cov.com
