**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
**IN ADMIRALTY**

ODYSSEY MARINE EXPLORATION, INC.,

                      Plaintiff,

           v.

MAP

THE UNIDENTIFIED SHIPWRECKED VESSEL,
If any, its apparel, tackle, appurtenances and
cargo located within a five mile radius of the
center point coordinates provided to the Court
under seal,

                      Defendant,
                      *in rem*

and

THE KINGDOM OF SPAIN, THE REPUBLIC OF PERU,
*et al.*,

                      Claimants.
_____/

CIVIL ACTION

Case No. 8:07-cv-00614-SDM-
MAP

**KINGDOM OF SPAIN RESPONSE**
**TO REPUBLIC OF PERU OBJECTION**
**TO THE JUNE 3, 2009 REPORT AND RECOMMENDATION**

# TABLE OF CONTENTS

**Page**

I.  PERU DOES NOT OBJECT TO MAGISTRATE JUDGE PIZZO'S
    DISPOSITIVE FINDINGS OF FACT. ............................................................. 4

II. PERU'S OBJECTION FAILS TO DEMONSTRATE THAT MAGISTRATE
    JUDGE PIZZO COMMITTED LEGAL ERROR. ........................................ 4

    A.  Magistrate Judge Pizzo Correctly Finds that Spain's Immunity Under the
        FSIA Mandated Granting Spain's Motion to Dismiss Or For Summary
        Judgment. ....................................................................................................... 4

    B.  Magistrate Judge Pizzo Correctly Rejected The International Law
        Arguments of Peru. ..................................................................................... 6

        1.  *By its own terms, Article 149 of the U.N. Convention on the Law of
            the Seas does not apply to the Mercedes.* .................................... 6

        2.  *Peru's argument that "this Court must rule" on its claim because
            no international forum will is incorrect as a matter of law.* ..................... 10

        3.  *No "international law related to the succession of states" applies
            to this case.* ................................................................................. 10

        4.  *Peru's arguments are inconsistent with U.S. interpretations of
            international and maritime law.* ................................................. 15

    C.  No Authority Peru Cites Supports its Claim that Any Rights The Res Were
        Ceded To Peru Or That This Would Allow This Court to Adjudicate
        Peru's Succession-Based Claim. .................................................................. 17

        1.  *Original jurisdiction cases regarding apportionments of property
            or water rights among U.S. states are not applicable.* ............................. 17

        2.  *The Breakups of the Soviet Union and Yugoslavia are irrelevant to
            this case.* ...................................................................................... 18

    D.  Magistrate Judge Pizzo Correctly Decided that Adjudicating Peru's Claim
        Would "Undermine the Traditional Notion of International Comity." ................. 19

    E.  Spain Has Not Waived its Right to Sovereign Immunity under FSIA By
        Filing a Claim to the Res. ............................................................................ 23

The Kingdom of Spain ("Spain") hereby responds to the Republic of Peru ("Peru")'s Objection (Doc. 231, "Peru Obj.") to Magistrate Judge Pizzo's June 3, 2009 Report and Recommendation.[1] (Doc. 209.)

After a careful review of the evidence and legal principles Peru proffered in support of its Response to Spain's Motion to Dismiss or for Summary Judgment in this case concerning the *res* that Peru agrees is the Spanish warship *Nuestra Señora de las Mercedes* ("*Mercedes*") (Doc. 141, Peru Resp.); the Reply filed by Spain, (Doc. 161, Spain Repl.); and Peru's Sur-Reply (Doc. 206),[2] the Report and Recommendation ("R&R") found that: (1) in 1804, when the *Mercedes* sailed from El Callao for Montevideo and Spain, what is now Peru was a Vice Royalty of Spain (R&R at 28); (2) Spain's showing that "the *res* is the *Mercedes*" means that "her status [is] cloaked with her sovereign's immunity" (*id.* at 1, 30); (3) that immunity "divest[s] the Court of

_____

[1] Spain also simultaneously files its Response to the Objections to the Magistrate's Report and Recommendation by Odyssey and Individual Claimants. ("Spain Resp. to Odyssey Objs.") To minimize repetition, Spain's Response to those Objections is incorporated herein by reference.

[2] The Affidavit of Professor John Norton Moore that is attached to Peru's Objection is a refiling of the same Exhibit Peru filed with its Sur-Reply, and constituted the only "evidence" Peru submitted. *Compare* Doc. 206-1, Peru Sur-Repl., Ex. A (Moore Aff.) *with* Peru Obj., Ex. A. (Moore Aff.) Peru argues that Magistrate Judge Pizzo erred by not specifically referring to Prof. Moore's affidavit (Peru Obj. at 30), but the cases it cites do not support that proposition. *See* Fed. R. Civ. P. 44.1 ("the court *may* consider" testimony "in determining foreign law"); *United States v. Juardo-Rodriguez*, 907 F. Supp. 568, 574 (E.D.N.Y. 1995) ("A court *may* seek the aid of expert witnesses in interpreting . . . international law") (emphasis in both added); *United States v. Royal Caribbean Cruises, Ltd.*, 11 F. Supp. 2d 1358, 1366, 1372 (S.D. Fla. 1998) (noting only that allowing expert testimony, including by affidavit, was "helpful" to the court in that case). (All cited at Peru Obj. at 30.) Moreover, Prof. Moore's affidavit merely advocates the same contentions that Peru presented at length in opposition to Spain's motion which Magistrate Judge Pizzo properly considered and rejected.

jurisdiction to resolve Peru's claim" (*id.* at 30); (4) Peru's claim is "an equitable one grounded on claims of exploitation by its former colonial ruler" (*id.* at 29); (5) Peru's arguments were "not persuasive" (*id.* at 31); and (6) interposing the Court between "one of [Spain's] sunken warships" and Peru would "undermine the traditional notions of international comity," and would make this Court the arbiter of a matter that "is best resolved through direct negotiations between the two and not in this forum." (*Id.* at 31-33.) Magistrate Judge Pizzo correctly recommends that Spain's Motion to Dismiss or for Summary Judgment be granted, notwithstanding Peru's opposition, and that the *res* be released to Spain. (*Id.* at 33-34.)

