UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ODYSSEY MARINE EXPLORATION, INC.,
    Plaintiff,

v.                                                                         Case No. 8:07-CV-614-SDM-MAP

UNIDENTIFIED, SHIPWRECKED
VESSEL,
    Defendant,

THE KINGDOM OF SPAIN, et al.,
    Claimants.

**STATEMENT OF INTEREST AND BRIEF OF THE UNITED STATES
AS AMICUS CURIAE IN SUPPORT OF THE KINGDOM OF SPAIN**

The United States has a substantial interest in the proper interpretation of maritime and international law applicable to sovereign immunity and ownership of sunken vessels of the United States and foreign sovereigns. The United States owns thousands of vessels that have been lost in U.S., foreign, and international waters along with their crews, passengers, and cargo. Under international law, the United States has a duty to protect cultural resources found at sea and to cooperate with other nations in safeguarding them. As even the most remote depths of the ocean have become accessible through sophisticated technology, there is an urgent need to protect these sunken vessels and their contents and wreck sites from unauthorized disturbance and recovery that may be overly intrusive and destructive of their significance as cultural heritage and maritime graves.

The United States also has a substantial interest in the proper interpretation and implementation of the reciprocal immunity obligations imposed by the 1902 Treaty of Friendship and General Relations with Spain ("Treaty"), 33 Stat. 2105. Article X of this

Treaty requires the United States and Spain to afford "the same assistance and protection and the same immunities" to each other's shipwrecks. The United States has a strong foreign policy interest in adherence to its treaty obligations. In addition, in supporting Spain, the United States seeks to ensure that its own sunken vessels, as well as their contents, and debris sites are protected from unauthorized exploration or exploitation and treated with respect and sensitivity.

For purposes of this Statement of Interest, the United States assumes, as Magistrate Judge Pizzo found, that the *res* recovered by Odyssey came from the *Nuestra Señora de las Mercedes*, a warship in the Spanish Royal Navy that has not been abandoned by Spain.

## ARGUMENT

**A. Article X of the Treaty Requires Sunken Spanish Vessels To Be Granted the Same Protection and Immunities As U.S. Vessels. [1]**

Article X of the Treaty provides, "In cases of shipwreck, damages at sea . . . each party shall afford to the vessels of the other . . . the same assistance and protection and the same immunities, which would have been granted to its own vessels in similar cases." Spain, the United States, and a U.S. Court of Appeals all interpret this language to require the United States to extend to Spain the same protection and immunities the United States customarily affords to its own sunken vessels. *Sea Hunt v. Unidentified Shipwrecked Vessel*,

---

[1] The Foreign Sovereign Immunities Act applies "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act . . . ." *See* 28 U.S.C. §§ 1604, 1609. Because the 1902 Treaty of Friendship preexisted the FSIA, if the subjects of this *in rem* complaint are the *Mercedes* and its cargo, they would be entitled under the 1902 Treaty to the same immunity as a U.S. sunken vessel and its cargo in a similar shipwreck case. We therefore believe it is not necessary to reach the question whether the *Mercedes* and its cargo are also entitled to immunity under the FSIA.

221 F.3d 634, 643 (4th Cir. 2000); Spain Mem. (Doc. 131 at 24-25). As discussed below, those protections and immunities include the rules that (1) sunken state vessels are not deemed abandoned absent a clear and affirmative sovereign act, and (2) sunken state vessels shall not be disturbed or subject to salvage without express sovereign consent.

Recognizing the significance of application of the Treaty to this litigation, Odyssey suggests two reasons the Court should find it does not apply. First, Odyssey contends that Article X has a narrow geographic scope that applies solely "in litigation concerning the wreck of a Spanish ship situated in United States waters." Doc. 138 at 19 & n.9. But unlike a prior treaty that it replaced and other articles in the Treaty such as Article IX, the language of Article X contains no such limitation; thus, Odyssey bases its contention upon a contemporaneous series of notes exchanged between Spain and the United States (Exec. Rpt. F, 57th Cong., 2d Sess. (1902) at 18-19) that Odyssey misinterprets as demonstrating the parties mutually understood the entire Treaty would apply only within the territories of their respective countries. Reference to the notes shows that they had an entirely different purpose and meaning. All Spain sought was assurance that articles of the Treaty with explicit territorial limits, such as Article IX, would apply to all U.S. territories, including Puerto Rico, the Philippines, and Cuba, and not just the territories of the Union.

