UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
IN ADMIRALTY

ODYSSEY MARINE EXPLORATION, INC.,

       Plaintiff,

       v.                               Case No: 8:07-cv-614-T-23MAP

THE UNIDENTIFIED, SHIPWRECKED
VESSEL, if any, its apparel, tackle,
appurtenances and cargo located within a five
mile radius of the center point coordinates
provided to the Court under seal,

       Defendant;
       *in rem*

And

THE KINGDOM OF SPAIN *et al.*,

       Claimants.
_____/

**PLAINTIFF ODYSSEY MARINE EXPLORATION, INC.'S
RESPONSE TO THE UNITED STATES' STATEMENT
<u>OF INTEREST & *AMICUS CURIAE* BRIEF (DOC. 247)</u>**

Odyssey Marine Exploration, Inc. ("Odyssey"), hereby responds to the United States' statement of interest filed on September 29, 2009 (Doc. 247) ("U.S. Br."). The U.S. Brief was filed following the Report and Recommendation ("R&R") of June 3, 2009 (Doc. 209). The U.S. Brief is based entirely on the assumption that the R&R's factual conclusions were correct. Odyssey, however, has objected to the conclusions in the R&R (Doc. 230), which the Magistrate Judge reached without an evidentiary hearing. As a result, until the Court has ruled on Odyssey's objections, consideration of the U.S. Brief is premature.

The U.S. Brief addresses the question whether privately owned cargo -- originally loaded as commercial freight, recovered from the seabed without any disturbance of a sovereign wreck, and properly brought into this Court's admiralty jurisdiction -- should be entitled to immunity from salvage (and from a determination of its rightful owners) solely because it had been carried on a government-owned vessel at the time it sank. The United States asserts that it should. To reach that result, the United States advances a novel and extraordinarily expansive interpretation of the scope of immunity for government vessels engaged in predominantly commercial activities. This position is inconsistent with U.S. law, with international law, and with U.S. practice.

## I. The 1902 Treaty Does Not Apply To The *Res* At Issue Here

The United States does not address the threshold question currently before the Court, which is whether the Court has subject matter jurisdiction over the *res* in this matter, and it sheds no light on the R&R's erroneous conclusion that the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-1611, requires dismissal of the case. (U.S. Br. at 2 n.1.[1]) Instead,

---

[1] Page numbers in record citations refer to the numbers assigned by the CM/ECF system.

the United States asserts this case is governed by the terms of Article X of the 1902 Treaty of Friendship and General Relations with Spain ("1902 Treaty"), 33 Stat. 2105, which incorporates the protections afforded to U.S. vessels by the Sunken Military Craft Act ("SMCA"), 10 U.S.C.A. § 113 note.

The United States advocates a broad interpretation of the 1902 Treaty's scope and applicability, asserting a canon of construction that favors Spain to extend the treaty's protection not only to "vessels" of Spain but also to privately-held cargo that was recovered without any interference with a vessel at all. (U.S. Br. at 4 n.2.) The United States asserts that there is "no language" in Article X that support's Odyssey's interpretation that private cargo is outside the scope of the treaty's protection. But it is the U.S. interpretation that finds no basis in the treaty text -- the primary source for interpreting the meaning of a treaty. Odyssey's interpretation is based squarely on the precise and unambiguous language of Article X itself, which requires that "each party shall afford to the *vessels* of the other ... the same assistance and protection and the same immunities, which would have been granted to its own *vessels* in similar cases." (Emphasis added.) As Odyssey has noted before, there is no vessel at the defendant site. In the absence of a vessel to protect, Article X therefore does not apply to the *res* at issue in this case. The United States asserts this construction "would negate the protections for sunken vessels that Article X was meant to provide," but provides no support for its contention that customary maritime protections intended by the Parties to the treaty in cases of "shipwreck and forced putting in" could be stretched to apply immunity from salvage to privately-owned commercial property recovered from the seabed floor on the high seas. Because the U.S. interpretation finds no support in the text of the agreement, it is

not entitled to deference by the Court. *The Amiable Isabella*, 19 U.S. 1, 72 (U.S. 1821) ("[T]his Court is bound to give effect to the stipulations of the treaty in the manner and to the extent which the parties have declared, and not otherwise").

II. **The U.S. Brief Incorrectly Asserts That Warships Are Entitled To Immunity Regardless Of Whether They Engaged In Predominantly Or Even Exclusively Commercial Conduct**

The U.S. Brief assumes that the *res* in this case was recovered from the wreck site of the *Mercedes*.[2] (U.S. Br. at 2.) It further assumes that the *Mercedes* was a "warship" -- adopting the position advanced by Spain -- although the United States makes no effort to define that term or identify the criteria that it deems relevant for evaluating that status. Having assumed that the *Mercedes* is a "warship" -- apparently without any consideration for whether it was being operated for commercial purposes -- the United States then concludes that the vessel's "warship" status serves to immunize not only that vessel but also its privately-owned cargo. This approach is not only tautological, but is inconsistent with international law, with U.S. law, and with other policy and legal positions articulated by the U.S. Government. Those laws and policies condition the immunity of government-owned vessels on the governmental *noncommercial* nature of the vessel's function.

