UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
IN ADMIRALTY

ODYSSEY MARINE EXPLORATION, INC.,

    *Plaintiff,*

v.　　　　　　　　　　　　　　　　　　　　Case No. 8:07-CV-00614-SDM-MAP

THE UNIDENTIFIED, SHIPWRECKED VESSEL,
If any, its apparel, tackle, appurtenances and cargo
located within a five mile radius of the center point
coordinates provided to the Court under seal,

    *Defendant,*
    *In Rem,*

and

The Kingdom of Spain and the Republic of Peru, et al.,

    *Claimants.*

_____/

# PERU'S REPLY IN SUPPORT OF ITS OBJECTION TO THE
# MAGISTRATE'S REPORT AND RECOMMENDATION

Subject to its sovereign immunity reservation, the Republic of Peru replies in support of its objection to the Magistrate's Report and Recommendation.

## 1. Spain invokes a strategy of confusing the issues before the Court.

Two equal sovereigns stand before this Court claiming ownership to the same Treasure. Those inconsistent claims cannot be avoided by merely assuming one of the sovereigns is correct and refusing to consider the other sovereign's claims. The conflicting claims must be addressed on their merits, and therefore, there can be no immunity.

Spain's Response tries to avoid directly addressing the issue of sovereign immunity through a confusing strategy of assuming the critical issue before this Court and ignoring the only issue ripe for review – sovereign immunity. In fact, Spain spends a mere seven paragraphs of its Response discussing immunity, at 5-6 and 24-25.

Perhaps the best way of resolving the confusion is through analogy that removes some of the historical aspects of this matter. Assume Odyssey finds a Soviet era warship filled with Ukrainian gold. The ship was lost before, but found after, the collapse of the USSR. The first claimant in Court is Russia, which, like Spain here, claims it owns the vessel as the continuation of the USSR. Then, Ukraine and perhaps others of the 15 nations that once formed the USSR come to court, claiming they too own a share of the vessel and its treasure.

In such a case, it is at least conceivable (albeit highly unlikely) that Russia eventually wins its argument that it, and it alone, succeeds to the property of the former Soviet Union, even when that property came from one of the other forming states. As Spain acknowledges, following the dissolution of the USSR, Russia claimed the naval and merchant fleets of the USSR (along with all external currency reserves and Embassy properties) on the same basis as Spain here that Russia created the USSR, and therefore succeeded to all of the its rights state after its demise.

Russia, however, was forced to abandon its claim to own all property outside the USSR because it was insupportable under international law.

It is also possible that this Court might decide that division of ownership of the vessel and its treasure is outside its judicial competence and therefore that it has to defer any ruling until the parties agree to a division or another forum decides the issue.

What is not possible is that this Court would simply award the Soviet vessel and the Ukrainian gold it carried to Russia without even considering the merits of Ukraine's claims or the claims of the 13 other nations that once formed the USSR, yet that is the course recommended by the Magistrate.

The legal authority before the Court (including Spain's) uniformly establishes that, when a nation divides, any property not within the physical territory of one of the resulting states is to be divided equitably, with (as Spain concedes) property linked to the territory of one resulting state granted to that state. *See* Docket 161 at 16. The division is analogous to a divorce.

In the analogy, the Soviet warship was owned by a nation comprised of what became 15 independent nations. Their independence creates an issue of international law as to their respective rights to the vessel and its contents, with Ukraine having the upper hand as to the gold mined in its territory. The division would not be decided by fiat, with the most powerful state (Russia, or here, Spain) taking everything. Nor would it depend on whether Russia decided to keep the name USSR or reverted to the USSR's original name, the Russian Soviet Federated Socialist Republic. This is a question of law and equity, not power or semantics.

In this case, the ultimate legal question before this Court is what are the rights of Peru and Spain to the Treasure following their division. This Court will search vainly for an answer to that question in Spain's Response.

***2. To avoid having to prove its ownership of the Treasure, Spain invokes the classic logical fallacy of begging the question.***

The law is clear: in an *in rem* action, there is only sovereign immunity as to property owned by the sovereign. The Magistrate misjudged this requirement by misinterpreting Peru's claim as being directed against Spain's property. Unable to justify that error, Spain simply assumes Spanish ownership of the Treasure and then claims immunity from any adverse claims, regardless of their basis.

