```
 1                  UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION

 3      Odyssey Marine Exploration,

 4         Plaintiff,

 5             vs.                CASE NO. 8:07-CV-614-T-23MAP
                                  8 JANUARY 2009
 6                                TAMPA, FLORIDA
                                  PAGES 1 - 22
 7
        The Unidentified Shipwrecked Vessel,
 8
           Defendant.
 9
        v.
10
        Claimant Kingdom of Spain
11

12                  TRANSCRIPT OF STATUS CONFERENCE
                    BEFORE THE HONORABLE MARK A. PIZZO
13                  UNITED STATES MAGISTRATE JUDGE

14      APPEARANCES:

15      For the Petitioner:  Allen K. Von Spiegelfeld
                             Banker Lopez Gassler, P.A.
16                           501 E. Kennedy
                             Suite 1500
17                           Tampa, FL 33602

18                           Melinda Joy MacConnel
                             O'Brien Bower, PA
19                           Bayshore Executive Center
                             511 W Bay St, Suite 330
20                           Tampa, FL 33606-3533

21                           Mr. Greg Stemm

22

23

24       Proceedings recorded and transcribed by
        computer-aided stenography.
25
```

1    For the Defendant:        **James Goold**
                               Covington & Burling, LLP
2                              1201 Pennsylvania Ave NW
                               Washington, DC 20004-2401
3
                               **David Christopher Banker**
4                              Bush Ross, PA
                               1801 N Highland Ave
5                              PO Box 3913
                               Tampa, FL 33601-3913
6
                               **Mark Maney**
7                              Maney Firm
                               711 Louisiana
8                              Suite 3100
                               Houston, TX 77002-2711
9
                               **Timothy Peter Shusta**
10                             Phelps Dunbar, LLP
                               Suite 1900
11                             100 S Ashley Dr
                               Tampa, FL 33602-5315
12
     Court Reporter:           Linda Starr, RPR
13                             Official Court Reporter
                               801 N. Florida Avenue
14                             Suite 13B
                               Tampa, Florida 33602

15

16

17

18

19

20

21

22

23

24

25

1    (Call to order of the Court.)

2         THE COURT:  Thank you.  Please be seated.  We

3    have our next Odyssey case, The Odyssey Marine

4    Exploration, Inc., plaintiff, versus The

5    Unidentified Shipwrecked Vessel and the various

6    claimants involved in this matter.  This is

7    Case Number 07 Civil 614-T-23MAP.  Will counsel

8    please announce their appearances.

9         MR. VON SPIEGELFELD:  Allen Von Spiegelfeld.

10   And I have Melinda MacConnel and Mr. Greg Stemm with

11   me.

12        MR. MANEY:  Mark Maney and Mr. Tim Shusta for

13   the Republic of Peru.

14        MR. HORAN:  David Paul Horan for the

15   claimants.

16        THE COURT:  Thank you.

17        MR. GOOLD:  Jim Goold, David Banker for Spain.

18        THE COURT:  Thank you.  And Mr. Horan, since

19   you're appearing here by telephone, if you would

20   please just simply be patient with us and hopefully

21   we will not lose you.  And if we do, well, I don't

22   know what we'll do then.  We'll just proceed without

23   you, but we'll figure it out.

24        MR. HORAN:  All right.

25        THE COURT:  But you could call our chambers

1     and see where we are.

2         I had to say that I had some hesitancy about

3     even scheduling a status hearing in this case

4     because -- because much of what needs to be done is

5     still in the process of being done.  But in

6     endeavoring to be a full service court and being

7     customer friendly, the parties wanted a status

8     conference, so -- at least some of the parties

9     wanted a status conference as it was explained to me

10    by my law clerk, and so we've scheduled a status

11    conference.

12        And I'm not sure -- I think it was counsel for

13    the Republic of Peru who was asking for a status

14    conference.  But since we have everybody here, is

15    there an abridged version as to where we are in this

16    case?

