UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ODYSSEY MARINE EXPLORATION, INC.,

        Plaintiff,

v.                                                Case No. 8:07-cv-614-T-23MAP

THE UNIDENTIFIED SHIPWRECKED
VESSEL,
        Defendant,

and

KINGDOM OF SPAIN, *et al.*,

        Claimant.
_____/

## REPORT AND RECOMMENDATION

On November 15, 2012, I issued a report ("November Report") recommending sanctions against Odyssey and its general counsel for post-mandate conduct that required Spain to incur additional litigation costs.[1] Odyssey objected to the award, and Spain argued the award should have been broader in time and scope (docs. 343, 344). In view of the issues these objections

---

[1] The November Report dealt with two motions Spain filed: one for sanctions dealing with Odyssey's post-mandate conduct (doc. 298) and the other for an award of attorney's fees, costs, and other expenses pursuant to Local Rule 7.03(g), the Court's inherent powers, and 28 U.S.C. §1927 (doc. 321). Specifically, I concluded in my November Report that Odyssey's director or officer and its general counsel, Melinda J. MacConnel, should be ordered to appear before the district judge to show cause why they should not be sanctioned for their post-mandate conduct and for Odyssey's violation of the Court's Orders of April 13, 2007, December 22, 2009, and February 17, 2012 (docs. 8, 270, 295) and ordered to pay Spain's attorney fees, expenses and costs associated with Spain's post-mandate efforts to obtain Odyssey's compliance with the Court's December 22, 2009, Order through and including March 20, 2012, aimed at compelling Odyssey's compliance with the Court's Orders of April 13, 2007, December 22, 2009, and February 17, 2012. *See* doc. 340, p.19.

presented, the district judge issued an order that (1) directed Spain to submit an affidavit establishing the hours worked, the hourly rates, the expenses, and the costs either recommended for reimbursement by my November Report or sought separately by Spain in its objections; (2) permitted Odyssey to object to Spain's calculations as appropriate; and (3) remanded these matters to me for the limited purpose of separately determining the putative award amounts for these two periods. *See* doc. 346. Three issues emerge from the parties' responses (docs. 350, 352): does the lodestar formula govern the calculations; if so, should the hourly rate of Spain's lead counsel reflect the customary fees of the local market (the general rule) or his higher charged rate due to the case's complexity (the exception); and are Spain's other costs reasonable. Having considered the matter carefully, I find that the lodestar formula applies and that Spain has satisfied its burden for showing the exception for the higher charge applies.

   *A. Lodestar Applies*

When fashioning an award of attorney's fees the usual starting point is to multiply the number of hours reasonably expended by a reasonable hourly rate. That product, which is the "lodestar," strongly suggests a figure the attorney appropriately deserves, although a court must consider whether that amount should be adjusted up or down for the results obtained. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 130 S.Ct. 1662, 1672-73 (2010); *Hensley v. Eckerhart,* 461 U.S. 424, 433-434 (1983); *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008); *Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292, 1302.[2] An example

---

[2] The lodestar presumptively includes all of the twelve factors applied in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), namely: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations

warranting a downward adjustment would be if the relief, no matter how significant, is limited when compared to the scope of the litigation. *Norman*, 836 F.2d at 1302. On the other hand, an upward adjustment might be warranted if the results were exceptional. *Id.* But this is a rarity. The reason is that "the law is usually faithful to its teachings," so vindicating a right and recovering an amount due is not exceptional. *Id.* Instead, an exceptional result warranting an upward lodestar adjustment requires record evidence showing that the quality of representation was superior to that which the court reasonably anticipated in light of the results claimed. *Id.* In the main, "the reasonable hourly rate should already reflect the skill demonstrated by the advocate." *Id.*

Odyssey argues the lodestar applies. Spain, whose demand is predicated under Local Rule 7.03(g) for Odyssey's wrongful arrest of its warship, or under the Court's inherent authority for Odyssey's misconduct, or under 28 U.S.C. § 1927 against Odyssey's general counsel for her vexatious conduct, says the award of fees is compensatory in nature; as such, the lodestar has no application.[3] For this proposition, Spain points to a case that I quoted in my November Report, *In re Chase & Sanborn Corp.*, 872 F2d 397, 401 (11th Cir. 1989): "Because a compensatory civil contempt fine 'must be based on proof of the complainant's actual loss,' [citation omitted], I

---

imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Norman,* 836 F.2d 1299-1300.

