UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ODYSSEY MARINE EXPLORATION,
INC.,

      Plaintiff,

v.                                   CASE NO. 8:07-cv-614-T-23MAP

THE UNIDENTIFIED SHIPWRECKED
VESSEL,

      Defendant.

_____/

## **ORDER**

    This action between Odyssey Marine Exploration and the Kingdom of Spain adjudicates the right to possession and ownership of more than $600,000,000.00 in silver specie.[1]  This action presented from the outset not merely the dicey prospects of a damages action; this action presented a claim to ownership by a party holding-in-hand an enormous, historic trove of treasure, holding-in-hand riches "beyond the dreams of avarice."  A contest for $600 million – winner take all – is plenty sufficient

---

[1] The detailed factual and legal history of this extraordinary action appears in the magistrate judge's splendid report and recommendation (Doc. 209; *Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel*, 675 F. Supp. 2d 1126 (M.D. Fla. 2009), and again in the affirming opinion of the court of appeals (Doc. 286; *Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel*, 657 F.3d 1159 (11th Cir. 2011), *cert. denied*, 132 S. Ct. 2379 (2012)).

to endanger any boundary, to awaken any frailty, and to excite any temptation.

Observing this contest evokes an ageless insight on money:

> She is the sovereign queen of all delights;
> For her, the lawyer pleads and the soldier fights.

Richard Barnfield, *The Encomion of Lady Pecunia* (1598).

Important to understanding the character of this action is that before Odyssey explored the site and recovered the treasure from the seabed south of Cape Saint Mary (*Cabo de Santa Maria*), Portugal, Odyssey asked Spain for permission to explore this sector of ocean and to recover any Spanish treasure discovered, but Spain declined.  With reason to suspect the availability of almost unfathomably valuable treasure and with the remote but arresting prospect of prevailing in the expected judicial showdown with Spain, Odyssey undertook both unauthorized recovery of the treasure from the seabed near Cape Saint Mary and furtive removal of the treasure to central Florida, near Odyssey's corporate headquarters in Tampa. Odyssey's calculus of corporate risk emerges writ large from this history:  in the event of a litigation win, an upside of $600 million; in the event of a litigation loss, a downside of legal fees and costs of less than ½ of 1% of the potential upside (in either event incurring the costs of recovery, removal, archiving, and storage).

* * * * *

After successfully contesting Odyssey's claim, Spain moves (Docs. 298 and 321) for reimbursement of attorney's fees and costs and alleges in support

- 2 -

(1) that Odyssey knew from the time the treasure was recovered and removed and that Odyssey necessarily knew at the outset of this action that the wrecked vessel was Spain's naval vessel *Nuestra Señora de las Mercedes*, lost in combat in 1804 while in transit to Cadiz, Spain, from Peru; (2) that Odyssey frivolously and in bad faith denied the existence and the identity of the vessel and, in furtherance of the bad faith denial, purposefully withheld evidence establishing beyond reasoned doubt the existence and identity of the vessel; and (3) that, even after issuance of the circuit court of appeals' mandate deciding this action finally against Odyssey and for Spain, Odyssey contemptuously continued a determined course of studied and defiant resistance both to the mandate and to the orders of the district judge and the magistrate judge during Spain's attempt to enforce the mandate.

* * * * *

In a report (Doc. 340) that includes facts "certified" under 28 U.S.C. § 636(e)(6)(B)(iii), the magistrate judge states:

> I make the following recommendations to the district judge: (1) that he find Odyssey in contempt for its post-mandate conduct and its violation of the Court's Orders of April 13, 2007, December 22, 2009, and February 17, 2012 (Docs. 8, 270, 295); (2) that he sanction Odyssey's general counsel, Melinda J. MacConnel, under 28 U.S.C. § 1927 for her vexatious conduct during the post-mandate period; (3) that he require Odyssey and Odyssey's general counsel to pay Spain's attorney fees, expenses, and costs associated with Spain's post-mandate efforts through and including March 20, 2012, aimed at compelling Odyssey's compliance with the Court's Orders of April 13, 2007, December 22, 2009, and February 17, 2012; and (4) that he deny the remaining aspects of Spain's motions.

In a second report (Doc. 358) that calculates attorney fees and costs attributable to pertinent intervals in this action (and that undertakes to resolve every remaining computational issue necessary to the complete resolution of this action not later than the next appeal, if any), the magistrate judge determines that $158,102 is Spain's reasonable attorney's fee incurred for necessary services rendered as a result of Odyssey's post-mandate contempt during the intervals recommended for reimbursement in parts (1) and (3) of the paragraph above but determines that Spain's account of costs lacks the requisite precision, which precludes an award of costs. Any objection by either party to the recommendations in parts (1), (2), or (3) of the above paragraph and the supporting paragraphs in the first report (Doc. 340) or to any part of the second report (Doc. 358) is **OVERRULED** (although, using the magistrate judge's computation, this order elsewhere awards Spain an assessment for fees and costs calculated by, but not awarded by, the magistrate judge; to the extent necessary to accomplish that end, Spain's objection to the second report is **SUSTAINED**). On the legal basis cited by the magistrate judge, I might have awarded Spain a larger fee and additional costs arising from Odyssey's post-mandate misconduct and, although I find the magistrate judge's order quite generous in narrating Odyssey's post-mandate actions, I defer to the magistrate judge's first-hand observation and to his consequent judgment to the extent of parts (1), (2), and (3).