Rather than demonstrating factual or legal error, Peru's Objection "simply summarize[s] what has been presented before." *See infra.* Peru's Objection gives this Court no reason not to rely on and adopt the R&R's findings of fact and conclusions of law.

## STANDARD OF REVIEW

The Magistrate Act's Section 636 calls for a district court to make a "de novo determination of those portions of the [magistrate's report and recommendations] to which objection is made." *United States v. Raddatz*, 447 U.S. 667, 673 (1980) (quoting 28 U.S.C. § 636). "[I]n providing for a 'de novo determination' rather than de novo hearing, Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations." (*Id.* at 676.)

In addition, "[p]arties filing objections must specifically identify those findings objected to," and "[f]rivolous, conclusive, or general objections need not be considered by the district court." *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir. 1982). A district court may make a "de novo determination of those portions of the [magistrate's report and recommendations] to which objection is made." *United States v. Raddatz*, 447 U.S. 667, 673 (quoting 28 U.S.C. § 636). "[I]n providing for a 'de novo determination' rather than de novo hearing, Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations." *Id.* at 676. It is also "incumbent upon the parties filing objections to an R&R to specifically identify those findings objected to and the specific basis for such objections." *State Contracting & Engineering Corp. v. Condotte America, Inc.*, 368 F.Supp.2d 1296, 1300 (S.D. Fl. 2005); see *also Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988). "If an objection fails to identify the specific findings or a specific basis the district court need not consider it." *Condotte America, Inc.*, *id.* General or reiterative objections are not favored:

> A general objection, or one that merely restates the arguments previously presented[,] is not sufficient to alert the court to alleged errors on the part of the magistrate judge. An "objection" that does nothing more than state a disagreement with a magistrate's suggested resolution, or simply summarizes what has been presented before, is not an "objection" as that term is used in this context.

*VanDiver v. Martin*, 304 F. Supp. 2d 934, 937 (E.D. Mich. 2004) (citing *Thomas v. Arn*, 474 U.S. 140 (1985)); *see also Spencer v. Bouchard*, 449 F.3d 721, 725 (6th Cir. 2006) ("Overly general objections do not satisfy the objection requirement. . . . The objections

must be clear enough to enable the district court to discern those issues that are dispositive and contentious.") (citation omitted).

## ARGUMENT

### I. PERU DOES NOT OBJECT TO MAGISTRATE JUDGE PIZZO'S DISPOSITIVE FINDINGS OF FACT.

Peru "agrees with the Recommendation's findings of historical fact" as to the identity of the *res* in this case. (*See* Peru Obj., Part III.A.) Peru does not dispute Magistrate Judge Pizzo's finding that "[t]he *res* is the *Mercedes*," a Frigate of War of the Royal Spanish Navy "commanded by officers and crewed by sailors of the Royal Spanish Navy throughout its service." (R&R at 12, 17.) Nor does Peru dispute the loss of more than 250 of those officers and crew in the sinking of the *Mercedes* and its pivotal role in the history of Spain. Peru also does not dispute that (1) "[w]hen the *Mercedes* departed El Callao in 1804, [Spain's] Viceroyalty of Peru covered present day Peru" (R&R at 28); (2) Peru "did not exist as a sovereign" at that time (*Id.* at 3); (3) in the 1824 Capitulation of Ayacucho, Spain "surrendered" to Peru "its territory and its objects *within* that territory" (*Id.* at 28) (emphasis added); and (4) the 1879 Peru-Spain Treaty of Friendship and Peace, in which "Spain formally recognized Peru's independence," provided that "there will be a complete forgetting of the past and a solid and inviolable peace between" the two countries. (*Id.*)

### II. PERU'S OBJECTION FAILS TO DEMONSTRATE THAT MAGISTRATE JUDGE PIZZO COMMITTED LEGAL ERROR.

#### A. Magistrate Judge Pizzo Correctly Finds that Spain's Immunity Mandated Granting Spain's Motion to Dismiss Or For Summary Judgment As Against Peru.

Peru's objection fails to show that Magistrate Judge Pizzo errs in his application of these dispositive facts to basic principles of law regarding the immunity of a sovereign vessel from judicial arrest. None of Peru's arguments support the notion that this Court can ignore Spain's showing and reverse Magistrate Judge Pizzo's finding that the fact that the *res* is the *Mercedes*, a Spanish sovereign vessel and warship, mandated the granting of Spain's Motions to Dismiss or for Summary Judgment (Doc. 131) and to Vacate the Arrest (Doc. 132).

Magistrate Judge Pizzo finds that Spain established that the *Mercedes* is the *res* in this case, and that Spain has never abandoned or relinquished its sovereign rights.[3] Magistrate Judge Pizzo also finds that once the *res* had been identified as such, "[i]n rem jurisdiction no longer exists." (R&R at 30.) "[T]he fate of any claim[] against the *res*," the R&R correctly notes, "has always hinged on the wreck's identity or its lack of any discernable identity. With the *Mercedes*'s identity confirmed and her status cloaked with her sovereign's immunity, her jurisdictional mooring line . . . has been severed." (*Id.*)

Peru shows no error in the R&R's holding that Spain's sovereign immunity has "divest[ed] the Court of jurisdiction to resolve Peru's claim to part of the *res*." (*Id.*)

---

[3] Peru repeats in its Objection the argument that "a sovereign cannot assert sovereign immunity if it does not possess the *res*." (Peru Obj. at 10.) This was succinctly dealt with by Magistrate Judge Pizzo: "[Peru's] reasoning is inconsistent. On one hand, Peru agrees that Spain is immune from Odyssey's salvage claim (indeed, it asserts it too is immune from Odyssey's claim); but on the other, it maintains Spain is not immune from Peru's claim against the *res*." (R&R at 29.) Beyond the inconsistency, moreover, Peru's argument seeks to rewrite the FSIA to add a "possession" requirement, and Magistrate Judge Pizzo appropriately declined to do so. (R&R at 20.) *See also* Spain Resp. to Odyssey Objs. at Part III.C.