Second, Odyssey urges that "the substantive scope of protection provided by article X is limited by its very terms to 'vessels' of the other party" and not their cargo. Doc. 138 at 19. No language in either Article X, the other articles of the Treaty, or the exchange of notes supports this construction. Indeed, such a construction would negate the protections for

3

sunken vessels that Article X was meant to provide and is inconsistent with treatment of sunken vessels and cargo under U.S. law. *See, e.g.*, 43 U.S.C. § 2102(d) (defining "shipwreck" in the Abandoned Shipwreck Act of 1987 to include "a vessel or wreck, its cargo, and other contents") and the Sunken Military Craft Act, 10 U.S.C.A. § 113 note, §§ 1408(1)(A)(B), 1408(3)(A)(C). See *infra* at 6-7.

These interpretations of Article X by Spain and the United States are shared by both Parties, including the agency in the United States charged with implementation of the Treaty, and are reasonable and fair constructions of the terms of the Treaty. As a result, they are entitled to deference. *See, e.g., Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982). [2]

### B. United States Vessels Are Not Abandoned Absent Express Renunciation of Ownership by the United States and Are Not Subject to Unauthorized Salvage.

The protections the *Mercedes* must receive, if the Court concludes it is the subject of this lawsuit, include protection against a finding that it was abandoned absent express renunciation by Spain. The Fourth Circuit held in *Sea Hunt* that "one of the immunities granted to United States vessels is that they will not be considered abandoned without a clear and affirmative act by the government," and that "[u]nder the terms of the 1902 Treaty, Spanish vessels can likewise be abandoned only by express renunciation." *Sea Hunt*, 221

---

[2] Although Odyssey takes a more restrictive view of the Treaty's language, a canon of treaty interpretation favors a broad reading of this treaty provision. A fundamental principle of treaty interpretation is that "[w]here a treaty admits of two constructions, one restrictive [of] rights that may be claimed under it, and the other [favorable to them], the latter is to be preferred." *Hauenstein v. Lynham*, 100 U.S. 483, 487 (1880); *Factor v. Laubenheimer*, 290 U.S. 276, 293-94 (1933)).

F.3d at 642-43. Congress codified this rule in the Sunken Military Craft Act ("SMCA"). *See* 10 U.S.C.A. § 113 note, §§ 1401(1)(2).

Similarly, a sunken Spanish vessel is entitled to protection against unauthorized salvage. A 2001 Presidential Policy Statement warned "[t]hose who would engage in unauthorized activities directed at sunken State craft . . . that such disturbance or recovery should not occur without the express permission of the sovereign, and should only be conducted in accordance with professional scientific standards and with the utmost respect for any human remains." *See* 69 Fed. Reg. 5647, 5648. The Presidential Statement explicitly extended this policy to "sunken State craft of the United States and other nations, whether located in the waters of the United States, a foreign nation, or in international waters." *Id.*

The Presidential Statement is anchored in federal case law incorporating established principles of maritime salvage and international law. In *International Aircraft Recovery, L.L.C. v. Unidentified, Wrecked, and Abandoned Aircraft*, 218 F.3d 1255, 1257 (11th Cir. 2000), the court held that the United States, as owner of a historic aircraft that "crashed in deep international waters," has authority to prohibit unauthorized salvage efforts. *See also United States v. Steinmetz*, 973 F.2d 212, 222 (3d Cir. 1992). "United States warships that were sunk during military hostilities are presumed not to be abandoned and are considered not subject to salvage in the absence of express consent from the United States Government." *Id.* The rationale for "[t]his policy stems not only from concern about preservation of American history but from sensitivity to the fact that wrecks of warships 'are the watery

5

graves of American war dead.'" *Id.* at 222 n.11.