**The *Mercedes* Was Freighting Commercial Cargo and Was not Acting as a "Warship."** The U.S. Brief starts from the assumption that the *Mercedes* was a warship and then concludes that as a warship, it must be immune regardless of the nature of its voyage.

---

[2] In this assumption, the United States relied on the conclusions in the R&R. Other factual assertions advanced by the United States lack any apparent foundation in the record of this case, such as the mystifying assertion that Odyssey's recovery of privately-owned cargo from the wreck site "necessarily disturbed property belonging to Spain and may even have injured it irreparably." (U.S. Br. at 7.) These assertions reveal either a fundamental misunderstanding or a willful misconstruction by the United States of the nature of the defendant site.

3

But there are significant questions regarding whether the *Mercedes* could properly be characterized as a warship at all.  As Odyssey previously demonstrated, the record contains ample evidence that the *Mercedes* was transporting a large volume of commercial goods for hire, and was not operating as a warship at the time of its sinking.  Spain's own expert, Hugo O'Donnell, observes the *Mercedes* and other frigates could not "put into effect an effective combat plan since the frigates were loaded with bundles of goods that presented obstacles to fire in the battery and combat on deck…" (Decl. of Hugo O'Donnell at 37 (Doc. 163-9).)  The ship was carrying substantial quantities of bulky cargo, such as animal skins, vicuna wool, cascarilla branches, cocoa and similar products.  (*See* Annex 31, Aff. of Rodney Carlisle (Doc. 138-62); Ex. 4, Decl. of Gianluca Morello (Doc. 232-5).)  In addition, there is evidence that the *Mercedes* was not fully armed, not fully manned, and that her gun decks had been reconfigured to accommodate paying passengers. (Aff. of Rodney Carlisle ¶ 12 at 20 (Doc. 138-31); Reply Aff. of William Flayhart at 10 (Doc.179-2).)  These characteristics of the *Mercedes* cannot be reconciled with the United States' assumptions regarding the vessel's status as a warship.

**U.S. Statutes Limit "Warships" to Public Vessels Whose Use Is Restricted to Governmental Noncommercial Activities.**  The U.S. Brief recognizes no limit to the commercial activity that a vessel could undertake without affecting its sovereign immunity, provided that the vessel is called a "warship."  Yet, U.S. statutes are consistent that what defines warships and other public vessels for purposes of sovereign immunity is their strict use for governmental noncommercial purposes.  U.S. statutes consistently refer to "warship[s] or other ship[s] owned or operated by a country and used, for the time being,

*only on Government noncommercial service*" (emphasis added). 33 U.S.C. § 1483; *see also* 33 U.S.C. § 1902(b)(1).

**The United States Relies on an Incorrect Reading of the SMCA.** These earlier statutes were the basis for the SMCA's definition of the term "sunken military craft," i.e., "all or any portion of – (A) any sunken warship, naval auxiliary, or other vessel that was owned or operated by a government on military noncommercial service when it sank." SMCA § 1408(3)(A). The United States twists the language of this provision and asserts that the phrase "on military noncommercial service" applies only to the "or other vessel" category. This reading of the language is not only unnatural, but is inconsistent with the structure of the SMCA. If the same construction were applied to the next provision of the SMCA -- Section 1408(3)(B), which refers to "any sunken military aircraft or military spacecraft that was owned or operated by a government when it sank" -- it would mean that the government ownership requirement would apply to military spacecraft but not military aircraft. Congress clearly intended that this requirement would apply to both categories of craft, just as it intended that the "noncommercial service" language in Section 1408(3)(A) would modify each of the classes of vessel mentioned in that section, including "warships."[3]

**The United States' Position Is Inconsistent with International Agreements.** The relevant international agreements to which the United States is a party adopt a similar

---

[3] The United States also contends the term "associated contents" in the SMCA covers all property located in the "debris field" of a wreck, not just government-owned property. (U.S. Br. at 7 n.5.) The U.S. contention is inconsistent with international law, which draws a clear distinction between government vessels and private property on them. *See* Brussels Convention for the Unification of Certain Rules Concerning the Immunity of State-Owned Ships (Brussels Convention), Apr. 10, 1926, art. 3(2) ("*State-owned* cargoes carried on board [warships or State vessels still subject to] claims in respect of salvage"). To read this provision of the SMCA as extending perpetual U.S. (or foreign) government ownership to private property on board a vessel as "associated contents," moreover, would pose insuperable constitutional problems, including the taking of private property without just compensation in violation of the Fifth Amendment to the Constitution.