Spain's argument, however, relies on the classic logical fallacy first recognized by Aristotle of begging the question to be decided. In this case the question begged is, "Who owns the Treasure?" The logical fallacy was illustrated by one philosopher with a story:

> [T]hree thieves were arguing about how to divide up seven pearls they had just obtained. One of the thieves cut off the discussion by handing two pearls to each of the other two, and announcing, "I will keep three!" The other two thieves were not too happy with this arrangement, and one of them asked, "Why do you get to keep three of the pearls?" The reply: "Because I am the leader." The questioner was still not satisfied by this reply, and asked another question: "Why are you the leader?" To this the man with the three pearls responded, "Because I have more pearls."

D. Walton, BEGGING THE QUESTION: CIRCULAR REASONING AS A TACTIC OF ARGUMENTATION at xiii (Greenwood Press 1991).

Spain's version of the story goes like this: Spain and Peru were arguing about how to divide up the Treasure. Spain cuts off the discussion, proclaiming, "I will keep all the Treasure." Unhappy with that unilateral declaration, Peru asks, "Why do you get to keep it all when the Treasure came from my land and my people." The reply: "Because I own it." Still unsatisfied, Peru asks another question: "But why do you own all the Treasure?" To this Spain replies: "I'm sorry; my Treasure is immune from such questions."

If the ploy worked, however, it would apply to Peru as well: Peru claims the Treasure, and therefore, Peru's Treasure should be immune from Spain's ownership claim.

### 3. Spain's factual and legal argument is exactly backward: The issue is whether Peru has ceded its rights, not whether Spain has.

#### (a) Peru's rights as a sovereign are not dependent on Spain.

Spain's assumption of ownership distorts even its statement of the facts. According to Spain, the fact question before the Court is whether Spain granted Peru rights in its Treasure:

- "Spain granted Peru its independence in 1824." Docket 161 at 2.

- The Court should avoid a dispute "involving Spain and its present or former subjects." *Id.* at 25.

- "Spain has never abandoned or relinquished its sovereign rights," Response at 5;

- Peru has rights only if Spain "'intended to cede non-territorial state property' and 'did so with great particularity;'" *id.* at 14, and

- "No authority Peru cites supports its claim that any rights to the *res* were ceded to Peru …;" *id.*

It is hard to believe that these statements were made by an American lawyer. They are the equivalent of stating that for two hundred years the United States has gotten it wrong: July 4, 1776 is an insignificant date. The United States was not a sovereign nation until England "granted" it independence on September 3, 1783, in the Treaty of Paris. More to the point, when it became a nation, the United States only had the rights England ceded to it.

Of course, such propositions are not even worthy of consideration. The United States became a sovereign nation on July 4, 1776, and from that date forward it had all the rights of any other sovereign nation, whether its former colonizer agreed or not.

The same is true for Peru. Its rights stem from international law, not Spain.

#### (b) Peru's rights to the Treasure are set by international law, not Spanish grant.

To be clear: Peru was not **granted** its independence by Spain in December of 1824. Peru **declared** itself and **became** independent on July 28, 1821. On that date, Peru became a fully

sovereign nation with **all** the coordinate rights under international law.[1]

Included in Peru's sovereign rights were rights to the Treasure, which was Peruvian property since well before Pizarro set foot on Peruvian soil. Peru's rights to the Treasure stem from the Treasure's origin in Peru's mountains.

Returning to the analogy, there is no authority for proposition that the rights of Ukraine depend on Russia's having granted it such rights. Ukraine's rights stem from its historical ownership of the gold on its lands, its independence, and international law.

### (c) Peru has never ceded its rights to the Treasure.

Pursuant to international law, Peru had rights to the gold and silver in its mountains before Spain arrived, during the time of Spanish domination, and after Peru declared independence. Thus, Spain gets the argument backwards: the issue is not whether Spain ceded rights to Peru, but whether Peru ever relinquished its rights to the Treasure to Spain.

The desperate nature of Spain's argument can be seen in the lengths it goes to try to prove that Peru's rights were limited by Spain. Particularly telling is Spain's interpretation of the Capitulation of Ayacucho, the document by which Spain surrendered to the already sovereign "State of Peru," as stated in the document itself. The Capitulation is an Act, not a treaty, and it does not set forth grants of rights by Spain to Peru. Rather, the Capitulation was the document by which the Spanish Army pleaded leniency from the "State of Peru."