17        MR. GOOLD:  I'll start.  Well, the end is --

18        THE COURT:  Don't say that, Mr. Goold.

19        MR. GOOLD:  -- near as far as the briefing

20    process.

21        THE COURT:  For the briefing process, perhaps.

22        MR. GOOLD:  I'll be glad when January 27 rolls

23    around and I've seen the confirmation on the screen

24    that the papers being done for that day have come

25    through.

1        And other than that, I'm here because -- I

2    didn't oppose the request because I didn't think it

3    was worth fighting about and I was going to be here,

4    anyway.  I have no -- I have no agenda other than to

5    finish as rapidly as possible and get back to work

6    on the briefs I've got to do by the end of the

7    month.

8        MR. VON SPIEGELFELD:  For Odyssey, we're not

9    too far away from Mr. Goold's position.  We'd like

10   to see this moving along as quickly as possible.

11   One of the issues that has come up is the fact that

12   there are -- we're continuing to get calls from

13   potential claimants, and we would like to be able to

14   file a notice of an end date for filing, something,

15   because otherwise this could go on indefinitely with

16   new claimants coming in.

17        The time has run for claimants, theoretically.

18   We have not moved for a default as to any future

19   claimants, but the time has run.  And --

20        THE COURT:  Refresh my recollection, Mr. Von

21   Spiegelfeld, but -- since I didn't look at that

22   issue before I came here on the bench.  But the time

23   period is specified by local rule?

24        MR. VON SPIEGELFELD:  Yes, Your Honor.  Well,

25   it's by the federal rules and the local rule.  The

1    notice -- the -- normally it's 30 days from the time

2    of the notice.  The problem is -- well, it's not a

3    problem.  In this case there was a second notice

4    given that was given in Spain, if you remember

5    correctly.

6          THE COURT:  Yes.

7          MR. VON SPIEGELFELD:  And when that second

8    notice was given, that's when new claimants have

9    come forward.  Now, that -- the time for that -- the

10    30 days has run on that notice, also.

11          THE COURT:  So why is there a need to set any

12    time for a deadline if, as I read it, the

13    deadline --

14          MR. VON SPIEGELFELD:  Well, we have not moved

15    for default at this time because of the fact that

16    there have been people coming forward all the time.

17    But we would like to move for a default at this

18    point in time as to any future claimants.  We will

19    do that.

20          MR. HORAN:  Could you speak up just a little

21    bit.

22          MR. VON SPIEGELFELD:  We will -- we plan on

23    moving for a default in the near future as to any

24    future claimants.

25          THE COURT:  All right.

1          MR. HORAN:  I'm getting the same thing.  This

2     is Dave Horan in Key West.  I'm getting the same

3     thing with regard to inquiries as to additional

4     parties.  And it would make it a lot simpler for me

5     to have a default so that there would not be this

6     continual -- I mean, it's spreading like wild fire

7     in South America.

8          MR. VON SPIEGELFELD:  And in that same regard,

9     we'd like the Court to enter an order setting --

10     ending the date of affidavits and things so that we

11     have something.

12          THE COURT:  Why don't you submit a motion,

13     Mr. Von Spiegelfeld, as to that.

14          MR. VON SPIEGELFELD:  Okay.

15          THE COURT:  And it will be considered.

16          MR. MANEY:  Your Honor, I guess I asked for

17     this.  Mark Maney for the Republic of Peru.

18          I've got two issues that I wanted to address

19     and, frankly, I also wanted to see what was going to

20     happen in the other proceeding, because Peru is

21     anxiously awaiting if there's any chance there was

22     Peruvian gold on the Merchant Royal, and if it's the

23     Merchant Royal.

24          And that leads me -- given where it is, I'll

25     start with the first issue, which is other

1    claimants.  I didn't have a piece of the last

2    hearing, but I am troubled by the prospects as Peru

3    is troubled by the prospects that a company could

4    find part of a vessel, give notice that gives very

5    little notice because they don't know what they've

6    found or what the vessel is, and obtain orders that

7    say they are owners of that property, and perhaps in

8    the future, in this case shutting off future

9    claimants, before anyone knows exactly whose

10    property it is.