[3] In my November Report, I rejected Spain's argument's that Local Rule 7.03(g) trumped the American Rule applicable in admiralty action, namely: the prevailing party in an admiralty action is not entitled to recover its fees as a matter of course unless the award is statutorily authorized, the non-prevailing party acted in bad faith, or the parties contractually agreed to indemnification. *See* doc. 340 at 11 (citations omitted). Spain has objected to this portion of my report.

recommend that the district judge require Spain to provide billing records to establish the specific amount of attorney's fees, expenses, and costs so incurred." *See* doc. 340 at 19.

Admittedly, the isolated language seemingly supports Spain's reading. Yet, when examined in the context of precedent, the quoted text simply stands for the principle that civil contempt sanctions can serve two purposes, to coerce compliance with a court order and to compensate the complainant for actual losses due to the contumacy. 872 F.2d at 400-01 citing *United States v. United Mine Workers of America*, 330 U.S. 258, 303-304 (1947) (judicial sanctions in civil contempt proceeding can be employed for two purposes, to coerce compliance with a court order and "to compensate the complainant for losses sustained").[4] By assessing fees against the contemnor, which is an exception to the American Rule that each party pay its attorney's fees, "the court is merely seeking to insure that its original order is followed." *Cook v. Ochsner Foundation Hospital*, 559 F.2d 270, 272 (5th Cir. 1977).[5] But that does not mean that compensation for actual losses will always equate to compensation for the *actual* amount of attorneys' fees the complainant paid to its counsel. The fee award must still be reasonable; moreover, longstanding precedent points to the lodestar formula as the appropriate measure for determining a reasonable fee amount. *See Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 827 (5th Cir. 1976) ("Compensatory civil contempt reimburses the injured party for the losses

---

[4] *In re Chase & Sanborn* involved the imposition of a $1,000 daily fine imposed on the contemnor for failure to abide by a bankruptcy court's discovery order which the bankruptcy judge made payable to the trustee. Because the trustee offered no proof of any actual loss and the district judge did not clarify whether the sanction was intended to be coercive or compensatory, the panel remanded the matter back to the district court for further proceedings.

[5] The Eleventh Circuit in an *en banc* decision, *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

and expenses incurred because of his adversaries non-compliance. This includes losses flowing from the non-compliance and expenses *reasonably* and *necessarily* incurred in the attempt to enforce compliance.") (emphasis added); *Cook v. Ochsner, supra,* 559 F.2d at 272 (same and applying the *Johnson* factors to determine fee award); *Rickard v. Auto Publisher, Inc.*, 735 F.2d 450, 458 (11th Cir. 1984); *Abbott Laboratories v. Unlimited Beverages, Inc.*, 218 F.3d 1238, 1242 (11th Cir. 2000); *see also Boswell v. Gumbaytay*, 2009 WL 1516246 (M.D. Ala. 2009) (applying lodestar to determine reasonable and necessary attorney fees as component of compensatory civil contempt).[6]

    *1. hours expended and hourly rates*

Odyssey does not object to the hours Spain's counsel billed for the periods at issue here (*see* doc. 352 at 1).[7] But Odyssey does object to the hourly rates Spain seeks for its lead counsel, James A. Goold ("Goold") of the Washington, D.C. law firm, Covington & Burling LLP, and

---

[6] An unpublished Eleventh Circuit opinion contradicts this line of precedent, *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Olympia Holding*, 140 Fed. Appx. 860 at*4 n.1 (11th Cir. 2005) ("Sanctions for civil contempt are not equivalent with typical payment of attorneys' fees, and civil contempt sanctions do not require the use of the lodestar method. We yield to the broad discretion enjoyed by the district courts in fashioning sanctions for civil contempt, and do not find the amount of sanctions unreasonable."). Unpublished decisions are not binding precedent. *Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336, 1338 (11th Cir. 2008); 11th Cir. R. 36-2. Besides, when circuit authority is in conflict, the earlier line of authority controls because a decision of a prior panel cannot be overturned by a later panel. *Walker v. Mortham*, 158 F.3d 1177, 1188 (11th Cir. 1998).