Part (4) of the paragraph above recommends "that [the district judge] deny the remaining aspects of Spain's motions."  In other words, the magistrate judge recommends that Spain receive from Odyssey no reimbursement for the attorney's fees and costs incurred in securing success in the district court in the first instance – in securing discovery about the identity of the vessel; in procuring evidence, including expert evidence, in an attempt to determine conclusively the identity of the vessel; in addressing the array of legal and factual obstacles erected by Odyssey in resisting Spain's motion for summary determination of the vessel's identity and for dissolution of the order of arrest; and in otherwise litigating athwart Odyssey's resistance.

Although my admiration for his thorough and thoughtful work in this action stands, I cannot agree finally with the magistrate judge's conclusion that the scope and intensity of Odyssey's bad faith before the February 10, 2012, mandate fails to rise to a level that requires a sanction.  For example, the magistrate judge's report includes his determination that, with respect to Odyssey's conduct in the district court:

> I cannot say based on the record before me that Odyssey, prior to the Court's Order of December 22, 2009, acted in bad faith, although I consider Odyssey's inconsistent representations troubling and its denial of a vessel's existence frivolous.[18]

Footnote 18 states, "Odyssey's denial of a vessel's existence was not its sole argument."  Apparently, the magistrate judge concludes either (1) that Odyssey's

advancing one or more non-frivolous arguments – even if only an argument about a non-dispositive issue – excuses, counter-balances, or supersedes Odyssey's liability for advancing in bad faith one or more frivolous arguments about the central and dispositive issue or (2) that Odyssey's advancing one or more non-frivolous secondary arguments precludes an award to Spain for the cost of contending with the bad faith maintenance of the frivolous primary argument.  On the contrary, a litigant cannot advance in bad faith – without risk of sanction – any knowingly meritless, false, or frivolous claim or defense or other litigation position (a merely unsuccessful argument, yes; a reasonable argument for a change in the law, yes; a reasoned but novel application of established law, yes; but an assertion advanced in bad faith, based on nothing, and maintained by evasion or deceit, absolutely not). In litigation, neither the meritless, nor the false, nor the frivolous, nor the vexatious should progress in safety and for free.  In this instance, Spain's objection appearing at pages 18 through 23 of Spain's objection (Doc. 344) to the report and recommendation (Doc. 340) (and appearing at pages 3 through 7 of Spain's motion (Doc. 321)) is **SUSTAINED**.  Spain's explanatory narrative and commentary (again, including both pages 18 through 23 of Spain's objection and pages 3 through 7 of Spain's motion (Doc. 321)), which is undoubtedly correct both factually and legally is **ADOPTED**.

* * * * *

This action began in April, 2007, when Odyssey filed an action *in rem* in admiralty and asserted under the law of "finds" and the law of salvage a claim against a purportedly "unidentified" wreck "about 100 miles west of the Straights of Gibraltar." In an August 7, 2007, motion for preliminary injunction, Odyssey denied possessing "evidence which would confirm the existence of a particular ship, or in fact, any ship at all" and stated:

> Odyssey first located the Defendant Site in March, 2007 using sophisticated sonar and magnetometer equipment. At the time of filing of the initial Complaint, Odyssey had not discovered evidence of a ship, but based upon its research, it believed that the vessel associated with the wreck site was a nineteenth century ship. At the time of filing of this Amended Complaint, Odyssey still has not recovered evidence which would confirm the existence of a particular ship, or in fact, any ship at all.

(Doc. 28 at 4) After a series of motions and responses and replies (and enlargements of the time to respond and to reply), the magistrate judge issued an order on January 10, 2008, that states:

> Within 14 days of the issuance of the protective order, Odyssey shall provide to the Kingdom of Spain (1) the exact location of the vessel or vessels; (2) any information material to the identification of the vessel or vessels; (3) a listing and description of the artifacts uncovered to date; and (4) any photographs or videotapes of the site or vessel. The parties also shall arrange an opportunity for the Kingdom of Spain to inspect the artifacts retrieved to date at a mutually agreeable time and place.

The fourteen days passed without complete disclosure and without Odyssey's identifying the wrecked vessel. On February 1, 2008, Spain moved to compel complete disclosure and stated:

> Odyssey provided the exact location of the vessel or vessels
> (Category #1); a partial listing and description of the artifacts
> uncovered to date (Category #3); and photographs and videotapes of
> the sites or vessels (Category #4).  *See* Order at 1 (Dkt. 75) (listing the
> categories of information to be provided).  Odyssey refused, however,
> to provide critical information material to the identification of the
> vessels (Category #2).  *Id.*  In addition, Odyssey provided incomplete
> listings and descriptions of artifacts.  Odyssey also demanded
> unworkable and unreasonable conditions on the inspection of artifacts
> held by Odyssey in substitute custodianship.