Instead, Peru argues, without supporting authority, that its claim must be resolved before Spain's motion can be granted. (Peru Obj. at 6-7.) The order of business Peru proposes is contrary to law. *See S & Davis Intern., Inc. v. The Republic of Yemen*, 218 F.3d 1292, 1300 (11th Cir. 2000) (to defeat a motion to dismiss based on lack of subject matter jurisdiction under the FSIA, the opposing party "must overcome the presumption that the foreign state is immune from suit in the United States' courts."); *see also* Doc. 114, Order at 1 ("the Court is duty-bound to determine [the sovereign immunity] issue at the earliest possible stage in the case") (citing *Guevara v. Republic of Peru*, 468 F.3d 1289, 1309 (11th Cir. 2006)). Having shown the *res* is the *Mercedes*, Spain is relieved of litigating "any claims against the *res*" (R&R at 30)—including Peru's claim. And as shown below, Magistrate Judge Pizzo correctly finds that Peru has manifestly failed to demonstrate either factual or legal grounds to deny Spain's motion.

### B. Magistrate Judge Pizzo Correctly Rejects The International Law Arguments of Peru.

#### 1. By its own terms, Article 149 of the U.N. Convention on the Law of the Seas does not apply to the *Mercedes*.

Peru's Objection, like its opposition to Spain's motion, relies heavily on an argument that is based on a misreading of Article 149 of UNCLOS and ignores UNCLOS Article 95 that specifically recognizes complete immunity of the flag state for its warships. (Peru Obj. at 42-51.) Even though Peru does not dispute Magistrate Judge Pizzo's finding that Peru "concedes it has neither signed nor ratified UNCLOS" (R&R at 31), Peru persists in arguing that UNCLOS's Article 149 is "the only relevant rule in UNCLOS or international law" for this case. (Peru Obj. at 47, 50.) However, as Peru

concedes and as Magistrate Judge Pizzo finds (Peru Obj. at 46-47; R&R at 30-31), Article 149 expressly provides that it concerns "objects of an archaeological and historical nature *found in the Area*" (emphasis added), and "the *Mercedes* is not within the 'Area.'" (R&R at 31.) UNCLOS defines the "Area" as "the seabed and ocean floor and subsoil thereof, *beyond the limits of national jurisdiction.*" UNCLOS, art. 1 (emphasis added). In its Objection, Peru acknowledges that the *Mercedes* was not "found in the Area." (Doc. 141, Peru Resp. at 18; Peru Obj. 46-47; Ex. A (Moore Decl.) at ¶ 33 ("technically Article 149 applies only to 'the Area'").) Accordingly, Article 149, by its own terms, has no bearing on this case.

Peru's Objection argues, as Peru did in opposition to Spain's motion (*see* Doc. 141. at 18), that Article 149's plain language of limitation is "irrelevant to this dispute" and "does not affect the Article's application here," "because no nation makes a claim based on the rights of a coastal state." (Peru Obj. at 46-47.) Peru argues that the *Mercedes* sank in Portugal's Exclusive Economic Zone, and Portugal has made no claim to the *Mercedes*; therefore, this Court should rewrite Article 149 for purposes of this case. But the Court may not do so. *See, e.g.*, *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699 (1988) ("When interpreting a treaty, we begin with the text of the treaty and the context in which the written words are used."); *Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 375 (2nd Cir. 2004) ("Where the language of such an international treaty is plain, a court must refrain from amending it because to do so would be to make, not construe, a treaty."); *Brink's Ltd. v. S. African Airways*, 93 F.3d 1022, 1027 (2d Cir. 1996) (where a treaty's language is "reasonably susceptible of only one interpretation,

our task of interpretation ends there") (quotations omitted); Vienna Convention on the Law of Treaties, art. 31.1 ("A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms"). Peru's interpretation of Article 149 also ignores terms of limitation elsewhere in UNCLOS. *See* UNCLOS, art. 134 ("This Part [Part XI, "The Area," which includes Article 149] applies to the Area.").[4] Article 149 by its terms does not apply to a shipwreck outside the "Area," whether a claim "based on any rights it might have as a coastal State" (Peru Obj. at 47) has been made or not.

Peru also argues that it, not Spain, is the "State of origin," the "State of cultural origin," and the "State of historical and archaeological origin" for Article 149 purposes as to coins taken from the *res*. (Peru Obj. at 43-44.) Even if Article 149 were applicable, Article 149 refers to "States," not "territory," and the undisputed historical fact is that what is now Peru was not a "State" in 1804 when the *res* "originated." As Magistrate Judge Pizzo found, and Peru has submitted no evidence to the contrary, the coins are "of Spanish nationality." (R&R at 9.)

An UNCLOS provision ignored by Peru, Article 95, speaks specifically to the *res* in this case, and precludes the application of Article 149 here. UNCLOS Article 95 provides that warships "have complete immunity from the jurisdiction of any State other

---

[4] Professor Moore's Declaration refers to a discarded draft provision that would have applied Article 149 "to all ocean areas." (*See* Doc. 231-1, Ex. A (Moore Aff.) at ¶ 33.) References to a rejected draft proposal only serve to confirm that the drafters of UNCLOS considered whether to apply Article 149 to artifacts found outside the Area and decided not to do so.

than the flag State."[5]  *See also* Statement of Interest and Brief of the United States as *Amicus Curiae* in Support of the Kingdom of Spain (Doc. 235-1, "U.S. Stmt. of Int."), at 22 (UNCLOS's Article 95 establishes "when [warships] are accorded immunity under international law"); *see also* UNCLOS, art. 32 (providing that, except in certain narrow circumstances, "nothing in [UNCLOS] affects the immunities of warships . . . ."). As Magistrate Judge Pizzo finds, the immunity of sovereign vessels, and especially warships, is "rooted in customary international law" (R&R at 26) recognized by the United States since at least 1812 and carried forward explicitly in treaties (including UNCLOS), statutes, and Executive Branch measures which mandate that the flag State's sovereignty be respected. *See, e.g.*, R&R at 24-26; *Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 144 (1812) (interference with a "public armed vessel of a foreign sovereign" "cannot take place without affecting [the sovereign owner]'s power and his dignity"); Int'l