In reversing the salvage award below, the court in *International Aircraft Recovery* pointed to the consensus among admiralty treatise writers regarding the right of owners to reject salvage initiated without their consent,[3] quoting with approval the language from 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 16-1 (2d ed. 1994), emphasizing "'[o]nly in a rare case where the governmental owner gives express or implied consent to salvage, should an award be given because the government has full power to reject or prohibit the services.'" *Id.* at 1262 n.16. The court expressed no opinion on "whether an owner could refuse salvage assistance if anything other than its own property interests were at stake." *Id.* at 1262 & n.17.

This case could present this Court with that issue. A number of individuals have filed verified claims as "named descendants" to their ancestors' private property. Had the property they claim been cargo on board a sunken U.S. naval craft, they would not be allowed access to it without the prior consent of the United States.[4] The SMCA prohibits unauthorized disturbance or salvage of "a sunken military craft," its "associated contents"

---

[3] *See also* Gerard J. Mangone, *United States Admiralty Law*, 209 Kluwer, 1997 ("Voluntary salvors cannot act against the will of the owner or master if it is expressed, which may be done orally, by letter, sign, buoy, or public notice.").

[4] Department of the Navy Policy Fact Sheet: "Sunken Naval Vessels & Naval Aircraft Wreck Sites" (http://www.history.navy.mil/faqs/faq28-1.htm) and similar policies of the U.S. Coast Guard (http://www.uscg.mil/history/faqs/USCG_Shipwreck_Policy.asp). The National Oceanic and Atmospheric Administration requires permits to recover artifacts, whether publicly or privately owned, in a National Marine Sanctuary. 15 C.F.R. §§ 922.62 (*USS Monitor*); 922.166 (Florida Keys); 922.74 (Channel Islands).

and "debris field."⁵ Odyssey maintains it has not disturbed or recovered any property owned by Spain. *See* Doc. 179 at 4. But even if Odyssey could establish that only privately owned property from the *Mercedes* had been recovered, retrieval of that property from the wreck site necessarily disturbed any property belonging to Spain and may even have injured it irreparably, contrary to the SMCA § 1402(a)(b).⁶

Odyssey acknowledges that, "assuming *arguendo* it applies here, the 1902 Treaty of Friendship . . . accords Spanish vessels the same rights accorded to U.S. vessels under similar circumstances," and that "[r]elevant protections accorded to U.S. vessels under U.S. law are codified in the Sunken Military Craft Act ("SMCA")." *See* Doc. 230 at 24. Odyssey argues, however, that the *Mercedes* "would not have qualified for various protections – including immunity – under the SMCA if it were a U.S. vessel," because it would not satisfy § 1408(3)(A) of the SMCA defining a "sunken military craft" as "any sunken warship, naval auxiliary, or other vessel that was owned or operated by a government on military noncommercial service when it sank." *See id.* at 25.

---

⁵ Odyssey argues the definition of "associated contents" in the SMCA does not cover privately owned property. Doc. 230 at 39 n.24. The salvor contends the language of § 1408(3) - "if title thereto has not been abandoned or transferred by the government concerned" - "implicitly means that cargo is assimilated to a vessel only if the vessel's title holder also holds title to the cargo." *Id.* Odyssey's reading is inconsistent with the reasons why the SMCA was enacted, i.e., to prevent looting and unauthorized salvage of sunken military craft. If this Court were to accept Odyssey's argument then nothing in the Act would deter a salvor from approaching and disturbing a sunken military craft like the *USS Arizona* or the *USS Monitor* (15 C.F.R. §§ 922.61-62) to search for and retrieve personal effects or cargo it claimed to belong to private parties. Read in context, and with the purpose of the statute in mind, the language relied upon by Odyssey is consistent with the SMCA only if read to refer to the "sunken military craft" itself as opposed to its "associated contents." *See* § 1408(3)(A)(B).

⁶ It is of course highly unlikely that Odyssey was able to distinguish between private- and government-owned coins and recover only those claimed to be privately owned.