5

approach. The United States points to the fact that the Geneva Convention on the High Seas ("Geneva Convention"), Apr. 27, 1958, 13 U.S.T. 2312, separately addresses the immunity of "warships" on one hand and other government vessels on noncommercial missions on the other hand. But this ostensible distinction between warships and other governmental vessels has never been interpreted to mean that a vessel otherwise qualifying as a warship may engage in commercial missions and still be cloaked with sovereign immunity. Indeed, the first UN Conference on the Law of the Sea refused to accord government ships on commercial service the immunities of warships. This approach hardly supports the United States' assertion that a warship could engage in commercial activity and retain its immunity. Rather, the Conference's action supports the contrary conclusion: that the Conference believed, as do most experts today, that warships by definition must be engaged in exclusively noncommercial government service. In other words, the noncommercial nature of a warship's mission is part of what makes the vessel a warship. This is precisely the characterization adopted by one authority cited approvingly in the U.S. Brief, which succinctly states that a warship is "a special subclass of government ships *operated for non-commercial purposes*." (U.S. Br. at 9), citing Oxman, *The Regime of Warships under the UN Convention on the Law of the Sea*, 24 Va. J. Int'l L. 809 (1984) (emphasis added).

The United States has cited no precedent for interpreting the law of the sea as it now advances. Indeed, the United States specifically rejected the position it now advocates when it considered whether a Uruguayan auxiliary vessel, *Presidente Rivera,* was entitled to immunity. *See* July 13, 1989, Legal Advisers Office of the U.S. Department of State memorandum, *reprinted in* DIGEST OF U.S. PRACTICE IN INTERNATIONAL LAW (1989-90)

(available at http://www.state.gov/s/l/c8183.htm). This memorandum concluded that the *Presidente Rivera*, "although a government vessel, was on commercial service, [and] is not entitled to the sovereign immunity of a warship or other ship owned or operated by a State and used, for the time being, only on government non-commercial purposes." The memorandum states:

> "[o]nly warships and other government ships operated for non-commercial purposes *not engaged in commercial activity* are entitled to sovereign immunity. Under international law government ships operated for commercial purposes are treated in the same fashion as merchant ships." *Id.* (emphasis added).

Any other interpretation of the relevant provisions of the 1982 Law of the Sea Convention would improperly allow a foreign sovereign to satisfy the formalities for qualifying a vessel as a "warship" even if it was employed on predominantly commercial missions. To avoid this exact result, contemporary international instruments assimilate the "warship" and "other government owned or operated vessel" categories and uniformly require that vessels engage in noncommercial purposes to receive sovereign immunity. The United States cites the International Convention on Salvage, Apr. 28, 1989, S. Treaty Doc. No. 102-12, to illustrate its point that international law distinguishes between warships and other governmental vessels. (U.S. Br. at 10.) In fact, that agreement explicitly links the treatment of warships with that of other governmental vessels, and in both cases conditions that treatment on the noncommercial nature of their missions. Article 4(1) of this instrument (which the United States cites but does not quote) provides: "this Convention shall not apply to warships or *other non-commercial vessels* owned or operated by a State and entitled, at the time of salvage operations, to sovereign immunity under generally recognized principles of

7

international law unless that State decides otherwise." *Id.* art. 4(1) (emphasis added).

**The United States' Position Is Inconsistent with that of the U.S. Navy.** Contemporary practice of the U.S. Navy further demonstrates that, far from stating the law as it stands today, the U.S. Brief instead seeks to establish a novel principle that would immunize vessels engaged in a commercial activity. For example, the Director of Naval Intelligence recently issued revised instructions on clearance procedures for visits to U.S. ports by foreign naval and public vessels, i.e., those vessels owned by foreign sovereigns. These instructions define the term "foreign naval vessel" to mean:

> [a]ny ship belonging to the armed forces of a foreign state, bearing the external marks distinguishing warships of its nationality, under the command of an officer duly commissioned by the government of the State and whose name appears in the appropriate service list or its equivalent, and manned by a crew which is under regular armed forces discipline, and *engaged solely in government service, not carrying commercial cargo or passengers for hire.*

Dept. of Navy, OPNAV Instruction 3128.10G (2008) (emphasis added). Thus, for purposes of regulating visits of foreign warships to U.S. ports, the U.S. Navy unambiguously requires that a warship not engage in commercial service if it is to retain its immunities.