The idea that the document expressing Spain's surrender established Peru's rights as a nation is nonsensical. Spain was surrendering to Peru, not Peru to Spain. Spain was asking leniency of Peru, not Peru of Spain. Peru could accept Spain's surrender and grant its request for

---

[1] The United States recognized the Republic of Peru as a sovereign in 1822, a year before it issued the Monroe Doctrine, declaring that "the American continents, by free and independent condition which they have assumed and maintain, are henceforth not to be considered as subjects to future colonization by any European powers."

leniency only as a sovereign nation. Surely, Spain does not suggest that it created Peru in order to surrender to it. Nor does the fact that Peru allowed a few Spanish naval vessels (not including the Mercedes) to leave with the Spanish Army limit Peru's rights; Peru certainly did not want the Spanish Army and Navy to stay in Peru.

Equally desperate is Spain's reference to the Treaty of Peace and Friendship of 1879, by which Spain established diplomatic relations with Peru some 50 years after Peru's recognition by the United States. According to Spain, the Treaty's flowery language that Peru and Spain were going to forget their troubled past was meant to convey an agreement by Peru to limit its sovereignty over its own patrimony – some 58 years after Peru's Declaration of Independence. Beyond being absurd on its face, the position completely contradicts the legal standard Spain claims for itself. When the question is whether Spain has abandoned rights to its patrimony, Spain demands clear and convincing evidence of an express act of abandonment, but according to Spain, Peru agrees to limit its sovereign rights merely by agreeing to enter into diplomatic relations with Spain. *See* Response at 14.

**4. Spain cannot avoid the clear precedent of the United States Supreme Court in <u>Deep Sea Research</u>.**

The most telling example of Spain's strategy of avoiding the difficult issues is its treatment of the dispositive Supreme Court authority of *California v. Deep Sea Research,* 523 U.S. 491 (1998). Without mentioning the name of the opinion, Spain uses a footnote to waive off Supreme Court authority directly addressing sovereign immunity in *in rem* admiralty proceedings. Response at 5 n.3.

Spain ignores the opinion in the face of the Supreme Court's statement that its rule applies to foreign sovereigns. *Id.* at 507. Spain's only argument is that the requirement is not in the FSIA, but the FSIA, on its face, applies only if Spain owns the Treasure, and according to

*Deep Sea Research*, Spain must affirmatively prove its ownership when it does not possess the *res*.

Moreover, as the United States notes in its Statement of Interest, Spain's immunity is governed by its Treaty with the United States, not the FSIA. Statement at 2 n.1. By agreement, Spain's immunity is the same as would be the United States', and the Supreme Court expressly applied the possession rule to the federal government. 523 U.S. at 508. Other courts have done the same. *International Aircraft Recovery, LLC v. The Unidentified Wrecked and Abandoned Aircraft*, 54 F. Supp. 2d 1172 (S.D.Fla. 1999), *rev'd on other grounds*, 218 F.3d 1255 (11th Cir. 2000). Notably, the United States also relies on the holding of *International Aircraft*, again showing the applicability of *Deep Sea Research* to Spain in this case. Statement at 5-6.

### 5. *Peru's Immunity Position is consistent.*

Spain reiterates the Magistrate's statement that Peru's argument is inconsistent,[2] but the alleged inconsistency is merely a reflection of Spain's circular argument. Peru's argument sounds inconsistent only if one assumes that Spain owns the Treasure and that Peru, like Odyssey, is laying a claim against Spain's property. If, on the other hand, Peru owns the Treasure and not Spain, Peru is entitled to the same immunity that Spain claims. Given the nature of Spain's Response, however, some clarity is in order, so Peru sets out its core position.

First, under the rule of *Deep Sea Research*, when the *res* is not in the possession of the sovereign, the sovereign must prove ownership, not merely declare it, so, there is no immunity as to competing ownership claims. Thus, the alleged descendants are not precluded by sovereign immunity from raising their ownership claims. Likewise, Odyssey's claim under the Law of Finds is not barred by immunity, although it is barred by the rule that sovereigns do not impliedly

---

[2]The Magistrate stated: "On one hand, Peru agrees that Spain is immune from Odyssey's salvage claim (indeed, it asserts it too is immune from Odyssey's claim); but on the other, it maintains Spain is not immune from Peru's claim against the *res*." Recommendation at 29; Response at 5 n.3.

abandon their rights. As the Sixth Circuit explained, applying the rule of *Deep Sea Research,* when the dispute is over ownership, the issue of sovereign immunity is a "red herring" and has no relevance. *Fairport Int'l Exploration, Inc. v. The Captain Lawrence*, 177 F.3d 491, 496 (6th Cir. 1998).