11        In this case, we inspected the silver in

12    December or late November and we found one coin from

13    Mexico, minted in Mexico.  Mexico's never gotten

14    notice.  In fact, it was Mexico who sent me to Peru

15    to talk to the Peruvians about bringing a claim.

16        I don't represent Mexico in this case.  I

17    don't have a power of attorney.  But I know that if

18    material portions of Mexican silver are found aboard

19    a vessel, that Mexico has an interest in protecting

20    them.  So having an end filing date before we know

21    what the vessel is for sure and where it is I think

22    is troublesome, particularly for sovereigns.

23        In this case, there are potential sovereign

24    claims from Colombia, Chile and Bolivia, all of whom

25    have gold coins that were minted in their countries.

1          The second issue I wanted to address was I

2     became troubled with the motions that were being

3     filed that I think there's some confusion that may

4     develop because three separate issues are being

5     confused.  Spain originally moved for sovereign

6     immunity against Odyssey.  They did that shortly

7     after Peru was entered.

8          It was unclear to me whether their motion was

9     addressed to Peru, although the relief they

10    requested included Peru's claim.  Since then,

11    private claimants have come forward saying they had

12    property on the Mercedes.

13         In my mind there are three very distinct

14    sovereign immunity issues here.  Spain versus

15    Odyssey, the briefing on which I believe is

16    finished.  The replies now are really addressed to

17    my motions.

18         THE COURT:  No.  No.

19         MR. MANEY:  Okay.  But the Spain versus

20    Odyssey, what I would say is really Spain versus

21    Peru versus Odyssey.  If there's a sovereign owner

22    of this vessel, does Odyssey -- or is there immunity

23    as against Odyssey's claim for salvage or finds?

24    There's a distinct claim of immunity, whether Spain

25    would have immunity against another sovereign

1    claimant.  Peru as a successor state to the former

2    kingdom -- Worldwide Kingdom of Spain.  Those

3    issues, I think, are very distinct.

4         I also think there are very strong

5    distinctions between claims by the private claimants

6    as owners of property and Peru and Spain, because

7    they're of the same kind, that is, they're ownership

8    claims.

9         My goal here was to try to convince this Court

10   to divide those things so that they could be

11   addressed logically rather than in the -- what I

12   view as a confused manner that they're being viewed

13   at now.

14        THE COURT:  Well, you may view it as a

15   confused matter but I don't necessarily view it as a

16   confused matter.  I mean, as bad enough as it is,

17   seems like this thing grows exponentially.

18        Mr. Goold?

19        MR. GOOLD:  Yes, sir.

20        THE COURT:  Let me ask you a question, not to

21   single you out.  But let's assume for a moment

22   that -- and this is not meant and please do not take

23   it as this way by the parties at all.  But let's

24   assume for a moment for argument sake that I were to

25   determine that your sovereign immunity claim as with

1    respect to the res and Odyssey's claim to it had

2    merit.  And so Spain's property is immune from any

3    judicial determination by this Court.

4         The res is still in the confines of the Court.

5    The Court has to make some determination about the

6    res as it pertains to the other parties who have

7    filed claims, many of whom are Spanish subjects.

8    Would not the appropriate approach be to make a

9    determination that a Spanish court would be the

10   appropriate court to determine the claims at issue,

11   and that that court could determine, as well, if

12   appropriate and appropriate any claims by any

13   foreign sovereigns, including Peru or Mexico?  And

14   if that is the case, what would be the vehicle for

15   doing that?  How would an order be fashioned,

16   thinking backwards?