[7] Odyssey says it "takes issue" with Goold's "block billing," a practice where an attorney lists all the day's task on a case in a single entry, without separately identifying the time spent on each task. *Ceres Environmental Serv., Inc. v. Colonel McCrary Trucking, LLC*, 476 Fed. Appx. 198, 203 (11th Cir. 2012) (unpublished); *see* doc. 351 at 1. *Norman*, however, teaches that because a "district court must be reasonably precise in excluding hours thought to be unreasonable or unnecessary, so should be the objections and proof from fee opponents." 836 F.2d at 1301. Since Odyssey accepts Spain's hours, only the hourly rate is at issue.

the rates charged by associates and paralegals of that firm, all of which exceed local market rates.[8] Odyssey's fee expert, a local admiralty practitioner (David McCreadie), opines that a $400 hourly rate, which reflects the maximum market rate a Tampa admiralty lawyer would charge for this type of case, is reasonable for Spain's lead counsel.

The fee applicant bears the burden of producing satisfactory evidence that "speak[s] to rates actually billed and paid in similar lawsuits." *Norman*, 836 F.2d at 1299. The place where the case is filed is the customary relevant market for determining the reasonable hourly rate. *American Civil Liberties Union v. Barnes*, 168 F.3d 423, 428 (11th Cir. 1999). And that rate should reflect the prevailing market rate in the relevant legal community for similar services charged by lawyers of reasonably comparable skills, experience, and reputation in that venue. *Norman,* 836 F.2d at 1299. But as with most general rules, *Barnes* points out an exception:

> We do not rule out the possibility that there might be a case where use of an attorney from a higher-rate market who had extensive prior experience with a particular factual situation could be justified because of efficiencies resulting from prior experience. That could be reasonable and cost-sensible, especially if it resulted in lower costs than would otherwise be necessary.

*Barnes*, 168 F.3d at 438. Spain, promotes this exception. *See* doc. 350-2. Odyssey, despite the fact that its legal team includes both local and out-of-district lawyers, promotes the general rule.[9] My view is that *Barnes's* exception applies because Goold possessed unique experience and

---

[8] Goold's rates varied over time from $590 in 2007 up to $795 in 2012.

[9] Lawyers entering appearances on behalf of Odyssey include John D. Kimball of New York office of Blank Rome LLP, a Philadelphia-based law firm in which Mr. Kimball is the "international and maritime litigation and ADR practice group leader," and Russell K LaMotte of Beveridge & Diamond in Washington, D.C., a former Deputy Assistant Legal Adviser at the Department of State. *See* Parrish Aff. Ex. C and D (doc. 356-2).

knowledge for litigating this case.

In the overwhelming majority of fee disputes, the hourly-rate determination is straightforward. The fee applicant usually presents expert testimony whose breadth of experience includes the type of case at issue. That expert opines that the rates billed are in line with those customarily charged in the relevant market by counsel of similar skill, reputation, and experience in like cases. *Norman*, 836 F.2d at 1299. The party opposing the award counters with its own expert. And then the court, who is itself an expert on the question, objectively weighs the testimony, taking into account some of the *Johnson* factors that have utility in figuring out the appropriate hourly rate. *Id.*, 836 F.2d at 1299-1300, 1303. For most cases, the *Johnson* factors assist a court in picking the reasonable rate among a range of local rates charged by attorneys of like skill and reputation to the fee applicant's counsel. But *Johnson's* factors are also helpful for deciding if the relevant market should be something other than the usual local market.