(Doc. 77 at 2)  The magistrate judge's order required Odyssey to produce

unconditionally "any information material to the identification of the vessel or

vessels," but Odyssey withheld information and imposed unauthorized conditions

on disclosure.

In the motion to compel, Spain reminded the court that nine months earlier, in

April, 2007, in moving for arrest of the wrecked vessel, Odyssey claimed an

investment of "substantial [] money and effort in locating, surveying, photographing,

and researching the history of the Defendant Shipwrecked Vessel(s) and in planning

and conducting the physical recovery of artifacts from the Defendant Vessel(s)."

(Doc. 3 at 3)  In contrast with the earlier claims and in response to the magistrate

judge's disclosure order, Odyssey denied knowledge of the identity of the vessel and

demanded an unauthorized and sweeping confidentiality agreement (Doc. 77 – 8).

Spain insisted (Doc. 77 – 6) on disclosure in accord with the magistrate judge's order.

The pre-trial conference was set for March 5, 2008, before the magistrate

judge.  In the days preceding the pre-trial conference, the district judge (the judge

writing this order) considered Spain's pending motion to dismiss (Doc. 37) Odyssey's

amended complaint (Doc. 25).  Aware of the extraordinary difficulty the magistrate judge was encountering in obtaining necessary disclosure from Odyssey, the district judge attended the pre-trial conference held by the magistrate judge (and observed the proceedings from a seat in the jury box).  The evasive nature of Odyssey's conduct and assertions at the pre-trial conference prompted the district judge to issue the next day an order (Doc. 91) denying Spain's motion to dismiss but warning Odyssey that the allegations in the amended complaint satisfied the pleading requirements only:

> . . . assuming satisfactory and prompt disclosure in accord with the orders of the magistrate judge, failing which the plaintiff's disclosure of the vessel's identity or the best available hypothesis regarding identity will follow expeditiously by other means.

In other words, the district judge found the allegations of the complaint sufficient to pass muster only if coupled with compliant disclosure by Odyssey, failing which disclosure the district court would employ "other means" – that is, compulsion against Odyssey – to obtain disclosure.  Odyssey's unseemly display at the March 5 hearing confirmed in the district judge the need for this stern and unmistakable warning to Odyssey.

In an order issued one week after the March 5 pre-trial conference, the magistrate judge addressed disclosure, granted in part and denied in part Spain's motion, and stated:

> [I]n the interest of protecting the security of the site, the Court finds that the preliminary site assessments, the site plans, the photographs of the sea bed, and the photomosaics should remain confidential at this stage of the litigation.

(Doc. 92 at 4)  However, despite having invested "substantial [] money and effort in locating, surveying, photographing, and researching the history of the Defendant Shipwrecked Vessel(s) and in planning and conducting the physical recovery of artifacts from the Defendant Vessel(s)" (Doc. 3 at 3) and despite possessing site assessments, site plans, and photographs and photomosaics of the sea bed, Odyssey unyieldingly failed to disclose to the court, to Spain, and to the public the identity of the wrecked vessel.  To combat this determined resistance and to prompt Odyssey's disclosure of the vessel's identity and acting in concert with the district judge's warning a few days earlier, the magistrate judge promulgated four interrogatories designed to identify the wrecked vessel and required Odyssey to respond within thirty days:

> Interrogatory #1:  State the identity of the vessel relating to the site.
>
> Interrogatory #2:  If you are not certain of the identity of the vessel relating to the site, state your good faith belief as to the identity of the vessel.
>
> Interrogatory #3:  State your working hypothesis that the site relates to a particular vessel or one among several vessels.
>
> Interrogatory #4:  If you are unable to provide the name of a particular vessel or vessels in response to the first three interrogatories, state which vessel you thought you had located to justify the expenditure of corporate funds in exploring the site and recovering artifacts.

(Doc. 92 at 5)  In sum, Odyssey's core of resistance both to the court's orders and to full disclosure prompted the court's attempt to require disclosure directly in response to the court's simple and direct interrogatories.

Although evincing at first instance a certain measure of verisimilitude,

Odyssey's carefully contrived answer (Doc. 105) to the court's interrogatories

convincingly evidences – after examination and reflection – Odyssey's bad faith; the

answer presents unmistakably vivid evidence of Odyssey's sanctionable conduct.