---

[5] Peru also argues that immunity for a sovereign's military vessels ceases if they are not in active service. (Peru Obj. at 22-23.) Peru again seeks to rewrite the FSIA and international law to create an exception that does not exist. No authority strips a sovereign's vessels (or aircraft) of immunity if they suffer misfortune. "[U]nder customary international law, warships and their associated contents are, unless captured prior to their sinking in armed conflict, entitled to recognition . . . of the flag state." (Doc. 235-2 (Decl. of Ambassador Balton) at 2.) *See also Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, 221 F.3d 634, 647 (4th Cir. 2000) (an "original sovereign owner's claim to its shipwrecked vessels" which "sank against [its] will and to which [it] still lay[s] claim" is an interest "rooted in customary international law"); *United States v. Steinmetz*, 973 F.2d 212, 222 (3d Cir. 1992) ("warships that were sunk during military hostilities are presumed not to be abandoned"); *Int'l Aircraft Recovery, L.L.C. v. Unidentified, Wrecked & Abandoned Aircraft*, 218 F.3d 1255, 1258-59 (11th Cir. 2000) ("In the realm of admiralty law, courts have held that the United States has not abandoned its interests in ships sunk over a century ago during the Civil War.").

Peru's arguments are thus also foreclosed by the U.S.-Spain Treaty of Friendship and General Relations. (R&R at 24-25; *see also* Spain Resp. to Odyssey Objs. at Part III.B.1.)

Convention on Salvage, art. 4(1), Apr. 28, 1989, S. Treaty Doc. No. 102-12 (salvage awards may not be granted against warships without express consent from the sovereign, and the owner of any vessel has the right to refuse salvage) (ratified by U.S. and Spain). There is no dispute that the *Mercedes* is a Frigate of War that sailed under the Spanish Royal Navy flag, manned by Spanish officers and sailors, and Spain is the owner and "flag State" for immunity purposes. It was therefore not error for Magistrate Judge Pizzo to decline to apply Article 149.

> **2.      *Peru's argument that "this Court must rule" on its claim because no "international forum" will is incorrect as a matter of law.***

According to Peru, "this Court must" allow Peru to proceed with its claims, even if the FSIA prohibits it from doing so, "given Spain's rejection of an international forum." (Peru Obj. at 29.) Peru cites no authority or record evidence for such a "rejection," and whether the International Court of Justice, the U.N. Tribunal on the Law of the Sea, or any other international forum would consider Peru's claims vis-à-vis Spain is irrelevant to whether *this* Court has jurisdiction. Even if a party "will be left without a forum for definitive resolution of [its] claims . . . [that is a result] contemplated under the doctrine of sovereign immunity." *Republic of the Philippines v. Pimentel*, 128 S. Ct. 2180, 2194 (2008). *See also Makah Indian Tribe v. Verity*, 910 F.2d 555, 560 (9th Cir. 1990) ("Sovereign immunity may leave a party with no forum for its claims.").

> **3.      *No "international law related to the succession of states" applies to this case.***

Peru also seeks to rely on what it claims is "international law related to the succession of states." (Peru Obj. at 30.) Peru argues that this Court should adopt the

Vienna Convention on the Succession of States in Respect of State Property ("Convention")—a 1983 draft Convention that has never taken force anywhere in the world and that the United States rejected as in violation of international law—and then construe it to find that Peru retroactively acquired rights relating to the *res* when it became an independent nation in the 1820s. (Peru Obj. at 38-39.)  It bears noting as a threshold matter that Peru's argument therefore concedes that it had no such rights in 1804, when the *Mercedes* sailed from El Callao.  (*See* Doc. 141 at 2, 26-28; Peru Obj. at 6 (referring "to the rules of international law related to property law when a sovereign divides, as the Spanish Empire did *in the Nineteenth Century*.") (emphasis added).)

Peru's reliance on the 1983 Convention (Doc. 141 at 27-28), (and Article 15 in particular, *see infra*,) is telling.  Far from being accepted by the U.S. or internationally as customary law, the Convention has been ratified by only seven states in the twenty-five years since it was drafted.[6]  That is less than half the fifteen states required for the Convention to take force—in those states that ratify it—and the Convention was strongly opposed by the U.S.

The U.S. position was that the Convention was so contrary to generally accepted legal principles that it would *never* be considered customary international law, even if it entered into force in those nations that might ever ratify it.  (*See* Official Records, U.N. Conference on Succession of States in Respect of State Property, Archives, and Debts,

---

[6] The seven nations that have ratified the Convention are Croatia (1994), Estonia (1991), Georgia (1993), Liberia (2005), Slovenia (2002), Macedonia (1997), and Ukraine (1993).  *See* http://treaties.un.org/Pages/ViewDetails.aspx?src=IND&mtdsg_no=III-12&chapter=3&lang=en.

Summary records of the plenary meetings and of the meetings of the Committee of the Whole, Vienna, 1 March—8 April 1983 (Vol. 1), 9th Plenary Meeting (7 April 1983), ¶ 4 (ratifications "would not confer upon the rules embodied in it a sufficient degree of authority for them to be acknowledged as valid otherwise than strictly between the parties which had subscribed to the instrument"), included with Doc. 161 at Ex. B.)  Spain also noted that the principles underlying the Convention "had not been generally accepted by the international community."  (Doc. 161 at 15 & n.15.)  Legal scholars agree that the Convention cannot serve as a basis for the "crystallization of norms of customary international law."  Eli Nathan, "The Vienna Convention of Succession of State Property, Archives and Debts," *in International Law at a Time of Perplexity* 489, 493 (Yoram Dinstein ed., 1989).