7

Odyssey's assumption is unfounded for two reasons: (1) its application of the "on military noncommercial service" language is not historically accurate, and (2) its construction of this language is contrary to generally accepted principles of international law. First, the mere fact warships engaged in transport of privately owned cargo for fees in no way affects their "warship" status. As reflected in the official historical records of the Naval History and Heritage Command, U.S. Department of Navy, carriage of specie and other privately owned articles was an officially authorized activity of United States warships in carrying out the military responsibility of the Navy to protect the interests of the nation and its citizens.[7] Pursuant to U.S. Navy policy and practice, U.S. vessels transported privately owned valuables ("gold, silver and jewelry") as an official military function. *See id. See also* "An Act for the better government of the navy of the United States" of April 23, 1800, art. XXIII, 2 Stat. 45, 48. Although U.S. Navy officers were authorized to perform this function without specific orders from the Navy Department and to receive a reasonable payment from the owner for doing so, in no way did this practice denationalize a warship or affect its rights and immunities as a warship in international law. *Id.*

Second, Odyssey misconstrues the phrase "on military noncommercial service" in the SMCA, § 1408(3)(A), contending that it modifies every category of vessel listed in the definition, including "any sunken warship." Correctly construed, this language is limited to the "or other vessel" category and is not intended to require a sunken warship to be

---

[7] *See* Doc. 131 (Spain Mem. at n.4) (referencing Act of April 23, 1800, art. XXIII). *See also id.* at Ex. D (Delgado Decl. ¶ 16); Ex. I, tab 3 (Goold Decl. ¶ 4)(Annexes 3-6); Doc. 163 (Spain Reply at 8 & n.5).

exclusively "on military noncommercial service" in order to come within the protection of the SMCA. In addition to being the most natural reading of the statutory language, this construction is the only one that, as required by the SMCA § 1406(b), "shall be applied in accordance with generally recognized principles of international law and in accordance with the treaties, conventions, and other agreements to which the United States is a party."

The distinction between warships and other kinds of ships owned or operated by a government is reflected in the Geneva Convention on the High Seas of 1958, to which both the United States and Spain are parties. In that Convention, the immunity of warships is addressed in an article different from the article addressing immunity of other government vessels, and only the latter article includes language about use "only on government non-commercial service." *See* Convention on the High Seas, arts. 8, 9, 13 U.S.T. 2312, 2315-16 (1958). The distinction was no accident, and was reflected in the President's transmittal of the Convention to the Senate. *See* Exec. Rpts. J to N, 86th Cong., 1st Sess. at 8.

This same distinction was reiterated in the 1982 United Nations Convention on the Law of the Sea ("UNCLOS"), 1834 U.N.T.S. 4, 41, which is reflective of customary international law. The presence in that Convention of two separate articles, 95 and 96, with different textual language demonstrates the distinction between warships and other types of government ships with respect to when they are accorded immunity under international law. *See* UNCLOS arts. 95, 96. *See also* Oxman, The Regime of Warships under the UN Convention on the Law of the Sea, 24 Va. J. Int'l L. 809 (1984) (describing warships as "a special subclass of government ships operated for non-commercial purposes").

9

The different treatment of warships is also reflected in international law specifically addressing wrecked vessels, including conventions to which the United States is a party. The 1910 Brussels Convention on salvage, for instance, provides that it "does not apply to ships of war "*or to Government ships appropriated exclusively to a public service*." Convention for the Unification of Certain Rules of Law with Respect to Assistance and Salvage at Sea, art. 14, 37 Stat. 1658, 1672 (1910) (emphasis added). *See also International Convention on Salvage*, art. 4, Sen. Treaty Doc. 102-12, Sen. Exec. Rep. 101-1 (1989).

For the reasons given above, the Treaty between the United States and Spain requires that the *Mercedes* be afforded the same protection and immunities from implied abandonment and unconsented access and salvage as a sunken U.S. warship and its cargo in similar circumstances. The United States takes no position on any dispute between Spain and Peru.

Dated: September 29, 2009

Respectfully submitted,

TONY WEST
Assistant Attorney General
A. BRIAN ALBRITTON
United States Attorney
 s/Barbara B. O'Malley
District of Columbia Bar Number 106617
Special Litigation Counsel
U.S. Department of Justice
Civil Division, Torts Branch
P. O. Box 14271
Washington, DC 20044-4271
Telephone (202) 616-4081
Fax (202) 616-4159
E-Mail:  barbara.o'malley@usdoj.gov