### III. The U.S. Brief Incorrectly Suggests That U.S. Warships Routinely Engaged In Commercial Activities And That They Retained Their Immunity

The U.S. Brief implies that U.S. warships regularly engaged in commercial activity similar to that of the *Mercedes*, and asserts that such activity in no way affected the immunity of such warships. This is simply untrue. At most, the United States demonstrates that in unusual cases, U.S. warships might have received special limited authorization to carry limited amounts of valuables and specie. Nothing in the U.S. Brief supports the idea that U.S. military vessels engaged in anything remotely similar to the kind of commercial cargo

trade in which the *Mercedes* was engaged.  Moreover, in referring to U.S. warships' purported commercial activity, the United States erroneously asserts that "U.S. Navy officers were authorized to perform this function without specific orders from the Navy Department." (U.S. Br. at 8.)  Contrary to this assertion, Article XXIII of the Act of April 23, 1800 for the Better Government of the Navy of the United States, ch. 33, provides:

> If any commander or other officer shall receive or permit to be received, on board his vessel, any goods or merchandise, other than for the sole use of his vessel, *except gold, silver, or jewels*, and except the goods or merchandise of vessels which may be in distress, or shipwrecked, or in imminent danger of being shipwrecked, in order to preserve them for their owner, w*ithout orders from the President of the United States or the navy department*, he shall on conviction thereof, be cashiered, and be incapacitated forever afterwards, for any place or office in the navy.  2 Stat. 45, 48 (1800).

This statute shows the practice of transporting private property by U.S. Navy ships was very limited and was shaped by a narrow and unusual grant of limited immunity to naval commanders to carry "gold, silver or jewels" on their own account.[4]  The clear implication is that in 1804, the time of the loss of *Mercedes*, a similarly-situated U.S. Navy vessel carrying private cargo for freight would not have been considered engaged in an "official" mission sanctioned by the U.S. government.

Nothing in the U.S. Brief (or in the Spanish declarations) demonstrates that it was established practice in 1804 for the official mission or duties of a naval vessel to transport specie and large volumes of commercial cargo for private merchants.  Indeed, the citations

---

[4]  Indeed, at least once the President intervened to raise a concern about the carriage of specie on the private account of the commander of a U.S. Navy vessel.  On November 29, 1811, Secretary of the Navy Paul Hamilton wrote to the commander of the *U.S. Hornet* that: "[i]t having been intimated that application would be made to you to convey in the Hornet specie abroad on private account, I have it in charge from the president of the United States to inform you that such conveyance is wholly inadmissible; any such application, therefore, is to be rejected...." Nat'l Archives, Washington, D.C., Sec'y of the Navy's Correspondence, M149 Roll9 P521; *see* McKee, Gentlemanly and Honorable Profession: The Creation of the U. S. Naval Officer Corps, 1794-1815 (1991) (also noting there are very few examples of freightage in the archival record).

provided by the United States and the evidence presented by Spain shows that the world's navies had not adopted a practice allowing naval vessels to engage in an essentially commercial function. Such a trade was reserved to merchant marines or to fleets such as the *Correos Maritimos* (for which the *Mercedes* was sailing on its final voyage), specially designated for that purpose. Trafficking in private cargoes or consignments, for profits, simply was not an official military function.

IV. **Conclusion**

Neither U.S. nor international law supports the extraordinary policy positions advanced in the U.S. Brief: first, that a government vessel could engage in limitless commercial activity and yet enjoy immunities simply by being characterized as a "warship;" and second, that such immunities would extend to the privately-owned commercial cargo carried on that vessel at the time of its sinking. Contrary to the assertions of the United States, the SMCA and other relevant instruments extend the protection of immunity only to vessels that are engaged in governmental non-commercial activities -- regardless of what the vessels are called. Because the *Mercedes* was not engaged in such a mission, the U.S. Brief has no bearing on the Court's disposition of Spain's motion to dismiss.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 14, 2009, I electronically filed this document with the Clerk of the Court by using the CM/ECF system and mailed a true and correct copy to non-CM/ECF participant Joseph A. Rodriguez, *pro se*, 4611 South University Drive, Davie, FL 33328-3817.

Respectfully submitted,

s/ Gianluca Morello
Carl R. Nelson, FBN 0280186
cnelson@fowlerwhite.com
Gianluca Morello, FBN 034997
gianluca.morello@fowlerwhite.com
FOWLER WHITE BOGGS P.A.
501 E. Kennedy Blvd., Suite 1700
Tampa, FL 33602
Phone: (813) 228-7411
Fax No: (813) 229-8313

Melinda J. MacConnel, FBN 871151
mmacconnel@shipwreck.net
Odyssey Marine Exploration, Inc.
5215 West Laurel Street
Tampa, FL 33607
Phone: (813) 876-1776, ext. 2240
Fax No.: (813) 830-6609

Attorneys for Plaintiff Odyssey Marine Exploration, Inc.