Odyssey's salvage claim is different. It is not a claim to own the Treasure, but one against the Treasure. Therefore, once sovereign ownership is established, immunity should attach, precluding the claim. Candidly, the question is not entirely clear: Whether, the rule of *Deep Sea Research* applies following establishment of ownership in such a case has not been definitively decided by a court. Given the uncertainty of the immunity issue as to the salvage claim, the Court should consider independently dismissing Odyssey's salvage claim on the ground of the refusal of salvage, which clearly applies to any sovereign property.

In any event, once ownership of the *res* before this Court is determined, a sovereign owner of any part of that *res* has the same immunity as any other sovereign owner.

**6. This Court must decide ownership of the Treasure before awarding it to anyone.**

**(a) If the ownership question is not justiciable, then this Court cannot award the property.**

Spain's unwarranted assumption of ownership also bases its argument that, if the dispute between Peru and Spain is not justiciable, then the Court should award Spain the Treasure, but no such award can be made without a legal basis.

Spain's own authority defeats its argument. Spain's central authority on justiciability involves the Federal Republic of Yugoslavia's attempt to be declared the sole owner of the official residence of the UN Ambassador of the former Socialist Federal Republic of Yugoslavia. *Federal Republic of Yugoslavia v. Park-71st Corp.*, 913 F.Supp. 191 (S.D.N.Y. 1995). This opinion was one of a series of cases involving assets of the former Yugoslavia. This dispute is directly analogous, because the other nations that resulted from the breakup of Yugoslavia intervened to

"oppose the relief requested by Plaintiff and each claim an interest in the Property." *Id.* at 193. Ultimately, the court held that apportioning ownership among the sovereign claimants was not a justiciable question, but that part of the opinion is distinguishable.

The relevant point that Spain misses is that, after concluding that it could not determine ownership of the government property, the court did **not** award the property to any of the sovereign claimants. Instead, the court held that, until the United States government endorsed a division, the claims of all successor states were incapable of judicial resolution and the property could therefore not be awarded to any of them. In other words, the opinion (and the others like it) establish there was a real controversy over the division of the non-territorial assets among the successor states, but that this particular controversy had to be decided by the Executive Branch, which had taken control of the assets. Certainly, the Federal Republic of Yugoslavia did not win by fiat or on immunity grounds.

In all of the cases cited by Spain on this issue, the property in question remained within the court's jurisdiction following dismissal. In most of the cases, the property was being held by the United States government for the express purpose of aiding the negotiation over division of the debts and assets of the divided sovereign. None of these opinions supports an award of the Treasure to Spain.

Thus, according to Spain's own authority, until this Court can determine ownership of the Treasure, it should refuse to award it to any party.

**(b) This matter is justiciable.**

**(1) Successor state issues are justiciable if there is a framework for decision.**

Spain grossly overstates its authority when it claims that "U.S. courts have uniformly found that claims based on state succession theories are not justiciable." Response at 21. Justice Holmes expressly held that the determination of an equitable apportionment was squarely within

the competence of the United States courts in *Commonwealth of Virginia v. State of West Virginia,* 220 U.S. 1, 31 (1911).

Spain itself cites to *Yucyo, Ltd. v. Republic of Slovenia*, 984 F. Supp. 209, 218 (S.D.N.Y. 1997); Response at 22, which states:

> Matters involving state succession do not always present nonjusticiable political questions. The political question doctrine should not be invoked merely because a case involves controversial matters or issues that are of some political significance.

*Id.* (footnote omitted). Ten years later, the same court returned to the issue of dividing the property of the former Socialist Federal Republic of Yugoslavia among the resulting nations, but this time the court held that the dispute was justiciable, because there was now a framework for the decision, established by the agreement of the parties. *The Bank of New York v. Yugoimport SDPR J.P.*, 2007 WL 1378426, at 5 (S.D.N.Y. 2007)(dividing interpleaded funds of a state agency).