17        MR. GOOLD:  Well, I think it would be the

18   appropriate and logical scenario.  It is what the

19   outcome was, albeit on a smaller scale, of the Sea

20   Hunt case where, at the end of the day -- well, the

21   Court is familiar with that.  But that included --

22   it wasn't discussed in any detail in the Fourth

23   Circuit opinion, but it had been dealt with by the

24   district court that ownership, denial of salvage,

25   Spanish ownership, Spanish sovereign vessel,

1    anything -- all artifacts returned to the custody of

2    Spain.  As it happens, those we loaned permanently

3    to the National Park Service for display in

4    Virginia, but that's a different matter.

5         It is the logical scenario.  Spain has courts,

6    Spain has laws.  If -- the order that I would think

7    would be appropriate would be a natural one under

8    Rule -- I think it's E(5)(C) about release of

9    arrested property.  I'll address this, you know,

10   later this month, also.  That it -- there were

11   provisions there for release of arrested property

12   and they include by order, court order, of course.

13   And that the Court's order should direct that the

14   material be returned to the owner of the vessel from

15   which it was taken.

16        And if it -- I'm not even going to suggest

17   this, but I could see a court giving consideration

18   to something about it being without prejudice to the

19   ability or the -- whatever rights others might have

20   to pursue claims against the sovereign and owner of

21   that vessel.

22        THE COURT:  If I were to decide that an

23   evidentiary hearing was needed, that is, I wanted

24   some explication aside from what's in the papers and

25   the affidavits, how much time do you think you would

1    need to prepare for something like that?  Or how

2    much notice, I guess, maybe would be more

3    appropriate?

4          MR. GOOLD:  Sixty days, Your Honor.

5          THE COURT:  Location, location, location,

6    Mr. Goold.

7          MR. GOOLD:  I was -- I'll go with Mr. Von

8    Spiegelfeld on that.  I was starting to think 30,

9    but it would also depend on if the Court gave any

10   guidance on what it wanted to hear about.

11         THE COURT:  Sure.  Sure.

12         MR. GOOLD:  I mean, you won't be surprised,

13   we've thought about that.  But I -- you know, of

14   course, I think the evidence is crystal clear and

15   there's no possible doubt, etcetera, but that if the

16   Court had any particular issues where it felt it

17   would be appropriate to hear more evidence, of

18   course.

19         THE COURT:  Okay.

20         MR. HORAN:  Could I ask a question?

21         THE COURT:  Yes, Mr. Horan.

22         MR. HORAN:  As far as the people who consigned

23   cargo onboard that vessel, if it is the Mercedes, if

24   this was contract salvage, we would just go ahead

25   and do a contract with Odyssey and they would go out

1    there as our contracted salver and salvage the cargo

2    that we own.  And -- and in this case, it's

3    voluntary salvage and it's not contract salvage, but

4    I'm not sure that does anything with regard to

5    whether there is, in fact, a sovereign claim against

6    the property that my clients consigned onboard.

7         So the -- it seems like to me, I'm not sure

8    that Spain can claim sovereign immunity against the

9    descendent claimants.  I -- I don't understand how

10   they can do that.

11        THE COURT:  Well, you're free to file any

12   papers you want to, Mr. Horan, with respect to that

13   issue.  But I think the first order of business for

14   me to decide is, A -- and this is obviously part of

15   the sovereign immunity issue -- is, A, which vessel

16   is it.  I mean, is it the vessel that Spain thinks

17   it is and that the parties have discussed here in

18   these pleadings?  So --

19        MR. HORAN:  Certainly.

20        THE COURT:  -- that will be the first order of

21   business because that's an integral question dealing

22   with sovereign immunity aspect, and we can go from

23   there.

24        MR. HORAN:  I -- the one thing that I would

25   say is that the -- the -- the concept of the --

1    treating the vessel as a unity and not separating

2    out the ownership of cargo, that was something that

3    we faced in the Central America litigation and --

4    and in others that I've been involved in.  I was

5    also the attorney who took the review to the Supreme

6    Court right after the election mess in Florida and

7    hanging chads did away with our ability to get

8    review by the Supreme Court, but I was not involved

9    in the prior litigation on the Kingdom of Spain

10   case.

11        THE COURT:  Well, Mr. -- let me ask Peru's

12   counsel whether there was -- I kind of cut you off.