Objectively weighing the testimony, I find McCreadie's opinion as to the upper market rates charged by local admiralty lawyers to be low. Spain's local fee expert (Paul Parrish), for example, attests he bills as much a $500 an hour. But even if McCreadie accurately reports the highest market rate, many of *Johnson's* factors support a conclusion that the exception to the general rule should apply: the novelty and difficulty of the questions; the skill requisite to perform the legal service properly; the time and labor required; the preclusion of other employment by the attorney due to acceptance of the case; time limitations imposed by the client or the circumstances; the amount involved and the results obtained; and the experience, reputation, and ability of the attorney.

7

The lawyers who practice in this sphere of admiralty law – treasure salvage – are few. In fact, the local few are limited to Odyssey's counsel and McCreadie (whose cases all appear to have involved Odyssey). And of the dozen or so *in rem* actions Odyssey has filed in this district over the years, none has approached this case's complexity nor its high stakes. Spain's fee expert (Paul E. Parrish) accurately sums up this case's novelty and difficulty:

> This case was also highly novel in several respects and involved new, complex and difficult legal principles. In my almost 30 years as a practitioner in the Middle District of Florida admiralty bar, I do not recall hearing of any similar case being litigated in this district. Indeed, a Westlaw search that I conducted revealed only a handful of cases involving the issues presented by this matter in any federal court and no case involving the wide array of issues arising from the respective positions of Spain, Odyssey Marine Exploration, the Republic of Peru and the descendant-claimants. The difficulty posed by this case thus called for a combination of background and experience in a wide variety of factual and legal areas that would be required to competently represent Spain. Any attorney would have to have knowledge that might begin with maritime and admiralty law, but would also have to encompass international law, treatises between countries– some of which go back over 200 years, foreign sovereign immunity, and international law on succession of states and maritime history and archeology. ... To my knowledge no attorney in the Middle District of Florida has the totality of background experience and knowledge required for a case of this nature. For that matter, very few, if any, people in the country would have the requisite background, experience and knowledge. At minimum, if Mr. Goold had not been available, Spain would have had to engage a larger team, with multiple lead lawyers handling issues within their own areas of specialization.

Parrish Aff., doc. 356-2, ¶¶10, 12.

From the outset, all knew this case potentially involved claims of national patrimony. Jorge Sobredo ("Sobredo"), Cultural Counselor of the Embassy of Spain at Washington, D.C. from 2005-2010 and responsible for protecting historic Spanish shipwrecks from unauthorized disturbance and spoilation, points out in his declaration the case's importance for Spain. When

8

Spain learned of Odyssey's recovery of a large amount of coins and artifacts from an underwater vessel it identified as the "Black Swan," he states Spain became concerned that Odyssey may have conducted an unauthorized disturbance of a sunken Spanish vessel. With the filing of Odyssey's complaint, Spain decided to retain skilled and experienced counsel to rapidly and aggressively investigate the situation, determine the identity of the "Black Swan," and preserve Spain's rights and interests. Because Odyssey claimed the vessel was unidentified, Spain also says it needed counsel with specialized expertise and experience in nautical history, undersea operations, and nautical archaeology to determine how to gather and evaluate the evidence necessary to identify the "Black Swan." And it needed counsel fully knowledgeable in salvage and other aspects of admiralty law, their interrelationship with sovereign immunity, experience working with relevant governmental agencies in Madrid, and a personal commitment from counsel that this case would be top priority from start to finish. Sobredo thought it important to retain counsel from a law firm of high prominence and credibility in the Washington, D.C. area because the case involves close work with the Embassy, and experience and credibility with U.S. government agencies that may be called upon to assist in the investigation to identify the identity of the site, experience with diplomatic procedure and protocol including preparation of *Notes Verbales* and obtaining documents such as U.S. Customs import records and U.K. export records for the shipment of coins and artifacts. Lastly, Sobredo instructed Goold not to undertake any other representation that would prevent him from personally preparing all briefs and appearing on Spain's behalf at court hearings and from being available on short notice for meetings in Washington and Madrid. *See* Sobrado Declar., doc. 350-5, ¶¶22-23. *Johnson,* 488 F.2d at 717-18.