Odyssey's answer denies the existence of sufficient evidence "to provide reasonable

certainty as to the identity of a vessel related to the site . . . " (in other words,

Odyssey preposterously denies knowledge that the site is the site of the wreck of a

vessel), denies that "sufficient evidence exists to state a good faith belief as to the

identity of a vessel related to the site . . . ," and – with wholesale disregard for

candor – states:

> Odyssey discovered, at the site, a large field of artifacts including coins
> and other ship's cargo, but no ship's hull, ballast pile or keel which is
> typically associated with a shipwreck.  One vessel Odyssey has
> considered which may be related to the site is the "*Nuestra Señora de las
> Animas*" (the "Mercedes"), a Spanish vessel which had been assigned
> to transport mail, private passengers and consignments of merchant
> goods and other cargoes at the time of its sinking in 1804.  There is
> information under review, however, which may be inconsistent with a
> hypothesis that the wreck site is that of the Mercedes.  Among other
> things, this conflicting information includes reports that the Mercedes
> has already been located in a different location.

As Odyssey knew at all pertinent times, *Mercedes* was a Spanish warship with a

naval crew.  When destroyed in 1804 at the start of a naval battle with hostile British

vessels, *Mercedes* carried a huge cargo of silver specie from Peru toward Spain to assist

Spain's war effort; she did so under orders from the King of Spain.  Odyssey's

characterizing her as a "vessel . . . assigned to transport mail, private passengers, and

consignments of merchant goods and other cargoes" is a splendid and representative example of Odyssey's cynically deploying a few random nodes of truth to the end of evading the acknowledgment of an over-arching and regnant truth – that is, the answers are an example of Odyssey's not expressly lying (*Mercedes* carried the civilian family of an officer serving on *Mercedes* and carried some mail and carried some miscellaneous civilian cargo, as was the practice in the day) but, rather, the answers exemplify Odyssey's evading, and conveying denial of, the larger, more salient, and regnant truth (*Mercedes* carried an enormous cargo of silver specie commanded by the King of Spain in an effort to salvage a war). This bad faith conduct by Odyssey, dismissive of the applicable standards, dismissive of the court, and dismissive of the opposing party, cannot stand unaddressed by sanctions.

Odyssey's carefully crafted answer to the court's interrogatories constitutes an enormity that no court and no litigant should suffer, regardless of the immense stakes in the litigation. In objecting (Doc. 344) to the magistrate judge's first report and recommendation (Doc. 340), Spain captures well the scope of Odyssey's contumacy:

> Odyssey's answers were beyond frivolous and reflected objective bad faith by any standard. As the Court is well aware from its exhaustive review of the record, the evidence wrested by Spain and the Court from Odyssey after a year of delay, denial and obfuscation was "overwhelming" and "so one-sided that Spain would prevail as a matter of law that the *res* is the *Mercedes*." (Doc. 270 at 15, 17).
>
> It is critical to keep in mind just how disingenuous Odyssey's interrogatory answers were. No mention was made of the cannons, anchors, hull remains, hull sheathing and ballast that were in plain view in the photographs and videotapes that Odyssey had made at the

> site in April-May 2007.  (Doc. 270 at 8-12).  No mention was made of
> the blast damaged artifacts that were plainly visible on the seabed
> (Doc. 270 at 11) or the "blast damage" coins in Gibraltar whose
> existence was concealed from Spain and the Court.
>
> After a year in which Odyssey had represented to Spain and the Court
> that there was nothing which would indicate the existence of "a
> particular ship, or, in fact, *any* ship at all," no mention was made of
> the fact that the coins all originated in the Americas and dated to 1804
> or before, the seabed was littered with the copper and tin ingots listed
> on the *Mercedes*' manifest and the highly distinct "canones bronzes
> inutiles" on the *Mercedes's* manifest were in plain sight.  All of this
> "overwhelming evidence" was in plain view in photographs and
> videotapes of the site that Odyssey took in April-May 2007 or, in the
> case of copper and tin ingots and coins, had also been in Odyssey's
> physical possession for a year.  (Doc. 270 at 7-12).

(Doc. 344 at 21)

The magistrate judge's report and recommendation (Doc. 209) on Spain's

motion for summary judgment – the report and recommendation adopted entirely by

the district court and affirmed entirely by the circuit court of appeals – details exactly

the same scope of evidence, all of which was available to Odyssey from the outset of

the litigation but which was hidden or obscured by Odyssey's campaign of

obstruction and feigned ignorance and doubt.  In fact, with respect to two "*cañones de*

*bronce inútilies*," two culverins, the magistrate judge's report and recommendation

includes this telling and preclusive finding:

> The *Mercedes* also carried two other distinctive cannons, not as
> weapons but as cargo.  Per a manifest, two *cañones de bronce inútilis*
> ("useless bronze cannons") were loaded onto the vessel at El Callao
> to be ferried to Cadíz.  (Doc. 131, Ex. D at Annex 7.)  Another
> contemporaneous report confirmed this using a slightly different
> description, *dos culebrinas excluidas de bronce* (two discarded bronze
> culverins).  (Doc. 131, Ex. D at Annex 17 at 4.)  By 1804, these items

- 13 -

> were obsolete as weaponry.  (Doc. 131, Ex. D at ¶ 106.)  Their value
> was in their metal, bronze, which could be melted to manufacture
> artillery, sheathing for warships, and other military hardware.
> (Doc. 131., Ex. C at ¶ 25.)  The site includes two culverins, a fact
> Spain contends makes identification certain.  I agree.