It is particularly noteworthy that the Convention article that Peru asks this Court to adopt, Article 15 on newly independent states, *see* Doc. 141 at 27-28, is especially objectionable to the U.S., nor was it accepted by Spain.  The U.S. Representative to the Convention drafting conference singled out Article 15 as creating "distinctions which were not well founded in logic, law or inherent justice," and "[n]othing in the material before the Committee . . . indicated that [Article 15] was an accurate statement of existing law or that its provisions should be accepted."  (*See* Official Records, U.N. Conference on Succession of States in Respect of State Property, Archives, and Debts, Summary records of the plenary meetings and of the meetings of the Committee of the Whole, Vienna, 1 March—8 April 1983 (Vol. 1), 13th Committee of the Whole (10 March 1983), ¶ 2, included with Doc. 161 at Ex. B.)  Adoption of Article 15 by the Court, as Peru

urges, would contravene the U.S.'s position concerning the Convention as well as customary international law. Doing so would also, in effect, ratify and adopt the Convention over the express disapproval of the Executive Branch. *Cf. Ehrlich v. Am. Airlines, Inc.*, 360 F.3d at 375 (judicial interpretation of a treaty contrary to its plain terms "would be to make, not construe" a treaty).

Even if it had achieved acceptance, the Convention also cannot apply retroactively. The Convention provides that it is intended to apply "*only* in respect of a succession of States which has occurred after the entry into force of the Convention except as may otherwise be agreed." (*See* Convention, art. 4; Doc. 161 at 14-15.) Moreover, even if the Convention were customary international law, neither the Convention nor its underlying principles can apply to this case because in the Capitulation of Ayacucho, Spain agreed to surrender Spain's "territory and its objects within that territory" (R&R at 28), not ships or anything else that had left the territory. As scholars have noted, "[i]nheritance agreements between the new emerging states and colonial power regarding succession," where they exist, will always control. R.C. Hingorani, *Modern International Law* 103 (1984); *see also Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, 221 F.3d 634, 644 (4th Cir. 2000). Consistent with that sound principle, the Convention provides that it would only apply in future successions—if it ever took force—"unless otherwise agreed by the States concerned." Convention, art. 10.

The Capitulation of Ayacucho expressly defined the geographic scope of Spain's cessions as to the territory that became the Republic of Peru, and ceded Peru rights

"within the territory" to property such as "garrisons," "the plaza del Callao," "parks, workshops, and all the existing military warehouses," and other "forces and objects."[7] Far from ceding any rights with respect to Spanish vessels and their contents that had left long before, Articles 13 and 14 of the Capitulation of Ayacucho provided for "Spanish war and merchant ships . . . to restock provisions in the ports of Peru."[8] Spanish ships were also "given passport, so that they can leave from the Pacific to the ports of Europe."[9] And when Peru and Spain entered into the 1879 Treaty of Friendship and Peace by which their relations were normalized, they stipulated that "the dissensions that took place between [the two] governments and their subjects are, on both sides, completely forgotten." (Doc. 161 at Ex. A, Annex 3, Preamble and arts. 1, 3 & 4.)

As the Fourth Circuit held in *Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, where parties "intended to cede non-territorial state property" and "did so with great particularity," and where the cession provisions do not include terms such as "shipwreck," "vessels," "frigates" and "warships," and other provisions mention such

---

[7] Doc. 161, Ex. A (Martínez-Shaw Decl.) at Annex 2, art. 1 (stating that "[t]he territory that the Spanish troops garrisoned in Peru, shall be surrendered to the arms of the liberator army up to Desaguadero, with the parks, workshops, and all the existing military warehouses"); *id.* art. 11 (surrendering "[t]he fortress of Callao . . . to the united liberatory army, and its garrison"). Article 6 also provides that the "State of Peru shall equally respect the properties of the Spanish individuals who are outside the territory, of which they shall be free to dispose of before the end of three years, being considered on the same terms of the Americans who do not want to move to the Peninsula, and who have interests belonging to them there."

[8] *Id.* at art. 13 ("The Spanish war and merchant ships shall be permitted to restock provisions in the ports of Peru, for a term of six months after the notification of this agreement, to make themselves fit and leave from the Pacific Ocean.").

[9] *Id.* at art. 14 ("The Spanish war and merchant ships shall be given passport, so that they can leave from the Pacific to the ports of Europe.").

terms explicitly, a claim based on implied cession is foreclosed. *Sea Hunt*, 221 F.3d at 644; *see also id.* ("plain meaning" of territorial limitation on cession of state property was to cede "only what was located on land," and "Spain did not cede possessions in the sea or seabed"). Here, where the Capitulation (1) unambiguously cedes only territory and defined state property within that territory; and (2) ensures the safe departure of Spanish ships from Peru's ports—and in so doing, "specifically catalogues items other than territory intended to be conveyed" and does so with "great particularity," *id.* at 644—any claim that Spain ceded to Peru rights to vessels or anything else that had left the Vice Royalty of Peru before Peru gained independence must fail.

  *Sea Hunt* warns of the dangers of "supplant[ing] the textual framework of negotiated treaties with an unpredictable judicial exercise in weighing equities." *Sea Hunt*, 221 F.3d at 643. That sound warning applies here as well.[10]

    **4.**   ***Peru's arguments are inconsistent with U.S. interpretations of international and maritime law.***

---

[10] Peru argues that *Sea Hunt*, which upheld Spain's rights to its sunken Spanish Navy frigate and dismissed all claims against those vessels and their artifacts by the Commonwealth of Virginia, and a treasure hunter, somehow shows that Magistrate Judge Pizzo erred in granting Spain's motion in this case. (Peru Obj. at 19.) On the contrary, in *Sea Hunt*, Spain filed a Verified Claim with reservation of sovereign immunity and the case was decided under, *inter alia*, the U.S.-Spain Treaty of Friendship and General Relations on Spain's motion for judgment on the pleadings. The Fourth Circuit held that Spain was entitled to the "well-established prerogatives of sovereign nations" to dismissal of all claims against their sunken vessels and to the return to Spanish custody of all artifacts taken from them. 221 F.3d at 644-46; Opinion and Order, *Sea Hunt*, Case No. 2:98-cv-00281 (E.D. Va.), Doc. No. 139 (ordering Sea Hunt to "deliver to Spain any artifacts" advertently or inadvertently "salvaged from JUNO which are currently in Sea Hunt's possession").