In this case, there is also a framework for dividing the Treasure. The international community set out the appropriate rule in UNCLOS Article 149. In keeping with the universally accepted principle of equitable apportionment, the Treasure should be returned to the country of historical and archeological origin. The United States notes that UNCLOS reflects customary international law and thus is part of United States law.[3] Statement at 9.

### (2) The United States "takes no position on any dispute between Peru and Spain."

In *Federal Republic of Yugoslavia*, the court determined that division of the property was a political question because the United States had frozen the assets and "a judicial decision on who has title to the frozen assets would affect the executive's use of those assets in present or

---

[3] Spain notes that Peru, like the United States, has not ratified UNCLOS, but that lack of ratification does not affect the binding nature of the Convention as customary international law, thereby incorporated into United States law.

contemplated negotiations." 913 F. Supp. at 194. The court in Spain's other chief case, *Can v. United States,* also dealt with property held by the United States, as to which the Executive Branch stated that its political determinations could not be disturbed. 14 F.3d 160.

There is no such restriction here. The United States has officially stated that it "takes no position on any dispute between Peru and Spain," leaving this Court free to address the merits. Statement at 10. The express statement by the Executive Branch that it has no interest means this Court "need have no concern that interference with important governmental interests." *See Kadic v. Karadz,* 70 F.3d 232, 250 (2d Cir. 1995).

**(c) In the alternative, this Court should hold the Treasure until there is a resolution of ownership.**

This Court has direct control over the Treasure. If this Court cannot determine ownership, the proper course is to maintain control over the Treasure until the parties agree or the appropriate forum decides the matter.[4]

Spain argues that the equitable divisions of the property of the USSR and Yugoslavia are irrelevant here because those divisions were ultimately determined by "negotiations and arbitration." Response at 19. Spain also finds comfort in the Recommendation's statement that such divisions are "best resolved through direct negotiations between the two [sovereigns] and not in this forum." Recommendation at 33.

What Spain wants the Court to ignore is that Russia and the former Federal Republic of Yugoslavia were forced to those negotiations because the international legal community rejected

---

[4] Spain questions Peru's statement that Spain rejected an international forum, stating, "Peru cites no authority or record evidence for such a 'rejection'...." Response at 10. Admittedly, the rejection was not on the record. When Spain first claimed this case had to be decided at the International Court of Justice, undersigned counsel inquired of Spain's counsel if Spain was agreeing to go to that court. The answer was no. Spain, however, does little to fulfill its duty of candor to the Court by skirting the issue through evidentiary challenges. The issue is straightforward: Does Spain really prefer another forum or is the argument that this is not the proper court merely another ploy to gain Peru's Treasure without legal analysis of Spain's ownership?

their claims to be the sole successor to all property of the now divided nations. Peru recognizes that it has a duty under international law to try and resolve the ownership issue with Spain, but Spain is clearly not going to conduct such negotiations while it thinks it might obtain the entire Treasure on the basis of immunity.

If the parties cannot agree, this Court should act.

There is ample precedent for this Court's holding the Treasure for some time for the parties to negotiate, and then deciding the issue if there has been no resolution. First, that is the procedure set by international law: "In sum, the principal rule for redistributing assets and liabilities in separation or dissolution is that the states concerned have to agree on the issue. Failing an agreement there shall be distribution in equitable proportions." T. Langstrom, TRANSFORMATION IN RUSSIA AND INTERNATIONAL LAW 223 (2003).

United States courts have followed the recommended course, including in some of the Yugoslavia cases. *E.g., Bank of New York v. Yugoimport SDPR J.P.*, 2007 WL 1378426 (S.D.N.Y. 2007). The court in *Yugoimport* determined the best course was to hold interpleaded funds for a period of time to allow the successor states to negotiate or to turn to another forum. The court noted that, absent agreement, the court would resolve the matter. In other cases, such as *Federal Republic of Yugoslavia* and *Can v. United States*, the property in question was held by the Executive Branch for the express purpose of affecting negotiations on the successor state issues. *See Federal Republic of Yugoslavia*, 913 F. Supp. at 194; *Can*, 14 F.3d at 164.

**7. Spain cites no authority for the proposition that property is to be divided inequitably.**

Based on a series of legal references and the expert opinion of the leading admiralty professor, Peru posits the rather unsurprising proposition that this Court should apply a general equitable principle set out in UNCLOS and in opinions dating from the Civil War to divide property lost in international waters since before Peru's independence from Spain.