13   I didn't -- I think the issues that you want to

14   explore are issues that I don't think at least for

15   me right now are ripe for me to identify.  I think

16   the first order of business is to wait to see

17   Spain's response.  If I think I need a status

18   conference after that to discuss any dates for

19   argument or dates for an evidentiary hearing, I can

20   do that.

21        But I'd like to proceed in a -- in a piecemeal

22   fashion and first make some determination as to the

23   identity of the vessel and then go from there.

24   We'll talk to Judge Merryday to see whether I need

25   to do this on a report and recommendation or I can

1    do it on an order.  I don't see why I can't perhaps

2    do it on an order, but we'll see where we are.

3        I think as to the dismissal of -- the

4    potential dismissal of -- let me put it this way.  I

5    think as to the motion to dismiss, I can either

6    proceed if it's to be denied either on an order or a

7    report and recommendation.  Certainly, if there's to

8    be a recommendation to be granted, it must be done

9    in a report and recommendation to be dispositive.

10   If it's denied, it's not dispositive of the case,

11   it's simply dispositive of the motion, perhaps.

12       But leave that as it may, that's an

13   internal -- that's an inside the park, ballpark

14   issue between the magistrate judges and the district

15   judges, so we'll resolve that.

16       Are there any other matters with respect to

17   this case that anyone wants to raise?

18           MR. HORAN:  May I ask a question?

19           THE COURT:  Yes, Mr. Horan.

20           MR. HORAN:  The determination of whether or

21   not it is the Mercedes, until such time as that

22   determination is made, the claimants don't have a

23   claim.

24           THE COURT:  Correct.

25           MR. HORAN:  Okay.  So I guess I can just go

1    ahead and wait until you make those -- that

2    determination, and then we -- and then we go forward

3    with regard to any --

4         THE COURT:  Well, let me make this suggestion.

5    If you have an argument to make now as to whether

6    it's the Merced or not, you should file the

7    appropriate pleading so as to support your position,

8    you shouldn't wait.  And I'll expect a motion or

9    some pleading from Mr. Von Spiegelfeld on behalf of

10   Odyssey to cut off the date as -- as he has

11   proposed, and we can proceed in that fashion, as

12   well.

13        MR. MANEY:  Your Honor, I would like, if

14   possible, to address your suggestion that this

15   matter that Peru's claim be moved to Spanish courts.

16        THE COURT:  Well, I haven't gotten that far.

17        MR. MANEY:  Well, I know.  But even the

18   possibility raises the hair at the back of my neck

19   because --

20        THE COURT:  Why is that?

21        MR. MANEY:  Well, because Peru has a long

22   history of dealing with Spanish justice and I'm not

23   sure it's a welcome one.  And our argument in this

24   case, Your Honor, is not that Peru has a claim

25   against property of Spain.  Our argument is this

1    vessel is no longer Spanish as that term is used

2    today.  This vessel and its contents were Spanish in

3    1804 when Peru was part of Spain.  And, therefore,

4    this vessel today is -- and particularly the gold

5    and silver on it are Peruvian, not Spanish.

6         Russia tried this not that many years ago and

7    said they were the successor to the Soviet Union and

8    they wanted all the embassies, all the Merchant

9    fleet, all the foreign gold reserves.  They said

10   they're now Russian.  The International Court said

11   no, it doesn't work that way.

12        Every one of the successor nations to the

13   former Soviet Union have a part of that property,

14   and if it originated in their territory, they get it

15   all.  It is not enough to say this was the Nuestra

16   Senora de las Mercedes, therefore, it's Spanish,

17   and, therefore, it's Spain's.  It is Spanish in the

18   sense of 1804.

19        It's not 1804 anymore and Peru has those

20   rights.  And we shouldn't have to go to Spain to

21   raise those rights.  In fact, this Court shouldn't

22   be able to award it to Spain unless it's sure it's

23   Spain's, as that term is used today, not as it was

24   used in 1804.