Goold had extensive experience in nautical archaeology, eliminating the necessity of retaining a consultant with such experience, and Sobredo concluded no other lawyer provided the combination of experience, knowledge, skills, and record of proven success Goold possessed. *See* Sobredo Decl., doc. 350-5.  He was an obvious choice for Spain as he has represented Spain since 1998 when he acted as lead counsel in a matter involving two Spanish wrecks (the *Juno* and *La Galga*) that had legal relevance to this case.  *See Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel of Vessels*, 221 F.3d 634 (4th Cir. 2000).  The legal framework Goold used in *Sea Hunt* served as a template for his litigation approach here.

This case presents the rare exception to the usual standard – the hourly rate should reflect the prevailing market rate in the relevant legal community for similar services charged by lawyers of reasonably comparable skills, experience, and reputation in that venue.  I am unaware of any local maritime lawyer who has Goold's comparable skills, experience, and reputation in salvage cases involving sunken Spanish naval vessels.  The fictional local admiralty lawyer of similar skill would have been less efficient as he or she would have needed to spend additional time delving into the nuances of the treaty obligations between the United States and Spain and the intricacies of the Foreign Sovereign Immunities Act.  Without Goold, Spain would have done what Odyssey did – add specialists to its legal team.  For all these reasons, I find a reasonable hourly rate for Goold to be $590, which is the amount he charged in 2007.[10]  But as for Goold's associates and paralegals, I find that local rates should prevail.  Odyssey's suggested rates

---

[10] Goold's hourly rate jumped to $700 an hour in October 2007, a 19% increase from his earlier rate of $590 an hour.  That rate eventually increased to $795 an hour in January 2012.  In any event, I find $590 an hour to be reasonable.  This amount exceeds the market average charged by local maritime lawyers whose years of experience are similar to Goold's.

reasonably reflect the current market.

### 2. lodestar calculations

The order of referral directed me to recommend putative amounts for two distinct periods: that covered by my November Report (doc. 340), which dates from February 10, 2012 (the date of the mandate) to March 20, 2012 (the date of my order granting in part Spain's motion to compel); and that covered by Spain's objections (doc. 344). Spain's objections to my November Report, however, actually carve out three separate periods: April 12, 2007 (arrest of bessel) to February 10, 2012 (issuance of mandate), October 2011 (when Odyssey "staked out its position in communications with Spain's counsel") to February 9, 2012 (the date prior to mandate), and March 21, 2012 (the date subsequent to mandate) to June 8, 2012 (when *res* in Gibraltar finally released to Spain's custody). The following four tables, listed in chronological order, reflect my lodestar findings for all these periods.

### a. April 12, 2007 through February 10, 2012 (Spain's objections)[11]

Pursuant to Local Rule 7.03(g) and the inherent power of the court in admiralty cases where litigation misconduct has occurred, Spain seeks reimbursement of attorney and legal assistant hours worked by Spain from April 12, 2007, arrest of the Spanish Royal Navy Frigate *Nuestra Senora de las Mercedes* (doc. 5) to the February 10, 2012, issuance of the mandate by the Eleventh Circuit vacating the arrest, or alternatively to the end of calendar year 2012.[12] *See* doc. 350-3, Schedule 2- Part C. Rather than providing detailed time entries, Spain provided

---

[11] In my November Report I rejected Spain's argument that Local Rule 7.03(g) shifts its entire litigation costs onto Odyssey. See doc. 340, pp. 10-12.

[12] Spain indicates it incurred the following additional attorney hours from February 11, 2012, through the end of 2012: Goold, 593.5 hours; Arvelo, 48.6 hours; Armijo, 91 hours, and Mellis, 16.3 hours. *See* doc. 350-3, p.10.

aggregated figures by year or partial year and states that "[t]he data provided herein is under-inclusive of actual hours worked ... with the objective of minimizing potential disputes" and hours worked are limited to the attorneys at Covington & Burling LLP who have been most active in the case (Goold, Arvelo, Armijo, Mellis) and to one paralegal assigned to the case at any given time (Inakis-Cue, 2007-2008, Bodenheimer, 2008-2010, McLaughlin, 2010-2011). *See* doc. 350-3, Schedule 2- Part C, p.7. Spain proposes that it can provide more detailed billing records should the Court determine these fees are compensable.