(Doc. 209 at 10)

Odyssey's protestations aside, the evidence that Spain's *Mercedes* wrecked at the site south of Cape Saint Mary, Portugal, was – at all times pertinent to this litigation – conspicuous, plentiful, unrebutted, unmistakable, and imminently convincing beyond any reasoned doubt, especially to informed, highly-motivated, experienced, and smart professionals, including Odyssey and those at work in Odyssey's behalf.  (Doc. 270 at 5-12)  In sum, Odyssey's persistent denial and feigned uncertainty about the existence and identity of the wrecked vessel was a demonstrably purposeful and bad faith litigation posture effected from the beginning of this action to deflect, delay, and if possible, defeat (or, at least, compromise) Spain's rightful claim.

Although the events in January through April, 2008, illustrate Odyssey's posture at that time, Odyssey's bad faith persisted from the outset of the litigation through and including Odyssey's post-mandate contempt, described in detail by the magistrate judge.  (Doc. 340)  In other words, the conclusion of this order is not based merely on the fact of bad faith answers to court interrogatories or the fact of the necessity to hold hearings on motions to compel in discovery disputes.  The conclusion of this order is based on Odyssey's continuous, core campaign of bad

faith, deception, and deflection that pervaded this litigation from the start and in which Odyssey's bad faith interrogatory answers and the attendant papers and hearings constitute only an instructive, telling, and vivid episode.

As stated earlier, Odyssey's sanctionable, bad faith denial and feigned ignorance of the existence and identity of Spain's *Mercedes* and her cargo of silver suffused this action from the start and accounted for nearly the whole of this action. Had Odyssey admitted and announced the identity of the wrecked vessel, the far greater portion of this action never would have occurred. Determining with precision what part of the action would not have occurred is impossible, but creating an impossible confusion should protect no one from a sanction. My careful monitoring of, and participation in, this action from the outset informs me, and my review of this large record (twice – once in adopting the report and recommendation and granting summary judgment and again in connection with this order and associated matters) assures me, that no less than two-thirds – in no conceivable circumstance, bearing all doubt in Odyssey's favor, no less than two-thirds – of the totality of this action arises from Odyssey's bad faith. The magistrate judge found that between April 12, 2007, and February 10, 2012, Spain reasonably incurred legal fees of $2,624,937.10, two-thirds (0.6667) of which is $1,750,045.50.

* * * * *

As noted above, the magistrate judge's first report (Doc. 340) recommends a finding under 28 U.S.C. § 1927 against Melinda Joy MacConnel, who is described as follows in Odyssey's 2012 Form 10-K, filed with the United States Securities and Exchange Commission on March 12, 2013:

> Melinda J. MacConnel (age 48) was appointed as Executive Vice President, General Counsel and Secretary in June 2012 and formerly served as Vice President and General Counsel from 2008 to June 2012. She joined Odyssey in March 2006 as a Legal Consultant and became Odyssey's General Counsel in January 2007. Prior to joining the Company, Ms. MacConnel practiced law as a Litigation Consultant, providing counsel to attorneys in all areas of law.

This order earlier overruled the objections to the magistrate judge's report respecting MacConnel and confirmed the magistrate judge's finding that MacConnel needlessly multiplied these proceedings contrary to 28 U.S.C. § 1927.

Elsewhere, this order levies a substantial assessment against Odyssey in response to Odyssey's misconduct. MacConnel's actions are perhaps not in all instances co-extensive with Odyssey's actions; as an attorney, a member of The Florida Bar, and a member of the bar of the Middle District of Florida, she has an independent obligation to the court. However, the assessment against Odyssey is sufficiently large and sufficiently proximate to the interests of MacConnel that the assessment against Odyssey partakes also of an assessment in part against MacConnel. The former will encompass satisfactorily the latter. However, I reiterate to MacConnel my comments, delivered at the February 5, 2013, hearing on the pending objections to the reports and recommendations, about her need to

exercise independent judgment and to remain mindful of her obligation as an attorney and as an officer of the court, notwithstanding her simultaneous service as a corporate counsel and as a corporate officer.  (Doc. 353 at 47-55)  The fact that in 2007 MacConnel was new in service as corporate counsel gravitates toward extending to her the benefit of the doubt and toward assuming that this action has taught her more about the difficult balance with which corporate counsel must often contend.[2]

* * * * *

The Advisory Committee Notes that accompany the 1993 amendments to Rule 11, Federal Rules of Civil Procedure, include a non-exclusive list of factors for consideration in assessing a Rule 11 penalty.  Although this order relies finally (as to Odyssey's pre-mandate conduct) on the inherent authority of the court to sanction bad faith litigation, the Advisory Committee's list serves as a widely and frequently consulted resource in considering an assessment authorized elsewhere and in fixing a sanction in accord with the salutary principle that "sanctions should not be more severe than reasonably necessary to deter repetition of the conduct by the offending person or comparable conduct by similarly situated persons."  In fixing the