The Statement of Interest and Brief of the United States as *Amicus Curiae* in Support of the Kingdom of Spain makes eminently clear that the novel arguments Peru asks this Court to adopt are contrary to the "proper interpretation of maritime and international law applicable to sovereign immunity and ownership of sunken vessels of the United States and foreign sovereigns." (U.S. Stmt. of Int. at 1.) As the U.S. Statement of Interest demonstrates, "the United States retains title indefinitely to its sunken State craft unless title has been abandoned or transferred," and "recognizes the rule of international law that title to foreign sunken State craft may be transferred or abandoned only in accordance with the law of the foreign flag State"—a "policy [which] applies to all sunken state craft, with no geographic limitation." (U.S. Stmt. of Int. at 11; *see also* Doc. 235-2 (Ambassador Balton Decl.) at ¶ 4-5.) The United States has made it clear that the law and policy of the United States is that "[t]he warship has a fundamental sovereign immunity which should be maintained." (U.S. Stmt. of Int. at 23 (quoting *Report of the U.S. Delegation to the 12th Sess. of the Diplomatic Conf. on Maritime Law*, Brussels, Belgium, May 16-17, 1967).) "Thus, under international law, warships are completely immune from arrest, seizure, and enforcement by any foreign nation," and "[o]nly the flag State has the authority to waive such vessels' immunity." (*Id.* at 24.) This immunity encompasses sunken "warships and their associated contents." (Doc. 235-2 (Ambassador Balton Decl.) at ¶ 5.) Any "distinction between a shipwrecked vessel and its cargo would lend to an interpretation that dramatically weakens the intended purpose of protection" (*id.* at ¶ 16) to which Spain is also entitled under the 1902 Treaty of Friendship and General Relations Between the United States and Spain, and would not be

"consistent with U.S. law on the subject, as reflected in both the Sunken Military Craft Act and the Abandoned Shipwreck Act of 1987." (*Id.*) "The United States must uphold the[se] principles" for sunken vessels—and their "cargo and equipment." (*Id.*; *see also* Spain Resp. to Odyssey Objs. at Part III.A.)

**C.** **No Authority Peru Cites Supports its Claim that Any Rights To The *Res* Were Ceded To Peru Or That This Court May Adjudicate Peru's Succession-Based Claim On Any Other Basis.**

Peru's Objection cites a series of cases and examples that it claims stand for the proposition that this Court should engage in a weighing of equities between Spain and Peru, in the face of all of the foregoing rules of law. (Peru Obj. at 34-40.) None of these are remotely applicable.

**1.** ***Original jurisdiction cases regarding apportionments of property or water rights among U.S. states are not applicable.***

Peru cites *Virginia v. West Virginia*, 220 U.S. 1 (1911) and *Colorado v. New Mexico*, 459 U.S. 176 (1982) and argues that it was error for Magistrate Judge Pizzo not to discuss or apply them. (*See* Peru Obj. at 28-29, 39-40.) Both of those cases were brought under the Supreme Court's original and exclusive jurisdiction over disputes between U.S. states. *See* U.S. Const., art. III, § 2; 28 U.S.C. § 1251(a). The Supreme Court's original jurisdiction over such cases does not remotely begin to grant authority for a U.S. court to decide matters "intertwined with centuries of mutual history" (R&R at 32-33) lacking "any nexus to our nation's sovereign boundaries" (R&R at 29), in derogation of the Foreign Sovereign Immunities Act and the act of state doctrine. By Peru's logic, because the U.S. Supreme Court effected an equitable apportionment of

water rights between two states, this Court should now sit in equity on historical relationships as between foreign sovereigns and their present or former territories or possessions.  Peru reads these cases to *require* this Court to exercise jurisdiction in such a case, regardless of the statutory mandates of the FSIA and the compelling comity considerations applied by Magistrate Judge Pizzo.

The dispute between Virginia and West Virginia was contract-based, and "neither state disputed its indebtedness [to the other] *vel non*."  (Spain Repl. at 20-21 (citing *Virginia*, 220 U.S. at 28-31).)  "Equitable apportionment" as applied in *Colorado v. New Mexico* and other original jurisdiction water rights cases provides no authority for a U.S. court to sit in judgment on the sovereign acts of other nations.  "Equitable apportionment" at issue in such cases is a term of art, meaning "the doctrine of federal common law that governs disputes between states concerning their rights to use the water of an interstate stream."  *Colorado v. New Mexico*, 459 U.S. at 183.

> ### 2. *The breakups of the Soviet Union and Yugoslavia are irrelevant to this case.*

Peru argues that Spain's position in this case "is reminiscent of Russia's relatively recent claim to succeed to all the rights of the former Soviet Union," or "the Federal Republic of Yugoslavia['s claim] to own all the moveable property of the former Socialist Federal Republic of Yugoslavia" (Peru Obj. at 36-37.) Asking this Court to examine the dissolutions of those nations and apply them to this case only confirms that Magistrate Judge Pizzo was right in noting that courts should be reluctant to adjudicate claims by one sovereign against another.  (R&R at 32.)  Spain's Reply—as well as the authority that Peru itself cites in its Objection and elsewhere (*see* Peru Obj. at 36-37;

Doc. 141 at 28)—shows that "distributions of those former nations' assets were settled via mutual agreements and/or consented-to proceedings among the relevant states and/or their creditors, not via a U.S. court." (Doc. 161 at 19-20.)[11] Negotiations and arbitrations among the successor states of the Soviet Union and Yugoslavia to settle their affairs provide no precedent for this Court to step into such a role vis-à-vis Spain and Peru, or any other sovereigns.