In the face of that authority, and with none of its own, Spain makes the bold statement: "No 'international law related to the succession of states' applies in this case." Response at 10. That statement and the rest of Spain's merits response, however, rests on the same assumption that the Treasure is inherently Spanish, so that if Spain can find any technical reason to reject or refuse to apply a general principle of international or admiralty law, Spain gets the Treasure. There is no basis for the assumption. Spain can be awarded the Treasure only if it can provide some legal support for its claim that its dramatic change in sovereignty since the loss of the Mercedes has no legal effect or that somehow Peru's rights to its own gold and silver were cut off by its Declaration of Independence.

In the same manner, Judge Pizzo did not "reject the international law arguments of Peru." Response at 6. Judge Pizzo refused to decide Peru's ownership claim on the sole basis that it was barred by Spain's sovereign immunity, which in turn was based on the assumption that Spain owns the Treasure and that Peru is merely making a claim against Spain's property.

Spain seems to think that if it treats Peru's legal claim with disdain, the Court will not even address the serious claims brought by Peru, but Spain's own authority demonstrates that when a nation divides, there is a real legal dispute under international law **among** the resulting nations; Spain is simply trying mightily to avoid that dispute.

Other than disdain, Spain's chief tactic is to take potshots at Peru's argument, but it never presents a real alternative. For example, the principle stated in Article 149 is a general one, in keeping with the equitable rules governing state succession. As explained by Ambassador Moore, while there was clear international consensus on the general principle of Article 149, there was no general consensus on how to weigh that general rule against the rights of a coastal state when a wreck is found in the Exclusive Economic Zone (or EEZ), so Article 149 is binding only in the Area. The equitable principle of Article 149, however, still applies within the

EEZ pursuant to UNCLOS Article 59, which states that if there is a dispute over rights within the EEZ of a State, the dispute is to be determined "on the basis of equity and in the light of the interests involved of the parties as well as to the international community as a whole." In this case, since no coastal state is making a claim to the Treasure, there is no need to balance the principle set out in Article 149 with any other equitable principles.

Spain also spends pages of its Response responding to what it describes as Peru's argument "that this Court should adopt the Vienna Convention on Succession of States in Respect of State Property ('Convention')," particularly the controversial aspects of that Convention, but the implication is completely untrue. *See* Response at 10-11. Peru does not argue that the Convention should be adopted; nor does it even argue that all of its provisions are customary international law. Peru's international law claim is limited to the uniformly accepted rule of equitable apportionment, which is found throughout the Convention, which applies to all state divisions, and which has been accepted into international law. *E.g.,* Convention Articles 17, 18, and 37. When it was drafted, there were some controversial provisions of the Convention, but the rule of equitable apportionment was certainly not among them. As set out in Peru's original Objection, the rule of equitable proportion is, like Article 149, customary international law, and has been since before the Civil War.

There is no legal authority before this Court that disputes Peru's right to at least an equitable share of the Treasure that originated in its mountains and its people.

***Conclusion***

In the Eighteenth Century, the vast majority of the World was subject to colonial domination from a few European powers. This Nation was the first to shed its colonial rule and, in the Monroe Doctrine, to declare our hemisphere free from foreign domination. According to

United States law, when a state declares itself free from foreign domination, its rights begin from that declaration, and its rights are the equal of all other sovereign states.

Pursuant to these indisputable principles of United States law, the Republic of Peru comes before this Court as an equal of Spain and requests that its rights to its historical patrimony receive the same respect and dignity as Spain's and in particular that this Court apply international law that defines the rights of Peru to property lost at sea that originated in Peru's territory and with Peru's people.

Dated: October 16, 2009

Respectfully Submitted,

/s/ Mark Maney
Mark Maney (Trial Counsel)
Texas State Bar No. 12898200
Burford & Maney PC
700 Louisiana, Suite 4600
Houston, Texas 77002
713.237.1111
713.222.1475 (fax)
mmaney@burfordmaney.com

and

s/ Timothy P. Shusta
Timothy P. Shusta
FBN: 442305
Phelps Dunbar LLP
100 S. Ashley Drive
Suite 1900
Tampa, FL 33602-5315
813-472-7550
813-472-7570   Fax
shustat@phelps.com
Attorneys for the Republic of Peru