25        I mean, I can't tell you how strongly Peru

1   believes that and that is the law and it's been the

2   law in the United States since when they let West

3   Virginia back in the Union and said they had to

4   divide the assets and debts of Virginia equitably,

5   just as the same rule they applied to the Soviet

6   Union, Czechoslovakia and Yugoslavia when they broke

7   up.

8          To put it another way, Peru and Spain got a

9   divorce after this vessel sank.  You can't give it

10  to the husband without determining whether the other

11  party has rights.  And so I don't think this Court

12  can just say it's the Mercedes and pass on.  And

13  that's why I think Peru's claim is very different

14  from Odyssey's claim or someone else's claim.  We're

15  claiming essentially we're -- you know, we changed

16  our name but we're part of that same former Kingdom

17  of Spain in 1804.  These coins have --

18          THE COURT:  So I take it by that token Peru

19  can lay claim to most of the gold altars in Spain

20  where gold leaf is encrusted on the altars and say

21  it's Peruvian property?

22          MR. MANEY:  Not at all, Your Honor.  Those

23  were covered by the treaty.  The Independence Treaty

24  divided property that they had, not property that

25  had been lost before.  This is -- I mean, this

1      property, found treasure that was sunk before the

2      independence of Peru is unique.  Property that was

3      in Spain's possession since then, not to mention

4      adverse possession, is different.

5          THE COURT:  Well, we'll just take it as it

6      comes.

7          MS. MACCONNEL:  Your Honor, if I could say one

8      thing.  We talked about identifying the vessel here

9      as a threshold issue.  I think Mr. Horan and

10     Mr. Maney will agree with me that that issue is

11     relevant only insofar as the property that we have

12     recovered and whether it came from the Mercedes.

13     Again, there isn't a vessel at this site and we're

14     not determining the rights to a vessel.  We're

15     determining rights to property that may or may not

16     have come from that vessel.

17         And as Your Honor perfectly well knows,

18     there's a lot of claimants here.  There's

19     individuals, there's Peru, there's Spain who may

20     have owned some property aboard that.  But we're not

21     talking about just the vessel or a vessel at all.

22     We're talking about the property.  I just want to

23     put that on the record as a reminder.

24         THE COURT:  All right.

25         MR. HORAN:  Well, then, the analogy that he

1     made with regard to the divorce, we're grandchildren

2     and I don't care whether it's the mother or the

3     father.  The fact is we are grandchildren.

4          THE COURT:  You know, this could be taken to

5     its logical beginning and that is Adam and Eve and

6     we're all descendents of each other.

7          MR. GOOLD:  But that's not for the Middle

8     District of Florida.

9          THE COURT:  It certainly isn't.

10          MS. MACCONNEL:  Although, Your Honor, Florida

11     was part of Spain in 1840.

12          THE COURT:  I was thinking that as we heard

13     the history lesson here today.  All right.  We'll be

14     in recess.

15          MS. MACCONNEL:  Thank you.

16          MR. HORAN:  Thank you, Your Honor.

17     (Hearing concluded.)

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3     STATE OF FLORIDA          )

 4     COUNTY OF HILLSBOROUGH    )

 5         I, Linda Starr, RPR, Official Court Reporter for

 6     the United States District Court, Middle District,

 7     Tampa Division,

 8         DO HEREBY CERTIFY, that I was authorized to and

 9     did, through use of Computer Aided Transcription,

10     report in machine shorthand the proceedings and

11     evidence in the above-styled cause, as stated in the

12     caption hereto, and that the foregoing pages,

13     numbered 1 through 22, inclusive, constitute a true

14     and correct transcription of my machine shorthand

15     report of said proceedings and evidence.

16         IN WITNESS WHEREOF, I have hereunto set my hand in

17     the City of Tampa, County of Hillsborough, State of

18     Florida, this 18th day of November 2009.

19

20

21            _/s/ Linda Starr_____
              Linda Starr, RPR, Official Court Reporter
22

23

24

25
```