| April 12, 2007 through February 10, 2012 | | | |
|---|---:|---:|---:|
| **Attorney** | **Hours** | **Hourly Rate** | **Dollar Amount** |
| Goold | 3365.24 | 590 | 1,985,491.60 |
| Arvelo | 1455.10 | 250 | 363,775.00 |
| Armijo | 663.17 | 250 | 165,792.50 |
| Paralegals | 732.52 | 150 | 109,878 |
| TOTAL | | | 2,624,937.10 |

*b. October 2011 through February 9, 2012 (Spain's objections)*

Spain has provided documentation for attorney hours worked during this time period: Goold worked 38 hours in 2011, and 15.20 hours in 2012, and an associate attorney, Laura Mellis worked five hours.[13] *See* doc. 350-2, Schedule 1-Part A.

---

[13] Spain seeks a rate of $320.00 for Mellis's work. Spain has not provided any information about Mellis's legal experience or her background, only that she succeeded another associate who had worked on the case, Enrique Armijo. *See* Goold Declr., p.7. As stated already, in calculating a reasonable rate for Mellis, I adopt Odyssey's recommendation and set Mellis's hourly rate at $250.00.

| October 2011 through February 9, 2012 | | | |
|---|---|---|---|
| **Attorney** | **Hours** | **Hourly Rate** | **Dollar Amount** |
| Goold | 53.2 | 590 | 31,388 |
| Mellis | 5 | 250 | 1,250 |
| TOTAL | | | 32,638 |

*c. February 10, 2012 through March 20, 2012 (the November Report)*

I concluded in my November Report that "Spain has presented clear and convincing evidence that Odyssey failed to comply in a timely fashion with the Court's Orders to turn over the *res* and that Odyssey and its general counsel acted in bad faith during the post-mandate period until the Court's March 20, 2012 Order (Doc. 311)." Spain's documentation describes the work James A. Goold ("Goold") performed a total of 121.7 hours during this time frame (doc. 350-2, schedule 1-part B).

| February 10, 2012 through March 20, 2012 | | | |
|---|---|---|---|
| **Attorney** | **Hours** | **Hourly Rate** | **Dollar Amount** |
| Goold | 121.7 | 590 | 71,803 |

*d. March 21, 2012 through June 8, 2012 (Spain's objections)*

Spain has provided documentation for attorney hours worked from March 21, 2012, through June 8, 2012, showing that Goold worked a total of 58.00 hours (doc. 350-3, Schedule 2-Part A).

| March 21, 2012 through June 8, 2012 | | | |
|---|---|---|---|
| **Attorney** | **Hours** | **Hourly Rate** | **Dollar Amount** |
| Goold | 58 | 590 | 34,220 |

*3. enhancement*

The lodestar method yields a fee that is presumptively sufficient, and includes most, if not all, of the relevant factors constituting a "reasonable attorney's fee." *Perdue, supra,* 130 S.Ct. at 1673 (affirming Eleventh Circuit panel holding that no enhancement to lodestar allowed because quality of attorneys' performance adequately accounted for either in determining reasonable number of hours expended or in setting the reasonable hourly rates). In *Perdue,* the Court held that an enhancement may not be awarded based on a factor that is subsumed in a lodestar calculation. *Id.*(finding novelty and complexity of case and quality of attorney's performance already reflected in attorney's reasonable rate) (citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air (Delaware Valley I)*, 478 U.S. 546, 566 (1986)).[14] I find that the lodestar calculation derived above adequately compensates Goold and supports this Court's inherent power to assess attorney's fees against a party as a sanction for willfully disobeying a court order or for acting in bad faith and vexatiously.