---

[2] In regard to these public statements by MacConnel, I accept her expression of regret and her apology for saying publicly, as reported in the media on February 17, 2012, and as acknowledged by her at the February 5, 2013, hearing, "Clearly, the political influences in this case overshadowed the law." (Doc. 353 at 48) (The transcript at Doc. 353 erroneously reports that, when challenging MacConnel's claim that politics influenced the judges in their deciding this action, I referred to Circuit Judge Hull as Judge "Hall" and as "he"; I most assuredly did not.)

assessment against Odyssey in this instance, I have consulted those factors, and I succinctly review as follows the factors as iterated in Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse* § 16(D)(1), 278-80 (4th. ed. 2008):

a. *the good faith or bad faith of the offender:*  In the core claim, Odyssey acted in manifest bad faith throughout the litigation, even after the mandate from the circuit court of appeals.

b. *the degree of willfulness, vindictiveness, negligence or frivolousness involved in the offense:*  Odyssey's bad faith was willful and purposeful throughout the action and, as explained elsewhere, Odyssey's principal and core posture was frivolous.

c. *the knowledge, experience and expertise of the offender:*  Odyssey enjoys immense – even singular – knowledge, experience, and expertise in researching, locating, identifying, exploring, and recovering wrecked vessels and their cargo in any ocean or other water worldwide.  Odyssey's counsel is similarly-situated with respect to the pertinent law.

d. *any history of sanctionable conduct on the part of the offender:*  None is known and, therefore, none is considered.

e. *the amount, reasonableness and necessity of the out-of-pocket expenses incurred by the offended person as a result of the misconduct:*  The magistrate judge's report (Doc. 358) details the computation.  The reasonable, necessary, and aggregate expenditure by Spain in reclaiming through this action the cargo of *Mercedes* easily exceeds

$3,000,000.00.  The dominant portion, not less than two-thirds, of Spain's aggregate expenditures in this action, are attributable to Odyssey's misconduct.

   *f.  the nature and extent of prejudice, apart from out-of-pocket expenses, suffered by the offended person as a result of the misconduct:*  The offended party is a nation, a sovereign, and not an individual, and in some respects, the non-monetary prejudice to Spain is not a factor.  However, Spain enjoys a rich and celebrated history as a seafaring nation and cherishes both the intangible and the tangible expression of this patrimony, part of which in this instance Odyssey seized from the seabed and removed to a remote location contrary to Spain's will and contrary to accepted law, all of which offends Spain's plenary rights in the vessel, the cargo, and the solemn site, which absent Spain's consent should have remained undisturbed (as any nation rightly expects with respect to the site of a lost military vessel).  Odyssey or someone else might regard a reference to Spain's patrimony as unctuous sentimentality oddly loosed in an age of practicality and materialism, but only Spain – not Odyssey or anyone else – enjoys the right to render that judgment.

   *g.  the relative culpability of client and counsel, and the impact on their privileged relationship of an inquiry into that area:*  Odyssey's culpability and MacConnel's culpability – that is, the relative contribution of client and counsel to the decisions that created the offense in this action – are intimately insinuated and practically inseparable and indistinguishable.  But the respective roles require no separation because this order directs the assessment to the client, of whom counsel is a corporate

officer.  As stated elsewhere in this order, an assessment against the one partakes largely and effectively of an assessment against the other.

    *h.  the risk of chilling the specific type of litigation involved:*  The sanction will have no chilling effect on similar litigation (or any other litigation) because the sanction arises not from the nature of the admiralty claim asserted but arises from conduct peculiar to the offender and the offender's counsel in this action.

    *i.  the impact of the sanction on the offender, including the offender's ability to pay a monetary sanction:*  Consulting Odyssey's public filings with the Securities and Exchange Commission confirms Odyssey's ability to pay.  The assessment is noticeable and discomfiting to Odyssey but neither unmanageable nor unduly burdensome.  Although certainly not willing, Odyssey is able to pay.[3]

    *j.  the impact of the sanction on the offended party, including the offended person's need for compensation:*  Although a "need" always exists to effect justice in behalf of an

---

[3] Publicly traded under the symbol "OMEX," Odyssey features a market capitalization around $240 million (about 79 million shares outstanding; a float of about 75 million shares; and a closing price on September 20, 2013, of $3.03 per share, ranging in the last year from $2.41 to $3.75). Odyssey's March 12, 2013, annual report (Form 10-K) for 2012 declares "ending cash and cash equivalents" of $10.1 million, a $2.1 million increase over 2011.  The annual report reveals several rewarding and promising marine salvage projects in progress.  In light of the assessment levied against Odyssey in this order, a prominent and easily understood indicator of Odyssey's ability to pay is the executive compensation detailed in Odyssey's April 19, 2013, proxy disclosure (Form 14A):

| | | |
|---|---|---|
| Gregory P. Stemm (CEO) | 2012 | 1,230,787 |
| | 2011 | 1,014,408 |
| Mark D. Gordon (Pres. and COO) | 2012 | 654,642 |
| | 2011 | 510,229 |

offended litigant, Spain is not crippled or rendered either impecunious or unable to meet current obligations because of the cost of this litigation.