  **D.** **Magistrate Judge Pizzo Correctly Decided that Adjudicating Peru's Claim Would Undermine the Traditional Notion of International Comity.**

  Even if the Court were to "accept Peru's jurisdictional presupposition" that the FSIA did not mandate granting Spain's motion, the R&R holds that "[a]ddressing [Spain and Peru's] differences in this forum, as Peru argues equity dictates, would undermine the traditional notions of international comity as applied from [1812's] *The Schooner Exchange* through [last year's] *Pimentel*." (R&R at 30, 32.) The R&R observes that Peru's asserted grievances are "best resolved through direct negotiations between the two and not in this forum." (*Id.* at 33.)

  The issues which Peru contends this Court should adjudicate attest to the soundness of what Peru derides as a "manifest reluctance" to entertain its claims.

---

[11] *See also* Williams & Harris, "State Succession to Debts and Assets: The Modern Law and Policy," 42 *Harv. Int'l L.J.* 355, 359 (2001) (successor states to U.S.S.R. "developed a process for negotiating an allocation of the debts and the assets of the predecessor state"); Hasani, "The Evolution of the Succession Process in Former Yugoslavia," 29 T. Jefferson L. Rev. 111, 111-13 (property among former S.F.R.Y. states apportioned via Succession Agreement). (both cited by Peru Obj. at 36-37.)

According to Peru's Objection, the R&R should be set aside so that this Court may proceed to adjudicate issues such as:

- Whether "Spain forced a dominion over Peru, but Peru retained its separate sovereign status, so that the Treasure was always the sovereign property of Peru, over which Spain claimed a dominion that is now irrevocably lost." (Peru Obj. at 34.)

- Whether returning the *res* in this case to Spain "would have the practical effect of dividing all sunken artifacts in the world among a handful of European nations, leaving the rest of the World with no rights to their own cultural heritage." (Peru Obj. at 45.)

- Whether "[u]nder international law, all of the nations that formed the Spanish Empire, including [Peru], have rights to property linked to their territories that is not in the actual physical possession of another sovereign," and whether those rights are "identical." (Peru Obj. at 33.)

- The "legal implications" of the "dramatic changes in Spain's sovereignty over the last 200 years." (Peru Obj. at 33.)

Peru's Objection drives home that Magistrate Judge Pizzo was correct in finding that Peru's claims are also precluded under the act of state doctrine. (*See* R&R at 32-33.) As the R&R correctly notes, even if this case were viewed from the perspective that Peru advocates, the act of state doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." (R&R at 32-33 (citing *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964).) Peru's response is that the act of state doctrine is "irrelevant" here, because it is not "seeking damages from Spain." (Peru Obj. at 6 n.2.) No authority supports the proposition that the applicability of the act of state doctrine turns on the type of relief sought from the relevant sovereign, and that this Court may sit in equitable judgment on how another nation governs its territory.

Moreover, questions of sovereignty and succession such as those Peru raises are "[inherently] political . . . [and lacking] judicial or manageable standards . . . for determination." *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum Laden Aboard Tanker Dauntless Colocotronis*, 577 F.2d 1196, 1205 (5th Cir. 1978).[12] Reaching such sovereignty-based issues would extend "the judicial power beyond its philosophical limits." *Occidental of Umm al Qaywayn, Inc.*, 577 F.2d at 1205.

The R&R's "manifest reluctance" to reach Peru's contentions (Peru Obj. at 25) is also well-founded in the case law disposing of succession-based claims brought in U.S. courts. U.S. courts have uniformly found that claims based on state succession theories are not justiciable. Following the breakup of the Socialist Federal Republic of Yugoslavia, Serbia and Montenegro sought a declaratory judgment in the Southern District of New York that they had succeeded to ownership of Manhattan property of Yugoslavia's Embassy to the United Nations. *Federal Republic of Yugoslavia v. Park-71st Corp.*, 913 F. Supp. 191, 194 (S.D.N.Y. 1995). Other newly independent states that had been part of the former Yugoslavia intervened, each claiming an interest in the property. The court found the issues nonjusticiable, denied the request for declaratory judgment, and dismissed the case, noting an "absence of judicial competence to determine issues of succession, even where the succession is to property, rather than power." *Id.* (citing *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

---

[12] In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the 11th Circuit adopted as binding precedent the decisions of the former Fifth Circuit handed down prior to Oct. 1, 1981.

Even state succession-based claims by private parties are nonjusticiable.  In *Can v. United States*, 14 F.3d 160, 162 (2d Cir. 1994), which was quoted at length in *Federal Republic of Yugoslavia*, the plaintiffs, citizens from the former South Vietnam, brought a claim as "successor[s] in interest to the property of their former government."  The Second Circuit held that "the threshold determination of title to the blocked assets would require resolution of issues related to state succession," and "[t]he existence of competing claims demonstrates that adjudication of appellants' claims is intertwined with sovereign recognition *vel non*."  *Id.* at 163.  Therefore, "[w]ere a court to grant appellants the relief they seek, it would not only decide a question of sovereign succession, but it would interfere with executive foreign policy prerogatives more generally"; the claim therefore presented a nonjusticiable political question:

> [T]he determination of title [to the former state's property] is . . . beyond judicial competence. The federal courts cannot decide cases on the basis of political theories that incorporate no statutory, constitutional or common-law basis. The courts have no standards for judging a claim of succession to a former sovereign. . . . The recognition of any rights of succession to a foreign sovereign's power or property is in the first instance constitutionally committed to the executive branch of government, not to the judiciary.