*B. Expenses*

In addition to attorney's fees, my November Report recommended that the district court require Odyssey and its general counsel to pay Spain's expenses, and costs associated with Spain's post-mandate efforts to obtain Odyssey's compliance with the Court's December 22,

---

[14] In rejecting the contention that a fee determined by lodestar method may never be enhanced, the *Perdue* Court recognized a few "rare" and "exceptional" circumstances in which superior attorney performance is not adequately taken into account in the lodestar calculation: 1) where method used in determining hourly rate in lodestar calculation does not adequately measure attorney's true market value (perhaps where hourly rate is determined by a single factor or only a few similar factors, such as years of bar admission), 2) attorney's performance includes an extraordinary outlay of expenses and the litigation is exceptionally protracted, 3) exceptional delay in payment of fees. *Id.*

2009, Order through and including March 20, 2012. Goold has provided only vague lists of expenses incurred each year from 2007 through 2012, and it is impossible to determine which expenses Spain incurred between February 10, 2012 (the date of the mandate) and March 20, 2012 (the date of my Order granting in part Spain's motion to compel), or what expenses Spain incurred associated with its post mandate efforts to obtain Odyssey's compliance with these orders. Goold Aff. Doc. 350-1, p.3; Schedule of costs and expenses, doc. 350-3, pp.11-18.[15] Spain's costs and expenses after its voluntary 20% reduction are $79,510.46 for 2008, $18,834.20 for 2009, $13,494.20 for 2010, $5,776.22 for 2011, $1,947.76 for January through February 10, 2012 (pre-mandate), and $21,471.46 for all of 2012. Odyssey objects, and for the reason Odyssey gives, I find its objections appropriate. *See Dolen v. Rylas,* 2012 Wl 983787, *6 (M.D.Fla. Feb. 10, 2012) (recommending denial of motion for costs due to lack of specificity "as to when the costs were incurred and what they were incurred for, the Court is unable to discern reasonable costs"), *adopted by* 2012 WL 983771 (Mar. 22, 2012) (Merryday, J.).

 C.  *Other fees Spain seeks*

For the first time in its affidavit submitted per Judge Merryday's instructions, Spain requests fees incurred seeking sanctions against Spain (doc. 350-3, Schedule 2-Part B). The fees Spain seeks were incurred preparing Spain's motion for attorney's fees and costs filed on April

---

[15] Spain submitted only seven pages of documentation explaining the costs and expenses it incurred in defending this action itemized for each year from 2007 through 2012. Spain explains that the listed expenses are "underinclusive" ... "with the objective of minimizing potential disputes" and has applied a 20% discount factor to all totals. Goold attests that he has not included costs such as copying and telecommunications and other expenses such as travel because the time it would take to categorize and itemize entries for these schedules is disproportionate to the amounts involved. *See* Goold Aff. Doc. 350-1, p.3; doc. 350-3, p.7.

16, 2012 (doc. 321), preparing Spain's response and objections to the November Report (doc. 344), and preparing Spain's response to this Court's December 27, 2012 Order (doc. 346). Spain did not include hours worked subsequent to December 2012, but requests the right to update and supplement regarding post-December 2012 activity. Goold submits that he worked 11.50 hours in April 2012 preparing the motion for attorney fees, costs and other expenses that he filed on Spain's behalf on April 16, 2012 (doc. 321) (doc. 350-3, p.5), he worked 54.2 hours from November 16, 2012 through December 6, 2012, following the issuance of my November 15, 2012 Report and Recommendation preparing the objections that he filed on December 6, 2012 (doc. 350-3, pp 5-6), and he worked 12.40 hours from December 28-31, 2012, assembling and reviewing time records and supporting materials pursuant to this Court's December 27, 2012 order (doc. 350-3, p.6). In *Norelus v. Denny's, Inc.*, the Eleventh Circuit decided that a district court "may" award a moving party costs, expenses, and fees for successfully litigating a § 1927 sanctions proceeding. 628 F.3d 1270 (11th Cir. 2010).

| FEES INCURRED SEEKING SANCTIONS | | | |
|---|---|---|---|
| **Attorney** | **Hours** | **Hourly Rate** | **Dollar Amount** |
| Goold | 78.1 | 590 | 46,079 |

### D. Conclusion

In accordance with the district judge's order of referral, the above recommendations cover the dollar amounts of the award recommended in doc. 340 and the dollar amounts that the Kingdom of Spain seeks in doc. 344.

IT IS SO REPORTED at Tampa, Florida, on July 2, 2013.

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

16

## **NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal. 28 U.S.C. § 636(b)(1).