k.  *the relative magnitude of sanction necessary to achieve the goal or goals of the sanction:*  In determining the amount of the sanction in the circumstances of this action this factor is quite influential because of the enormous prize sought by Odyssey and the unwholesome and potent temptation to exhaust all available measures, propriety and decorum aside, to obtain the prize.  This action presents a classic instance of the need for an assessment that will effectively deter.  In fact, this order assesses the lowest amount that plausibly would influence this offender and other similarly situated offenders when deliberating the tactics to employ in seeking a prize of this magnitude.  Although a doubt remains that the assessment against Odyssey is sufficient to deter a litigant from misconduct in a comparably high-stakes event, a greater assessment, although warranted by Spain's expenditures and useful for deterrence in litigation on this scale, is too large an assessment against Odyssey in the sum of the circumstances.

l.  *burdens on the court system attributable to the misconduct, including consumption of judicial time and incurrence of juror fees and other court costs:*  This action began in the spring of 2007 and, assuming another appeal, will extend at least into 2014 and probably into 2015 before issuance of the mandate.  As stated elsewhere, if Odyssey had disclosed with candor and completeness, nearly the whole of this action never

would have occurred (of course, had Odyssey acted in the first instance in accord with the law, the wreck of *Mercedes* would remain undisturbed).   Although both the circuit court of appeals and the magistrate judge issued a lengthy opinion in this action, I have not factored into my monetary assessment any burden on the court (the burden on Spain consumes the available room for monetary assessment).[4]

    *m. the degree to which the offended person attempted to mitigate any prejudice suffered by him or her:*   Led by a highly focused and skilled counsel, Spain persistently attempted to secure through discovery from Odyssey the claimed identity of the vessel and the evidence supporting that identification.   Of course, Odyssey knew at all times that Spain, given the information pertinent to identification, possessed the historical information and the expertise to identify immediately whether the wreck in question was a Spanish vessel and, if so, which one.   The fact that Odyssey never asked for Spain's assistance in identifying the vessel reveals much about Odyssey's motives and objectives.   In this instance, Odyssey's disclosing to Spain complete information was tantamount to immediate and definitive identification of the vessel as Spain's lost *Mercedes* (and tantamount to Odyssey's losing the treasure).

---

[4] However, as I painstakingly review this record over several days and write this somewhat lengthy and (for me) uncomfortable but necessary post-judgment, post-appeal order and because I recognize that this order will receive a spirited attack from the offender and will absorb additional and detailed attention from judges on the circuit court of appeals (who will be no happier than I at the prospect of resolving a sanction issue), I wonder if the public, like Spain, is not, after all, entitled to an increment of compensation for the elongation of these proceedings owing to Odyssey's ungoverned quest for so many pieces of silver.

*n. the degree to which the offended person's own behavior caused the expenses for which recovery is sought:* Spain contributed nothing unnecessary or unwarranted to the fees and costs incurred in this action.

*o. the extent to which the offender persisted in advancing a position while on notice that the position did not have evidentiary support or was not warranted by existing law or a non-frivolous argument for the extension, modification or reversal of existing law or the establishment of new law:* As explained elsewhere in this order, the record establishes beyond peradventure that Odyssey in bad faith and for an improper purpose manufactured and maintained a frivolous and vexatious position throughout this litigation.

*p. the time of, and circumstances surrounding, any voluntary withdrawal of a pleading, written motion or other paper:* Odyssey has withdrawn nothing.

## CONCLUSION

In assessing this litigation, one must remember that Odyssey is a world leader in deep ocean exploration and recovery.  As Odyssey assured the court, Odyssey had invested "substantial [] money and effort in locating, surveying, photographing, and researching the history of the Defendant Shipwrecked Vessel(s) and in conducting the physical recovery of artifacts from the Defendant Vessel(s)."  In other words, a publicly traded, world-leading corporate marine explorer expended extensive corporate resources and employed corporate expertise in search of sunken treasure and researched the plentiful and available history of seafaring disasters in an effort to

identify wrecks, wherever situated, that promised the recovery of a sunken treasure. With the benefit of those corporate exertions, Odyssey chose from the oceans and the seas and the gulfs of the world a focused range of ocean south of Cape Saint Mary, Portugal.  Before exploring the designated area, Odyssey asked Spain for permission. Not Portugal.  Not England.  Not Italy.  Not Holland.  Not any other country but Spain, a nation whose naval vessel *Mercedes* was destroyed at Cape Saint Mary in 1804 by British cannons (or a calamitous accident during the combat), a fact and a vessel and a location and a cargo all well documented and well known to Odyssey from the start and from long before the first day of this litigation.