*Id.* at 162-63.  *See also Yucyco, Ltd. v. Republic of Slovenia*, 984 F. Supp. 209, 218 (S.D.N.Y. 1997) ("Courts have held that certain intractable issues involving state succession may pose . . . problems of justiciability," and therefore a U.S. court could not

resolve corporation's claim that successor state should be liable for equitable share of former Yugoslavia's debt). [13]

These comity and justiciability considerations are especially compelling in this case, given the substantial foreign relations considerations inherent in the United States' policy to recognize sovereign immunity of other nations' vessels and its treaty obligation to do so for Spain's vessels. Ambassador David A. Balton, U.S. Deputy Assistant Secretary of State for Oceans and Fisheries, notes that:

> the United States has a foreign policy interest in obtaining reciprocal treatment from Spain and other countries for its own vessels. . . . [U.S. ships] serve as the final resting place for individuals lost in service to their country[, and the U.S. must therefore] uphold the principles that afford protection to these sunken vessels, not only to meet its obligations under international law, but also to ensure commensurate reciprocal treatment by other States of our vessels.

(Doc. 235-3 (Ambassador Balton Decl.) at ¶ 19.)

These same comity considerations apply specifically in this case to "a vessel and the contents of that vessel" as bilateral Spain-U.S. obligations under the 1902 Treaty of Friendship and General Relations. Doc. 235-2; U.S. Stmt. of Int. at 5-8; Doc. 235-2, Decl. of Ambassador Balton at ¶¶ 12-18; *Sea Hunt*, 221 F.3d 642-44.

**E. Spain Has Not Waived its Right to Sovereign Immunity under FSIA By Filing a Claim to the *Res*.**

---

[13] Peru also argues that *In re the Amistad*, 40 U.S. 518 (1841), contradicts Magistrate Judge Pizzo's conclusion that Peru's claims would undermine international comity. (Peru Obj. at 24.) At issue in *Amistad* was whether individuals held as slaves on a private merchant ship in U.S. waters were "unlawfully kidnapped, and forcibly and wrongfully carried on board" by private citizens in violation of Spanish anti-slavery law. *Amistad*, 40 U.S. at 525, 593.

Peru also claims that Spain has waived sovereign immunity by appearing as an *in rem* claimant in this case, citing *Lord, Day, & Lord v. Socialist Republic of Vietnam*, 134 F. Supp. 2d. 549 (S.D.N.Y. 2001) as its sole authority.  (Doc. 141 at 9-10; Peru Obj. 14-15.)  But *Lord, Day, & Lord* is irrelevant to this case.

In *Lord, Day, & Lord*, Vietnam appeared in the Southern District of New York, with no reservation of sovereign immunity, to file and prosecute an *in personam* action. 134 F. Supp. 2d. at 553. Vietnam obtained a settlement, then asserted immunity from counterclaims to the proceeds of its *in personam* suit. *Id.* at 555-57.  In accordance with FSIA Sections 1605 and 1607, the court held that, by bringing an *in personam* claim as a plaintiff, Vietnam had waived immunity from claims in the nature of counterclaims arising from or relating to the same cause of action, as Section 1607 expressly provides. *Id.* at 557-59.

Spain, by contrast, has appeared here solely as *in rem* claimant to protect its sovereign vessel and expressly reserved its sovereign immunity. Nor has Spain waived its immunity impliedly pursuant to the law of this Circuit.  *See Calzadilla v. Banco Latino Internacional*, 413 F.3d 1285, 1287 (11th Cir. 2005) (Section 1605(a)(1)'s implied waiver provision "is narrow" and "does not apply unless the foreign state reveals its intent to waive its immunity by . . . filing a responsive pleading in an action *without raising the defense of sovereign immunity*.") (emphasis added).  *See also* Doc. 161 at 22-24.

Peru's waiver argument has been laid to rest in any event.  As Magistrate Judge Pizzo notes, "the district judge has already determined Spain is immune under the FSIA

from Odyssey's *in personam* claims." (R&R at 17, n.15.)  Accordingly, this Court has previously held that Spain's appearance *in rem* with express reservation of sovereign immunity to protect the *Mercedes* and secure the return of artifacts taken from the *Mercedes* and brought to this District, did not effect a waiver of immunity.[14]

*      *      *

Magistrate Judge Pizzo appropriately notes that "no court has ventured into waters far beyond its jurisdictional boundaries to resolve a dispute between two sovereigns over the remnants of one of the sovereign's sunken warships."  (R&R at 31.)  Peru has shown no reason why this Court can or should be the first.

## CONCLUSION

For the foregoing reasons, and the reasons stated in Spain's Response to the Objections of Odyssey Marine Exploration and Individual Claimants, Spain respectfully submits that the Court should affirm the granting of Spain's Motion to Dismiss or for Summary Judgment and order the release of the wrongly arrested *res* to Spain as provided in the R&R.

Respectfully submitted on August 31, 2009,

s/ James A. Goold
James A. Goold                                    David C. Banker
District of Columbia Bar #430315        Florida Bar #352977
Covington & Burling LLP                     Bush Ross, PA

---

[14] *See* Verif. Claim of Kingdom of Spain (Doc. 13) (fully reserving sovereign immunity); Spain Mot. to Dismiss Odyssey's *in personam* claims, at 15-17 (Doc. 37) (noting that the waiver exception to FSIA does not apply because Spain's claim expressly reserved immunity);  March 6, 2008 Order (Doc. 91) (granting Spain's motion to dismiss Odyssey's *in personam* claims for lack of subject matter jurisdiction).

1201 Pennsylvania Ave. NW
Washington, DC  20004
Telephone: (202) 662-5507
Fax: (202) 662-6291
E-mail: jgoold@cov.com

220 S. Franklin St.
Tampa, FL  33601-3913
Telephone: (813) 224-9255
Fax: (813) 223-9255
E-mail: dbanker@bushross.com

## CERTIFICATE OF SERVICE

I hereby certify that on this date, August 31, 2009, I caused the foregoing Response to Peru's Objection to the Magistrate's Report and Recommendation on Spain's Motion to Dismiss the Amended Complaint or for Summary Judgment and Spain's Motion to Vacate the Arrest to be served on counsel of record for all parties by filing with the Court via its CM/EMF system.

s/ James A. Goold
James A. Goold
District of Columbia Bar #430315
Covington & Burling LLP
1201 Pennsylvania Ave. NW
Washington, DC 20004
Telephone: (202) 662-5507
Fax: (202) 662-6291
E-mail: jgoold@cov.com