Odyssey went where it went because it knew full well where to go; Odyssey found what it found because it knew full well what it was looking for; Odyssey withheld and deceived and deflected with respect to what it found because Odyssey knew full well why Spain was asking and knew full well the adverse consequence to Odyssey's financial aspirations if Spain discovered the answer.  To come to court and deny the truth of these facts is, as stated earlier, an unacceptable enormity propounded and maintained in bad faith and for an improper purpose.  Therein lies this entire tale.  So, (1) to "meet the case" in this instance, that is, to meet a core of misconduct in a case in which Odyssey in bad faith advanced a frivolous claim for an improper purpose and (2) mindful of the standard stated in *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991), and applied in, for example, *In re Porto*, 645 F.3d 1294 (11th Cir. 2011) (and in cases cited there), this order invokes the inherent authority of

- 24 -

the court to sanction a party for bad faith litigation and details explicit factual support for the attendant conclusions.

Resolving the sanction issue presented by Spain's motion and the magistrate judge's order evokes the "reasonable doubt" instruction, delivered by district judges in the Eleventh Circuit for many years, which informs the jury that to establish a fact (guilt, in a criminal case) beyond a reasonable doubt the evidence need not exclude every "possible doubt" but must exclude every "reasonable doubt," every "real doubt . . . based on reason and common sense" in light of "all the evidence in the case." The evidence that the wrecked vessel in this action was *Mercedes* excluded every reasonable doubt (although Odyssey attempted in vain to elevate implausible and unjustified "metaphysical doubt" to the level of a "real doubt").  Odyssey relied on the same evidence in asking Spain to explore, and afterward exploring without permission, the site at Cape Saint Mary.  Odyssey was at each pertinent moment so convinced by the available evidence that, to paraphrase the jury instruction, Odyssey was willing to rely and act on the evidence without hesitation in the most important of its own affairs.

If a litigant in a high-stakes litigation engages in bad faith litigation and if the judiciary solemnly and meaningfully responds in defense of the fortifying principles of ethical litigation, the consequence to the offending party is derivatively but proportionally large in scale.  Otherwise, the consequence is merely trivial and effectively superfluous in the circumstance (and implicitly invites ethically arid tactics

- 25 -

in high-stakes litigation elsewhere).  The magistrate judge observes in his second report (Doc. 340) that in considering sanctions the court must act with "restraint and discretion."  Yes, especially when relying on the court's inherent power to sanction, but the court must act with determined, honest, and sober recognition of the true nature of both the sanctioned conduct and the attendant forces that catalyzed the sanctioned conduct.  In sum, any sanction must rise in proportion to the excesses of the case – must, in other words, "meet the case" – or otherwise the court's undue timidity reduces the sanction to symbolism and impotence and encourages cynicism toward the ethics of litigation and toward the court.  Ensuring a palpable congruity between the severity of the sanction and the severity of the transgression is neither indiscrete nor unrestrained.  On the contrary, congruity is essential to the maintenance of established norms and to the credibility of the deterrence and enforcement mechanisms available to the judiciary.

Spain's objection (Doc. 344) is **SUSTAINED IN PART** and Spain's motion (Doc. 321) is **GRANTED IN PART**.  Accordingly, for bad faith and abusive litigation Odyssey is assessed $875,022.75, which equals only a half of two-thirds of Spain's attorney's fees incurred in the district court before February 10, 2012.  For bad faith and abusive litigation, Odyssey is assessed an additional $39,855, which equals only a half of two-thirds of the costs and expenses (reduced by 20%) incurred by Spain before February 10, 2012 (that is, one-half of two-thirds of each of $79,510

for 2008; $18,834.20 for 2009; $13,494 for 2010; $5,776 for 2011; and $1,947 through February 10, 2012).  As detailed above and as recommended by the magistrate judge, for contempt Odyssey is assessed $152,102 for events after February 10, 2012 ($71,803 for February 10, 2012, through March 20, 2012; $34,220 for March 21, 2012, through June 8, 2012; and $46,079 in seeking sanctions).  Stated in familiar terms, this aggregate assessment is sufficient but not greater than necessary to accomplish the applicable statutory, regulatory, and judicial purposes.  The Clerk shall enter a judgment for the Kingdom of Spain and against Odyssey Marine Exploration, Inc., for $1,072,979, for which amount let execution issue.[5]

ORDERED in Tampa, Florida, on September 25, 2013.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

---

[5] Mindful that this order involves sanctions for contempt, for multiplication of proceedings under 18 U.S.C. § 1927, and for bad faith litigation, I carefully considered the applicable procedural protections to which each party is entitled.  Because of the filing of, and the hearing on, the parties' respective objections to the magistrate judge's report and recommendation, each party has presented fully the argument respecting each issue addressed in this order.  Nonetheless, on September 16 and September 18, 2013, I conferred with the parties in an on-the-record telephone conference and offered each party the opportunity for a further hearing on any or all issues. Confident that the record is complete and the issues developed, each party explicitly waived any further hearing in the district court on the matters addressed in the parties' papers and in this order.  In reliance on that waiver, I resolved the pending issues without further hearing (which I otherwise would have granted for the asking, even if not required).